**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re                               :

                                     :     Chapter 7

**ORLY GENGER,**                      :     Case No. 19-13895 (JLG)

                   Debtor.     :
-----------------------------------------------------------------X
**DALIA GENGER,**                  :

                                     :     Adv. Pro. No. 20-01010 (JLG)

                   Plaintiff,    :

                                       :

      v.                          :

                                     :

**ORLY GENGER, MICHAEL BOWEN,**  :
**ARIE GENGER, ARNOLD BROSER,**  :
**DAVID BROSER, ERIC HERSCHMANN,** :
**THE GENGER LITIGATION TRUST,**  :
**ADBG LLC, TEDCO INC., and**      :
**DEBORAH PIAZZA, as Chapter 7 Trustee,** :

                                     :

                 Defendants.  :
-----------------------------------------------------------------X


## VARIOUS DEFENDANTS' MOTION TO
## DISMISS DALIA GENGER'S AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ............................................................................................... 1

JURISDICTION ......................................................................................................................... 5

RELEVANT BACKGROUND ................................................................................................. 5

ARGUMENT ............................................................................................................................ 23

     I.      THE COMPLAINT IS BARRED BY THE STATUTE OF
           LIMITATIONS ............................................................................................. 23

              a.      The Events Giving Rise to the Complaint Occurred
                     Sixteen Years Ago ......................................................................... 23

              b.      At Best, The Statue of Limitations Began to Run In
                     June 2013 ........................................................................................ 26

     II.      DALIA LACKS STANDING ...................................................................... 27

            A.    Dalia Cannot Establish Constitutional (Article III) Standing ................... 28

            B.    Dalia Cannot Satisfy the Prudential Standing Doctrine ............................ 30

     III.    DALIA FAILS TO STATE A CLAIM FOR CONSTRUCTIVE
           TRUST .......................................................................................................... 31

     IV.    DALIA'S  DECLARATORY JUDGMENT, EQUITABLE LIEN
           AND INJUNCTION CLAIMS SHOULD BE DISMISSED ................................. 36

     V.     DALIA'S AMENDED COMPLAINT WAS IMPROPERLY
           FILED AND ANY AMENDMENT TO THE COMPLAINT
           WOULD BE FUTILE .................................................................................. 38

JOINDER IN OTHER MOTIONS TO DISMISS ................................................................ 39

NOTICE .................................................................................................................................... 39

NO PRIOR REQUEST FOR RELIEF .................................................................................. 40

CONCLUSION ......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1031 Tax Grp., LLC*, 439 B.R. 47 (Bankr. S.D.N.Y. 2010) ......................................28, 30, 31

*Adelphia Communications Corp. v. Bank of America, N.A.*, 365 B.R. 24 (Bankr.
    S.D.N.Y. 2007) ........................................................................................................................5

*Ades & Berg Group Investors v. Breeden*, 550 F.3d 240 (2d Cir. 2008)......................................35

*Allen v. Wright,* 468 U.S. 737 (1984) ...........................................................................................28

*Ampal-Am. Israel Corp.*, 502 B.R. 361 (Bankr. S.D.N.Y. 2013) ...........................................28, 30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................6, 32

*Augustine v. Szwed*, 77 A.D.2d 298, 432 N.Y.S.2d 962 (1980) ..................................................26

*Bankers Sec. Life Ins. Soc. v. Shakerdge,* 49 N.Y.2d 939, 406 N.E.2d 440 (1980).....................34

*Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) ...........................................................................31

*Brenner v. Heller (In re Lincoln Logs, Ltd.)*, No. 1:11-CV-481, 2011 WL
    6011786 (N.D.N.Y. Nov. 30, 2011) ....................................................................................32

*Caballero v. Anselmo*, 759 F. Supp. 144 (S.D.N.Y. 1991)............................................................34

*Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171 (2d Cir. 2007) ........................................32

*Cerabono v. Price*, 7 A.D.3d 479, 775 N.Y.S.2d 585 (2004)........................................................33

*In re Commodore Bus. Machines, Inc.*, 180 B.R. 72 (Bankr. S.D.N.Y. 1995)........................33, 35

*Counihan v. Allstate Ins. Co.*, 194 F.3d 357 (2d Cir. 1999) ........................................................35

*D'Angelo-Fenton v. Town of Carmel Police Dep't*, 470 F. Supp. 2d 387 (S.D.N.Y.
    2007) ........................................................................................................................................5

*Dalia Genger v. Arie Genger*, No. 13 170 Y 00996 07, American Arbitration
    Association, Commercial Arbitration Tribunal, New York City....................................7, 8, 29

*In re DJK Residential LLC,* 416 B.R. 100 (Bankr. S.D.N.Y. 2009).............................................32

*Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357 (2d Cir. 2003) .................................................38

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145 (2d Cir. 2014) ...................................................................................................................6

*Dybowski v. Dybowska*, 146 A.D.2d 604, 536 N.Y.S.2d 838 (1989) ....................25, 26

*East 51st Street Development Co. v. HFZ East 51, LLC*, No. 652135/2016, 2019 WL 6916089 (N.Y. Sup. Ct. Dec. 19, 2019) ..........................................................37

*Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1 (2004) ...........................27, 30

*Ellis v. Chao*, 336 F.3d 114 (2d Cir. 2003) ...................................................................39

*In re First Republic Grp. Realty, LLC.*, 421 B.R. 659 (Bankr. S.D.N.Y. 2009) .........37

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) .................................37

*Genger v. Genger*, 121 A.D.3d 270, 990 N.Y.S.2d 498 (2014) .....................................8

*Genger v. Genger*, 39 Misc. 3d 1235(A), 972 N.Y.S.2d 143 (Sup. Ct. 2013), *aff'd as modified*, 115 A.D.3d 421, 982 N.Y.S.2d 11 (2014), *order recalled and vacated*, 120 A.D.3d 1102, 993 N.Y.S.2d 297 (2014) .............................................8

*Genger v. Genger*, 663 F. App'x 44 (2d Cir. 2016) .....................................................18

*Genger v. Genger*, 76 F. Supp. 3d 488 (S.D.N.Y. 2015) .............................................17

*Genger v. Genger*, No. 651089/2010, 2015 WL 112831 (N.Y. Sup. Ct. Jan. 07, 2015) .......................................................................................................................9

*Genger v. TR Inv'rs, LLC*, 26 A.3d 180 (Del. 2011) ......................................................9

*Matter of Genger*, Index No. 2008-0017 (Sur. Ct. NY County) ....................................9

*Glencova Inv. Co. v. Trans-Resources, Inc.*, 874 F.Supp.2d 292 (S.D.N.Y. 2012) ......6

*Glover v. Hill*, No. 87 CIV. 4450 (SWK), 1989 WL 13752 (S.D.N.Y. Feb. 14, 1989) .....................................................................................................................24

*Hardoon v. Seward Park Housing Corp.*, No. 113632/2004, 2005 WL 8169476 (N.Y. Sup. Ct. Mar. 01, 2005) .............................................................................33

*James v. Alderton Dock Yards*, 256 N.Y. 298, 176 N.E. 401 (1931) ..........................37

*Jenkins v. Virgin Atl. Airways, Ltd.*, 46 F. Supp. 2d 271 (S.D.N.Y. 1999) ..................5

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ......................................30

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ..................................................................30

*Leonelli v. Pennwalt Corp.*, 997 F.2d 1195 (2d Cir.1989) ............................................39

*Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243 (2d Cir. 2002) ................................39

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)...................................................27, 28

*Manhattan Safety Maine, Inc. and Recovery Effort, Inc. v. Michael Bowen, et al.*,
    Civil Action No. 1:19-cv-5642 (S.D.N.Y. 2019) ...................................................22

*McGovern v. Solomon*, 466 F.Supp.2d 554 (S.D.N.Y. 2006)...........................24, 26, 27

*Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972) ....................................................28

*In re Omegas Grp., Inc.*, 16 F.3d 1443 (6th Cir.1994) ..................................................32

*Powers v. Am. Exp. Fin. Advisors, Inc.*, 82 F. Supp. 2d 448 (D. Md. 2000) ...............31

*Quiroga v. Fall River Music, Inc.*, No. 93 CIV. 3914 (RPP), 1998 WL 851574
    (S.D.N.Y. Dec. 7, 1998)............................................................................................25

*In re Rama Grp. of Companies, Inc.*, No. 00-BK-12654K, 2002 WL 1012974
    (W.D.N.Y. May 6, 2002) ..........................................................................................37

*Rapoport v. Asia Elecs. Holding Co., Inc.*, 88 F.Supp.2d 179 (S.D.N.Y. 2000) ...........6

*Rodriguez v. Federal Nat. Mortg. Ass'n*, No. 508453/2019, 2020 WL 2789915
    (N.Y. Sup. Ct. May 29, 2020) .................................................................................25

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)............................................................5

*Ryan v. Cover*, 75 A.D.3d 502, 904 N.Y.S.2d 750 (2010) ...........................................37

*Sagi Genger v. Orly Genger*, No. 17-cv-8181 (VSB) (S.D.N.Y. June 11, 2019).........20

*Scheuer v. Scheuer*, 308 N.Y. 447, 125 N.E.2d 555 (1955) ..........................................24

*In re Schick*, 246 B.R. 41 (Bankr. S.D.N.Y. 2000).................................................31, 34

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293
    (Bankr. S.D.N.Y. 1999) .............................................................................................5

*Sitkowski v. Petzing*, 175 A.D.2d 801, 572 N.Y.S.2d 930 (1991) ................................25

*Spencer v. Kenna*, 523 U.S. 1 (1998)............................................................................28

*Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101 (2d Cir. 1992) ................................27

*Superintendent of Ins. for the State of N.Y. v. Ochs (In re First Central Fin.
    Corp.)*, 377 F.3d 209 (2d Cir. 2004) ..........................................................32, 33, 34

*Tekinsight.Com, Inc. v. Stylesite Mktg, Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503 (Bankr. S.D.N.Y. 2000) .................................................................................34

*TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*, No. 13 CIV. 8243 JFK, 2014 WL 1979932 (S.D.N.Y. May 15, 2014) ...........................................................10, 11

*TR Investors, LLC v. Genger*, C.A. No. 6697-CS, 2013 WL 603164 (Del. Ch. Ct. Feb. 18, 2013) ...........................................................................................................6

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464 (1982) .................................................................................................28

*Vardaros v. Zapas*, 24 Misc. 3d 1247(A), 901 N.Y.S.2d 911 (Sup. Ct. 2009)............37

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................27, 28

**Statutes and Rules**

28 U.S.C. § 157 .................................................................................................................5

28 U.S.C. § 157(b).............................................................................................................5

28 U.S.C. § 1334 ...............................................................................................................5

28 U.S.C. § 1409 ...............................................................................................................5

§ 541(a)(1) of the Bankruptcy Code ...............................................................................32

§ 541(d) of the Bankruptcy Code....................................................................................32

CPLR § 213(1) .................................................................................................................24

Fed. R. Bankr. P. 7004(e) ...............................................................................................38

Fed. R. Bankr. P. 7008 .................................................................................................1, 5

Fed. R. Bankr. P. 7012 .....................................................................................................5

Fed. R. Bankr. P. 7012(b) ................................................................................................1

Fed. R. Civ. P. 4(m) ........................................................................................................38

Fed. R. Civ. P. 8 ...........................................................................................................1, 5

Fed. R. Civ. P. 12 .........................................................................................................1, 5

Fed. R. Civ. P. 12(b)(6)................................................................................................5, 39

Fed. R. Civ. P. 15(a) .......................................................................................................38

Fed. R. Evid. 201(b)(2) ...................................................................................................5

Local Bankruptcy Rule 9013-1(b) ..................................................................................39

TO THE HONORABLE JAMES L. GARRITY JR.,
UNITED STATES BANKRUPTCY JUDGE:

Defendants Orly Genger ("Orly" or the "Debtor"), Arie Genger ("Arie"), Arnold Broser, David Broser, The Genger Litigation Trust, ADBG LLC, and TEDCO, Inc. (collectively, the "Defendants"), by and through their respective undersigned counsel, respectfully submit this motion to dismiss (the "Motion") *the Amended Complaint* (the "Complaint")[1] filed by Dalia Genger ("Dalia" or "Plaintiff"), pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable pursuant to Rules 7008 and 7012(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and in support thereof respectfully state as follows:

## PRELIMINARY STATEMENT

This action should be dismissed because it is long time barred, Dalia lacks standing to assert her claims and the Complaint fails to sufficiently plead its claims.

Dalia is no stranger to litigation. She is also no stranger to the property she seeks in this action or the parties here, and she is far from the innocent elderly "homemaker" victim that she wants the Court to believe she is. Indeed, since Dalia's 2004 divorce from Arie, in concert with her son Sagi Genger ("Sagi") (Orly's brother), she has actively pursued claims against or involving Arie, and her estranged daughter, Orly, in multiple actions, many of which relate to the very same issues raised by her Complaint here. Dalia has sought to relitigate the very clear terms of her divorce agreement with Arie, which make clear that she relinquished all rights to Arie's shares in a company called Trans-Resources, Inc. ("TRI") that are the subject of this and many other actions. She has sued the other defendants in this action. She has sued the "Trump Group"

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Complaint (ECF No. 1). *See* Declaration of Jared C. Borriello dated June 25, 2020 ("Borriello Decl."), Ex. 1.

with which the Court has become familiar to block payment of $15 million to Arie. She has

even sued her co-conspirator son, Sagi, as a means of attempting to unlock "claims" against Orly

through his assertion of cross-claims against Orly just hours after the obviously coordinated

filing of those claims against him. And through Sagi and Dalia's "coordinated" efforts, the

entities they created in June 2019 on the eve of Orly's bankruptcy filing, Manhattan Safety

Maine and Recovery Effort, have sought to manufacture diversity jurisdiction in a District Court

action and improperly split existing claims against Orly (against whom the old action remains

pending and is stayed) and the defendants here (against whom the new action is pending and the

old action has been dismissed) to attempt to pursue, outside of bankruptcy and in violation of the

automatic stay, the very same claims relating to the same transfers and the very same property.

Through these combined efforts, Dalia and Sagi, individually and through the entities

controlled by them – despite already receiving 100% of the benefit of their bargain for 100% of

the Genger family's TRI shares that they sold out from under Orly and Arie and siphoning that

money to offshore accounts in Lichtenstein and the Cook Islands – have filed at least five

separate actions under different theories of ownership to seek to steal for themselves the 2013

Trump Group settlement proceeds, relating to the very same transfers of the very same property

and all based on the very same fact that Orly was a party to a settlement agreement along with

certain of the Defendants. Dalia and Sagi do not even care who wins (none of them will)

because they also entered into an "inter-creditor agreement" on the eve of bankruptcy in which

they and/or entities controlled by them agreed to split any proceeds of their various litigation.

This roulette-style spreading of their chips around the table in the hopes of hitting one number is

exactly what Delaware Judge Strine called it immediately after the June 2013 Trump Group

settlement – an attempt to collect on a Powerball ticket. The problem is, none of the members of

this "Sagi/Dalia Group" actually has any rights to those 2013 Trump Group settlement proceeds. They have never established that the settlement proceeds at issue belong to Orly; they just continually say that they do, hoping to dupe at least one of the multiple courts where they have spread their chips. Dalia has even made this claim that the settlement proceeds belong to Orly, despite, for most of the years at issue, serving as the trustee of Orly's trust that owned the shares at issue, and having a duty of undivided loyalty to the trust's beneficiary, Orly (Orly's daughter has also since become a beneficiary) – a duty Dalia has never understood and has consistently breached. Dalia has been admonished, and has had numerous improper acts she has taken with Sagi voided, by multiple courts.

Indeed, despite all of their efforts to mislead this and other Courts, the very simple fact is that Dalia and Sagi's actions have resulted in them receiving over $44 million relating to the Genger family's TRI shares – the full benefit of Sagi's bargain with the Trump Group, which Dalia supported – while Orly has not received one penny. These actions and other improper conduct by Dalia are the subject of extremely valuable claims of the bankruptcy estate that will be pursued for the benefit of this chapter 7 estate and its stakeholders (these claims are part of the subject matter of the Trustee's pending 9019 settlement motion). The movants are confident that after the evidence is presented throughout this chapter 7 case, it will become clear to the Court very quickly who the bad actors are here – Dalia and Sagi.

Yet despite her active involvement in all of the actions described above, Dalia failed to pursue the constructive trust claim she asserts in this adversary proceeding during the sixteen years since her divorce and during the almost seven years after the 2013 Trump Group settlement proceeds were paid, proceeds she now alleges belong to her. This was no accident. In fact, Dalia did not concoct her latest frivolous constructive trust claim until October 2019, when she

asserted it for the very first time in an objection to the Texas chapter 7 trustee's motion to approve a settlement with the Defendants – a motion that would have resolved any and all potential claims regarding the 2013 Trump Group settlement and that would have resulted in the pursuit of the estate's valuable claims against Dalia. That motion made clear that the Texas trustee had undertaken an extensive investigation of the estate's claims against all parties and had interviewed most of the parties/their counsel. Dalia argued in her objection that the Texas trustee could not settle those potential claims relating to the 2013 Trump Group settlement because the proceeds belonged to her under this constructive trust theory.

Thus, Dalia's newly concocted theory was a direct reaction to the proposed Texas settlement and the target it put squarely on her back. It was also a clear attempt to remove the potential Trump Group settlement-based claims from the estate so that she could pursue 100% of the claims for her own benefit. Indeed, through his motion to dismiss this chapter 7 case, Sagi has sought to do the same. Sagi and Dalia's new shell company "assignees", Manhattan Safety and Recovery Effort, have also sought to do the same through their recently-filed motion seeking a declaration that the automatic stay somehow does not apply to their action which, prior to the improper claim splitting, was (and as to the old action remains) pending against Orly (who was described in that action by Dalia as a "necessary party"). Not surprisingly, the automatic stay does apply and bars that action.

Yet despite raising these arguments in October 2019, Dalia continued to sit on her rights and not formally assert these claims until this adversary proceeding was commenced on January 22, 2020, almost 10 years after the six-year statute of limitations expired. A first year law student would understand that this action, asserting alleged rights stemming from a 2004

agreement, is long time-barred. Even if the June 2013 date of the Trump Group settlement was the relevant date on which the claims arose, the claims are still time barred by seven months.

Moreover, Dalia lacks standing and has failed to sufficiently plead any of the required elements of a constructive trust claim against the Defendants. Dalia also fails to sufficiently plead any facts which would give rise to an equitable lien or allow for injunctive relief.

For these reasons and those below, this action should be dismissed with prejudice and with costs, including sanctions (as to which the movants reserve all rights).

## JURISDICTION

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1409. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      The predicates for relief requested herein are Federal Rules 8 and 12 and Bankruptcy Rules 7008 and 7012.

## RELEVANT BACKGROUND

3.      The following is a recitation of the pertinent facts as alleged in the Complaint, as well as a description of the relevant events that have occurred in the Debtor's bankruptcy case and other Genger family legal proceedings that are relevant to this action.[2]

---

[2]     On a Rule 12(b)(6) motion, this Court may consider documents: "(1) that have been incorporated by reference in the complaint; (2) of which judicial notice may be taken; or (3) of which plaintiff had knowledge of and relied upon in bringing the lawsuit." *Jenkins v. Virgin Atl. Airways, Ltd.*, 46 F. Supp. 2d 271, 275 (S.D.N.Y. 1999) (internal citations omitted); *see also Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Adelphia Communications Corp. v. Bank of America, N.A.*, 365 B.R. 24, 34 (Bankr. S.D.N.Y. 2007) (taking judicial notice of documents incorporated in the complaint by reference); *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 309 (Bankr. S.D.N.Y. 1999). Matters as to which judicial notice may be taken include documents "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" pursuant to Rule 201(b)(2) of the Federal Rules of Evidence. *See D'Angelo-Fenton v. Town of Carmel Police Dep't*, 470 F. Supp. 2d 387, 393 n.5 (S.D.N.Y. 2007). Judicial notice can be taken by this Court of documents filed on the public docket, including those cited in this Motion or attached to the Borriello Declaration, as applicable.

4.      In 1985, Arie formed TRI, a company that specializes in manufacturing and producing chemicals for agricultural use.  *See Glencova Inv. Co. v. Trans-Resources, Inc.*, 874 F.Supp.2d 292, 295 (S.D.N.Y. 2012).  TRI was wholly owned by TPR Investment Associates, Inc. ("TPR").  *Id.*  By 1993, TPR was owned by Arie, Dalia, a trust for Sagi's benefit (the "Sagi Trust"), and a trust for Orly's benefit (the "Orly Trust").  *See TR Investors, LLC v. Genger*, C.A. No. 6697-CS, 2013 WL 603164 at * 3 (Del. Ch. Ct. Feb. 18, 2013).  The subsequent Genger family litigation saga has been ongoing for over a decade, spawning over a dozen proceedings across the federal and state courts of New York and Delaware.

**The 2004 Divorce**

5.      This action arises out of the 2004 divorce of Arie and Dalia.  (*See* Compl. ¶ 15.) As part of that divorce, Arie and Dalia entered into a stipulation of settlement dated as of October 26, 2004 (the "2004 Divorce Agreement").  (*See* Borriello Decl., Ex. 2).  The 2004 Divorce Agreement provides that TPR's shares of TRI "shall be distributed as follows:  (i) The Husband [Arie] will receive 794.40 shares of the TRI Stock representing 13.99468% of the common stock of TRI; [and] (ii) Each of Sagi Genger and Orly Genger, will receive in trust 1,102.80 shares of the TRI Stock representing 19.42766% of the common stock of TRI for each of Sagi and Orly and such trusts will simultaneously therewith execute and deliver proxies to

---

Although the Court generally must accept as true all well-pleaded factual allegations for the purposes of this Motion, it need not accept conclusory or implausible allegations, *see, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009), or "general allegations that are contradicted 'by more specific allegations in the Complaint,'" *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 152 (2d Cir. 2014).  For the avoidance of doubt, the Defendants note that many of the allegations in the Complaint are false, and those that are contradicted by documents that are integral to the Complaint need not be accepted by this Court.  *Rapoport v. Asia Elecs. Holding Co., Inc*., 88 F.Supp.2d 179, 184 (S.D.N.Y. 2000) ("[i]f these documents contradict the allegations of the . . . complaint, the documents control and this Court need not accept as true the allegations in" the complaint).

Husband [Arie] for all of the TRI stock owned by the trusts." (*See id.*, Ex. 2 at Art. II, § 9(a)). The "trusts" referenced therein are the Sagi Trust and the Orly Trust.

6. The 2004 Divorce Agreement further provides that, "[f]ollowing the foregoing transfers of TRI Stock, ***the Wife [Dalia] will have no ownership interest in TRI***." (*Id.*, Ex. 2, Art. II, § 9(e)(emphasis added)).

7. Dalia received substantial consideration under the 2004 Divorce Agreement, including, among other property, all of Arie's interest in TPR. (*See generally, id.*, Ex. 2, Art. II).

8. Nevertheless, on May 31, 2007, Dalia commenced an arbitration challenging various parts of the 2004 Divorce Agreement and seeking additional property from Arie. *See Dalia Genger v. Arie Genger*, No. 13 170 Y 00996 07, American Arbitration Association, Commercial Arbitration Tribunal, New York City. Following extensive discovery and fourteen days of hearings, the arbitrator issued a Final Award of Arbitration dated May 6, 2008 (the "<u>Final Arbitration Award</u>"), which confirmed that Dalia has no ownership interest in TRI shares transferred to the Sagi Trust and the Orly Trust after the 2004 Divorce Agreement finalized. (*See* Borriello Decl., Ex. 3 at 3-4 ("Article II(9)(a) gives Arie 50% of the marital interest in TRI (794.40 shares or 13.999468% [*sic*] of its common stock) and gives the children's trusts (Sagi and Orly) 1,102.80 or 19.42766[% each] of [its] common stock . . . (e) Following the foregoing transfers of TRI Stock, the Wife [Dalia] will have no ownership in TRI."). The Final Arbitration Award also noted that "the TRI stock transfer was accomplished by a Stock Purchase Agreement which sold the TRI shares to Arie and which was approved by Dalia and provides that the shares were 'free and clear of all liens, claims, and encumbrances.'" (*See id.*, Ex. 3 at 6). But the arbitrator did award Dalia one-half of the ownership interest in the TRI shares that ***Arie*** received under the 2004 Divorce Agreement "in order to correct the marital distribution imbalance,

namely $3.85 million." (*See id.*, Ex. 3 at 11). Thus, Dalia received one-half of what was considered to be the marital interest – that is, the 794.40 TRI shares that *Arie*, not the Sagi Trust nor the Orly Trust, received as part of the divorce.

9.     Separately, Sagi agreed to provide Dalia with future financial support capped by at an amount equal to all dividends, distributions, proceeds or other payment attributable to 794.40 shares of TRI (adjusted for splits or similar action) that have previously been paid to Orly, me or any trust for the benefit of either of us" (the "2004 Support Agreement"). (*See* Compl. ¶ 17; Borriello Decl., Ex. 4 (2004 Support Agreement)).

10.    Dalia and Sagi contend that Orly also "agreed to indemnify Sagi for 50% of the amounts [Sagi] paid to Dalia on account of" the 2004 Support Agreement (the "2004 Indemnity", and together with the 2004 Support Agreement, the "2004 Agreements"). (*See* Comp. ¶ 18; Borriello Decl., Ex. 5 (2004 Indemnity)). Dalia is not a party to the 2004 Indemnity, which is solely between Sagi and Orly.

**Dalia and Sagi Begin to Collude Against Arie and Orly Post-Divorce**

11.    After Dalia obtained control of TPR following the divorce, Sagi became TPR's president. *See Genger v. Genger*, 121 A.D.3d 270, 276, 990 N.Y.S.2d 498, 501 (2014).

12.    Dalia also became the trustee of the Orly Trust in 2008. *Genger v. Genger*, 39 Misc. 3d 1235(A), 972 N.Y.S.2d 143 (Sup. Ct. 2013), *aff'd as modified*, 115 A.D.3d 421, 982 N.Y.S.2d 11 (2014), *order recalled and vacated*, 120 A.D.3d 1102, 993 N.Y.S.2d 297 (2014). Orly was not consulted regarding this appointment and immediately challenged it and sought to remove Dalia as trustee. (Borriello Decl., Ex. 6 (Orly's Amended Surrogate's Court Complaint)). While the original action was dismissed on the grounds that Dalia had not yet taken any improper action in the short time she had been trustee, in 2009, Orly commenced an

amended proceeding to remove Dalia as trustee. (*See id*.). The New York State Surrogate's Court never decided that action, but shortly before this bankruptcy was commenced determined that the case could proceed against Dalia. (*See* Borriello Decl., Ex. 33, *Matter of Genger*, Index No. 2008-0017 (Sur. Ct. NY County June 21, 2017) at 12-13).

**The 2008 Sagi/TPR Sale of the TRI Shares to the Trump Group**

13. By 2008, the Trump Group had challenged the assignments of the TRI shares from TPR to Arie, the Orly Trust and the Sagi Trust, contending that the assignments were void under TRI's organizational documents absent the Trump Group's prior consent. *See Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 184 (Del. 2011).

14. Thereafter, in August 2008, Sagi, in his alleged capacity as President of TPR, entered into two or more agreements with the Trump Group. In the first agreement, he sold the Sagi Trust's TRI shares to the Trump Group for approximately $26.7 million. *See Genger v. Genger*, No. 651089/2010, 2015 WL 112831, at *3 (N.Y. Sup. Ct. Jan. 07, 2015). The theory being that Sagi had the ability to transfer title to those shares to the Trump Group, regardless of whether he was acting in his capacity as the Sagi Trust or in his capacity as president of TPR. Separately, pursuant to an August 22, 2008 side letter agreement (the "2008 Side Letter Agreement"), Sagi, in his capacity as president of TPR, purported to sell to the Trump Group both the Orly Trust's TRI shares (for $10.3 million) and Arie's TRI shares (for $7.4 million) without the consent of or prior consultation with Orly or Arie. (Borriello Decl., Ex. 7). Thus, Sagi sold the Orly Trust and Arie shares of TRI for approximately 40% less than the Sagi Trust shares under the ruse that they were "minority shares" due to his sale of the Sagi Trust shares.

15.     Thereafter, in separate litigation, Sagi, without opposition from Dalia[3], eventually successfully captured for himself the $10.3 million in funds that had been attributable to the Orly Trust's TRI shares (and the $7.4 million attributable to Arie's TRI shares), by arguing that these TRI shares did not belong to Orly or the Orly Trust, but rather to TPR (controlled by Sagi).  *See TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP*, No. 13 CIV. 8243 JFK, 2014 WL 1979932 (S.D.N.Y. May 15, 2014).  Thus, Sagi/TPR have now received all of the over $44 million in sale proceeds that Sagi/TPR had bargained for as the full and final consideration from the Trump Group for the sale of the TRI shares.

16.     Upon information and belief, Sagi caused the transfer of over $44 million that he/TPR received in connection with his two agreements to offshore accounts in Lichtenstein and the Cook Islands for his and/or Dalia's benefit.  (Borriello Decl., Ex 8 (Dalia Testimony Transcript) at 862:2-12).  Sagi has not transferred any of that money to Arie or to the Orly Trust (or Orly as its beneficiary) despite the express distribution of property called for by the 2004 Divorce Agreement.

**The 2013 Settlement Agreement**

17.     In June 2013, Orly (in her individual capacity and in her capacity as beneficiary of the Orly Trust), Arie, and the Brosers, on the one hand, and the Trump Group[4], on the other hand, entered into a settlement agreement to settle claims relating to the TRI shares (the "2013 Settlement Agreement") that were being litigated against the Trump Group.  (*See* Borriello Decl., Ex. 9 (2013 Settlement Agreement)).

---

[3]     *See* April 29, 2014 transcript of hearing before Judge Keenan in *TPR Inv. Assocs., Inc. v. Pedowitz* litigation where counsel for Dalia, as trustee for the Orly Trust, stated, "we don't object if this Court would direct that the escrow [*i.e.*, the escrowed $10.3 million] be given to TPR" Hr'g Tr. 26:7-9. (April 29, 2014) (ECF No. 45), *TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP, et al.*, No. 13-cv-08243-K (S.D.N.Y.).

[4]     The "Trump Group" refers to non-parties TR Investors, LLC, Glencova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources, LLC, Jules Trump, Eddie Trump and Mark Hirsch.

18.	ADBG LLC, an entity owned by the Brosers, provided litigation funding to Arie

that funded the litigations that were settled by the 2013 Settlement Agreement.  (*See id.*, Ex. 10

(Genger Trust Agreement)).  The 2013 Settlement Agreement documented a settlement, which in

total encompasses approximately $50 million in value related to TRI shares.  (*See id.*, Ex. 9 at 2-

3).  A breakdown of this settlement follows:

| Total 2013 Settlement Agreement Consideration | $50 Million |
|---|---|
| Orly Trust TRI shares | Release claims to $10.3 Million held in escrow |
| Arie TRI shares | Release claims to $7.4 Million held in escrow |
| Additional consideration | $32.3 Million |

(*See id.*)

19.	A total of $17.3 million of the additional consideration in the settlement was paid

to Arie in early July 2013 by the Trump Group, as transferor, not the Orly Trust or Orly.  That

amount was required to be repaid to ADBG both pursuant to the ADBG litigation funding

agreement and an unavoidable 2012 assignment by Arie and Orly of any proceeds of the ADBG-

funded litigations to the Genger Litigation Trust, which is then obligated to pay ADBG for the

outstanding obligations owed to it. (*See id.*, Ex. 10 (Genger Litigation Trust Agreement)).

ADBG is still owed millions of dollars in unpaid loan obligations that are improperly being held

up by Sagi and Dalia's frivolous claims.  (*See id*., Ex.11 (ADBG Claim)).

20.	The Trump Group also released claims to funds attributable to Arie's TRI shares

and the Orly Trust's TRI shares held in two escrow accounts, for $7.4 million and $10.3 million,

respectively.  (*See id.*, Ex. 9. at 2).  At the time, there was a pending dispute between Orly and

TPR (controlled by Sagi) regarding this $10.3 million and those funds had been placed in escrow

in a litigation between Orly and TPR.  *TPR Investment Associates, Inc. v. Pedowitz & Meister*

*LLP*, No. 13-cv-8243, 2014 WL 1979932, at *3 (S.D.N.Y. May 15, 2014).  TPR prevailed in that lawsuit.  *See id.* at *8.  As discussed above, Sagi/TPR have since received that money but failed to distribute it to Arie or the Orly Trust (or Orly as its beneficiary).

21.　　The remaining $15 million due under the 2013 Settlement Agreement has not been paid to anyone yet.  These funds are in the form of two $7.5 million notes, which are not yet due to be paid as a result of Sagi and Dalia's malicious litigation efforts against the Trump Group (and against the Defendants).  Additionally, this remaining amount is subject to ongoing depletion based on indemnity claims by the Trump Group, additional targets of Sagi and Dalia's malicious efforts.

22.　　Members of the AG Group (the term used to refer to the non-Trump Group parties to the 2013 Settlement Agreement), including Orly have consistently testified that, under the 2013 settlement, Orly was not entitled to any portion of either the $17.3 million payment or the remaining $15 million.  Moreover, even if she ever did somehow receive any proceeds, she has already assigned any such proceeds to the Genger Litigation Trust in 2012.  (Borriello Decl., Ex 10 (Genger Litigation Trust Agreement)).

23.　　On June 26, 2013, a stipulation was filed with the New York State Supreme Court dismissing Orly's claims against the Trump Group "in her individual capacity and as beneficiary of the [Orly Trust]." (*Id.*, Ex. 13).  The state court "so ordered" that stipulation on July 1, 2013. (*Id.*, Ex. 13.)

24.　　Both the 2013 Settlement Agreement and the foregoing stipulation expressly crossed out and initialed the inaccurate statement that the 2013 Settlement Agreement was entered into on behalf of the Orly Trust.  (*See id.*, Ex. 9 ¶ 4, Ex. 13 at 1).

25.     Although Dalia was not a party to the 2013 Settlement Agreement, she was aware

of it as of no later than June 26, 2013.  (*See id*. Ex. 12 (Dalia Affidavit)).  On June 26, 2013,

*before* the stipulation was so ordered, Dalia filed an affidavit with the state court arguing that the

claims Orly was settling "are entirely claims of the Orly Trust and that [Orly] has no individual

rights" to the claims.  (*Id.*, Ex. 12 ¶ 2).  Dalia further argued that "to the extent [Orly] is

receiving consideration for dismissing claims against the Trump Group, she is converting assets

belonging to the Orly Trust, this Court ought not allow that."  (*Id.*, Ex. 12 ¶ 3.).  Dalia did not

assert that she had any individual claim to the settlement proceeds.  (*Id.*)  Sagi also interfered

with the 2013 Trump Group Settlement at around the same time.  (*Id.*, Ex. 14 (Objection to

Stipulation)).

26.     Shortly after Sagi and Dalia began interfering with the 2013 Settlement

Agreement, on June 30, 2013, the Trump Group's counsel wrote an e-mail to Sagi's counsel that

strongly objected to that interference.  (*Id.*, Ex. 15 (Skadden Letter).  The e-mail provides,

among other things, as follows:

> - "During the course of both our conference call with Justice Jaffe on Thursday afternoon and my call with you on Friday, you left me with the impression that Sagi and the Sagi Trust intend to seek some sort of a judicial review of the Trumps' settlement with Orly, and that you may well question the fairness of that settlement as it affects claims that the Orly Trust purportedly has relating to the so-called 'Orly Trust Shares.'  Similarly, in papers you filed with Justice Jaffe on Wednesday, you object to our settlement because, as stated in paragraph 4 of Nicholas Schretzman's affidavit, it 'purports to dismiss claims brought on behalf of the [Orly] Trust, and give away its claim to title to the Trust's central asset – its claim to 1,102.80 shares of Trans-Resources, Inc. (the "TRI Shares") – without any consideration to the Orly Trust.'  Mr. Schretzman goes on to make clear in paragraph 5 that his objection is being registered on behalf of the Sagi Trust, as the Orly Trust's remainderman beneficiary . . . ."

> - "[Y]ou and Sagi cannot expect us to sit by while you interfere with and attempt to disrupt the Settlement Agreement we reached with Arie and Orly on grounds that are diametrically opposed to positions that Sagi has taken in court and the contractual obligations of TPR, Sagi and the Sagi Trust."

- "Sagi, as President of TPR, negotiated the terms of the sale of the so called 'Orly Trust Shares' and then signed the agreement and later the stock powers transferring those shares to our clients. He repeatedly acknowledged on the record that the consideration received for those shares was fair and reasonable."

- "Sagi should also be reminded that both he **and Dalia (on behalf of the Orly Trust, through its counsel Bob Meister) strongly urged my clients to consummate the purchase of the Orly Trust Shares in February 2011.** My clients had little reason to do so as they were content to wait out judicial determinations rather than commit to the purchase at a time when questions concerning the future of the business remained unanswered and they had an open date option to complete the purchase." (Emphasis added.)

- "Your arguments before Justice Jaffe in opposition to our settlement with Arie and Orly are in direct violation of contractual commitments of TPR, the Sagi Trust and Sagi, and are contrary to Sagi's repeated representations to our client and the courts regarding the effective and appropriate disposition of the Orly Trust Shares on fair, reasonable and acceptable terms."

- "***I urge you to advise Sagi immediately to stop suggesting, in any forum and in any manner whatsoever, that the Orly Trust has any rights whatsoever to TRI shares***, and to withdraw his objections and those of his Trust to our settlement of claims brought against the Trump Group by Arie and Orly in Justice Jaffe's court." (Emphasis added.)

27.     Despite receiving this strong admonishment, Dalia and Sagi pressed forward by challenging the 2013 Settlement Agreement before Delaware Chancery Court Judge Strine. Judge Strine immediately recognized the ludicrous, frivolous, scorched-earth litigation tactics concocted by Sagi/Dalia in furtherance of their campaign to steal all of the family wealth by attempting to turn what was supposed to be an agreed (between Arie and Dalia) division of that wealth among the family members in the 2004 Arie/Dalia divorce into what Judge Strine described as a "Powerball ticket." (*See id.* Ex. 16, Aug. 1, 2013 Hearing Tr. 36:21-37:6 ("To the extent that your client happened to end up in control of TPR and then turns it into a Powerball award for himself, leaving his sister -- apparently you believe -- in a cold, ruthless way, out of the family settlement. Orly would be entitled to bupkis. That's your client's ruthless belief; and

that he, by virtue of the father having not given the prior notices of the transfers, that -- you know, "Heck, life's tough, Sis. Hope your art sells well."); *id.* at 38:21-39:5 ("But that, from a fundamental equitable basis, the idea that -- again, that the world -- that this was just a Powerball ticket handed to Sagi Genger; that this lack of notice gave him all the family wealth -- it's not, certainly, something that strikes a Delaware judge, and it's not going to be my ultimate opinion, it doesn't strike me as why courts of equity were ever founded. It seems capricious."); *id.* at 40:23-41:5 ("This family was already so torn apart that your client [Sagi] cut a deal, and cut a deal in which he didn't give ratable treatment on behalf of the other family members. And now, in your view, what you're saying is, as a cold, ruthless legal matter he claims to have won some sort of life's Powerball because he ended up with control of TPR."); *id.* at 69:22-24 ("And, look. I do, frankly, put a low probability on the notion that a judge in New York is going to conclude that Sagi won the Powerball.")

28.     Less than a month after Judge Strine made these comments, on August 30, 2013, the Delaware Chancery Court entered a so-ordered Stipulation and Proposed Order of Dismissal, whereby Dalia (as trustee of the Orly Trust) agreed that the Trump Group had purchased the Orly Trust's TRI shares from TPR for $10.3 million and dismissed all claims against the Trump Group relating to the Orly Trust's TRI shares with prejudice.  *See id.*, Ex. 17 **(**So-Ordered Stipulation and Proposed Order of Dismissal).  Yet six and a half years later, Dalia is now shockingly claiming that those same settlement proceeds somehow belong to her.

29.     Here, Dalia recycles the allegation that Orly "monetized" the Orly Trust's "claim" by entering into the 2013 Settlement Agreement (Compl. ¶ 5), but now alleges that claim was a claim for "beneficial ownership of ***Dalia's*** marital claim to the economic benefit of 794.40 shares of Trans-Resources, Inc." (*id.* ¶1 (emphasis added)), and that those proceeds should be

held in constructive trust for **Dalia's own** benefit, not the Orly Trust, (*id.*). However, Dalia

omits that by 2013, Sagi/TPR had already sold all of the Genger family's TRI shares for over

$44 million under the 2008 Side Letter Agreement and related agreements and that the proceeds

of those sales went to offshore accounts in Lichtenstein and the Cook Islands set up by Sagi

and/or Dalia. She also neglects to state that the 2013 Settlement Agreement was only reached

after Arie continued to pursue an appeal against the Trump Group relating to the TRI shares, and

that such litigation was funded by ADBG. (Borriello Decl., Ex. 18 (Notice of Appeal)). Thus,

were it not for the continued efforts of Arie and the continued funding by ADBG, the 2013

Settlement Agreement would not have existed.

   30.  Despite having asserted on the Orly Trust's behalf that the settlement proceeds

belonged to the Orly Trust in her affidavit opposing the 2013 stipulation of discontinuance

entered in connection with the 2013 Settlement Agreement, and effectively supporting TPR's

recovery of those funds in the subsequent litigation concerning rights to the $10.3 million the

Trump Group paid to purchase the Orly Trust's TRI shares, by her Complaint, Dalia is now

taking the exact *opposite* position, asserting that the *all* of the proceeds from the 2013 Settlement

Agreement are somehow attributable to the *same* TRI shares that Sagi/TPR sold to the Trump

Group and for which Sagi/TPR already recovered $10.3 million, and that somehow those

proceeds belong to her. Dalia's current position is also contrary to the position that Dalia, in her

capacity as trustee of the Orly Trust, took when she filed a Surrogate's Court Petition against

Orly, Arie, the Brosers, and the Trump Group, seeking to recover the same 2013 Settlement

Agreement proceeds and the imposition of constructive trust on those proceeds in favor of the

Orly Trust under an argument that the proceeds belonged to the Orly Trust. (*See* Borriello Decl.,

Ex. 19 ¶¶ 21("Under applicable law, the proceeds of the [2013 Settlement Agreement] obtained

in a derivative lawsuit belong to the direct plaintiff (in this case, the Orly Trust), not the derivative plaintiff (in this case, Orly personally).”), 29 (“. . . the Settlement Proceeds belong to the Orly Trust”)), 40 (“Pursuant to the Trust Agreement Obligations, all trust funds were to be held in the name of the Orly Trust, and no Orly Trust assets [i.e., the 2013 Settlement Agreement proceeds] were to be used for the benefit of Orly’s creditors”), 41 (“the Settlement Proceeds . . . belong to the Orly Trust”), 50 (same), 60 (same), 69 (same)).

**The 2014 Action**

31.    In February 2014, Sagi sued Orly to enforce the 2004 Indemnity for 50% of a $200,000 demand made by Dalia to Sagi under the 2004 Support Agreement.  *Genger v. Genger*, 76 F. Supp. 3d 488, 494 (S.D.N.Y. 2015).

32.    In the 2014 action, Orly challenged the enforceability of the 2004 Indemnity on the ground, among others, that it failed for lack of consideration.  She argued – and discovery in that action showed – that she had not previously been paid any amount attributable to the shares of TRI.[5]  The United States District Court for the Southern District of New York (the “District Court”) held, however, on summary judgment that Orly had “effectively monetized” the TRI shares by signing, as one of the members of the group that signed the 2013 Settlement Agreement, a settlement agreement with other parties who had competing legal claims pertaining to the shares, and that “monetization” was held to be consideration sufficient to render the 2004 Indemnity enforceable.  *See id.* at 499-500.  Despite Sagi and Dalia’s consistent and repetitious citing of this one *dicta* quote in conclusory support of their claims against the Defendants, no court has ever ruled on what amount Orly had been paid, if anything.

---

[5]    Pursuant to the 2004 Divorce Agreement, the Orly Trust and the Sagi Trust each received a total of 1,102.80 shares of TRI.

33.     Indeed, as was clarified on appeal, that holding only means that Orly received "more than a peppercorn": the "$32 million transaction" involving "her shares would confer upon her more than a peppercorn, which is all we need to conclude (*and all we do conclude*) as to the extent of any benefit she received." *Genger v. Genger*, 663 F. App'x 44, 49 (2d Cir. 2016) (emphasis added). That decision and the more recent decision granting Sagi his $3 million judgment against Orly under the alleged 2004 Indemnity says nothing about whether Orly ever received or is entitled to receive any funds paid by the Trump Group under the 2013 Settlement Agreement. That issue was *never* litigated in those courts and no court has *ever* heard any evidence that Orly received more than a peppercorn. So despite what Sagi and Dalia would like the Court to believe, the Second Circuit did not ever determine what amount, if any, Orly was entitled to or did receive under the 2013 Settlement Agreement.

**The 2017 Action**

34.     Thereafter, in 2017, Dalia sued Sagi for breach of the 2004 Support Agreement seeking an award of $6,000,000 in damages. Within hours after that action was filed, Sagi then sued Orly again, for $3 million – half of the demand supposedly made by Dalia under the 2004 Support Agreement.

35.     Dalia admits that she has only received $200,000 on account of her demands to Sagi, meaning that Sagi has not paid Dalia any of the remaining $24.5 million to which she is purportedly entitled to supposedly support her lifestyle. (Compl. ¶ 38 (". . . Orly must pay Dalia up to $12.25 million . . . representing 50% of the $24.7 million to which Dalia is entitled under the 2004 Agreements after deducting $200,000 that Dalia received pursuant to her first demand.")).

## Dalia and Sagi's Litigation Tactics

36.     Much of the litigation at issue centers around attempts by Sagi, Dalia and entities they created and/or control (collectively, the "Sagi Parties"), to claw back the early July 2013 transfer of $17.3 million by the Trump Group pursuant to the 2013 Settlement Agreement and whatever amounts are ultimately transferred on account of the two $7.5 million notes currently held in escrow.  While the Sagi Parties have concocted different legal positions[6], all of their efforts are based on the fact that Orly was a signatory to the 2013 Trump Group Settlement, and allegedly caused the $17.3 million to be fraudulently transferred to Arie/ADBG/the Brosers.

37.     Despite the fact that Dalia and Sagi have repeatedly misrepresented to this Court and the Texas Bankruptcy Court that this chapter 7 case was filed on the verge of Sagi obtaining a judgment against the Defendants to turnover the proceeds of the 2013 Settlement Agreement, nothing could be further from the truth.  Rather, the Defendants' time to respond to the various actions that were commenced had not even elapsed before this chapter 7 case was filed.  Here are the real facts.

38.     It was no secret that Orly was going to seek bankruptcy relief if she was unsuccessful in her appeal of Sagi's $3 million judgment against her.  For example, on January 8, 2019, Orly's counsel informed the District Court that: "Mr. Dellaportas [Sagi's counsel] well

---

[6] There is no question that Sagi controls the Sagi Parties' legal strategy.  Dalia has testified that Sagi controls all of her financial affairs.  (Borriello Decl., Ex 8 (Dalia Testimony Transcript) at 870:9-14).  As stated below, Sagi appointed his business partner to an officer position at his newly fabricated plaintiff entity, Manhattan Safety, and the "Inter-Creditor Agreement" Sagi concocted in June 2019 appoints Sagi's lawyer as the escrow agent.  Moreover, if there was any doubt about where pleadings originate, one only need look at the three certificates of service Dalia has filed in this adversary proceeding, all of which show that Sagi's lawyer served Dalia's pleadings here.  (*See id.*, Ex. 20 (Certificate of Service)).  Texas Bankruptcy Judge Davis recognized Sagi's game instantly, stating the following at the first substantive hearing in this chapter 7 case, "So, we've got this motion to dismiss.  We've got an objection to debtor's motion to continue. And we've got DK [Dalia and her entity's] joinder to exemption to the objection. . . . I think one person wrote all three. And I don't think I need a linguistic algorithm to tell me that. . . Excessive advocacy. . . . How much of what you write can I believe? . . . . [A]ll three of these briefs, there's more time spent calling Orly a liar than there is on the substance of the motion.  That kind of pleading I find disgusting and unhelpful."  *See* Transcript of Oct. 23, 2019 status conf. at 7:24-8:15 (*In re Orly Genger*, ECF. No. 140).

knows that if this judgment is upheld on appeal, that Orly will file for bankruptcy. That has been made clear. There is no dispute about that fact, right. I don't think Sagi Genger disputes it. Orly Genger has said it under oath. It has been – it becomes abundantly clear that's what will transpire." (*See* Borriello Decl., Ex. 21 (January 8, 2019 Tr.) at 67:9-14).

39.      So in June 2019, after obtaining the $3 million judgment against Orly described above and around the time of the Second Circuit's affirmance of that judgment, Sagi and Dalia took numerous steps to obtain possession of the $17.3 million in cash and $15 million in promissory notes relating to the $50 million 2013 Settlement Agreement (as stated above, they had already obtained the other $17.7 million that Sagi had sold out from under Orly and Arie). First, just a few weeks before this chapter 7 case was commenced, on June 11, 2019, Sagi filed a turnover motion (the "Turnover Motion") in the District Court action in which Sagi had obtained the $3 million judgment seeking this property by claiming that all of these settlement proceeds belong to Orly individually, not the Orly Trust. *See Sagi Genger v. Orly Genger*, No. 17-cv-8181 (VSB) (S.D.N.Y. June 11, 2019) (ECF Nos. 212-214) ("For purposes of the instant motion . . . Sagi seeks to set aside . . . (a) the $17.3 million cash transfer to Arie, the Brosers and their entity, Tedco, Inc. (and, to the extent necessary, the intermediary entities through which the money passed); and (b) the encumbrances placed on the two $7.5 million promissory notes by Orly's husband and father.").

40.      Within days, Sagi and Dalia, through Sagi's company TPR, and the Orly Trust (which at the time Dalia controlled as trustee) incorporated two entities – Manhattan Safety Maine, Inc. ("Manhattan Safety") in Maine and Recovery Effort, Inc. ("Recovery Effort") in Arkansas, assigned them their claims, and entered into an "Inter-Creditor Agreement" to share any recoveries. (*See* Borriello Decl., Ex. 22 (incorporation documents); *id.*, Ex. 23 (assignment

to Recovery Effort); *id.*, Ex 24 (Inter-Creditor Agreement, which contains the assignment to Manhattan Safety)).

41.     On June 4, 2019, the Orly Trust, which Dalia continued to control as trustee, incorporated Recovery Effort in Arkansas. (*See* id., Ex. 22). On June 12, Manhattan Safety was incorporated in Maine. (*See id.*). Also on June 12, Dalia purported to resign as trustee of the Orly Trust and appoint Michael Oldner as her successor despite never having met or spoken with him. (*Id.*, Ex. 31 (Orly Genger 1993 Trust Instrument of Resignation of Trustee and Appointment of Successor Trustee.); *id.*, Ex. 32 (Dalia Genger's Responses to Chapter 7 Trustee's Requests for Admission, at 3)). On June 13, Dalia, as trustee (despite purportedly resigning the day before), purported to assign the Orly Trust claims to Dalia, as sole director of the Recovery Effort, for no stated consideration. (*See id.*, Ex. 23). Presumably at some point thereafter, Mr. Oldner, also became President of Recovery Effort. Recovery Effort is wholly owned by the Orly Trust. (*See id.*, Ex. 24 at 1). Manhattan Safety's purported president, Robin Rodriguez, invests with Sagi pays Sagi $600,000 per year. (*See id.*, Ex. 25, at 496:11-497:2 (excerpts of Sagi testimony from August 4, 2016 hearing transcript)). Sagi previously attempted to engage in a series of transactions with Manhattan Safety's present or former parent company, but the New York Supreme Court held those transactions void for self-dealing by Sagi at Orly's expense. (*See id.*, Ex. 26).

42.     Sagi, Manhattan Safety, Recovery Effort, the Orly Trust and certain others then entered into an Inter-Creditor Agreement dated as of June 16, 2019.[7] The Inter-Creditor

---

[7]     Dalia was not a party to the June 16, 2019 Inter-Creditor Agreement, which was signed by the alleged successor trustee of the Orly Trust, Michael Oldner, who allegedly is also the sole officer of Recovery Effort. However, certain of the Defendants received correspondence from her counsel on June 17, 2019, the day after the Inter-Creditor Agreement was entered into, which made demands on behalf of Dalia, in her capacity as trustee of the Orly Trust. (*See id.*, Ex. 27). And, as stated above, Dalia signed the Recovery Effort assignment agreement on behalf of the Orly Trust and Recovery Effort just a few days earlier.

Agreement provides that the Orly Trust's "principal asset is its claim to the $32.3 million in litigation proceeds . . . accruing under a Settlement and Release Agreement, dated as of June 16, 2013 . . . ." (*Id.*, Ex 24 at 1). The Orly Trust has assigned those claims to Recovery Effort, "an entity wholly owned by [the Orly Trust]." (*Id.*) Finally, in the event of any recovery, the parties will share in the recoveries pursuant to a defined waterfall. (*Id.* at 2.) In effect, all the proceeds will go to Sagi and his business partner, Robin Rodriguez.[8]

43.    On June 17, 2019, five days after Dalia purportedly resigned as trustee of the Orly Trust and four days after Dalia purportedly assigned the Orly Trust's claims to Recovery Effort, Dalia's counsel, as "counsel to Dalia Genger, Trustee of the Orly Genger 1993 Trust," stating that Dalia would take certain acts if all of the Disputed Settlement Proceeds were delivered to the Orly Trust. (Borriello Decl., Ex. 27 (Letter from Judith Bachman dated June 17, 2019)). Later that day, Manhattan Safety and Recovery Effort filed a new action in District Court seeking to avoid the remaining $32.3 million of the $50 million 2013 Settlement Agreement proceeds as fraudulent transfers. *Manhattan Safety Maine, Inc. and Recovery Effort, Inc. v. Michael Bowen, et al.*, Civil Action No. 1:19-cv-5642 (S.D.N.Y. 2019) (the "Manhattan Safety Action").

44.    Several days after the Manhattan Safety Action was filed, Dalia and Mr. Oldner voluntarily dismissed, as against certain of the Defendants in this action that were parties there,

---

[8]    The Inter-Creditor Agreement is a blatant attempt by the Sagi Parties to litigate around the automatic stay. That stay prevents Sagi from seeking the property he claims belongs to Orly. So Sagi is using Dalia, the Orly Trust, Manhattan Safety and Recovery Effort, the latter two of which did not exist until mid-June 2019, to seek the same property by simply claiming that the same property does not belong to Orly. Dalia asserts that it belongs to her and is subject to a constructive trust to avoid the bankruptcy; the Orly Trust, Recovery Effort and Manhattan Safety claim it belongs to the Orly Trust. Under the Inter-Creditor Agreement, the Orly Trust acknowledges that it does not matter which of Sagi or Plaintiffs prevail on their respective claims because they have agreed to share the recoveries. *See id.*, Ex. 28, at 11, n. 4 (The Orly Trust states "While [Plaintiff Recovery Effort, Inc.] and Sagi have somewhat different positions on ownership of the 2013 settlement proceeds, these parties and the [Orly] Trust have agreed under an intercreditor agreement to share in any recovery, rather than expend limited resources competing with one another for the same funds.") As the movants will show in their upcoming opposition papers, the Manhattan Safety Action is also subject to the automatic stay.

the same types of claims for the same property pending in New York State Surrogate's Court that Dalia had filed in her capacity as trustee of the Orly Trust against Orly, the Trump Group and certain of the Defendants here. (Borriello Decl., Ex 18). Dalia dismissed only the claims against the Defendants, not the other defendants in that case, Orly and the Trump Group, so that the same claims could be re-filed in the Manhattan Safety Action. (*See id*., Ex. 29 (Notice of Discontinuance)).

45.     All of these parties are seeking the same property that Dalia now seeks pursuant to this adversary proceeding under different legal theories of ownership. The end result is that Sagi, individually, is claiming in his Turnover Motion that the 2013 Settlement Agreement proceeds *belong entirely to Orly*, while Sagi and Dalia have caused Manhattan Safety and Recovery Effort to claim in another action that the Settlement Proceeds *belong entirely to the Orly Trust*. Now Dalia is claiming that the 2013 Settlement Agreement proceeds *belong entirely to Dalia*, despite previously arguing that they belong to the Orly Trust and supporting the release of $10.3 million attributable to the Orly Trust TRI shares to Sagi/TPR. Despite the inconsistent theories, through the sharing arrangement, the parties to the Inter-Creditor Agreement will benefit from any recovery in these various actions (the movants dispute that any recovery will occur on any of these frivolous claims).

## ARGUMENT

## I.     THE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS

### a.     The Events Giving Rise to the Complaint Occurred Sixteen Years Ago

46.     The Complaint is a thinly veiled attempt to relitigate the 2004 Divorce Agreement between Dalia and Arie, an event that occurred sixteen years ago, in order to attack the 2013 Settlement Agreement, an event that occurred six years and seven months before this action was

commenced. Regardless of which of those dates started the clock on Dalia's claims here, her claims must be dismissed with prejudice because they are barred by the applicable six-year statute of limitations.

47. The Complaint suggests that in 2004, Dalia was induced by a supposed promise from Orly to transfer Dalia's beneficial ownership of certain TRI shares to the Orly Trust. (Compl. ¶ 15). Further, Dalia has previously admitted that her constructive trust claim is "in the nature of a Domestic Support Obligation" stemming from the divorce. (*See* Borriello Decl., Ex. 30 (Dalia Objection to the Texas Settlement Motion) ¶¶ 5 (stating that proceeds of the TRI shares "are being used in lieu of maintenance, in the nature of a Domestic Support Obligation"), 16 (stating that "the [2013] Settlement Agreement improperly interferes with the equitable distribution of marital property ordered by the New York Supreme Court as a domestic support obligation.")) Thus, Dalia concedes that her claims here stem from the 2004 Divorce Agreement. As a result, Dalia's claim for imposition of a constructive trust stems entirely from events which occurred over sixteen years ago.

48. In New York, an action for constructive trust is an equitable action governed by the six-year statute of limitations in CPLR § 213(1). An "action for a constructive trust begins to accrue, and the limitations period begins to run, as of 'the date when the acts occurred on which the claim of constructive trust is predicated.'" *McGovern v. Solomon*, 466 F.Supp.2d 554, 558 (S.D.N.Y. 2006 (quoting *Scheuer v. Scheuer*, 308 N.Y. 447, 450, 125 N.E.2d 555, 557 (1955)). Rather than raise her alleged interests during the numerous Genger-related litigations that have come before this, Dalia sat on her rights for sixteen years in clear violation of the policies sought to be protected by the statute of limitations. *See Glover v. Hill*, No. 87 CIV. 4450 (SWK), 1989 WL 13752, at *1 (S.D.N.Y. Feb. 14, 1989) ("Statutes of limitations protect defendants against

stale claims and encourage aggrieved parties not to sit on their rights.").  Similarly, a claim

seeking an equitable lien is subject to a six-year statute of limitations.  *See Rodriguez v. Federal*

*Nat. Mortg. Ass'n*, No. 508453/2019, 2020 WL 2789915, at *4 (N.Y. Sup. Ct. May 29, 2020).

Dalia's claims are therefore clearly barred by the statute of limitations.

49.     New York courts distinguish between situations where the constructive trustee

acquired the property wrongfully and where the constructive trustee has wrongfully withheld

property which was lawfully acquired.  *See Sitkowski v. Petzing*, 175 A.D.2d 801, 802, 572

N.Y.S.2d 930, 932 (1991).  Where the constructive trustee acquired the property wrongfully, the

statute of limitations runs from the date of acquisition.  *See Quiroga v. Fall River Music, Inc.*,

No. 93 CIV. 3914 (RPP), 1998 WL 851574, at *34 (S.D.N.Y. Dec. 7, 1998) (quoting *Sitkowski*,

175 A.D.2d at 802).  The relevant event for the purposes of the statute of limitations is therefore

"the wrongful conduct or event giving rise to a duty of restitution."  *See Dybowski v. Dybowska*,

146 A.D.2d 604, 605, 536 N.Y.S.2d 838 (1989). ("[T]he operative event for purposes of the

period of limitations was the allegedly fraudulent conduct which induced the taking of title to the

property . . . .").

50.     In this case, that period would be the negotiation and signing of the 2004

Agreements sixteen years ago, well outside the six year statute of limitations.  Dalia however

attempts to save her claims through her unsupported assertions that Orly refused to perform

under the 2004 Indemnity.  (Compl. ¶ 18).  This attempt must fail because a defendant's later

refusal cannot extend or toll the limitations period.  *See Dybowska*, 146 A.D.2d at 605 ("The

defendant's later refusal to convey her alleged paper interest in the property did not serve to

extend or otherwise toll the period of limitations since the defendant's interest in the property

was held adversely to the plaintiffs' interest from the date of acquisition of the property.").

### b.  At Best, The Statue of Limitations Began to Run In June 2013

51.     Even interpreting the Complaint in the most generous manner possible, the alleged wrongful act giving rise to the claim for constructive trust occurred no later than the June 2013 Settlement Agreement.  The Complaint alleges that, pursuant to the 2013 Settlement Agreement, Orly monetized "her beneficial ownership of Dalia's marital claim" and "devised devious and fraudulent schemes to deprive Dalia of her bargain."  *See* (Compl. ¶¶ 1, 20).  Dalia was well aware of the 2013 Settlement Agreement as of no later than June 26, 2013.  *See* Borriello Decl., Ex. 7 (Dalia Affidavit) ¶¶ 2-3 ("I was informed that Plaintiff Orly Genger has reached a settlement with the Trump Group . . .").

52.     Where it is alleged that a constructive trustee acquires property wrongfully, as is the case here, the trustee holds it adversely from the date of acquisition, regardless of any later refusal to convey.  *Augustine v. Szwed*, 77 A.D.2d 298, 301, 432 N.Y.S.2d 962 (1980); *McGovern v. Solomon*, 466 F. Supp. 2d 554, 559 (S.D.N.Y. 2006); *Dybowski*, 146 A.D.2d at 605.  Here, Dalia has clearly and unambiguously demanded a constructive trust related to the allegedly wrongful monetization of Dalia's TRI shares in June 2013 (Compl. ¶¶ 21, 22), and not related to Dalia's demand to Sagi in 2014.  In fact, the Complaint explicitly refers to these events under a heading entitled "The Fraudulent Transfers." (Compl. ¶ 39).  That section makes clear that it is these alleged acts in 2013 that form the basis of Dalia's claims, stating "***In order to frustrate Dalia's rights***, ***in 2013 Orly secretly and fraudulently transferred*** approximately $17.3 million of the $32.3 million obtained in the 2013 Settlement Agreement to creditors and/or business partners of Arie, namely, Broser and his affiliated entities, including the Litigation Trust and ADBG, in purported satisfaction of false liabilities and for no consideration or value to Orly."  (Compl. ¶ 39.)

53.     Therefore, Dalia cannot claim that Orly engaged in some type of elaborate, illegal scheme to defraud her through the 2013 Settlement Agreement and simultaneously attempt to evade the statute of limitations by mere citation to Orly's alleged February 2014 refusal.  *See McGovern v. Solomon*, 466 F.Supp.2d at 558 (where "the contention is that an original transfer is wrongful, it has been held that even a 'later refusal to convey ... did not serve to extend or otherwise toll the period of limitations since the defendant's interest in the property was held adversely to the plaintiffs' interest from the date of acquisition of the property.'").

54.     Accordingly, the Complaint is long time barred and must therefore be dismissed with prejudice.

## II.     DALIA LACKS STANDING

55.     Dalia also lacks standing to claim a constructive trust or equitable lien (or her related declaratory judgment and injunction claims) over the proceeds of the 2013 Settlement Agreement because she has no legal or equitable claim to those proceeds.

56.     Every plaintiff must establish standing.  *See, e.g., Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 11 (2004); *see also Warth v. Seldin,* 422 U.S. 490, 498-99 (1975). Standing encompasses two principles:  Constitutional standing (also referred to as Article III standing), which focuses upon the fact, cause, and redressability of concrete injuries suffered by a plaintiff, *see, e.g., Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992), and prudential standing, which focuses upon judicially self-imposed limits on the exercise of federal jurisdiction,  *see Newdow,* 542 U.S. at 11;  *Sullivan v. Syracuse Hous. Auth.,* 962 F.2d 1101, 1106 (2d Cir. 1992).

57.     Dalia has the burden of affirmatively demonstrating both components of standing. *See, e.g., Lujan,* 504 U.S. at 561 ("Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any

other matter on which the plaintiff bears the burden of proof.");  *Spencer v. Kenna,* 523 U.S. 1, 11 (1998) ("[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." (citation omitted)).  The Complaint should be dismissed because Dalia cannot satisfy either component of standing.

A.      **Dalia Cannot Establish Constitutional (Article III) Standing**

58.      The doctrine of constitutional standing confines the jurisdiction of federal courts to actual cases and controversies.  *See Allen v. Wright,* 468 U.S. 737, 750 (1984); *see also Lujan,* 504 U.S. at 560; *Ampal-Am. Israel Corp.,* 502 B.R. 361, 369 (Bankr. S.D.N.Y. 2013).  To meet the constitutional standing requirement, a plaintiff must allege three necessary and independent elements:  (1) actual personal injury, (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) that it is likely to be redressed by the requested relief.  *See, e.g., In re 1031 Tax Grp., LLC*, 439 B.R. 47, 59-60 (Bankr. S.D.N.Y. 2010); *Lujan,* 504 U.S. at 560.

59.      The "injury in fact" requirement requires that a litigant allege that the putatively unlawful conduct of which she complains has caused the litigant to personally suffer a cognizable injury to its own legally protected interest.  *See Allen,* 468 U.S. at 751; *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church and State,* 454 U.S. 464, 472 (1982);  *Lujan,* 504 U.S. at 560 n.1 (explaining that "injury must affect the plaintiff in a personal and individual way");  *see also Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166 (1972) (stating that a party may invoke the court's authority in order to "seek redress for injuries done to him … not [to] seek redress for injuries done to others").  This prerequisite ensures that a litigant has a sufficient personal stake in the action, *see, e.g., Warth*, 422 U.S. at 498-99, such as an interest in the subject *res*.

60.     Dalia's entire Complaint is premised on the false representation that she is entitled to the benefit of the TRI shares.  (*See* Compl. ¶ 1 ("Dalia's marital claim to the economic benefit of 794.40 shares of Trans-Resources, Inc.");  ¶ 54 ("Dalia is entitled to the specific enforcement of the remedy of constructive trust in her favor and for her benefit upon the proceeds of Orly's monetization of the shares...").

61.     However, Dalia cannot establish an actual personal injury related to the TRI shares that were transferred to the Orly Trust or the proceeds thereof upon which she seeks to impose a constructive trust because the 2004 Divorce Agreement and the 2008 Final Arbitration Award make clear that she has no ownership interest in any TRI shares.  The 2004 Divorce Agreement on which Dalia bases her claim (Compl. ¶ 15) provides that "[f]ollowing the foregoing transfers of TRI stock, *[Dalia] will have no ownership interest in TRI*."  (Borriello Decl. Ex. 2 (2004 Divorce Agreement) at 14; *see also id.*, Ex. 3 (Final Arb. Award) at 4 (same)).  The Complaint also fails to plead the existence of any agreement between Dalia and Orly (or the Orly Trust) regarding the TRI Shares or their proceeds.

62.     While Dalia wants the Court to believe that the 2004 Support Agreement (an agreement between her and Sagi) and/or the 2004 Indemnity entitle her to the relief she seeks, neither of these agreements are between Dalia and Orly.  There is simply no privity whatsoever between Dalia and Orly.  And the 2004 Support Agreement and 2004 Indemnity are clear that all interest in the TRI shares was transferred to the Orly Trust and Sagi Trust, and that Dalia was not otherwise granted any continuing ownership interest in those TRI shares.  *See id.*, Ex. 4 (2004 Support Agreement) and Ex. 5 (2004 Indemnity).  Dalia's own prior legal actions exemplify this lack of privity.  Notably, in her coordinated effort to sue Sagi under the 2004 Support Agreement, which allowed Sagi to in turn promptly sue Orly under the 2004 Indemnity, Dalia

did not sue Orly. To the extent she believed that she had a multimillion dollar constructive trust claim against Orly, she could have sought to do so there. Her failure to do so exemplifies the fact that her constructive trust claim is nothing more than a newly devised defensive measure asserted now only in response to the Texas and New York trustees' efforts to settle with the Defendants and to pursue claims against Dalia.

63. The Complaint should therefore be dismissed because Dalia lacks any legal or equitable interest in the Orly Trust's TRI shares or their proceeds, and thus Plaintiff cannot establish an actual, personal injury in fact sufficient to establish constitutional standing.

### B. Dalia Cannot Satisfy the Prudential Standing Doctrine

64. The prudential standing doctrine encompasses the general prohibition against a litigant raising another person's legal rights. *See, e.g., Newdow,* 542 U.S. at 12; *1031 Tax Grp.,* 439 B.R. at 60. To satisfy prudential standing, a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *See Kowalski v. Tesmer,* 543 U.S. 125, 129 (2004) (citation omitted). As courts within this jurisdiction have observed, "[p]rudential limitations on standing are especially important in bankruptcy proceedings which often involve numerous parties who may seek to assert the rights of third parties for their own benefit." *Ampal-Am.,* 502 B.R. at 369; *see also Kane v. Johns-Manville Corp.,* 843 F.2d 636, 644 (2d Cir. 1988) ("The prudential concerns limiting third-party standing are particularly relevant in the bankruptcy context.").

65. Moreover, a plaintiff's ability to establish prudential standing is of particular concern in actions seeking to impose a constructive trust. "Due in part to an acknowledgement that the right to have a constructive trust established is personal, courts consistently hold that parties may not argue that a constructive or resulting trust exists if they would not be the beneficiaries of the trust." *In re 1031 Tax Grp., LLC*, 439 B.R. 47, 61–62 (Bankr. S.D.N.Y.),

*supplemented*, 439 B.R. 78 (Bankr. S.D.N.Y. 2010); *see also In re Schick,* 246 B.R. 41, 46

(Bankr. S.D.N.Y. 2000) (noting that "the personal nature of the equitable right prevents someone

other than the beneficiary from using it offensively or defensively. Thus, a stranger cannot sue to

impose a constructive trust for the benefit of a defrauded party."); *Powers v. Am. Exp. Fin.*

*Advisors, Inc.,* 82 F. Supp. 2d 448, 453 (D. Md. 2000) (explaining that "defendant does not have

standing to assert a constructive trust on behalf of" a third party).

66.     As discussed above, Dalia retained no personal interest in any TRI shares after the

2004 Divorce Agreement.  (*See* Borriello Decl., Ex. 2 (2004 Divorce Agreement) Art. II, § 9(e)).

Those TRI shares were transferred to the Sagi Trust and Orly Trust under the terms of the 2004

Divorce Agreement.  *Id.*, Ex. 2, Art. II, § 9(a).

67.     Dalia's Complaint is a plain attempt to assert the purported rights of a third party,

which is impermissible under the doctrine of prudential standing.  *See, e.g., 1031 Tax Grp.,* 439

B.R. at 63 ("Only those Exchangers who had money wrongfully transferred to Boulder would be

the putative beneficiaries of a constructive trust, thus only they would have standing to assert the

existence of a constructive trust.").  For the same reasons as stated in the section above with

respect to constitutional standing, Dalia has demonstrably failed to show that she is asserting her

own rights, and thus should be precluded from litigating this action under the doctrine of

prudential standing.

### III.     DALIA FAILS TO STATE A CLAIM FOR CONSTRUCTIVE TRUST

68.     To survive a motion to dismiss for failure to state a claim, a plaintiff's obligation

to "provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell*

*Atlantic v. Twombly,* 550 U.S. 544, 555 (2007) (alteration in original).  Rather, "a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "To show facial plausibility, the Claimant must plead 'factual content that allows the court to draw the reasonable inference that the [defendant] is liable for the misconduct alleged.'" *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949).

69.    Courts "are generally reluctant to impose constructive trusts without a substantial reason to do so." *Superintendent of Ins. for the State of N.Y. v. Ochs (In re First Central Fin. Corp.*), 377 F.3d 209, 217-218 (2d Cir. 2004) (noting that "the equities of bankruptcy are not the equities of common law," and that "[e]nrichment alone will not suffice to invoke the remedial powers of a court of equity"); *see also Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 180 (2d Cir. 2007) ("The effect of a constructive trust in bankruptcy is profound. While the bankruptcy estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to include all legal or equitable interests of the debtor, any property that the debtor holds in constructive trust for another is excluded from the estate pursuant to § 541(d)."); *In re Omegas Grp., Inc.*, 16 F.3d 1443, 1452 (6th Cir.1994) ("Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor."); *Brenner v. Heller (In re Lincoln Logs, Ltd.*), No. 1:11-CV-481, 2011 WL 6011786 (N.D.N.Y. Nov. 30, 2011) (dismissing constructive trust claim and holding that "[t]he effect of a constructive trust in bankruptcy is "profound," because it removes the trust res from the bankruptcy estate and "places its beneficiary ahead of other creditors with respect to the trust res. [It is] not the debtor who generally bears the burden of a constructive trust in bankruptcy, but the debtor's general creditors. This type of privileging of one unsecured claim over another

clearly thwarts the principle of ratable distribution underlying the Bankruptcy Code." (internal citations omitted)).

70.     Under New York law, the stated elements for a claim of constructive trust are:  (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of subject *res* in reliance on that promise; and (4) unjust enrichment.  *See, e.g., Superintendent of Ins. for the State of N.Y. v. Ochs (In re First Central Fin. Corp.*), 377 F.3d 209, 212 (2d Cir. 2004). Here, the Complaint fails to allege facts sufficient to establish any of these elements, instead relying only on conclusory assertions.  *See In re Commodore Bus. Machines, Inc.*, 180 B.R. 72, 79 (Bankr. S.D.N.Y. 1995) (J. Garrity) (indicating that mere conclusory allegations are insufficient to support the imposition of a constructive trust); *Cerabono v. Price*, 7 A.D.3d 479, 480, 775 N.Y.S.2d 585 (2004).  As a result, the Complaint must be dismissed.

71.     First, the Complaint fails to sufficiently allege that any confidential or fiduciary relationship exists.  Rather, the Complaint asserts only that "[a] confidential and fiduciary relationship of familial trust and confidence existed between Dalia and her daughter, Orly, when Dalia transferred the Rights to her."  (Compl. ¶ 43).  Beyond this wholly conclusory assertion, the Complaint fails to allege any facts that would support a finding of a confidential relationship between Dalia and Orly.  New York courts agree that in the context of a constructive trust claim, "[t]here is nothing inherent in the relationship between parents and adult children that makes it confidential."  *Hardoon v. Seward Park Housing Corp.*, No. 113632/2004, 2005 WL 8169476, at *2 (N.Y. Sup. Ct. Mar. 01, 2005).  This is particularly true here, where the Genger family has been embroiled in litigation for nearly sixteen years following the dissolution of Arie and Dalia's marriage, and where multiple courts have recognized that Dalia and Orly have been on opposite sides of this litigation for years.

72. Dalia has also failed to allege any facts to suggest that Orly made a promise to her or that Dalia made a transfer in reliance on that promise. *Bankers Sec. Life Ins. Soc. v. Shakerdge,* 49 N.Y.2d 939, 940, 406 N.E.2d 440, 441 (1980) (affirming the rejection of a constructive trust claim where the plaintiff failed to show evidence of a promise and indicating that imposition of a constructive trust is a "fraud-rectifying" rather than "intent-enforcing" remedy). The Complaint purposefully elides any information related to the supposed promise because it never existed and improperly seeks to extend Orly's contractual arrangement to indemnify Sagi to create the appearance of a promise by Orly to Dalia.

73. Orly's obligation to indemnify Sagi pursuant to the 2004 Indemnity cannot be construed as a promise to provide support to Dalia. *In re Schick*, 246 B.R. 41, 46 (Bankr. S.D.N.Y. 2000) ("The personal nature of the equitable right prevents someone other than the beneficiary from using it offensively or defensively."). Even if this were possible, the Complaint must be dismissed because a party cannot pursue a constructive trust claim where, as Dalia alleges here, there is an agreement governing the parties' relationship. *See In re First Cent. Fin. Corp.*, 377 F.3d at 212 (holding the existence of controlling agreements precludes the imposition of a constructive trust); *Tekinsight.Com, Inc. v. Stylesite Mktg, Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000) (dismissing constructive trust claim where the relationship was governed by contract). Here, the Complaint alleges that "The promise was reflected in counter-signed documents executed by Dalia and her two children (together, the "2004 Agreements"). (Compl. ¶ 16). Thus, there can be no dispute that Dalia's constructive trust claim is based in contract, and must therefore be dismissed.

74. Because no promise is adequately alleged, the complaint also fails to allege that any transfer took place in reliance on such a promise. *See Caballero v. Anselmo*, 759 F. Supp.

144, 148 (S.D.N.Y. 1991) (finding that where no promise was made, it was clear that no transfer was made in reliance of a promise). To the contrary, the 2004 Divorce Agreement and the 2008 Arbitration Award make clear that Dalia had no further ownership interest in TRI shares following the distribution of TRI shares to the Orly Trust.

75. The constructive trust claim also fails because no facts are alleged to support a claim that Orly was unjustly enriched. To the contrary, Dalia and Sagi have been unjustly enriched by their receipt of over $44 million in TRI share proceeds that they wrongfully withheld from Arie and Orly, while Orly has not received one penny from TRI shares. New York courts "insist upon a showing that property is held under circumstances that render unconscionable and inequitable the continued holding of the property and that the remedy is essential to prevent unjust enrichment." *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 362 (2d Cir. 1999). The need for such a showing is heightened in bankruptcy cases, where the effect of imposing a constructive trust on a debtor's property would be to remove it from the debtor's estate, and thus put it outside the reach of the debtor's creditors.[9] *See In re Commodore Bus. Machines, Inc.*, 180 B.R. at 83 (constructive trust would "diminish the funds available to pay general unsecured creditors of the estate…and reserve those funds for the partial repayment of [plaintiff's] claim").

76. In *Ades & Berg Group Investors v. Breeden*, 550 F.3d 240, 245 (2d Cir. 2008), where a party objected to the allocation of proceeds in a settlement with the trustee and asserted a constructive trust over such amounts, the Second Circuit held that "retention by the bankruptcy estate of assets that, absent bankruptcy, would go to a particular creditor is not inherently unjust" (emphasis added). The court noted that "there is no inequity in treating [the creditor asserting a constructive trust] in the same manner as any other depositor/creditor who was

---

[9] To be clear, the Movants dispute that Orly received, or has any right to receive the 2013 Settlement Agreement proceeds, and also dispute that the Orly Trust or Dalia have any right to receive such proceeds.

unfortunate enough to have placed its money with the [debtor]"). *Id*. Consequently, the Second

Circuit found that the unjust enrichment element required to impose a constructive trust and that

"[e]quity and good conscience do not demand the creation of a constructive trust in this

instance." *Id*.

77.     The Complaint does not allege that Orly actually possesses or ever possessed any

funds stemming from the TRI shares.  As described above, Sagi had previously monetized the

Orly Trust's TRI Shares behind Orly's back.  It therefore defies logic that Orly could be unjustly

enriched by her failure to indemnify Sagi for financial support paid to Dalia from the economic

value of the shares because Sagi had already monetized these shares himself and Dalia with

Dalia's support.

78.     For these reasons, the Complaint should be dismissed with prejudice because

Dalia has failed to sufficiently plead her claims as a matter of law.

## IV.     DALIA'S  DECLARATORY JUDGMENT, EQUITABLE LIEN AND INJUNCTION CLAIMS SHOULD BE DISMISSED

79.     Count I of the Complaint seeks a declaratory judgment that the proceeds of the

2013 Settlement Agreement are held by Orly and the Transferees in constructive trust for Dalia's

benefit, pursuant to the provisions of the 2004 Agreements.  (Compl. ¶ 51).  Count III seeks to

impose an equitable lien on the very same grounds as the constructive trust complaint.  (*Id.* ¶ 56).

The declaration sought by Count I and the equitable lien sought by Count III are plainly

redundant of Count II, which also asks the Court to impose a constructive trust over the same

property.  Accordingly, the Court should dismiss Dalia's request for declaratory relief and for an

equitable lien for the same reasons discussed above –the claims are barred by the statute of

limitations, Dalia lacks standing, and Dalia cannot state a claim for relief.

80.     The Court must also dismiss Count III because for an equitable lien to exist, "there must be an agreement that is intended by the parties to create a lien upon specific property." *In re Rama Grp. of Companies, Inc.*, No. 00-BK-12654K, 2002 WL 1012974, at *1 (W.D.N.Y. May 6, 2002) (quoting *James v. Alderton Dock Yards*, 256 N.Y. 298, 303, 176 N.E. 401, 403 (1931)).  The agreement must identify specific property that is to be transferred as security for the underlying obligation.  *See id*.  Further, an equitable lien requires "clear intent" that the specific property at issue acts as security for the obligation.  *See Ryan v. Cover*, 75 A.D.3d 502, 502, 904 N.Y.S.2d 750, 751 (2010).

81.     Dalia makes no attempt to allege that the parties ever intended for specific property to serve as security for any obligations of the defendants.  The 2004 Agreements, upon which the Complaint relies, provide only that Orly will indemnify Sagi and makes no mention of specific property operating as security.  However, the intention to create an equitable lien must "clearly appear from the language and attendant circumstances."  *See Vardaros v. Zapas*, 24 Misc. 3d 1247(A), 901 N.Y.S.2d 911 (Sup. Ct. 2009).  Because Dalia fails to allege the existence of an agreement that the property at issue was supposed to be held as security for the obligations of the defendants, the claim must be dismissed.  *See East 51st Street Development Co. v. HFZ East 51, LLC*, No. 652135/2016, 2019 WL 6916089, at *3 (N.Y. Sup. Ct. Dec. 19, 2019).

82.     Dalia's injunction claim (Count IV) also fails.  A preliminary injunction cannot be granted absent a showing that the movant will suffer irreparable harm and a likelihood of success on the merits.  *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).  An irreparable harm is one which cannot be remedied by a monetary award.  *In re First Republic Grp. Realty, LLC.*, 421 B.R. 659, 678 (Bankr. S.D.N.Y. 2009).  Further, "[a] claim of irreparable harm is undercut by a party's unreasonable delay in seeking injunctive relief."  *See id*. at 679.

Dalia has waited over sixteen years to seek relief, all her allegations seek solely monetary relief and she cannot show a likelihood of success on the merits. As a result, injunctive relief would be wholly inappropriate in these circumstances.

83.     Alternatively, the Court should exercise its considerable discretion and refrain from deciding Counts I, III and IV. *See, e.g., Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. 2003) ("Courts have consistently interpreted this permissive language [of the Declaratory Judgment Act] as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear.").

## V.     DALIA'S AMENDED COMPLAINT WAS IMPROPERLY FILED AND ANY AMENDMENT TO THE COMPLAINT WOULD BE FUTILE

84.     The Complaint should also be dismissed because Dalia failed to seek leave from either the Court or the Defendants prior to filing her amended complaint. Absent consent from the Defendants or permission from the Court, the amended complaint was required to be filed within 21 days after service of the original complaint. Fed. R. Civ. P. 15(a). After the 21-day period has expired, the plaintiff must get the opposing party's written consent or the Court's leave before amending the complaint. Sagi's counsel purports to have served Dalia's original complaint (ECF No. 5) on May 11, 2020.[10] Dalia's amended complaint was filed on June 8, 2020, which is twenty-eight days after Sagi's counsel purported to serve the original complaint on Dalia's behalf. Accordingly, Dalia's amended complaint was filed seven days after her deadline to do so expired and should therefore be dismissed.

---

[10] The purported May 11, 2020 service of the original complaint and second summons (ECF No. 5), was also defective as a matter of law. Specifically, such attempted service was untimely because the original summons and complaint were not served within 7 days after the original summons was issued on February 20, 2020 (ECF No. 2 (original summons); (ECF No. 3) (certificate of service reflecting purported "service" on April 20, 2020), and because service of the original complaint was not effectuated within 90 days after the original summons was issued. *See* Bankruptcy Rule 7004(e) (requiring delivery of the summons and complaint within 7 days after the summons is issued); Fed. R. Civ. P. 4(m) (requiring service be effectuated within 90 days after the summons is issued). Defendants reserve all rights and defenses with respect to such defective purported service.

85.     Finally, in the event that Dalia argues that leave to amend the Complaint should be granted or cross moves for leave to amend the Complaint, such argument or motion is without merit.

86.     "It is well established that leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003); *see Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).").

87.     Here, Dalia's lack of standing and the statute of limitations are an absolute non-curable bar to her claims such that, Dalia will be unable to offer any legitimate basis upon which this Court could conclude that a complaint for a constructive trust could survive a motion to dismiss.  *See e.g.*, *Leonelli v. Pennwalt Corp.,* 997 F.2d 1195, 1198 (2d Cir.1989) (affirming district court's denial of motion to amend where claims are time-barred).  Dalia has also already filed one amended complaint, and has been aware of all pertinent facts relating to her claims for years.  Accordingly, any request for leave to amend the Complaint should be denied.

## **JOINDER IN OTHER MOTIONS TO DISMISS**

88.     The Defendants hereby join in any other motions to dismiss filed by parties in interest, only to the extent not inconsistent herewith.

## **NOTICE**

Notice of this Motion has been provided to:  (i) the Plaintiff;  (ii) the Chapter 7 Trustee; and (iii) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(b).  In light of the relief requested, Defendants respectfully submits that no further notice is necessary.

## NO PRIOR REQUEST FOR RELIEF

No prior request for the relief sought herein has been made to this or any other court.

## CONCLUSION

**WHEREFORE**, Defendants respectfully request entry of an order dismissing the

Complaint with prejudice, and such other and further relief as the Court may deem just and

appropriate.

DATED:  New York, New York
        June 25, 2020


*/s/ Yann Geron*_____
Yann Geron
Reitler Kailas & Rosenblatt LLC
885 Third Avenue
20th Floor
New York, NY 10022
(212) 209-3050
Fax : (212) 371-5500
Email: ygeron@reitlerlaw.com
*Attorneys for Debtor Orly Genger*

*/s/ Christopher Gartman*_____
Christopher Gartman
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000
Fax : (212) 422-4726
Email: chris.gartman@hugheshubbard.com
*Attorneys for Arnold Broser, David Broser,*
*ADBG LLC, and TEDCO, Inc.*


*/s/ Frank A. Oswald*_____
Frank A. Oswald
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, NY 10119
(212) 201-5590
Fax : (212) 967-4258
Email: frankoswald@teamtogut.com
*Attorneys for Arie Genger*

*/s/ Lance Harris*_____
Lance Harris, Esq., as Trustee of
The Genger Litigation Trust