**EXHIBIT 1**

IRA DANIEL TOKAYER, ESQ.
Attorney for Plaintiff Dalia Genger
420 Lexington Avenue, Suite 2400
New York, New York 10170
(212) 695-5250 (Telephone)
(212) 695-5450 (Facsimile)
imtoke@mindspring.com

UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

In re:                                  :  Chapter 7

    ORLY GENGER,                        :  Case No. 19-10926-tmd

                Debtor.           :

----------------------------------------x

DALIA GENGER,                           :  Adv. P. No. 20-01010

                Plaintiff,      :

        -against-                  :  <u>AMENDED COMPLAINT</u>

ORLY GENGER, MICHAEL BOWEN, ARIE        :
GENGER, ARNOLD BROSER, DAVID BROSER,
ERIC HERSCHMANN, THE GENGER LITIGATION  :
TRUST, ADBG LLC, TEDCO INC., and        :
DEBORAH PIAZZA as chapter 7 trustee,
                           :
                Defendants.     :

----------------------------------------x

TO THE HON. JAMES L. GARRITY, JR., U.S.B.J:

        Dalia Genger ("Dalia"), by and through her undersigned

attorney, Ira Daniel Tokayer, Esq., as and for her Amended

Complaint herein, alleges as follows:

PRELIMINARY STATEMENT

1.    By this action, Dalia seeks, <u>inter alia</u>, a declaratory judgment recognizing a constructive trust and/or an equitable lien imposed for her benefit on all property the Debtor, Orly Genger ("Orly"), has realized from her beneficial ownership of Dalia's marital claim to the economic benefit of 794.40 shares of Trans-Resources, Inc. (the "Rights"), including the Trump Notes (hereinafter defined), up to $12.25 million plus interest.  The proceeds from such Rights have been diverted from Dalia and misappropriated by Orly to insiders, including the Trump Notes which have been transferred to Michael Bowen ("Bowen") for no legal consideration, with the actual and/or constructive intent to hinder, delay and defraud Dalia's entitlement to such proceeds.

THE PARTIES

2.    Dalia, Debtor's mother, is a 74 year old retired homemaker who has received no support payments from her ex-husband, Arie Genger ("Arie"), since their divorce in 2004. Instead, Dalia has relied in key part for her retirement upon the 2004 Agreements (hereinafter defined) in which she contributed her Rights in the family business in exchange for living expenses as requested from her son and daughter out of the monetized proceeds of the Rights.

2

3.    Orly, the Debtor in this bankruptcy case, is Dalia's daughter.  She is an individual who most recently claims to reside in the State of Texas.

4.    Bowen, is a natural person and Orly's attorney since 2015 as a partner at Kasowitz Benson and Torres LLP, who resides upon information and belief in the State of New York. Bowen holds the Trump Notes as an agent of Orly.  As Orly's attorney involved in the relevant events, Bowen knew of Dalia's interest in the Trump Notes prior to taking possession thereof. Bowen falsely testified under oath and falsely represented to various courts (a) that Orly has nothing to do with either the Trump Notes or an additional $17.3 million that Orly received from the Rights, and (b) that no written agreement exists with respect to the disposition of the proceeds of the Trump Notes. However, Kasowitz Benson and Torres LLP was a party and signatory to a March 2017 escrow agreement which provides that Orly's purported debts to her husband will be paid off by the Trump Notes.  It further provides her with joint signature authority, together with her father, to direct about $8.5 million due to be paid under the Trump Notes.

5.    Arie is a natural person, Orly's father and Dalia's ex-husband, who upon information and belief resides in the State of Florida.  A substantial portion of the proceeds from the Rights, approximately $17.3 million, were diverted by Orly to

3

Arie's creditors and/or business partners.  Arie knew of Dalia's
interest in the monetized proceeds of the Rights, including the
Trump Notes, prior to falsely asserting his interest therein
because he materially participated in the events that gave rise
to Dalia's constructive trust and/or equitable lien.  Arie has
asserted on various occasions, most recently in a letter to Judge
Garrity, that Orly has never had an interest in the Trump Notes.
That assertion was made despite contrary recitations and
representations made by him in writing to various parties,
including the March 2017 escrow agreement discussed above.

        6.    David Broser ("Broser") is a natural person who
upon information and belief resides in the State of New York, who
improperly received $17.3 million of Orly's monetization of the
Rights for no consideration and for no value to Orly.  Broser and
the entities related to him asserting an interest in the Trump
Notes on his behalf knew of Dalia's interest in the monetized
proceeds of the Rights, including the Trump Notes, prior to
asserting their interest therein because they and/or their
officers and agents materially participated in the events that
gave rise to Dalia's rights.  Broser filed a false affidavit
claiming he did not have documents reflecting what became of the
$17.3 million even though the money had earlier been transferred
in and through various accounts under his control and/or for his
benefit.  He also gave false sworn testimony asserting that no

4

written agreement existed with respect to the disposition of the Trump Notes, even though he is a signatory to such an agreement. Broser asserted to Courts on various occasions that Orly has never had an interest in the Trump Notes or the $17.3 million, most recently in a letter to Judge Garrity. That assertion was made despite a contrary recitations in the March 2017 escrow agreement which he executed.

7.   Eric Herschmann ("Eric") is a natural person, Orly's husband and, with Bowen, Orly's attorney as a partner at Kasowitz Benson and Torres LLP. He most recently claims to reside in the State of Texas. Eric claims to have an interest in the Trump Notes, which interest was created after Eric became aware of Dalia's interest therein. Eric knew of Dalia's interest in the Trump Notes prior to asserting his interest therein because he materially participated in the events that led to their creation. Eric asserted to Courts on various occasions that Orly has never had an interest in the Trump Notes or the $17.3 million realized from Orly's monetization of the Rights, most recently in a letter to Judge Garrity. That assertion was made despite contrary written recitations in the March 2017 escrow agreement that he executed.

8.   The Genger Litigation Trust (the "Litigation Trust") refers to a purported trust whose purported co-trustees, Lance Harris and David Broser, upon information and belief reside

5

in the State of New York.  At one time, an account titled to the
Litigation Trust improperly received $17.3 million from Orly's
monetization of the Rights for no consideration or value to Orly.
In a letter to Judge Garrity, the trustees of the purported
trust, asserted an interest in the Trump Notes for the Litigation
Trust.  The Genger Litigation Trust does not exist as a matter of
law, and even if it did, at no time was title to the Trump Notes
ever transferred to it.

9.    ADBG LLC ("ADBG") is a limited liability company
with its principal place of business in New York, whose managing
member upon information and belief is David Broser.  ADBG is a
lender to Arie which, at one time, improperly received $17.3
million from Orly's monetization of the Rights for no
consideration or value to Orly.  Further, ADBG improperly claims
to be entitled to in excess of $4 million of the Trump Notes.
ADBG has falsely asserted that Orly never had an interest in the
Trump Notes or the $17.3 million realized from Orly's
monetization of the Rights, most recently in a letter to Judge
Garrity.  That assertion was made despite contrary written
recitations in the March 2017 escrow agreement which ADBG
executed through Broser.

10.   Bowen, Arie, Broser, Eric, the Litigation Trust
(including Broser as Trustee thereof) and ADBG are collectively
referred to herein as the "Transferees."

6

11.  Deborah Piazza, is the successor Chapter 7 trustee in the underlying Chapter 7 bankruptcy case.

### JURISDICTION AND VENUE

12.  The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).  However, a motion to dismiss this bankruptcy case has been filed by Sagi Genger on the ground that the case was filed in violation of § 707 of the U.S. Bankruptcy Code.  Should the motion be granted, this Court would lack jurisdiction over this adversary proceeding.

13.  This dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (J) as more particularly set out herein below.

14.  Venue is proper pursuant to 28 U.S.C. § 1409.

### THE 2004 AGREEMENTS

15.  In 2004, as part of her divorce from Arie, Dalia relinquished marital rights in 794.40 shares (the "Rights") of Trans-Resources, Inc. ("TRI") to her children, Orly and Sagi, in exchange for their promise to set aside and pay funds received therefrom in an amount equal to all dividends, distributions, proceeds or other payments attributable to the shares (adjusted for any splits or similar action), or any lesser amount upon request by Dalia, for Dalia's retirement.

7

16. The promise was reflected in counter-signed documents executed by Dalia and her two children (together, the "2004 Agreements"). The 2004 Agreements also provided for Dalia to demand payment from Sagi who in turn had a right of indemnity from Orly. As explained by United States District Judge Katherine B. Forrest, this back-to-back arrangement was created as a result of Orly's physical absence from the United States when Dalia transferred the Rights.

17. Specifically, a counter-signed letter between Sagi and Dalia, dated October 30 2004, provides in substantive part:

> Dear Mom,
>
> This letter confirms our understanding with respect to certain payments that I am prepared to make to you in consideration of the following. My sister Orly and I are benefiting [sic] by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for our benefit. In reliance on this letter and in consideration of the trusts' receipt of these shares and other consideration, you are giving up valuable marital rights, and you desire further assurance that you will have sufficient funds to support your lifestyle.
>
> If you, in your sole and absolute discretion, from time to time desire funds to support your lifestyle, you may request in writing that I make payment to you as provided in this letter. Promptly upon receipt of the request, I will pay to you (1) an amount equal to all dividends, distributions, proceeds or other payments attributable to 794.40 shares of TRI (adjusted for any splits or similar action) that have previously been paid to Orly, me or any trust for the benefit

8

of either of us, less any amounts previously
paid to you pursuant to this letter, or (2)
any lesser amount indicated in your request.

We intend for this letter to be a binding
agreement under New York law.

18. A subsequent counter-signed letter between Sagi
and Orly, dated November 10, 2004, provides in substantive part:

Dear Orly:

In connection with the attached letter (the
"Promise") from me to our mother, Dalia
Genger, dated October 30, 2004, you agree to
indemnify, defend, and hold me harmless, for
and against one-half (½) of any and all
payments, liabilities, damages, claims,
actions, losses, settlements, penalties,
judgments or obligations (each a "Claim"),
including my reasonable counsel and other
professional fees, expenses and costs, which
arise from my undertakings in the Promise.

19. In a 2015 summary judgment decision, Judge Forrest
found that the 2004 Agreements were extant and enforceable, as
follows:

As part of the divorce, Dalia agreed to
convey her marital rights to 794.40 shares of
TRI to trusts benefitting Sagi and Orly (the
"Sagi Trust" and the "Orly Trust,"
respectively) in exchange for a commitment by
Sagi and Orly to financially support her.
This arrangement was effectuated via three
documents.

First, Dalia and Arie signed a stipulation of
settlement finalizing the terms of their
divorce settlement (the "2004 Divorce
Stipulation"), which was fully executed on
October 30, 2004. In the 2004 Divorce
Stipulation, Dalia promised to convey equal
interests in a total of 794.40 shares of TRI
to the Orly Trust and the Sagi Trust. The

9

2004 Divorce Stipulation contains an "entire
understanding" clause, which is subject to a
carve-out for other agreements . . ." entered
into concurrently herewith." . . .

The second was a letter signed by Sagi and
Dalia dated October 30, 2004 (the "2004
Promise").  In the 2004 Promise, Sagi agreed
to pay Dalia up to an amount equal to all
dividends, distributions, proceeds or other
payments attributable to the TRI shares, upon
Dalia's demand.  The 2004 Promise also states
that the agreement is made "in consideration
of" the following: "Orly and [Sagi] are
benefitting by the receipt of a total of
794.40 shares of [TRI], or beneficial
interests in those shares, by trusts for
[their] benefit." . . .

At the time the 2004 Promise was signed, Orly
was vacationing in Fiji, and thus could not
contemporaneously sign the 2004 Promise.

However, before Sagi signed the 2004 Promise,
Orly verbally agreed to indemnify Sagi for
50% of the payments he would have to make
under the 2004 Promise.

The third agreement was a letter signed by
Sagi and Orly dated November 10, 2004 (the
"2004 Indemnity").  In the 2004 Indemnity,
Orly agreed to indemnify Sagi "for and
against one-half (½) of any and all payments,
liabilities, damages, claims, actions,
losses, settlements, penalties, judgments or
obligations, including [Sagi's] reasonable
counsel and other professional fees, expenses
and costs, which arise from [Sagi's]
undertakings in the [2004 Promise]."

Genger v. Genger, 76 F. Supp. 3d 488, 492-494 (S.D.N.Y. 2015).

20.  Since the 2004 Agreements, Orly has devised

devious and fraudulent schemes to deprive Dalia of her bargain

with the intent to hinder, delay and defraud Dalia, including by

fraudulently transferring and encumbering Orly's $32.3 million of the proceeds from the monetization of the very Rights that were to be set aside for Dalia's retirement in order to nullify Dalia's ability to reclaim those Rights.

## ORLY MONETIZES THE RIGHTS

21.  Two judgments have been entered against Orly in the United States District Court for the Southern District of New York determining that $12.25 million of the monetization of the Rights remain subject to Dalia's clawback.  Both judgments were unanimously affirmed by the Second Circuit.

22.  Specifically, the court found that Orly had monetized her interest in the Rights by virtue of a settlement with the Trump Group (the "2013 Settlement Agreement").  U.S.D.J. Forrest found:

> On June 16, 2013, Orly entered into a settlement agreement (the "2013 Settlement Agreement") with the Trump Group and others regarding her claims to ownership of the TRI shares.  The agreement provides that Orly, Arie, and their litigation funders, will receive $32.3 million in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and that Orly waives all of her claims to the TRI shares...

Genger v. Genger, 76 F. Supp. 3d at 494 (S.D.N.Y. 2015).

23.  The $32.3 million payment pursuant to the 2013 Settlement Agreement consisted of $17.3 million in cash up front and $15 million in two un-matured promissory notes of $7.5

11

million each (the "Trump Notes"), made payable to Bowen as Orly's
agent which are in Bowen's possession and remain outstanding.

NO TRANSFEREE IS A GOOD FAITH PURCHASER FOR VALUE

24.   Arie claims an interest in Orly's assets including
the Trump Notes as evidenced by a UCC lien he filed in 2018,
immediately after summary judgment was granted by Judge Forrest
against Orly.  Arie's UCC lien is void because the debt it
purports to secure is wholly contrived and false, and further
because Arie knew of the events that led to the creation of
Dalia's constructive trust and/or equitable lien prior to the
filing of the UCC lien as he participated in all the events.

25.   Arie also claims a control interest in the Trump
Notes through the March 2017 escrow agreement.  Arie's alleged
interest in the Trump Notes is void because the U.S. District
Court has already adjudicated that the Trump Notes are related
solely to the monetization of Orly's interest in the Rights and
further because the agreement was executed after Dalia's
constructive trust and/or equitable lien came into being with
Arie's full knowledge of the events that led to it.  Arie's liens
are at the very least a constructive fraud as against Orly and/or
Dalia and therefore void.

26.   Eric claims an interest in Orly's assets including
the Trump Notes as evidenced by a UCC lien he filed in 2017.
Eric's lien is void because the debt it purports to secure is

12

wholly contrived and false.  Further, he was aware of the events
that created Dalia's constructive trust and/or equitable lien as
he personally represented Orly before Judge Forrest in 2014 and
thereafter married her.  Eric also asserts a claim against the
Trump Notes through the March 2017 escrow agreement.  That
agreement was executed after Dalia's constructive trust and/or
equitable lien came into being with Eric's full knowledge of the
events that led to it.  Eric's liens are at the very least a
constructive fraud as against Orly and/or Dalia and therefore
void.

  27.  Broser has asserted contradictory claims against
Orly's assets, including the Trump Notes, through, alternatively,
the Litigation Trust and ADBG by falsely asserting that such
assets belong to Arie and not to Dalia or Orly.  Broser and his
agents participated in the events that led to the creation of
Dalia's constructive trust and/or equitable lien and were
therefore aware of its existence and that it would exist once the
conduct they set in motion took place.  Further, the Litigation
Trust was never formed as a matter of New York law, its indenture
does not even purport to take possession of the Trump Notes, and
the Transferees have all made agreements in writing inconsistent
with any claim by the Litigation Trust.  Further, any transfer by
Orly to the Litigation Trust would be a fraudulent conveyance, as
Orly received no consideration or value for it.  The

13

aforementioned liens are at the very least a constructive fraud as against Orly and/or Dalia and therefore void.

DALIA'S FIRST DEMAND

28. Upon learning of the 2013 Settlement Agreement and thus of the fact that both her children had monetized the Rights she had transferred as part of her 2004 divorce, in 2014, Dalia made her first request of Orly and Sagi for $200,000 from the monetized proceeds of the Rights.

29. Sagi promptly paid the request, but when he sought 50% indemnity from Orly under the 2004 Agreements, Orly refused, repudiating her promise evidenced by the 2004 Agreements and claiming that the Agreement was a forgery and otherwise unenforceable.

30. In 2015, Judge Forrest rejected Orly's claims and granted summary judgment in favor of Sagi. Genger v. Genger, 76 F. Supp. 3d 488 (S.D.N.Y. 2015).

31. Judge Forrest disagreed with Orly's claim that her Rights were never monetized, holding that: "as it turns out, Orly has effectively monetized an interest in the very [TRI] shares she claims not to have received to the tune of $32.3 million." 76 F. Supp. 3d at 491.

32. Orly appealed the judgment against her. The Second Circuit unanimously affirmed, finding, inter alia, that "Orly benefitted from the shares regardless of whether the

14

settlement money went to Orly, or as a gift to Arie . . ."
<u>Genger v. Genger</u>, 663 Fed. App'x 44, 49-50 (2d Cir. 2016).

DALIA'S SECOND DEMAND

33.    In the Fall of 2017, with the validity of the 2004
Agreements now affirmed, Dalia invoked her clawback rights for a
second time, requesting $6 million from Sagi and Orly.

34.    In response, Orly repudiated the 2004 Agreements
yet again, necessitating further litigation in 2017 in which Orly
argued that Judge Forrest's finding in 2015 that Orly received
$32.3 million from the sale of the Shares was not binding.

35.    Judge Forrest again disagreed, finding in 2018
that: "Based on the prior rulings of this Court . . . [and] the
Second Circuit's subsequent affirmance . . . [it] has been
conclusively established that Sagi and Orly monetized their
beneficial interests in the TRI shares for a total of $69.3
million..."  2018 WL 3632521, *2.

36.    Judge Forrest calculated the maximum amount to
which Dalia was entitled under the 2004 Agreements to be
approximately $24.7 million:

> Both Dalia and Sagi agree that Dalia's
> conveyed marital interest of 794.4 shares
> represents 36% of the total TRI shares that
> were monetized.  Using that figure, the
> maximum amount payable to Dalia under the
> 2004 Integrated Agreement is approximately
> $24.7 million (or 36% of the total $69.3
> million value).  Orly has not specifically
> disputed the 36% figure, though she has
> raised unrelated questions about how the so-

15

        called "cap" in the 2004 Integrated Agreement
        affects her obligations to Sagi.

Genger v. Genger, 2018 U.S. Dist. Lexis 126958, *15 (S.D.N.Y.
July 27, 2018).

    37.  Once again, Orly appealed; and once again, the
Second Circuit affirmed.  Genger v. Genger, 771 Fed. App'x 99,
101–02 (2d Cir. 2019).

    38.  Thus, according to two final non-appealable
judgments, of the $32.3 million monetized and received by Orly
pursuant to the 2013 Settlement Agreement, Orly must pay Dalia up
to $12.25 million from the monetized proceeds of the Rights,
representing 50% of the $24.7 million to which Dalia is entitled
under the 2004 Agreements after deducting $200,000 that Dalia
received pursuant to her first demand.

<u>THE FRAUDULENT TRANSFERS</u>

    39.  In order to frustrate Dalia's rights, in 2013 Orly
secretly and fraudulently transferred approximately $17.3 million
of the $32.3 million obtained in the 2013 Settlement Agreement to
creditors and/or business partners of Arie, namely, Broser and
his affiliated entities, including the Litigation Trust and ADBG,
in purported satisfaction of false liabilities and for no
consideration or value to Orly.

    40.  In addition, the Trump Notes were secretly and
fraudulently transferred to Bowen, and the future proceeds

16

thereof fraudulently encumbered, in purported satisfaction of false liabilities and for no consideration to Orly.

41.  In 2019, the U.S. District Court for the Southern District of New York (Broderick, J.) was about to consider a motion to set aside the above conveyances as fraudulent when Orly filed this bankruptcy case (originally in Texas) to halt that proceeding in an attempt to delay and/or totally prevent Dalia from recovering the financial support which she has demanded from the monetized proceeds of the Rights pursuant to the 2004 Agreements.

<u>AS AND FOR A FIRST CLAIM</u>
(Declaratory Judgment)

42.  The preceding paragraphs are incorporated herein for all purposes as if set out herein verbatim.

43.  A confidential and fiduciary relationship of familial trust and confidence existed between Dalia and her daughter, Orly, when Dalia transferred the Rights to her.

44.  Orly promised to pay Dalia from the monetized proceeds of the Rights and/or reimburse and indemnify Sagi for his payments to Dalia made pursuant to Dalia's request.

45.  Dalia transferred the Rights in reliance on Orly's promise.

46.  In 2014 and thereafter, Orly breached her duty to Dalia and abused the trust and confidence placed by Dalia in her by repudiating her promise and refusing to pay Dalia from the

17

proceeds of her monetization of the Rights and/or reimburse and
indemnify Sagi for his payments to Dalia made pursuant to Dalia's
request.

47.    Instead, Orly diverted and misappropriated the
proceeds of her monetization of the Rights, including the Trump
Notes, by transferring and encumbering them for no legal
consideration or value to Orly and with the actual and/or
constructive intent to hinder, delay and defraud Dalia.

48.    The retention of the proceeds of the monetization
of the Rights, including the Trump Notes and any liens thereon,
by Orly, her estate and/or any of the Transferees would unjustly
enrich Orly and the Transferees.

49.    Orly, her estate and the Transferees may not in
good conscience retain the benefits of Orly's monetization of the
Rights.

50.    Construing a constructive trust and/or an
equitable lien as superior to any claim by the Transferees is
necessary to satisfy the demands of equity, promote fairness and
prevent injustice.

51.    For the foregoing reasons, Dalia seeks a
declaratory judgment that the proceeds of the monetization of the
Shares, including the Trump Notes, up to $12.25 million plus
interest, is held by Orly and the Transferees in constructive
trust and/or an equitable lien for Dalia's benefit whose interest

18

at all relevant times is and was superior to the interests of Orly, the Transferees and Debtors' other creditors.

AS AND FOR A SECOND CLAIM
(Equitable Remedy of Constructive Trust
for Unjust Enrichment)

52.   The preceding paragraphs are incorporated herein for all purposes as if set out herein verbatim.

53.   Dalia has no adequate remedy at law.

54.   For the foregoing reasons, Dalia is entitled to the specific enforcement of the remedy of a constructive trust in her favor and for her benefit upon the proceeds of Orly's monetization of the Shares, including the Trump Notes, up to $12.25 million plus interest, and Bowen should deliver the Trump Notes, in whole or in part, to Dalia.

AS AND FOR A THIRD CLAIM
(Equitable Lien)

55.   The preceding paragraphs are incorporated herein for all purposes as if set out herein verbatim.

56.   For the foregoing reasons, Dalia is entitled to the specific enforcement of an equitable lien in her favor and for her benefit upon the proceeds of Orly's monetization of the Shares, including the Trump Notes, up to $12.25 million plus interest, and Bowen should deliver the Trump Notes, in whole or in part, to Dalia.

19

## AS AND FOR A FOURTH CLAIM
(Injunction)

57. The preceding paragraphs are incorporated herein for all purposes as if set out herein verbatim.

58. Dalia will suffer irreparable harm if Orly and/or the Transferees sell, transfer, assign, encumber, hypothecate or otherwise alienate the proceeds of Orly's monetization of the Rights, including the Trump Notes.

59. For the foregoing reasons, Dalia is entitled to a temporary, preliminary and/or permanent injunction enjoining and restraining defendants from selling, transferring, assigning, encumbering, hypothecating, or otherwise alienating the Trump Notes and mandating that defendants take all actions necessary for Dalia to receive the proceeds of Orly's monetization of the Rights, including the Trump Notes.

WHEREFORE, Dalia prays for the relief above requested and for such other and further relief to which she may be justly entitled, both at law and in equity.

Dated: New York, New York
June 7, 2020

_____/s/_____
IRA DANIEL TOKAYER, ESQ.
Attorney for Plaintiff Dalia Genger
420 Lexington Ave., Ste. 2400
New York, New York 10170
(212) 695-5250 (Telephone)
(212) 695-5450 (Facsimile)
imtoke@mindspring.com