**EXHIBIT 8**

19-03810-jlg Doc 205-13 Filed 06/25/19 Entered 06/25/19 23:33:41 Exhibit 12
D. Genger Fiduciary Action Transcript excerpt (8/9/16) Pg 2 of 7

Orly Genger v.
Dalia Genger, et al

August 9, 2016

## Page 805

```
1
2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK : CIVIL TERM : PART 27
3  --------------------------------------------x
   ORLY GENGER, in her individual capacity and
4  on behalf of the Orly Genger 1993 Trust (both
   in its individual capacity and on behalf of
5  D&K Limited Partnership),
6                                      Plaintiff,
                                         Index No.
7       -against-                       109749/09
8  DALIA GENGER, SAGI GENGER, D&K GP LLC, and
   TPR INVESTMENT ASSOCIATES, INC.,    NON JURY TRIAL
9                                      Defendants.
10 --------------------------------------------x
11                         August 9, 2016
                           60 Centre Street
                           New York, NY 10007
12 B e f o r e :
13     HON. IRA GAMMERMAN, Judicial Hearing Officer.
14 A p p e a r a n c e s :
15     KASOWITZ, BENSON, TORRES, & FRIEDMAN, LLP
          Attorneys for Plaintiff
16           1633 Broadway
             New York, New York  10019
17     BY:   ERIC D. HERSCHMANN, ESQ., and
             MICHAEL PAUL BOWEN, ESQ.
18
       KELLEY, DRYE & WARREN, LLP
19        Attorneys for Defendants SAGI GENGER and
          TPR INVESTMENT ASSOCIATES
20           101 Park Avenue
             New York, New York  10178
21     BY:   JOHN G. DELLAPORTAS, ESQ.
22     PEDOWITZ & MEISTER, LLP
          Attorneys for Defendant DALIA GENGER
23           570 Lexington Avenue, 18th Floor
             New York, New York  10022
24     BY:   ROBERT A. MEISTER, ESQ.
25                              Reported By:
                                John Phelps, and
26                              William L. Kutsch
```

## Page 806

```
1                      Proceedings
2       THE COURT: Good morning.
3       Do we have Mr. Wachtel here?
4       MR. HERSCHMANN: Your Honor, if I could address
5  actually a couple of quick things first?
6       We had issued a trial subpoena to Dalia Genger.
7  Mr. Meister --
8       THE COURT: I thought we arranged to have her here.
9       MR. HERSCHMANN: I'm waiting for documents. Mr.
10 Meister has provided us with some documents but that's not
11 what we called for in the subpoena. We asked that he
12 provide the rest of the documents to us.
13      THE COURT: What other documents are we talking
14 about?
15      MR. MEISTER: Your Honor, the other documents they
16 have subpoenaed, which Dalia Genger has, are two personal
17 tax returns from 2013.
18      THE COURT: What years?
19      MR. MEISTER: 2012 and '13.
20      THE COURT: Why is that relevant?
21      MR. MEISTER: We obviously object.
22      THE COURT: I'm going to find out.
23      MR. HERSCHMANN: Your Honor, first of all, the
24 subpoena calls for documents.
25      THE COURT: Let's talk about the tax returns.
26      MR. HERSCHMANN: The tax returns are directly
```

## Page 807

```
1                      Proceedings
2  relevant because what your Honor heard yesterday, the
3  position that TPR takes is that Dalia Genger made loans to
4  TPR and, therefore, monies that came out of the entity were
5  just repayments of loans. So if that was correct, the tax
6  returns would have to reflect that there were loans due and
7  payments on those notes. If the tax returns don't reflect
8  those facts, then that would resolve that issue.
9       If Mr. Meister wants to stipulate --
10      THE COURT: How is that issue relevant? Tell me
11 why that issue is relevant to anything I have to decide.
12      MR. HERSCHMANN: Because the issue is this, your
13 Honor: The issue of damages relates to what was the value
14 of the TPR shares that were taken.
15      THE COURT: Yes.
16      MR. HERSCHMANN: On the tax returns of TPR, it
17 reflects that there is $14.5 million worth of value outside
18 of TRI. The defendants have now produced documents that
19 say: "Wait a minute, monies that were going to Dalia
20 Genger, including to the Double-Gen Trust in the Cook
21 Islands, are part of some legitimate transaction." We're
22 entitled to know, since they claim the value of TPR has
23 shrunken, and the money went to these two individuals
24 amongst others, is it part of a legitimate transaction or
25 not. If they have a document -- and our position is very
26 simple. They have created, as Judge Scheindlin found and
```

## Page 808

```
1                      Proceedings
2  Judge Jaffe found wholesale fraudulent and fake documents --
3       MR. DELLAPORTAS: That's not true.
4       MR. HERSCHMANN: I'll pull up the decision so you
5  can look at the rulings about Sagi Genger and Mr. Parnes.
6       But in light of those determinations they can't
7  hide behind: "Oh, money that went on paper between Dalia
8  Genger and Sagi Genger, and TPR, and Double-Gen, and the
9  Cook Islands, and Lichtenstein, and everywhere, is
10 legitimate," if it turns out that their tax returns don't
11 reflect that. If she made a legitimate loan to TPR, it
12 would have to be reflected. It would have to have an
13 interest payment. If he wants to stipulate --
14      THE COURT: Not necessarily. It could be an
15 interest-free loan.
16      MR. HERSCHMANN: It's not an interest-free loan
17 according to the documents, and it's a security interest.
18 It would have to be at least itemized on the returns. The
19 notes say it has an interest bearing on it. They claim that
20 she needed liquidity. We have an affidavit from a few days
21 ago which says: "I sold the shares back to get liquidity
22 not illiquidity. It's the opposite, to get liquidity." If
23 that is true, versus she is helping her son hide assets,
24 then we are entitled to see the returns.
25      THE COURT: I'm not sure how that in any way
26 reflects on the value of the shares.
```

1920361810-jlg Doc 205-12   Filed 09/25/19   Entered 09/25/19 23:33:41   Exhibit 12
Orly Genger v.                D. Genger Fiduciary Action Transcript excerpt (8/9/16)   Pg 3 of 7
Dalia Genger, et al                          Pg 3 of 7                    August 9, 2016

---

**Page 857**

D. Genger - by Plaintiff - Direct/Herschmann

1  lawyers?
2  A   Are you making a statement?
3  Q   I'm asking if you did it.
4      THE COURT: Don't interrupt the answer.
5      What's the answer?
6  A   I didn't give any direction to TPR to pay for whatever
7  you're saying that I did.  I didn't do that.
8  Q   Would it be appropriate under any circumstance that you
9  can think of where TPR should be paying for your matrimonial
10 attorneys?
11     MR. DELLAPORTAS: Objection.
12     THE COURT: Sustained.  Sustained.
13 Q   Well, Miss Genger, do you think you could take the
14 money out of TPR even though your daughter is a shareholder, no
15 matter what?
16     MR. DELLAPORTAS: Objection.
17     THE COURT: Sustained.
18 Q   Miss Genger, if money was paid out of TPR, who would
19 have signed the authority to transfer the money out; you or your
20 son, Sagi Genger?
21     MR. DELLAPORTAS: Objection.
22     THE COURT: Overruled.
23     I assume the son would sign it.
24     Let's move on.
25     We don't need the witness's testimony for that.  He

**Page 858**

D. Genger - by Plaintiff - Direct/Herschmann

1  was the president.
2      Let's move on.
3      MR. HERSCHMANN: She was the vice president.
4      THE COURT: He was the chief officer.
5  Q   Mrs. Genger, you never signed any checks or authorized
6  any wires from TPR to your matrimonial attorneys; right?
7  A   I assume not, but I don't think so.
8      THE COURT: That's the answer.  "I assume not."
9  Q   Did you ever tell your son that he should take money
10 that belonged to TPR and use it for your personal expenses?
11 A   Of course I didn't do that.
12 Q   Now, why do you have bank accounts in Lichtenstein?
13     MR. MEISTER: Objection.
14     THE COURT: I'll allow it.
15 A   Why?
16     THE COURT: Didn't we cover that before?
17     MR. HERSCHMANN: This is new testimony.  Not when
18 she was on the stand.  This came afterwards.
19     THE COURT: Go ahead.
20 A   Well, first of all, I didn't know that I have a bank
21 account in Lichtenstein.  I didn't know.
22 Q   When did you first find out?
23     MR. MEISTER: Objection.
24     THE COURT: Overruled.
25 A   Now.

**Page 859**

D. Genger - by Plaintiff - Direct/Herschmann

1  Q   Okay.  Well, did you discuss with your son how you
2  ended up with a bank account in Lichtenstein?
3  A   I just said I didn't know, so how could I have
4  discussed it with him, the account in Lichtenstein?
5  Q   Have you heard of something called Double-Gen?
6  A   Yes.  Actually now that you raised this, I was not
7  aware of that even though I did find a document that I signed.
8  Now I know what it is.  It's a trust Double-Gen for Genger
9  trust.  It's a trust.
10 Q   When and how did you find out that you had this
11 document?
12 A   You raised this name.  I didn't know what it was.  So I
13 asked my son what is it.
14 Q   Did he give you a document about it?
15 A   He told me what it is; okay?
16 Q   Go ahead.  I'm sorry.
17 A   It's a trust that Sagi established for himself and
18 Elana, his wife.  I don't remember what year it was.
19     Then when I received -- I received $3 million for
20 prepayment of the note from Sagi, I wanted to put the money in a
21 trust.  Since the Double-Gen Trust existed already, this is
22 where the money was deposited.  So at a certain time it was Sagi
23 and Elana's money, which I don't know how much was there, and my
24 money.
25 Q   Miss Genger, the document, is that one of those

**Page 860**

D. Genger - by Plaintiff - Direct/Herschmann

1  documents in which your son signed your name because he had the
2  authority to do so?
3  A   I don't know what document.
4  Q   You just mentioned you just saw --
5  A   No.
6  Q   -- a Double-Gen document.
7  A   There was one document that I signed concerning this
8  trust, that I'm depositing the money.
9  Q   Where is that document?
10 A   I don't have it in my pocket here.
11 Q   It's not a document you have ever produced anywhere;
12 right?  Is that one of the documents you gave Mr. Meister?  Can
13 you answer that question?
14 A   Ask my lawyer.  I do not produce everything.  I have
15 nothing to do with the production of documents.  I don't produce
16 documents.  The lawyers produce it.  They make it, they produce
17 it, they give it to whoever needs it.  Don't ask me about these
18 kind of things.
19 Q   You just signed and filed an affidavit in court last
20 week before Judge Jaffe.  Did you read it really carefully?
21 A   I read the document.
22 Q   Did you understand all the words that were in it?
23 A   I assume that I did.
24 Q   What does "adroit" mean?
25 A   I'm sorry?

Orly Genger v.
Dalia Genger, et al

August 9, 2016

---

**Page 861**

D. Genger - by Plaintiff - Direct/Herschmann

1
2  Q   What does "adroit", A-D-R-O-I-T, mean?
3        MR. DELLAPORTAS: Objection, your Honor.
4        THE COURT: Overruled.
5  A   Read me the sentence.
6        THE COURT: Do you know what the definition is of
7  that word?
8        THE WITNESS: The definition, I do not, no.
9  Q   So if someone put it in your affidavit, they never even
10 explained to you what the word meant; right?
11       MR. DELLAPORTAS: Objection, your Honor.
12       THE COURT: Please. Sustained.
13 A   English is not --
14       THE COURT: Please. Let's move on.
15 Q   Miss Genger, what $3 million note are you talking about
16 that your son said just prepaid?
17       MR. DELLAPORTAS: Objection. Misstates --
18       MR. MEISTER: Objection.
19 A   I didn't say $3 million note.
20       THE COURT: Just a moment.
21       MR. HERSCHMANN: I'm sorry. Let me withdraw it and
22 see if I can clarify it.
23 Q   Are you telling us that --
24       THE COURT: The question is withdrawn. The
25 question to which there was an objection is withdrawn?
26       MR. HERSCHMANN: Correct, your Honor.

---

**Page 862**

D. Genger - by Plaintiff - Direct/Herschmann

1
2  Q   Are you telling us that your son, Sagi Genger, prepaid
3  $3 million related to your sale of the TPR shares, and he
4  deposited that money in Lichtenstein; is that right?
5  A   I don't know where he deposited it. I know that he
6  deposited it in the trust. Where the trust is, actually I
7  recall that, because -- I didn't know anything about this trust.
8  I just knew I have money in a trust. I didn't know where it
9  was. Actually, when I talk to Sagi yesterday about the trust, I
10 think he said that he didn't remember that actually it wasn't in
11 Lichtenstein. I don't want to get involved in this, but I think
12 it was in -- again, in the Cook Islands or Cooks [sic] Island.
13 Q   I didn't hear what you said.
14 A   I think he made a misstatement. It was not a
15 Lichtenstein -- I don't know. I know it was in the trust.
16 Where the trust was --
17       THE COURT: One at a time. Please.
18 A   I don't know where the trust is.
19 Q   Mrs. Genger, is $3 million a lot of money to you?
20 A   Yes. Of course.
21 Q   I want you to focus on this. When did your son
22 supposedly pay you this $3 million?
23 A   When he got --
24       THE COURT: What year?
25 A   When he got money from the Trumps.
26       THE COURT: What year?

---

**Page 863**

D. Genger - by Plaintiff - Direct/Herschmann

1
2        THE WITNESS: I don't know when. It was 2008 or
3  '7, something like that.
4  Q   So in 2008, whenever he got the original money from the
5  Trumps?
6  A   So he had money. He said: "Let me prepay the $5
7  million note that I owe you."
8  Q   And so we're clear, it's your story that the transfer
9  of the note that was contemplated was based on that August 1,
10 2008 document that you signed?
11       MR. DELLAPORTAS: Objection.
12 A   I don't understand the question.
13 Q   We'll pull out Defendant's D for a minute and we will
14 cover it. But, did you ever have money maintained by someone
15 named David Parnes on your behalf?
16 A   You're asking me something. I don't know the answer to
17 that. Let me tell you in general.
18       THE COURT: That's the answer. She has answered
19 the question.
20 A   I don't handle any financing. My son is in charge. I
21 put him in charge of my business affairs, my money, and I am not
22 intervening in anything that's he's doing because I trust him. He
23 invest for me. That's all.
24 Q   You don't know where he put your money or with whom;
25 right?
26 A   In general, I don't. I mean, just yesterday I

---

**Page 864**

D. Genger - by Plaintiff - Direct/Herschmann

1
2  understood that there is this Double-Gen Trust. And when I even
3  remember there was a document like that that I did sign because
4  I saw there was a document that I signed.
5  Q   Have you ever been to Australia?
6  A   No.
7  Q   Do you have any idea why there would be a bank account
8  associated with the trust that you have in Australia?
9  A   I have no idea.
10       THE COURT: That's the answer.
11 A   I just told you, I have no knowledge of financing or
12 where the money is going or coming. I know that I need money
13 for living, and I'm getting it every month. That's all. More
14 than that, I don't know. And if you have question, ask Sagi
15 because he knows better than I do.
16 Q   Miss Genger, I'm going to hand you what is in evidence
17 as Defendant's D.
18 A   Okay.
19 Q   So we're clear, when you signed Defendant's D, did you
20 carefully review it?
21 A   This is when I restructured -- I think this is when we
22 restructured the sale of my TPR shares to TPR, reassigned it to
23 Sagi. Sagi instead of TPR. Sagi.
24 Q   You understand that your son has sworn under oath that
25 this document is so confusing, he would need lawyers to
26 deconstruct it to understand it. Has he ever told you that?

---

19-23850-jlg Doc 205-12 Filed 06/25/19 Entered 06/25/19 23:33:41 Exhibit 12
D. Genger Fiduciary Action Transcript excerpt (8/9/16) Pg 5 of 7
Orly Genger v.
Dalia Genger, et al
August 9, 2016

**Page 869**

```
 1        D. Genger - by Plaintiff - Direct/Herschmann
 2            MR. MEISTER: Objection.
 3            THE COURT: Overruled.
 4   A   I don't know.
 5   Q   Well, what would be the reason --
 6            THE COURT: The answer is "I don't know."
 7   Q   What would be the reason that David Parnes would be
 8   transferring to you a total of $861,535?
 9            MR. MEISTER: Objection.
10            THE COURT: Overruled.
11            Assume that occurred, do you know why?
12   A   I was very happy to receive any money from anyone, so
13   why should I ask why?
14            THE COURT: Do you know why Mr. Parnes sent you
15   that money?
16            THE WITNESS: I don't know.
17            THE COURT: "I don't know" is the answer.
18   Q   How much money are you aware of that Double-Gen ever
19   sent you?
20   A   I'm not aware of any money sending from Double-Gen to
21   me. I'm not aware if it came from Double-Gen or from David
22   Parnes or from Sagi Genger or from TPR. I don't know. I don't
23   know anything.
24            THE COURT: That's the answer.
25   Q   So, you personally never transferred any money to
26   Double-Gen; right?
```

**Page 870**

```
 1        D. Genger - by Plaintiff - Direct/Herschmann
 2   A   I don't remember.
 3   Q   Mrs. Genger --
 4   A   I don't remember how it was done. I don't remember
 5   technically how it was done.
 6   Q   Mrs. Genger, you just told us a few minutes ago you
 7   just heard of Double-Gen now; right? Correct?
 8   A   Yes. The name. Yes.
 9   Q   Did you arrange to transfer any of your own money from
10   the United States to Double-Gen? It's a yes or no.
11   A   Any financial arrangements are made by my son. That's
12   the answer. I told you in the beginning all questions that
13   pertain to financial actions, you should ask my son, don't ask
14   me because I don't know anything about it.
15   Q   If your son said to you, "I need you to sign documents
16   related to movements of money or loans," you signed them; right?
17            MR. MEISTER: Objection.
18            THE COURT: Overruled.
19   A   What is the question?
20   Q   If your son asked you to sign documents regarding
21   movements of money or loans, you signed them; right?
22   A   If he asked me, I usually trust that it's the right
23   thing to do.
24   Q   Can I ask you a question? How did you get money out of
25   either a trust that David Parnes had as an escrow agent or
26   Double-Gen? How would you actually get money?
```

**Page 871**

```
 1        D. Genger - by Plaintiff - Direct/Herschmann
 2            MR. MEISTER: Objection.
 3   A   To my account, I guess it was wired.
 4            THE COURT: The objection is overruled.
 5            Go ahead.
 6   A   Either it was wired to me, but I don't know from whom,
 7   but obviously otherwise I wouldn't be able to sustain myself
 8   financially.
 9   Q   I'm just trying to understand, how did you get money?
10            THE COURT: She said it was wired.
11            MR. HERSCHMANN: I understand that.
12   Q   Did you say to Sagi: "Sagi, I need money"?
13   A   Yes.
14   Q   And then the money showed up in your account; right?
15   A   Yes.
16   Q   And you don't know if that was your personal money or
17   some other person that Sagi had put somewhere. As long as you
18   got the money, you were happy; right?
19            MR. MEISTER: Objection.
20            THE COURT: Sustained.
21   Q   Miss Genger, do you know what the source of the money
22   was that was coming to you?
23   A   No.
24   Q   Since 1993, has any money been paid from the Orly
25   Genger trust to Orly Genger?
26   A   Not that I know of. Not that I know of. That's an
```

**Page 872**

```
 1        D. Genger - by Plaintiff - Direct/Herschmann
 2   answer.
 3   Q   When you made any type of transaction between yourself
 4   and Sagi Genger, or Sagi Genger on behalf of TPR, did you ever
 5   negotiate those terms or did you just trust Sagi?
 6   A   I trust Sagi.
 7   Q   Did Sagi ever tell you why right after he signed the
 8   deal with the Trumps he sent the money out of the country?
 9   A   Can you repeat the question?
10            THE COURT: Did he ever -- he received in August of
11   2008 -- wait for the question -- he received $26.7 million.
12            THE WITNESS: Yes.
13            THE COURT: That money was immediately sent out of
14   the country. Did he tell you why he did that?
15            THE WITNESS: I didn't know that he immediately
16   sent it out.
17            THE COURT: Let's assume he did. Did he tell you
18   why he did that?
19            THE WITNESS: No.
20            THE COURT: Next question.
21   Q   Did your son ever tell you that he's keeping money
22   outside of the United States so Orly won't be able to collect on
23   any judgments?
24   A   For sure he didn't tell me that because --
25            THE COURT: Did he ever say that to you?
26            THE WITNESS: No.
```

19-23863-jlg Doc 205-18 Filed 06/25/19 Entered 06/25/19 23:33:41 Exhibit 18
D. Genger Fiduciary Action Transcript excerpt (8/9/16) Pg 6 of 7

Orly Genger v.
Dalia Genger, et al

August 9, 2016

## Page 877

D. Genger - by Plaintiff - Direct/Herschmann

1  
2  A  I think it's a good idea to put it there. You
3  basically defer tax payments.
4  Q  And you said it was only $44,000; right?
5  A  I think that was the amount.
6  Q  Well, it wasn't $500,000; right?
7  A  Right. I think that is what it was. That's as far as
8  I remember. I gave the document, and that's what I saw.
9  Q  And when did you decide to set up this IRA?
10    MR. MEISTER: Objection.
11  A  I don't know. What kind of question, when? I don't
12  remember. It was years ago.
13  Q  Well, at the time of your divorce in 2004? Because you
14  just told us --
15  A  Yes. After I got divorced, I put some -- I don't
16  remember what it was, but I put some money in IRA. I mean, what
17  is the problem?
18    (Continued on next page.)
19  
20  
21  
22  
23  
24  
25  
26  

## Page 878

Ms. D. Genger - Direct/Mr. Herschmann

1  
2  DIRECT EXAMINATION
3  BY MR. HERSCHMANN: (Continued)
4  Q  Ms. Genger, do you remember the name of the IRA entity,
5  in which you supposedly put this $44,000?
6    MR. MEISTER: Objection.
7    THE COURT: Overruled.
8  A  The name of the IRA? At the moment, I don't remember.
9  You have the documents so why are you asking me?
10    MR. HERSCHMANN: Ms. Genger, because I'm allowed to
11  probe your memory before I show you documents.
12  A  I said I don't remember. You have the answer over
13  there so why are you asking me?
14  Q  So Ms. Genger, whatever is in the documents your lawyer
15  just provided to us, you believe to be accurate, right?
16  A  That's what I got from the IRA, so that's what I'm
17  giving you. You think the IRA is cheating me or cheating you?
18  Q  I'm trying to figure out how does someone who is
19  unemployed ends up with an IRA, that's all I'm asking you?
20    MR. MEISTER: Objection.
21    MR. DELLAPORTAS: Asked and answered.
22    THE COURT: Overruled.
23  A  What do you mean? Anyone can get an IRA because I have
24  assets I was not working, I got assets from the divorce. So
25  what this has to do with employment.
26  Q  So Mrs. Genger, I just want to understand you said you

## Page 879

Ms. D. Genger - Direct/Mr. Herschmann

1  
2  got assets from the divorce and you put money into an IRA?
3  A  Yes.
4  Q  Do you recall who suggested that you put money into the
5  IRA?
6    MR. MEISTER: Objection.
7    MR. DELLAPORTAS: Asked and answered.
8  A  I don't remember when you asked me, I cannot remember.
9  Q  Let me show you what's been marked as Exhibit 16?
10  A  Okay.
11  Q  Why don't you take a look. Can you just read for us
12  into the record, please, the date at the top and the total
13  dollar amount that's shown?
14  A  Okay. The date is December 9, 2008. Okay. We have
15  sent funds in the amount of $700,321 and some cents to Bristol
16  Ivory, LLC Citibank and --
17    MR. HERSCHMANN: B-R-I-S-T-O-L Ivory, LLC.
18  A  Bristol Ivory, LLC Citibank and 111 Wall Street New
19  York, for purchase of Bristol Ivory, LLC.
20  Q  Thank you. Can I have that back, please?
21  A  Yes.
22  Q  Now, what is Bristol Ivory, LLC?
23  A  It's LLC.
24  Q  I know it's an LLC. What is the entity, did you form
25  it?
26  A  I'm getting back to what I told you before.

## Page 880

Ms. D. Genger - Direct/Mr. Herschmann

1  
2  Q  If you answer the questions we can get through this.
3  A  I told you all the questions that have to do with
4  financing. You have to ask Sagi because really, he managed my
5  assets, okay, and I don't have knowledge of memories about
6  whatever, wherever my asset were first or invested. So if you
7  want to know, ask Sagi. I don't know.
8  Q  Does Sagi Genger have control over all of your money?
9  A  He doesn't have control. He's managing my money.
10  Q  When you want money, all you do is say to Sagi --
11  A  Yes, exactly. We established this already.
12  Q  I have to finish, if you don't mind. When you want
13  money, no matter how much it is, do you call up Sagi and say
14  give me how much money, right?
15  A  I called him and if he can provide me with whatever I'm
16  asking, he's giving me the money.
17  Q  Now have you asked Sagi to provide you with more than a
18  million dollars between February of 2013, through February
19  of 2015?
20    MR. MEISTER: Objection.
21    THE COURT: Overruled.
22  A  I don't remember that. I asked for a million dollars.
23  I don't remember this.
24  Q  Ms. Genger --
25  A  I don't remember. What can I tell you?
26  Q  I'm just trying to probe. Does your son, did he manage

19-23309-jlg Doc 205-18 Filed 06/25/19 Entered 06/25/19 23:33:41 Exhibit 18
Pg 7 of 7

Orly Genger v.
Dalia Genger, et al

D. Genger Fiduciary Action Transcript excerpt (8/9/16)   Pg 7 of 7

August 9, 2016

**Page 901**

1    D. Genger - by Plaintiff - Direct/Herschmann
2  T5    (Continued from preceding page.)
3    Q   Mrs. Genger, did you receive -- I'm sorry.  Withdrawn.
4    Do you have an account in Nevis?
5    A   You have to ask Sagi if I have an account there because
6  I told you already that I don't manage my money, that Sagi does.
7  If you have any questions of this kind, you better ask my son.
8    Q   Mrs. Genger, have you heard of Bat Paroh?  Have you
9  ever heard of that?
10    A   I remember that there was money sent because it was
11  unusual name.  That's why I remember.
12    Q   What does Bat Paroh mean?
13    A   What do you mean?
14    Q   Is Bat Paroh the Hebrew language?
15    A   What it has to do --
16    Q   Mrs. Genger --
17    THE COURT: No, no.  Mrs. Genger --
18    A   You want me to translate from Hebrew to English?
19    THE COURT: Yes.
20    A   Bat Paroh in English means the daughter of pharaoh, or
21  Pharaoh's daughter, so it's fun.  Whether you want to call like
22  AG-1, AG-2, AG Real Estate 2, AG Real Estate 4, it's more fun to
23  have some livelihood in the name.
24    THE COURT: If I may, what is the translation?
25    THE WITNESS: Pharaoh's daughter.
26    THE COURT: Pharaoh's daughter.

**Page 902**

1    D. Genger - by Plaintiff - Direct/Herschmann
2    Next question.
3    Q   Now, what would be the reason that you would be
4  receiving $200,000 from a Bat Paroh LLC, a Nevis limited
5  liability company?
6    A   All this is repeated, you are repeating the same kind
7  of questions, and I told you already, if you ask me another
8  question like that, it will be the same answer.  I have no idea.
9  I don't know.  Please refer these questions to my son; okay?  I
10  do not know.  That's the answer.
11    Q   Is Bat Paroh related in any way to your son, Sagi
12  Genger?
13    A   I do not know.
14    Q   Well, are you telling us you got $200,000 transferred
15  to you, and you don't think it relates to Sagi Genger?
16    THE COURT: Sustained.  It's argumentative.
17    Q   Mrs. Genger, you said Bat Paroh is a creative name.
18  Who picked the name?
19    A   Whoever opened this account or this company or LLC,
20  whatever it is.  I don't know what it really is.  But I think
21  it's a very creative name.
22    Q   Did you ever discuss the name with either your son,
23  Sagi Genger, or Elana Genger?
24    A   No.
25    Q   When you got $200,000 wired into your account from Bat
26  Paroh, you didn't question anybody as to where the money came

**Page 903**

1    D. Genger - by Plaintiff - Direct/Herschmann
2  from?
3    THE COURT: Sustained.
4    Q   Miss Genger --
5    A   You keep asking me these type of question.  It's a
6  waste of time.
7    THE COURT: There is no question pending.
8    Q   Mrs. Genger, were you lending money to your children at
9  some point, to Sagi or Elana Genger?
10    A   I don't remember.
11    Q   By the way, have you read any of your daughter's
12  deposition testimony?
13    A   I don't remember.
14    Q   Well, do you remember ever reading any of her pleadings
15  that she put into the various litigations?
16    A   Concerning what?  I know in general, but she was --
17  let's put it this way; okay?  So it will be more simple; okay?
18    As you know, when we started, we started the trust and
19  all the litigation, we had a young girl that was supported by
20  her father; okay?  And basically, as you probably noticed, she
21  did not have much understanding of legal matters, of financial
22  matters, and her father was helping her out to make decisions;
23  okay?
24    So -- and when you said like we had before example that
25  your Honor corrected my lawyer, or Sagi's lawyer, that Orly
26  said, and you said no, it's "a lawyer said"; okay?  So sometimes

**Page 904**

1    D. Genger - by Plaintiff - Direct/Herschmann
2  things are being written where, by the name of the client, that
3  are not exactly what the client is thinking or is the result of
4  whatever is written there.  It's not familiar.
5    What I'm saying is basically lawyers are doing the job,
6  and her father was the decision-maker.  She trusted him like I
7  trust my son.  And that's the story.  That's what we're talking
8  about, about two people who are not familiar with all the law,
9  our language, and my son helps me financially to make decisions,
10  and her father, my ex-husband, is helping Orly to make
11  decisions, and maybe not now because now obviously she is a
12  fiancee, and you are helping her.  So this is the real world
13  where we are living.
14    Q   Mrs. Genger, when was the last time you sat down and
15  had a conversation with your ex-husband?
16    A   Well, exactly, it was actually when we said, I don't
17  know if you can call it conversation, but we said --
18    THE COURT: No.  When did you last speak to him?
19    THE WITNESS: When we met with Judge Cooper.  I
20  don't remember how many months ago it was.
21    Q   Other than a settlement court-mandated meeting, when
22  was the last time you sat down -- I didn't finish.  Let me
23  finish.
24    A   You asked me when was the last time I spoke with him.
25    Q   Okay.  When was the last time you spoke with him?
26    A   I'm telling you, yeah.  We don't have conversations.