**EXHIBIT 25**

20-01010-jlg Doc 13-25 Filed 06/25/20 Entered 06/25/20 23:33:41 Exhibit 25
Pg 2 of 7

Case 1:19-cv-06642-LGS-DCF Document 54-10 Filed 11/13/19 Page 2 of 7

Orly Genger v.
Dalia Genger, et al

August 4, 2016

## Page 442

```
 1
 2  SUPREME COURT OF THE STATE OF NEW YORK.
    COUNTY OF NEW YORK : CIVIL TERM : PART 12
 3  ------------------------------------------x
    ORLY GENGER, in her individual capacity and
 4  on behalf of the Orly Genger 1993 Trust (both
    in its individual capacity and on behalf of
 5  D&K Limited Partnership),
 6                                  Plaintiff,
                                    Index No.
 7        -against-                 109749/09
 8  DALIA GENGER, SAGI GENGER, D&K GP LLC, and
    TPR INVESTMENT ASSOCIATES, INC.,
 9
                                    Defendants.
10  ------------------------------------------x
                                    August 4, 2016
11                                  60 Centre Street
                                    New York, NY  10007
12  B e f o r e :
13       HON. IRA GAMMERMAN, Judicial Hearing Officer.
14  A p p e a r a n c e s :
15       KASOWITZ, BENSON, TORRES, & FRIEDMAN, LLP
         Attorneys for Plaintiff
16            1633 Broadway
              New York, New York  10019
17       BY:  ERIC D. HERSCHMANN, ESQ., and
              MICHAEL PAUL BOWEN, ESQ.
18
         KELLEY, DRYE & WARREN, LLP
19       Attorneys for Defendants SAGI GENGER and
         TPR INVESTMENT ASSOCIATES
20            101 Park Avenue
              New York, New York  10178
21       BY:  JOHN G. DELLAPORTAS, ESQ.
22                MINUTES OF NONJURY TRIAL
23                                Reported By:
                                  John Phelps, and
24                                William L. Kutsch
                                  Senior Court Reporters
25
26
```

## Page 443

1                Proceedings

2     THE COURT: Good morning, all. Let's go.

3 Where is Mr. Genger?

4     MR. DELLAPORTAS: He's here, your Honor.

5     MR. BOWEN: Your Honor, I just want to note one

6 thing for the record.

7     THE COURT: Note anything you want.

8     MR. BOWEN: Thank you, Judge.

9     We had a trial subpoena to TPR, and there was some

10 discussion about it yesterday about producing electronic

11 records in an electronic format. We received a production

12 last night from Mr. Dellaportas of about binder-full of

13 documents. We noticed that it's in complete. We had

14 discussions with Mr. Dellaportas about it, and he told us

15 he's still looking for additional electronic documents. I

16 want to note that it's not complete. We need these

17 documents for this witness.

18     We also expecting electronic documents from places

19 like Cook Islands, Lichtenstein, and these other offshore

20 jurisdictions that they would have access to, that haven't

21 been produced yet.

22     MR. DELLAPORTAS: Your Honor, we have complied

23 extraordinarily with the trial subpoena. We produced over

24 50 boxes of documents. They then asked for yesterday, and

25 we agreed with, to the extent any of those are available in

26 electronic form, we would search and find them.

## Page 444

1                Proceedings

2     Last night we contacted the accountant and gave the

3 last 15 years of tax records in electronic form, along with

4 general ledgers and other financial balance sheets. We

5 thought since this was a damages trial, it was most

6 important to first get the financial records to them, in

7 particular because electronically searching for numbers is

8 always easier in electronic documents.

9     To the extent there are other documents that we

10 have in electronic form that we have previously produced in

11 paper form, or even that we didn't, we are still searching.

12 If there is anything else, we'll provide them.

13     MR. BOWEN: We also know that David Parnes, there

14 was some discussion about this yesterday, he was the records

15 custodian for TPR. He's based in Israel and he maintains

16 these records on his computer. We are expecting those in

17 electronic form, as well, and they were not produced.

18     THE COURT: Those could be transmitted

19 electronically to New York from Israel. There is no reason

20 we couldn't get those.

21     MR. DELLAPORTAS: Your Honor, about a decade ago

22 Mr. Parnes was the record custodian. That's what the

23 testimony was. In connection with this litigation, he was

24 the physical record custodian. The records were sent back

25 to the United States because we kept getting discovery

26 requests.

## Page 445

1     S. Genger - by Plaintiff - Direct/Herschmann

2     THE COURT: If Mr. Parnes -- who I assume now he's

3 living in Israel?

4     MR. DELLAPORTAS: Correct.

5     THE COURT: If he has electronically stored

6 information or records, he can transmit those, and since I

7 assume you can contact him, have him do that.

8     MR. DELLAPORTAS: Agreed, your Honor.

9     MR. BOWEN: Thank you, Judge.

10     MR. HERSCHMANN: May I inquire?

11     THE COURT: Yes. This is continued, I guess direct

12 examination, except it's really cross-examination.

13     Let's move on.

14     (At this time the witness, Sagi Genger, previously

15 affirmed, resumed the witness stand.)

16 DIRECT EXAMINATION

17 BY MR. HERSCHMANN (continuing):

18 Q  Mr. Sagi Genger, I want to follow up where we ended

19 yesterday, and we had e-mailed your counsel last night, first of

20 all, to ask you to check records so you can recall the names of

21 the various trusts that you have.

22     Have you had a chance to look? Do you recall the name

23 of the 2013 or 2014 trust names?

24 A  No. Just that denoted by year.

25 Q  How about Double-Gen Trust; is that it?

26 A  No.

Case 1:19-cv-09642-LGS-DCF Document 54-10 Filed 11/13/19 Page 3 of 7
20-01010-jlg Doc 13-25 Filed 06/25/20 Entered 06/25/20 23:33:41 Exhibit 25
Pg 3 of 7
Orly Genger v.
Dalia Genger, et al
August 4, 2016

Page 494

Mr. S. Genger - Direct/Mr. Herschmann

2 Q And do you think when those shares were transferred
3 from TPR down to your trust and your sister's trust, there was
4 an intention to try to benefit you?
5 A Yes.
6 Q Do you think there was likewise an intention to try to
7 benefit your sister?
8 A Yes.
9 Q You don't think ever there was an intention when you
10 executed that document solely to benefit you and the expense of
11 your little sister, do you?
12 A No.
13 Q And there was never an intent when you executed that
14 you should end up with all the money and your sister should end
15 up with nothing, right?
16    MR. DELLAPORTAS: Objection. Lack of foundation.
17    THE COURT: Don't say "objection". The objection
18 is overruled.
19 A No absolutely not.
20    THE COURT: Okay.
21      (Continued on next page)

Page 495

S. Genger - by Plaintiff - Direct/Herschmann

2 T3    (Continued from preceding page.)
3 Q Sir, how much money came in from the Trumps in which
4 you had control around the 2008 time period?
5    Let me withdraw it.
6    $44 million was paid to the Trumps to TPR or to the
7 Sagi Genger trust; correct?
8 A I think you misspoke in your question. Perhaps you
9 would like to rephrase it.
10 Q Was $44 million paid by the Trumps to TPR or the Sagi
11 Genger trust?
12 A Ultimately, correct.
13 Q Out of the $44 million that came, how much money did
14 you actually give your sister?
15 A Zero.
16 Q How much of the $44 million, any of it, went to, let's
17 say, David Parnes?
18 A Whatever fees he collected.
19 Q Well, he got more than just fees; didn't he, sir? He
20 got an interest in businesses that your sister at one time
21 owned; right?
22    MR. DELLAPORTAS: Objection, your Honor.
23 Q It's a yes or no, sir.
24 A It's not --
25    THE COURT: Did he get more than fees? Let's start
26 with that.

Page 496

S. Genger - by Plaintiff - Direct/Herschmann

1    THE WITNESS: Ever in life?
2    THE COURT: Out of that $44 million.
3    THE WITNESS: No.
4 Q Did he get at some point an interest in businesses that
5 your sister got an equal percentage to, that you had also
6 received?
7 A Yes, but nothing related --
8    THE COURT: "Yes" is the answer.
9    Next question.
10 Q Now, I want to take a step back, sir, because you were
11 talking yesterday about the Manhattan Safety, and you were
12 talking about Robin Rodriguez. Let me ask you this. I looked
13 at the record last night. We never closed the loop.
14    Are you getting paid a salary by Cordell?
15 A Yes.
16 Q What is your salary?
17 A It's $600,000 a year.
18 Q Do you have an employment agreement?
19 A Yes.
20 Q And is the $600,000 a year that you are now getting
21 paid based on any parameters associated with investments that
22 are made?
23 A You mean, are there yardsticks that I get paid
24 according to?
25 Q Right.

Page 497

S. Genger - by Plaintiff - Direct/Herschmann

1 A No. It's just a flat salary.
2 Q Do you own any part of Cordell?
3 A No.
4 Q Do you have any investments with Cordell?
5 A I don't want to give a misleading answer. Cordell is a
6 group of companies, and we discussed yesterday syndicated loans
7 that we had invested in, which are associated with that group.
8 I don't know if it's necessarily Cordell or something like that.
9 Q Were you invested in things dealing with Robin
10 Rodriguez and Cordell in August of 2008?
11 A Certainly soon thereafter. I don't know that in
12 August. Certainly soon thereafter. Whether in August, I don't
13 know.
14 Q Okay.
15 A You know, actually -- I don't know. I'm not sure.
16 Q Now, Mr. Genger, in August of 2008, is it accurate that
17 the TRI shares, just your interest, was worth approximately
18 $195 million?
19 A I'm sorry. In what time?
20 Q Is it accurate, sir, that in August of 2008, you
21 believe that your interest, pursuant to the ones attributed to
22 your trust, was worth about $195 million?
23 A It's difficult for me to answer the question because
24 it's a lot --
25    THE COURT: I can't hear you.

20-01010-jlg Doc 13-25 Filed 06/25/20 Entered 06/25/20 23:33:41 Exhibit 25
Pg 4 of 7
Case 1:19-cv-09542-GS-DCF Document 54-10 Filed 11/13/19 Page 4 of 7

| Orly Genger v. Dalia Genger, et al | | August 4, 2016 |
|---|---|---|

Page 498

1    S. Genger - by Plaintiff - Direct/Herschmann
2    A   It's very difficult for me to answer the question
3  because there are -- if you say the shares in a vacuum, by
4  themselves --
5    Q   That's my question, sir.
6        THE COURT: Let him finish.
7    A   There's two things. It's what are they worth in
8  general and what are they worth to me, and they are very, very
9  different because the shares themselves were very valuable.
10 Whether it's 100 or 200, or whatever it is, it is a very large
11 number.
12       THE COURT: Well, something just under
13  $200 million?
14       THE WITNESS: That's the number that the company
15  came up with, and we said: "That's what you said. We will
16  adopt your number." That's where that number came from, not
17  from me. Or maybe it's a number my sister came up with.
18       THE COURT: Go ahead.
19       THE WITNESS: The value though to us was --
20       THE COURT: By "us", you mean you?
21       THE WITNESS: Not me personally, either the trust
22  or to TPR, was potentially zero, to the Milonas number, and
23  that's a big difference between them, because we couldn't
24  achieve a value for those shares that was in excess of that
25  even if the shares were worth a trillion dollars. And
26  that's the whole issue. That is how this problem came

Page 499

1    S. Genger - by Plaintiff - Direct/Herschmann
2  about.
3    Q   Mr. Genger, let me see if I could ask you my question
4  again.
5        Did you ever -- I want to focus on you -- did you ever
6  claim that in the spring of 2008, TRI was valued at around a
7  billion dollars?
8        MR. DELLAPORTAS: Objection.
9    A   Yes, sir.
10   Q   You adopted that value?
11   A   Yes. Defendants valued it. I'm a plaintiff. What the
12 defendants say it's worth, I will say fine.
13   Q   Sir, let me ask you. Let's put you back into
14 August 2008, if we can. In August of 2008, TRI was
15 experiencing, by all accounts, a dramatic turnaround; correct?
16   A   Yes. It's fair.
17   Q   And you were even informed between August 22nd of 2008
18 and August 28th of 2008, that the IBITDA for TRI was about
19 $200 million; right?
20   A   I don't remember if it was 200, but some very large
21 number. It could be 200.
22   Q   Do you remember what multiple Mr. Fishman used in
23 calculating what a potential value is for a commensurate type of
24 company?
25   A   Mr. Fishman?
26   Q   Right.

Page 500

1    S. Genger - by Plaintiff - Direct/Herschmann
2    A   I don't know.
3    Q   You don't remember talking about eight-and-a-half
4  times?
5    A   No. But if he did it, then he did it.
6    Q   Well, you would agree, sir, that a multiple of IBITDA
7  is the primary way to value certain businesses; right?
8    A   Certain businesses under certain circumstances, that
9  would be the best route to achieving the enterprise, not the
10 equity, but the enterprise value of a business.
11   Q   And a separation between enterprise and equity value
12 is, one includes debt and one doesn't; right?
13   A   That's correct.
14   Q   Now, there are some comparable companies that trade at
15 a higher multiple and some that trade at a lower multiple;
16 right?
17   A   Different companies -- you mean, are there companies in
18 the same industry that trade at different multiples?
19   Q   Yes.
20   A   That happens. Sure. It can trade like on the stock
21 exchange, or on -- sure.
22   Q   Do you remember that Mr. Fishman said, for purposes of
23 the analysis, he was going to try to use an
24 eight-and-a-half-times multiple just to give a value of the
25 comparable companies? Do you remember that?
26   A   I actually don't remember anything other than the

Page 501

1    S. Genger - by Plaintiff - Direct/Herschmann
2  Black-Scholes, to tell you the truth.
3    Q   Why don't you look at page four of Mr. Fishman's
4  report.
5    A   Okay.
6        MR. DELLAPORTAS: Your Honor, we will stipulate
7  that the report says what it says. It's not my client's
8  document.
9        MR. HERSCHMANN: It a hundred percent your client's
10 document.
11       MR. DELLAPORTAS: It's not. It is from Mr. Fishman
12 to my client. And it says whatever it says, your Honor.
13       MR. HERSCHMANN: I'm asking him to refresh his
14 recollection.
15   Q   Mr. Genger, do you see on page four where it says:
16 "The selected MVIC/IBITDA multiple of 8.5 times." Do you see
17 that, sir?
18       THE WITNESS: Your Honor --
19       THE COURT: Do you see that?
20       THE WITNESS: I can't answer because I can't -- it
21 is very difficult.
22       One of the problems I have is with my ability to
23 hear, and the thundering voice, if he could speak at a more
24 normal tone, it will be more easy for me to follow him.
25 That's why I keep on asking him to repeat. So if he could
26 just, whatever, to speak like normally; otherwise, I'm going

Case 1:19-cv-06642-GS-DCF   Document 54-10   Filed 11/13/19   Page 5 of 7
20-01010-jlg   Doc 13-25   Filed 06/25/20   Entered 06/25/20 23:33:41   Exhibit 25
Pg 5 of 7
Orly Genger v.
Dalia Genger, et al
August 4, 2016

| Page 534 | Page 536 |
|---|---|
| Mr. S. Genger - Direct/Mr. Herschmann | Mr. S. Genger - Direct/Mr. Herschmann |

**Page 534**

    THE COURT: All right. You don't know if Mr. Parnes was involved in the creation of this document?
    THE WITNESS: Yes. That I don't know.
    THE COURT: Next question.
Q  Who is Robert Brighton, B-R-I-G-H-T-O-N, Junior?
A  Where is that?
Q  He's not on it. I'm asking you a question, sir, separate question. Who is Robert Brighton?
A  I don't know.
    THE COURT: Have you ever heard of that name before?
    THE WITNESS: I may have.
    THE COURT: But you don't recall?
    THE WITNESS: Yeah.
    THE COURT: Next question.
Q  Do you remember his being an attorney in Florida who was involved in Manhattan Safety creation of documents?
    THE COURT: He's trying to refresh your recollection now.
A  If that's the lawyer for the other side, then that's the lawyer for the other side.
Q  The other side being Robin Rodriguez, who you work for now, right?
A  The other side is Manhattan Safety. Robin Rodriguez is someone who arranges things.

**Page 535**

    THE COURT: All right. When you said the other side, what are you referring to?
    THE WITNESS: That's what I would ask him.
    THE COURT: No. Who's the other side?
    THE WITNESS: Exactly. The other side of the transaction would be Manhattan Safety, who is not --
Q  Who is the human being? When you said "the other side", who is the human being that you spoke with about Manhattan Safety?
A  I spoke to Robin.
Q  Robin Rodriguez?
A  Yes.
Q  The same Robin Rodriguez you now work with, right?
A  Yes.
Q  By the way, when you go to work with this job to Robin Rodriguez now, do you actually go to an office?
A  No.
Q  Where do you work for Robin Rodriguez now?
A  Wherever the work is.
Q  I'm sorry --
    THE COURT: Is the work at different locations?
    THE WITNESS: Yeah, because it's not like office-centered work. I have to go to a project here or to go do something. He lives in Mexico.
    THE COURT: The work you're doing is making

**Page 536**

evaluations of businesses.
    THE WITNESS: No.
    THE COURT: What is it?
    THE WITNESS: The principal issues now are to try to monetize the collateral that was seized in 2009, '8, when the crash was.
    THE COURT: Your job is to monetize collateral.
    THE WITNESS: The projects that I happen to be working on today involve monetizing the collateral that we ended up with because those loans busted.
    THE COURT: When you say we what, entity ended up with the collateral?
    THE WITNESS: Excuse me. You're absolutely right, your Honor. Well, each one is a different entity. He essentially had a range for the syndication of loans. Each loan presumably has a different entity because there are different partners in the loans.
    THE COURT: And there's some collateral that Manhattan, is it Manhattan -- what's the name of the company?
    THE WITNESS: No, it has nothing to do with this.
    THE COURT: All right. Who obtained the collateral?
    THE WITNESS: Those various companies who made the loans.

**Page 537**

    THE COURT: Okay. But you've been retained or your company that you've worked for has been retained to monetize monetize that collateral that was obtained by these various companies?
    THE WITNESS: That's the projects I'm working on presently.
    THE COURT: And where do you actually do that work?
    THE WITNESS: Usually to go on-site.
    THE COURT: By where?
    THE WITNESS: In Texas --
    THE COURT: So you went to Texas.
    THE WITNESS: Yes, I go to Texas and do the work.
    THE COURT: What did you do in Texas?
    THE WITNESS: We brought --
    THE COURT: No. You, you, you. What did you do in Texas?
    THE WITNESS: We -- brought potential buyers --
    THE COURT: You went to Texas. Where in Texas did you go?
    THE WITNESS: It's close to Austin.
    THE COURT: This is a town, city, what?
    THE WITNESS: It's called Horseshoe Bay Resort. I think Mr. Herschmann is familiar with it.
    THE COURT: Horseshoe Bay?
    THE WITNESS: Yeah.

20-01010-jlg Doc 13-25 Filed 06/25/20 Entered 06/25/20 23:33:41 Exhibit 25 Pg 6 of 7
Case 1:19-cv-09642-LGS-DCF Document 54-10 Filed 11/13/19 Page 6 of 7
Orly Genger v. Dalia Genger, et al
August 4, 2016

**Page 538**

Mr. S. Genger - Direct/Mr. Herschmann

THE COURT: That's in Texas?
THE WITNESS: Yes.
THE COURT: There's an office there you work out of?
THE WITNESS: No.
THE COURT: Out of a hotel room, where did you work out of?
THE WITNESS: I'm trying to explain, your Honor. In that particular instance, as an example, okay, we were trying to, we have land that we seized around --
THE COURT: That's the collateral. The land is collateral.
THE WITNESS: Yes. We want to either sell the land, rent out pieces of the land, there's a mortgage on the property. So you know, things that are like, you know, office kind of things, I would do from my place. From my own home. Things that are to go out and to deal with people. It's wherever the project might be I would go and deal with.
THE COURT: Who has title in this collateral?
THE WITNESS: It's one of the various -- these are syndicated loans. So each loan -- I don't know, there's a hundred different hedge funds that subscribe to the loans. It's a 50 million, hundred million dollar loan. So there's some entity that's a feeder for that loan.

**Page 539**

Mr. S. Genger - Direct/Mr. Herschmann

THE COURT: Okay. And the title to that collateral is in that entity, I take it.
THE WITNESS: Right.
THE COURT: All right. Let's move on.
Q  I'm sorry, did you tell us in the beginning you moved to Florida because you got this job at Cordell?
A  No, I don't believe I said that.
Q  I'm sorry. Why did you move to Florida?
A  You're going to laugh. The reason I moved to Florida is because of football.
Q  Do you own a football team?
A  No.
Q  Let me make sure I understand that. Are you seeking Homestead exemption in Florida?
A  No, I don't have -- I haven't applied for Homestead.
THE COURT: You moved to Florida because of football?
THE WITNESS: If you'd like me to explain it, I can explain it.
THE COURT: Go ahead.
THE WITNESS: It sounds funny, but it's true. My two eldest sons are particularly my eldest son, okay, had a lot of difficulties in school and a lot of issues. Actually because of my other son and because of him, we moved from New York to Connecticut to deal with

**Page 540**

Mr. S. Genger - Direct/Mr. Herschmann

educational issues.
When he was in Connecticut, they started to play football, okay, and it turned out to be very helpful towards that. The school in Connecticut finishes in eighth grade, all right --
THE COURT: You mean there's a school in Florida --
THE WITNESS: There are only two Jewish schools in the United States that we know of that plays football.
THE COURT: I see. So you had to find a Jewish football school?
THE WITNESS: We didn't have to. There was a large debate.
THE COURT: Okay. All right. Let's move on.
Q  Sir, you --
THE COURT: What's the name of this Jewish football school?
THE WITNESS: It's Shekular(ph) school.
THE COURT: Where in Florida is it located?
THE WITNESS: Basically, it's in Miami-Dade area.
THE COURT: The kids live at home when they go to the school or do they live at the school?
THE WITNESS: They live at home.
Q  Is it a tackle football team?
A  Yes.
Q  So we're clear, I want to make sure I understand this.

**Page 541**

Mr. S. Genger - Direct/Mr. Herschmann

You moved to Florida -- I apologize, your Honor. You moved to Florida after the two decisions for fraud and breach of your fiduciary duty so your oldest son, who is named Eitan, right, could play tackle football in a Jewish day school; is that right?
THE COURT: That's his testimony.
A  It's not the -- the premise isn't right. I'm not sure that's when we moved, but the decision to move to Florida is because of that. You're getting to the issue of the Homestead, which is actually what your interested in.
Q  I thought you said in the beginning if I misunderstood, I apologize, I thought you said you moved to Florida because you got a new job at Cordell?
A  No.
THE COURT: No, he did not.
A  It's different things. In order to work at Cordell, the football thing, I mean, it sounds strange, but the football thing is what prompted I know it's -- it became an important thing to move. Robin had projects in Louisiana, Texas and the Caribbean and basically in order to do that, I had to be somewhere that would be convenient to those projects.
Q  Sir, have you used project -- have you used a private plane since you sold your shares after August of 2008?
A  Yes.
MR. DELLAPORTAS: Objection.

Case 1:19-cv-09642-LGS-DCF   Document 54-10   Filed 11/13/19   Page 7 of 7
20-01010-jlg   Doc 13-25   Filed 06/25/20   Entered 06/25/20 23:33:41   Exhibit 25
Pg 7 of 7

Orly Genger v.
Dalia Genger, et al

August 4, 2016

### Page 542

Mr. S. Genger - Direct/Mr. Herschmann

1        THE COURT: "No" is the answer.
2        MR. HERSCHMANN: He said "yes".
3  Q  You take a lot of trips on private planes, right?
4  We've got the bank records now. You've taken lots of trips on
5  private planes?
6        MR. DELLAPORTAS: Objection.
7        THE COURT: Overruled.
8  A  Yes.
9  Q  You've used planes to go on vacation, right?
10  A  Yes.
11  Q  And you're telling us that in 2016, you had to move
12  down to Florida to be closer to the syndicated loan investments
13  to increase the value by your work, is that it?
14  A  Mr. Herschmann, I cannot afford to go on a private
15  plane every week. I also can't afford, from a time perspective,
16  to take long trips all the time. But having said that, the
17  issue of Florida was my son.
18        THE COURT: All right. That's the answer.
19  A  The issue for Cordell, I had to be in that area. If
20  you want to talk about the Homestead issue is a different issue.
21  We can talk about --
22  Q  Two things. The Homestead issue, if Judge Gammerman
23  makes a recommendation that your sister is entitled to the value
24  of the stock that was stolen, right?
25        MR. DELLAPORTAS: Objection.

### Page 543

Mr. S. Genger - Direct/Mr. Herschmann

1  Q  And Judge Jaffe affirms that decision, will you agree
2  to waive the Homestead exemption in Florida so your sister can
3  collect on the judgment?
4        MR. DELLAPORTAS: Objection. Objection.
5        THE COURT: Overruled.
6  A  I'm not waiving any rights sitting here.
7        THE COURT: That's the answer.
8  Q  Would you please agree, sir, to bring your money back
9  from the Cook Islands in case it's determined --
10       THE COURT: Sustained. I'm going to sustain it.
11  Let's move on.
12  Q  Let me ask you a question. What is EG Debt Limited,
13  sir?
14  A  EG Debt Limited was when, it has to do with the
15  Gusinski matter. In Canada, when we bought the note from -- the
16  Judge has the background.
17  Q  Can I start with what it is, sir? What is it?
18  A  I think right now it's nothing. I don't think it
19  exists.
20  Q  When it was formed, does EG stand for Eitan and Gavriel
21  G-A-V-R-I-E-L, correct, your first -- those are your two oldest
22  children, right?
23  A  Right.
24  Q  When you formed EG Debt Limited -- let me withdraw
25  that. Is it safe to say your children, who are still minors,

### Page 544

Mr. S. Genger - Direct/Mr. Herschmann

1  didn't form EG Debt Limited; is that correct?
2  A  That's correct, yes.
3  Q  Who formed EG Debt Limited?
4  A  I'm not sure. I'm not sure if it's McLaughlin Stern or
5  if it's a Nova Scotia counsel. I don't remember.
6        THE COURT: All right. That's the answer.
7        (Continued on next page)

### Page 545

S. Genger - by Plaintiff - Direct/Herschmann

1  T5  (Continued from preceding page.)
2  Q  Do you have money in Nova Scotia also?
3  A  I personally only have money, except for maybe $2,000,
4  in the United States.
5  Q  To your children or --
6  A  We just had this whole discussion.
7  Guys, we have trusts in --
8        THE COURT: Just a moment.
9  A  We have trusts in the Cook Islands, I have banks in the
10  Cook Islands. Whatever that reflects, whatever you want to say
11  about it, that's where I have money. I don't have foreign bank
12  accounts, I don't have --
13  Oh, the only other thing that we have is -- I'm sorry.
14  Justice Jaffe -- not Justice Jaffe. Excuse me. Anyway, the
15  courts ordered that certain funds be held in abeyance, and those
16  funds are being held in escrow by a lawyer in Canada.
17        THE COURT: Next question.
18  Q  Mr. Genger, you mentioned Nova Scotia. How does Nova
19  Scotia counsel get involved with EG Debt Limited?
20        MR. DELLAPORTAS: Your Honor, this is pretty far
21  afield.
22        THE COURT: I'll allow this, then we're to go back
23  to what is relevant.
24  A  I think it may be a Nova Scotia entity.
25        THE COURT: What is a Nova Scotia entity?