**EXHIBIT 30**

# IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CHAPTER 7** |
| **ORLY GENGER,** | § | |
| | § | **CASE NO. 19-10926-TMD** |
| Debtor. | § | |

## OBJECTION AND RESPONSE OF DALIA GENGER AND D&K GP LLC TO THE TRUSTEE'S APPLICATION UNDER FEDERAL RULE OF BANRUPTCY PROCEDURE 9019 AND LOCAL RULE 9019 TO APPROVE COMPROMISE
### [Dkt No. 52]

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

Dalia Genger ("**Dalia**") and D&K GP LLC, by and through the undersigned counsel of record, hereby files this Objection to the Application Under Federal Rule of Bankruptcy Procedure 9019 and Local Rule 9019 to Approve Compromise (the "**Settlement Motion**") filed by Ron Satija (the "**Trustee**"), the Chapter 7 trustee in the above-captioned bankruptcy case. In support of her objection, Dalia respectfully states as follows:

## I.
## PRELIMINARY STATEMENT

### A.    Summary of the Objections to the Proposed Settlement Motion

1.    This Court is being asked to enter an order resolving a case now pending in the U.S. District Court for the Southern District of New York (SDNY), that seeks the recovery from $32.3 million consisting of (i) $17.3 million in cash which was fraudulently transferred and (ii) $15 million in promissory notes held by Debtor's lawyer for her. This Motion favors four (4) insiders to this Debtor, depriving Dalia and Sagi Genger (the only other significant creditors) of access to the *Res* of the fraudulent transfer. The SDNY case has involved two years of work and supervision of factual and discovery disputes by the District Court, culminating in the District Court's order

requiring the Debtor and these insiders to respond to Sagi's damming list of evidence and law establishing the fraudulent transfers. It was precisely to avoid this impending ruling by the District Court that the Debtor filed this Chapter 7 bankruptcy case. This proposed "settlement" agreed to by the trustee, the Debtor, and her various cohorts (all "Insiders") would give clean title *and a release* to these fraudulently transferred funds to insiders and extinguish Debtor's rights to the $15 million in and promissory notes in favor of her father. It would not even end the litigation that has plagued the family for over a decade. Rather, it would *continue* that litigation, but leave only claims against Dalia and Sagi. Neither facts nor law support such an absurd and outrageous request. This settlement is an attempted "end-run" around the SDNY, which has the requisite knowledge and experience through two cases lost by these same insider fraud-actors. This matter belongs in New York in the case from which this Debtor wrongly seeks a change in venue.

2. This settlement is an attempted "end-run" around a Federal District Court's review and determination – in hopes to convince a bankruptcy court in a summary proceeding to take away the Federal District Court's function, knowledge and experience involving these same parties through two trials and appeals lost by these insider fraud-actors before this same Federal District Court. Central to the proposed Settlement Agreement is the disposition of claims of the estate to the two (2) $7.5 million promissory notes under which about $12 million is expected to be paid.[1] The Settlement Agreement seeks to assign rights to those notes (*See* paragraphs 4 and 5) to Debtor's father and husband with nothing to be retained by the estate.[2] This is exactly the issue now pending in the New York federal court involving all of these parties, less the Chapter 7 Trustee.

---

[1]  Dalia understands that the two Promissory Notes are subject to a $3 million set-off.
[2]  The $1 million contingent payment outlined in the agreement is meaningless as the payors security interest is being left undisturbed despite being created within the 1 year preference period.

3.     This matter belongs in New York in the case from which this Debtor and her Insiders wrongly seeks a new venue.

## II.
## RESPONSE TO THE STATEMENT OF
## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).

5.     This dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (J) as more particularly set out herein below.

6.     However, it does not follow that this Court has jurisdiction to grant all relief requested by such Motion.  Dalia argues that this Article I Court does not have jurisdiction to adjudicate the rights by and among only non-debtor third parties nor does this Article I Court have jurisdiction to set aside rights of non-debtor parties, including rights to a constructive trust under New York law over property not scheduled by the Debtor, prior to a determination on the merits of the Turnover Motion.[3]

7.     **Venue is Not Properly Placed**.  Dalia argues that this case is a stark example of forum shopping to avoid not only a pending deadline to respond to the Turnover Motion and hearing before the District Court SDNY but also a particular court (District Judge Forrest), wholly against the Fifth Circuit's guidance of "discouragement of forum-shopping and avoidance of inequitable administration of the laws."[4]   Only recently Magistrate Judge Austin of the Western

---

[3]     *Celotex Corp. v. Edwards*, 514 U.S. 300,308 (1995) instructs that "whatever test is used, . . . bankruptcy courts *have no jurisdiction* over proceedings that have no effect on the debtor." *Id*. at 308, n.6 (Emphasis Added.)] *See*, *Matter of Zale Corp*., 62 F.3d 746,766 (5th Cir.1995) *citing, Eastover Bank for Sav. v. Sowashee Venture (In re Austin Dev. Co.)*, 19 F.3d 1077,1084 (5th Cir.1994)

[4]     Improper forum shopping may result in a dismissal. *All Plaintiffs v. All Defendants*, 645 F.3d 329, 336 (5th Cir. 2011) *citing Hanna v. Plumer*, 380 U.S. 460, 469-70, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965);  *Hall v. GE Plastic Pac. PTE Ltd*., 327 F.3d 391, 395 (5th Cir. 2003).

District of Texas (Austin Division) ordered that a motion to quash a subpoena brought by Orly's husband should be transferred to the Southern District of New York, finding that: "[Eric] Herschmann and [Orly] Genger, as owners of multiple residences, have used this fact to their legal advantage by claiming to reside in *whichever location most suits their legal needs at the time*." *See Genger v. Genger*, Civil Action No.: 1:19-mc-00366-LY (W.D. Tex.), Docket No. 11 (p. 5 of 6) (Emphasis Added.). This Chapter 7 filing is simply a continuation of the Debtor's and her insiders' forum shopping for an improper purpose.

## III.
## BANKRUPTCY RULE 9019 STANDARDS

8.      Because only the Trustee may propose a settlement and prosecute a Rule 9109 Motion (*"[o]n motion by the trustee* and after notice and a hearing, the court may approve a compromise or settlement"*) it is the Trustee that must carry the burden of proof on any settlement. The overarching criteria permits approval of a settlement only if it is expressly found by the bankruptcy court that the settlement was negotiated in "good faith" and at "arms-length". *In re Asarco LLC*, No. 05-21207, 2009 Bankr. LEXIS 5721 at *34-35 (Bankr. S.D. Tex. June 5, 2009).[5] Critically, "[e]ven if a settlement is fair and equitable to the parties to the settlement, *approval is not appropriate if the rights of others who are not parties to the settlement will be unduly prejudiced*." *In re Devon Capital Management*, 261 B.R. 619, 623 (Bankr. W.D. Pa. 2001), *citing In re AWECO, Inc.*, 725 F.2d 293, 297-98 (5th Cir. 1984), *cert. denied*, 469 U.S. 880, 105 S. Ct. 244, 83 L. Ed. 2d 182 (1984). *See also In re Zale Corporation*, 62 F.3d 746, 754 (5th Cir. 1995), ci*ting Cullen v. Riley*, 957 F.2d 1020, 1026 (2d. Cir. 1992) (holding that "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties

---

[5]      *In re Palacios*, No. 14-70076, 2016 Bankr. LEXIS 249, at *1 (Bankr. S.D. Tex. Jan. 27, 2016) [a court must examine "… and the extent to which a settlement is truly the product of arms-length bargaining *and not of fraud or collusion*." *See, also In re ADPT DFW Holdings LLC*, 577 B.R. 232, 237 (Bankr. N.D. Tex. 2017)

is not enough to earn the judicial stamp of approval."). In evaluating the interests of the creditors, the court must take into account the consideration offered by the settling party and the degree to which the creditors object to determine whether the settlement furthers their best interests. *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Coop., Inc.)*, 119 F.3d 349, 358 (5th Cir. 1997).

9. Close scrutiny must be observed in any settlement among Insiders. *In re Foster Mortgage Co.*, 68 F.3d 914, at 918 (5th Cir. 1995) (noting that a settlement between insiders—the debtor and its parent company—reached without the participation of creditors required careful scrutiny). This is true because, according to the Supreme Court, the Bankruptcy Court "…must apprise itself of "all facts necessary for an intelligent and objective opinion of probabilities of ultimate success should the claim be litigated." *See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968). In this process, the Bankruptcy Court will review:

• First, the probability of success in the litigation, with due consideration for the uncertainty in fact and law.[6] *In re Cajun Elec. Power Coop.*, 119 F.3d 349, 355-56 (5th Cir. 1997) finds "(e)ssential to the process of evaluating proposed settlements, then, 'is the need to compare the terms of the compromise with the likely rewards of litigation.'" (*citing*) *In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009)(citations omitted)."

• Next, the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay. *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980), citing *Protective Committee for Independent Stockholders of TMT Trailer*

---

[6] "The probability of success in litigation encompasses two factors – damages (and) liability." *See, In re Tex. Extrusion Corp.*, 68 B.R. 712, 719-20 (N.D. Tex. 1986) citing *Jackson Brewing* at 602; *And See, Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop. Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997).

*Ferry, Inc. v. Anderson ("TMT Trailer"),* 390 U.S. 414, 425, 88 S. Ct. 1157, 1163, 20 L. Ed. 2d 1, 10 (1968).

• Finally, all **_Other Factors_** bearing on the wisdom of the compromise. *In re Jackson Brewing*, 624 F.2d at 602 (citations omitted), including:

a. *the paramount interest of the creditors; Id. Jackson Brewing*, at 602

b. *a proper deference to their reasonable views in the assets.*" *Id.*, *See, also In re Tex. Extrusion Corp.*, 68 B.R. 712, 719-20 (N.D. Tex. 1986); and

c. <u>the best interests of the creditors</u>, "with proper deference to their reasonable views." *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995); *See, also In re Jackson Brewing Co.,* 624 F.2d 599, 602 (5th Cir. 1980).

Application of these rules to the true facts illustrates that the proposed Settlement Agreement is opposed by the only two creditors with legitimate claims against the Debtor and her Insiders who by this proposed Settlement seek to get a release from the liability for their fraudulent acts while keeping 97% of the fraudulently transferred assets.

## IV.
### THE NATURE AND EXTENT OF DALIA GENGER'S CLAIMS AND RIGHTS IMPAIRED OR DESTROYED BY THE PROPOSED SETTLEMENT

10. For the relevant background facts, Dalia incorporates herein the Omnibus Statement of Background Facts (Dkt. No.112) as if set out *verbatim*. In summary, and while the background facts are a long-winded tragic path of a family's litigation (described in detail in the Omnibus Statement), this case is actually fairly simple. Arie Genger lied to his wife when they got divorced to induce her to transfer millions of dollars in property (the "TRI Stock") to their daughter's trust. Three lies were told:

     a. The stock was encumbered by a $30 million personal liability of Arie Genger and an even larger corporate liability. A retired justice in New York, acting as an arbitrator has already determined that representation to be false.[7]

     b. The stock was properly transferable. The Delaware Chancery Court already concluded Arie was guilty of "perfidy" in making that misrepresentation.[8]

     c. Orly would use 36% of the transferred property to support her mother should she so request.[9] She has refused to do so.

This Chapter 7 bankruptcy is about monetizing those lies through this Settlement, for a fraction of the actual fraudulent transfers, leaving the remainder with the fraud-actors. Arie now seeks, with his Debtor-daughter's assistance, her husband and his law firm, to have that which should be available for Dalia's support transferred to them through a blessing of their fraudulent scheme that includes this bankruptcy and this Settlement.

    11. The background facts further illustrate that no issues of Dalia's rights legitimately exist that have not already been ordered, appealed, and affirmed through the Second Circuit Court of Appeals or the Delaware Supreme Court or the New York Supreme Court. The history also shows that this case is forum shopping at its worse, with the goal of avoiding appearing any further before the District Court SDNY and settling a case with a Chapter 7 Trustee with a "promise" of a $1 million payment, but with conditions. And, finally, the facts show that this is a two-party suit among only family and their insiders, with no unsecured legitimate creditors' interest to protect. It is an abusive use of Title 11 U.S.C. § 101, *et. seq.*

    12. Critical to the understanding of the defects and underlying wrongful motives of this proposed Settlement is the fact that the Trustee is, effectively, giving away Dalia's right to a direct

---

[7]    *See, infra Genger vs. Arie Genger,* Arbitration Final Award, Case No. 13 170 Y 00996 0 (May 6. 2008) (herein the "Arbitration Award").

[8]    *TR Investors et. al. vs. Arie Genger*, 2010 WL 2901704 at *18 (Del Chancery 2010).

[9]    The economic value later calculated by Judge Forrest, SDNY Court to be $24.7 million (*See, Genger III*, 2018 U.S. Dist. Lexis 126958, *17 n.5).

claim to the $31+ million fraudulently transferred to the Debtor's Insiders, while seeking an order trampling on the rights of Dalia and implying that litigation exists that should be brought or continued *against Dalia.*

13.     This two-party family dispute does not belong in bankruptcy.  This contrived bankruptcy is intended solely to frustrate Dalia's extant rights to constructive trust over two $7.5 million promissory notes nominally held by Michael Bowen, Debtor's attorney, ***and to avoid the rights and remedies of only two people – Dalia and Sagi*** *Genger*.  Every other party to this bankruptcy and the Motion is an Insider to the Debtor, all of whom are expecting a multi-million dollar payday for their actual fraud.  Importantly, however, is that there are no other meaningful creditors.  Effectively, this is a two party dispute, now pending in the US District Court SDNY, that has been strategically removed to this venue to avoid the SDNY proceedings.

14.     The Settlement Agreement seeks to assign rights to the $15 million in promissory notes (*See* paragraphs 4 and 5) *to Debtor's father and husband* with nothing to be retained by the estate.[10]  As set out herein, Dalia already enjoys a constructive trust over that consideration by operation of New York Law.  Accordingly, her interest is superior to that of the Trustee under Fifth Circuit precedent.

15.     The Settlement Agreement seeks to remove all collectability on Dalia's final judgment which by statute is enforceable by Dalia directly against Orly and her real (not contrived and hidden) assets.

16.     Additionally, the Settlement Agreement improperly interferes with the equitable distribution of marital property ordered by the New York Supreme Court as a domestic support

---

[10]     The $1 million contingent payment outlined in the agreement is meaningless as the payors security interest is being left undisturbed despite being created within the 1 year preference period.

obligation which is being impaired or destroyed contrary to federal bankruptcy law.

17. Finally, the approval by this Court of the Settlement Agreement would be an offense to the principals of judicial comity between this Court and the courts of the Second Circuit and New York State and in tension with the Rooker-Feldman Doctrine.

## A. DALIA'S RIGHT TO ENFORCE HER CONSTRUCTIVE TRUST AGAINST THE PROPERTY TRANSFERRED TO AND FROM DEBTOR

18. The documented history (*See*, Omnibus Background Facts) establishes that from its inception Dalia has been the subject of fraud and misrepresentations. The details set out that through the Divorce Settlement Agreement and the Integrated Agreement which it incorporates, that Dalia was to be assured of her future support from her marital share of the TRI Stock. That is exactly what those two agreements, contingent on each other, provided.

19. Facts sufficient to establish that Dalia enjoys superior rights to currently $12.25 million of the $32 million have previously adjudicated by the Southern District of New York and affirmed by the Second Circuit. In those cases, both her children were named parties, but the opinions also bind Arie, Debtor's husband, his firm Kasowitz, and the Debtor's former law firm Zeichner Ellman under Supreme Court precedent. Accordingly, the Trustee, a successor in interest to Debtor, along with all the creditors of the estate who might object are bound under principals of collateral estoppel, estoppel by judgment, and *res judicata*.

20. Most critical is the determinations already rendered in final judgments in New York and Delaware, including the following Judge Forrest's (SDNY) findings in her 2015 opinion as affirmed by the Second Circuit:

> As part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI to trusts benefiting Sagi and Orly (the "Sagi Trust" and the "Orly Trust," respectively) in exchange for a commitment by Sagi and Orly to financially support her. This arrangement was effectuated via three documents.

First, Dalia and Arie signed a stipulation of settlement finalizing the terms of their divorce settlement (the "2004 Divorce Stipulation"), which was fully executed on October 30, 2004. (PSOF ¶ 1; DSOF ¶ 7.) *In the 2004 Divorce Stipulation, Dalia promised to convey equal interests in a total of 794.40 shares of TRI to the Orly Trust and the Sagi Trust. (PSOF ¶ 1; DSOF ¶ 27.)* The 2004 Divorce Stipulation contains an "entire understanding" clause, which is subject to a carve-out for other agreements expressly incorporated by reference and those "entered into concurrently herewith." (DSOF ¶ 24.)

The second was a letter signed by Sagi and Dalia dated October 30, 2004 (the "2004 Promise"). (PSOF ¶ 3; DRSOF¶ 51.) In the 2004 Promise, Sagi agreed to pay Dalia up to an amount equal to all dividends, distributions, proceeds or other payments attributable to the TRI shares, upon Dalia's demand. (PSOF ¶ 3.) The 2004 Promise also states that the agreement is made "in consideration of" the following: "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of [TRI], or beneficial interests in those shares, by trusts for [their] benefit." (DSOF ¶ 52.)

At the time the 2004 Promise was signed, Orly was vacationing in Fiji, and thus could not contemporaneously sign the 2004 Promise. (PSOF ¶ 4.) *However, before Sagi signed the 2004 Promise, Orly verbally agreed to indemnify Sagi for 50% of the payments he would have to make under the 2004 Promise. (PSOF ¶ 4.). The third agreement was a letter signed by Sagi and Orly dated November 10, 2004 (the "2004 Indemnity").*8 (PSOF¶ 5.) In the 2004 Indemnity, Orly agreed to indemnify Sagi "for and against one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations ..., including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]." (PSOF ¶ 5.)… *…Orly has effectively monetized an interest in the very shares she claims not to have received to the tune of $32.3 million.*

21.    These findings and conclusions were affirmed by the Second Circuit Court of Appeals. That this case remains ongoing as the pending Turnover Motion seeking to recover the $32 million in property.  Likewise, Dalia's right to this recovery is not disputed, as Judge Forrest laid out all the arithmetic calculations of Dalia's current debt:

 Based on the prior rulings of this Court…Sagi and Orly monetized their beneficial interests in the TRI shares for a total of $69.3 million, a substantial portion of which was attributable to Dalia's conveyed marital interest…

…Both Dalia and Sagi agree that Dalia's conveyed marital interest of 794.4 shares represents 36% of the total TRI shares that were monetized. Using that figure, **the maximum amount payable to Dalia under the 2004 Integrated Agreement is approximately $24.7 million** (or 36% of the total $69.3 million value). Orly has not specifically disputed the 36% figure, though she has raised unrelated questions

about how the so-called "cap" in the 2004 Integrated Agreement affects her obligations to Sagi.

[*Genger II*, at \*17, n. 5]  The Second Circuit then dealt directly with Orly's "unrelated question"

in affirming Judge Forrest's 2018 opinion:

> …the 2004 Promise states that Sagi must, at **Dalia**'s request, pay her 'an amount equal to all dividends, distributions, proceeds or other payments attributable to 794.40 shares of TRI ... that have previously been paid to Orly, [Sagi] or any trust for the benefit of either of us.' J.A. 198. This provision does indeed include a "cap" on the amount that Sagi is obliged to pay **Dalia**. It says nothing, however, about Orly's indemnification obligation. The 2004 Indemnity unconditionally requires Orly to "indemnify, defend, and hold [Sagi] harmless, for and against one-half (1/2) of any and all payments, ... claims, ... judgments or obligations" arising from the 2004 Promise. J.A. 365. We are not free to disregard the agreement's unambiguous terms.

*Genger v. Genger*, 771 Fed. Appx. 99, 100  (2nd Cir. 2019).

22.    Initially, Dalia is entitled to a constructive trust over the remaining $12.25 million

of that *res* under New York Law,[11] and thus her interest is superior to that of the Bankruptcy

Trustee under Fifth Circuit precedent. [*See, Infra Southmark*].  A constructive trust is created in

New York, when a transfer of property has been made in reliance of a promise to a person in a

confidential or fiduciary relationship and unjust enrichment ensues.  Unjust enrichment generally

ensues when the promise is broken, triggering an obligation to restore the property.  Mostly, this

principal is applied to transfers between family members.  *Sharp v. Kosmalski*, a case reviewed by

the New York Court of Appeals, property was transferred to the daughter.  There the court

---

[11]    A constructive trust under New York law is an equitable remedy imposed to prevent unjust enrichment (*see Simonds v Simonds*, 45 NY2d 233, 242 [1978]; *Sharp v Kosmalski*, 40 NY2d 119 [1976]). According to the Court of Appeals, the constructive trust is "the formula through which the conscience of equity finds expression. Where property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee" (*Beatty v Guggenheim Exploration Co*., 225 NY 380, 386 [1919]).   "[I]ts applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." *Latham v Father Divine*, 299 NY 22 , 27 [1949].

construed an _implied_ promise of support that was broken creating a constructive trust. Here, Debtor has already been adjudicated to have made such an express promise. A promise which is reflected in a written instrument. That case, and a panoply of New York decisions discussed below outline the legal principals at work.

23.     Since the Trustee's proposed Settlement Agreement not only interferes with those rights but in fact acts to also destroy those rights, it should not be approved. The Trustee's Settlement Agreement seeks to approve the theft of property owned by Dalia pursuant to her marital settlement which incorporated the contemporaneous Integrated Agreement executed by the Debtor. Dalia's current and ongoing priority rights to the constructive trust encumbering those funds under New York law is clear:

> _…the court has indicated that a constructive trust, similar to an express trust, 'springs from the intention of the testator and the promise of the legatee, and not from any act of the court._ (citations omitted).
> …
> It would seem that there is no foundation whatever for the notion that a constructive trust does not arise until it is decreed by a court. It arises when the duty to make restitution arises, not when the duty is subsequently enforced.

_United States v. Fontana_, 528 F.Supp- 137, 144, 146 (Dist Ct SD NY 1981).

24.     Dalia's rights to constructive trust sprung into existence not later than when Orly repudiated her of support triggering her duty as Dalia's constructive trustee to make restitution. This rule is recognized in a bankruptcy proceeding. In _N Geltzer v. Balgobin (In re Balgobin)_, 490 B.R. 13 (Bankr. E.D.N.Y. 2013) the Bankruptcy Courts sitting in New York explained:

> … the duty of restitution does not arise until the constructive trustee breaches or repudiates the agreement…

> … For this reason, the few cases in this Circuit in which a constructive trust has been imposed against a bankruptcy estate have found some pre-petition unjust conduct by the debtor relating to the property upon which the constructive trust was sought to be imposed…

Of course, here there is far more than "some pre-petition unjust conduct" by the Debtor. There is a total repudiation of the Integrated Agreement, and actual fraud in accomplishing the denuding of this Debtor.

25.     It is the New York law that creates the immediate constructive trust, and the Fifth Circuit likewise instructs as to how that impacts a bankruptcy case:

> ……the imposition of a constructive trust is a potent remedy, as it gives the successful claimant priority over the debtor's unsecured creditors; …We look to state law to determine whether a party has adequately demonstrated that property is held in constructive trust for another …. 541(d) excludes property subject to a constructive trust from the bankruptcy estate." [12]

26.     Southmark recognizes that property subject to a constructive trust is not "property of the estate" and thus the Settlement Agreement improperly interferes with Dalia's property. *Id*.

27.     Notwithstanding the unambiguous language (so found by several courts Orly and her father simply agreed Dalia would get nothing and implemented years of losing and wasteful litigation. Quickly thereafter, Orly suffered two judgments in excess of $3 million for the support payments due Dalia. The threat of these judgments, and the full extent of Orly's future liability triggered her decision to transfer and encumber the $32 million and file for bankruptcy.

28.     As documented in the Omnibus Statement of Facts, immediately upon Orly monetizing her TRI Stock, Orly directed that the $17.3 million in cash be wired to the purported "Orly Genger Litigation Trust", a trust for the repayment of ***Arie's creditors*** (*i.e*., David and Arnold Broser, the "Brosers"). Dalia has a right to recoup those funds the subject of her

---

[12]     *In re Southmark Corp*., 49 F.3d 1111, 1118 (5th Cir. 1995) further holding that "... the funds in question were held in "quasi" (or constructive) trust by Southmark for ARA. Section "541(d) excludes property subject to a constructive trust from the bankruptcy estate." citing *In re Carolin Paxson Advertising, Inc.*, 938 F.2d 595, 597 (5th Cir. 1991)  ("A constructive trust generally arises when a person with legal title to property owes equitable duties to deal with the property for the benefit of another."). *Id. Southmark 1115 at note 8; In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1217 n. 3 (9th Cir.) (explaining that presumption that funds in debtor's account belong to its estate is overcome by showing that funds were held in constructive trust for another), cert. denied, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988)*; Id. at note 20. Id. Southmark at 116.*

constructive trust from each of the transferees (all non-debtors).

29.     Next, when the judgments against Orly were entered this triggered the second round of fraud to occur - the Debtor encumbered the $15 million in unmatured promissory notes, by pledging them as security for millions of dollars in false liabilities to, her father and lawyer-husband.  Incredibly, the Debtor fails to list either of these unmatured notes in her bankruptcy schedules as potential assets.

30.     As part of the Court's analysis in recognizing Dalia's constructive trust, it should be noted that under New York law that Orly was a fiduciary to her mother at the time of the transfer.  Dalia enjoyed a confidential or fiduciary relationship with both her children and her soon to be ex-husband.  Under New York law, absent prior litigation, family members stand in a fiduciary relationship with each other as the New York Court of Appeals explained in *Braddock v. Braddock*, 871 N.Y.S.2d 68 (App Div, 1st Dept 2009):

> Family members stand in a fiduciary relationship toward one another in a co-owned business venture (see Venizelos v. Oceania Mar. Agency, 268 A.D.2d 291, 702 N.Y.S.2d 17 [2000]; see also Birnbaum v. Birnbaum, 73 N.Y.2d 461, 541 N.Y.S.2d 746, 539 N.E.2d 574 [1989]). A fiduciary relationship is "[f]ounded upon trust or confidence reposed by one  person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another" (Wende C. v. United Methodist Church, N.Y. W. Area, 6 A.D.3d 1047, 1055, 776 N.Y.S.2d 390 [2004], affd. 4 N.Y.3d 293, 794 N.Y.S.2d 282, 827 N.E.2d 265 [2005], cert. denied 546 U.S. 818, 126 S.Ct. 346, 163 L.Ed.2d 57 [2005] ).

*Id. Braddock* at 88-89.  In *Sharp v. Kosmalski*, 351 N.E.2d 721, 724 (1976), New York highest court, recognized that "[m]ost frequently, it is the existence of a confidential relationship which triggers the equitable considerations leading to the imposition of a constructive trust." It detailed a specific example appropriate for constructive trust somewhat similar to what is going on here, but with more ambiguous facts:

…the decision to invoke the remedy of constructive trust 'need not be determined exclusively by whether or not the defendant daughters expressed in so many words a promise to reconvey the properties to the father if he should ask'. Indeed, in the case before us, it is inconceivable that plaintiff would convey all of his interest in property which was not only his abode but the very means of his livelihood without at least tacit consent upon the part of the defendant that she would permit him to continue to live on and operate the farm. I would therefore reject the Trial Judge's conclusion, erroneously termed a finding of fact, that no agreement or limitation *123 may, as a matter of law, be implied from the circumstances surrounding the transfer of plaintiff's farm. [8] [9] [10] The salutary purpose of the constructive trust remedy is to prevent unjust enrichment and it is to this requirement that I now turn. The Trial Judge in his findings of fact, concluded that the transfer did not constitute unjust enrichment. In this instance also, a legal conclusion was mistakenly labeled a finding of fact. A person may be deemed to be unjustly enriched if he (or she) has received a benefit, the retention of which would be unjust (Restatement, Restitution, s 1, Comment a). A conclusion that one has been unjustly enriched is essentially a legal inference drawn from the circumstances surrounding the transfer of property and the relationship of the parties. It is a conclusion reached through the application of principles of equity. Having determined that the relationship between plaintiff and defendant in this case is of such a nature as to invoke consideration of the equitable remedy of constructive trust, it remains to be determined whether defendant's conduct following the transfer of plaintiff's farm was in violation of that relationship and, consequently, resulted in the unjust enrichment of the defendant. This must be determined from the circumstances of the transfer since there is no express promise concerning plaintiff's continued use of the land.

Therefore, the case should be remitted to the Appellate Division for a review of the facts. In so doing I would emphasize that the conveyance herein should be interpreted 'not literally or irrespective of its setting, but sensibly and broadly with all its human implications' (*Sinclair v. Purdy*, 235 N.Y. 245, 254, 139 N.E. 255, 258, Supra). This case seems to present the classic example of a situation where equity should intervene to scrutinize a transaction pregnant with opportunity for abuse and unfairness. It was for just this type of case that there evolved equitable principles and remedies to prevent injustices. Equity still lives. To suffer the hands of equity to be bound by misnamed 'findings of fact' which are actually conclusions of law and legal inferences drawn from the facts is to ignore and render impotent the rich and vital impact of equity on the common law and, perforce, permit injustice. Universality of law requires equity.  Id. at 725

Arie's fiduciary duties were even greater, yet here he is to be exonerated from all such liability for

a promise of a 3% share of the stolen funds.[13]  Unlike the *Sharp* court, this court is presented with

---

[13]     Arie, whose lawyer drafted Orly's indemnity agreement, had an even higher fiduciary duty then Sagi or Orly.  The New York Court of Appeals explained in Christian v. Christian at 72:

written promises made by Sagi, Orly, and Arie in the 2004 Promise and 2004 Indemnity which are integrated into the Matrimonial Agreement. Those agreements have been scrutinized by multiple courts, including by Judge Forrest as cited above holding:

> "As part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI to trusts benefiting Sagi and Orly (the "Sagi Trust" and the "Orly Trust," respectively) in exchange for a commitment by Sagi and Orly to financially support her."
> …
> The 2004 Divorce Stipulation contains an "entire understanding" clause, which is subject to a carve-out for other agreements expressly incorporated by reference and those 'entered into concurrently herewith.'" (*i.e.*, the Integrated Agreement signed by Orly).

There can be no argument that Dalia does not have a constructive trust enforceable against the funds that the proposed Settlement Agreement purports to convey or abandon for a ***possible 3% recovery*** (only the first $250,000.00 is actually paid on the Effective Date).

31.     The fiduciary duty of a trustee of a constructive trust is to restore the property to its rightful owner. As Dalia is now the beneficiary of that constructive trust, the Settlement Agreement has the effect of causing the trustees of that constructive trust, Debtor and Michael Bowen, to breach their duty to Dalia. This Court should not countenance an intentional tort.

---

*Agreements between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring the utmost of good faith (Ducas v. Guggenheimer, 90 Misc. 191, 194-195, 153 N.Y.S. 591, 593, 594; affd. sub. nom. Ducas v. Ducas, 173 App.Div. 884, 157 N.Y.S. 801). There is a strict surveillance of all transactions between married persons, especially separation agreements (Hendricks v. Isacs, 117 N.Y. 411, 417, 22 N.E. 1029, 1030, supra; Benesch v. Benesch, 106 Misc. 395, 402, 173 N.Y.S. 629, 633; 2 Lindey, Separation Agreements and Ante-Nuptial Contracts (rev. ed.), s 37, subd. 4, p. 37-9). Equity is so zealous in this respect that a separation agreement may be set aside on grounds that would be insufficient to vitiate an ordinary contract (Hungerford v. Hungerford, 161 N.Y. 550, 553, 56 N.E. 117, 118, supra; Cain v. Cain, 188 App.Div. 780, 782, 177 N.Y.S. 178, 179; Crowell v. Crowell, 135 Misc. 530, 532, 238 N.Y.S. 44, 45, affd. 229 App.Div. 771, 242 N.Y.S. 811). These principles in mind, courts have thrown their cloak of protection about separation agreements and made it their business, when confronted, to see to it that they are arrived at fairly and equitably, in a manner so as to be free from the taint of fraud and duress, and to set aside or refuse to enforce those born of and subsisting in inequity*
Christian v. Christian, 42 N.Y.2d 63, 72, 396 N.Y.S.2d 817, 365 N.E.2d 849 (1977)

32.     It may be that the Trustee simply ignores these facts, but as a successor in interest

the estate he is bound by prior judgments and opinions binding the Debtor, which incorporate New

York laws.

**B.     DALIA HAS STATUTORY RIGHTS TO ENFORCE HER FINAL JUDGMENT DIRECTLY AGAINST ORLY AND HER ASSETS**

33.     Dalia holds a final $6 million final judgment against Sagi and is vested with the

absolute right, pursuant to N.Y. C.P.L.R. Law § 5227 (Consol., Lexis Advance through 2019

released Chapters 1-334)[14] to collect ***directly from Orly on the Integrated Agreement indemnity***.

*See, infra*, *Matter of White Plains Plaza Realty, LLC v. Cappelli Enters., Inc.*, 2013 NY Slip Op

5220, ¶¶ 1-2, 108 A.D.3d 634, 635-36, 970 N.Y.S.2d 47, 49 (App. Div.), *albeit* a claim against a

Debtor that has both denuded her own trust and fraudulently conveyed the monetized resulting

funds. [Dalia incorporates herein her Objection to Orly's Discharge filed at Doc # 99]**.**

34.     Likewise, *Genger vs. Genger*, 76 F. Supp. 3d 488 ; 2015 U.S. Dist. LEXIS

649 (SDNY 2015) (affirmed in all things by the Second Circuit Court of Appeals) made it

absolutely clear that Dalia's contractual relationship with her daughter Orly was evidenced by a

"single integrated agreement" with rights to directly enforce the Integrated Agreement.[15]   Dalia

---

[14]     N.Y. C.P.L.R. Law § 5227 (Consol., Lexis Advance through 2019 released Chapters 1-334) allowing a judgment holder to pursue creditors of the judgment debtor reads as follows:

**§ 5227. Payment of debts owed to judgment debtor**

Upon a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment; or it may direct that a judgment be entered against such person in favor of the judgment creditor. Costs of the proceeding shall not be awarded against a person who did not dispute the indebtedness. Notice of the proceeding shall also be served upon the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested. The court may permit the judgment debtor to intervene in the proceeding. The court may permit any adverse claimant to intervene in the proceeding and may determine his rights in accordance with section 5239.

[15]     *Genger vs. Genger*, 76 F. Supp. 3d 488, 497-498 (SDNY 2015) has adjudicated the direct rights

has other rights and claims against the Debtor to be addressed in other pleadings as the case may

require and the Court has determined that the Integrated Agreement was part of the Divorce

Settlement Agreement.

### C. DALIA'S RIGHT TO ENFORCE (AND PROTECT) EQUITABLE DISTRIBUTIONS FROM A DIVORCE SETTLEMENT AND DOMESTIC SUPPORT

35.      Judge Forrest quoted above and extensively in the Omnibus Statement of

---

of Dalia against the Debtor

Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." *This Is Me, Inc.* v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); *accord Madeleine, L.L.C.* v. *Casden*, 950 F. Supp. 2d 685, 695-96 (S.D.N.Y. 2013). Contracts that are executed at different  times "should be interpreted together if 'the parties assented to all the promises as  a whole so that there would have been no bargain whatever if any promise or set of promises had been stricken.'" Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 53 (2d Cir. 1993) (quoting 6 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 863:275 (3d ed. 1970)). *Id*. at 496-97

Whether multiple documents should be read as *constituting a single agreement depends on the intent of the parties. TVT* Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005); accord Commander Oil, 991 F.2d at 52-53; *Madeleine*, 950 F. Supp. 2d at 696. The intent of the parties is "typically a question of fact for the jury, . . . [b]ut if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." TVT Records, 412 F.3d at 89 (citation omitted).

In TVT Records, the Second Circuit determined two agreements to be integrated based, <u>inter alia</u>, on the fact that the documents were intended to effectuate the same result. <u>Id.</u> As the parties under the later agreement were obligated to honor all of the terms and conditions of the earlier agreement, the later agreement was "meaningless" without the first. <u>Id</u>. The fact that the documents were "negotiated and signed at different times, memorialized in different documents and involved different parties" did not dictate  a contrary result, because these facts did not address "the legally operative question: whether the contracts were part of a single transaction intended to effectuate the same purpose." Id. at 90 (citations omitted).

Similarly, in This Is Me, the Second Circuit held that a jury was justified in reading two contracts together where they were executed "more or less" (but not exactly) concurrently, and where one of the two contracts stated that the two contracts were intended to be executed together, but the other contract did not. *157 F.3d at 145*. The Court also noted that counsel for a defendant conceded in a letter that the two contracts were intended to be read together. *Id*.

The 2004 Promise and the 2004 Indemnity are sufficiently unambiguous such that there is no triable issue as to whether they form an integrated agreement, even though they were executed on different dates and were not all between the same parties, and in this sense no different than the agreements at issue in <u>TVT Records</u>. ***Indeed, neither agreement makes any sense without the promises expressed in the other***.  [Emphasis added]

Background Facts clearly holds that the Divorce Settlement Agreement and the Integrated Agreement are both conditioned on each other and both deal directly with the disposition of marital property of Dalia in exchange for her support obligations. As such, it is the law between the parties that the $32 million represents an equitable distribution of property. That property is being used in lieu of maintenance, in the nature of a Domestic Support Obligation.

36.     As discussed above, the twin $7.5 million promissory notes are a corpus resulting from Dalia's transfer of her matrimonial rights under a Stipulation of Divorce ordered by the New York Supreme Court on January 5, 2005- a fact Judge Forrest recites in her 2015 opinion. The effect of the Settlement Agreement is to transfer that property back to Dalia's ex-husband. Bankruptcy courts are generally barred from redistributing marital property post-divorce decree.

37.     The Trustee's Settlement Agreement purports to convey and release $32.3 million. Dalia holds a prior and superior right pursuant to her constructive trust, and divorce decree to that property. Dalia's claims cannot be discharged, nor may her property be forfeited by a Settlement Agreement among the Debtor and her insiders. Accordingly, the Settlement should not be approved.

### D. THE SETTLEMENT AGREEMENT IGNORES ALL RULES OF JUDICIAL COMITY BETWEEN THE FEDERAL AND STATE COURTS' MULTIPLE ORDERS, JUDGMENTS AND OPINIONS

38.     Everything sought by the Settlement Agreement to be adjudicated in a summary contested Rule 9019 Settlement Agreement is now pending in the SDNY. As discussed in *Am. Bankers Life Assurance Co. v. Overton,* 128 F. App'x 399, 403 n.16 (5th Cir. 2005), "[t]he federal courts have long recognized that the principle of comity requires federal district courts ---- courts of coordinate jurisdiction and equal rank ---- to exercise care to avoid interference with each other's affairs." (citations and quotations omitted); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1161 n. 28 (5th Cir. 1992) ("The *West Gulf* and *First City* cases deal with the so-

called first-to-file rule, which comes into play when a plaintiff files similar lawsuits in two different federal districts."); *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985) ("To avoid these ills, a district court may dismiss an action where the issues presented can be resolved in an earlier-filed action pending in another district.")." The same rule applies when parallel proceedings are pending – ("Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999).

39.     Here every consideration warrants this Court not to wade into the determination of the merits of the Turnover Motion, Dalia's rights, and the Settlement Agreement that destroys those rights.  Not a single legal or equitable consideration supports taking away from the District Court the pending action in the SDNY in favor of a summary disposition that cannot be justified under any Rule 9019 consideration as the best interest of the estate or creditors.  In fact, there are only five "insiders" who profit by this proposed windfall.   The outcome of this dispute, involving more than \$32 million among this two-party dispute, is simply too significant for this bankruptcy court to determine in favor of the litigants that are already before the SDNY District Court.

40.     *Am. Radio Asso. v. Mobile S.S. Asso.*, 483 F.2d 1, 6 (5th Cir. 1973) also made clear that "Congress expressed a strong preference to avoid federal intervention in pending state proceedings."

41.     Finally, the companion in bankruptcy jurisdiction to comity is abstention. Discretionary abstention would clearly apply here.  *In re 801 S. Wells St. Ltd. Pshp.*, 192 B.R. 718 (Bankr. N.D. Ill. 1996) is instructive.  As in the case at bar, the Court there addressed a debtor who had no bona fide non-insider debt, and instead, the bankruptcy was the result of litigation contested

among insiders of the debtor over the sole property at issue in the bankruptcy but over which the debtor and her estate could have no interest.  *Id*., at 425.   That case was dismissed pursuant to principals of abstention and so too should this one be (if not transferred).   Thus, there can be little doubt argument against this Court abstaining from adjudicating any of these state law proceedings in this Chapter 7 case.  The analysis of the specific, permissive abstention factors can be left for another day, if necessary – including in the Dalia's formal objection to the 9019 Motion and Settlement Agreement, as to which Dalia reserves all rights.   As this Court stated in *IO at Tech Ridge*:

> In reading the statute, it is apparent that Congress believed that state court matters generally belong in state court unless a strong federal interest suggests otherwise….This suit is a state court matter as there is no independent basis for federal jurisdiction. So, what is the strong federal interest?....The right question is: Must the lawsuit be tried in bankruptcy court to resolve the bankruptcy case? The answer would be yes, if a plan could not be confirmed absent resolution of the lawsuit.  **But here the answer is no….that suit can be pursued in state court in the ordinary course of the litigation process…by a chapter 7 trustee.**

*Id*., at *8-9, *16-17.  There is no compelling reason to reward the beneficiaries of this Settlement Agreement with a $32 million windfall after their long history of fraud, including fraud that allowed them to obtain these funds in the first place.

42.      It is clear that the Trustee desires to pursue Dalia as if the Trustee truly understood the dynamics of these parties.  Separately, the Trustee has removed to New York federal court a *quasi in rem* proceeding in which Orly is seeking removal of Dalia as her trustee, **even though she already resigned and even though she appointed a new trustee in strict compliance with the presiding court's instructions**.  The removed case is from the New York Surrogate (or probate) Court dealing exclusively with the administration of a trust - no damages are being sought. If they were, they would accrue to the benefit of that trust estate, not this bankruptcy estate.  Clearly this Trustee is being guided by counsel with an agenda that is not in the best interest of the estate.

43.     It is worth noting what the Second Circuit has said on such an action in *Lefkowitz v. Bank of N.Y.*, 528 F.3d 102, 105 (2d Cir. 2007):

> …we established a two-part inquiry to determine whether the controversy at issue implicates probate matters such that the probate exception to federal jurisdiction applies. The first part of the inquiry questions whether the matter to be litigated is purely probate in nature — i.e. whether the federal court is being asked to probate a will or administer an estate directly. *Id. '[S]ince few practitioners would be so misdirected as to seek, for example, letters testamentary or letters of administration from a federal judge,'* the first prong of the analysis is rarely violated.

Except here, and except by this Trustee.   Removing a *quasi in rem* proceeding is a core comity issue. *See, Markham v. Allen* ("a federal court may not exercise its jurisdiction to disturb or affect the possession of property in the custody of a state court").   Again, even if successful the removed case will not bring a dollar into the estate.   But this is what "scorched earth" litigation looks like when it has been funded with someone else's money – here, Dalia's money stolen from her by her daughter and ex-husband.

44.     The litigation strategy of the Insiders, guiding and using the Trustee, appears to be also designed to secure the fraudulent transfers to the Brosers as well as Arie while the Trustee continues to do their bidding by seeking to get an action brought by the Orly Trust's new trustee (and its creditor) in the SDNY stayed.

45.     Finally, for all of these agreements that leave in the possession of the recipients of the fraudulent transfers and use of the Trustee's office, the Trustee is receiving from the Debtor and her insider only $1.2 million which (because all claims against them are released) the Trustee will then dividend back to these insiders as secured creditors.   It appears the Trustee has elected not to avoid a $5 million lien in favor of Debtor's father *filed less than a year before the bankruptcy* by granting the releases.   Thus, the only economic purpose of the $1.2 million payment, is the accompanying fee to the Trustee, and distribution back to the Debtor or her insiders.   Hardly a

proper use of the bankruptcy system and recognized *nothing more than bad faith and abuse of the bankruptcy system*.[16]

**E.    THE TRUSTEE NEVER CONSULTED DALIA GENGER BEFORE ENTERING INTO THIS SETTLEMENT AGREEMENT AND SHOWING UP IN NEW YORK STATE COURT SEEKING TO CONTINUE LITIGATION AGAINST HER BY SEVERANCE AND REMOVAL**

46.    Contrary to the representations of the Trustee in the proposed Settlement Agreement Motion that all parties were consulted with by the Trustee, Mr. Satija, in truth the Trustee never consulted with Dalia or any of her counsel before reaching conclusions and this proposed Settlement Agreement.  Neither Mr. Satija, nor his counsel, reached out to either Dalia or her counsel even though she is listed as a creditor in her individual capacity on Orly's schedule of financial affairs.

47.    Of all of the people the Trustee should not be ignoring is Dalia.  However, not only did the Trustee ignore Dalia (and the damage that will occur to her if her source of support is removed by this proposed Settlement), the Trustee has thus far (unsuccessfully) pursued litigation against Dalia in New York and refused to share the critical documents the Trustee has under the Confidentiality Agreement (and commitment by Dalia's counsel to execute the Confidentiality Agreement).  It is clear to Dalia that the Trustee is not disinterested and has determined that Dalia's rights or in her input into this process is unnecessary, notwithstanding his duty to do a thorough investigation of all of the facts and his duty to disinterestedly represent all creditors of this estate.

**V.**
**ADOPTION AND INCORPORATION BY REFERENCE OF SAGI GENGER AND THE ORLY GENGER 1993 TRUST OPPOSITION PLEADINGS**

---

[16]    *See, Krueger v. Torres (In re Krueger),* 812 F.3d 365 (5th Cir. 2016); *Jacobsen v. Sramek (In re Jacobsen),* 609 F.3d 647, 649 (5th Cir. 2010); *In re Jacobsen,* 432 F. App'x 341 (5th Cir. 2011); *In re Newton,* No. MW 01-031, 2002 Bankr. LEXIS 2089 (B.A.P. 1st Cir., 2002); *Condon v. Brady (In re Condon),* 358 B.R. 317 (B.A.P. 6th Cir. 2007); *Bauer v. Iannacone (In re Bauer),* 298 B.R. 353 (B.A.P. 8th Cir. 2003).

48.     Dalia adopts and incorporates by reference, as if set out herein verbatim, the facts, arguments and authorities of Sagi Genger in his opposition to approval of this Settlement Agreement and the opposition of The Orly Genger 1993 Trust to approval of this Settlement Agreement.

WHEREFORE, Dalia Genger and D&K GP LLC, request an order denying the approval of the Trustee's Settlement Agreement and dismissing this bankruptcy case, or alternative to dismissal, to transfer the venue of this bankruptcy to the Southern District of New York, where all other litigation and proceedings are pending, and for such other and further relief that Objectors, or any one of them, may be justly entitled, both at law and in equity.

Dated: October 18, 2019

Respectfully submitted,

  /s/ Shelby A. Jordan
Shelby A. Jordan
Texas Bar No. 11016700
**JORDAN HOLZER & ORTIZ, P.C.**
500 N. Shoreline Blvd., Suite 900
Corpus Christi, Texas 78401
Telephone:  (361) 884-5678
Facsimile: (361) 888-5555
sjordan@jhwclaw.com
**ATTORNEYS FOR DALIA GENGER AND D&K GP LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certified that a true and correct copy of the foregoing instrument has been served on this 18th day of October 2019 upon the parties listed in the attached service list and via ECF notification.

/s/ Shelby A. Jordan
Shelby A. Jordan

**Via ECF**
United States Trustee – AU12
United States Trustee
903 San Jacinto Blvd., Suite 230
Austin, Texas 78701

**Via ECF**
Arie Genger
c/o Deborah D. Williamson
Dykema Gossett PLLC
112 East Pecan St., Suite 1800
San Antonio, TX 78205

**Via ECF**
c/o Trustee Ron Satija
Brian Talbot Cumings
Graves, Dougherty, Hearon & Moody
401 Congress Avenue, Suite 2700
Austin, Texas 78701

**Via ECF**
Arie Genger
c/o Deborah N. Williamson
Dykema Gossett PLLC
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205

**Via ECF**
Eric Herschmann
c/o Raymond Battaglia
66 Granburg Circle
San Antonio, TX 78218-3010

**Via ECF**
Sagi Genger
c/o Sabrina Streusand & TPR Investment
Streusand, Landon, Ozburn & Lemmon, LLP
1801 S. MoPac Expressway, Suite 320
Austin, Texas 78746

**Via ECF**
Eric J. Taube
Waller Lansden Dortch & Davis, LLC
100 Congress Ave, Suite 1800
Austin, Texas 78701

**Via ECF**
Thomas A. Pitta
Emmet, Marvin & Martin, LLP
120 Broadway
New York, NY 10271

**Via ECF**
The Orly Genger 1993 Trust
c/o Jay Ong
Munsch Hardt Kopf & Harr PC
303 Colorado Street, #2600
Austin, Texas 78701

**Via ECF**
SureTec Insurance Co.
c/o Ryan Brent DeLaune
Clark Hill Strasburger
901 Main Street, Suite 6000
Dallas, Texas 75202

**Via ECF**
Ron Satija
P.O. Box 660208
Austin, TX 78766-7208