# EXHIBIT B

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------------------

3   SAGI GENGER,

4                          Third-Party Plaintiff,

5               -v-     Civil Action No. 1:17cv8181

6   ORLY GENGER,

7                          Third-Party Defendant.

8   -------------------------------------------

9

10                 DEPOSITION OF MICHAEL BOWEN, a Witness

11  herein, taken by the Plaintiff, at the offices of

12  KELLEY DRYE & WARRREN LLP, 101 Park Avenue, 27th

13  Floor, New York, New York 10178, on Friday, October

14  5, 2018, at 10:00 a.m., before Jeffrey Shapiro, a

15  Shorthand Reporter and notary public, within and

16  for the State of New York.

17

18

19

20

21

22

23

24

25



```
1   A P P E A R A N C E S :

2   KELLEY DRYE & WARREN LLP

3   Attorneys for SAGI GENGER

4   101 Park Avenue, 27th Floor

5   New York, New York 10178

6   BY:  JOHN DELLAPORTAS, ESQ.

7

8

9   Also Present:

10  Sagi Genger

11

12                    ***

13

14

15

16

17

18

19

20

21

22

23

24

25
```



MICHAEL PAUL BOWEN                                              October 05, 2018
SAGI GENGER -v- ORLY GENGER                                                    3

1

2

3              IT IS HEREBY STIPULATED AND AGREED by

4    and between the attorneys for the respective

5    parties hereto, that the filing, sealing and

6    certification be, and the same are hereby waived;

7

8                   IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to the form of the

10   questions, shall be reserved to the time of the

11   trial;

12

13                  IT IS FURTHER STIPULATED AND AGREED

14   that the within examination may be subscribed and

15   sworn to before any notary public with the same

16   force and effect as though subscribed and sworn to

17   before this Court.

18

19

20

21

22

23

24

25



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                         4

```
 1  Whereupon,
 2                       MICHAEL BOWEN,
 3  after having been first duly sworn, was examined
 4  and testified as follows:
 5                    DIRECT EXAMINATION
 6  BY MR. DELLAPORTAS:
 7        Q.    State your name for the record.
 8        A.    Michael Paul Bowen.
 9        Q.    What is your address?
10        A.    My work address is 1633 Broadway, New
11  York, New York 10019.
12              (Exhibit 1 was so marked for
13         identification.)
14  BY MR. DELLAPORTAS:
15        Q.    Good morning, Mr. Bowen.
16        A.    Good morning.
17        Q.    So I've marked as Exhibit Kasowitz 1,
18  the subpoena in this case for Kasowitz Benson &
19  Torres, LLP.
20        Mr. Bowen, you're here as the corporate
21  witness for Kasowitz Benson & Torres, LLP?
22        A.    Yes.  The witness for the entity
23  Kasowitz, Benson, & Torres.
24        Q.    And if I just refer to it for
25  shorthand as Kasowitz, you will know I'm referring
```



```
1                         Bowen

2    to the firm?

3           A.    Sure or KBT.

4           Q.    Yeah, I'll never remember that.

5    Let's go with Kasowitz, but you can refer to it as

6    KBT if you prefer.

7         So you have a subpoena in front of you?

8           A.    I do.

9           Q.    If you can turn to Exhibit A.

10          A.    Yes.

11          Q.    And, specifically, the document

12   request on subject matters?

13          A.    Yes.

14          Q.    Do you see numbers one through nine?

15          A.    Correct.

16          Q.    Did you undertake a search on behalf

17   of the firm to see what documents you had?

18          A.    Yes.

19          Q.    And can you describe that search or

20   that process?

21          A.    I made a reasonable inquiry and also

22   used my own intimate knowledge of the firm's role

23   in connection with all things Genger.

24          Q.    And you have produced in response to

25   that one document entitled, "First Amendment to
```



```
 1                      Bowen

 2     Settlement Agreement and Release"; is that

 3     correct?

 4          A.    Correct.  And I think that's

 5     responsive to Request No. 4.

 6               MR. DELLAPORTAS:  Okay.  So let's

 7          mark that as Kasowitz Exhibit 2.

 8               (Exhibit 2 was so marked for

 9          identification.)

10     BY MR. DELLAPORTAS:

11          Q.    So, other than this, you have no

12     responsive documents?

13          A.    That's correct.

14          Q.    Was anything withheld on privilege

15     grounds?

16          A.    Yes and no.  Excuse me.

17          Yes and no, because the primary objection is

18     relevance, although some documents that we deemed

19     irrelevant would also be privileged or at least

20     some of them are.

21          Q.    And when you say the primary

22     objection, where were those objections interposed?

23          A.    We can go through them all, but if

24     you take No. 4 as an example, "All documents

25     concerning the attached stipulation and the
```



```
1                        Bowen

2    attached first amendment to stipulation and

3    release," that would involve documents, for

4    example, of e-mail of either drafting this thing

5    or circulating it for signature.  And in our view

6    that's irrelevant.

7         Q.    Why is that irrelevant in your view?

8         A.    It's irrelevant because it has

9    nothing to do with identifying assets that belong

10   to Orly Genger or assets that are to be paid to

11   Orly Genger.

12        Q.    And has Kasowitz served any written

13   objections in response to the subpoena?

14        A.    No.  We are interposing the

15   objections orally.

16        Q.    So why don't we go through and you

17   can tell me what specifically are your objections?

18   Let's start with No. 1 -- if any.

19        A.    Well, we object to it as overbroad

20   and irrelevant because, again, to the extent the

21   firm has any knowledge of any agreements where

22   Orly Genger owes money or is a debtor, it's

23   irrelevant to property that -- or assets that she

24   owns or that are to be paid to her.  So it's

25   beyond the scope of Article 52.
```



```
1                            Bowen

2         On the other hand, if there are documents or

3    agreements that reflect assets owned by Orly

4    Genger or that are to be paid to Orly Genger, that

5    would be responsive and we think relevant and we

6    undertook a search for that and there are none.

7         Q.    Okay.  Number 2.  Do you have

8    objections to No. 2?

9         A.    No.  I think that's completely

10   responsive.  That states, quote, "All documents

11   concerning any property held by or debts owed to

12   Orly Genger."  We -- the firm has no documents

13   responsive to that, but we interpose no objection

14   to that.

15        Q.    Okay.  What about No. 3?  Any

16   objections to that?

17        A.    "All documents relating to the

18   settlement agreement -- " Right.

19        Well, we object to you using the phrase

20   "Orly Settlement Agreement" to define that because

21   it's misleading and confusing.  It's not an Orly

22   Settlement Agreement.  What you are referring to

23   is a settlement agreement between the AG Group and

24   the Trump group and it's usually referred to as

25   the "AG/Trump Settlement Agreement."
```



```
 1                         Bowen

 2         And because of that agreement or, quote,

 3   unquote, "all documents relating to that

 4   agreement," has nothing to do with property owned

 5   by Orly Genger or property or assets to be paid to

 6   Orly Genger.  That entire request, at least

 7   Subpart A, is irrelevant.

 8         Q.    Why in your -- I'm sorry.  I didn't

 9   mean to cut you off.

10         A.    Okay.  Subpart B, "any escrow

11   accounts, arrangements, to the extent that it was

12   for the benefit of Orly Genger" meaning the escrow

13   assets belong to her or are to be paid to her, we

14   deem that relevant and would produce responsive

15   documents if any, but I can attest today that

16   there are none.

17         And the same with Subsection C, "any

18   promissory notes issued thereunder."  So if there

19   were any promissory notes in the possession,

20   custody, or control of Kasowitz that were payable

21   to Orly Genger or reflected assets that she owns

22   or that are due to be paid to her, we'd deem that

23   responsive and would produce any documents if any.

24   But I can attest here today that we are in

25   possession of none; no such documents.
```

                                Bowen

1

2        Q.    Okay.  We'll circle back to that.

3    Let's move on.  Let's go through the list first.

4        A.    Okay.  Number 4, I have already spoke

5    about unless you want me to reiterate it.

6        Q.    So you have given us the first

7    amendment and the stipulation itself, but you

8    haven't given us any documents related to what you

9    are interposing and irrelevance objection?

10       A.    Correct.

11       Q.    Number 5?

12       A.    Which states, quote, "All agreements

13   as to the past, present, or future disposition of

14   any settlement proceeds under the Orly settlement

15   agreement," close quote.

16       Again, we object to that phrase Orly

17   settlement agreement as misleading and potentially

18   misleading and potentially false.

19       But if you are referring to the AG/Trump

20   Settlement Agreement, which we think you are, if

21   there were agreements that reflected assets owned

22   by Orly or to be paid to Orly under that

23   settlement agreement or in relation to that

24   settlement agreement, that's relevant in our view

25   and we would produce such documents if any



```
 1                         Bowen
 2    existed.  And we did search for such documents,
 3    but I can attest, on behalf of the firm, there ae
 4    no such documents in our possession, custody, or
 5    control.
 6           Q.    Let's go to No. 6.  Any objections to
 7    that?
 8           A.    Quote, "all accounts, statements for
 9    any escrow accounts related to the" -- what you
10    call the "Orly Settlement Agreement."
11           Again, the same objection as misleading,
12    intentionally so, but the AG/Trump Settlement
13    Agreement.  If there were account statements for
14    escrow accounts that reflected assets owned by
15    Orly or to be paid to Orly Genger, we would
16    produce those, but I can attest that we're not,
17    you know, we're not in custody, possession, or
18    control of any such accounts.
19           In fact, I don't mind telling you that we
20    are not in possession, custody, or control of any
21    account statements or any escrow accounts relating
22    to the AG/Trump Settlement Agreement, period.
23           Q.    Okay.  Number 7.  Do you have any
24    objection to that?
25           A.    Quote, "All documents concerning any
```



1                          Bowen

2    indemnity demands and/or indemnity payments made

3    under the Orly settlement agreement."  The same

4    objection as using that phrase to be potentially

5    misleading.

6         We read that as referring to the AG/Trump

7    Agreement.  It is kind of a vague, ambiguous

8    objection there.  I'm not really sure what you are

9    asking.  Maybe you can clarify that today, but I

10   can say we're not aware of any -- the firm is not

11   aware of indemnity demands and/or indemnity

12   payments related to the AG/Trump Settlement

13   Agreement period.

14        But we would deem, if we were aware or had

15   such documents and they reflected Orly's assets or

16   assets to be paid to Orly, we would deem that

17   relevant and responsive.

18        But like I said, I can go beyond that and

19   say we are not aware of any indemnity demands,

20   period.  But that is subject to you clarifying

21   what you really meant by that.  I may be

22   misinterpreting that.

23        Q.   We will come back to that, let's just

24   get through our list.

25        Number 8.  Any objections to that?



1                        Bowen

2        A.    Quote, "All payments made to any

3   person or entity pursuant to the Orly Settlement

4   Agreement."  The same objection as intentionally

5   misleading by referring to it as the "Orly

6   Settlement Agreement" it is the AG Group/Trump

7   Group Settlement Agreement.

8        With that understanding, if we had records,

9   meaning the firm, of payments to Orly or that were

10  to be paid to Orly in relationship to that -- in

11  relation to that particular settlement agreement,

12  but this is also subsumed under your first

13  request, those documents, in our view, would be

14  responsive and relevant and we would produce them,

15  if any.

16       To the extent that you are asking about

17  other people that -- that are not Orly or that

18  don't reflect assets owned by her or to be paid to

19  her, we would object that that is beyond the scope

20  of Article 52 and irrelevant and not responsive.

21       Having said all of that, on behalf of the

22  firm, I can attest that there are -- the firm is

23  in possession of no records whatsoever of any

24  payments made under this AG/Trump Settlement

25  Agreement.



**MICHAEL PAUL BOWEN**                                        October 05, 2018
**SAGI GENGER -v- ORLY GENGER**                                              14

```
 1                      Bowen
 2        Q.    Lastly, No. 9, "All non privileged
 3   communications regarding any of the forgoing
 4   subjects."
 5        A.    Everything I said previously would
 6   apply to that.
 7        Q.    Incorporate all of your prior
 8   objections?
 9        A.    Right.  Obviously, you're -- you're
10   subpoenaing a law firm that represents Orly
11   Genger.  Every single one of these requests could
12   impinge upon privilege; so it could be the case
13   that there are e-mails and other types of
14   documents that would be attorney-client privilege
15   and work-product privilege, and we're not
16   undertaking to do a log because we think that is
17   overly burdensome and bordering on harassment.
18        And when you subpoena a law firm that
19   represents a person that you are adverse to, I
20   assume you're expecting a lot of it to be
21   privileged.
22        Q.    So, other than what you have just
23   stated, does Kasowitz have any further objections
24   to Nos. 1 through 9?
25        A.    I don't think so.
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        15

                               Bowen

1                              Bowen

2        Q.    Let's go back to No. 7, because that

3   one, I think, you asked for clarification on?

4        A.    Correct.

5        Q.    Have you read the -- what you refer

6   to as the AG/Trump Settlement Agreement?

7        A.    Only in part and a long time ago.

8        Q.    Okay.  Are you aware that there are

9   two promissory notes that were issued pursuant to

10  the Trump Group -- AG/Trump Group Settlement

11  Agreement for $7.5 million each?

12       A.    There are promissory notes by the

13  Trump Group if I am remembering correctly, yes.

14       Q.    Okay.  And those payments, to the

15  best of your knowledge, have not been made yet;

16  correct?

17       A.    To the best of the firm's knowledge

18  -- I mean, the firm had no knowledge of that

19  whatsoever.

20       Q.    Okay.  Do you recall in reading the

21  agreement that the Trumps have certain rights to

22  deduct defense costs and other related legal costs

23  for indemnification and whatnot?

24       A.    Correct, yes.

25       Q.    From those ultimate payments of $15



MICHAEL PAUL BOWEN                                   October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        16

```
 1                       Bowen
 2   million?
 3        A.    That's my understanding, yes.
 4        Q.    Okay.
 5        A.    And when I say "my" I mean on behalf
 6   of the firm.
 7        Q.    Yeah.  I'll just -- everything from
 8   this point forward, I will have an understanding
 9   if you say "my" you mean the firm and if I say
10   "you" I mean the firm.
11        A.    If there are any singular pronouns, I
12   mean, I'm speaking with the royal we.
13        Q.    Yeah.  I'll assume the royal we
14   unless you specify other words and you can assume
15   from me the royal we unless I specify you
16   personally?
17        A.    Understood.
18        Q.    So with that clarification, do you
19   have any documents responsive to that demand?
20        A.    Well, with that clarification, the
21   firm is unaware of any documents relating to those
22   two promissory notes or the Trump Group's claim of
23   offset on promissory notes that relate to assets
24   owned by Orly or to be paid to Orly.
25        Q.    Okay.  So you have intentionally
```



```
 1                      Bowen

 2   narrowed the request to your view of anything

 3   that's relating to payments to be made to Orly?

 4         A.    Or that reflects assets she owns.

 5         Q.    Okay.  And why in your view would

 6   indemnity demands by the Trump Group not relate to

 7   any assets owned by Orly or to be paid to Orly?

 8         A.    You are dealing with the scope of the

 9   firm's understanding of this, so with that caveat,

10   the payments that are due under the AG/Trump

11   Settlement Agreement, and under those two

12   promissory notes, are to the AG Group and not to

13   Orly.

14         Q.    Okay.

15         A.    If there is some arrangement within

16   the AG Group that allocates any portion of the

17   payments to Orly, the firm is unaware of it.

18         Q.    Is the firm aware of any arrangement

19   with respect to the payment of the remaining

20   proceeds at all?

21         A.    My hesitation in answering that

22   question is that it may be impinging on privileged

23   information.  To the extent that we have that

24   information, it would be in the attorney-client

25   relationship with Orly.  And I'm not at liberty to
```



```
 1                      Bowen
 2   waive privilege, so I would assert privilege as to
 3   that question on behalf of Orly Genger as the
 4   owner of the privilege.
 5            Q.    Well, you declined to produce
 6   documents responsive to our requests on the ground
 7   that Kasowitz affirmatively takes the position
 8   that there is no arrangement that Orly will get
 9   any of that money.  Do I understand that
10   correctly?
11            A.    No.  You misstated my testimony.
12   It's not that we affirmatively understand that
13   Orly is not getting any of that money, it's that
14   the Kasowitz has no information.
15            Q.    Does that include Mr. Hirschman when
16   you say, "Kasowitz has no information"?
17            A.    Well, Mr. Hirschman is Orly Genger's
18   spouse, so he may have information qua spouse, but
19   not as a partner in the firm.  And I frankly don't
20   know what is in his head.
21            Q.    Okay.  So nobody in -- in making the
22   decision not to produce documents responsive to
23   this request on the ground that Orly wasn't
24   getting any of the money, nobody asked
25   Mr. Kasowitz as to his knowledge of the ultimate
```



MICHAEL PAUL BOWEN                                October 05, 2018
SAGI GENGER -v- ORLY GENGER                                      19

```
 1                        Bowen
 2   disposition of the $15 million?  I'm sorry,
 3   Mr. Hirschman?
 4        A.    I understood you meant Mr. Hirschman.
 5        Well, I'm not going to get into any
 6   methodology that I used in preparing for the
 7   deposition because that's privileged work product.
 8   I am testifying under oath that I made a
 9   reasonable inquiry and a reasonable search.  And
10   your question was -- I'm sorry.  I lost your
11   question.
12        Q.    In deciding not to produce documents
13   responsive to the subpoena on the ground that they
14   do not relate to payments ultimately to be made to
15   Orly Genger, did the firm inquire with its
16   partner, Mr. Hirschman, to confirm that in fact
17   none of the $15 million will ultimately be paid to
18   Orly Genger?
19        A.    Well, without specifying what
20   methodology I used to gather information
21   responsive to this subpoena, and to make decisions
22   about what is and is not responsive, I can testify
23   that to firm's understanding and to the firm's
24   knowledge, none of that money belongs to or is to
25   be paid to Orly Genger.
```



1                              Bowen

2          Q.    And is your position driven by the

3    fact that on the face of the agreement it says

4    that the money is to be paid to something called

5    the "AG Group"?

6          A.    I don't understand your question.

7          Q.    What is the basis of your

8    understanding that none of the money is to be paid

9    to Orly Genger?

10         A.    The basis for the firm's

11   understanding is the knowledge, institutional

12   knowledge, that we have based on our review of

13   documents, some of which are privileged, and my

14   reasonable inquiry of the lawyers at the firm that

15   have been involved in the Genger matter since the

16   firm was originally involved.

17        And if you are asking me did we make some

18   kind of interpretation and are we just basing this

19   on the interpretation of one document, the answer

20   is no.

21         Q.    Okay.  And circling back to my

22   question:  Did anyone inquiry of Mr. Hirschman

23   about that?

24         A.    I'm not going to answer any questions

25   about methodology that I used on behalf of the



1                         Bowen

2   firm to be prepared to answer questions today

3   because that's a protected work product.  But I am

4   telling you and attesting under oath that I made

5   reasonable inquiry.  I don't mind telling you that

6   reasonable inquiry would involve communications

7   with Mr. Hirschman.

8           Q.    Is Mr. Hirschman currently a partner

9   in the firm?

10          A.    Yes.

11          Q.    Is he an equity partner?

12          A.    I don't know what you mean by that.

13  I'm not sure what that means at my firm.  Now I'm

14  speaking personally, not on behalf of the firm.

15  The firm knows.

16          I did not do any reasonable inquiry on that

17  particular question, so I don't know the answer to

18  that.

19          Q.    Okay.

20          A.    It's beyond the scope.

21          Q.    Well, you know, every firm organizes

22  their partnership different from every other firm,

23  but in some cases the title "partner" is just a

24  title and in other cases it implies what I view as

25  more of an actual partnership which is an



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        22

```
 1                        Bowen
 2   ownership, and they share the profits and what
 3   have you.  So I don't know how Kasowitz organizes
 4   things, but to that extent, would you view
 5   Mr. Hirschman as a either an equity partner or a
 6   true partner or a profit sharing partner?
 7           A.    That is beyond the scope of what I'm
 8   prepared to attest to on behalf of the firm.  I
 9   honestly don't know the answer to that question.
10           Q.    Okay.  So who, in your view, is the
11   $15 million to be paid to?
12           A.    Well, the view of the firm is that
13   the money is to be paid into -- into, I guess, a
14   trust or into an escrow -- I forget how the
15   wording works -- into an escrow that's to be held
16   by me personally and in -- I shouldn't say
17   personally, but me in my capacity as partner with
18   the Kasowitz firm.  But the disposition of that
19   money, once -- if it is ever received -- is up to
20   the AG Group.
21           Q.    When you say, "the AG Group" what do
22   you mean by that?
23           A.    Well, the AG Group is defined in the
24   AG/Trump Settlement Agreement.
25           Q.    Let's go ahead and mark that as
```



```
 1                    Bowen
 2    Kasowitz 3.
 3              (Exhibit 3 was so marked for
 4         identification.)
 5   BY MR. DELLAPORTAS:
 6         Q.   So if you look on the opening
 7    paragraph, there is the description of the AG
 8    Group.  Do you see that?
 9         A.   Yes.
10         Q.   When you refer to the AG Group are
11    you -- what you are referring to is consistent
12    with this definition?
13         A.   Yes.
14         Q.   And so the definition has the AG
15    Group including Arie Genger; is that right?
16         A.   Yes.
17         Q.   And Orly Genger?
18         A.   Yes.
19         Q.   And Arnold Broser?
20         A.   Yes.
21         Q.   And David Broser?
22         A.   Yes.
23         Q.   And it says, "In their individual
24    capacity on behalf of all entities managed, owned
25    or controlled in any way by Arnold or David Broser
```



1                        Bowen

2    and which are in any way relating to the subject

3    matter hereof."

4          Do you see that?  It's lines 4 and 5?

5          A.    Yes.  That's the -- you read the

6    parenthetical after David Broser?  Yes.

7          Q.    So, what entities are those?

8          A.    I have no idea.

9          Q.    You don't know any -- you don't know

10   the names of any entities associated with Broser?

11         A.    No.

12         Q.    Let's go back to Kasowitz 2 --

13         A.    Okay.

14         Q.    -- which is the first amendment.

15         A.    Right.

16         Q.    What are the circumstances by which

17   this came about?

18         A.    I'm not sure that's within the scope

19   of your subpoena, but I'm willing to give you some

20   leeway.

21         Q.    I think there is a whole category.

22         Well, all documents concerning any property

23   -- it's No. 4.  So you can answer, you can object,

24   but that's my question.

25         A.    Well, I object that it's outside the



1                          Bowen

2    scope of the subpoena.  Your authority is to look

3    for assets that belong to Orly Genger or that are

4    to be paid to her.  I don't see how the context of

5    this first amendment has anything to do with that

6    for the reasons we just discussed.

7            Q.    Yet you produced it.

8            A.    Yes.  Yes, we did because you

9    specifically asked for it and you produced a copy

10   to us but it was unsigned so we gave you the

11   executed copy.

12           Q.    Okay.  And you would agree --

13           A.    Just so it's perfectly clear that you

14   have the operative document.

15           Q.    Okay.  And you would agree with me,

16   wouldn't you, that this document contemplates an

17   eventually payment of up to $15 million to you;

18   correct?

19           A.    No.

20           Q.    No?  What does it do?  You tell me.

21           A.    It is a mechanism for payment under

22   the AG/Trump Settlement Agreement that goes into

23   an escrow account that would be set up by me

24   and/or the Kasowitz firm per direction from the AG

25   Group.



```
 1                            Bowen

 2          Q.    And so when you say, "direction by

 3    the AG Group," what would you consider to be

 4    direction by the AG Group?

 5          A.    I don't know how else to describe

 6    what I just described.

 7          Q.    Let's assume a year from now $15

 8    million comes in.  What will it take for you to

 9    make a payment to anyone of that $15 million?

10          A.    It would take direction from the AG

11    Group.

12          Q.    Meaning what?

13          A.    Meaning direction from the members of

14    the AG Group.

15          Q.    Meaning Arie Genger, Orly Genger, and

16    the two Brosers?

17          A.    That's how it's defined to the firm's

18    understanding in the relevant documents.

19          Q.    Okay.  So, the only way you will

20    release the proceeds at some -- if such proceeds

21    should come in the future -- is from a written

22    instrument signed by Arie Genger, Orly Genger,

23    Arnold Broser and David Broser?

24          A.    I don't know if there is a

25    requirement for a written instrument.  It may be
```



```
 1                      Bowen
 2   right.  I don't -- it's beyond the scope.
 3        Q.   Well, let's say they all get on the
 4   phone with you.  Let's take out writing.
 5        A.   What is the question?
 6        Q.   Is it correct that the only way you
 7   will release the proceeds is if you are instructed
 8   by all four of those individuals to do so in the
 9   same manner?
10        A.   No, that is not correct.
11        Q.   How is it incorrect?
12        A.   There is no understanding that the
13   firm is aware of that it's a majority vote or a
14   consensus vote or anything like that.  It's
15   whatever -- whatever the agreement there is in and
16   among the members of AG Group, the firm has no
17   knowledge of that.
18        Q.   Is the AG Group a corporation?
19        A.   I have no idea.
20        Q.   A trust?
21        A.   I have no knowledge.
22        Q.   LLC?
23        A.   No knowledge.
24        Q.   When you say you are going to take
25   instructions from the AG Group, how is that going
```



                            Bowen

 1

 2   to be communicated to you?

 3          A.    I think that's beyond the scope of

 4   this deposition and beyond the scope of your

 5   authority under Article 52.  With that objection,

 6   and without waiving that objection, I'm really not

 7   sure how to answer that question.

 8       How would that be communicated to me.

 9          Q.    Look, in a few days we are going to

10   go before a judge, just to be frank.  The judge is

11   going to want to know about this $15 million.  You

12   are the escrow agent for the $15 million.  Clearly

13   you know the circumstances under which you would

14   release the $15 million, so why don't you just

15   share this with me now so that you don't

16   unnecessarily annoy the federal judge?

17          A.    Is that a question?

18          Q.    It's a suggestion.  I've asked

19   several questions and you have been very

20   disingenuous.  Why don't you just try to answer

21   them.

22          A.    Look.  I don't understand why you are

23   making this into a hostile, ad hominem attack on

24   me.

25          Q.    I'm not making an ad hominem on you.




```
 1                        Bowen
 2          A.    I'm speaking on behalf of the firm.
 3   I have --
 4          Q.    You are saying you have $15 million
 5   and you --
 6          A.    Excuse me.  Let me finish.
 7          Q.    -- have no idea how it is going to.
 8   Do you understand how this is going to look when
 9   the judge sees this transcript?  I'm trying to
10   help because I don't want -- I don't need to make
11   unnecessary motions.  I'm just trying to collect
12   some money here.  I'm not trying to burden the
13   court.
14          A.    You interrupted my answer.  You spoke
15   over me so that the court reporter couldn't take
16   down what I was saying.
17          Q.    Knock yourself out.
18          A.    I'm not going to engage in this kind
19   of argumentative behavior.  I thought that we were
20   going to be here as two professionals talking in a
21   professional way.  You have immediately devolved
22   into your normal mode of behavior, which is ad
23   hominem attack and unreasonable speeches on the
24   record.
25          Everything you said I disagree with.  I have
```



1                              Bowen

2    been very clear about the scope of which I'm

3    prepared to answer and the scope within which we

4    think your subpoena is authorized.

5         If you want to continue this, you must deal

6    with me civilly.  If you do that again, I'm going

7    to leave and then you can explain to the federal

8    judge and you can go look at the ethical rules,

9    the professional rules which require you to be

10   civil, why it was you weren't able to complete

11   this deposition.

12        Q.    I have been perfectly --

13        A.    Do you want to continue?

14        Q.    I have been perfectly civil with you.

15   Your answers, frankly, are an embarrassment.

16        A.    Don't characterize my answers.

17   That's not being civil.  Ask a question.  If you

18   have objections to my answers, you can proceed.

19        Q.    Please testify as to under -- what

20   circumstances you will release the proceeds

21   pursuant to the document where you are the escrow

22   agent?

23        A.    I have already testified.  This is

24   asked and answered -- I'll interpose that

25   objection -- at the direction of the AG Group.



```
 1                          Bowen
 2          Q.    What does that mean?
 3          A.    I don't know how else to explain it
 4   to you.
 5          Q.    What does it mean?
 6          A.    What do you not understand about it?
 7          Q.    Tell me what it means to be at the
 8   direction of the AG Group?
 9          A.    Well, first of all I object that this
10   is outside the scope of your subpoena.  If you had
11   a basis to say that some of that money is either
12   belongs to Orly Genger or is payable to Orly
13   Genger, you can make that showing and we can have
14   that discussion.
15          Q.    Well, I think we have a document
16   here --
17          A.    We'll probably have to -- excuse me.
18   I'm in the middle of my answer.
19          Q.    Okay.
20          A.    We'll probably have to litigate that,
21   but as of right now I see that outside of the
22   scope of your authority under Article 52 and
23   outside the scope of this subpoena.
24          However, without waiving that objection, I'm
25   willing to give you some latitude which is what I
```



```
 1                      Bowen

 2   said and I'm willing to describe to you the firm's

 3   understanding of how this mechanism works.

 4          Q.    So please proceed.

 5          A.    Well, I have already told you that

 6   the AG Group has to give direction about how the

 7   money is disbursed after it hits the escrow

 8   account held by the firm.

 9          Q.    Uh-huh.

10          A.    You asked me how is that direction

11   going to be communicated.  My response is, on

12   behalf of the firm, however the AG Group wants to

13   communicate it.  It can be in writing, it can be a

14   phone call.  It would have to be something that

15   could be documented I would assume just to, you

16   know, discharge our recordkeeping responsibilities

17   to show the flow of the money and, you know, 1099s

18   and whatnot.

19          And then you are asking me who can speak on

20   behalf of the AG Group whether it has to be all

21   four in consensus, whether it has to be a majority

22   vote, whether somebody else can speak on behalf of

23   the AG group and my answer is:  We don't have any

24   information about any agreements between the AG

25   Group.  We're not aware that there is any dispute
```

MICHAEL PAUL BOWEN                          October 05, 2018
SAGI GENGER -v- ORLY GENGER                              33

1                       Bowen

2    among the members of the AG Group, that there is

3    any agreement among the AG Group about who can

4    direct the money and who can't direct the money

5    maybe.  If that -- maybe that will become an issue

6    down the road but we are not aware of it.

7            Q.    Are you aware of anyone who is

8    authorized to speak on behalf of the AG Group?

9            A.    Well, my understanding is that the

10   members of the AG are reflected in Exhibit 3,

11   these four individual people, and then the

12   entities as you have pointed out.  I'm not aware

13   of any issue about who the spokesperson for the

14   group can be.

15           If you are asking me can I identify who the

16   spokesperson for the group is, the answer is no.

17   We're not aware that a spokesperson has been

18   designated.  We're not aware that it's an issue.

19           Q.    Well, let me ask you:  $15 million

20   comes in, Arie Genger calls you up and says, I'm

21   speaking on behalf of the AG Group, will you send

22   him the money?

23           A.    I can't really answer that question.

24   It's a hypothetical.  I'm not -- again, I think

25   it's outside the scope of the subpoena so I'll



```
 1                      Bowen

 2   object on that basis, but in the spirit of giving

 3   you some latitude so that you have some

 4   transparency into this arrangement at least as far

 5   as the firm is aware, the answer is maybe yes,

 6   maybe no.  I mean, if we don't hear from the other

 7   members of the group that there is some

 8   dissension, then the answer would be that we would

 9   follow that direction, hypothetically speaking.

10          Q.   If I ask that question for Orly

11   Genger, would you give the same answer?

12          A.   If Orly Genger called up speaking on

13   behalf of the AG Group?  Yes, the same answer.

14          Q.   What about Arnold Broser?

15          A.   Same answer.

16          Q.   David Broser?

17          A.   Same answer.

18          Q.   Has any money been received pursuant

19   to this document?

20          A.   No.

21          Q.   This Kasowitz 2?

22          A.   No.

23          Q.   Okay.  Have there been any

24   communications with members of the Trump Group

25   about potential receipt of this money pursuant to
```



1                              Bowen

2   this document?

3           A.    Well, the trump Group signed Exhibit

4   2, the members of the Trump Group did, so yes.

5           Q.    Were new notes issued pursuant to

6   this document?

7           A.    No.

8           Q.    Promissory notes?

9           A.    I think there were amendments.  It

10   might have been a supplemental amendment.  I don't

11   recall.  It just reflects the same information

12   that's in this amendment.

13           Q.    I'm sorry.  Can you just read that

14   back.

15           A.    I will explain.  If you read Exhibit

16   2 you will see that it's making amendments about

17   the direction of how the Trump group is to route

18   the money.  I believe and I'm going from memory

19   here, that the note itself -- the originally

20   issued note -- refereed to Watell.

21         That there was either a supplemental

22   attachment to the note or an amendment to the note

23   that substituted Kasowitz firm, me, for Watell.

24   Any changes to the note are changes that you see

25   reflected here.



```
 1                        Bowen
 2         Q.    And Kasowitz was in possession of the
 3   old notes?
 4         A.    The answer to that is no.
 5         Q.    What about the new notes?  Or the
 6   amended notes?
 7         A.    Yes.
 8         Q.    You haven't produced those?
 9         A.    No.
10         Q.    Why haven't you produced those?
11         A.    Because we don't see it within the
12   scope of the subpoena or the scope of your -- the
13   wording.
14         Q.    And the reason?
15         A.    If you want it, I will take it under
16   advisement.  I mean, we gave you the executed
17   version of the first amendment because you gave it
18   to us unsigned.  In the spirit of full
19   transparency, we wanted you to have the document
20   that shows that that's the operative agreement so
21   you don't have any confusion about it.
22         Q.    And in your view, why were the
23   amended subordinated notes production of the
24   amendment subordinated notes beyond the scope of
25   the subpoena?
```



1                         Bowen

2          A.    Because it doesn't reflect assets

3    owned by Orly or to be paid to Orly.

4          Q.    Why not?

5          A.    I don't know what you mean "why not,"

6    it doesn't.

7          Q.    Well, because it's to be paid to a

8    quote, unquote, group of which Orly is one member;

9    correct?

10         A.    Well, your statement that she is a

11   member of the AG Group is correct.

12         Q.    And the notes are to paid to the AG

13   Group; correct?

14         A.    No.  They are to be paid at the

15   direction of the AG Group.

16         Q.    Okay.  And the AG Group is not in

17   itself some sort of corporation or partnership as

18   far you know.  It's not some sort of legal entity;

19   correct?

20         A.    The firm has no information about

21   that.

22         Q.    Okay.  But to the best of your

23   knowledge, you're not aware of any legal entity

24   created that's known as the AG Group?

25         A.    The firm is not.



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        38

1                         Bowen

2          Q.    Okay.  So we have notes to be paid at

3    the direction of a group of which Orly is one

4    member and yet you are taking the position that

5    that is not, in any way, relevant to that process

6    by which we seek to identify assets potentially

7    payable to Orly Genger herself?

8          A.    That's correct because as I testified

9    earlier, it is the firm's understanding that there

10   is no -- there is no arrangement that any amount

11   of that money is to be paid to Orly or that she

12   owns or has any claims to any amount of that

13   money.

14         Q.    What is the firm's understanding as

15   to how that money is to be disbursed if received?

16         A.    It's up to the AG Group.  It has

17   nothing to do with any kind of ownership claim by

18   Orly.

19         Q.    Has the AG Group shared that

20   understanding with Kasowitz?

21         A.    That's the firm's understanding.  I'm

22   not going to try and parse out what part of that

23   may be protected by privilege and what part of it

24   is coming through third party communications.  I'm

25   not in a position to do that.



1                     Bowen

2          Q.    Well, has the AG Group shared its

3    intention as to how, if the money is received, it

4    intends to direct you to disburse it?

5          A.    No.  Other than it's our

6    understanding, again, based on communications that

7    I can't parse out, that Orly Genger has no claim

8    to any of that money nor is any of that money

9    being paid to her.

10         Q.    What is your understanding based on?

11         A.    I already explained to you that I

12   can't parse out what communications that's based

13   on because some are privileged and some are not.

14   And it's just -- it's an impossibility to try and

15   make that kind of fine distinction, but it

16   involved communications with our client and it

17   involved communications with the members of the AG

18   Group.

19         Q.    Okay.  Is Arnold Broser a client of

20   the firm with respect to this matter?

21         A.    Not with respect to the Gengers, no.

22         Q.    With respect to anything else?

23         A.    No.  Well, I don't know.

24         Q.    That you are aware?

25         A.    Well, I -- I don't know.



                              Bowen

2       Q.     In which you, Michael Bowen, are
3    aware?
4       A.     Well, I'm not really here testifying
5    on my behalf to try and move this along.  I can
6    say that it's without the scope of the subpoena so
7    I didn't do any reasonable inquiry trying to
8    figure out if the firm represents the Brosers in
9    any, you know, any other matter totally unrelated
10   to this.  I have no knowledge of that.  I guess,
11   just to help you, I will volunteer in my
12   individual capacity, I have to idea.
13      Q.     Let me just limit it to this.
14   Limited to this, Arnold Broser is not a client of
15   the firm?
16      A.     That's correct.
17      Q.     And what about David Broser?
18      A.     Same answer.
19      Q.     What about Arie Genger?
20      A.     Arie Genger is a little more
21   complicated because we -- the firm has appeared on
22   his behalf in some of his litigations involving
23   disputes with Sagi Genger, who may or may not be
24   related to this settlement agreement because it's
25   so convoluted.  I don't know the answer to that.



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        41

1                        Bowen

2        Q.    With respect to this settlement

3   agreement, you are not able tell me whether the

4   firm believes it has a privileged attorney-client

5   relationship with Arie Genger?

6        A.    That's correct.  I'd have to look

7   into that.

8        Q.    And the reason I ask is because you

9   declined to answer certain questions with regard

10  to your knowledge of the ultimate disposition o

11  these proceeds on privileged grounds.

12        So, when you make that objection, are you

13  specifically speaking of Orly's privilege or are

14  you speaking also of a potential privilege with

15  Arie?

16        A.    Well, I haven't declined to answer

17  anything.  I have answered all of your questions.

18  I have interposed objections that constrain the

19  information that I can provide.

20        It is certainly the case that we represent

21  Orly Genger in all aspects of her dispute --

22  disputes, plural, with Sagi Genger, and certainly

23  in connection with the AG/Trump Group Settlement

24  Agreement so that prohibits me from divulging

25  communications that we have had with members of



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        42

```
 1                        Bowen
 2   the AG Group to come to conclusions or the
 3   understanding that we have.  It's not really
 4   conclusions, it's really just our understanding.
 5           Q.    So you are declining or you feel
 6   constrained not to identify communications with
 7   any of the four members of the AG Group?  Is that
 8   what I understood your last answer to mean?
 9           A.    I can't parse out how we came to the
10   understanding based on who told us what, because
11   some of that is privileged and I'm not going to
12   give you unprivileged communications so you can
13   deduce privileged information.
14           Q.    Well, let's put aside what I can
15   deduce and not deduce.  You have made a statement
16   that Kasowitz believes that none of the $15
17   million will ultimately be paid to Orly.  I have
18   asked you the basis for that understanding and you
19   said it's -- you're constrained by the privilege
20   from answering it.  I have asked who that
21   privilege is with --
22           A.    I've got to correct you.
23           Q.    Hold on.  Let me finish and then you
24   can correct everything I said that is wrong.
25           I've asked you the basis for who you had the
```



```
 1                          Bowen

 2    privilege with, and you said, "Orly and maybe

 3    Arie."  What I'd like for you to do is to identify

 4    for me any communications you have had with anyone

 5    who is not Orly Genger or Arie to the extent you

 6    are maintaining a privileged relationship with him

 7    with respect to this matter with regard to the

 8    ultimate disposition of the $15 million?

 9          A.    I can't answer that question because

10    you -- you made some misstatements in there about

11    what I have said just moments ago.  So I can't

12    adopt your long preamble and now, because you

13    interrupted me when I tried to correct you, I

14    don't remember what it was you were saying that it

15    was mistaken.

16          Q.    I can do without the preamble.

17          A.    I'd like to correct the preamble.

18          Q.    You can read it back and make any

19    corrections you want.

20                (Readback of prior question.)

21                THE WITNESS:  So you are mistaken in

22             saying that I'm constrained from telling

23             you the basis for the understanding.  I

24             told you the basis for the understanding.

25             You didn't ask to get into the
```



                              Bowen

  1   communications that -- the substance of

  2   the communications that the firm has had,

  3   I presume the question is with each member

  4   of the AG Group on that topic, and my

  5   answer to that is:

  6        Because of the privilege, I cannot

  7   parse out which information came from

  8   which member of the AG Group, or how many

  9   discussions we had over what period of

 10   time or who had these discussions on

 11   behalf of the firm.  That's not within the

 12   scope of preparing for this deposition so

 13   I don't have that information at my

 14   fingertips.

 15        And then, on top of that, there are

 16   privilege concerns because some of that

 17   information certainly came from Orly

 18   Genger who is a client and some came from

 19   Arie Genger who may be a client for these

 20   purposes.  I'm not clear on that on behalf

 21   of the firm.  That would take further

 22   investigation on my part.

 23        Q.    Let me just limit it to the Brosers.

 24   What communications have you had with Brosers with



                         Bowen

 1
 2   respect to the ultimate disposition of the
 3   proceeds?
 4        A.    Other than telling you that there
 5   were communications with the Brosers between the
 6   Brosers and the firm on that topic I cannot get
 7   into details of the communications.  That's not
 8   available to me.
 9        Q.    Why can't you?
10        A.    That's not something that I prepared
11   in anticipation of the testimony today.  I did not
12   see it within the scope of the subpoena or
13   relevant to your inquiry.
14        Q.    Why did you not see it within the
15   scope of the subpoena?
16        A.    The question is:  Did the firm have
17   an understanding that anything relating to the
18   settlement agreement or the $15 million notes, you
19   know, minus whatever setoffs the Trump Group is
20   going to claim.  And that payment mechanism, if
21   anything related to that has a relationship to or
22   assets owned by Orly or assets to be paid to Orly,
23   and the firm's understanding is that it does not.
24        So how the firm came to that understanding
25   and what goes into that understanding and what



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        46

```
 1                       Bowen

 2   other people may have claims to that money or

 3   don't have claims to that money, all of that is

 4   irrelevant to us and irrelevant to your subpoena.

 5        Once the firm has the understanding that it

 6   is not an asset of Orly and it's not payable to

 7   Orly, that answers your question.

 8        Q.    And so even if the firm has an

 9   understanding as to whom that money is payable to,

10   you're not going to share that with me here today?

11        A.    It's payable at the direction of the

12   AG Group, the AG Group has given us no direction

13   on where the money is to be paid.

14        Q.    How do you know that it is not

15   ultimately to be paid in part to Orly Genger?

16        A.    Because our understanding, based on

17   communications that we have had with members of

18   the AG Group, Orly has no claim to any of that

19   money and none of that money is payable to her.

20        Q.    What's that understanding -- I'm

21   sorry, when were those communications made?

22        A.    Over the course of multiple years

23   going back to at least the day of the amendment.

24   I think even earlier than this.  What's the date

25   of this?  June of -- no.  This is dated, I think,
```



```
 1                         Bowen

 2    last summer, in 2017.  It certainly predates that

 3    so it's a series of communications that goes back

 4    many years.

 5            Q.    When you say, "many years" what is

 6    the start of that?

 7            A.    When was the trial that we did in

 8    front of Judge Jaffe

 9            Q.    In 2015?

10            A.    Yeah, so it started in that time

11    period to the present.

12            Q.    So who does have a claim to those

13    assets if not Orly?  To those proceeds if not

14    Orly?

15            A.    Well, since it's at the control of

16    the AG Group, I think the AG Group would have that

17    understanding.  The firm does not.

18                 (Recess taken.)

19    BY MR. DELLAPORTAS:

20            Q.    I'm going to just clarify one of your

21    prior answers.

22            A.    Sure.

23            Q.    When you say that Orly Genger has no

24    claim to the payments made under the note, are you

25    saying that the money -- that the money is going
```



 1                          Bowen

 2    to AG Group, and beyond that you don't know what

 3    they plan to do with it, or are you saying that

 4    you have knowledge that the AG Group will not be

 5    transmitting any of that to Orly Genger?

 6           A.    The latter.

 7           Q.    Okay.

 8                 MR. DELLAPORTAS:  I would like to

 9           next mark as Kasowitz 4 a document

10           entitled:  "Satisfaction of Judgment"

11           dated March 28, 2018.

12                 (Exhibit 4 was so marked for

13           identification.)

14    BY MR. DELLAPORTAS:

15           Q.    Mr. Bowen, this is a satisfaction of

16    judgment in the predecessor case in which your

17    firm represented Ms. Genger; correct?

18           A.    It's a 2014 case?

19           Q.    Yes.

20           A.    Yes.  That's correct.

21           Q.    And this payment was -- this

22    satisfaction was filed on March 28, 2018?

23           A.    According to the document, yes.

24           Q.    Okay.  And the third whereas clause

25    says that, "Whereas Orly Genger caused the



```
 1                       Bowen
 2    $21,005.24 to be paid on March 27, 2018."
 3           A.    I see that.
 4           Q.    And it was signed and filed by
 5    Kasowitz; correct?
 6           A.    Yes.
 7           Q.    How did Ms. Genger make that payment?
 8           A.    I have no knowledge.
 9           Q.    Do you know where the money came
10    from?
11           A.    No.
12           Q.    And Kasowitz doesn't know where the
13    money came from?
14           A.    I don't believe so.  I don't believe
15    this went to Kasowitz.
16           Q.    How did Kasowitz have the comfort
17    level to file a statement in federal court saying
18    a payment was made?
19           A.    I don't understand your question.
20    Are you saying that we didn't have a reasonable
21    basis to make that statement?  Did you receive the
22    money?  Your client should know whether or not he
23    received the money.  We never heard any complaint
24    that the money was not received.
25           Q.    What was the basis for your belief
```



```
 1                        Bowen

 2   that the $21,000 and so forth, was paid by Orly

 3   Genger on March 27, 2018?

 4         A.    That's beyond the scope of your

 5   subpoena, number one.  It's trying to invade

 6   privilege, number two.  Number three, do you have

 7   the basis to say the money wasn't paid?  Is what

 8   you are saying is that the money was not paid?  Is

 9   that what your claim is?

10         Q.    Well, I'm just here to ask

11   questions --

12         A.    Is that implicit in your questions?

13         Q.    -- not to answer questions.

14         A.    Let me put it this way:  To the

15   extent that you are implicit in your question of

16   the claim that $21,005.24 reflected on Exhibit 4

17   was not in fact paid in full satisfaction of the

18   judgment, then to the extent that that is what you

19   are saying, we -- we reject that claim.  We have

20   no information that it was not paid.

21         Q.    Implicit in my question is that if

22   Kasowitz was being truthful in his representation

23   in federal court, then Ms. Genger, at one point in

24   time, during the course of this litigation, had

25   access to $21,000 in order to make that payment.
```



```
 1                       Bowen
 2    My question is:  Where did that come from?
 3           A.    That's a false premise.  Why would
 4    you possibly say that.
 5                  (Laughter.)
 6                  Why are you laughing?
 7           Q.    Because you are being an idiot.
 8    That's fine.
 9           A.    So you just called me an idiot.
10    Calling me an idiot in a federal deposition is
11    against your ethical obligations.
12           Q.    Can you answer the question?
13           A.    Can you acknowledge the fact that you
14    just violated your ethical obligations by calling
15    me an idiot?
16           Q.    Can you answer the question?
17           A.    Do you want to retract that statement
18    or do something to try and fix the fact that you
19    just made another ad hominem attack after I told
20    you that I will not tolerate that?
21           Q.    Can you please answer the question?
22           A.    If you acknowledge the fact that you
23    are out of line and you retract your statement.
24           Q.    I will correct it:  Your answer was
25    idiotic.
```



**MICHAEL PAUL BOWEN**                                      October 05, 2018
**SAGI GENGER -v- ORLY GENGER**                                            52

1                            Bowen

2          A.    Fine.  That's still an ad hominem

3    attack.  Do you think that's better?  Do you know

4    a federal judge is going to be reviewing this

5    transcript?  Fine.  I will take that as your -- as

6    your position.  I'll make sure a federal judge

7    reviews this transcript.

8          Q.    Wonderful.  Can you now answer the

9    question?

10         A.    State your question again, please.

11         Q.    Can you read back the last question.

12               (Question read back.)

13   BY MR. DELLAPORTAS:

14         Q.    If Kasowitz was being truthful in his

15   representation to the federal court that Orly paid

16   -- cause to be paid $21,000, implicit within that

17   is that Orly at one time had access to $21,000 and

18   my question is:  What is Kasowitz' knowledge with

19   respect to the source of that asset?

20         A.    I can't answer that question because

21   you have false premises.  The fact that somebody

22   has paid a judgment doesn't mean that that person

23   had the assets to pay the judgment.  You can ask a

24   third party to pay the judgment.  You can obtain

25   loans which means you are taking on even more debt



MICHAEL PAUL BOWEN                              October 05, 2018
SAGI GENGER -v- ORLY GENGER                                    53

1                         Bowen

2     to pay the judgment.

3         Q.     So which is it?

4         A.     So I don't know, but I can't answer

5     the question with all of those presuppositions

6     that you put in there, which are not necessarily

7     true.  Leaving that aside, if your question is,

8     what does the firm know about where Orly Genger

9     got the money to pay this judgment, this amount of

10    money that is reflected in Exhibit 4, the answer

11    is, which I think I told you before, we don't

12    know.

13        Q.     That includes Mr. Hirschman?  He

14    doesn't know how his wife paid that judgment?

15        A.     I don't know how a spouse or the

16    information a spouse had in relationship to a

17    spouse.  I'm not here testifying on behalf of

18    Mr. Hirschman.  And there are spousal privileges

19    that may or may apply to that information.  I can

20    only speak on behalf of the firm.

21            On behalf of the firm, we have no knowledge

22    about where that money was sourced from or even

23    how it was transmitted.  I guess I have to look at

24    how it was transmitted.  I may -- the firm may

25    have that information.  It was not something I



1                          Bowen

2    prepared for today because you didn't identify it

3    as a topic in your subpoena.

4          But, in any event, to suggest that Kasowitz

5    as a firm is acting in bad faith because it didn't

6    have a good faith basis for filing this

7    satisfaction of judgment, on behalf of the firm, I

8    completely reject that and I think it's unethical

9    and unprofessional for you even to suggest it.

10   That's my answer.

11         Q.    First of all, you're being

12   disingenuous.  There was no suggestion that you

13   were acting in bad -- the firm was acting in bad

14   faith in filing this piece of paper.  I do think

15   there is a serious question in that regard with

16   respect to your answers here today but we will

17   proceed.

18         Is that your signature on page 2 or is that

19   Mr. Hirschmann?

20         A.    Well, I will just note that, once

21   again, you are making an ad hominem attack.

22         Q.    I'm clarifying an allegation you made

23   against me.

24         A.    You're making an ad hominem attack on

25   me and you are saying I'm acting in bad faith when



                              Bowen

1

2   I'm here --

3                   (Talking over each other.)

4          Q.    That's a serious question.

5          A.    -- trying to give you serious and

6   professional and careful answers on behalf of the

7   firm.

8          Q.    Okay.  Well, one is them is:  Whose

9   signature is that on page 2?

10         A.    Which exhibit?

11         Q.    Kasowitz 1.

12         A.    That's my signature.

13         Q.    And so at the time you made this, you

14  had no idea how Orly came to pay the $21,000?

15         A.    It's asked and answered, but I will

16  try and explain it again to you.  The firm has no

17  information about the source of those funds.  It

18  may have information about the mechanism of how

19  the funds were transferred, but I did not prepare

20  that information for today.  I don't personally

21  have it and I did not prepare that information for

22  today, because it was not identified as a topic

23  for this deposition.

24      By the way, this also doesn't refer to

25  assets that Orly owns or that are payable to Orly.



1                            Bowen

2          Q.    And when you say "the firm" you are

3    excluding Mr. Hirschman who is a partner of the

4    firm?

5          A.    Absolutely not.

6          Q.    So you are saying Mr. Hirschman has

7    no idea where that money came from?

8          A.    Absolutely not.  I'm speaking only on

9    behalf of the firm.

10         Q.    And you understand that the firm is

11   comprised of its partners; correct?

12         A.    Yes.

13         Q.    Mr. Hirschman is one of its partners?

14         A.    Yes.

15         Q.    If fact, he was the -- listed as the

16   lead counsel with respect to the matter in which

17   the satisfaction of judgment was filed.

18         A.    That may be.

19         Q.    He is not just some random partner

20   who I picked out of the website.  He was actually

21   the lead partner and lead attorney with respect to

22   the matter that I'm now asking you about; correct?

23         A.    Asked and answered.

24         Q.    Okay.  And so when you're speaking

25   that the firm doesn't know where this $21,000 came



1                              Bowen

2    from, are you including Mr. Hirschman in that or

3    are you excluding Mr. Hirschman from that?

4          A.    Speaking on the information that is

5    available to the firm, qua firm, that

6    Mr. Hirschman has information available to him,

7    qua spouse -- I'm not privy to that information

8    speaking only on behalf of the firm.  Speaking on

9    behalf of the firm, I'm not excluding any

10   available source of information available to the

11   firm.

12         Q.    And how do you parse through, in your

13   mind, what Mr. Hirschman knows qua firm versus qua

14   spouse?

15         A.    I don't even know how to answer that

16   question.

17         Q.    It was the basis upon which you

18   answered the last question so I'd like to probe

19   the basis on which you answered the last question.

20         A.    Let me put it this way:  I didn't

21   interview Mr. Hirschman to invade his marital

22   relationships with his wife.  I didn't ask him

23   about personal information of any sort at any

24   time.  I am, however, privy to information that

25   Mr. Hirschman has that's relevant to your



1                      Bowen

2    subpoena.  And that is available to the firm

3    meaning it's information that he learned in his

4    capacity as a lawyer at the firm.

5           Q.    When you said you didn't interview

6    him about his marital communications, did you

7    interview Mr. Hirschman at all with respect to

8    your preparation for this?

9           A.    I 'm not providing any answers about

10   what I did to prepare for this deposition other

11   than saying that I made reasonable inquiry and I

12   made reasonable searches and drawing upon my own

13   personal experiences as a partner at the firm, and

14   as a lawyer for Orly Genger, since we became

15   involved in the Genger affairs on behalf of Orly

16   Genger in, I guess, that was 2015.

17          Q.    Let me ask you more generally:  What

18   bank accounts are you aware that Ms. Genger

19   currently has access to?

20          A.    The firm is aware of no bank accounts

21   that she has that is in her name or that belong to

22   her.  I have anecdotal information that -- that

23   belongs to the firm that she had some kind of an

24   account that was attached, I think, by your client

25   that had a few thousand dollars, like, $8,000 or



```
 1                        Bowen
 2    something to that extent, which is, I think, part
 3    of this 2014 proceeding, if I remember right.
 4          Q.    Does Ms. Genger pay for your
 5    services?  Pay the firm?
 6          A.    That's privileged information.  I'm
 7    not getting into any financial arrangements
 8    between Orly Genger and the firm other than to
 9    tell you that there is no money or assets that
10    belong to her or that are payable to her in that
11    relationship.
12          Q.    Can you read that back.
13                (Readback of prior question.)
14    BY MR. DELLAPORTAS:
15          Q.    What do you mean by that?
16          A.    I mean, there is no money going the
17    other way.  Meaning the firm doesn't hold assets
18    for Orly Genger and there are no assets or funds
19    that are payable to Orly Genger that the firm has.
20    For example, sometimes clients pay a retainer that
21    has not been charged against yet.  There's nothing
22    like that in this relationship.
23          Q.    Okay.  Have payments been made during
24    the relationship from Orly Genger to the firm?
25          A.    I'm not privy to answer that
```



```
 1                        Bowen
 2   question; it's privileged information.
 3          Q.    What's your basis for saying that's
 4   privileged information?
 5          A.    Because the relationship between
 6   attorney-client is highly confidential and most
 7   often privileged.  Unless you have some authority
 8   you want to talk about, we can reconsider it.  You
 9   have to have a reason if you are going to get into
10   the financial relationship with an attorney and a
11   client.
12          Q.    Yes.
13          A.    Given the fact that you are looking
14   for assets I'm comfortable in telling you that
15   there has been no payment of any sort from Orly
16   Genger to my firm in this year, 2018.
17          Q.    What about during the -- since the
18   lawsuit was filed in October 2017?
19          A.    I'm not -- I think that information
20   would both be irrelevant and protected by
21   privilege.
22          Q.    Why in your view would it be
23   irrelevant?
24          A.    It's not identifying assets that
25   belong to Orly Genger or that are payable to Orly
```



```
 1                        Bowen

 2   Genger.

 3          Q.    And you don't believe that if Orly

 4   Genger made a payment from an account less than a

 5   year ago, that might not have some bearing on the

 6   location of her assets today?  You are so

 7   confident in that that you are willing to have the

 8   direction to yourself not to answer that question

 9   in the context of discovery?

10          A.    I don't understand your question.  If

11   your question is:  Is the firm aware of the bank

12   account that it received funds from and the bank

13   account belongs to Orly Genger, the answer to that

14   question is no.  The firm is not aware -- other

15   than the one account I identified a moment ago,

16   which had $8,000 in it and I believe that was

17   attached by your client in the prior proceeding,

18   sub district, I believe, I may be getting those

19   facts mixed up in my head, but again, to try and

20   reframe your question so I understand it.

21          If your question is:  Did the firm ever

22   receive any payment from Orly Genger from a bank

23   account that the firm can identify as belonging to

24   Orly Genger?  The answer is no.

25          Q.    When you use the term "belong" --
```



MICHAEL PAUL BOWEN                                        October 05, 2018
SAGI GENGER -v- ORLY GENGER                                            62

```
 1                      Bowen
 2    "an account belonging to Orly Genger," what do you
 3    mean by that?
 4          A.    I mean an account that is either for
 5    her benefit or that she controls.
 6                MR. DELLAPORTAS:  We'll mark Kasowitz
 7          5 a document entitled "Satisfaction of
 8          Judgment" dated May 8, 2018.
 9                (Exhibit 5 was so marked for
10          identification.)
11    BY MR. DELLAPORTAS:
12          Q.    This is, again, a document that your
13    firm filed it looks like May 2018.  Do you
14    recognize it?
15          A.    Yes.
16          Q.    Is that your signature on the second
17    page?
18          A.    Yes.
19          Q.    It reflects that a judgment was
20    satisfied to Ms. Dahlia Genger in the amount of
21    $58,059.30.
22          Do you see that?
23          A.    Yes.
24          Q.    What was the source of the payment
25    for that $58,000?
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        63

1                          Bowen

2          A.    The firm has no information about

3   that.

4          Q.    So you are representing that the firm

5   does not know how Ms. Genger made that $58,000

6   payment?

7          A.    No.  That's a separate question.  The

8   first question was what's the source and the

9   answer is that the firm does not know the source.

10  The second question is how the payment was made.

11  The answer to that is that the firm may have that

12  information, but I didn't research that and I'm

13  not prepared to address it because it wasn't

14  within the scope of your subpoena.

15      Had you identified it I could have given you

16  a definitive answer.  So we made no, you know,

17  whatever mechanism or method or route the money

18  went, but I don't have that information at the tip

19  of my finger tips right here today.

20         Q.    So, your view is that Ms. Genger's

21  access to $58,000 just a few months ago, was not

22  within the scope of our subpoena?

23         A.    No.  I didn't testify to that.  I

24  testified that had you identified that one of the

25  topics that you wanted to discuss was the method



                              Bowen

 1

 2    or manner in which these satisfaction -- excuse

 3    me -- these judgments were paid that are reflected

 4    in these two documents Exhibits 4 and 5, I could

 5    have been prepared to address that because it may

 6    very well be that the firm does know how those

 7    payments were made

 8         Q.    Well, one of the subjects are

 9    assets --

10         A.    Excuse me, one second.

11         Q.    -- of Ms. Genger?

12         A.    I have to finish that answer.

13         Q.    Okay.

14         A.    You also said that the fact that she

15    had access to this money and you made a comment

16    that that should be relevant within the scope of

17    your subpoena --

18         Q.    One would think.

19         A.    Well, I understand that you are

20    expressing your view -- your own personal view of

21    that -- but logic kind of dictates that that may

22    or may not be true because it always is the case

23    that an impecunious person can have a debt paid by

24    somebody else on their behalf, now whether that

25    happened here or not, I have no information.  The



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        65

```
 1                        Bowen
 2   firm has no information.
 3        Q.    So the firm doesn't know where this
 4   money came from either?  That's what you are
 5   saying?
 6        A.    No.  Because you keep subtilely
 7   changing the question and I think -- I want to,
 8   make sure we are not misunderstanding each other.
 9   If you are asking me the source of the money, the
10   firm does not know the source of the money.
11        If you are asking where the money came from,
12   what the manner was in which the money was
13   transferred from one location to another, was it
14   by check, was it by wire, or some other type of
15   electronic transfer, the answer is:  We may be
16   aware of that but I have not prepared that
17   information for today's deposition.
18        Q.    Is the firm aware of where Ms. Genger
19   currently resides?
20        A.    I believe that's outside the scope of
21   this deposition.  I don't understand what her --
22   where she -- I guess -- well, first of all, I
23   should clarify:  When you say where she resides,
24   are you asking for her domicile, in the technical
25   sense of that word?
```



```
 1                         Bowen

 2        Q.    Interpret it however will yield an

 3   answer.

 4        A.    Well, the firm is aware that she

 5   primarily resides in Tel Aviv, Israel.  And also

 6   that she has an interest in some form that -- I'm

 7   not necessarily -- I may not be remembering

 8   correctly, I believe a condominium in Austin,

 9   Texas.  She spends some time there.  But I don't

10   know.  And I think there have been public filings

11   on that.  So whatever the public filings are to

12   the extent that the firm's knowledge on that as of

13   the time that those filings were made.

14        Q.    Does Ms. Genger have any interest in

15   any other homes other than the two that you just

16   described?

17        A.    Well, I don't know that she has any

18   interest in the Tel Aviv home.  If by "interest"

19   you mean ownership interest, the firm doesn't have

20   information about that at all.

21        Q.    What do you know about that subject?

22        A.    The only information that the firm

23   has is that she lives there at the address that is

24   a matter of public record.

25        Q.    What about other homes?
```



1                           Bowen

2          A.    The firm has no information about

3    that at all other than the fact that she does have

4    some type of interest and it may be through

5    marital property and it may not.  I don't know the

6    ins and outs -- the firm doesn't know the ins and

7    outs of the Austin, Texas property.

8          Q.    When you say "marital property," what

9    do you mean?

10         A.    I'm not using that in any kind of

11   legal or technical meaning or a term of art

12   meaning.  I just know that sometimes a husband and

13   wife can own property as joint tenants in common

14   or income and it's not something where -- it

15   doesn't necessarily reflect that one spouse or

16   another actually contributed anything to the

17   purchasing the property it's just by virtue of

18   their status of being married that it's considered

19   to belong to both.

20         Q.    What other marital property are you

21   aware of with respect to Ms. Genger?

22         A.    None.

23         Q.    Does Ms. Genger have an interest in

24   her husband's partnership interest?

25         A.    The firm is not aware of that.  To



1                          Bowen

2    the extent it's relevant, the firm is not aware of

3    it.

4         Q.    When you mentioned you made a

5    reasonable inquiry with respect to the subject

6    matters of the subpoena, what specifically did you

7    do?

8         A.    I'm sorry?

9         Q.    When you say you made a reasonable

10   inquiry with respect to the subject matters of the

11   subpoena -- it's a term you've used several times

12   in deposition -- what, specifically, did you do?

13        A.    I'm not going to answer that

14   question.  That is privileged work-product

15   information.  I will repeat what I said before,

16   which is:  I made reasonable inquiries of

17   personnel at the firm who have knowledge into

18   Genger matters.  I made reasonable searches in the

19   sense that I looked at information both in

20   documentary form and otherwise that's available to

21   the firm that's related to this topic, and the

22   representation of Orly Genger.

23        And I'm basing it on my extensive knowledge

24   and participation in representing Orly Genger

25   since the firm became involved in the very



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                          69

1                          Bowen

2    beginning -- I mean, in the very beginning of the

3    firm's involvement starting sometime in 2015, I

4    believe.

5              Q.    Where does Mr. Hirschman live?

6              A.    Well, I don't think that's relevant.

7    I don't see how that's relevant to the subpoena.

8              Q.    So you are declining to answer?

9              A.    I'm declining to answer on the basis

10   that confidential information about a partnership,

11   individual partners, is beyond the scope of this

12   subpoena.  If you want to clarify why you think

13   it's relevant I'm willing to reconsider, but I

14   don't see any relevance whatsoever.

15             Q.    To the best of your knowledge, are

16   they still married?

17             A.    I don't see how that's relevant

18   either.

19             Q.    Okay.

20             A.    If you want to explain why you think

21   it -- I mean, look, one of the things that you

22   have not ever tried to justify is why you are

23   trying to interfere or interpose into this private

24   marital relationship between Ms. Sagi's own sister

25   and her husband.  If you want to explain it, you



1                          Bowen

2    can explain it.

3         Q.    You just said they had marital

4    property.

5         A.    How -- how --

6         Q.    I have an uncollected $3 million

7    judgment.  Isn't it, at least, marginally rel

8    event that I inquiry about their marital property?

9         A.    You're not asking about their marital

10   property.  Now you are asking about their marital

11   relationship and whether or not they are still

12   married.

13        Q.    Yes.

14        A.    And I guess the question --

15        Q.    Isn't that relevant to marital

16   property if they are in fact still married?  No?

17        A.    No.  Well, first of all, I don't

18   think it's a valid question.  I think it's an

19   offensive question.

20        Q.    An offensive to ask whether they are

21   still marred?

22        A.    Yes.

23        Q.    Okay.

24        A.    Secondly, I'm speaking on behalf of

25   the firm, and the firm doesn't have information



```
 1                        Bowen

 2  about the marital status of it's various partners

 3  unless or until there is some reason to notify the

 4  firm about a marriage or a divorce or some other

 5  type of change in status that the firm might need

 6  to be aware of in terms of insurance.

 7        I see that you're not really paying

 8  attention to my answer so I am just going to stop

 9  even though my answer is not finished.  If you

10  want to listen --

11        Q.    The reporter is capturing you

12  answers.

13        A.    No, I'm not going to speaking when

14  I'm being treated in this fashion.  If you want to

15  listen to the answer --

16        Q.    You're being treated perfectly fine.

17  Stop making speeches.  You are allowed to answer

18  the question.  I didn't interrupt.  You

19  interrupted yourself.  You were making a speech,

20  finish your speech and then we will go on to the

21  next question.  I'm listening.  I can do two

22  things at the same time.

23        A.    You were talking to your client.

24        Q.    I was not talking to my client.  I

25  was reviewing my notes while I was listening to
```



1                          Bowen

2     your answer.  Believe it or not, I'm capable of

3     doing that.

4              A.     Tell me where I was and I will pick

5     it up.

6              Q.     The reporter can tell you that.

7                   (Readback of prior question.)

8              THE WITNESS:  I got it.  So continuing

9              my answer to the extent that your question

10             is asking whether or not there has been

11             any communications with the firm with

12             respect to Mr. Hirschman marital status

13             other than the fact he was married to Orly

14             Genger at some point, I believe, in 2016

15             if my memory is correct, the answer is no.

16             MR. DELLAPORTAS:  Make the next one

17             marked as Kasowitz Exhibit 6, February 5,

18             2018 letter.

19                   (Exhibit 6 was so marked for

20             identification.)

21     BY MR. DELLAPORTAS:

22             Q.     This is a letter you submitted to the

23     court.

24             A.     Correct.

25             Q.     If you go to the last page, the first



MICHAEL PAUL BOWEN                                October 05, 2018
SAGI GENGER -v- ORLY GENGER                                    73

```
1                        Bowen
2    full paragraph on page 3.
3         A.    Yes.
4         Q.    In it you wrote to Judge Freeman
5    "Orly has attested that long before this action,
6    she purchased a home in Tel Aviv with her husband
7    and that she lives there with her infant
8    daughter."
9         What attestation are you referring to there?
10        A.    It would be the sworn declaration
11   that she submitted in this action.
12        Q.    In this case?
13        A.    I believe so.
14        Q.    Okay.  Do you represent Arie Genger
15   with respect to this matter?  I'm talking about
16   the case we are currently in to today?
17        A.    The judgment enforcement case?
18        Q.    Yes.
19        A.    I don't think he is a party in this
20   action.  We may or may not represent him for
21   purposes of discovery if and when there is any
22   discovery propounded on him, but I don't know the
23   answer to that.
24        Q.    So, I will represent to you that we
25   served a subpoena on him and he did not appear for
```



1                        Bowen

2    that as in fact I e-mailed you a few weeks ago.

3    Are you representing with respect to that

4    subpoena?

5           A.   I don't believe so.  What do you mean

6    you e-mailed me about it?

7           Q.   I e-mailed you --

8           A.   Do you mean me personally or the

9    firm?  Somebody else?

10          Q.   I e-mailed you personally.

11          A.   About Arie Genger?

12          Q.   Yes.  I e-mailed you, Mr. Freedman,

13   and Mr. Montclair --

14          A.   Mr. who?  I'm sorry.

15          Q.   Montclair?  Paul Montclair?  He was

16   prior attorney of Arie with regard to our subpoena

17   and asked if you represented him with regard to

18   that subpoena?

19          A.   You didn't get a response from

20   anybody at my firm?

21          Q.   No, I only e-mailed you.

22          A.   When you say Mr. Friedman, who are

23   you talking about?

24          Q.   Leon Friedman.  That's another prior

25   attorney of Mr. Genger.



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        75

                              Bowen

1

2         A.    It's possible that I missed that

3    e-mail.  If you didn't include anybody else on the

4    Kasowitz team.  I don't remember it personally.

5    On behalf of the firm, I have no information that

6    we represent Arie Genger with respect to any

7    process that you may or may not have served on

8    him.

9         Q.    In this case.

10        A.    I have no information about whether

11   or not -- right, in this case.  Currently.  Let's

12   just say currently.  And I don't have any

13   information about whether you in fact did serve

14   process on him.

15        Q.    Okay.

16        A.    So I can't comment on that either.

17        Q.    So, suffice it to say that we don't

18   believe your relevance objections were well taken.

19        Our position is this deposition has to be

20   continued until the proper documents are produced

21   and the proper questions are answered, but subject

22   to that position we have nothing further for

23   today?

24        A.    Okay.

25             (Time noted:  11:41 a.m.)



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        76

```
 1                          Bowen

 2              THE WITNESS:  Read and sign.

 3          (Time noted:  p.m.)

 4

 5
                   _____
 6                     MICHAEL BOWEN

 7

 8   Subscribed and sworn to before me
     this _____ day of _____, 20____.
 9   _____
               NOTARY PUBLIC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1

2                            I N D E X

3

WITNESS               EXAMINATION BY                    PAGE

4

MR. BOWEN             DIRECT / DELLAPORTAS              4

5

6

7                            EXHIBITS

KASOWITZ       DESCRIPTION                            PAGE

8

1               Subpoena                              4

9

2               Amendment to Settlement Agreement     6

10

3               AG/Trump Settlement Agreement         23

11

4               Satisfaction of Judgment              48

12

5               Satisfaction of Judgment              62

13

6               February 5, 2018 letter               72

14

15

16

17

18

19

20

21

22

23

24

25



1                    C E R T I F I C A T I O N
2
3                    I, Jeffrey Shapiro, a Shorthand
4    Reporter and notary public, within and for the
5    State of New York, do hereby certify:
6                    That MICHAEL BOWEN, the witness whose
7    examination is hereinbefore set forth, was first
8    duly sworn by me, and that transcript of said
9    testimony is a true record of the testimony given
10   by said witness.
11                   I further certify that I am not
12   related to any of the parties to this action by
13   blood or marriage, and that I am in no way
14   interested in the outcome of this matter.
15
16                   IN WITNESS WHEREOF, I have hereunto
17   set my hand this 14th day of October, 2018.
18
19
20
21
22
23                                    JEFFREY SHAPIRO
24
25

