UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------ X
                                              :    Chapter 7
In re:                                        :
                                              :    Case No. 19-13895 (JLG)
       ORLY GENGER,                           :
                                              :
                       Debtor.                :
                                              :
-----------------------------------------------------------------x
 DALIA GENGER,                                :    Adv. P. No. 20-01010
                       Plaintiff,             :
                                              :
                                              :
            - against -                       :
                                              :
ORLY GENGER, MICHAEL BOWEN, ARIE              :
GENGER, ARNOLD BROSER, DAVID BROSER,          :
ERIC HERSCHMANN, THE GENGER                   :
LITIGATION TRUST, ADBG LLC, TEDCO INC.,       :
and DEBORAH PIAZZA as chapter 7 trustee,      :
                                              :
                       Defendants.            :
-----------------------------------------------------------------x
```

**PLAINTIFF DALIA GENGER'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTIONS TO DISMISS AMENDED COMPLAINT AND
IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Ira Daniel Tokayer, Esq. (IT-4734)
420 Lexington Avenue, Suite 2400
New York, New York 10170
(212) 695-5250

Paul J. Labov, Esq.
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016-1314
(212)682-7474

*Attorneys for Plaintiff Dalia Genger*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... i

PRELIMINARY STATEMENT ............................................................................... 1

FACTS ..................................................................................................................... 4

   A.   The 2004 Commitments.................................................................................. 4

   B.   Orly Monetizes the Rights ............................................................................ 7

   C.   Dalia's First Demand Under the 2004 Commitments..................................... 7

   D.   Dalia's Outstanding Second Demand Under the 2004 Commitments............. 9

   E.   Orly Transfers the Monetized Proceeds from the Rights............................... 10

   F.   This Action.................................................................................................... 10

ARGUMENT............................................................................................................ 11

   I     THE ACTION WAS TIMELY COMMENCED WITHIN SIX YEARS OF
        ORLY'S REPUDIATION OF HER OBLIGATIONS ............................... 11

        A   The Action Was Timely Commenced....................................................... 11

        B   In the Alternative, Equitable Tolling Applies........................................... 13

   II    DALIA HAS STANDING TO ASSERT HER CLAIMS ..................... 19

        A   Dalia Has Constitutional Standing............................................................ 20

        B   Dalia Has Prudential Standing .................................................................. 20

   III   THE AMENDED COMPLAINT STATES A CLAIM UNDER THE LEGAL
        STANDARDS FOR MOTIONS TO DISMISS .................................... 22

        A   The Legal Standard ................................................................................... 22

        B   Dalia States a Claim For the Relief of Constructive Trust ....................... 23

             1.   Confidential or Fiduciary Relation ............................................. 26

             2.   A Promise and a Transfer In Reliance Thereon.......................... 27

             3.   Unjust Enrichment ...................................................................... 28

        C   Dalia States A Claim For Equitable Lien ................................................. 32

   IV   IN THE ALTERNATIVE, LEAVE TO REPLEAD SHOULD BE GRANTED.. 33

   V    SUMMARY JUDGMENT SHOULD BE GRANTED TO DALIA .................... 34

   VI   MOVANT'S RECITATION OF PAST LITIGATION  IS ENTIRELY FALSE .38

CONCLUSION........................................................................................................ 40

APPENDIX A ......................................................................................................... A1

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>Allen v. McCurry</u>,
    449 U.S. 90 (1980).........................................................................................34

<u>Amgen Inc. v. Connecticut Retirement Plans and Trust Funds</u>,
    568 U.S. 455 (2013).......................................................................................27

<u>Antonios A. Alevizopoulos & Associates, Inc. v. Comcast International Holdings, Inc.</u>,
    100 F. Supp. 2d 178 (S.D.N.Y. 2000) ........................................................13

<u>Ashcroft v. Iqbal</u>,
    556 U.S. 662 (2009).......................................................................................23

<u>Augustine v. Szwed</u>,
    77 A.D.2d 298 (4th Dep't 1980) ..................................................................25

<u>Bank Capital Servs. LLC v. Chef's Depot Inc.</u>,
    2019 WL 7291240 (S.D.N.Y. Dec. 30, 2019) .............................................31

<u>Bell Atlantic Corp. v. Twombly</u>,
    550 U.S. 544 (2007).......................................................................................23

<u>Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.</u>,
    448 F.3d 573 (2d Cir. 2006) .............................................................29, 30, 31

<u>Bo Zhang v. N. County Beautification Co.</u>,
    2013 WL 4458731 (W.D.N.Y. Aug. 16, 2013) ...........................................23

<u>Bower v. Bower</u>,
    (Sup. Ct. Monroe Co. 2014) .........................................................................12

<u>Braddock v. Braddock</u>,
    871 N.Y.S.2d 68 (1st Dep't 2009) ...............................................................26

<u>Buntzman v. Buntzman</u>,
    1991 WL 120470 (S.D.N.Y. June 24, 1991) ...............................................26

<u>Coco v. Coco</u>,
    485 N.Y.S.2d 286 (2d Dep't 1985)...............................................................25

<u>Counihan v. Allstate Insurance Co.</u>,
    194 F.3d 357 (2d Cir. 1999) .........................................................................25

<u>Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>,
    1995 WL 43669 (S.D.N.Y. Feb. 2, 1995).....................................................31

<u>Diaz v. Diaz</u>,
    130 A.D.3d 560 (2d Dep't 2015)..................................................................26

<u>Dybowski v. Dybowska</u>,
    146 A.D.2d 604 (2d Dep't 1989)..................................................................13

FDIC v. Nat'l Union Fire Ins. Co.,
   205 F.3d 66 (2d Cir. 2000) ............................................................................. 37

Gaddi v. Gaddi,
   108 A.D.3d 430 (1st Dep't 2013) ................................................................... 12

Geisler v. Petrocelli,
   616 F.2d 636 (2d Cir. 1980) ......................................................................... 22

Genger v. Genger,
   2018 WL 3632521 (S.D.N.Y. July 27, 2018) ................................... 5, 7, 9

Genger v. Genger,
   2019 WL 1330905 (Sup. Ct. N.Y. Cnty. Mar. 25, 2019) ......................... 37

Genger v. Genger,
   663 F. App'x 44 (2d Cir. 2016) ...................................................................... 8

Genger v. Genger,
   76 F. Supp. 3d 488 (S.D.N.Y. 2015) .............................................................. 5

Genger v. Genger,
   771 F. App'x 99 (2d Cir. 2019) ...................................................................... 9

Gimbel v. Feldman,
   1995 WL 500487 (E.D.N.Y. Aug. 8, 1995)................................................. 20

Golden Buddha Corp. v. Canadian Land Co. of Am., N.V.,
   931 F.2d 196 (2d Cir. 1991) ......................................................................... 29

Hicks v. Baines,
   593 F.3d 159 (2d Cir. 2010) ......................................................................... 34

In re Adler, Coleman Clearing Corp.,
   1998 WL 551972 (Bankr. S.D.N.Y. Aug. 24, 1998), aff'd, 208 F.3d 202 (2d Cir.
   2000) ............................................................................................................. 29

In re Allou Distributors, Inc.,
   387 B.R. 365 (Bankr. E.D.N.Y. 2008)......................................................... 19

In re Balgobin,
   490 B.R. 13 (Bankr. E.D.N.Y. 2013)............................................................ 12

In re Black & Geddes, Inc.,
   16 B.R. 148 (Bankr. S.D.N.Y. 1981)........................................................... 32

In re Chowaiki & Co. Fine Art Ltd.,
   593 B.R. 699 (Bankr. S.D.N.Y. 2018)......................................................... 20

In re Ciprofloxacin Hydrochloride Antitrust Litigation,
   261 F. Supp. 2d 188 (2003) ......................................................................... 35

In re Helms,
   467 B.R. 374 (Bankr. W.D.N.C. 2012) ....................................................... 35

In re Howard's Appliance Corp.,
   874 F.2d 88 (2d Cir. 1989) ........................................................................... 24

In re Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc.,
    961 F.2d 341 (2d Cir. 1992) ............................................................... 25

In re Schick,
    246 B.R. 41 (Bankr. S.D.N.Y. 2000) ................................................... 20

In re Southmark Corp.,
    49 F.3d 1111 (5th Cir. 1995) .............................................................. 24

In re Tesmetges,
    47 B.R. 385 (E.D.N.Y. 1984) ............................................................. 12

James v. Alderton Dock Yards, Ltd.,
    256 N.Y. 298 (1931) .......................................................................... 32

Latham v. Father Divine,
    299 N.Y. 22 (1949) ............................................................................ 24

Lazarek v. Ambit Energy Holdings, LLC,
    2017 WL 4344557 (W.D.N.Y. Sept. 29, 2017) .................................... 23

Lengel v. Lengel,
    86 Misc. 2d 460 (Sup. Ct. Nassau Cnty. 1976) ............................... 36, 37

Lines v. Bank of Am. Nat. Trust & Sav. Ass'n,
    743 F. Supp. 176 (S.D.N.Y. 1990) ...................................................... 27

Luce v. Edelstein,
    802 F.2d 49 (2d Cir. 1986) ................................................................. 33

McCarthy v. Dun & Bradstreet Corp.,
    482 F.3d 184 (2d Cir. 2007) ............................................................... 23

McGovern v. Solomon,
    466 F. Supp. 2d 554 (S.D.N.Y. 2006) ............................................ 13, 20

McIvor v. Di Benedetto,
    121 A.D.2d 519 (2d Dep't 1986) ........................................................ 14

Merrin Jewelry Co. v. St. Paul Fire and Marine Insurance Co.,
    301 F. Supp. 479 (S.D.N.Y. 1969) ...................................................... 22

Mitra v. State Bank of India,
    2005 WL 2143144 (S.D.N.Y. Sept. 6, 2005) ....................................... 33

Montana v. U. S.,
    440 U.S. 147 (1979) ........................................................................... 35

Palazzo v. Palazzo,
    121 A.D.2d 261 (1st Dep't 1986) ........................................................ 25

Peterson v. Insurance Co. of North America,
    40 F.3d 26 (2d Cir. 1994) ................................................................... 33

Petition of Treco,
    205 B.R. 358 (Bankr. S.D.N.Y. 1997) ................................................. 24

Pike v. Freeman,
   266 F.3d 78 (2d Cir. 2001) ............................................................................ 34

Powers v. American Exp. Financial Advisors, Inc.,
   82 F. Supp. 2d 448 (D. Md.), aff'd, 238 F.3d 414 (4th Cir. 2000) ......................... 21

Price v. Cushman & Wakefield, Inc.,
   808 F. Supp. 2d 670 (S.D.N.Y. 2011) ............................................................... 34

Quadrozzi v. Estate of Quadrozzi,
   99 A.D.3d 688 (2d Dep't 2012)............................................................. 11, 12, 25

Reiner v. Reiner,
   100 A.D.2d 872 (2d Dep't 1984)......................................................................... 26

Republic of Philippines v. Marcos,
   806 F.2d 344 (2d Cir. 1986) ............................................................................... 27

Rogers v. Rogers,
   63 N.Y.2d 582 (1984) ....................................................................................... 36

Rossi v. Morse,
   153 A.D.3d 1637 (4th Dep't 2017) ................................................................ 25, 31

S.E.C. v. Levine,
   689 F. Supp. 317 (S.D.N.Y. 1988) ..................................................................... 27

Sharp v. Kosmalski,
   40 N.Y.2d 119 (1976) ................................................................................. passim

Simonds v. Simonds,
   45 N.Y.2d 233 (1978)................................................................................. 23, 24

Slattery v. Board of Estimate and Apportionment of City of New York,
   271 N.Y. 346 (1936) ........................................................................................ 36

Spokeo, Inc. v. Robins,
   136 S. Ct. 1540 (2016)...................................................................................... 20

Stone v. Williams,
   970 F.2d 1043 (2d Cir. 1992) ............................................................................. 13

Summers v. Earth Island Institute,
   555 U.S. 488 (2009).......................................................................................... 20

Tordai v. Tordai,
   486 N.Y.S.2d 802, 804 (3d Dep't1985)............................................................... 25

Trepel v. Dippold,
   2005 WL 1107010 (S.D.N.Y. May 9, 2005) ......................................................... 22

Uddo v. DeLuca,
   425 F. Supp. 3d 138 (E.D.N.Y. 2019) ................................................................. 26

United States v. Fontana,
   528 F. Supp. 137 (1981) .................................................................................... 11

iv

Venizelos v. Oceania Maritime Agency, Inc.,
      268 A.D.2d 291 (1st Dep't 2000) ............................................................... 26

*Weaver v. Chrysler Corp.*,
      172 F.R.D. 96 (S.D.N.Y. 1997) ................................................................. 33

Wright v. Goord,
      554 F.3d 255 (2d Cir. 2009) ..................................................................... 34

Yoder v. Orthomolecular Nutrition Institute, Inc.,
      751 F.2d 555 (2d Cir. 1985) ..................................................................... 33

Zucker v. Katz,
      708 F. Supp. 525 (S.D.N.Y. 1989) .......................................................... 23

Zumpano v. Quinn,
      6 N.Y.3d 666 (2006) ................................................................................ 13

Rules and Regulations

Fed. R. Civ. P. 8(a)(2) ............................................................................. 3, 22

Fed. R. Civ. P. 12(b)(6) .................................................................. 3, 22, 23, 31

Fed. R. Civ. P. 15(a)(2) ................................................................................. 11

Fed. R. Civ. P. 56(a) .................................................................................... 34

Plaintiff Dalia Genger ("Dalia"), by and through her attorneys, Ira D. Tokayer, Esq. and Foley & Lardner LLP, submits this Memorandum of Law: (a) in opposition to the motions to dismiss filed by the Chapter 7 Trustee (the "Trustee") and various defendants (ECF docs.12, 14, 16) (together the "Motions"); and (b) in support of her own cross-motion for summary judgment.

## PRELIMINARY STATEMENT

By this adversary proceeding, Dalia seeks a declaratory judgment recognizing her constructive trust and/or equitable lien on a substantial portion of the proceeds that the debtor, Orly Genger ("Orly"), realized from the monetization of 794.40 shares of Trans-Resources, Inc. ("TRI"). In 2004, as part of a divorce settlement, Dalia transferred her marital rights to beneficial ownership in the TRI shares to trusts for the benefit of her adult children, Orly and Sagi Genger ("Sagi") (the "Rights"), upon their express commitment to their mother that she could claw-back any monetization arising from those Rights, should she request it to support her retirement. The federal courts have since found that in 2013 Orly monetized those Rights for a substantial sum, which included two unmatured promissory notes for $7.5 million each (the "Trump Notes") and a $17 million cash payment for a total of approximately $32 million. The Trump Notes have since been transferred to defendant Michael Bowen as escrow agent. Dalia's constructive trust and/or equitable lien on the proceeds of the Trump Notes derives from the findings of the U.S. District Court and the U.S. Court of Appeals for the Second Circuit, which are final and binding on each of the defendants in this proceeding.

Defendants move to dismiss Dalia's Amended Complaint in three successive motions, each of which, to varying degrees, seeks to relitigate the adverse findings of the federal courts. As explained below, that is simply not permitted. Beyond that, the Trustee's motion is premised largely on a misunderstanding of the proper accrual date for the applicable statute of limitations,

1

and fallacious arguments as to "standing," which find no support in the case law.

The motion to dismiss filed by defendants Orly, Arie Genger ("Arie"), and Arnold and David Broser and related entities (together, the "Movants"), in turn, piggybacks off many of those same misguided legal arguments, but adds to it an incendiary and irrelevant screed -- a retelling of the two-decade litigation history of the Gengers, told from the viewpoint of the parties who lost the underlying litigations. By stitching together preliminary findings by Courts later revisited and reversed, with out-of-context quotes, and more than a fair amount of outright falsehoods, the Movants try to paint a picture of Dalia and her son Sagi as wrongdoers unworthy of the equity of this Court. We suspect these arguments are directed more toward the upcoming motion to dismiss the bankruptcy case because they have no bearing on the instant motion. Following the counsel of the Court to use "fewer adjectives," we will largely allow these false smears to pass unremarked, except to note that Dalia's silence as to any allegation should not be misconstrued as agreement with anything the movants say.

Lastly, defendants Eric Herschmann and Michael Bowen have filed a "joinder" to the two aforementioned motions to dismiss, which they use to take issue with the allegations against them in the Amended Complaint. Mr. Bowen is named because he is the holder of the Trump Notes; Mr. Herschmann is named because he has filed UCC-1 financing statements claiming a priority in the proceeds therefrom. Had these defendants not been named, the Amended Complaint could have been susceptible to a motion to dismiss for failure to name a necessary party. If they now wish to be excused from the case, Dalia has no objection, as long as it can be assured that the Notes will not be alienated. However, in light of Mr. Bowen's claims that the allegations put him "under a cloud," we annex hereto as Appendix A, respectively, charts showing, line by line, the evidentiary basis for each and every allegation Dalia has asserted against Messrs. Herschmann and

Bowen in the Amended Complaint. The Court will note that, if anything, the reality is worse than that which has been alleged, their protestations notwithstanding.

Returning to the legal arguments, the Motions should be denied in their entirety. This adversary proceeding was commenced within six years of Orly's repudiation of her promise to Dalia and thus squarely within the limitations period for constructive trust claims (which would be tolled in any event), as demonstrated in Point I. Dalia's entitlement to a constructive trust upon the proceeds of Orly's monetization of the Rights provides her with "constitutional standing" and the fact that she seeks recognition of a constructive trust belonging to her and not to an unrelated third-party defeats the argument that Dalia has failed to meet the requirements of "prudential standing," as demonstrated in Point II. Finally, in Point III it is demonstrated that, by providing a short and plain statement of the claim sufficiently particular to give ample notice of the matter in controversy, the Amended Complaint fully complies with the requirements of Fed. R. Civ. P. 8(a)(2) and more than meets the requirements of "facial plausibility" under Fed. R. Civ. P. 12(b)(6). If, however, the Court were inclined to grant any part of the Motions, plaintiff should be given leave to re-plead and cure any perceived deficiencies, as demonstrated in Point IV.

That leaves Dalia's cross-motion for summary judgment. As noted above, the Gengers are not a *tabula rasa*. Dalia first filed for divorce in 2001, and the family members have been embroiled in litigation ever since. For the first six to seven years, such litigation only involved the parents, as the children remained on good terms with both. For reasons too long to discuss here, and irrelevant to the instant motions, that family dynamic changed around 2007, after which Dalia and Sagi found themselves named as defendants by Orly in an unending series of lawsuits funded by Arie and his business associates, the Brosers, for their own benefit. Orly ultimately lost all of those lawsuits, but not before the Courts rendered a series of rulings that remain binding on the

3

defendants in this action. Those rulings, properly applied, not only require *denial* of the motions to dismiss, but also the *grant* of summary judgment in favor of Dalia.

## **FACTS**[1]

### A.    **The 2004 Commitments**

Dalia is a 74-year old retired homemaker who has received no ongoing support payments from her ex-husband, Arie. Rather, since the couple's divorce in 2004, Dalia has relied in principal part on certain commitments made to her by Sagi and Orly in 2004 (hereinafter, the "2004 Commitments"). Pursuant thereto, Dalia agreed to relinquish her "valuable martial rights" in a certain block of TRI shares in exchange for which her children promised to pay her, out of funds received upon their monetization of those Rights, "an amount equal to all dividends, distributions, proceeds or other payments attributable to the Rights 794.40 shares of TRI (adjusted for any splits or similar action)," or any lesser amount as demanded. (AC, ¶ 2, 15.)

Orly and Sagi's oral promises to Dalia are reflected by counter-signed documents executed by Dalia and her two children which also provide for Orly's indemnification of Sagi for one-half of any payments made by Sagi to Dalia. As explained by Judge Forrest, this back-to-back arrangement was created as a result of Orly's physical absence from the United States when Dalia transferred the Rights. (AC, ¶ 16.) Specifically, a counter-signed letter between Sagi and Dalia, dated October 30, 2004, provides in substantive part:

> Dear Mom,
>
> This letter confirms our understanding with respect to certain payments that I am prepared to make to you in consideration of the

---

[1]    The facts set forth herein consist of, *inter alia*, matters set forth in the Amended Complaint dated June 7, 2020 ("AC"), in the judicial opinions of U.S. District Judge Katherine B. Forrest and the affirmances by the U.S. Court of Appeals for the Second Circuit (Exhs. A-D), and in the declarations and other materials annexed to the accompanying declaration of Ira Daniel Tokayer, Esq.

> following. <u>My sister Orly and I are benefitting [sic] by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"),</u> or beneficial interests in those shares, by trusts for our benefit. In reliance on this letter and in consideration of the trusts' receipt of these shares and other consideration, <u>you are giving up valuable marital rights, and you desire further assurance that you will have sufficient funds to support your lifestyle</u>.
>
> If you, in your sole and absolute discretion, from time to time desire funds to support your lifestyle, you may request in writing that I make payment to you as provided in this letter. Promptly upon receipt of the request, I will pay to you (1) an amount equal to all dividends, distributions, proceeds or other payments attributable to 794.40 shares of TRI (adjusted for any splits or similar action) that have previously been paid to Orly, me or any trust for the benefit of either of us, less any amounts previously paid to you pursuant to this letter, or (2) any lesser amount indicated in your request.
>
> We intend for this letter to be a binding agreement under New York law.

(AC, ¶ 17; emphasis supplied.)  In turn, a counter-signed letter between Sagi and Orly, dated November 10, 2004, referencing and attaching the October 30, 2004 letter, provides:

> Dear Orly:
>
> In connection with the attached letter (the "Promise") from me to our mother, Dalia Genger, dated October 30, 2004, you agree to indemnify, defend, and hold me harmless, for and against one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations …, including my reasonable counsel and other professional fees, expenses and costs, which arise from my undertakings in the Promise.

(AC, ¶ 18.)

In 2015, Judge Forrest held that both Sagi and Orly had committed to support Dalia, and that such commitment was extant and enforceable. The Court found as follows:

> As part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI to trusts benefitting Sagi and Orly (the "Sagi Trust" and the "Orly Trust," respectively) <u>in exchange for a commitment by Sagi and Orly to financially support her</u>.

Genger v. Genger, 76 F. Supp. 3d 488, 492 (S.D.N.Y. 2015), aff'd, 663 F. App'x 44 (2d Cir. 2016)

(emphasis added); accord Genger v. Genger, 2018 WL 3632521, *2 (S.D.N.Y. July 27, 2018) ("As

part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of [TRI] … to trusts

benefiting Sagi and Orly. In exchange, Sagi and Orly committed to financially support Dalia.")

(emphasis added), aff'd, 771 F. App'x 99 (2d Cir. 2019).

As the District Court found, this set of oral agreements among Dalia, Orly and Sagi was

subsequently reflected in three written documents:

> First, Dalia and Arie signed a stipulation of settlement finalizing the
> terms of their divorce settlement (the "2004 Divorce Stipulation"),
> which was fully executed on October 30, 2004. In the 2004 Divorce
> Stipulation, Dalia promised to convey equal interests in a total of
> 794.40 shares of TRI to the Orly Trust and the Sagi Trust. The 2004
> Divorce Stipulation contains an "entire understanding" clause,
> which is subject to a carve-out for other agreements . . ." entered
> into concurrently herewith." . . .
>
> The second was a letter signed by Sagi and Dalia dated October 30,
> 2004 (the "2004 Promise"). In the 2004 Promise, Sagi agreed to pay
> Dalia up to an amount equal to all dividends, distributions, proceeds
> or other payments attributable to the TRI shares, upon Dalia's
> demand. The 2004 Promise also states that the agreement is made
> "in consideration of" the following: "Orly and [Sagi] are benefitting
> by the receipt of a total of 794.40 shares of [TRI], or beneficial
> interests in those shares, by trusts for [their] benefit." . . .
>
> At the time the 2004 Promise was signed, Orly was vacationing in
> Fiji, and thus could not contemporaneously sign the 2004 Promise.
> However, before Sagi signed the 2004 Promise, Orly verbally
> agreed to indemnify Sagi for 50% of the payments he would have to
> make under the 2004 Promise.
>
> The third agreement was a letter signed by Sagi and Orly dated
> November 10, 2004 (the "2004 Indemnity"). In the 2004 Indemnity,
> Orly agreed to indemnify Sagi "for and against one-half (1/2) of any
> and all payments, liabilities, damages, claims, actions, losses,
> settlements, penalties, judgments or obligations, including [Sagi's]
> reasonable counsel and other professional fees, expenses and costs,
> which arise from [Sagi's] undertakings in the [2004 Promise]."

<u>Genger</u>, 76 F. Supp. 3d at 492-493. (AC, ¶ 19.)

**B.    <u>Orly Monetizes the Rights</u>**

Two judgments have since been entered against Orly in the U.S. District Court for the

Southern District of New York, each one expressly finding that Orly had "monetized" the Rights

by virtue of a litigation settlement with the Trump Group (the "2013 Settlement Agreement")

and determining that up to $12.25 million of the settlement proceeds from that monetization are

subject to Dalia's claw-back right. (AC, ¶ 21.)  Specifically, Judge Forrest found:

> On June 16, 2013, Orly entered into a settlement agreement … with
> the Trump Group and others regarding her claims to ownership of
> the TRI shares.  The agreement provides that Orly, Arie, and their
> litigation funders, will receive $32.3 million in exchange for a
> declaration that the Trump Group owns "all right, title and interest
> (beneficially, of record, and otherwise)" to the TRI shares, and that
> Orly waives all of her claims to the TRI shares...

<u>Genger v. Genger</u>, 76 F. Supp. 3d at 493-494. (AC, ¶ 22.)   As the Court explained: "The $32.3

million consists of $17.3 million in cash upfront, plus two additional $7.5 million payments to be

made over four years [the Trump Notes]." <u>Id</u>. at 494 n.11.

In their motion to dismiss, the defendants spend a considerable amount of time arguing that

Sagi also monetized the TRI shares (and then they falsely attribute that to Dalia).  That Sagi did

so is not in dispute.  As the District Court twice found: "Sagi had monetized his beneficial interest

in the TRI shares for $37.0 million, and … Orly had monetized her beneficial interest for $32.3

million, <u>a substantial portion of each attributable to Dalia's conveyed marital interest</u>." <u>Genger</u>,

2018 WL 3632521 at *6 (emphasis added, citing <u>Genger</u>, 76 F. Supp. 3d at 493-94).  We are here

is because, while Sagi is honoring his commitment, Orly repudiated hers.

**C.    <u>Dalia's First Demand Under the 2004 Commitments</u>**

In January 2014, upon learning that the Rights had been monetized, Dalia requested

$200,000 from the proceeds thereof. (AC, ¶ 28.) Sagi promptly paid the request. However, when Sagi sought 50% reimbursement from Orly, she refused, initially claiming the agreement bearing her signature was a forgery, then drawing back that defense when contemporaneous evidence and a handwriting expert definitively proved the document's authenticity, switching gears to argue lack of consideration. Genger, 76 F. Supp. 3d at 493, n.8.

Judge Forrest denied each and every one of Orly's defenses, and instead granted summary judgment to Sagi. Genger, 76 F. Supp. 3d at 503. (AC, ¶ 30.)  In doing so, Judge Forrest specifically rejected Orly's argument that she had received no consideration as a consequence of her mother having conveying the Rights to her, holding that: "as it turns out, Orly has effectively monetized an interest in the very [TRI] shares she claims not to have received to the tune of $32.3 million." Genger, 76 F. Supp. 3d at 491 (emphasis added).

Orly appealed the District Court's ruling, arguing, inter alia, "the record does not reveal that she actually received any money from the settlement," and therefore the "agreement at issue here is invalid for lack of consideration." Genger v. Genger, 663 F. App'x 44, 49 (2d Cir. 2016) (emphasis added).  The Second Circuit expressly rejected this argument, and unanimously affirmed the District Court's decision in full, holding that: "Orly does not dispute that she was part of a group that settled a claim involving the shares she was to receive as part of the Divorce Stipulation. Orly benefitted from the shares regardless of whether the settlement money went to Orly, or as a gift to Arie or to pay debts owed to her litigation partners [i.e., the Brosers]." Id. at **49-50 (emphasis added). " The Second Circuit further held that because Dalia's children had given her "sole and absolute discretion" to demand funds up to the value of the Rights, there was "no merit" to the argument that Sagi or Orly could avoid payment by "challenging Dalia's need for the money she demanded." Id. at *50.

8

**D.**     <u>Dalia's Outstanding Second Demand Under the 2004 Commitments</u>

In the fall of 2017, after the Second Circuit had affirmed the validity and enforceability of

the 2004 Commitments, Dalia again invoked her claw-back right, this time requesting $6 million.

(AC, ¶ 33.)  In response, Orly again sought to repudiate her 50% indemnity of Sagi, necessitating

litigation in which Orly (as Movants do here) argued that Judge Forrest's finding that Orly

monetized $32.3 million from the sale of the Shares was not binding. (AC, ¶ 34.)  Judge Forrest

again granted summary judgment to Sagi, finding that:

> Based on the prior rulings of this Court . . . [and] the Second
> Circuit's subsequent affirmance . . . <u>[it] has been conclusively
> established that Sagi and Orly monetized their beneficial interests in
> the TRI shares</u> for a total of $69.3 million...

<u>Genger</u>, 2018 WL 3632521 at *6 (emphasis added); (AC, ¶ 35).

In the 2017 action, the limits of the claw-back right also came into issue, in light of the size

of Dalia's $6 million demand.  Judge Forrest calculated that Dalia was entitled to claw-back up to

approximately $24.7 million from her two children from the monetized Rights:

> Both Dalia and Sagi agree that Dalia's conveyed marital interest of
> 794.4 shares represents 36% of the total TRI shares that were
> monetized. Using that figure, the maximum amount payable to Dalia
> under the 2004 Integrated Agreement is approximately $24.7
> million (or 36% of the total $69.3 million value). Orly has not
> specifically disputed the 36% figure, though she has raised unrelated
> questions about how the so-called "cap" in the 2004 Integrated
> Agreement affects her obligations to Sagi.

<u>Genger v. Genger</u>, 2018 WL 3632521, *6 n.5 (S.D.N.Y. July 27, 2018). (AC, ¶ 36.)  Once again,

Orly appealed.  Once again, the Second Circuit unanimously affirmed in full. <u>Genger v. Genger</u>,

771 F. App'x 99, 101–02 (2d Cir. 2019). (AC, ¶ 37.)

Thus, according to two final and non-appealable judgments, Orly must pay up to $12.25

million from the $32.3 million she received from the Rights.  This represents 50% of the $24.7

million to which Dalia is entitled after deducting $200,000 that Dalia received pursuant to her first demand. (AC, ¶ 38.)  It is Orly's repudiation of her obligation to make any part of this payment that is the subject of the instant adversary proceeding.[2]

### E.      Orly Transfers the Monetized Proceeds from the Rights

Unbeknownst to Dalia until post-judgment discovery in late 2018 and early 2019, Orly encumbered the $15 million Trump Notes in 2017 in favor of Mr. Herschmann and in 2018 in favor of Arie, also in purported satisfaction of false liabilities, pursuant to back-dated notes, and for no consideration to Orly. (AC, ¶ 4, 7, 26.)

In 2019, the District Judge Broderick was about to consider a motion to set aside the above conveyances, when Orly filed this bankruptcy case (originally in Texas) to halt that proceeding.  This was plainly an attempt to delay and prevent Dalia from recovering the support to which she is entitled from Orly's monetized proceeds of the Rights while also protecting the parties -- here the Movants -- that designated and participated in the fraud. (AC, ¶ 44.)

### F.      This Action

Dalia asserted a claim for constructive trust in this bankruptcy case in October 2019.  On January 22, 2020 -- nearing the six-year anniversary of the date on which Orly first refused Dalia's demand to pay her share of the support obligation to her mother -- Dalia commenced this adversary proceeding. Genger, 76 F. Supp. 3d at 494 ("On or about January 22, 2014, Dalia demanded $200,000 from Sagi under the 2004 Promise, which Sagi paid. …On January 23, 2014, Sagi informed Orly of Dalia's demand. 13 … On February 17, 2014, Sagi demanded $100,000

---

[2] As defendants note, there may be multiple claimants to these proceeds, including the Orly Trust and potentially the Trustee on behalf of Orly's bankruptcy estate.  However, Dalia's claim is superior to all such claims since the Rights belonged to her in the first place and were only transferred subject to her right to demand to be paid from them. (See Point III.)

from Orly under the 2004 Indemnity. … Orly refused to pay.").

On June 7, 2020, in response to a motion served by defendants Herschmann and Bowen pursuant Rule 9011 (complaining that the complaint "makes no allegations of actionable conduct against either Movant"), plaintiff amended the Complaint as of right to supplement the allegations against those two defendants, and thus the 9011 motion was never filed (although they have since served, but not filed, a new such motion).[3]  The Motions, seeking dismissal on the grounds of the statute of limitations, standing, and the failure to state a claim for relief, ensued. As demonstrated below, none of the grounds for dismissal have any merit.

## ARGUMENT

## I

## THE ACTION WAS TIMELY COMMENCED
## WITHIN SIX YEARS OF ORLY'S REPUDIATION OF HER OBLIGATIONS

### A.    The Action Was Timely Commenced

The definitive case on when a cause of action for constructive trust arises is Judge Sand's decision in United States v. Fontana, 528 F. Supp. 137 (1981).  In that case -- which defendants curiously ignore -- the Court reviewed a century of New York precedent, before concluding, based in part on 5 Scott, Trusts (3d ed.) that "New York law holds a constructive trust to exist from the time of the occurrence of the circumstances giving rise to the duty to surrender the property in question to another." Id. at 146 (emphasis added).  Subsequent decisions agree.

In Quadrozzi v. Estate of Quadrozzi, 99 A.D.3d 688, 690 (2d Dep't 2012), for example,

---

[3] The Complaint was timely and properly amended as of right pursuant to Fed. R. Civ. P. 15(a)(2), which provides that "a party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."

the Appellate Division held that: "[t]he equitable claim for the imposition of a constructive trust

is governed by a six-year statute of limitations, which begins to run <u>upon the occurrence of the</u>

<u>wrongful act from which a duty of restitution arises</u>."  As the Court explained:

> A determination of when the wrongful act triggering the running of
> the Statute of Limitations occurs depends upon whether the
> constructive trustee acquired the property wrongfully, in which case
> the property would be held adversely from the date of acquisition or
> whether the constructive trustee wrongfully withholds property
> acquired lawfully from the beneficiary, in which case the property
> would be held adversely <u>from the date the trustee breaches or</u>
> <u>repudiates the agreement to transfer the property</u>.

<u>Id</u>. (citations omitted, emphasis added).  This principle applies equally in bankruptcy.  <u>See</u>, <u>e.g.</u>, <u>In</u>

<u>re Balgobin</u>, 490 B.R. 13, 22 (Bankr. E.D.N.Y. 2013) (holding that there is "no doubt" a

constructive trust claim arises "<u>at the earliest, [when] the constructive trustee is under a duty to</u>

<u>surrender [the property in question]</u>") (citations omitted, emphasis added).

Indeed, the Trustee in her motion to dismiss recites the correct standard, but, fails to apply

it.  Specifically, in paragraph 24, she quotes <u>In re Tesmetges</u>, 47 B.R. 385, 391 (E.D.N.Y. 1984)

for the following holding: "New York courts have ruled that in claims for the creation of a

constructive trust which are similar to actions for an equitable lien, in that both have no applicable

limitations prescribed by law and rely essentially on the courts equity powers, <u>the six year statute</u>

<u>of limitations for the cause of action does not begin to run until a demand for the property or share</u>

<u>in the property is made and rejected</u>." (Emphasis added.)

Here, contrary to Movants' contention, Dalia does not allege that Orly acquired the Rights

unlawfully in 2004.  Nor does Dalia allege that Orly wrongfully monetized the Rights when she

settled the Trump litigation in 2013.  Rather, Dalia alleges in her Amended Complaint that Orly

wrongfully withheld property by repudiating her commitment to support Dalia pursuant to Dalia's

demand in 2014 and again in 2017.  Because there was no demand by Dalia prior to that time,

12

there was no wrongful withholding of property which would have triggered the running of the statute of limitations. See Quadrozzi, 99 A.D.3d, 690-91 (2d Dep't 2012) (six-year statute of limitations for constructive trust did not begin to run until defendant repudiated plaintiff's purported interest); Gaddi v. Gaddi, 108 A.D.3d 430, 431 (1st Dep't 2013) (limitations period did not begin to run until defendant unequivocally repudiated her promise); Bower v. Bower, 42 Misc. 3d 1231(A) (Sup. Ct. Monroe Co. 2014) (constructive trust claim did not accrue until defendant declined to return property).[4]

## B.    In the Alternative, Equitable Tolling Applies

In their motion to dismiss, defendants argue, incorrectly, that the cause of action actually accrued when Orly first took steps "to frustrate Dalia's rights." Defendants' Motion, p. 26.  As noted above, Judge Forrest has calculated that Dalia's claw-back is limited to $12.25 million -- an amount the $15 million Trump Notes would more than satisfy.  Accordingly, Orly only acted to frustrate Dalia's Rights in 2017 and 2018 when she -- having earlier given away the first $17.3 million to pay her father's alleged debt to the Brosers -- then began encumbering the anticipated proceeds of those notes in favor of her father, brother and business partners.  It is undisputed that Dalia did not become aware of Orly's encumbrance of the Trump Notes until 2019 at the earliest, because defendants fraudulently concealed it.

As noted by the Second Circuit, "'the law is clear that fraudulent concealment of the existence of a cause of action tolls the running of the statute of limitations.'" Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir. 1992) (citation omitted).  To rely on the doctrine of fraudulent

---

[4] By contrast, in both McGovern v. Solomon, 466 F. Supp. 2d 554, 559 (S.D.N.Y. 2006) and Dybowski v. Dybowska, 146 A.D.2d 604 (2d Dep't 1989), cited by Movants, the original transfer of property was wrongful and thus repudiation was not at issue in either case. Orly, it should be noted, takes the position that she has never repudiated her obligations. See Defendants' Motion, ¶ 75, n. 9.

concealment, a plaintiff must demonstrate "(1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." <u>Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.</u>, 100 F. Supp. 2d 178, 183 (S.D.N.Y. 2000); <u>accord</u>, <u>e.g.</u>, <u>Zumpano v. Quinn</u>, 6 N.Y.3d 666, 673-74 (2006) (defendant estopped from pleading statute of limitations where plaintiff was induced by fraud, misrepresentation, or deception to refrain from timely commencing an action or, in the case of a fiduciary relationship, concealment without actual misrepresentation); <u>see</u> <u>also</u> <u>McIvor v. Di Benedetto</u>, 121 A.D.2d 519, 522 (2d Dep't 1986) (whether defendant should be equitably estopped from asserting statute of limitations is a question of fact to be determined upon trial). The doctrine applies here.

In this case, pretty much every defendant other than the retired Arnold Broser engaged in active misrepresentations to conceal the fraudulent encumbrances of the Trump Notes. It should be noted that, while Dalia was provided a copy of the 2013 Settlement Agreement, the Agreement itself only states that the initial $17.3 million payment would be made to Orly's then-attorney of record, William Wachtel, and that the $15 million Trump Notes were not yet payable, and until they became payable (an indefinite date dependent on various litigations) they would be held in escrow by the same Mr. Wachtel.

Efforts to learn the truth were thereafter repeatedly stymied by defendants, typically with false statements under oath. In the summer of 2016, a trial was held before J.H.O. Gammerman in the case of *Orly Genger v. Dalia Genger et. al,* Index No. 109749/09 (Sup. Ct., N.Y. Cnty.), a case in which Orly claimed (falsely) that Dalia and Sagi had conspired to deny Orly her "equal" share in a family business, TPR Investment Associates, Inc., and sought $85 million in damages to remedy this alleged "imbalance." Orly claimed not to know what became of the Trump

14

settlement proceeds, so David Broser, one of the signatories, was served with a trial subpoena.

The trial subpoena sought only two categories of documents:

1.      All documents constituting, containing or reflecting any agreement with Orly Genger or communications with Orly Genger or financial arrangements with Orly Genger, and/or payments made to Orly Genger or any other person at her direction, including but not limited to all agreements, correspondence and other documents concerning in any way the initial Settlement Agreement, dated June 16, 2013 among Orly Genger, Arie Genger, Arnold Broser, David Broser, and [the Trump Group].

2.      All documents concerning the funding or financing of any litigations of which Orly Genger is a party.

Exh. K at 3.

It has since become known that Mr. Broser was in possession of several directly responsive documents, including, *inter alia*, a 2012 Genger Litigation Trust Agreement, whereby Orly and Arie purported to pledge future litigation proceeds to the Brosers, an interrelated Credit Agreement between Arie and the Brosers, significant sums from which went to fund Orly's various lawsuits. Exhs. G, J, W.[5]    Production of these documents would have given Dalia some sense of the efforts to frustrate her claw-back right.

But Mr. Broser did not produce them.  Instead, he moved to quash.  In support thereof, Mr. Broser attested under penalty of perjury that: "I have no documents called for in the Schedule attached to the subpoena." He went on to accuse the subpoenaing party, Sagi, of having "no good faith basis to issue the subject trial subpoena," and claimed the subpoena was "intended only to burden and harass me, and, as such, it is invalid and should be quashed." Exh. K at 5.  Based on his affidavit, the Court granted Mr. Broser's motion to quash, and the trust stayed concealed.

_____

[5] The Genger Litigation Trust was never properly formed, as the trustees never accepted their positions in an acknowledged instrument and, in any case, the Trump Notes were never titled to a trustee, but instead held by Messrs. Wachtel and Bowen.

The affidavit was plainly false.  When asked at his recent deposition why he denied possessing documents he clearly possessed, Mr. Broser responded only by blaming his lawyer for his own false statements. Exh. Y at 3 ("It's what my attorney, my attorneys, gave me to sign.")

The next thwarted attempt by Dalia to learn of the transfers and encumbrances on the proceeds of the trust came in October 2018, after Sagi had been awarded a $3.2 million judgment against Orly and began taking post-judgment discovery.  He started with a Rule 30(b)(6) deposition of the Kasowitz firm, for which Mr. Bowen sat as designee.  Mr. Bowen was repeatedly questioned about any agreements with respect to settlement proceeds, in particular the $15 million Trump Notes, which were more than sufficient to satisfy Dalia's demand.  He was equally evasive.  In response to a request to produce "any escrow accounts, arrangements, to the extent that it was for the benefit of Orly Genger," Mr. Bowen testified that "we deem that relevant and would produce responsive documents if any, but I can attest today that there are none." Exh. L at 9.

Mr. Bowen was repeatedly asked if there was any other sort of agreement directing the disposition of the Trump Note proceeds.  He repeatedly denied that there was:

> Q.  Is it correct that the only way you will release the proceeds is if you are instructed by all four of those individuals to do so in the same manner?
>
> …
>
> A.  There is no understanding that the firm is aware of that it's a majority vote or a consensus vote or anything like that.· It's whatever -- whatever the agreement there is in and among the members of AG Group, the firm has no knowledge of that.
>
> …
>
> A.  And then you are asking me who can speak on behalf of the AG Group whether it has to be all four in consensus, whether it has to be a majority vote, whether somebody else can speak on behalf of the AG group and my answer is: We don't have any information about any agreements between the AG Group.  We're not aware that there is any dispute among the members of the AG Group, that there is any agreement among the AG Group about who can direct the money and who can't direct the money

16

maybe. If that -- maybe that will become an issue down the road but we are
not aware of it.

Exh. L at 27, lines 6-17 (emphases added).

As it turns out, there was indeed at that time "an agreement among the AG Group about
who can direct the money." On or around March 31, 2017, all members of the AG Group (Orly,
Arie and the Brosers), along with two members of the Kasowitz firm (Eric Herschmann and
Michael Rosenbloom), executed an Escrow Agreement giving explicit instructions on who could
direct the proceeds from the Trump Notes. Exh. Q. At the time the parties executed this Escrow
Agreement, they were all well aware of the scope of Dalia's potential claw-back, as the first Judge
Forrest decision had recently been affirmed by the Second Circuit, following an unsuccessful
appellate argument by the very same Kasowitz firm acting as Orly's counsel. Indeed, it is
impossible to read this Agreement as anything other than the first attempt to frustrate Dalia's rights.
And yet Mr. Bowen twice claimed under oath that the Agreement did not exist

There are only two possible explanations for Mr. Bowen's testimony, neither of which is
very comforting. Either he was aware of the Escrow Agreement but deliberately concealed it from
the questioner, or his partners (e.g., Mr. Herschmann, who orchestrated the Escrow Agreement)
deliberately concealed it from him, so that he would answer in ignorance on the firm's behalf. For
his part, Mr. Bowen claimed to have consulted with Herschmann, as follows: "I am telling you
and attesting under oath that I made reasonable inquiry. I don't mind telling you that reasonable
inquiry would involve communications with Mr. Hirschman [sic]." Exh. L at 21.

Whatever the truth, the outcome was the same -- Dalia was kept in the dark. Orly did her
part to keep the fraudulent transfers and encumbrances hidden. Asked in an interrogatory to
"[i]dentify the amount, date, and recipient of all payments made and/or to be made to any person
or entity pursuant to Defendant's 2013 settlement with, inter alia, the parties known as 'The Trump

17

Group,' including any and all payments made from any escrow accounts thereunder," Orly responded in relevant part as follows: "Orly has received $0.00, as well as no non-monetary benefit, in connection with the 2013 settlement with the parties known as 'The Trump Group,' <u>and has no knowledge of any amounts or benefits other parties may have received under that settlement</u>." (Emphasis added.) Exh. M at 17.   Yet, Orly at that time was a party to multiple agreements (*e.g.,* the Genger Litigation Trust Agreement, the Escrow Agreement) expressly dictating where the proceeds from the $15 million Trump Notes were supposed to go.

Slowly the truth did come out, albeit no thanks to the defendants in this case.  A subpoena to Mr. Wachtel turned up a $17.3 million wire report made out to the "Genger Litigation Trust," which revealed the existence of the trust and therefore, by necessity, an unproduced and previously unidentified trust bank account and a trust agreement.  Months of motion practice followed, as defendants still refused to produce the trust agreement until finally ordered to do so by Judge Freeman in January 2019. Exh. R.  This revealed that Orly and Arie were signatories on a document purporting to commit the settlement proceeds.

Around that same time, in post judgment discovery in the District Court action, Sagi uncovered UCC-1 financing statements by which Orly purported to pledge all her assets to both her husband and father, albeit without identifying the bases for the debt.  More discovery motion practice followed, culminating in a hearing in January 2019 at which Mr. Herschmann vociferously opposed his wife having to produce any information about the liabilities underlying these mystery UCC's:

> MR. HERSCHMANN: With all due respect to Mr. Dellaportas … let me start with this, <u>if Orly has other liabilities. That's not applicable to a judgment creditor.  He's entitled to know what assets she has, right, and he's entitled to know what debts are due and owing to her</u>. But if she owes additional debts, that's not relevant to the judgment creditor in collecting his judgment. Exh. R at 60.

Judge Freeman disagreed with Mr. Herschmann's reading of the law and ordered Orly to produce any documents she had with regard to either assets or liabilities. It was only then that two promissory notes were produced, albeit without any hint they had been backdated by 1-2 years. And incredibly, even on that late date, Orly and the Kasowitz firm still did not produce the March 31, 2017 Escrow Agreement, nor make anyone aware of its existence. The only reason we even know of the 2017 Escrow Agreement today is because passing reference is made to it on Section 6(f) of the "December 31, 2016" promissory note that Orly gave to her husband a few months into their marriage. (Apparently, the drafter did not notice the anachronism when he backdated the note to make it appear to coincide with a much earlier payment Herschmann had made to his own law firm.)

Finally, on March 20, 2019, Kasowitz came clean and produced the Escrow Agreement, purporting to govern the disposition of settlement proceeds. It was only then that Dalia realized that Orly had fully committed all of Dalia's Rights to the other defendants in this case. Suffice it to say that Courts have found far less egregious conduct to justify equitable tolling under the doctrine of fraudulent concealment. See, e.g., In re Allou Distributors, Inc., 387 B.R. 365, 399 (Bankr. E.D.N.Y. 2008) (holding that "Trustee has alleged sufficient grounds to assert that equitable tolling may apply to his claims" where "Trustee alleges that these transactions were concealed by the use of secret sets of books and records"). In sum, Dalia's claims are all filed within the applicable statute of limitations. Even under the erroneous standard pressed by defendants, the statute of limitations would have been tolled and the action timely.

## II

### DALIA HAS STANDING TO ASSERT HER CLAIMS

Defendants' contention that Dalia lacks either "Constitutional" or "prudential" the

19

standing to assert a claim for constructive trust is also without merit.

## A.   Dalia Has Constitutional Standing

To maintain an action in federal court, a plaintiff must have "a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009) (quotation and citation omitted).  And to establish "constitutional standing," a plaintiff must "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citations omitted).

Here, Dalia's entitlement to a constructive trust and/or an equitable lien, as demonstrated in Point III, grants her standing. See In re Chowaiki & Co. Fine Art Ltd., 593 B.R. 699, 712 (Bankr. S.D.N.Y. 2018) (party asserting constructive trust has standing to bring claim); McGovern v. Solomon, 466 F. Supp. 2d 554, 557 (S.D.N.Y. 2006) (constructive trust conveys standing upon those entitled to it). As the Courts have noted: "[It] is implicit that the equitable doctrine of the constructive trust -- which operates upon a defendant's promise to [the beneficiary of the trust] made within a confidential relationship, reliance by the [beneficiary], and unjust enrichment of the defendant to the detriment of the plaintiffs -- conveys standing to the plaintiffs." Gimbel v. Feldman, 1995 WL 500487, *4 (E.D.N.Y. Aug. 8, 1995).

## B.   Dalia Has Prudential Standing

Defendants' reliance on the non-Constitutional doctrine of prudential standing is equally misplaced.  Defendants cite this doctrine as a rule of judicial restraint that prohibits a litigant from raising the legal rights of third parties.   In this case, however, Dalia is asserting a constructive trust claim on behalf of herself, not third parties.  Accordingly, each of the cases

cited by the defendants -- In re 1031 Tax Grp., LLC, 439 B.R. 47, 53 (Bankr. S.D.N.Y.),

supplemented, 439 B.R. 78 (Bankr. S.D.N.Y. 2010); In re Schick, 246 B.R. 41, 46 (Bankr.

S.D.N.Y. 2000); and Powers v. Am. Exp. Fin. Advisors, Inc., 82 F. Supp. 2d 448, 453 (D. Md.),

aff'd, 238 F.3d 414 (4th Cir. 2000) -- is inapposite.  In each of those cases, unlike this one, the

plaintiff sought to assert constructive trust claims on behalf of unrelated third parties.  Here, Dalia

is not asserting a constructive trust on behalf of anyone other than herself.

Defendants try to get around this proposition of law by pointing to a provision in the 2004

Divorce Agreement stating that: "[f]ollowing the foregoing transfers of TRI stock, [Dalia] will

have no ownership interest in TRI."  This is a non sequitur.  Since transferring her interest in the

TRI shares pursuant to the 2004 Divorce Agreement (including the 2004 Promise and

Indemnification Agreement) Dalia has never claimed an interest in the actual TRI shares.  Rather,

under the 2004 Commitments, Sagi and Orly granted her an interest in the future monetization

of her marital rights to those shares, i.e., the proceeds.  Nothing in the 2004 Divorce Agreement

prohibits this grant.   To the contrary, as Judge Forrest noted, the Agreement's "'entire

understanding' clause … is subject to a carve-out for other agreements expressly incorporated

by reference and those 'entered into concurrently herewith.'" Genger, 76 F. Supp. 3d at 492. The

2004 Promise was executed concurrently with the Divorce Agreement. Id.  Moreover, as set forth

above, Judge Forrest indeed found that Orly had monetized her TRI shares -- those in which

Dalia has an interest -- to the tune of $32.3 million. Genger v. Genger, 76 F. Supp. 3d.  Thus,

nothing about this argument divests Dalia of her claim to a constructive trust for the commitments

made to her.

Accordingly, the requirement that a plaintiff have standing to assert a claim in federal

court is not an impediment to Dalia's claim.  As set forth below, Dalia satisfied all of the elements

for a New York common law claim of constructive trust and/or equitable lien as against Orly.

That is the only standing that is required, and Dalia has it in spades.

### III

### THE AMENDED COMPLAINT STATES A CLAIM
### UNDER THE LEGAL STANDARDS FOR MOTIONS TO DISMISS

The Motions also seek dismissal of the Amended Complaint under Fed. R. Civ. P. 12(b)(6).  As demonstrated below, the Amended Complaint, which provides a short and plain statement of the claim sufficiently particular to give notice of the matter in controversy, fully complies with the requirements of Fed. R. Civ. P. 8(a)(2) and, accepting as true all factual statements alleged in the Amended Complaint and drawing all reasonable inferences in favor of plaintiff, states a claim to relief that is far more than just "facially plausible."  Indeed, as set forth in Point V below, because all material allegations are drawn from Court findings and sworn admissions by Orly, summary judgment should be awarded to Dalia.

#### A.    The Legal Standard

Under Fed. R. Civ. P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  This means only that a complaint be "sufficiently particular to give notice of the matter in controversy." Merrin Jewelry Co. v. St. Paul Fire and Marine Ins. Co., 301 F. Supp. 479, 481 (S.D.N.Y. 1969).  "Pleadings are to give 'fair notice' of a claim and 'the grounds upon which they rest' in order to enable the opposing party to answer and prepare for trial, and to identify the nature of the case." Trepel v. Dippold, 2005 WL 1107010, *3 (S.D.N.Y. May 9, 2005). The Federal Rules prefer "simple pleadings" and leave it to "liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Id. (citation omitted).

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is "to assess the legal

feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980).  To defeat a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim has facial plausibility, "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the] facts is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556 (quotation omitted).  In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).

Contrary to the Trustee's argument, Rule 9(b) does not apply here, as Dalia is not claiming Orly obtained the Rights fraudulently. See Lazarek v. Ambit Energy Holdings, LLC, 2017 WL 4344557, *6 (W.D.N.Y. Sept. 29, 2017); Zucker v. Katz, 708 F. Supp. 525, 530 (S.D.N.Y. 1989).  In any event, accepting plaintiff's factual allegations as true and drawing all inferences in the light most favorable to her, the Court should find that Dalia has pleaded the elements of her claim with sufficient specificity under any conceivable standard, as demonstrated below. See Bo Zhang v. N. Cty. Beautification Co., 2013 WL 4458731, *3 (W.D.N.Y. Aug. 16, 2013) (unjust enrichment claim pleaded with sufficient particularity).

**B.     Dalia States a Claim For the Relief of Constructive Trust**

A constructive trust is an equitable remedy imposed to prevent unjust enrichment. Simonds v. Simonds, 45 N.Y.2d 233 (1978); Sharp v. Kosmalski, 40 N.Y.2d 119 (1976).  As

23

Judge Cardozo has stated, a constructive trust is "the formula through which the conscience of equity finds expression." Simonds, 45 N.Y.2d at 241 (citation omitted).  When the holder of legal title "may not in good conscience retain the beneficial interest [in property], equity converts him into a trustee." Id.  The applicability of the remedy of a constructive trust "is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." Latham v. Father Divine, 299 N.Y. 22, 27 (1949).

Defendants suggest in their Motions that the doctrine of constructive trust is somehow alien to or incompatible with bankruptcy.  In fact, the opposite is true.  As this Court has previously explained: "The finding of a constructive trust by the bankruptcy court and a determination of the proper distribution of that trust are intimately tied to the traditional bankruptcy functions and estate …"  Petition of Treco, 205 B.R. 358, 363 (Bankr. S.D.N.Y. 1997) (citation omitted); accord, e.g., In re Adelphia Commc'ns Corp., 325 B.R. 89, 112 (Bankr. S.D.N.Y.), aff'd in part, rev'd in part, 331 B.R. 93 (S.D.N.Y. 2005) (cited by the Trustee) ("the Second Circuit has 'rejected the notion that bankruptcy law trumps state constructive trust law'") (citation omitted). Similarly, the Second Circuit has explained that:

> Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition. A constructive trust . . . confers on the true owner of the property an equitable interest in the property superior to the trustee's. The reason for this priority is clear: but for the debtor's misconduct, the trust beneficiary would have perfected his security interest in the *res* of the trust and thus would have prevailed over the debtor as well as the debtor-in-possession.

In re Howard's Appliance Corp., 874 F.2d 88, 93 (2d Cir. 1989) (citations and quotations omitted) (imposing constructive trust); accord In re Southmark Corp., 49 F.3d 1111, 1118 (5th Cir. 1995) (funds were held by the debtor in constructive trust; Section 541(d) of the Bankruptcy Code specifically excludes such property from the bankruptcy estate).

24

Federal courts look to state law to determine whether to impose a constructive trust. In re Howard's Appliance Corp., 874 F.2d at 93.  Under New York law, generally, a constructive trust has been found to contain four elements: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." Sharp, 40 N.Y.2d, 121.  However, that these elements "serve only as a guideline [and] a constructive trust may still be imposed even if all of the elements are not established." Quadrozzi, 99 A.D.3d, 691 (citation omitted).  As the court has stated, the relief of constructive trust is not limited to cases in which the four elements are found. See Augustine v. Szwed, 77 A.D.2d 298, 303 (4th Dep't 1980); see also Palazzo v. Palazzo, 121 A.D.2d 261, 264 (1st Dep't 1986) (the power of equity to employ a constructive trust to reach a just result is not strictly limited by the conditions set forth in Sharp); Tordai v. Tordai, 486 N.Y.S.2d 802, 804 (3d Dep't1985) (Sharp factors are not rigid, but flexible considerations for the court to apply in determining whether a constructive trust should be imposed); Coco v. Coco, 485 N.Y.S.2d 286, 289 (2d Dep't 1985) (these factors are merely useful guides and are not talismanic).  The federal courts have found that New York courts "do not insist that a constructive trust must fit within the framework of these elements." Counihan v. Allstate Ins. Co., 194 F.3d 357, 362 (2d Cir. 1999). Rather, as federal courts applying New York law have held, "[a]lthough these factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be 'rigidly limited'." Id., citing In re Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc., 961 F.2d 341, 352 (2d Cir. 1992). Accord Rossi v. Morse, 153 A.D.3d 1637, 1638 (4th Dep't 2017) (declining to rigidly apply the Sharp factors since a constructive trust is an equitable remedy).

In any event, all four elements establishing Dalia's entitlement to a constructive trust are present here.

### 1.    Confidential or Fiduciary Relation

Under New York law, a confidential and fiduciary relationship exists:

> in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another

Braddock v. Braddock, 871 N.Y.S.2d 68, 72 (1st Dep't 2009) (citation and quotation omitted).  As the Court further noted in Braddock, family members often stand in a fiduciary relationship with one another. Id.; accord, e.g., Uddo v. DeLuca, 425 F. Supp. 3d 138, 155 (E.D.N.Y. 2019) (fiduciary relationship exists between family members who often repose greater confidence and trust in each other than they do in others); Diaz v. Diaz, 130 A.D.3d 560, 561 (2d Dep't 2015) (confidential relationship found to exist between family members); Buntzman v. Buntzman, 1991 WL 120470, *6 (S.D.N.Y. June 24, 1991) (motion to dismiss denied, as a fiduciary duty may arise "out of the parties' close family and business relationship[s]"); Venizelos v. Oceania Maritime Agency, Inc., 268 A.D.2d 291, 291 (1st Dep't 2000) (finding that son breached fiduciary duties arising from his entrustment with the management of a family business); Reiner v. Reiner, 100 A.D.2d 872, 874 (2d Dep't 1984) ("no doubt that the family ties constitute a confidential relationship").

In their Motions, defendants note that Orly and Dalia for several years now have been at loggerheads.  That is undeniable; it is also irrelevant.  What matters for these purposes is the status of their relationship in 2004, when the promise was made.  At the time that Dalia transferred her valuable marital Rights there was no hint of any adversity.  As Orly has previously testified, "before everything became terrible, we were a very close family." Exh. S.  Indeed, Orly has previously sworn in a verified pleading that, as late as 2009: "Dalia also owes duties of care and loyalty to Orly arising from the close familial relationship between herself and her daughter. Orly

26

relied upon her mother to protect her interests, including her Trust's ownership interests in TPR and TRI, and alert her to anything that may adversely affect her or her Trust's assets." Exh. T at 9. In that pleading, Orly had the very same TRI ownership interest at issue in this case.

As the Supreme Court has held, most recently in <u>Amgen Inc. v. Connecticut Retirement Plans and Trust Funds</u>, 568 U.S. 455, 470 n.6 (2013): "Factual assertions in pleadings …, unless amended, are considered judicial admissions conclusively binding on the party who made them." (citations and quotations omitted). And even if Orly could disavow her prior admission, a fiduciary relationship is not a necessary requirement for the imposition of a constructive trust. <u>See</u>, <u>e.g.</u>, <u>Lines v. Bank of Am. Nat. Trust & Sav. Ass'n</u>, 743 F. Supp. 176, 179–80 (S.D.N.Y. 1990); <u>S.E.C. v. Levine</u>, 689 F. Supp. 317, 321–23 (S.D.N.Y. 1988), <u>aff'd in part, rev'd in part</u>, 881 F.2d 1165 (2d Cir. 1989). <u>See</u> <u>also</u> <u>Republic of Philippines v. Marcos</u>, 806 F.2d 344, 355 (2d Cir. 1986) ("constructive trust is simply a remedy to prevent unjust enrichment and may or may not involve a fiduciary relationship") (citation omitted).

Moreover, here the circumstances surrounding the transfer of Dalia's Rights, specifically the enormous trust that would have been required for Dalia to transfer her most substantial asset to her children for no consideration other than their commitment to support her in retirement, establishes on its face the existence of a confidential and fiduciary relationship.

### 2.    A Promise and a Transfer In Reliance Thereon

As Judge Forrest found, Orly made an express "commitment ... to financially support" Dalia from the proceeds of the Rights, in exchange for Dalia's transfer of those rights. This finding is based upon the writings between the parties, and Dalia and Sagi's <u>undisputed</u> testimony. <u>Genger</u>, 76 F.Supp. 3d at 493, n.8 ("Orly does not affirmatively deny the existence of the 2004 Indemnity, or that she signed it"). Thus, the elements a promise and a transfer in reliance

27

thereon have been conclusively established.  "Even without an express promise, however, courts of equity have imposed a constructive trust upon property transferred in reliance upon a confidential relationship. In such a situation, a promise may be implied or inferred from the very transaction itself." Sharp, 40 N.Y.2d, 122.

Defendants' argument that a written agreement precludes a constructive trust claim is unavailing. Orly's oral promise is not contained in Orly's executed 2004 indemnity, although its economic substance is reflected therein.   Indeed, defendants elsewhere admit there is no contractual privity between Dalia and Orly.  Defendants' Motion,  p. 29.  As Judge Forrest explained, this was due to a scheduling quirk whereby Orly was vacationing in Fiji when the divorce settlement was executed. Genger, 76 F. Supp. 3d.  Regardless of the reason, the fact remains that Dalia has no direct legal remedy against Orly, but rather must rely on equity.

New York courts have sanctioned constructive trusts in the wake of an oral or implied promise and in the absence of a direct claim for breach of contract. See, e.g., Sharp, supra; Maya, supra.  However, in the alternative, Dalia claims an equitable lien based upon Orly's agreement to use the proceeds of the monetization of the Rights for her support -- what Judge Forrest termed the parties' "2004 Integrated Agreement."[6]

3. **Unjust Enrichment**

The final element of unjust enrichment is also present.  It is clear that, in the absence of a constructive trust or equitable lien, Dalia will not receive her rightful support from Orly.  While

_____

[6]      It is unclear whether Judge Forrest viewed the agreement as "integrated" only as between Sagi and Orly, or also as among Sagi, Orly and Dalia, as the court did not need to reach this precise issue for either decision.  If this Court agrees with defendants that there is no privity as between Dalia and Orly, a constructive trust applies.  Otherwise, an equitable lien theory applies.  See Point III(c), infra.  The result is the same.

the Trustee may think she is "in the best position" to pursue a fraudulent transfer action to recover

the proceeds of the monetization of the Rights from insiders of Orly, such as Arie's business

associates and Orly's husband, in whole or in part, that has not happened in the year the case has

been pending.  Further, there is no indication she will do so at all or, if she does, that she will

succeed in such an effort.  Indeed, the Trustee now seeks to borrow money from, and otherwise

do business with, the fraudulent transferees.  In any event, the possible existence of such

alternative remedies do not trump Dalia's constructive trust claim.

Clearly, Orly "hold[s] property 'under such circumstances that in equity and good

conscience [she] ought not to retain it.'"  Golden Buddha Corp. v. Canadian Land Co. of Am.,

N.V., 931 F.2d 196, 202 (2d Cir. 1991) (citation omitted).  The appropriate inquiry is whether

the defendants have been enriched at the expense of Dalia under circumstances warranting

restitution in "equity and good conscience."  In re Adler, Coleman Clearing Corp., 1998 WL

551972, *16 (Bankr. S.D.N.Y. Aug. 24, 1998), aff'd, 208 F.3d 202 (2d Cir. 2000) (citation

omitted).  As the Second Circuit has held, a claim for unjust enrichment requires only: "(1) that

the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience

require restitution."  Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448

F.3d 573, 586 (2d Cir. 2006).  All three exist here.

As the District Court held, "[t]here is no genuine dispute as to whether [Orly] has so

benefited [from the Rights]: Orly's claims to beneficial ownership of the TRI shares individually

and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the

2013 Settlement Agreement." Genger, 76 F. Supp. 3d at 499.  As Judge Forrest further found,

letting Orly off the hook on her financial commitment to her mother "would not serve the interests

of equity, … as doing so would enable Orly to obtain her benefit from the agreement (the  $32.3

million she received for the beneficial interest in the TRI shares) while escaping her obligations under it (her commitment to financially support her mother)." Id. at 501.

Defendants also repeat the argument that Orly did not receive any benefit because, she has given away all $32.3 million in settlement proceeds and apparently received no consideration from the transferees in return. In other words, the non-debtor defendants would like legal immunity because they successfully pillaged what belonged to Dalia and is not part of the bankruptcy estate. As the Second Circuit explained, however, in weighing and rejecting this same, specious argument, the premise is incorrect: "Orly benefitted from the shares regardless of whether the settlement money went to Orly, or as a gift to Arie or to pay debts owed to her litigation partners." Genger, 663 F. App'x at 49-50 (emphasis added). That adjudication may not be relitigated.

Moreover, pursuant to the March 31, 2017 Escrow Agreement -- a document the Second Circuit did not have before it because, as discussed above, the defendants fraudulently concealed it -- it has now been established beyond peradventure that Orly has co-signing authority over at least $8.5 million of the 2013 settlement proceeds, belying her claims that she has received no benefit from the proceeds of the monetization of the rights. Equity and good conscience demand that Orly not be permitted to retain any such benefit from the Rights after abjectly repudiating her promise to support Dalia from the proceeds derived therefrom.

Sharp, supra, is a compelling example of a case where imposition of a constructive trust was deemed appropriate. In that case, a plaintiff had transferred his property to a woman 16 years his junior. Id. at 121. The New York Court of Appeals found that a relationship of trust and confidence existed between the parties and, even absent an express promise, it was "inconceivable" that the plaintiff would convey his property without "at least tacit consent" that

30

she would permit him to continue to live there. Id. at 122. The Court found that the "salutary

purpose of the constructive trust remedy is to prevent unjust enrichment" and "a person may be

deemed to be unjustly enriched if he (or she) has received a benefit, the retention of which would

be unjust." Id. at 122. As the Court explained:

> A conclusion that one has been unjustly enriched is essentially a
> legal inference drawn from the circumstances surrounding the
> transfer of property and the relationship of the parties. It is a
> conclusion reached through the application of principles of equity.
> Having determined that the relationship between plaintiff and
> defendant in this case is of such a nature as to invoke consideration
> of the equitable remedy of constructive trust, it remains to be
> determined whether defendant's conduct following the transfer of
> plaintiff's farm was in violation of that relationship and,
> consequently, resulted in the unjust enrichment of the defendant.
> This must be determined from the circumstances of the transfer
> since there is no express promise concerning plaintiff's continued
> use of the land.

Id. at 123. The Court of Appeals therefore reversed the trial judge who had dismissed the

complaint and the Appellate Division which had affirmed that dismissal. The case was remitted

for "a review of the facts" and the Court "emphasized" that the transaction "should be interpreted

not literally or irrespective of its setting, but sensibly and broadly with all its human implications."

Id. Sharp is instructive for the case at bar and compels the imposition of a constructive trust in

favor of Dalia against the proceeds of the Rights.

Rossi v. Morse, 153 A.D.3d 1637 (4th Dep't 2017), is a case on all fours with this one

and is likewise instructive. There, a mother transferred assets to her daughter in reliance on her

daughter's promise to use the money for her mother's needs. Id. at 1638. The Court concluded

that a relationship of trust and confidence existed between the parties before it had become

strained and a constructive trust was imposed. Id. The same result should obtain here.

Certainly, it cannot be found as a matter of law that the imposition of a constructive trust

in this case would not satisfy the demands of equity, promote fairness and prevent injustice. The motion to dismiss under Fed. R. Civ. P. 12(b)(6) should be denied under the appropriate standard for such motions set forth above. See Bank Capital Servs. LLC v. Chef's Depot Inc., 2019 WL 7291240, *4 (S.D.N.Y. Dec. 30, 2019) (denying motion to dismiss claim for unjust enrichment and constructive trust); Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp., 1995 WL 43669, *5 (S.D.N.Y. Feb. 2, 1995) (same); In re Black & Geddes, Inc., 16 B.R. 148, 152-53 (Bankr. S.D.N.Y. 1981) (same). At a minimum, there are factual issue to be tried. Based on the doctrine of collateral estoppel, however, the proper relief is summary judgment in favor of Dalia, as noted below in Point V.

## C.   Dalia States A Claim For Equitable Lien

As an alternative to a constructive trust, Dalia is entitled to an equitable lien on the proceeds of Orly's monetization of the Rights. An equitable lien arises where the parties by agreement indicate an intention to create a lien upon specific property. As the New York Court of Appeals has explained, an equitable lien:

> …is dependent upon some agreement, express or implied, that there shall be a lien upon specific property, or else it is the means adopted for enforcing equities which could not be otherwise established. ... The agreement must deal with some particular property either by identifying it or by so describing it that it can be identified and must indicate with sufficient clearness an intent that the property so described or rendered capable of identification is to be held, given or transferred as security for the obligation.

James v. Alderton Dock Yards, Ltd., 256 N.Y. 298, 303 (1931).

The situation at bar fits well within this doctrine. Here, the so-called "2004 Integrated Agreement," as articulated by Judge Forrest, specifically links Orly and Sagi's promise to pay Dalia with Orly's and Sagi's monetization of the Rights. This evidences an agreed-upon express, let alone implied, lien upon the Rights and the proceeds therefrom, which stands as security for

the obligation to support Dalia.  Orly's repudiation of her commitment to Dalia makes it equitable and just for the Court to impose a lien where otherwise there might be no relief.  As the District Court explained, without Orly's 50% commitment, "Sagi could be obligated under the 2004 Promise to pay Dalia double the economic benefit he received from his shares of TRI, and Orly would effectively have received the shares as a gift."  Genger, 76 F. Supp. 3d at 497.

Thus, Dalia's claim for an equitable lien should not be dismissed , nor should any other claim in the Amended Complaint, merely because defendants say it is "redundant." [CITE] As the Second Circuit has explained, "under our system of notice pleading and pleading in the alternative, a party should plead all theories that he wishes to pursue." Peterson v. Insurance Co. of North America, 40 F.3d 26, 32 n.3 (2d Cir. 1994).  That principle applies here.

IV

**IN THE ALTERNATIVE,
<u>LEAVE TO REPLEAD SHOULD BE GRANTED</u>**

Finally, should the Court find any technical pleading deficiency in the Amended Complaint, Dalia stands ready to cure that deficiency and, in such event, would respectfully request leave to re-plead.  As the Courts have held, pleadings are "almost always" dismissed with leave to amend. See Yoder v. Orthomolecular Nutrition Institute, Inc., 751 F.2d 555, 562 n.6 (2d Cir. 1985), citing 2A Moore & Lucas, Moore's Federal Practice ¶ 9.03 at 9-34 (2d ed. 1984); Weaver v. Chrysler Corp., 172 F.R.D. 96, 102 (S.D.N.Y. 1997) ("it is the usual practice upon granting a motion to dismiss to allow leave to replead").  Defendants cannot claim to be "prejudiced" by the granting of leave, since issue has not been joined, substantive discovery has not commenced and the case is still in its earliest stage.  While plaintiff has amended its Complaint once as of right, the amendment was not made with notice of, or with the intention to cure any of the pleading deficiencies raised by the Motions.  Thus, there have been no "repeated failures to cure deficiencies

33

by amendments previously allowed." <u>Mitra v. State Bank of India</u>, 2005 WL 2143144, *6 (S.D.N.Y. Sept. 6, 2005) (citation omitted).

Accordingly, no part of the motions to dismiss should be granted without leave to replead. <u>See</u> <u>Luce v. Edelstein</u>, 802 F.2d 49, 57 (2d Cir. 1986) ("dismissal of the complaint without granting leave to amend was an abuse of discretion") (citation omitted).

V

## <u>SUMMARY JUDGMENT SHOULD BE GRANTED TO DALIA</u>

The Motion to Dismiss should also be denied as three of four elements have already been adjudicated and the fourth is subject to judicial admission.  Thus, Dalia's defense to the motion includes a logical corollary - her entitlement to summary judgment.

Summary judgment may be granted where the movant shows, based on admissible evidence in the record placed before the Court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. <u>See</u> <u>Price v. Cushman & Wakefield, Inc.</u>, 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials ... cannot by Themselves create a genuine issue of material fact where none would otherwise exist." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010).

Dalia cross-moves for summary judgment based on Orly's prior sworn admissions and the District Court's final adjudication of all four elements for a claim for constructive trust.  "[A] final

34

judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94 (1980); see also Pike v. Freeman, 266 F.3d 78, 91 (2d Cir. 2001) ("To prove that a claim is precluded under this doctrine, 'a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action.'") (citation omitted).  These precedents apply here.

Specifically, as set forth above, a constructive trust under New York law has four elements: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." Sharp, 40 N.Y.2d at 121.  As noted above, Orly has previously sworn to the truth of #1 (Exh. T), the District Court has adjudicated #2 and #3 ("Dalia agreed to convey her marital rights to 794.40 shares of TRI to trusts benefitting Sagi and Orly … in exchange for a commitment by Sagi and Orly to financially support her"), and the Second Circuit has ruled on #4 ("Orly benefitted from the shares regardless of whether the  settlement money went to Orly, or as a gift to Arie or to pay debts owed to her litigation partners").

Orly plainly is estopped from relitigating these findings against her for a third time, as is the Trustee, who stands in her shoes.  It is black-letter law that, "if the doctrines of collateral estoppel and res judicata would prevent the debtor from asserting a claim, the trustee is also bound." In re Helms, 467 B.R. 374, 384 (Bankr. W.D.N.C. 2012) (citations omitted).

Arie and the Brosers, who admitted in their respective depositions to having funded Orly's litigations (including the 2014 action before Judge Forrest) for Arie's sole benefit (Exhs. Z, AA), are also bound.  As the Supreme Court has explained: "the persons for whose benefit and at whose direction a cause of action is litigated cannot be said to be 'strangers to the cause. . . . [O]ne who

35

prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own . . . is as much bound . . . as he would be if he had been a party to the record.'" Montana v. U. S., 440 U.S. 147, 154 (1979) (quoting Souffront v. Compagnie des Sucreries, 217 U.S. 475, 486-487 (1910)); accord, e.g., In re Ciprofloxacin Hydrochloride Antitrust Litigation, 261 F. Supp. 2d 188, 253 (2003) (applying Montana where "HMR and Rugby clearly assisted Barr in Barr's defense of the Bayer/Barr patent litigation in aid of their respective interests under the Litigation Funding Agreement"); Slattery v. Board of Estimate and Apportionment of City of New York, 271 N.Y. 346, 351 (1936) (extending Souffront principle to New York law).

As for Mr. Bowen, his protestation of innocence does not raise a material issue of fact sufficient to deny summary judgment. At the end of the day, he is named only as the holder of the Trump Notes. It is black letter New York law that: "one who possesses equity in an asset is entitled to restitution of the asset by a subsequent title holder who paid no value even if the latter had no knowledge of the predecessor's equitable interest." Rogers v. Rogers, 63 N.Y.2d 582, 586 (1984) (citing 5 Scott, *Trusts* [3d ed.], § 462.2; 1 Palmer, Restitution, § 2.20; Lengel v. Lengel, 86 Misc. 2d 460 (Sup. Ct. Nassau Cnty. 1976)).

In Rogers, supra, the New York Court of Appeals reversed the Appellate Division, and granted summary judgment to a divorcee on her constructive trust claim over certain life insurance proceeds, even though her ex-husband had switched life insurance policies post-divorce. See Rogers, 63 N.Y.2d. at 588-589. In this case, the 2004 promise was plainly broad enough to capture the Trump notes, covering "all dividends, distributions, proceeds or other payments attributable to 794.40 shares of TRI." Exh. E. Judge Forrest expressly attributed the 2013 settlement proceeds to those same TRI shares, finding that: "Orly's claims to beneficial ownership of the TRI shares

36

individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group

under the 2013 Settlement Agreement." Genger, 76 F. Supp. 3d at 498.

As a last-ditch effort to avoid being bound by the federal courts' final adjudications,

defendants argue, without explanation, that those rulings are mere "dicta." They are most certainly

not. The existence and sufficiency of Orly's receipt of consideration were the central issues

litigated in both the 2014 District Court action, and Judge Forrest necessarily decided that issue in

order to resolve the defenses raised by Orly. See Genger, 76 F. Supp. 3d at 491 ("Orly, for her

part, denies the agreement's validity and enforceability, primarily because she claims … the

agreement is not supported by consideration. But, as it turns out, Orly has effectively monetized

an interest in the very shares she claims not to have received to the tune of $32.3 million").

Thereafter, in the 2017 District Court action, Judge Forrest ruled that her factual findings

in the 2014 District Court action were controlling in the second case, a ruling which the Second

Circuit then affirmed. Genger, 2018 WL 3632521, *1 ("Though at first glance the issues raised

appear complex, the Court's resolution of this action is not; many if not all of the relevant questions

have been decided in prior proceedings."), aff'd, 771 F. App'x 99 (2d Cir. 2019).[7] As Judge

Forrest explained: "Based on the prior rulings of this Court in Genger I (and the Second Circuit's

subsequent affirmance …), is has been conclusively established that … Sagi and Orly monetized

their beneficial interests in the TRI shares for a total of $69.3 million, a substantial portion of

which was attributable to Dalia's conveyed marital interest …." Id. at *6.

That should resolve the "dicta" argument.   Even in the Genger's world, litigation must

---

[7]    In Genger v. Genger, 2019 WL 1330905, **1-2 (Sup. Ct. N.Y. Cnty. Mar. 25, 2019), the 2009
state court action in which Dalia is a defendant, the state court also held that the federal courts' findings
were binding as collateral estoppel, rejecting this very same "dicta" argument.

come to an end.  Judge Forrest's factual findings were based on unrebutted sworn testimony. Exhs. H, I.  In response to that testimony, Orly only said she had "no recollection." As the Second Circuit held, "vague denials and memory lapses . . . do not create genuine issues of material fact." Genger, 663 F. App'x at 49 n.4 (quoting FDIC v. Nat'l Union Fire Ins. Co., 205 F.3d 66, 75 (2d Cir. 2000)). Thus, whether pursuant to collateral estoppel or under standard Rule 56 burden of persuasion, Dalia is entitled to summary judgment on her cross-motion.

VI

**MOVANT'S RECITATION OF PAST LITIGATION
IS ENTIRELY FALSE**

Lastly, although we have abided the Court's wise counsel to avoid adjectives, and have therefore bitten our tongue with respect to most of the incendiary and false allegations in the Movants' motion to dismiss (the Trustee engages in much less of this), we do ask the Court's indulgence to address the objectively-false claim that Dalia and Sagi are engaged in a "campaign to steal all of the family wealth."  Defendants' Motion, p. 14.

The Court, of course, cannot be expected to have absorbed the two-decade history of Genger litigation, and indeed, other than the decisions cited above, the rest of it is largely irrelevant at this point.  What the Court should realize, however, is that until Dalia first sought financial support for her retirement in 2014, Arie and Orly were the plaintiffs in virtually every Genger action, suing Dalia and Sagi at least eight times, all unsuccessful, on various theories.  Not content to merely frivolously sue their own family members, Arie and Orly also initiated a tragically unsuccessful set of lawsuits against the billionaire Trump family in Delaware, in which Arie ended up being sanctioned $4 million for destroying evidence and found by Chancellor Strine to have committed "perfidy," a finding which was unanimously affirmed by the Delaware Supreme Court.

38

See TR Investors, LLC v. Genger, 2010 WL 2901704, *18 (Del. Ch. Ct.  July 23, 2010), aff'd,

Genger v. TR Investors, LLC, 26 A.3d 180, 203 (Del. S.C. 2011).

Sagi-run TPR did not participate in Arie's and Orly's Delaware litigation misadventure,

but it affected TPR anyway.  The company found itself sued by the Trump Group based on certain

misconduct committed by Arie dating back to when he ran TPR.  Rather than litigate, Sagi caused

TPR to settle the Trump Group's suit by selling its voting rights for certain blocks of TRI shares,

including the block beneficially owned by the Orly Trust, for $10.3 million.  The money was then

placed in escrow pending the outcome of the various litigations.

While Movants now try to spin this sale as some sort of crime against humanity (in certain

segments of the Genger family, any litigation settlement is considered anathema), when Judge

Forrest did a deep dive into the facts, she came a more sanguine conclusion:

> Orly further argues that the parties were mutually mistaken … that
> they would receive equal interests in the TRI shares. … [T]he parties
> were in fact only mistaken as to their ability to receive and/or
> monetize record ownership in the TRI shares, and this mistake was
> not substantial or material because the money was clearly in the
> beneficial interest—Orly monetized her beneficial interest in the
> Orly Trust shares for $32.3 million, while Sagi sold his interests in
> the TRI shares for $37.0 million [which includes the aforementioned
> $10.3 million]. … [It] would not serve the interests of equity to
> rescind the 2004 Integrated Agreement here, as doing so would
> enable Orly to obtain her benefit from the agreement (the $32.3
> million she received for the beneficial interest in the TRI shares)
> while escaping her obligations under it (her commitment to
> financially support her mother).

Genger, 76 F. Supp. 3d at 501 (emphases in original).

Notwithstanding the foregoing, Dalia, during her tenure as trustee of the Orly Genger 1993

Trust, tried repeatedly to secure that $10.3 million for the Trust, but at every point in the process,

Orly sabotaged her efforts.  Most notably, countermanded an instruction by Dalia to the escrow

agent directing that the $10.3 million be paid to the Trust. Exh. X.  Later, she "successfully" voided

an agreement executed by Dalia under which TPR would have contributed the $10.3 million to the Trust in return for releasing TPR from further litigation. <u>Genger v. Genger</u>, 120 A.D.3d 1102, 1104 (1st Dep't 2014).

TPR went on to prevail in that lawsuit, following a trial in which J.H.O. Gammerman rejected Orly's $85 million damages claim, finding that Orly was compensated "exactly" the correct amount for her interest in TPR, "and that no damages were, therefore, suffered." Exh. V. At some point, Orly must take responsibility for the consequence of her choices.

This Court cannot undo the Debtor's past mistakes. But it can enforce her present commitments, as previously adjudicated. That is all that Dalia asks.

<strong><u>CONCLUSION</u></strong>

In sum, the matters at issue in this case have already been litigated and decided. All that is left is for this Court to implement those prior rulings in the context of the present adversary proceeding. Doing so necessarily requires a constructive trust and/or equitable lien in Dalia's favor. Accordingly, for the foregoing reasons, plaintiff respectfully requests that the motions to dismiss be denied in their entirety and that the Court instead grant summary judgment in favor of the plaintiff, along with such other and further relief as this Court may deem just and proper.

Dated: New York, New York
     July 14, 2020

*s/ Ira Daniel Tokayer*
_____
Ira Daniel Tokayer, Esq.
420 Lexington Avenue, Suite 2400
New York, New York 10170
(212) 695-5250

Paul J. Labov, Esq.
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016-1314
(212)682-7474

*Attorneys for Plaintiff Dalia Genger*

**APPENDIX A:**

**EVIDENTIARY BASES FOR ALLEGATIONS IN AMENDED COMPLAINT
AGAINST MESSRS. BOWEN AND HERSCHMANN**

| **Allegation:** | **Evidentiary Basis:** |
|---|---|
| "Bowen, is a natural person and Orly's attorney since 2015 as a partner at Kasowitz Benson and Torres LLP, who resides upon information and belief in the State of New York." (AC, ¶ 4.) | Not in dispute. |
| "Bowen holds the Trump Notes as an agent of Orly." (AC, ¶ 4.) | *See* Trump Notes, defined in the Amended Complaint as the notes which were "made payable to Bowen as Orly's agent" (AC ¶ 23), which were created on or around Nov. 20, 2017 (Doc. 14-2). |
| "As Orly's attorney involved in the relevant events, Bowen knew of Dalia's interest in the Trump Notes prior to taking possession thereof." (AC, ¶ 4.) | *See* August 2, 2017 Appearance by Michael Bown in Case #1:14-cv-05683-KBF-DCF (SDNY) (case in which Dalia's interest in TRI monetization was first adjudicated); Trump Notes, defined in the Amended Complaint as the notes which were "made payable to Bowen as Orly's agent" (AC ¶ 23), which were created on or around Nov. 20, 2017 (Doc. 14-2). |
| "Bowen falsely testified under oath and falsely represented to various courts (a) that Orly has nothing to do with either the Trump Notes or an additional $17.3 million that Orly received from the Rights, and (b) that no written agreement exists with respect to the disposition of the proceeds of the Trump Notes." (AC, ¶ 4.) | *See, e.g.,* Oct. 5, 2018 Deposition of Michael Bowen (Doc. 14-3) ("We don't have any information about any agreements between the AG Group. We're not aware … that there is any agreement among the AG Group about who can direct the money and who can't direct the money maybe."). |

A1

| | |
|---|---|
| "However, Kasowitz Benson and Torres LLP was a party and signatory to a March 2017 escrow agreement which provides that Orly's purported debts to her husband will be paid off by the Trump Notes."  (AC, ¶ 4.) | *See* March 31, 2017 Escrow Agreement (setting out payment waterfall whereby, for the final $15 million due on the Trump Notes, the Broser entity gets the first $4.5 million, Mr. Herschmann gets the next $2 million, and then--pursuant to Section 2(a)(3)--the remaining $8.5 million is paid "in accordance with joint written instructions of [Arie] and [Orly] in respect of any remaining Settlement Proceeds after payment of the foregoing amounts.") (Tokayer Decl. Exh. Q). |
| "It further provides her with joint signature authority, together with her father, to direct about $8.5 million due to be paid under the Trump Notes."  (AC, ¶ 4.) | Same as above. |
| "Eric Herschmann ("Eric") is a natural person, Orly's husband and, with Bowen, Orly's attorney as a partner at Kasowitz Benson and Torres LLP."  (AC, ¶ 7.) | Not in dispute. |
| "He most recently claims to reside in the State of Texas."  (AC, ¶ 7.) | Not in dispute. |
| "Eric claims to have an interest in the Trump Notes, which interest was created after Eric became aware of Dalia's interest therein." (AC, ¶ 7.) | *See* UCC Financing Statement annexed to Claim #4-1 filed by Eric Herschmann, claiming security interest in, <u>inter alia</u>, "litigation claims (including any settlement agreements in respect thereof) and any proceeds thereof"; Feb. 4, 2015 Notice of Appearance by Eric Herschmann in Case #1:14-cv-05683-KBF-DCF (SDNY) (case in which Dalia's interest in TRI monetization was first adjudicated); Trump Notes, defined in the Amended Complaint as the notes which were "made payable to Bowen as Orly's agent" (AC ¶ 23), which were created on or around Nov. 20, 2017 (Doc. 14-2). |

A2

| | |
|---|---|
| "Eric knew of Dalia's interest in the Trump Notes prior to asserting his interest therein because he materially participated in the events that led to their creation."  (AC, ¶ 7.) | *See* Feb. 4, 2015 Notice of Appearance by Eric Herschmann in Case #1:14-cv-05683-KBF-DCF (SDNY) (case in which Dalia's interest in TRI monetization was first adjudicated); Trump Notes, defined in the Amended Complaint as the notes which were "made payable to Bowen as Orly's agent" (AC ¶ 23), which were created on or around Nov. 20, 2017 (Doc. 14-2). |
| "Eric asserted to Courts on various occasions that Orly has never had an interest in the Trump Notes or the $17.3 million realized from Orly's monetization of the Rights, most recently in a letter to Judge Garrity."  (AC, ¶ 7.) | *See, e.g.,* April 17, 2020 Joint Status Report by Erich Herschmann et al. (Doc. 237) (claiming that "the Remaining Trump Group Settlement Proceeds do not belong to Orly"); *see also*  March 11, 2019 Orly Reply Brief, Case 18-2471 (2d Cir.) (arguing that: "This $17.2 million … had nothing to do with Orly. The remaining balance of $15 … similarly has nothing to do with Orly."). |
| "That assertion was made despite contrary written recitations in the March 2017 escrow agreement that he executed."  (AC, ¶ 7.) | *See* March 31, 2017 Escrow Agreement (setting out payment waterfall whereby, for the final $15 million due on the Trump Notes, the Broser entity gets the first $4.5 million, Mr. Herschmann gets the next $2 million, and then--pursuant to Section 2(a)(3)--the remaining $8.5 million is paid "in accordance with joint written instructions of [Arie] and [Orly] in respect of any remaining Settlement Proceeds after payment of the foregoing amounts.") (Tokayer Decl. Exh. Q). |

A3