# EXHIBIT A

76 F.Supp.3d 488
United States District Court,
S.D. New York.

Sagi **GENGER**, Plaintiff,
v.
Orly **GENGER**, Defendant.

No. 14–cv–5683 (KBF).
|
Signed Jan. 5, 2015.

**Synopsis**
**Background:** Corporate president brought action against his sister, alleging that she breached contract requiring her to indemnify him for payments he made to their mother. Both parties moved for summary judgment.

**Holdings:** The District Court, Katherine B. **Forrest**, J., held that:

[1] agreement between plaintiff and mother and agreement between plaintiff and defendant constituted integrated contract;

[2] contract was supported by consideration;

[3] judicial estoppel did not bar plaintiff's argument;

[4] defendant was not entitled to rescission of contract based on mutual mistake;

[5] notice was not required to trigger defendant's indemnification obligations;

[6] even if contract was not enforceable, plaintiff was entitled to equitable relief on his promissory estoppel claim.

Ordered accordingly.

West Headnotes (23)

**[1]** **Contracts** ☞ Grounds of action

Under New York law, to recover for breach of contract, a plaintiff must prove: (1) the existence of a contract between plaintiff and that defendant; (2) performance of the plaintiffs obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach.

**[2]** **Contracts** ☞ Construing instruments together

Under New York law, all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even though they were executed on different dates and were not all between the same parties.

7 Cases that cite this headnote

**[3]** **Contracts** ☞ Construing instruments together
**Contracts** ☞ Ambiguity in general

Under New York law, whether multiple documents should be read as constituting a single agreement depends on the intent of the parties; the intent of the parties is typically a question of fact for the jury, but if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court.

3 Cases that cite this headnote

**[4]** **Contracts** ☞ Construing instruments together

Under New York law, agreement providing that son, in return for his mother's transfer of stock to trusts benefiting son and her daughter, would pay mother upon her demand, and subsequent agreement that daughter would indemnify son for half of any such payments, formed an integrated contract, even though they were executed on different dates and were not between the same parties; indemnification agreement explicitly attached and cross-referenced son's agreement with mother, and without the indemnification agreement, son could be obligated to pay mother double the economic benefits he received from his stock.

3 Cases that cite this headnote

**[5]**    **Contracts** 🔑 Necessity in general

     **Contracts** 🔑 Nature and Elements

Under New York law, to be valid, a contract must be supported by consideration; consideration to support an agreement exists where there is either a benefit to the promisor or a detriment to the promisee.

2 Cases that cite this headnote

**[6]**    **Contracts** 🔑 Performance of Legal Obligation

As a general matter under New York law, a promise to perform a pre-existing legal obligation does not amount to consideration.

**[7]**    **Contracts** 🔑 Natural affection

Affection, love, and feelings cannot constitute consideration under New York law.

**[8]**    **Corporations and Business Organizations** 🔑 Requisites and validity in general

     **Indemnity** 🔑 Requisites and Validity of Contracts

Agreement providing that son would provide payments to his mother in return for transfer of stock to trusts benefiting son and her daughter and that daughter would indemnify son for half of such payments was supported by consideration; even if daughter's trust never actually received the stock, her claims to beneficial ownership of the stock enabled her to obtain a $32.3 million settlement payment, and although the stock had been previously transferred pursuant to mother's divorce, the past consideration was precisely and unambiguously stated in the agreement. N.Y.McKinney's General Obligations Law § 5–1105.

**[9]**    **Estoppel** 🔑 Claim inconsistent with previous claim or position in general

The "judicial estoppel doctrine" protects the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.

**[10]**    **Estoppel** 🔑 Claim inconsistent with previous claim or position in general

Several factors typically inform court's decision whether to apply judicial estoppel doctrine in particular case: (1) the party's later position is clearly inconsistent with its earlier position; (2) the party has succeeded in persuading a court to accept its earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) the party asserting the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

**[11]**    **Estoppel** 🔑 Claim inconsistent with previous claim or position in general

Because the judicial estoppel doctrine is primarily concerned with protecting the judicial process, relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain.

**[12]**    **Estoppel** 🔑 Claim inconsistent with previous claim or position in general

Even assuming he took an inconsistent litigation position, judicial estoppel did not bar brother from arguing, in his action against his sister for breach of contract, that sister's trust received beneficial ownership of shares of stock transferred pursuant to their mother's divorce; no court issued a binding final judgment that the trust did not receive a beneficial interest in the shares, and there was no indication that allowing the argument would give brother an

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Genger v. Genger, 76 F.Supp.3d 488 (2015)

unfair advantage or impose an unfair detriment on sister.

**[13]    Contracts** 🔑 Mutual mistake

Under New York law, a contract is voidable under the equitable remedy of rescission if both parties entered into the contract under a mutual mistake of fact.

**[14]    Contracts** 🔑 Mutual mistake

Under New York law, in order to obtain rescission of a contract due to mutual mistake, it must be shown that the mistake in question is mutual, substantial, material and exists at the time the contract is entered.

1 Cases that cite this headnote

**[15]    Contracts** 🔑 Weight and sufficiency

Under New York law, a mutual mistake must be established by clear and convincing evidence.

1 Cases that cite this headnote

**[16]    Corporations and Business Organizations** 🔑 Rescission

**Indemnity** 🔑 Requisites and Validity of Contracts

Sister was not entitled, based on alleged mutual mistake, to rescission of agreement providing that her brother would make payments to their mother in return for transfers of stock to trusts benefiting brother and sister, and that sister would indemnify brother for half of any such payments made; even if parties were mistaken as to siblings' ability to receive or monetize record ownership on the stock, they sold their beneficial interest for millions of dollars, and rescinding agreement would be inequitable because it would allow sister to obtain her benefit under the agreement while escaping her obligations.

**[17]    Indemnity** 🔑 Notice in general
**Indemnity** 🔑 Notice in general

Under New York law, an indemnitee cannot seek reimbursement from an indemnitor unless the indemnitee first notifies the indemnitor of a potentially covered claim and gives them an opportunity to defend against it; however, notice to the indemnitor is not required if an indemnitee can establish that it would have been liable and that there was no good defense to that liability.

**[18]    Indemnity** 🔑 Notice in general

Even if brother failed to properly notify his sister of his intent to make payments to their mother under agreement allowing mother to demand support payments in return for transfer of stock to trusts benefiting brother and sister, notice was not required to trigger sister's indemnification obligations because brother had no good defense against mother's demands.

**[19]    Estoppel** 🔑 Future events; promissory estoppel

A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance.

**[20]    Estoppel** 🔑 Future events; promissory estoppel

Even if agreement providing that sister would indemnify brother for payments made to their mother was not valid and enforceable, brother was entitled to equitable relief under promissory estoppel doctrine; sister made clear and unambiguous promise to indemnify brother for half of all payments he made to mother, brother relied on that promise in paying mother, and it was foreseeable that brother would rely on the promise.

1 Cases that cite this headnote

**[21]    Estoppel** 🔑 Future events; promissory estoppel

While New York courts limit promissory estoppel claims to instances of unconscionable injury only where promissory estoppel is invoked as a defense to the statute of frauds, a showing of unconscionability is generally not required where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise.

[22]    **Equity**  👈 Nature of unconscionable conduct

**Equity**  👈 Conduct with respect to different transactions

Under New York law, the doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.

4 Cases that cite this headnote

[23]    **Equity**  👈 Nature of unconscionable conduct

Unclean hands doctrine did not bar corporate president from recovering on promissory estoppel claim arising from his sister's failure to honor promise to indemnify him for payments he made to their mother; president's failure to honor agreement to transfer shares of corporation's stock to sister's trust was consistent with his duty to corporation and its shareholders.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*491**  John Dellaportas, Mary Christina Pennisi, Nicholas Schretzman, Morgan Lewis & Bockius, LLP, New York, NY, for Plaintiff.

Bryan Dean Leinbach, Yoav Michael Griver, Zeichner Ellman & Krause LLP, New York, NY, for Defendant.

*OPINION & ORDER*

KATHERINE B. FORREST, District Judge:

As Tolstoy famously wrote, "Happy families are all alike; every unhappy family is unhappy in its own way." Leo Tolstoy, *Anna Karenina* 1 (Constance Garnett trans., 1978). In the case of the wealthy Genger family, that unhappiness has taken the form of a seemingly never-ending series of lawsuits stemming from the divorce of Arie Genger and Dalia Genger, the family patriarch and matriarch, respectively. Together, Arie, Dalia, their son Sagi, and their daughter Orly [1] have employed a small army of lawyers to fight over the pieces of the family pie and, it seems, to make each other's lives as miserable as possible.

This latest installment in the Genger family's litigation saga concerns a straightforward contract dispute between Sagi and Orly. Sagi alleges that he and Orly entered into a tri-party agreement with Dalia, under which Sagi and Orly would receive shares of stock in exchange for providing Dalia with financial support derived from the economic value obtained from that stock. Sagi contends that Orly has breached the agreement, and now seeks damages from her. Orly, for her part, denies the agreement's validity and enforceability, primarily because she claims she never actually received the promised shares of stock, which means that the agreement is not supported by consideration. But, as it turns out, Orly has effectively monetized an interest in the very shares she claims not to have received to the tune of $32.3 million.

Orly contends that this case is "an attempt to push the camel's nose under the tent flaps," and that Sagi and Dalia "hope to create a pipeline allowing them to siphon money from Orly for the rest of her life." (ECF No. 92 at 1.) The Court sees things differently: this case is a simple breach of contract action. Nothing more, nothing less.

Because there is no triable issue as to whether there was a valid and enforceable agreement supported by consideration, and for the reasons that follow, the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all pending motions *in limine*.

I. BACKGROUND

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

A. *Factual Background*[2]

The **Genger** family consists of father Arie, mother Dalia, son Sagi, and daughter **\*492** Orly. (DSOF ¶ 5.) Sagi is currently the President and CEO of TPR Investment Associates, Inc. ("TPR"). (DSOF ¶ 4.) In 2004, Arie and Dalia divorced.[3] (DSOF ¶¶ 5; PRSOF ¶ 5.) As part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI to trusts benefiting Sagi and Orly (the "Sagi Trust" and the "Orly Trust,"[4] respectively) in exchange for a commitment by Sagi and Orly to financially support her. This arrangement was effectuated via three documents.

First, Dalia and Arie signed a stipulation of settlement finalizing the terms of their divorce settlement (the "2004 Divorce Stipulation"), which was fully executed on October 30, 2004.[5] (PSOF ¶ 1; DSOF ¶ 7.) In the 2004 Divorce Stipulation, Dalia promised to convey equal interests in a total of 794.40 shares of TRI to the Orly Trust and the Sagi Trust. (PSOF ¶ 1; DSOF ¶ 27.) The 2004 Divorce Stipulation contains an "entire understanding" clause, which is subject to a carve-out for other agreements expressly incorporated by reference and those "entered into concurrently herewith." (DSOF ¶ 24.)

The second was a letter signed by Sagi and Dalia dated October 30, 2004 (the "2004 Promise"). (PSOF ¶ 3; DRSOF ¶ 51.) In the 2004 Promise, Sagi agreed to pay Dalia up to an amount equal to all dividends, distributions, proceeds or other payments attributable to the TRI shares, upon Dalia's demand. (PSOF ¶ 3.) The 2004 Promise also states that the agreement is made "in consideration of" the following: "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of [TRI], or beneficial[6] interests in those shares, by trusts for [their] benefit." (DSOF ¶ 52.) The parties dispute whether **\*493** the 2004 Promise was intended to be integrated with the 2004 Divorce Stipulation. (*See* DRSOF ¶ 3.)

At the time the 2004 Promise was signed, Orly was vacationing in Fiji, and thus could not contemporaneously sign the 2004 Promise. (PSOF ¶ 4.) However, before Sagi signed the 2004 Promise, Orly verbally agreed to indemnify Sagi for 50% of the payments he would have to make under the 2004 Promise.[7] (PSOF ¶ 4.)

The third agreement was a letter signed by Sagi and Orly dated November 10, 2004 (the "2004 Indemnity").[8] (PSOF ¶ 5.) In the 2004 Indemnity, Orly agreed to indemnify Sagi

"for and against one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations ..., including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]." (PSOF ¶ 5.)

On August 22, 2008, Sagi-controlled TPR entered an agreement with the Trump Group to sell the Sagi Trust's shares of TRI to the Trump Group for $26.7 million. (DSOF ¶ 34.) Sagi also sold the Orly Trust's TRI shares to the Trump Group for approximately $10.3 million, subject to the condition that TPR was determined to be an owner of the shares.[9] (DSOF ¶ 35.)

In 2011, the Supreme Court of Delaware affirmed a judgment invalidating the 2004 transfer of the TRI shares to the Orly Trust as to record ownership. ***Genger** v. TR Investors, LLC,* 26 A.3d 180, 198–200 (Del.2011). As a result of this invalidation, record ownership of the TRI shares reverted to Sagi-controlled TPR. In that same decision, the Supreme Court of Delaware held that because the trial court lacked personal jurisdiction over the Orly Trust and TPR, it lacked the power to declare who beneficially owned the TRI shares, and therefore reversed the beneficial ownership determinations flowing from the trial court's orders. *Id.* at 203.

On June 16, 2013, Orly entered into a settlement agreement (the "2013 Settlement Agreement") with the Trump Group and others regarding her claims to ownership of the TRI shares. (ECF No. 84 ex. A ("2013 S.A.").) The agreement provides **\*494** that Orly, Arie, and their litigation funders[10] will receive $32.3 million[11] in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and that Orly waives all of her claims to the TRI shares, both as a trust beneficiary[12] and individually. (2013 S.A. ¶¶ 2–4.) The 2013 Settlement Agreement does not waive any of the Orly Trust's claims. (*See* 2013 S.A. ¶ 4.) However, in the agreement Orly agreed to cause the Orly Trust to do the same. (2013 S.A. ¶ 8(a)(ii).)

Then, on August 30, 2013, the Orly Trust (by Dalia), TPR, and the Trump Group agreed that "the Trump Group owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to all authorized and issued shares of [TRI]." (ECF No. 85 ex. 5 ¶ 2.) This stipulated agreement was so-ordered by the Delaware Court of Chancery. (ECF No.

85 ex. 5 at 7.) Subsequently, a court in this District and New York's First Department both concluded that this so-ordered stipulation determined the Trump Group to be the beneficial owner of the TRI shares. *TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP,* No. 13 Civ. 8243(JFK), 2014 WL 1979932, *2, 2014 U.S. Dist. LEXIS 67116, *5–6 (S.D.N.Y. May 15, 2014); *Genger v. Genger,* 121 A.D.3d 270, 280, 990 N.Y.S.2d 498 (N.Y.App.Div.2014).

On or about January 22, 2014, Dalia demanded $200,000 from Sagi under the 2004 Promise, which Sagi paid. (PSOF ¶¶ 6, 9.) On January 23, 2014, Sagi informed Orly of Dalia's demand.[13] (PSOF ¶ 7.) On February 17, 2014, Sagi demanded $100,000 from Orly under the 2004 Indemnity. (PSOF ¶ 10.) Orly refused to pay. (PSOF ¶ 11.) This lawsuit for breach of contract followed.

B. *Procedural Background*[14]

1. *General procedural background.*

Sagi initially filed a breach of contract action against Orly in this Court on February 18, 2014. (No. 14–cv–1006, ECF Nos. 1–2.) Orly filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) on May 2, 2014. (No. 14–cv–1006, ECF No. 9.) Orly then filed a motion to dismiss for lack of subject-matter jurisdiction under Rules 12(b)(1) and 12(h)(3) on May 29, 2014. (No. 14–cv–1006, ECF No. 24.) That same day, Sagi filed a motion for summary judgment. (No. 14–cv–1006, ECF No. 18.)

On July 22, 2014, the Court granted Orly's Rule 12(b)(1) motion[15] and dismissed the action without prejudice, after finding that diversity jurisdiction was inappropriate because both Sagi and Orly were domiciled in New York on the date the action was filed. (No. 14–cv–1006, ECF No. 52.) Two days later, on July 24, 2014, Sagi commenced the instant proceeding, which was initially assigned to Judge Caproni. (ECF No. 1.) On August 5, 2014, **\*495** the case was reassigned to this Court, which set an accelerated schedule for discovery, briefing, and trial owing to the material similarity between this action and the previous one. (ECF No. 9.)

Orly filed a motion to dismiss under Rule 12 on August 27, 2014. (ECF No. 10.) The motion became fully briefed on September 18, 2014. (ECF No. 19.) The Court denied the motion on September 19, 2014, finding that (1) subject-matter jurisdiction over this action was appropriate; (2) Sagi

had sufficiently alleged the elements of the causes of action; and (3) the parties' briefing revealed a host of factual issues outside the four corners of the complaint. (ECF No. 20.)

Both Sagi and Orly moved for summary judgment on October 20, 2014. (ECF Nos. 32, 35.) Sagi filed motions *in limine* on November 17, 2014. (ECF No. 59.) The following day, Orly filed motions *in limine,* (ECF No. 68), as well as a motion to disqualify Sagi's counsel John Dellaportas from acting as counsel at trial on November 18, 2014, (ECF No. 65). Sagi and Orly submitted their oppositions to each others' motions *in limine* on November 24, 2014. (ECF Nos. 79, 81.)

Sagi then submitted his opposition to Orly's motion to disqualify on November 26, 2014. (ECF No. 89.) That same day, the Court issued an order stating its intention to decide the case on summary judgment, and adjourning the trial date and all other dates. (ECF No. 90.) The parties submitted reply briefs on December 5 and 6, 2014. (ECF Nos. 91, 92.)

2. *Motion to compel production of the 2013 Settlement Agreement.*

On September 30, 2014,[16] Sagi filed a letter-motion to compel production of the 2013 Settlement Agreement. (ECF Nos. 22–23.) Orly filed her opposition to the letter-motion on October 3, 2014, (ECF No. 25), the same day she filed her Answer, (ECF No. 24). On October 7, 2014, the Court denied Sagi's letter-motion, based on its mistaken belief that the 2013 Settlement Agreement was irrelevant to the claims at issue. (ECF No. 26.)

Upon reviewing the parties' summary judgment briefing, the Court realized its mistake, and on November 18, 2014 the Court vacated the October 7, 2014 order and granted Sagi's letter-motion to compel.[17] (ECF No. 64.) In the November 18, 2014 order, the Court ordered the parties to submit three-page letters regarding the potential impact of the 2010 Settlement Agreement on the claims and defenses at issue not later than November 25, 2014. (ECF No. 64.) The parties submitted their letters on November 25, 2014. (ECF Nos. 84–85.)

II. SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party does not bear the ultimate burden on a particular **\*496** claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. *Id.* at 322–23, 106 S.Ct. 2548. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano,* 604 F.3d 732, 740 (2d Cir.2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. *Price v. Cushman & Wakefield, Inc.,* 808 F.Supp.2d 670, 685 (S.D.N.Y.2011); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citations omitted); *see also Price,* 808 F.Supp.2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—"facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## III. DISCUSSION

**[1]** Under New York law, to recover for breach of contract, a plaintiff must prove "(1) the existence of a contract between [plaintiff] and that defendant; (2) performance of the plaintiffs obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by

that defendant's breach." *Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 52 (2d Cir.2011) (citation omitted); *see also Flomenbaum v. N.Y. Univ.,* 71 A.D.3d 80, 91, 890 N.Y.S.2d 493 (N.Y.App.Div.2009); *Clearmont Prop., LLC v. Eisner,* 58 A.D.3d 1052, 1055, 872 N.Y.S.2d 725 (N.Y.App.Div.2009). There is no triable issue as to whether all four elements are satisfied in this case. Accordingly, the Court grants Sagi summary judgment as to his breach of contract claim. There is also no triable issue as to Sagi's promissory estoppel cause action, and so the Court grants him summary judgment on that alternative basis.

### A. *Enforceability*

#### 1. *Integrated agreement.*

**[2]** **[3]** Under New York law, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 143 (2d Cir.1998); *accord Madeleine, L.L.C. v. Casden,* 950 F.Supp.2d 685, 695–96 (S.D.N.Y.2013). Contracts that are executed at different times "should be interpreted together if 'the parties assented to all the promises as **\*497** a whole so that there would have been no bargain whatever if any promise or set of promises had been stricken.'" *Commander Oil Corp. v. Advance Food Serv. Equip.,* 991 F.2d 49, 53 (2d Cir.1993) (quoting 6 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts,* § 863:275 (3d ed.1970)). Whether multiple documents should be read as constituting a single agreement depends on the intent of the parties. *TVT Records v. Island Def Jam Music Grp.,* 412 F.3d 82, 89 (2d Cir.2005); *accord Commander Oil,* 991 F.2d at 52–53; *Madeleine,* 950 F.Supp.2d at 696. The intent of the parties is "typically a question of fact for the jury, ... [b]ut if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." *TVT Records,* 412 F.3d at 89 (citation omitted).

In *TVT Records,* the Second Circuit determined two agreements to be integrated based, *inter alia,* on the fact that the documents were intended to effectuate the same result. *Id.* As the parties under the later agreement were obligated to honor all of the terms and conditions of the earlier agreement, the later agreement was "meaningless" without the first. *Id.* The fact that the documents were

"negotiated and signed at different times, memorialized in different documents and involved different parties" did not dictate a contrary result, because these facts did not address "the legally operative question: whether the contracts were part of a single transaction intended to effectuate the same purpose." *Id.,* at 90 (citations omitted).

Similarly, in *This Is Me,* the Second Circuit held that a jury was justified in reading two contracts together where they were executed "more or less" (but not exactly) concurrently, and where one of the two contracts stated that the two contracts were intended to be executed together, but the other contract did not. 157 F.3d at 145. The Court also noted that counsel for a defendant conceded in a letter that the two contracts were intended to be read together. *Id.*

 **[4]** The 2004 Promise and the 2004 Indemnity are sufficiently unambiguous such that there is no triable issue as to whether they form an integrated agreement, even though they were executed on different dates and were not all between the same parties, and in this sense no different than the agreements at issue in *TVT Records.* Indeed, neither agreement makes any sense without the promises expressed in the other. Without the 2004 Indemnity, Sagi could be obligated under the 2004 Promise to pay Dalia double the economic benefit he received from his shares of TRI, and Orly would effectively have received the shares as a gift. Further, the 2004 Indemnity explicitly attaches and cross-references the 2004 Promise, which makes the situation here directly analogous to that in *TVT Records,* where the later agreement was "meaningless" without the earlier one. *Id.* at 89.

There is accordingly no triable issue as to whether the documents were "designed to effectuate the same purpose" and to "be read together." *This Is Me,* 157 F.3d at 143. For this reason, the Court will refer to the integrated agreement in the rest of this Opinion as the "2004 Integrated Agreement." [18]

**\*498** 2. *Consideration.*

 **[5]** Under New York law, to be valid, a contract must be supported by consideration. *Murray v. Northrop Grumman Info. Tech., Inc.,* 444 F.3d 169, 178 (2d Cir.2006). Consideration to support an agreement exists where there is "either a benefit to the promisor or a detriment to the promisee." *Hollander v. Lipman,* 65 A.D.3d 1086, 1087, 885 N.Y.S.2d 354 (N.Y.App.Div.2009) (quoting *Weiner v.*

*McGraw–Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441, 445 (1982)).

 **[6]** As a general matter, "[a] promise to perform a pre-existing legal obligation does not amount to consideration." *Murray,* 444 F.3d at 178 (citing *Goncalves v. Regent Int'l Hotels, Ltd.,* 58 N.Y.2d 206, 460 N.Y.S.2d 750, 447 N.E.2d 693, 700 (1983)). However, § 5–1105 of New York's General Obligations Law provides:

> A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

N.Y. Gen. Oblig. Law § 5–1105.

To meet § 5–1105's requirement that the consideration be "expressed" in the writing, the recitation of consideration must not be vague or imprecise. [19] *See United Res. Recovery Corp. v. Ramko Venture Mgmt., Inc.,* 584 F.Supp.2d 645, 656 (S.D.N.Y.2008); *Movado Grp., Inc. v. Presberg,* 259 A.D.2d 371, 371, 687 N.Y.S.2d 116 (N.Y.App.Div.1999); *Umscheid v. Simnacher,* 106 A.D.2d 380, 482 N.Y.S.2d 295, 297 (1984). For example, courts have held that the statements "past work on the Company's behalf" and "services rendered on the respondent's behalf" are too vague and imprecise to meet the expression requirement. *United Res. Recovery,* 584 F.Supp.2d at 656; *Umscheid,* 482 N.Y.S.2d at 297. By contrast, in *Movado Group, Inc. v. Presberg,* the Appellate Division of New York's First Judicial Department held that a commitment to pay all of a company's debts to a party on an "absolute, unconditional, and continuing" **\*499** basis was sufficient to establish past consideration under § 5–1105, despite its being "a broad commitment, certainly not limited to one opening transaction." 259 A.D.2d at 371, 687 N.Y.S.2d 116.

 **[7]** The 2004 Integrated Agreement clearly purports to provide each party with a benefit in exchange for a legal obligation: Dalia receives financial support in exchange for

the transfer of the TRI shares to the Sagi Trust and the Orly Trust; Sagi receives an ownership interest in the TRI shares [20] in exchange for a commitment to financially support Dalia; and Orly receives an ownership interest in TRI shares in exchange for a commitment to indemnify Sagi.

**[8]**    Orly contends that the 2004 Integrated Agreement is not supported by consideration for two reasons. First, Orly contends that the 2004 Integrated is not supported by consideration because the Orly Trust never received the TRI shares. But the 2004 Promise states that Orly and Sagi are benefiting from receipt of *either* the TRI shares *or* "beneficial interests in those shares," by their respective trusts. (ECF No. 1 ex. A.) Thus, the question becomes whether Orly has benefited from the Orly Trust's receipt of beneficial interests in the TRI shares. There is no genuine dispute as to whether she has so benefited: Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement. Further, no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares. [21]

Second, Orly contends that the TRI shares cannot serve as valid consideration because they had already been transferred when the 2004 Indemnity was signed, and they were transferred pursuant to the 2004 Divorce Stipulation, which is a separate agreement. This argument fails because the 2004 Integrated Agreement satisfies § 5–1105 of New York's General Obligations Law. The past consideration is precisely and unambiguously stated in the 2004 Promise, which states that "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of Trans–Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for [their] benefit." (ECF No. 1 ex. A.) This statement is sufficiently precise and unambiguous so as to satisfy § 1105's expression requirement —indeed, this statement is considerably more exact than a promise to pay all of a company's debts on an ongoing basis, which was found to be sufficient in *Movado Group.* And as established above, there is no triable issue as to whether Orly was for all intents and purposes given a beneficial interest in the TRI shares.

Accordingly, there is no triable issue as to whether the 2004 Integrated Agreement **\*500**  was supported by valid consideration. [22]

    B. *Defenses*

There is no triable issue as to whether Orly has a viable defense to the 2004 Integrated Agreement.

1. *Judicial estoppel.*

**[9]    [10]    [11]**    The doctrine of judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine,* 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citation and internal quotation marks omitted). The decision whether judicial estoppel should bar a litigant from making a particular argument is highly fact-specific. *See id.* at 751, 121 S.Ct. 1808. Several considerations counsel in favor of applying the doctrine in a particular case: (1) the party's later position is clearly inconsistent with its earlier position; (2) the party has succeeded in persuading a court to accept its earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; (3) the party asserting the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Adelphia Recovery Trust v. Goldman Sachs & Co.,* 748 F.3d 110, 116 (2d Cir.2014) (citing *New Hampshire,* 532 U.S. at 750–51, 121 S.Ct. 1808). However, "[b]ecause the doctrine is primarily concerned with protecting the judicial process, relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain." *Id.* (alteration in original) (quoting *Republic of Ecuador v. Chevron Corp.,* 638 F.3d 384, 397 (2d Cir.2011)).

**[12]**    Orly argues that Sagi should be judicially estopped from arguing that the Orly Trust received a beneficial interest in the TRI shares. However, in this case embracing Sagi's position runs no risk of endangering judicial integrity, as no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares. Further, there is no reason to believe that permitting Sagi to argue that the Orly Trust received the beneficial interest in the TRI shares would give Sagi an unfair advantage or impose an unfair detriment on Orly—indeed, embracing Orly's argument here would effectively allow her to avoid paying hundreds of thousands of dollars due under an otherwise valid agreement for a technical and formalistic reason unrelated to the equities of the situation. Accordingly, even assuming that Sagi has taken an inconsistent litigation position, [23] judicial estoppel does not bar Sagi from arguing

that the Orly Trust received beneficial ownership of the TRI shares.

### 2. *Mutual mistake.*

 **[13]**    **[14]**    **[15]**   "A contract is voidable under the equitable remedy of rescission if both parties entered into the contract under a mutual mistake of fact." *Schultz v. Hourihan,* **\*501** 238 A.D.2d 818, 656 N.Y.S.2d 526, 528 (1997). In order to obtain rescission of a contract due to mutual mistake, "it must be shown that the mistake in question is mutual, substantial, material and exists at the time the contract is entered." *Rodriguez v. Mower,* 56 A.D.3d 857, 858, 866 N.Y.S.2d 815 (3d Dep't 2008) (citation omitted). In New York, a mutual mistake must be established by "clear and convincing" evidence. *E.g., Carney v. Carozza,* 16 A.D.3d 867, 792 N.Y.S.2d 642, 644 (2005); *Silver v. Gilbert,* 7 A.D.3d 780, 776 N.Y.S.2d 867, 867 (2004).

 **[16]**   Orly first argues that if the 2004 Integrated Agreement is valid, it should nevertheless be rescinded because there was a mutual mistake as to whether Sagi and Orly were being treated equally in their parents' divorce. This argument fails because there was no mistake of fact here—the 2004 Divorce Stipulation and the 2004 Integrated Agreement explicitly provide for equal treatment of Orly and Sagi.

Orly further argues that the parties were mutually mistaken with regard to whether the interests in the TRI shares could be validly transferred to their trusts, such that they would receive equal interests in the TRI shares. This argument too fails, because as established above, the parties were *in fact* only mistaken as to their ability to receive and/or monetize *record* ownership in the TRI shares, and this mistake was not substantial or material because the money was clearly in the *beneficial* interest—Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million, while Sagi sold his interests in the TRI shares for $37.0 million.

In any event, rescission due to mutual mistake is an equitable remedy, and it would not serve the interests of equity to rescind the 2004 Integrated Agreement here, as doing so would enable Orly to obtain her benefit from the agreement (the $32.3 million she received for the beneficial interest in the TRI shares) while escaping her obligations under it (her commitment to financially support her mother). Accordingly, the Court declines to rescind the contract under the doctrine of mutual mistake.

### 3. *Lack of opportunity to defend.*

 **[17]**    **[18]**   Orly argues that as an indemnitor she has no contractual duty to indemnify Sagi without first receiving notice and a chance to defend. Under New York law, an indemnitee cannot seek reimbursement from an indemnitor unless the indemnitee first notifies the indemnitor of a potentially covered claim and gives them an opportunity to defend against it. *See Chase Manhattan Bank v. 264 Water St. Assocs.,* 222 A.D.2d 229, 634 N.Y.S.2d 687, 689 (1995). However, notice to the indemnitor is not required if an indemnitee can "establish that [it] would have been liable and that there was no good defense to that liability." *Deutsche Bank Trust Co. of Ams. v. Tri–Links Inv. Trust,* 74 A.D.3d 32, 900 N.Y.S.2d 246, 253 (2010).

Although the parties do not dispute that Sagi twice informed Orly and her counsel of Dalia's demand prior to paying Dalia, they do dispute whether Sagi informed Orly of his intention actually to honor Dalia's demand. (*See* DRSOF ¶ 7; PRSOF ¶ 61.) Ultimately, however, even if Sagi did fail to properly notify Orly, notice was not required as a matter of law because Sagi had no good defense against Dalia's demand—the 2004 Integrated Agreement expressly gives Dalia the right to make such a demand and clearly obligates Sagi to pay it, and as established above there is no valid argument against the agreement's enforceability or validity. Accordingly, the parties' dispute over whether Sagi properly provided Orly with notice does not preclude this Court from granting Sagi summary judgment as to the validity of the  **\*502**  indemnification obligation as a matter of law.

### C. *Performance, Breach, and Damages*

The parties do not dispute that Sagi performed his obligations under the 2004 Integrated Agreement, as it is undisputed that Sagi paid Dalia $200,000. There is also no dispute as to whether Orly breached the 2004 Indemnity by refusing to pay Sagi, and nor is there a dispute that Sagi suffered damages of at least $100,000 as a result. Accordingly, because the 2004 Integrated Agreement is valid and enforceable, there is no triable issue as to whether all of the elements of Sagi's breach of contract claim are satisfied, and summary judgment is thus granted in Sagi's favor as to his breach of contract claim.

### D. *Promissory Estoppel*

 **[19]**    **[20]**    **[21]**    Even if the 2004 Integrated Agreement were not valid and enforceable, Sagi is also entitled to equitable relief under the doctrine of promissory estoppel. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." [24] *Kaye v. Grossman,* 202 F.3d 611, 615 (2d Cir.2000) (citing *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir.1996)).

In the 2004 Indemnity, Orly made a clear and unambiguous promise to indemnify Sagi for "one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]." (PSOF ¶ 5.) There is no material dispute as to whether Sagi relied on this promise in paying Dalia, or that he sustained injury as a result of this reliance.

However, Orly argues that Sagi's reliance was not reasonable or foreseeable, because when he paid Dalia he was already aware that Orly disputed the validity and enforceability of the 2004 Integrated Agreement. This argument is unpersuasive. First, the time from which foreseeability is determined is when the promise is made, not the time of performance, and there is no genuine dispute as to whether it was foreseeable that Sagi would rely on the promise when it was made. Second, there is no genuine dispute as to whether Sagi's reliance was reasonable, because as explained above, Orly's position that the 2004 Integrated Agreement was invalid and unenforceable objectively lacked merit.

 **[22]**    **[23]**    Orly argues that Sagi should be barred from recovering under a theory of promissory estoppel due to unclean hands. "The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter

in litigation and the party seeking to invoke the doctrine was injured by such conduct." *Kopsidas v. Krokos,* 294 A.D.2d 406, 742 N.Y.S.2d 342, 344 (2002) (quoting **\*503** *Nat'l Distillers & Chem. Corp. v. Seyopp Corp.,* 17 N.Y.2d 12, 15–16, 267 N.Y.S.2d 193, 214 N.E.2d 361 (N.Y.1966)) (internal quotation marks omitted). Orly argues that Sagi's hands are unclean because under his Presidency, TPR was obligated to effectuate the transfer of the TRI shares to her, and failed to do so. However, on July 24, 2014, the Appellate Division of New York's First Judicial Department held that as an officer of TPR, Sagi's fiduciary duty was to the corporation and its stockholders, and that Sagi had not breached any duty to Orly in failing to honor the agreement to transfer the TRI shares to her trust. *Genger v. Genger*, 121 A.D.3d 270, 278–79, 990 N.Y.S.2d 498 (N.Y.App.Div.2014). Sagi's behavior here is consistent with his duty to TPR and its shareholders, and does not rise to the immoral or unconscionable level required to bar him from relief under the doctrine of unclean hands.

Accordingly, there is no triable issue as to Sagi's promissory estoppel claim, and Sagi is granted summary judgment on that cause of action in addition to his breach of contract cause of action.

## IV. CONCLUSION

For the above reasons, the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all pending motions *in limine.*

The Clerk of Court is directed to close the motions at ECF Nos. 32, 35, 59, 65, and 68 and to terminate this action.

SO ORDERED.

**All Citations**

76 F.Supp.3d 488

## Footnotes

1    For the sake of clarity, in this Opinion the Court will refer to the members of the **Genger** family by their given names.
2    The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials (ECF No. 34 ("PSOF"), 37 ("DSOF"), 51 ("DRSOF"), 52 ("DCMUF"), 55 ("PRSOF")), the factual materials submitted with the parties' letters dated November 25, 2014 (ECF Nos. 84–85), and public records of the parties' prior judicial proceedings. The Court cites to the parties' factual submissions only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by a counter-statement

supported by citation to evidence that would be admissible. *See* Local Civil Rule 56.1(d); *Chimarev v. TD Waterhouse Investor Servs., Inc.,* 280 F.Supp.2d 208, 223 (S.D.N.Y.2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), *aff'd,* 99 Fed.Appx. 259 (2d Cir.2004). The Court recites only those facts relevant to the claims and defenses currently at issue, but also includes some factual allegations that are not material to the claims asserted but that are important to understanding the context for this case. Some of defendant's responses fail to directly address straightforward factual allegations, and these failures are considered admissions as a matter of law. *See* Local Civil Rule 56.1(c); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998); *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003).

3     The divorce was finalized by a 2005 judgment. (PRSOF ¶ 5.)

4     The trusts are officially named the "Sagi **Genger** 1993 Trust" and the "Orly **Genger** 1993 Trust." (DSOF ¶ 26.)

5     The 2004 Divorce Stipulation states that it is "made as of October 26, 2004." (DSOF ¶ 7.)

6     Beneficial ownership is "[a] corporate shareholder's power to buy or sell the shares, though the shareholder is not registered on the corporation's books as the owner." *Ownership,* Black's Law Dictionary (9th ed.2009); *see also Cartica Mgmt. v. CorpBanca, S.A.,* 50 F.Supp.3d 477, 494–95, No. 14–CV–2258 PKC, 2014 WL 4804491, at *15 (S.D.N.Y. Sept. 25, 2014) (explaining the definition of beneficial ownership under federal securities law). Record ownership is determined based on who is "listed in the issuer's books as the owner of stock on the record date." *Stockholder of Record,* Black's Law Dictionary (9th ed.2009).

7     In response to this factual allegation by Sagi, Orly counters that she does not remember a phone call with Sagi on the day of the divorce, and makes several non-responsive statements concerning the drafting and execution 2004 Promise and the 2004 Divorce Stipulation. (*See* DRSOF ¶ 4.) But she does not actually deny making this oral promise.

8     At the initial case conference in the prior action, Orly's counsel stated that they believed the 2004 Indemnity was a forgery, and they would investigate this theory by, *inter alia,* using the services of an ink expert. (DRSOF ¶ 11.) The ink expert's examination of the 2004 Indemnity was also discussed at the October 31, 2014 status conference in the instant action; the Court ordered the parties to meet and confer regarding any outstanding issues with respect to expert discovery (ECF No. 48), and no such issues were subsequently raised with the Court.
      Despite the considerable amount of discovery in this case, and her retention of an ink expert, Orly is unable to point to any admissible evidence suggesting that the 2004 Indemnity is a forgery. Further, in her briefing on this motion, Orly did not advance the argument that the 2004 Indemnity is a forgery or is otherwise inauthentic. Most importantly, in her Rule 56.1 responses, Orly does not affirmatively deny the existence of the 2004 Indemnity, or that she signed it. (*See* DRSOF ¶¶ 5, 11.) A party cannot create a *genuine* issue of material disputed fact through mere say-so and the hiring of an expert. There is accordingly no genuine issue of material disputed fact as to the authenticity of the 2004 Indemnity or as to whether Orly signed it.

9     The parties dispute exactly what ownership interest was required by the condition. (*See* PRSOF ¶ 35.)

10    The 2013 Settlement Agreement refers to these parties collectively as the "AG Group." (2013 S.A. at 1.)

11    The $32.3 million consists of $17.3 million in cash upfront, plus two additional $7.5 million payments to be made over four years. (2013 S.A. ¶¶ 2–3.)

12    Specifically, as a beneficiary of the Orly Trust. (2013 S.A. ¶ 4.)

13    Sagi first provided Orly's counsel with a written copy of Dalia's demand on January 29, 2014. (DSOF ¶ 60.)

14    The Court recounts only the procedural history immediately relevant to the disposition of this motion.

15    The Court also denied as moot Orly's Rule 12(b)(6) motion to dismiss and Sagi's motion for summary judgment.

16    Sagi filed the same letter twice; once on September 30, 2014, and again on October 1, 2014. (ECF Nos. 22–23.) An additional exhibit is attached to the October 1, 2014 version.

17    This order refers to the 2013 Settlement Agreement as the "2010 Settlement Agreement."

18    Orly vigorously disputes whether the 2004 Divorce Stipulation is integrated with the 2004 Promise and the 2004 Indemnity. However, Sagi does not contend that the 2004 Divorce Stipulation is integrated with the 2004 Promise and the 2004 Indemnity (ECF No. 57 at 10), and so the Court need not reach this issue.

19    In several cases, courts have stated that in order to recover under § 5–1105, "the writing must contain an unequivocal promise to pay a sum certain, at a date certain, and must express consideration for the promise." *E.g., United Res. Recovery Corp. v. Ramko Venture Mgmt., Inc.,* 584 F.Supp.2d 645, 656 (S.D.N.Y.2008) (quoting *Umscheid v. Simnacher,* 106 A.D.2d 380, 482 N.Y.S.2d 295, 297 (1984)); *In re Maxwell Commc'n Corp.,* 198 B.R. 63, 69 (S.D.N.Y.1996) (same); *Kreuter v. Tsucalas,* 287 A.D.2d 50, 734 N.Y.S.2d 185, 188 (2001) (same). The citation provided for this statement of

law is typically the Second Department's decision *Umscheid v. Simnacher,* 106 A.D.2d 380, 482 N.Y.S.2d 295 (1984), which in turn cited as support *Sarama v. John Mee, Inc.,* 102 Misc.2d 132, 422 N.Y.S.2d 582 (N.Y.Civ.Ct.1979), and *Citibank National Ass'n v. London,* 526 F.Supp. 793 (S.D.Tex.1981), the latter of which cited only *Sarama* as support for this proposition.

However, *Sarama* in fact states that "[i]n order for plaintiff to recover for breach of contract, defendant's letter must contain an unequivocal promise to pay a sum certain, at a date certain, and, *further,* it must conform with General Obligations Law [§ ]5–1105, by expressing in the letter the consideration for the promise." *Sarama,* 102 Misc.2d at 133, 422 N.Y.S.2d 582 (emphasis added). *Sarama* thus states that the requirement of "an unequivocal promise to pay a sum certain, at a date certain" is a general requirement for recovery for breach of contract under the facts of that case, *not* a requirement for recovery under § 5–1105. The Court further notes that the "sum certain" and "date certain" requirements are found nowhere in the text of § 5–1105, nor can they be implied from that text, and that New York's Court of Appeals has never embraced an interpretation of § 5–1105 encompassing those requirements.

20    Sagi contends that the contract is supported by two forms of consideration: (1) the Orly Trust's receipt of the TRI shares as part of the divorce stipulation; (2) love, affection, and the end to parental strife. (Compl. ¶ 8.) The Court rejects Sagi's argument that the 2004 Integrated Agreement is supported by consideration because Orly received an emotional and psychological benefit in helping to bring about an end to her parents' bitter divorce. Affection, love, and feelings cannot constitute consideration under New York law. *See, e.g., McRay v. Citrin,* 270 A.D.2d 191, 706 N.Y.S.2d 27, 28 (2000); *Rose v. Elias,* 177 A.D.2d 415, 576 N.Y.S.2d 257, 258 (1991); *see also* 22 N.Y. Jur.2d Contracts §§ 116–17.

21    The Delaware Court of Chancery's beneficial ownership determinations were reversed by the Supreme Court of Delaware's July 18, 2011 decision. ==Genger== *v. TR Investors, LLC,* 26 A.3d 180, 203 (Del.2011).

22    Orly makes much of the fact that the 2013 Settlement Agreement did not release the Orly Trust's claims to the TRI shares. But this fact does nothing to disprove that Orly benefited from her claim to beneficial ownership of the TRI shares, and to the extent that it is relevant, it just provides further evidence that the Orly Trust had a legitimate claim to beneficial ownership of the TRI shares.

23    Given the strong rationale for not applying the doctrine of judicial estoppel here, the Court need not delve into the specific arguments advanced by Sagi or TPR in the course of their numerous years of prior litigation involving Orly and/or the TRI shares.

24    "New York courts limit promissory estoppel claims to instances of unconscionable injury only where promissory estoppel is invoked as a defense to the Statute of Frauds.... But New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise." *Pearce v. Manhattan Ensemble Theatre, Inc.,* 528 F.Supp.2d 175, 181 (S.D.N.Y.2007) (collecting cases).

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    13