# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x
SAGI GENGER,

                        Plaintiff,    14-CV-01006 (KBF)

          – against –

ORLY GENGER,

                        Defendant.

------------------------------------------------------------------------ x

## REPLY DECLARATION OF SAGI GENGER

       I, Sagi Genger, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct:

       1.     I am the plaintiff in the above-referenced action. I respectfully submit this reply declaration in further support of my cross-motion for summary judgment. Specifically, I wish to respond to certain points made in defendant's opposition papers.

       2.     At the outset, I note that at a March 20, 2014 deposition in an unrelated case, Orly's lawyers deposed me at length on these issues. I respectfully annex hereto as Exhibit F the transcript from that portion of my deposition dealing with these matters.

       3.     As I set forth in my Complaint, and again in my deposition, in September and October 2004, Orly and I promised our mother, Dalia, that in exchange for (amongst other things) her agreement to convey her marital rights to 794.40 shares of Trans-Resources, Inc. ("TRI") to two trusts for the benefit of Orly and myself (a term insisted on by our father, Arie, who remained on as the company's Chairman and did not want his ex-wife as his business partner), Orly and I orally agreed to give our mother a claw-back right to her for living expenses, to the extent of any economic value derived from the TRI shares.

-1-

4.  Originally, our oral agreement was reflected in draft documents by which we would have both made a direct commitment to our mother. (*See* Exhibit G, an October 18, 2004 email from David Parnes to myself, redacted to preserve attorney-client privilege, attaching two versions of the draft agreement, both reflecting the same economic terms.) Orly and I ultimately agreed to sign such a document, but then a few days before the divorce settlement closing date, Orly left for a yacht trip off the coast of Fiji, without having signed the agreement. Accordingly, our oral agreement was refashioned into the two documents ultimately attached to the Complaint – the Oct. 30, 2004 Promise and Nov. 10, 2004 Indemnity – whereby I promised to provide full support to our mother, and Orly agreed to indemnity me for half of my commitment.

5.  At the October 30, 2004 closing, I called Orly in order to make sure she was still in agreement as to our joint commitment to our mother, and to review with her my Oct. 30, 2004 Promise to Dalia and Orly's corresponding indemnity of 50% of my liability to Dalia thereunder. On the call, Orly reconfirmed our agreement.

6.  Orly returned to New York around November 10, 2004. Upon her return, I emailed her the Nov. 10, 2004 Indemnity – a document prepared by our father's attorney, Ed Klimerman of Sonnenschein Nath & Rosenthal LLP. In my email to Orly, I wrote: "Since you were in Fiji I promised to mom her full share interest in TRI <u>instead of only half</u>." (Emphasis added.) This was a reference to earlier versions of the document that had us each committing to pay half our mother's support, rather than my paying the full amount and Orly indemnifying me for half, the arrangement necessitated by Orly's trip.

7.  Shortly thereafter, David Parnes went to Orly's apartment, picked up a signed copy of the document she had left with her doorman, and brought it to me for my signature. The fully-executed Nov. 10, 2004 Indemnity was then maintained in my files (with the original Oct.

30, 2004 Promise appended thereto) until January of this year, when I directed Mr. Parnes to send the document to Morgan Lewis & Bockius LLP.

8. Until recently, I had understood the Nov. 10, 2004 Indemnity in the corporate files to contain original signatures of both myself and my sister. I am advised that Dennis Ryan, the handwriting expert, has examined the Nov. 10, 2004 Indemnity and concluded that only my signature is original, but my sister's is not. I surmise that the signed document my sister left with her doorman for Mr. Parnes was a copy, and she kept the original.

9. In her opposition papers, my sister raises the question of whether I actually paid my mother the $200,000 she requested. I did. (*See* Exhibit H, which are bank records reflecting my February 6, 2014 payment to Dalia, with confidential information redacted.)

10. Lastly, in her initial motion to dismiss, my sister also claimed my Complaint should be dismissed because: "Sagi Is Barred From Seeking Indemnity Because He Failed To Notify Orly Of Dalia's Claim …." (ECF Doc. No. 11.) In response, my counsel produced emails showing that her counsel was well aware of Dalia's claim. Now, my sister has changed her story and is claiming that "[i]t is still the fact that Sagi never made a demand to Orly under the November Document until February 17, 2014 …."

11. That, too, is false. I made clear that the January 23, 2014 meeting at the offices of Zeichner Ellman & Krause LLP that the Nov. 10, 2004 Indemnity constituted a liability to our mother which I intended to honor, and would have to be dealt with as part of our broader efforts (ultimately unsuccessful) to bring global family peace. At no point did either my sister or any of her lawyers ever tell me or any of my lawyers not to pay our mother's demand.

12. Lastly, I am aware of no reason why I should have refused Dalia's demand, as both my mother and I acknowledge the validity of the Oct. 30, 2004 Promise.

_____
SAGI GENGER

Executed on: July 7, 2014
 Shanghai, China