# EXHIBIT I

*ARIE GENGER VS.*
*SAGI GENGER*

---

*SAGI GENGER*
*March 20, 2014*

---



**Ellen Grauer**
**COURT REPORTING** Co. LLC
126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106465A.TXT*
*Min-U-Script® with Word Index*

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NEW YORK
     -----------------------------------------X
 3   ARIE GENGER and ORLY GENGER, in her
     individual capacity and on behalf of
 4   THE ORLY GENGER 1993 TRUST,

 5                        Plaintiffs,

 6       -against-

 7   SAGI GENGER, TPR INVESTMENT ASSOCIATES,
     INC., DALIA GENGER, THE SAGI GENGER
 8   1993 TRUST, ROCHELLE FANG, individually
     and as trustee of THE SAGI GENGER 1993
 9   TRUST, GLENCLOVA INVESTMENT COMPANY, TR
     INVESTORS, LLC, NEW TR EQUITY I, LLC,
10   NEW TR EQUITY II, LLC, JULES TRUMP,
     EDDIE TRUMP, MARK HIRSCH and
11   TRANS-RESOURCES, INC.,

12                        Defendants.

13   -----------------------------------------X
     (CAPTION CONT'D ON FOLLOWING PAGE)
14
                            1211 Avenue of the Americas
15                          New York, New York

16                          March 20, 2014
                            10:13 a.m.
17

18           CONTINUED DEPOSITION of SAGI GENGER,

19   taken before Ashley Shugar, a Shorthand

20   Reporter and Notary Public of the State of New

21   York.

22

23           ELLEN GRAUER COURT REPORTING CO. LLC
                 126 East 56th Street, Fifth Floor
24                  New York, New York 10022
                          212-750-6434
25                        Ref: 106465A
```

```
 1   (CAPTION CONT'D FROM PREVIOUS PAGE)
     -----------------------------------------X
 2   SAGI GENGER, individually and as assignee
     of THE SAGI GENGER 1993 TRUST, and TPR
 3   INVESTMENT ASSOCIATES, INC.

 4        Cross-Claimants, Counterclaimants,
          and Third-Party Claimants,
 5

 6        -against-

 7   ARIE GENGER, ORLY GENGER, GLENCLOVA
     INVESTMENT COMPANY, TR INVESTORS, LLC,
 8   NEW TR EQUITY I, LLC, NEW TR EQUITY II,
     LLC, JULES TRUMP, EDDIE TRUMP, MARK
 9   HIRSCH, TRANS-RESOURCES, INC., WILLIAM
     DOWD, and THE ORLY GENGER 1993 TRUST,
10

11        Cross-Claim, Counterclaim and/or
          Third-Party Defendants.
12
     Index No. 651089/2010
13   -----------------------------------------X

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2

 3   ZEICHNER ELLMAN & KRAUSE LLP

 4   Attorneys for Plaintiff Orly Genger

 5        1211 Avenue of the Americas, 40th Floor

 6        New York, New York 10036

 7   BY:  BRYAN D. LEINBACH, ESQ.

 8        PHONE     212.223.0400

 9        E-MAIL    bleinbach@zeklaw.com

10

11

12   MITCHELL SILBERBERG & KNUPP LLP

13   Attorneys for Plaintiff Arie Genger

14        12 East 49th Street, 30th Floor

15        New York, New York 10017

16   BY:  LAUREN J. WACHTLER, ESQ.

17        PHONE     212.509.3900

18        E-MAIL    ljw@msk.com

19

20

21

22

23

24

25
```

```
 1    A P P E A R A N C E S  (CONT'D):

 2

 3    MORGAN, LEWIS & BOCKIUS LLP

 4    Attorneys for Defendant Sagi Genger

 5         101 Park Avenue

 6         New York, New York 10178

 7    BY:  JOHN DELLAPORTAS, ESQ.

 8         PHONE    212.309.6690

 9         E-MAIL   jdellaportas@morganlewis.com

10

11

12    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

13    Attorneys for Defendants Glenclova Investment

14    Company, TR Investors, LLC, New TR Equity I,

15    LLC, New TR Equity II, LLC, TRANS-RESOURCES,

16    INC., MARCH HIRSCH, EDDIE TRUMP and JULES TRUMP

17         One Rodney Square

18         Wilmington, Delaware 19899

19    BY:  DOUGLAS D. HERRMANN, ESQ.

20         PHONE    302.651.3163

21         E-MAIL   douglas.herrmann@skadden.com

22

23

24

25
```

```
 1    A P P E A R A N C E S  (CONT'D):

 2

 3    GOLDBERG SEGALLA LLP

 4    Attorneys for the Third-Party Defendant William

 5    Dowd

 6        11 Martine Avenue, Suite 750

 7        White Plains, New York 10606

 8    BY:  BRIAN T. STAPLETON, ESQ.

 9        PHONE    914.798.5470

10        E-MAIL   bstapleton@goldbergsegalla.com

11

12

13    ALSO PRESENT:

14        ROBERT A. MEISTER, ESQ.,

15        Pedowitz & Meister LLP

16

17

18

19

20

21

22

23

24

25
```

```
 1   ------------------ I N D E X ------------------
 2   WITNESS                EXAMINATION BY        PAGE
 3   SAGI GENGER            MR. LEINBACH            9
 4
 5
 6   ------ REQUESTS FOR PRODUCTION OF DOCUMENTS -----
 7   PAGE    81  The original document of Page 2
 8               to Exhibit S
 9           81  Any e-mails or writings relating
10               to Page 2 of Exhibit S in Sagi
11               Genger or his counsel's
12               possession
13          110  Any documents that relate to
14               drafts of Page 1 or Page 2 of
15               Exhibit S
16          110  Any e-mails referring to any
17               drafts of Page 1 or Page 2 of
18               Exhibit S
19          144  An image of Sagi Genger's
20               computer hard drive
21          197  Identify the deposition
22               referenced in Paragraph 23 of
23               the Counterclaims
24
25
```

```
 1    --------------- E X H I B I T S ---------------
 2    SAGI          DESCRIPTION                    I.D.   REF.
 3    Exhibit R    First Amended Answer,           ---    153
 4                 Counterclaims,
 5                 Cross-Claims, and
 6                 Third-Party Complaint of
 7                 Sagi Genger, Individually
 8                 and as Assignee of the
 9                 Sagi Genger 1993 Trust,
10                 and TPR Investment
11                 Associates, Inc.
12                 Description
13    Exhibit S    The promise letter dated   12    ---
14                 October 30, 2004 and
15                 attached indemnity letter
16                 dated November 11, 2004
17    Exhibit T    Exhibit C to Sagi          126   ---
18                 Genger's Reply Affidavit
19
20
21         (EXHIBITS RETAINED BY MR. LEINBACH)
22
23
24
25
```

```
 1             S T I P U L A T I O N S

 2

 3             IT IS HEREBY STIPULATED AND AGREED by

 4    and between the attorneys for the respective

 5    parties herein, that filing and sealing be and

 6    the same are hereby waived.

 7             IT IS FURTHER STIPULATED AND AGREED

 8    that all objections, except as to the form of

 9    the question, shall be reserved to the time of

10    the trial.

11             IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be sworn to and

13    signed before any officer authorized to

14    administer an oath with the same force and

15    effect as if signed and sworn to before the

16    Court.

17

18

19                      - oOo -

20

21

22

23

24

25
```

```
 1   S A G I   G E N G E R,
 2   called as a witness, having been first duly
 3   sworn by a Notary Public, continued to be
 4   examined and testified as follows:
 5
 6   CONTINUED EXAMINATION BY
 7   MR. LEINBACH:
 8        Q.      Good morning, Mr. Genger.
 9        A.      Good morning, Mr. Leinbach.
10        Q.      Of course you know I'm
11   Bryan Leinbach.  I represent Orly Genger.
12        A.      Uh-huh.
13        Q.      I know you've been through all the
14   instructions.  I'm not going to waste your time
15   with those.
16              MR. DELLAPORTAS:  I'm sorry, Bryan.
17        Which case are we on?
18              MR. LEINBACH:  This is the Arie --
19        the 2010 case.
20              MR. DELLAPORTAS:  Oh, okay.
21              MR. LEINBACH:  The Arie/Orly case.
22              MR. DELLAPORTAS:  All right.  Go
23        ahead.
24        Q.      So we're starting today with the --
25   well, I guess what we've called the 2010 case.
```

```
 1                        GENGER

 2              Do you understand what that means?

 3      A.      Yes.

 4      Q.      Okay.  I'm not going to go through

 5  the instructions again.  But of course, as you

 6  know, if you don't understand something, you

 7  can tell me you don't understand it and I'll

 8  rephrase the question.

 9      A.      Fair enough.

10      Q.      Is there any reason why you cannot

11  give truthful testimony today?

12      A.      Not that I'm aware.

13      Q.      Okay.  Do you know who Rochelle

14  Fang is?

15      A.      Yes, I do.

16      Q.      Okay.  Who's Rochelle Fang?

17      A.      She is my mother-in-law.

18      Q.      Okay.  And what is Rochelle Fang's

19  mailing address?

20      A.      I don't know her mailing address.

21  I can tell you where her home is.

22      Q.      Okay.  Where does she live?

23      A.      The last time I visited her, she

24  was at 73rd and Broadway.

25      Q.      Okay.  But you know she doesn't
```

```
 1                          GENGER
 2    live there right now?
 3        A.      I don't know that.
 4        Q.      Okay.  Do you know where she does
 5    live right now?
 6        A.      That's the only address I have for
 7    her.
 8        Q.      Okay.  So you've -- you're saying
 9    that she lives where?
10        A.      As far as I know, she lives on 73rd
11    and Broadway.
12        Q.      She lives in an apartment building
13    on 73rd and Broadway?
14        A.      Between Broadway and West End,
15    yeah.
16        Q.      Okay.  Would it be surprising to
17    tell you that when we last tried to serve
18    process upon her at that apartment building,
19    that they had told us that she does not live
20    there any longer?
21        A.      That would surprise me.
22        Q.      Okay.  How is it that you get in
23    contact with Ms. Rochelle?
24        A.      She usually comes over for the
25    weekends to see her grandchildren.
```

```
 1                           GENGER
 2      Q.      Okay.  And you visit her where she
 3  lives?
 4      A.      No.  I haven't in years visited
 5  her.
 6      Q.      So your testimony, just to make
 7  sure that I understand this correctly, is that
 8  she lives at an apartment building on 73rd and
 9  Broadway?
10      A.      Right.  Well, it's called the Level
11  Club.  And I used to live in that building many
12  years ago.  The last time I saw her, she was
13  there, and I'm not aware that she moved.
14      Q.      And you're not aware that she lives
15  anywhere else?
16      A.      That's correct.
17              (Discussion off the record.)
18      Q.      I believe we marked this last time,
19  but I don't have the originals from the last
20  time, so we're going to mark this again as --
21           MR. LEINBACH:  Where were we at the
22      last time?  We stopped at T?
23           MR. HERRMANN:  R.
24           MR. LEINBACH:  So this would be S.
25              (Sagi Exhibit S, the promise letter
```

```
 1                         GENGER

 2              dated October 30, 2004 and attached

 3              indemnity letter dated November 11, 2004,

 4              was marked for identification.)

 5                  (Discussion off the record.)

 6      Q.      Mr. Genger, if you could just

 7  please take a look at the -- the document --

 8      A.      Yeah.

 9      Q.      -- and tell me when you're ready.

10      A.      (Document review.)

11              Ready for what?  Ready for

12  questions about it?

13      Q.      Yes.

14              Do you recognize this document?

15      A.      I do.

16      Q.      If you'd actually turn to Page 2.

17              Do you recognize that document?

18      A.      I do.

19      Q.      Okay.  Let's start with Page 2.

20      A.      Okay.

21      Q.      This is a letter.  It has your

22  letterhead, and it's dated October 30th, 2004.

23              Do you see that?

24      A.      Yeah.  I mean, it's my incorrect

25  letterhead, but yes.
```

```
 1                              GENGER
 2        Q.       Okay.  Why do you say it's your
 3     incorrect letterhead?
 4        A.       Because I lived at 1211 Park
 5     Avenue, not 1121.
 6        Q.       1221 or 1121 Park Avenue.  Okay.
 7        A.       Right.  Just like your building
 8     here --
 9        Q.       Yep.
10        A.       -- at 1211.
11        Q.       1211.  So that's a typo.
12                 Who prepared this document?
13                 MR. DELLAPORTAS:  "This" being
14        Page 2?
15                 MR. LEINBACH:  Yes.
16        Q.       We're just talking only about
17     Page 2.
18                 Who prepared Page 2?
19        A.       I think it was Carter Ledyard, with
20     the assistance of Edward Klimerman.
21        Q.       Okay.  Carter Ledyard?  Who did
22     Carter Ledyard represent --
23        A.       My mother.
24        Q.       -- when they prepared this
25     document?
```

1              GENGER
2      A.      My mother.
3      Q.      They represented Dalia Genger?
4      A.      Right.
5      Q.      And you say Edward Klimerman also
6  prepared this document?
7      A.      Yeah.  Because I remember there
8  were some changes that had to be made and -- I
9  don't remember exactly, but Carol Schepp
10  was at -- at Carter Ledyard is the principal
11  drafter.
12      Q.      Okay.  Carol Schepp at Carl --
13  Carter Ledyard?
14      A.      Yeah.
15      Q.      Can you spell her name, please?  Do
16  you remember?  Is it with a C?
17      A.      It's on the front page of the -- of
18  the stipulation settlement --
19      Q.      Okay.
20      A.      -- I believe.
21      Q.      Okay.  Now, I believe when we ended
22  last time, we were talking about the genesis of
23  this document.
24              How did Page 2, how did this
25  document come to be?

```
 1                      GENGER
 2       A.      Well, my sister and I were pleading
 3   with my mother to sign what substantially was a
 4   stipulation of settlement, and she was very
 5   doubtful about his representations that the TRI
 6   shares were worthless --
 7                 MR. DELLAPORTAS:  Wait.  Arie?  You
 8       said "his."
 9       A.      His being Arie's.
10                 His representations were worthless.
11   And my sister and I said that we would execute
12   these documents to give her more comfort.
13       Q.      Okay.  You say your sister and I
14   were pleading with her.
15       A.      Right.
16       Q.      You had conversations where it was
17   you, your sister, and Dalia?
18       A.      Yeah.  I wouldn't even call it
19   conversations, but yes.
20       Q.      Okay.  What do you mean you
21   wouldn't "call it conversations"?
22       A.      My sister was, I mean, crying
23   hysterically and literally begging my mother to
24   bring this -- all this matter to a conclusion.
25   It was very difficult for her, as it was for
```

```
 1                    GENGER
 2   me.
 3       Q.      Okay.
 4       A.      And, you know, this is I think what
 5   I would say it was an important part in --
 6   in -- in getting her to agree.
 7       Q.      Okay.  So let's unpack that a
 8   little bit.
 9               You say your sister was crying.
10               So you're talking about a specific
11   meeting in person?
12       A.      I have one specific meeting in
13   mind.  I'm sure that there were others, but
14   there was one that was particularly emotional.
15       Q.      Okay.  And where was this meeting?
16   Where did that take place?
17       A.      It was at her -- it was then a
18   hotel room she was staying in.  It was like a
19   long-term hotel at the --
20       Q.      Who's "she"?
21       A.      My mother.  Excuse me.
22               -- at the Bristol Plaza --
23       Q.      Okay.
24       A.      -- which is now -- she lives at the
25   condominium side of that hotel, so it's the
```

```
 1                      GENGER
 2   same address.
 3        Q.      Okay.  So Dalia's hotel room at the
 4   Bristol Plaza.
 5                Do you know when?
 6        A.      It must have been before the
 7   agreement was signed.  I don't remember how
 8   much it was before.
 9        Q.      And by "agreement," we're talking
10   about the divorce stipulation --
11        A.      That's what I meant, yes.
12        Q.      -- between your father and mother?
13        A.      Right.  Right.
14        Q.      Okay.  So it was sometime before
15   the divorce stipulation was signed.
16                And the divorce stipulation was
17   signed on October 30th, 2004?
18        A.      I think it was signed on various
19   dates.
20        Q.      It was signed on various dates?
21        A.      I don't know.  It speaks for
22   itself.  It has -- it has notarized signatures
23   so . . .
24        Q.      Okay.  You're saying that this
25   conversation took place before the stipulation
```

```
 1                      GENGER
 2   was signed?
 3       A.      Yes, for sure.
 4       Q.      Okay.  It was at the Bristol Hotel
 5   Plaza in your mom's hotel room.
 6               And what -- what --
 7       A.      And -- and there was a
 8   conversation, actually, while it was -- while
 9   she was -- I remember speaking to her.  She was
10   on a yacht somewhere and I spoke to her just to
11   reconfirm our position on the matter.
12       Q.      Okay.  So that's a second
13   conversation?
14       A.      Yeah.  I mean, again, I don't want
15   to give the impression that there were only
16   two.  Those are the two that stick out in my
17   mind.
18       Q.      All right.  Well, let's go back to
19   the first conversation.
20       A.      Sure.
21       Q.      What do you remember about your
22   conversation between you, your mother, and
23   Orly?
24       A.      My mother was highly suspicious
25   about my father's representation that the TRI
```

```
1                        GENGER
2    shares were worthless --
3         Q.      Okay.
4         A.      -- and that she wanted some ability
5    to call it back.  And in the beginning, she
6    wanted the ability to call it back within the
7    context of the agreement so that the
8    stipulation of settlement itself would reflect
9    that.
10        Q.      Okay.  So Dalia did not believe
11   that the TRI shares were worthless?
12        A.      I wouldn't say that she did not
13   believe.  I said -- I said she expressed
14   significant pessimism or skepticism about my
15   father's representations.
16        Q.      What'd you think?
17        A.      I thought she was nuts.
18        Q.      Okay.  You thought the TRI shares
19   were worthless?
20        A.      I -- yeah.  That's what I thought.
21        Q.      And what did you say during this
22   conversation that was --
23        A.      I don't remember.  I remember what
24   the upshot of it was.  I don't remember who
25   said what.
```

```
1                         GENGER
2              The only thing I can really
3     remember saying was my sister was literally
4     crying, you know, "Why?  Why not just bring
5     this to an end?"
6              I mean, she was -- it was very,
7     very emotional and, you know, we said we'll do
8     anything that's, you know, necessary to --
9     to -- to move it forward --
10       Q.      Do -- okay.  Do anything necessary?
11       A.      -- and --
12       Q.      Go ahead.  I'm sorry.
13       A.      I mean, you know, not "anything
14    necessary," I don't know if we used those
15    words, but that she should just tell us what it
16    is that she wants so that she can have comfort
17    that these things are moving forward properly.
18       Q.      Okay.  And what did she say?  What
19    did Dalia say?
20       A.      I don't -- I don't remember.  I
21    don't remember what she said at that meeting.
22       Q.      Okay.
23       A.      I just I really remember my sister
24    because it was so emotional.  It was just a
25    very, very sharp -- it's a very sharp memory.
```

```
 1                      GENGER
 2      Q.      Okay.  Do you remember anything
 3   else that your sister said during that meeting?
 4      A.      No.  Just, "Why aren't you willing
 5   to agree?  Why won't you do this?"
 6              At some point we offered to enter
 7   into the arrangement that's reflected in these
 8   documents.
 9      Q.      Okay.  So at that meeting you
10   discussed this document --
11      A.      I --
12      Q.      -- Page 2?
13      A.      I don't know that we discussed the
14   document, but the concept.  I don't remember if
15   it was in that meeting or it grew out of that
16   meeting later on.  I just don't remember.
17      Q.      Okay.  Do you remember whether you
18   and your sister and Dalia discussed this
19   document at that meeting?
20      A.      I don't think this document was in
21   existence --
22      Q.      Okay.  Do you remember --
23      A.      -- I mean, because of the
24   concept --
25      Q.      -- speaking to your sister and
```

```
 1                          GENGER
 2    Dalia about a promise -- the promise that's
 3    memorialized in this document?
 4         A.      Sure.
 5         Q.      Okay.  What did your sister say on
 6    that point?
 7         A.      She said that, you know, it's
 8    whatever -- whatever I'll commit to, she'll do
 9    50 percent of.  And I explained to her the
10    general concept is that we would give my mother
11    the ability to call back value in the -- of her
12    shares that would have been allocated to her.
13    She was fine with that.
14         Q.      Okay.  I just want to make sure I
15    understand.
16                 So you're the one who suggested a
17    promise that you would repay your mother?
18         A.      I don't remember if I'm the one who
19    suggested it or if it was suggested by my
20    mother or by her attorney, but I had a
21    discussion with Orly about it.
22         Q.      Okay.  And it was --
23         A.      I don't -- I don't remember whose
24    idea it was.
25         Q.      And it was at that meeting --
```

```
 1                      GENGER
 2      A.      No.
 3      Q.      -- you suggested that you would
 4  repay your mother?
 5      A.      No.  I don't think -- I don't -- I
 6  don't remember that it was at that meeting.
 7  I --
 8      Q.      Okay.  So what did you say at that
 9  meeting about --
10      A.      As I told you before, the only
11  specific thing that I remember at that specific
12  meeting was my sister's comments because they
13  were, you know, so emotional.  I mean, she was
14  crying.  I -- I've really never seen her like
15  that before.
16              And a product of that meeting, I
17  don't know if it was in that meeting or later,
18  was a decision to put it -- bring -- you could
19  sort of say effect the arrangement that we have
20  here --
21      Q.      Okay.
22      A.      -- in these documents.
23      Q.      So when did you talk about this
24  document -- if you didn't talk about this
25  document or the promise at that meeting, when
```

```
 1                        GENGER
 2    did you talk about this document with your
 3    sister?
 4        A.      At some point before the divorce,
 5    you know, I informed my sister or maybe she was
 6    informed on her own, I don't remember, that
 7    what we were going to do was give my mom the
 8    ability to exercise rights as described in the
 9    second page.
10        Q.      Okay.
11        A.      And -- and she said, "I'll just do
12    whatever you do and I'll split it with you
13    50-50."
14        Q.      So this was -- the conversation was
15    in person?
16        A.      Yes.
17        Q.      Okay.  Where was this conversation?
18        A.      I shouldn't say I know it was in
19    person.
20                But let me think about it for a
21    second.
22                I don't -- I don't remember the
23    specifics.  I remember that when she left, she
24    was -- she -- she told me that she would split
25    with me whatever -- whatever the commitment
```

```
 1                         GENGER
 2    was.   And at that point, she already understood
 3    what the commitment would be.
 4         Q.       Okay.
 5         A.       And then I -- I reconfirmed it by
 6    phone with her.
 7         Q.       Okay.  But let's -- okay.  Let's go
 8    back here.
 9               So you said when I left, so that
10    means it was an in-person conversation.
11               MR. DELLAPORTAS:  "When she left."
12         Q.       "When she left" --
13         A.       "When she left," right.
14         Q.       -- so it was an in-person
15    conversation?
16         A.       You know, I really -- as I said --
17    I want to correct what I said before.
18               I -- I have to think about it.  But
19    I don't remember if it was in person or phone.
20    It's over ten years ago.
21         Q.       Okay.
22         A.       Or may it's not over; it's about
23    ten years ago.
24               I remember that that's what she
25    told me, and then that was it.
```

```
 1                        GENGER
 2       Q.       Okay.  Over the phone or in person,
 3   do you remember when this conversation was?
 4       A.       It was -- it was -- we had multiple
 5   conversations about what was going on, and she
 6   was interested in knowing that this thing was
 7   being brought to a conclusion.
 8       Q.       Okay.  And when did these multiple
 9   conversations take place?
10       A.       Again, in the weeks leading to
11   October of -- end of October 2004.
12       Q.       So in October?  September?
13       A.       September, October.
14       Q.       How many conversations would you
15   say?
16       A.       If I had to guesstimate, I'd say
17   half a dozen, somewhere thereabouts.
18       Q.       Okay.  And during any of these
19   conversations, did you discuss the terms of
20   Page 2 with your sister?
21       A.       Yes.
22       Q.       Okay.  What did you say?
23       A.       That we would give my mother the
24   ability to call back the value of those shares.
25   Essentially the substance of what's in here.
```

```
 1                        GENGER
 2       Q.      Okay.  Did you give her a copy of
 3   Page 2 to review?
 4              MR. DELLAPORTAS:  Object to form.
 5       A.      Did I give her a copy of Page 2 to
 6   review?  I think at least -- at least a draft
 7   of it, if not the final copy.
 8       Q.      You gave her a draft to review?
 9       A.      At least a draft.  I don't --
10   because I know she's had a piece of paper like
11   this before her, but I don't remember if it was
12   a final draft or -- I don't remember.
13       Q.      Okay.  So when did you give her a
14   draft or final to review?
15       A.      In one of those meetings.
16       Q.      At one of those meetings in
17   September or October of 2004?
18       A.      Yeah.
19       Q.      But you don't know whether it was a
20   draft or whether it was a signed copy?
21       A.      Well, it was not a signed copy
22   because she wasn't around on October 30th,
23   2004, so it could not have been signed.
24       Q.      When you say "she," who are you
25   talking about?
```

```
 1                        GENGER
 2       A.      My mother -- my sister.  Excuse me.
 3       Q.      Okay.  But your sister didn't sign
 4  Page 2.
 5       A.      Oh, you're absolutely right.
 6               Yes, but my point is that I believe
 7  my mother signed the agreement on October 30th,
 8  2004, and that would have been its final form,
 9  and my sister wasn't around.  That's what I
10  think I was trying to get to.
11       Q.      Okay.  We'll get back to that.
12               So let me to talk to you about
13  these conversations with your sister where you
14  told her about this agreement.
15               What did your sister say to you
16  when you explained the terms of Page 2?
17       A.      That it's absolutely appropriate;
18  that if that's what moves the ball forward, it
19  should be done; and that we should -- she'd
20  back me, obviously, 50-50 on whatever we had to
21  do.
22       Q.      Did you have conversations with her
23  after the document was signed?
24       A.      Yes.
25       Q.      Okay.  What did you tell her?
```

```
 1                      GENGER
 2      A.       The document was signed, we have a
 3   letter prepared to essentially split it.  It
 4   was a nonevent.
 5      Q.       A nonevent?
 6      A.       From my perspective, at least, it
 7   was.
 8      Q.       All right.  Let's go back to -- you
 9   said that there was a second conversation that
10   took place on a -- when your sister was on a
11   boat?
12      A.       Yeah, she was, I think --
13               MR. MEISTER:  Wait.
14               Objection to form.
15      A.       I believe she was on a boat off of
16   Fiji while the divorce settlement was being
17   signed.
18      Q.       Okay.  Boat off of Fiji.
19               Do you know when that was?
20      A.       October 30th, 2004, or thereabouts.
21      Q.       Around October 30th?
22      A.       Yes.
23      Q.       Okay.  So you called your sister
24   on, what, her cell phone?
25      A.       No.  It was like some special phone
```

```
 1                              GENGER
 2    call.  I remember a satellite phone or
 3    something like that.  I don't know exactly, but
 4    it was an unusual phone mechanism.
 5         Q.      Okay.  Do you know like what time
 6    of day?
 7         A.      I believe it was the evening of the
 8    30th --
 9              MS. WACHTLER:  I --
10              MR. HERRMANN:  I'm sorry --
11              MS. WACHTLER:  Yeah.
12              MR. HERRMANN:  I got lost, too.
13              Was it Orly who was on the boat off
14       of Fiji --
15              MS. WACHTLER:  Or Dalia?
16              THE WITNESS:  Yes.
17              MS. WACHTLER:  You said --
18              MR. DELLAPORTAS:  It was Orly.
19              THE WITNESS:  Orly.
20    BY MR. LEINBACH:
21         Q.      Orly is off a boat -- is on the
22    boat off of Fiji.
23         A.      Fiji, that's right.
24              MS. WACHTLER:  And you called Orly.
25       Okay.
```

```
1                          GENGER
2       Q.      So you called her.  It was in the
3   evening where you were?
4       A.      I believe it was the evening, yeah.
5       Q.      Okay.  And what did you say to her
6   on that phone call?
7       A.      That I was about to sign the
8   document reflective of what we discussed.
9       Q.      Okay.
10      A.      I think I read it to her, she said,
11  "Fine, whatever it is I'll back -- backstop you
12  50-50."
13      Q.      You read the document to her over
14  the phone?
15      A.      I -- I think I did.
16      Q.      Okay.
17      A.      If not -- if not read it to her, I
18  certainly described it to her.
19      Q.      Okay.  Was anybody else in the room
20  with you when you had this phone call with your
21  sister?
22      A.      I don't remember.
23      Q.      Where were you when you had this
24  phone call?
25      A.      I was at Sonnenschein's offices.
```

```
1                          GENGER
2       Q.      You were at Sonnenschein's offices?
3       A.      Yeah.
4       Q.      Okay.  Was anybody -- did you hear
5  anybody on the phone with your sister when you
6  had this conversation?
7       A.      I think I also spoke to my father.
8       Q.      You also spoke with your father --
9       A.      Right.
10      Q.      -- during that conversation?
11      A.      Right.
12      Q.      Okay.  What did you tell your
13  father during that conversation?
14      A.      That it looked like things would
15  get wrapped up, and -- you know, obviously, in
16  retrospect, I was wrong.  Apparently we had
17  successfully resolved all of the matrimonial
18  issues.
19              I mean, it sounds to say funny it
20  now sitting here.
21      Q.      Okay.  Did you tell your father
22  during this phone conversation in Fiji that
23  this Page 2, this document, existed?
24      A.      Did I?  No.
25      Q.      Why?
```

```
 1                      GENGER
 2      A.      I mean not that I remember.  I
 3  don't know.
 4      Q.      Why?
 5      A.      I don't -- I mean, it's not hiding
 6  it from him.  I don't know.  What's the --
 7      Q.      Why didn't you tell him?
 8      A.      Well, the only -- you can start off
 9  why did I tell Orly at all as opposed to --
10              MR. DELLAPORTAS:  Just answer the
11      question.
12      A.      I didn't see a reason to speak to
13  him about it.
14      Q.      You didn't see a reason to tell
15  your father about this document which is
16  Page 2?
17      A.      I don't -- I don't remember on that
18  phone call having a -- thinking that this was a
19  problem with him.
20      Q.      You didn't think that this would be
21  an issue, that he'd need to know this at all?
22      A.      Well, I would think he knows.
23      Q.      You would think he knows?
24      A.      Yes.
25      Q.      How?
```

```
 1                         GENGER
 2      A.       Well, I knew it.  Orly knew it.
 3  His lawyer knew about it.  It was in drafts of
 4  the stipulation that were taken out.
 5      Q.       Okay.  Did you ever share drafts of
 6  Page 2 with your father?
 7      A.       Well, as I recall, it was in part
 8  of -- at the beginning it was going to be an
 9  exhibit to the stipulation itself.  So when we
10  circulated those, it was attached to it.
11      Q.       When you circulated the divorce --
12      A.       Well, I didn't circulate it;
13  when -- when the lawyers circulated it.
14      Q.       When the lawyers circulated the
15  divorce stipulation --
16      A.       Right.
17      Q.       -- you're saying a draft of Page 2
18  was attached to the drafts of the divorce
19  stipulation?
20      A.       That's right.
21      Q.       Okay.  When were those drafts sent?
22      A.       I'm guessing, but, you know,
23  Septemberish of 2004.
24      Q.       Okay.  Are there any e-mails -- do
25  you have any e-mails that corroborate, you
```

1                          GENGER

2     know, drafts being sent with this document

3     attached to the divorce stipulation?

4          A.     I'd have to go back.  I mean --

5     yeah, it was -- it was basically a table of

6     contents, and I remember clearly that it was

7     there and that Ed didn't want it to be in

8     there.

9          Q.     Okay.  Let's unpack it for one more

10    second though.

11         A.     Sure.

12         Q.     You say drafts of the divorce

13    stipulation were sent out that attached Page 2;

14    is that correct?

15         A.     I don't remember if it attached it

16    or just named it.  I don't remember.

17         Q.     Okay.  You don't know if it

18    attached it or not?

19         A.     It's so many hundreds of pages.  I

20    really don't remember.  I couldn't -- that --

21    that would be the same answer for any page in

22    the stipulation.

23         Q.     Okay.  You have drafts of the

24    divorce stipulation which you say named the

25    document in it?

1                        GENGER

2       A.      Drafts or at least it was listed as

3   an exhibit.

4       Q.      It was listed as an exhibit in --

5       A.      For that for sure I remember.

6   That -- that's --

7       Q.      Okay.  When were those drafts sent?

8       A.      Well, before -- I don't remember,

9   so October, September, or something.

10      Q.      Do you have copies of those drafts?

11      A.      I don't know.  I could check.

12      Q.      Did you -- have you ever produced

13  those drafts in any litigation?

14      A.      Not that I can think of, no.

15      Q.      Have you ever produced drafts of

16  the divorce stipulation in any litigation?

17      A.      I know in the arbitration there

18  were -- they went through drafts.  I don't

19  remember if I'm the one who produced them.

20      Q.      But the question is:  Did you

21  produce any drafts --

22      A.      I -- I don't know.

23      Q.      -- of the divorce stipulation?

24      A.      I don't know.

25      Q.      Do you have any drafts of the

```
 1                    GENGER
 2   divorce stipulation in your possession?
 3        A.      If I go back to old e-mails, I may
 4   have them.
 5        Q.      Okay.  Who else would have had had
 6   drafts of the divorce stipulation with
 7   reference to Page 2?
 8        A.      I would guess Carol Schepp because
 9   she -- she's the one that wanted it in the
10   table of contents.
11        Q.      Okay.  Carol Schepp.
12        A.      Right.
13        Q.      Anybody else?
14        A.      Well, I think Ed Klimerman received
15   them and objected to it.
16        Q.      Ed Klimerman received them?
17        A.      Yes.
18        Q.      So he would have drafts.
19        A.      I don't know what he has or doesn't
20   have.
21        Q.      Your father?
22        A.      It was -- it was -- it was
23   circulated so I don't know -- you know, it was
24   circulated by them, so I don't know what --
25        Q.      When you say "them," who do you
```

```
 1                              GENGER

 2    mean?

 3         A.        I mean by -- by Carter Ledyard.

 4         Q.        Okay.  Your father, did he receive

 5    these drafts?

 6         A.        I don't know.  As I said in my

 7    earlier deposition, I don't know what he and Ed

 8    were speaking about behind closed doors.

 9         Q.        Okay.  So you know that Carol

10    Schepp received drafts of the divorce

11    stipulation that referenced Page 2?

12         A.        I think she produced them, not --

13         Q.        You know that Ed Klimerman received

14    copies of the divorce stipulation

15    that referenced Page 2?

16         A.        I presume so, because if it was

17    circulated to me, it was circulated to him.

18         Q.        Okay.  Why do you say you

19    "presume"?

20         A.        Because -- because as a matter of

21    practice -- you know, I'm not sure.

22                   I want to say that everything that

23    I was given also went to my father simult- --

24    my father's counsel simultaneously, but I'm not

25    sure that's true.  It's ten years ago.
```

```
 1                        GENGER
 2            What -- the one thing I do remember
 3   is there being a discussion between Carol
 4   Schepp and Ed Klimerman where Carol wanted to
 5   make this agreement an integrated part of the
 6   stipulation, and Ed did not want it.
 7       Q.    Okay.  Let's -- we'll get back to
 8   that in a second, but I want to make sure that
 9   I understand this.
10            Drafts of the divorce stipulation
11   were circulated which attached this document or
12   made reference to it.
13            How were they circulated; by
14   e-mail?
15       A.    I don't remember.
16       Q.    Do you -- you don't remember?
17            So you don't remember if someone
18   walked up --
19       A.    I remember get --
20       Q.    -- and handed you them or if they
21   got e-mailed to you?
22       A.    No, I remember I received e-mails
23   from that period.  I'm not sure that everything
24   that I received was by e-mail.  It's ten years
25   ago.  It's -- it's difficult to remember.  But
```

```
 1                      GENGER

 2    there are -- certainly are e-mails that deal

 3    with drafts.

 4        Q.      Okay.

 5        A.      I don't know that essentially what

 6    would be the table of contents that I'm

 7    referring to was included in there or in an

 8    e-mail or if it was just done by hard copy.  I

 9    just don't know.

10        Q.      Okay.  Let's talk about

11    conversations that you had with Ed Klimerman

12    about Page 2 of this document.

13        A.      Sure.

14        Q.      How many conversations do you

15    think -- would you say you had with Ed

16    Klimerman about this document?

17        A.      At least two.

18        Q.      At least two?

19        A.      Yeah.

20        Q.      Okay.  When were those

21    conversations?

22        A.      It's the same time frame.

23        Q.      Okay.  So what time frame are we

24    talking about?  September, October 2004?

25        A.      Yeah.
```

```
 1                            GENGER
 2        Q.      Okay.  What was the substance --
 3   let us back up one second.
 4                Can you remember the difference
 5   between these two conversations?
 6        A.      I remember the second conversation
 7   reasonably well.
 8        Q.      Okay.  What do you remember about
 9   the first conversation?  Do you remember
10   anything about that?
11        A.      That he didn't want it to be part
12   of the stipulation of settlement.
13        Q.      Okay.  So he knew this document
14   existed but did not want it to be part of the
15   stipulation of settlement; is that accurate?
16        A.      That's correct.
17        Q.      Why?
18        A.      Because it's an agreement between
19   the children and the mother, and it has nothing
20   to do with Arie, and it's -- it doesn't belong
21   there.
22        Q.      Okay.  You testified earlier that
23   he may have had a hand in drafting this
24   document?
25        A.      Yeah, only because -- when I say
```

GENGER

1

2      "hand in," there was some touch-ups done on the

3      night it was done, and it was done in his

4      office.  So when I say -- it's not that he

5      stood behind drafting it, he just may have

6      helped ministerially.

7          Q.      Okay.  You say there were touch-ups

8      of it, do you mean touch-ups of this document?

9          A.      Of the -- of the second page, yes.

10         Q.      Okay.  You were in his office doing

11     what?

12         A.      It was closing.  All the documents

13     were being closing, documents that needed to be

14     signed.

15         Q.      So it was the closing of the

16     divorce stipulation?

17         A.      Right.

18         Q.      That was when, on the evening of

19     October 30th?

20         A.      It was the 30th going into -- it

21     was on the 30th going into the 31st, if I

22     remember correctly.

23         Q.      Okay.  So it was late in the

24     evening?

25         A.      Right.

```
1                          GENGER
2        Q.      Okay.  And this document was one of
3    the documents that was being shuffled back and
4    forth for signature?
5        A.      Yes.
6        Q.      Okay.  Who was it being shuffled
7    back and forth to?
8                MR. MEISTER:  Are you referring to
9        October 30th?
10               MR. LEINBACH:  Yeah.
11       A.      I think the people who were there
12   were Ed Klimerman, my mother, Carol Schepp, and
13   myself.
14       Q.      Okay.  Ed Klimerman, your mother,
15   Carol Schepp, and yourself all saw this
16   document?
17       A.      Absolutely.
18       Q.      Okay.  When was this document
19   signed?
20               MR. HERRMANN:  Talking still just
21       about Page 2?
22               THE WITNESS:  Yeah.
23               MR. LEINBACH:  Just -- just about
24       Page 2.
25       A.      I'm not sure if I signed it -- I'm
```

```
1                          GENGER
2    not sure if I signed it only when Orly
3    returned.  I know that it was held -- David
4    held the documents so that they would both be
5    released together --
6        Q.      Okay.  You --
7        A.      -- but I don't remember if I signed
8    it before he started to hold it or after.
9        Q.      So you don't remember whether you
10   signed it on October 30th, 2004?
11               MS. WACHTLER:  I'm sorry.  Did you
12      say "David"?
13               THE WITNESS:  David Parnes.
14               MS. WACHTLER:  Oh, David Parnes.
15               MR. LEINBACH:  Yeah.
16       A.      I think I signed it at the closing
17   table --
18       Q.      Okay.
19       A.      -- and gave it to David.
20       Q.      So you weren't sure, but you're
21   sure now?  You --
22       A.      I'm not sure.  I'm giving you my
23   best guesstimate.  I'm not sure.
24       Q.      I don't want you to guess.  I want
25   you to --
```

```
 1                        GENGER
 2      A.      Then I can't answer the question.
 3      Q.      Did you -- so you don't know
 4  whether you signed it on the 30th or not?
 5      A.      I mean, I don't have recollection
 6  sufficient enough to say that I'm sure.
 7      Q.      Do you remember signing the
 8  document at all?
 9      A.      Yeah, I signed it at some point.
10      Q.      Okay.  So looking at Page 2, down
11  here where it says "Sagi Genger," that's your
12  signature?
13      A.      Yes, it is, absolutely.
14      Q.      Okay.  And underneath that where it
15  says "Dalia Genger," that's Dalia Genger's
16  signature?
17      A.      Yes.
18      Q.      Okay.  Do you know when Dalia
19  Genger signed this document?
20      A.      I'm reasonably sure that she did at
21  the closing table.
22      Q.      Okay.  When you say "at the closing
23  table," was that before or after the divorce
24  stipulation was signed?
25      A.      I don't remember.
```

```
 1                         GENGER

 2       Q.      Do you remember whether it was on

 3   the same day that the divorce stipulation was

 4   signed?

 5       A.      Yeah.  It was at that -- at that

 6   time around the table.

 7       Q.      It was on the same day that the

 8   divorce stipulation was signed?

 9       A.      Yeah.  We left there with a signed

10   copy.

11       Q.      Okay.

12       A.      What I remember was we had a signed

13   copy, David took it and was holding until Orly

14   signed the indemnity.  That was --

15       Q.      Okay.  You had a --

16       A.      That's what I remember.

17       Q.      -- you had a signed copy that was

18   signed by Dalia, and you left where?  You left

19   Sonnenschein's offices?

20       A.      I left Sonnenschein's offices, yes.

21       Q.      Okay.  You had --

22       A.      It may have also been signed by me.

23   I just don't -- I don't remember.

24       Q.      You had in your hand an original

25   copy that was signed by Dalia?
```

```
1                        GENGER

2        A.      I think David had in his hand an

3   original copy that was --

4        Q.      Okay.  How many copies of this

5   document were signed?

6        A.      I don't know.

7        Q.      More than one?

8        A.      I don't remember.

9        Q.      You don't remember?

10       A.      No.

11       Q.      So it could have just been one?

12       A.      Could be.

13       Q.      It could be more than one?

14       A.      Could be.

15       Q.      You say that David had the

16   document?

17       A.      Yes.

18       Q.      Was David present for signing of

19   the divorce stipulation?

20       A.      I guess so, yeah.  Yes.

21       Q.      And just to make sure that the

22   record is clear, when you say "David," you're

23   referring to David Parnes?

24       A.      To David Parnes, yes.

25               So when I enumerated the people, I
```

```
1                            GENGER
2    forgot to mention David.  David was there.
3        Q.       Okay.  So David Parnes was present
4    at Sonnenschein's offices during the
5    negotiation and signature of the divorce
6    stipulation?
7        A.       The negotiation is a completely --
8        Q.       Yeah.
9        A.       -- it's a -- for the finalization
10   of the documents.
11       Q.       That's fair enough.
12                During the day when these documents
13   were executed, David Parnes was present at
14   Sonnenschein?
15       A.       Yeah.
16       Q.       Okay.  Did David Parnes know about
17   Page 2?
18       A.       Yes, very much so.
19       Q.       Okay.  And why do you -- why do you
20   say "very much so"?
21       A.       Because it -- it was a matter that
22   concerned me personally and he was my attorney.
23       Q.       Okay.
24       A.       And it was a -- a very important
25   document for getting the stipulation of
```

```
 1                          GENGER

 2    settlement executed.

 3         Q.      Okay.  Did --

 4         A.      And --

 5         Q.      Did you provide David Parnes with

 6    drafts of Page 2?

 7         A.      I don't know that I ever provided

 8    drafts.  I think probably Carol did.  But,

 9    again, I don't remember.

10         Q.      Okay.  Did Carol circulate drafts

11    of Page 2 to David Parnes?

12         A.      I just don't remember.

13         Q.      Did Carol Schepp circulate the

14    divorce stipulation that you say attached or

15    referenced Page 2 to David Parnes?

16         A.      I remember seeing it.  I presume

17    David got it, but I don't remember.

18         Q.      Okay.  You say David -- when you

19    left their offices, David had the agreement,

20    that he was holding it?

21         A.      That's right.

22         Q.      Can you tell me why David Parnes

23    was holding this agreement?

24         A.      Because it was -- it was in -- it

25    was not in balance.  My -- we didn't have -- we
```

```
 1                          GENGER
 2      expected that we would have this document and
 3      my sister's document signed at closing --
 4          Q.       Uh-huh.
 5          A.       -- and my sister did not leave a
 6      power of attorney -- attorney with sufficient
 7      scope to do that.  And that's what I remember
 8      with Ed.  So when she came back, we did what we
 9      did here.
10          Q.       Okay.  When she came back?
11          A.       From her trip to Fiji.
12          Q.       Okay.  Who knew that David Parnes
13      had the original?  You.  Anybody else?
14          A.       I don't remember.
15          Q.       Where is the original of Page 2
16      now?
17          A.       I believe it's with my attorneys.
18          Q.       Who's your attorneys?
19          A.       Morgan Lewis.
20          Q.       Okay.  So Morgan Lewis right now
21      has the original copy of Page 2?
22          A.       I haven't examined it to see it's
23      original, but it looks to me like it's an
24      original.
25          Q.       Well, how did they get the original
```

```
1                            GENGER
2     copy of Page 2?
3          A.      Mr. Parnes had them, and he --
4          Q.      Okay.
5          A.      -- had sent them to them.
6          Q.      David Parnes had this original
7     document --
8          A.      Right.
9          Q.      -- and he gave it to your lawyers?
10         A.      Yes.
11         Q.      At whose direction?
12         A.      At my direction.
13         Q.      You told him to give them this
14    document?
15         A.      I did.
16         Q.      Have you ever produced Page 2 in
17    any litigation?
18                 MR. DELLAPORTAS:  Other than in
19         the -- in the settlement conference,
20         correct?
21                 MR. LEINBACH:  Yeah.
22         Q.      I'm -- I'm asking about in any
23    litigation at all, have you ever produced this
24    document?
25                 MR. DELLAPORTAS:  Well, I have an
```

```
 1                         GENGER

 2       agreement with Yoav that it be treated

 3       as --

 4                MR. LEINBACH:  I understand.  I get

 5       it.

 6                And I'm not asking --

 7                MR. DELLAPORTAS:  No, but

 8       just state --

 9                MR. LEINBACH:  Yeah.

10                MR. DELLAPORTAS:  -- that we had an

11       agreement whereby it would be treated as

12       produced in this litigation,

13       notwithstanding that it was initially

14       handed over in the settlement conference.

15                MR. LEINBACH:  I -- I get that --

16                MR. DELLAPORTAS:  Okay.

17                MR. LEINBACH:  -- and that's not

18       what I'm asking.

19    BY MR. LEINBACH:

20       Q.      What I'm saying is --

21       A.      In the arbitration.

22       Q.      This document was produced during

23    the arbitration before Judge Milonas?

24       A.      It was -- yeah, it was produced.

25       Q.      Okay.  Produced by whom?
```

```
1                              GENGER
2         A.      By me.
3         Q.      You produced this document during
4    the Milonas arbitration?
5         A.      I gave a copy of it to my mother's
6    attorneys.
7         Q.      Okay.  You gave a copy to whom?
8    Let's just be clear.
9         A.      I think it's Frank Velie.
10                MS. WACHTLER:  I'm sorry.  Frank
11        who?
12                MR. HERRMANN:  Velie.
13                THE WITNESS:  Velie.
14                It doesn't matter.  It's some guy
15        at Sullivan & Worcester, whoever --
16                MS. WACHTLER:  No, it does matter.
17        I just want to know.  I've never heard the
18        name, so . . .
19                MR. LEINBACH:  Yeah, I haven't
20        either.
21                MR. STAPLETON:  Frank Velie, I
22        think -- I think it's V-I-L --
23                MR. HERRMANN:  -- E-L-E.
24        V-I-E-L-E, I think.
25                MR. STAPLETON:  V-I- --
```

```
 1                      GENGER

 2              Yeah, I remember he was at the

 3       arbitration.

 4                  MR. LEINBACH:  Okay.  So --

 5                  MS. WACHTLER:  Is he a lawyer?  I

 6       don't know.

 7                  THE WITNESS:  Yeah.

 8                  MS. WACHTLER:  I'm sorry.

 9                  MR. HERRMANN:  I thought he --

10                  THE WITNESS:  Yeah.

11                  MR. HERRMANN:  Wasn't he the guy

12       that questioned everybody?  Did he

13       question --

14                  THE WITNESS:  Yeah, I think so.

15   BY MR. LEINBACH:

16       Q.      Okay.  So this is -- this is

17   Dalia's lawyer?

18                  MS. WACHTLER:  Oh, Dalia's lawyer?

19       Q.      And you gave -- you gave Dalia's

20   lawyer a copy of this document -- we're talking

21   about Page 2 still -- You gave it to him --

22       A.      Right.

23       Q.      -- during the Milonas arbitration?

24       A.      Yes.  Absolutely.

25       Q.      Okay.  And did you give it to him
```

```
 1                        GENGER
 2    in hard copy?  Did you send him an e-mail?
 3        A.      I don't remember.
 4        Q.      Okay.  Did you ever speak with
 5    Mr. Velie about this document?
 6        A.      Yes.
 7        Q.      Okay.  Tell me about that
 8    conversation.
 9                Was there more than one?
10        A.      I don't know if there's a privilege
11    issue.  So one second.  Hold on.
12        Q.      Was Mr. Velie your lawyer?
13        A.      Yes.
14                MS. WACHTLER:  He was your lawyer?
15        Q.      He was your lawyer during the
16    arbitration?
17                MS. WACHTLER:  I thought you said
18        he was Dalia's lawyer.
19        A.      May I speak to my lawyer and I'll
20    come back.
21        Q.      Okay.
22                MS. WACHTLER:  There's a question
23        pending.
24                MR. STAPLETON:  Yeah, there's a
25        question pending.
```

```
1                           GENGER
2                MR. DELLAPORTAS:  And there's a
3           privilege question.
4           Q.     Just answer just yes or no, was he
5      your lawyer?
6           A.     And as I'm saying to you, he was my
7      lawyer, and I need to understand if -- in this
8      context of whether he was acting as my lawyer.
9           Q.     Okay.
10                     (A recess was taken from 10:52 a.m.
11               to 10:57 a.m.)
12                MR. LEINBACH:  Can you just read
13           back the question that I had asked before
14           we went on break?
15                     (The requested portion of the
16               record was read.)
17                MR. DELLAPORTAS:  So we took a
18           break because the witness wanted to consult
19           about a privilege issue.  I think the
20           answer is that Mr. Velie had previously
21           represented the witness for other unrelated
22           matters, but was not the witness's lawyer
23           for purposes of this arbitration, and thus
24           there's no privilege, and so you can ask
25           about those conversations.
```

```
 1                        GENGER
 2    BY MR. LEINBACH:
 3        Q.      Okay.  Tell me about your
 4    conversations with Mr. Velie concerning Page 2
 5    of this exhibit.
 6        A.      That it's a document; that it
 7    exists; that it may be relevant to the
 8    arbitration.
 9        Q.      Okay.  So you told this -- you
10    told -- and this guy's name is Frank Velie?
11        A.      Yeah.
12        Q.      You told Mr. Velie that this
13    document exists?
14        A.      Yes.
15        Q.      You provided him with a copy of
16    this document?
17        A.      Yes.
18        Q.      Was this prior to the hearings
19    before Justice Milonas?
20        A.      Yes.
21        Q.      Okay.  So you provided him with a
22    copy of the document before the hearings and
23    told him what about it?
24        A.      "This may be relevant to your
25    case."
```

```
 1                              GENGER
 2          Q.      Did you say why?
 3          A.      What?
 4          Q.      Did you say why?  Did you explain
 5     it?
 6          A.      It has to do with the shares.  I
 7     don't -- it has to do with it.
 8          Q.      Okay.  You told him it has to do
 9     with the TRI shares.
10                  Anything else?
11          A.      No.  I said, "Here, read it.  This
12     is what it is.  It may be relevant; it may not
13     be relevant.  This document exists."
14          Q.      Okay.  Did he ask you any questions
15     about the document?
16          A.      Not that I can recall.
17          Q.      He didn't ask you anything?  He
18     just said --
19          A.      You're talking about --
20          Q.      -- he took it and said, "Thank
21     you"?
22          A.      He took it.  He looked at it.  You
23     know, he said, "Thank you."  That's it.  I
24     don't remember -- he maybe didn't say, "Thank
25     you."  He just took it.  I don't know what's --
```

```
 1                         GENGER
 2    I didn't ask him for a legal analysis.
 3         Q.      Okay.  Was anybody else present
 4    with you when you had these conversations with
 5    Frank Velie?
 6         A.      I don't remember.
 7         Q.      Was it -- were they in person?
 8         A.      Yes.
 9         Q.      Okay.  They were in person.
10                 Where were these conversations?
11         A.      In his office.
12         Q.      They were in his offices.
13                 And it was just you and him?
14         A.      I didn't say that.
15         Q.      Okay.  Can you remember whether
16    there was anyone present?
17         A.      I just don't remember.
18         Q.      Did you provide him with -- well,
19    you provided him with a copy, right?
20         A.      Yes.
21         Q.      Okay.  At that time, the original
22    was where?
23         A.      I don't remember at that time where
24    it was.
25         Q.      Okay.  Going back to 2004, you say
```

```
 1                           GENGER
 2    that when you guys -- when you left the signing
 3    at Sonnenschein, David Parnes had possession of
 4    this document which is Page 2?
 5         A.       I think so, yeah.
 6         Q.       Was there ever a time between 2004
 7    and the time when David Parnes provided this
 8    document to Morgan Lewis that he was not in
 9    possession of the original document?
10         A.       Yes.
11         Q.       Okay.  When was that?
12         A.       Well, for some time it was in my
13    possession, and I think -- I think before that,
14    it was in my father's possession.
15         Q.       Okay.  So 2004, he takes the
16    document.  And then you said at some point in
17    time, it came in your father's possession and
18    your possession, the original document?
19         A.       I -- I'm not sure it was the -- I
20    think it's the original that came into my
21    father's possession and was returned to me.
22         Q.       Okay.
23         A.       And then it -- then I had it for a
24    while.  And then when I moved offices, I
25    identified documents that were particularly --
```

# Exhibit F

# Part 2

*ARIE GENGER VS.*
*SAGI GENGER*

---

*SAGI GENGER*
*March 20, 2014*

---



**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106465A.TXT*
*Min-U-Script® with Word Index*

```
 1                        GENGER
 2    that when you guys -- when you left the signing
 3    at Sonnenschein, David Parnes had possession of
 4    this document which is Page 2?
 5         A.        I think so, yeah.
 6         Q.        Was there ever a time between 2004
 7    and the time when David Parnes provided this
 8    document to Morgan Lewis that he was not in
 9    possession of the original document?
10         A.        Yes.
11         Q.        Okay.  When was that?
12         A.        Well, for some time it was in my
13    possession, and I think -- I think before that,
14    it was in my father's possession.
15         Q.        Okay.  So 2004, he takes the
16    document.  And then you said at some point in
17    time, it came in your father's possession and
18    your possession, the original document?
19         A.        I -- I'm not sure it was the -- I
20    think it's the original that came into my
21    father's possession and was returned to me.
22         Q.        Okay.
23         A.        And then it -- then I had it for a
24    while.  And then when I moved offices, I
25    identified documents that were particularly --
```

1                          GENGER

2      where originals might be of importance, and I

3      sent them to David.

4          Q.     Okay.  You said it came into your

5      father's possession.

6                   How did that happen?

7          A.     Well, I used to share office space

8      with him.

9          Q.     Okay.

10         A.     And I left -- when he asked me to

11     leave, I left there a box of documents which

12     included this.

13         Q.     Okay.

14         A.     And eventually, if I remember

15     correctly, David Lentz returned them to me.

16         Q.     Okay.  You said it came into your

17     father's possession.

18                   Did you hand this document to your

19     father?

20         A.     No.  I mean, the box with documents

21     that contained that.

22         Q.     Okay.  So you put the original

23     document in a box?

24         A.     I think it's the original, I'm not

25     sure.  But certainly a copy of it was there.

```
 1                            GENGER
 2         Q.       Okay.  But I'm not talking about
 3    copies.  We're talking about the original
 4    document.
 5                  And you say that it was originally
 6    with David Parnes and sometime it came into
 7    your father's possession, I just want to know
 8    when that was.
 9         A.       I'm not sure if it's the original.
10         Q.       Okay.  So you don't know whether it
11    came into your father's possession?
12         A.       I don't know whether the original
13    came into his possession.
14         Q.       Okay.  So once again, from the
15    beginning, from 2004 --
16         A.       Right.
17         Q.       -- when you left the divorce
18    stipulation signing --
19         A.       Right.
20         Q.       -- at Sonnenschein's offices, it
21    was in David Parnes's possession?
22         A.       Right.
23         Q.       Was there any point in time between
24    2004 and the time when David Parnes provided
25    the original document to Morgan Lewis that it
```

```
 1                       GENGER
 2   was out of David's possession?
 3        A.     Yes.
 4        Q.     Okay.  When was the original
 5   document out of David Parnes's possession?
 6        A.     I had it for a while and produced
 7   it to him.  And prior to that, it may or may
 8   not be true that my father had the original.
 9        Q.     Okay.  You don't know whether or
10   not that was the original document?
11             MR. MEISTER:  Objection.
12             Whether what was the original
13        document?
14             MR. LEINBACH:  Whether -- whether
15        the document that was provided to Arie --
16        and we'll get into that -- was the original
17        document which came-- the original
18        Page 2 --
19             THE WITNESS:  Right.
20             MR. LEINBACH:  -- which came from
21        David Parnes.
22        Q.     You don't know?
23        A.     I don't know.
24        Q.     How did this copy come into your
25   father's possession?  Did you hand it to him?
```

```
 1                          GENGER
 2        A.        No.  As I said, I had a box there
 3   with documents.
 4        Q.        Okay.  So you put the document,
 5   whether -- either an original or a copy, into a
 6   box --
 7        A.        Right.
 8        Q.        -- and you presented the box to
 9   him?
10        A.        No.  I left it there.  And
11   Mr. Lentz was kind enough to bring it back to
12   me.
13        Q.        Okay.  So you had a box of
14   documents that you brought to the office?
15        A.        Yeah.
16        Q.        Okay.  And when I say "offices,"
17   we're talking about?
18        A.        TRI's offices.
19        Q.        And this was on West 57th Street?
20        A.        I think so, yeah.
21        Q.        Okay.  You brought a box of
22   documents to the offices at West 57th Street?
23        A.        Right.
24        Q.        And that -- one of the documents in
25   that box you think was either an original or a
```

```
 1                         GENGER
 2    copy of Page 2?
 3         A.      Yes.
 4         Q.      Okay.  Did your father know what
 5    was in the box?
 6         A.      I have no idea.
 7         Q.      Okay.  So when you say that you --
 8    it came into Arie's possession, you don't know
 9    whether Arie actually had -- knew he had a
10    document?
11         A.      That's true.
12         Q.      Okay.  Did you ever speak with your
13    father about this document?
14         A.      No.
15         Q.      Ever?
16         A.      No.  Not about the stipulation.
17    Always with Ed.
18         Q.      Okay.  No, but we're talking about
19    Page 2.
20         A.      No, this was part of the whole
21    stipulation arrangement.
22                 And what I said at the last time,
23    and people didn't take it seriously apparently.
24    I, at the time, was trying shepherd everyone to
25    a document that they're willing to sign.
```

```
 1                        GENGER
 2              Ed was having private conversations
 3    with my father, Ms. Schepp was having -- and
 4    another lawyer were having private
 5    conversations with my mother.  I don't know
 6    what happened in those conversations.
 7              All I know is was that I was
 8    helping to wordsmith a document that they were
 9    both willing to sign.
10        Q.     Okay.  I heard that.
11              But I want to ask you this question
12    again.
13              Did you ever --
14        A.     And I -- I didn't -- I didn't deal
15    directly --
16        Q.     Did you ever --
17        A.     Yeah.
18        Q.     -- speak with your father about
19    Page 2 to this exhibit?
20        A.     No.
21        Q.     Ever?
22        A.     Well, we did recently, but no prior
23    to 2014.
24        Q.     Okay.  Prior to 2014, you've never
25    spoken with your father about this document?
```

```
 1                        GENGER
 2      A.        About the document itself?  I don't
 3   remember having a conversation about the
 4   documents.
 5      Q.        Okay.  Do you remember having any
 6   conversation that such a document, in sum or in
 7   substance, existed?
 8      A.        That such an arrangement existed,
 9   yes.  But not necessarily that it was
10   documented.
11      Q.        Okay.  Do you remember talking to
12   your father about an arrangement -- the
13   arrangement that's memorialized in this
14   document?
15      A.        Yes.
16      Q.        Okay.  When?
17      A.        I don't remember.
18      Q.        2010?  2011?  2004?  2005?
19      A.        Somewhere between 2004 and 2007.
20      Q.        Okay.  How many conversations did
21   you have?
22      A.        I don't remember.
23      Q.        More than one?
24      A.        I really don't remember.
25      Q.        Where were these conversations?
```

```
 1                         GENGER
 2        A.      I don't remember.
 3        Q.      Okay.  What was the substance of
 4   your conversations with your father about the
 5   sum or substance of Page 2 of this exhibit?
 6        A.       That Orly and I agreed that Mom
 7   could come back to us with respect to the
 8   shares that were -- would have been allocated
 9   to her otherwise.
10        Q.      Okay.  You told your father that
11   you had agreed --
12        A.      Right.
13        Q.      -- that you and Orly had agreed to
14   pay your mother money that related to the
15   shares, the TRI shares?
16        A.      Yes.
17        Q.      And what'd your father say?
18        A.      He didn't like it.
19        Q.      Okay.  Do you remember specifically
20   what he said?
21        A.       I don't remember.  But I remember
22   he didn't like it.
23        Q.      Did he tell you why he didn't like
24   it?
25        A.      He just -- he didn't like his
```

```
 1                          GENGER
 2    ex-wife getting anything.
 3         Q.      Okay.
 4         A.      If I'd have told him she's getting
 5    a nickel, he wouldn't like that.
 6         Q.      Okay.  He -- you're saying that he
 7    knew this promise document existed between 2004
 8    and 2007?
 9         A.      He knew that we had an arrangement.
10    I don't know if he saw -- listen, I don't know
11    what Ed -- what his lawyers showed him.  So I
12    can't tell you that I know what he saw.
13                 The way he would have seen it in
14    the normal course would not have been from me.
15    Documents were delivered through the lawyers.
16                 So, you know, I can't tell you --
17    for instance, I can't tell you sitting here
18    today, that he saw the penultimate draft of the
19    stipulation of settlement, or any draft for
20    that matter, because it was given to his
21    lawyers, and the lawyers would speak to him.  I
22    was one step removed from him.
23         Q.      Uh-huh.
24         A.      So I don't know -- I don't know
25    whether he saw this or any of the other myriad
```

```
 1                        GENGER
 2    of documents.
 3         Q.        But you'd had conversations with
 4    your father about the divorce stipulation prior
 5    to its signing, correct?
 6         A.        Yes.
 7         Q.        Okay.  And during any of those
 8    conversations prior to the divorce stipulation
 9    signing, did you ever think to inform your
10    father that this document was being negotiated
11    or was being -- or was going to be signed?  And
12    when I say "this," I mean Page 2 to this
13    exhibit.
14         A.        Yes.
15         Q.        Okay.  You just -- you just
16    testified that you had never had any
17    conversations with your father about the
18    document itself.
19         A.        That's correct.
20         Q.        Okay.  Between 2004 and 2007, you
21    informed him that it existed?
22         A.        I rem- -- that the arrangement
23    existed.
24         Q.        Okay.  Do you remember whether
25    these conversations were prior to the divorce
```

```
1                          GENGER
2    stipulation's signing?
3         A.      Yes, we had conversations
4    beforehand.
5         Q.      So prior to the divorce stipulation
6    signing --
7         A.      Right.
8         Q.      -- you had conversations with your
9    father about the substance of Page 2?
10        A.      Yes.
11        Q.      Okay.  And what did your father say
12   to you during those conversations prior to the
13   divorce stipulation signing?
14        A.      I think he was -- he was dead set
15   against it.
16        Q.      Okay.  Did he say why?
17        A.      He didn't want anything going to my
18   mother.
19                He said it's worthless, this is an
20   opportunity for estate planning, and there's no
21   reason to give my mother a window to get any
22   money out of it, something along those lines.
23        Q.      Did you have conversations prior to
24   this document's signing -- we're still talking
25   about Page 2.
```

```
1                            GENGER
2                Did you have any conversations with
3   anyone other than the people you've named?
4                You've named so far Carol Schepp,
5   Ed Klimerman --
6        A.      Right.
7        Q.      -- and your sister.
8        A.      Right.
9        Q.      Did you speak with anyone else
10  prior to this document's signing?
11       A.      About the document?
12       Q.      Yeah.
13       A.      Not that I can remember --
14               MS. WACHTLER:  You forgot David
15       Parnes.
16       Q.      Yeah.
17       A.      And David Parnes, I'm sorry.
18       Q.      And you spoke with David Parnes,
19  I'm sorry.
20               MR. LEINBACH:  Thank you for that.
21               THE WITNESS:  Thank you.
22               MR. MEISTER:  And you forgot Arie.
23               THE WITNESS:  Right.
24               MR. LEINBACH:  Well, that's true.
25       Q.      Arie Genger, you spoke with Arie
```

```
 1                      GENGER
 2   Genger.
 3       A.      So all the people -- all the people
 4   that I mention now --
 5       Q.      Uh-huh.
 6       A.       -- I don't -- no one else comes to
 7   mind as being part of this, but I'd be
 8   surprised if there were.  I can think about it.
 9       Q.      Do you have any e-mails
10   from 2004, 2005, 2006 that reference this
11   document?
12       A.      Yes.
13       Q.      Okay.  Have you produced those
14   e-mails in any litigation?
15       A.      Yes.
16       Q.      What litigation did you produce
17   those e-mails?
18              THE WITNESS:  Which litigation did
19       we produce those?
20       A.      Oh, I gave a copy of the e-mail
21   to -- actually, to Robert Meister who had it
22   produced in an action that I'm not a party to.
23       Q.      Okay.  And this was in what year?
24       A.      It was a few weeks ago.
25       Q.      Okay.  Prior to 2014, have you
```

```
 1                        GENGER
 2    produced any e-mails that reference Page 2 in
 3    any litigation?
 4         A.       Not that I can recall.
 5         Q.       Okay.  Prior to 2014, have you
 6    produced any other writings that reference
 7    Page 2 in any litigation?
 8         A.       Again, in the arbitration they got
 9    a copy of the document itself.
10         Q.       Did you give Mr. Velie any other
11    documents that relate to Page 2?  Any e-mails,
12    writings?
13         A.       I don't know.
14         Q.       You don't know?
15                  Do you have copies of what you
16    produced to Mr. Velie during the marital
17    arbitration?
18         A.       I don't know.
19         Q.       Do you know -- is there a way for
20    you to audit what you gave Mr. Velie?
21         A.       All of it went to my father and to
22    my mother.  They both have copies of it so --
23    or had copies of it, so I don't --
24         Q.       You're saying -- you said that you
25    gave documents to Mr. Velie?
```

```
 1                          GENGER
 2      A.       Yeah.  So what I'm trying to
 3  explain, maybe inartfully, is that my father,
 4  at that point at least, I thought, my father
 5  and my mother are the principals.  I've given
 6  them the documents.  I don't have to be the
 7  custodian of the documents for the rest of my
 8  life, so I -- you know, that's . . .
 9      Q.       You said that you gave documents to
10  Mr. Velie during the Milonas arbitration.
11               I'm asking you:  Do you know what
12  documents you gave him during that arbitration?
13      A.       Well, this is one of them.
14      Q.       Okay.
15      A.       I couldn't give you a scope of
16  everything.
17      Q.       Do you know whether you gave him
18  any other documents that relate to this Page 2
19  that we're talking about?
20      A.       I -- I don't know.
21      Q.       Okay.  Do you know whether you have
22  given e-mails or had -- or have had e-mail
23  conversations -- -- strike that -- let's clean
24  this up.
25               Have you sent e-mails to anyone
```

1                           GENGER

2      that relates to this Page 2, you talk about

3      Page 2?

4          A.      Yes.

5          Q.      Okay.  Who?

6          A.      My attorneys.

7          Q.      Okay.  Your attorneys.

8                  And who are those people?

9          A.      Mr. Dellaportas.

10         Q.      Uh-huh.

11         A.      Mr. Parnes.

12         Q.      Anybody else?

13         A.      Not that I can think of.

14         Q.      Can you think of any other

15     conversations you've had with anyone about this

16     document, Page 2?

17         A.      With anyone else that I mentioned?

18         Q.      Yeah.

19         A.      No, sitting here right now, I don't

20     remember.

21         Q.      Okay.  How did Page 2, the original

22     document, come back in David Parnes's

23     possession?

24         A.      As I said, when I moved to

25     Connecticut, I took -- I gathered some of the

```
 1                        GENGER
 2     documents that I thought may be particularly
 3     important --
 4          Q.      Uh-huh.
 5          A.      -- and I sent them to David for
 6     safekeeping.
 7          Q.      You sent them to David for
 8     safekeeping?
 9          A.      Yes.
10          Q.      Okay.  And how did they -- the
11     original Page 2 come into your possession?
12          A.      I don't remember.
13          Q.      You don't remember if he sent it
14     directly to you?
15          A.      I don't remember because I don't
16     remember if Lentz gave me back the original.  I
17     just don't remember what the custody, you know,
18     of it was.
19          Q.      Okay.  Did David --
20          A.      I don't know if David had it, and
21     he -- David just left it at my office at some
22     point.  I just don't know.
23          Q.      Okay.  But that's -- you're talking
24     about the box that was in TRI's offices?
25          A.      No, there's multiple things.  We're
```

```
 1                      GENGER
 2    confusing things, and maybe it's my fault I
 3    wasn't clear.
 4              I don't remember if that box had
 5    the original or a copy.  That's one.
 6        Q.      Yeah.
 7        A.      Two, assuming it didn't have the
 8    original for the moment --
 9        Q.      Uh-huh.
10        A.      -- I don't know if David had the
11    original, left them in my offices, and I
12    returned them to him, whether my mother had the
13    originals, gave them to David, and then they
14    came back to me.  I just don't remember.
15        Q.      How did your mother get in
16    contact -- get in possession with the original
17    document?
18        A.      Well, it's a letter to her.
19        Q.      Okay.  You said that that letter,
20    once it was signed at the -- on October 30th,
21    left in David Parnes's possession?
22        A.      That's right.
23        Q.      Okay.  So how did it come into your
24    mother's possession?
25        A.      He may have given it to her.  I
```

```
 1                        GENGER
 2    just don't know.
 3              I -- you know, you're asking me
 4    about some -- about a piece of paper ten years
 5    ago that at the time was of no great
 6    significance to me.  So I just don't know.
 7        Q.      Okay.  It didn't mean anything to
 8    you?
 9        A.      It meant they would -- they would
10    execute this thing and get it over with, which
11    was obviously a mistaken belief.
12        Q.      Okay.  Do you know whether the
13    original -- whether it was the original
14    document that you instructed David Parnes to
15    send to your lawyers?
16        A.      I don't -- I don't know.  I'm
17    sorry, I don't understand your question.  I
18    apologize.
19        Q.      Okay.  Do you know for a fact that
20    your lawyers possess the original copy of this
21    document?  And I'm talking about Page 2 of this
22    exhibit.
23        A.      They have what I think is the
24    original.  I don't know -- I'm not like a --
25    you know, sometimes something looks like the
```

```
1                         GENGER
2    original and it's not.
3         Q.      So you've seen it?
4         A.      Yes, I've seen it.
5         Q.      You've seen the document?
6         A.      Yes.
7         Q.      Okay.  And that's what we're
8    calling -- you're saying is the original which
9    is in your lawyer's possession?
10        A.      I believe so, yes.
11               MR. LEINBACH:  Okay.  At this
12       time -- and I know we've asked for it
13       before -- we would ask that the original
14       copy of this document be produced to us so
15       that we can review it and have it analyzed,
16       and we would also ask that any e-mails or
17       any other writings that relate to this
18       document that you have in your possession
19       or in your lawyer's possession be produced
20       to us.
21               MS. WACHTLER:  I join in that
22       request.
23               MR. DELLAPORTAS:  I don't know if
24       what I have is the original.  I'm not a
25       handwriting expert.  It did not come with a
```

```
 1                        GENGER
 2      giant red stamp on it that said "Original."
 3      If it turns out -- we're going to have it
 4      looked at.  If it turns out it is the
 5      original, we'll make it available for
 6      inspection.
 7              MS. WACHTLER:  Well, we'd like to
 8      make it available for inspection to
 9      determine if it's the original at the same
10      time your expert does.
11              MR. LEINBACH:  I -- that was
12      actually what I thought my point was.
13              MS. WACHTLER:  Yeah, I agree.
14              MR. DELLAPORTAS:  What's the
15      significant of that?  I don't know how --
16              MR. STAPLETON:  What's the
17      significance of this -- of finding the
18      original of this particular set of
19      documents?
20              MR. DELLAPORTAS:  No, no.  What is
21      the significance of experts reviewing it to
22      see if it's an original at the same time or
23      in succession?
24              I don't know if they can both do it
25      at the same time.  I don't know how this is
```

```
 1                        GENGER
 2        done.  I assume someone puts it in a
 3        microscope and --
 4             MS. WACHTLER:  I'm not a
 5        handwriting expert, but I have had some
 6        experience with having things done pursuant
 7        to a forensic analysis to determine whether
 8        or not they're an original, and I think
 9        that if you have all of your experts there
10        at once, that's up to you.
11             But we are entitled to the original
12        when there is an issue here relating to the
13        genuineness of these documents.
14             MR. DELLAPORTAS:  Well, let me --
15             MR. LEINBACH:  Yeah, I --
16             MR. DELLAPORTAS:  Let me start with
17        the following which is:  This document has
18        absolutely nothing to do with the case.  We
19        agreed to allow --
20             MS. WACHTLER:  Oh, I disagree.  I
21        disagree.
22             MR. LEINBACH:  Okay.  With all due
23        respect --
24             MR. DELLAPORTAS:  Let me finish.
25             We allowed the witness to -- as an
```

1           GENGER

2      accomodation, to answer questions about it

3      just so we could avoid another discovery

4      fight.

5           MS. WACHTLER:  Or sanctions.

6           MR. DELLAPORTAS:  Whatever.

7           And if it's the original, I'll make

8      it available for inspection.  If it's

9      simply another copy, then you already have

10     a copy.

11          MS. WACHTLER:  You know, John, I --

12     I don't disagree with your, you know,

13     genuineness and everything, but -- and I'm

14     not saying I don't trust you, but for you

15     to come back and say, "Oh, by the way, this

16     is not the original," or "This is the

17     original," I just don't think that that's

18     the appropriate way to produce or respond

19     to a request for an original.

20          MR. DELLAPORTAS:  I don't know

21     that -- I was -- I was asked to produce the

22     original.

23          MS. WACHTLER:  Correct.

24          MR. DELLAPORTAS:  I, as of today,

25     don't know whether I have the original.  If

```
 1                        GENGER
 2        I --
 3                MS. WACHTLER:  Well, why don't you
 4        produce what you were given by Sagi --
 5                MR. DELLAPORTAS:  Well, first of
 6        all -- first of all, I'm never going to
 7        produce anything.  I'll make it available
 8        for inspection.  So that's No. 1.
 9                And I'll make it available for
10        inspection if it turns out to be an
11        original.  If it's another copy, then
12        there's really no point in it.
13                MS. WACHTLER:  How are we going to
14        know whether it's the original?  Just
15        because you say it's the original or it's a
16        copy?
17                MR. DELLAPORTAS:  If I --
18                MS. WACHTLER:  That's just as good
19        as Sagi saying he doesn't even know if
20        it -- what he gave somebody or where it
21        was.
22                I just -- I --
23                MR. DELLAPORTAS:  If I believe it's
24        an original --
25                MS. WACHTLER:  I'm not -- I don't
```

1                          GENGER
2        want to get into colloquy.
3                  Our request stands, and I join in
4        the request for the original.  If you're
5        not going to make it available, we'll do
6        what we need to do.
7                  MR. DELLAPORTAS:  If I believe it's
8        an original, I will make it available.
9                  MS. WACHTLER:  Right.  That's --
10                 MR. DELLAPORTAS:  And your expert
11       can come and look at it and see whether
12       they believe it's an original.
13                 MS. WACHTLER:  Okay.  Okay.  That's
14       your solution.
15                 MR. DELLAPORTAS:  Is there
16       something objectionable about that, and if
17       so, what?
18                 MS. WACHTLER:  I'm objecting.
19                 MR. LEINBACH:  Yeah, there is
20       something objectionable about it.
21                 MS. WACHTLER:  I told you what my
22       objection is.
23                 MR. LEINBACH:  Because -- because
24       we have the right to our own independent
25       expert to review the document --

```
 1                         GENGER
 2              MR. DELLAPORTAS:  We agree.
 3              MR. LEINBACH:  -- and determine
 4       it's validity.
 5              Yeah, but that's not -- that's not
 6       contingent on whether or not you determine
 7       that it's an original.  You see?  Because
 8       you're not a handwriting expert.
 9              MR. DELLAPORTAS:  I agree.  I'm not
10       a handwriting expert.
11              MR. LEINBACH:  And -- and you're --
12       the person that you pay as a handwriting
13       expert is not someone that I have to take
14       at face value to determine it's validity.
15              MR. DELLAPORTAS:  I a hundred -- so
16       far we're in agreement.
17              MR. LEINBACH:  Okay.  So --
18              MR. STAPLETON:  And there's a far
19       more pragmatic objection also which is
20       this:  Having had some experience with
21       determining the originality of handwriting
22       specimens, the process may be one in which
23       the original document is destroyed.  So
24       if -- and I don't mean the original
25       document is destroyed, I mean the original
```

```
 1                      GENGER
 2      ink that they are looking at is destroyed.
 3      So if that examination by your expert
 4      destroys the original specimen such that we
 5      can't meaningfully examine it, then you're
 6      subject to a spoliation sanction.
 7            MR. DELLAPORTAS:  What does this
 8      have to do with your client?  I'm just
 9      curious.  Can you articulate what this has
10      to do with --
11            MS. WACHTLER:  You -- you've
12      brought him in.
13            MR. LEINBACH:  You've made
14      multiple --
15            MS. WACHTLER:  You brought him in.
16            MR. STAPLETON:  Because my client's
17      being sued by your client.
18            MS. WACHTLER:  Right.
19            MR. DELLAPORTAS:  And what does
20      this have to do with your client's defense
21      of my claims?
22            MR. STAPLETON:  Because --
23            MR. DELLAPORTAS:  Articulate it.
24      Since you've decided --
25            MS. WACHTLER:  Why don't you
```

```
 1                       GENGER
 2        articulate what your client --
 3                MR. DELLAPORTAS:  Since you've --
 4                MS. WACHTLER:  -- has to do with
 5        brining him into a lawsuit?
 6                MR. DELLAPORTAS:  Since it's --
 7        since you've decided to offer your opinion
 8        on this, please tell me what this has to do
 9        with the defense of your client.
10                MR. LEINBACH:  No, no, no, we're
11        not taking a deposition of Brian Stapleton;
12        we're taking the deposition of your client.
13                And what we're asking for is the
14        original document, and we have every right
15        to it.  And we don't have --
16                MR. DELLAPORTAS:  I agree.
17                MR. LEINBACH:  And we do not have
18        to rely upon your expert's
19        determination for --
20                MR. DELLAPORTAS:  I didn't ask you
21        to rely --
22                MS. WACHTLER:  Yeah, let's not
23        waste everybody's time.  That's your
24        position.  We'll make whatever application
25        we need to make for --
```

```
 1                           GENGER

 2              MR. DELLAPORTAS:  Let me articulate

 3         my position.

 4              MS. WACHTLER:  You did.  You --

 5         you've articulated it.

 6              Let's move on.

 7              MR. DELLAPORTAS:  I'm going to

 8         articulate my position just so it's clear

 9         because it was interrupted through all of

10         this.

11              We have what may be an original.

12         We are going to review it.  Whether it's an

13         original or not in our view, we will make

14         it available after we review it for

15         everybody to look at and examine to their

16         heart's content.  Okay?

17              Thank you.

18              MR. LEINBACH:  We -- I object

19         with -- I object to your proposed solution,

20         all right?  Because I think it's -- I think

21         it's not sufficient, and we'll -- we'll

22         deal with that in due course.  Either we'll

23         call the Court or we'll do a motion, I

24         suppose.

25              MR. DELLAPORTAS:  Wonderful.
```

```
 1                            GENGER
 2               MR. LEINBACH:  Okay.  Moving along.
 3   BY MR. LEINBACH:
 4       Q.      Let's look at Page 1 of this
 5   document.
 6       A.      Yes.
 7       Q.      Okay.  You know Page 1 of this
 8   document?
 9       A.      Yes.
10       Q.      Do you know who drafted Page 1 of
11   this document?
12       A.      Yes.
13       Q.      Who was that?
14       A.      I should say I know the firm.  In
15   all likelihood, Ed Klimerman and such.
16       Q.      "All likelihood"?
17               Do you know Ed Klimerman drafted --
18       A.      I know it came --
19       Q.      -- Page 1?
20       A.      I know it came from his office.
21       Q.      You know it came from his offices.
22               And how do you know that?
23       A.      Because I have the original e-mail
24   in which he sent it to me.
25       Q.      Okay.  We'll get to that.
```

```
 1                      GENGER
 2              Did you have any conversations --
 3    well, actually let's back that up.
 4              You see here it says "Sagi Genger."
 5              Is that your signature on the
 6    document?
 7         A.    Yes.
 8         Q.    Okay.  You see down here where it
 9    says "Orly Genger"?
10              Is that your sister's signature on
11    the document?
12         A.    It is, yes.
13         Q.    Were you present when your sister
14    signed this document?
15         A.    I don't remember.
16         Q.    Do you know whether -- so this --
17    but this is your sister's signature?  You know?
18         A.    I recognize it as her signature,
19    yes.
20         Q.    Okay.  Were you present when she
21    signed this document?
22         A.    I don't remember.
23         Q.    Okay.  Do you know when this
24    document was signed?
25         A.    I think it was signed on -- on the
```

```
 1                         GENGER
 2    day -- either on that day or on the 11th.
 3        Q.        Okay.  You know or you're guessing?
 4        A.        I have good reason to believe.
 5        Q.        Okay.  What is your basis?
 6        A.        Because at the time, it was David
 7    Parnes's practice to essentially fax himself
 8    documents instead of scan, and we have one that
 9    says -- with her signature that says
10    November 11th in the fax line.
11        Q.        You have a document that has a fax
12    legend on it?
13        A.        Right.  You have it.  I gave it to
14    you.
15        Q.        It's a copy?
16        A.        What?
17        Q.        It's a copy?
18        A.        Right.
19        Q.        It's not this document?
20        A.        It's -- these documents were
21    scanned in on that date, on November 11th.
22        Q.        Okay.
23        A.        So by November 11th, they were
24    signed.
25        Q.        Is there a fax cover sheet --
```

```
 1                          GENGER
 2       A.        No.
 3       Q.        -- that goes with this copy you're
 4   talking about?
 5       A.        It's what I gave you, which is this
 6   page but with a -- what do they call the thing
 7   on the top --
 8       Q.        A fax legend.
 9       A.        -- a fax legend at the top that
10   indicates November 11th.
11       Q.        Okay.  Let's unpack that for a
12   second.
13                 So this document, you say this is
14   your sister's signature?
15       A.        Yeah.
16       Q.        You don't recognize -- you don't
17   know when -- or you don't know when she -- if
18   you were there when she signed it?
19       A.        I don't remember.
20       Q.        And you don't know when that was?
21       A.        I think it was on the 10th or the
22   11th.
23       Q.        Okay.  Do you know who has the
24   original copy of this document?  And by "this,"
25   I mean Page 1 of this exhibit.
```

```
 1                         GENGER
 2       A.       Yeah, I believe it's with
 3   Mr. Dellaportas's offices.  Same answer.
 4       Q.       Okay.  So Mr. Dellaportas has the
 5   original copy of this document?
 6       A.       He has what appears to me to be an
 7   original.
 8       Q.       Okay.  Do you know that it's the
 9   original document?
10       A.       With absolute certainty it's -- it
11   appears to me to be the original.  I -- I
12   believe it's the original.
13       Q.       How did the -- how did what you
14   think is the original document come to --
15       A.       It was in the files for years.  We
16   took it out.  It looks -- doesn't look like a
17   copy.  It looks like a normal pen signature.
18   In fact, I think one of the signatures, I
19   forgot on which document, is in blue.  So that
20   would suggest to me that it's the original.
21       Q.       Okay.  Let's start at the
22   beginning.
23                You say that you have reason to
24   believe this document was signed on
25   November 10th or November 11th of 2004; is that
```

```
 1                        GENGER
 2    accurate?
 3        A.       That's right.  That's right.
 4        Q.       Okay.  Where did -- once the
 5    document was signed, where did the original
 6    document go?
 7        A.       To the best of my recollection,
 8    David had it at least immediately thereafter.
 9        Q.       Okay.  Did that go into David
10    Parnes's possession in November of 2004?
11        A.       He would have, at least at the
12    outset, have all of the documents.
13        Q.       Okay.  And how did it come to be
14    signed?  Who gave it to Orly to sign?
15        A.       I think ultimately Ed gave it to
16    her to sign.
17        Q.       Ed Klimerman gave this document to
18    Orly?
19        A.       Yeah, because I -- I think -- I'm
20    not sure.  Maybe I shouldn't answer.  And I --
21    I don't know the answer.
22        Q.       How do you know -- do you know that
23    Ed Klimerman --
24        A.       I don't know.  I think so, but I
25    don't know.  So I shouldn't --
```

GENGER

Q.      So what's your basis for believing?

A.      Because as I recall, my sister wanted to consult with Ed about the document before signing it.

Q.      Okay.  So before signing the document, your sister --

A.      I think so.

Q.      -- spoke with Ed Klimerman?

A.      I think so, yes.

Q.      You think so?

A.      I know she spoke to someone.  I presume it's either Ed or it's my father, but I don't know that for a fact.

Q.      Okay.  So what's your basis for believing that your sister spoke with Ed Klimerman about this document?

A.      Because she told me so.

Q.      She told you?

A.      She told me that she just wanted to take time to have -- to have -- she had wanted someone to look at it, and I don't remember if it was Ed or my father.  Maybe it was another person.

Q.      Okay.  So let's do this.  You --

```
 1                        GENGER
 2    did you speak with your sister about this
 3    document before it was signed?  And when I say
 4    "this document," you know we're talking about
 5    Page 1 now, right?
 6         A.        Yes.
 7         Q.        Okay.  Did you speak with your
 8    sister about Page 1?  Let's call it the
 9    "indemnity document."
10         A.        Yes.
11         Q.        When?
12         A.        I spoke to her on October 30th that
13    -- well, I spoke to her beforehand that we
14    would have to put -- that she would put a
15    document -- a document together that we would
16    split the -- the commitment to my mother.
17                   And on October 30th, told her that,
18    you know, for whatever reason she had failed to
19    give Ed a power of attorney that would have
20    enabled it to be done at the closing table.
21    And she was, like, "Fine, you know, what we
22    agreed to is what we agreed to," and she came
23    back and she signed it.
24         Q.        Okay.  So let's just unpack that.
25                   You had a conversation with your
```

```
 1                         GENGER
 2    sister before this document was signed about an
 3    indemnity that she was going to indemnify you?
 4    You guys spoke about that?
 5        A.      Right.
 6        Q.      And what did you say to her about
 7    this indemnity?
 8        A.      I think it's more about what she
 9    said to me.
10        Q.      Okay.  What did she say to you
11    about this indemnity?
12        A.      She said to me, "Obviously whatever
13    you think is correct and that it's 50-50
14    between us and, you know, if that's what mom
15    wants and it gets it closed, that's what we'll
16    do."
17        Q.      Okay.  So you explained to her --
18    strike that because I'm putting words in your
19    mouth.
20                Did you explain to your sister --
21        A.      Right.
22        Q.      -- that -- that you were asking her
23    to indemnify you?
24        A.      No.  What she said to me was
25    what -- I mean, she was the talker; I was the
```

```
 1                        GENGER

 2   listener.

 3       Q.      Okay.

 4       A.      So she said, "Sagi, I understand

 5   what needs to be done.  Whatever you do, I'll

 6   back you 50-50."

 7               That's the conversation.

 8       Q.      Okay.  So you didn't talk to her

 9   about an indemnity.  She just volunteered to

10   you --

11       A.      Well, I explained, "This is the

12   situation.  What do you think we should do?"

13               It's two siblings trying to get

14   matters solved.  She understood the concept.

15   And she said, "Yes, Sagi, whatever you'll do,

16   we'll do it 50-50."

17       Q.      When was this conversation?

18       A.      That was -- I described earlier,

19   well before the stipulation was signed.

20       Q.      Oh, so you -- this conversation is

21   the -- this conversation with your sister and

22   your mother -- and -- and Dalia in the hotel

23   room?

24       A.      No.  That's where the kernel -- I

25   guess the kernel started to -- either developed
```

```
1                          GENGER
2   or started to develop there.
3              But afterwards we discussed that
4   this is what was going to be done, and she
5   thought that's fine and that she'll split with
6   me whatever it is that we have to do.
7       Q.      Okay.  And when was that
8   conversation?
9       A.      Those conversations occurred in
10  September or October 2004.
11      Q.      Okay.  And where did these
12  conversations take place?  Were they in person?
13  Were they on the phone?
14      A.      In -- I want to say in person.  I
15  don't remember having telephone conversations
16  with her.
17      Q.      Okay.  And where did they take
18  place?
19      A.      I think at my place.
20      Q.      Okay.  Your place.
21              Where were you living at the time?
22      A.      1211 Park.
23      Q.      Okay.  So these were all
24  conversations you had with your sister at 1211
25  Park Avenue?
```

```
 1                          GENGER
 2        A.      I believe it's 1211 Park.
 3        Q.      During any of these conversations,
 4    did you describe to your sister, in sum or in
 5    substance, Page 1, what's written here?
 6        A.      She described it to me.
 7        Q.      She described to you the indemnity?
 8        A.      She described to me that she would
 9    backstop me for 50 percent of whatever it is
10    that we do, and I explained to her what had to
11    be done.
12        Q.      Okay.  But you read this document,
13    correct?
14        A.      Which one are you referring to now?
15        Q.      Page 1 --
16        A.      Yes.
17        Q.      -- of this exhibit, which I believe
18    this is Exhibit S we're talking about --
19        A.      Yes.
20        Q.      -- you've read this document,
21    correct?
22        A.      Yes.
23        Q.      Okay.  Did you explain to her the
24    substance of this document, or did she explain
25    to you the substance of this document?
```

```
 1                          GENGER
 2              MR. DELLAPORTAS:  Object to form.
 3              I think your timeline is a little
 4        off.
 5              THE WITNESS:  Again --
 6              MS. WACHTLER:  There was no
 7        timeline in the question.
 8              THE WITNESS:  Maybe you were
 9        getting confused.
10              MR. DELLAPORTAS:  You asked him if,
11        sitting here today, he's read the document
12        and he said yes.  And then you asked him if
13        he explained that document --
14              MR. LEINBACH:  Yeah.  Okay.
15              MR. DELLAPORTAS:  -- to her.
16              MR. LEINBACH:  Look.  That's fair
17        enough.
18     BY MR. LEINBACH:
19        Q.      In September or October, did you --
20              THE WITNESS:  I don't even know
21        what you're confused about so . . .
22        Q.      In September or October --
23        A.      Right.
24        Q.      -- 2004, did you explain the sum or
25     substance of Page 1 of Exhibit S to your
```

```
 1                        GENGER
 2   sister?
 3       A.      So, again, what I would say is we
 4   talked about the contents of Page 2 of the
 5   document.
 6       Q.      Okay.
 7       A.      And she said obviously, "Whatever
 8   you do, I'll share and I'll pay half of it."
 9       Q.      So she just said, "I'll pay half"?
10       A.      Absolutely.
11       Q.      Okay.  Did -- so you didn't
12   describe this document to her?
13       A.      No.  She said to me, "Whatever it
14   is that you'll do, I'll back you for half of
15   it."  I mean, that's --
16       Q.      Okay.
17              MR. DELLAPORTAS:  Object.  Object
18       to form.
19              I don't know that you've
20       established that the document existed at
21       the time of the calls.
22       Q.      When --
23       A.      Yeah, the concept --
24              THE WITNESS:  Thank you.
25       A.      But when I'm talking about -- these
```

```
 1                      GENGER
 2   discussions may even predate the existence of
 3   the document.  So I explained to her the idea,
 4   and she said, "Yes, whatever you do, I'll cover
 5   you for half."
 6       Q.      Okay.  Who asked for this document
 7   to be drafted?
 8       A.      Which one?
 9       Q.      Page 1 of Exhibit S.
10       A.      I don't remember specifically.
11       Q.      You don't remember if you asked
12   someone to draft this document?
13       A.      I saw in the e-mail from Ed that
14   says "as you requested."  I don't know if that
15   was precise -- I mean, I don't remember
16   personally myself requesting it but it may very
17   well be correct.
18       Q.      Okay.  Do you know if you -- strike
19   that.
20               Were any drafts of this document,
21   Page 1 of Exhibit S -- were any drafts of Page
22   1 circulated before they were signed -- before
23   the document was signed?
24       A.      I don't know.
25       Q.      You don't know whether any drafts
```

1               GENGER

2   were circulated?

3       A.      I don't know.

4       Q.      Did you ever provide a copy of this

5   document to your sister to look at?

6       A.      She signed it, so yeah.

7       Q.      Did you provide a copy of this

8   document to your sister?

9       A.      Again, I don't remember if I'm the

10  person that gave it to her to sign.

11      Q.      Did you ever speak to your sister

12  about this document after it had been drafted?

13      A.      Yes.

14      Q.      Okay.  When was that?

15      A.      Sometime after, a day or two after.

16      Q.      After what?

17      A.      After she signed it --

18      Q.      Oh.

19      A.      -- maybe even the same day.

20      Q.      So between the time it was

21  drafted --

22      A.      Right.

23      Q.      -- and the time that she signed

24  it --

25      A.      Right.

```
 1                           GENGER
 2        Q.       -- you had no conversations with
 3   your sister about this document at all?
 4        A.       I did not say that.
 5        Q.       Okay.  Did you have any
 6   conversations with your sister?
 7        A.       I just don't remember.
 8        Q.       Did you have any conversations with
 9   your father about this document between the
10   time it was drafted and the time it was signed?
11        A.       I don't remember.
12        Q.       Did you have conversations with
13   anyone about this -- this document, and we're
14   talking about Page 1 --
15        A.       Right.
16        Q.       -- of Exhibit S, between the time
17   the document was drafted and the time the
18   document was signed?
19        A.       Everyone who was at the closing
20   table.
21        Q.       Okay.  So you had a conversation
22   with Carol Schepp about this document?
23        A.       Carol Schepp, my mother, Ed
24   Klimerman, David Parnes.
25        Q.       Okay.  Please tell me about your
```

```
 1                          GENGER
 2     conversations with Carol Schepp about Page 1 of
 3     Exhibit S.
 4          A.        The conversation was that this was
 5     the arrangement; that unfortunately Ed did not
 6     have a proper power of attorney to deal with
 7     this on the 30th; that I had spoken to my
 8     sister and that she would, you know, back me
 9     for half of whatever has to be done; and that
10     we'll draft a document to reflect that.
11          Q.        Okay.  And what did she say to you?
12          A.        I don't think she cared.  I think
13     it was just Ed that had to do something.
14          Q.        When was this conversation?  When
15     did it take place?
16          A.        Around the closing table, so that's
17     the 30th, 31st.
18          Q.        Oh, so it was on that day?
19          A.        Yeah.
20          Q.        So did she know about the document
21     before the actual closing on the 30th?
22          A.        Did who know?
23          Q.        Carol Schepp.
24          A.        Carol Schepp had drafted various --
25     various forms of the promise beforehand.
```

20-01303-jlg-4-cv-01204-KBF Filed 07/15/2045 Entered 07/15/20 00:28:31 Exhibit I

1                              GENGER

2          Q.       Okay.   We're talking about Page 1,

3      this document.

4          A.       No, no -- because what -- what

5      Carol was envisioning is that there would be

6      one -- Page 2, that there would be two sister

7      documents, one reflecting my part and one

8      reflecting my sister's part, but that -- that's

9      not how matters got arranged.

10                   So the -- the -- the need for

11     this -- I guess there was some sort of

12     misunderstanding, but I guess the need for this

13     document came about on October 30th, you know,

14     to have this specifically drafted.

15                   MS. WACHTLER:   I'm sorry.   Which

16          specifically?   Are you talking about Page 1

17          or 2?

18                   THE WITNESS:   Page 1.   Page 1, yes.

19         Q.       Okay.   Carol Schepp originally

20     envisioned a single document?

21         A.       Well, no, two -- two documents that

22     looked like Page 2, one signed by me and one

23     signed by my sister.

24         Q.       Okay.   Are there any drafts that

25     reflect this?

```
 1                          GENGER
 2       A.       Not -- I don't think I have, but
 3    there were drafts, I'm sure, at the time.
 4       Q.       Were there drafts circulated that
 5    reflected this idea that there would be two
 6    identical documents like Page 2?
 7       A.       I don't remember.
 8       Q.       Do you have copies --
 9       A.       I don't --
10       Q.       -- of any drafts?
11       A.       I could check, but I doubt it.
12       Q.       Do you have copies of any e-mails
13    that refer to this original idea --
14       A.       I can go back and check if you guys
15    want, but it's a long time ago.  It's ten years
16    ago.
17              MR. LEINBACH:  All right.  At this
18       time I would like to ask that any documents
19       that relate to drafts of either Page 1 or
20       Page 2 of Exhibit S be produced to us.
21              MR. DELLAPORTAS:  We'll take it
22       under advisement.
23              MR. LEINBACH:  And with that, of
24       course, any e-mails referring to any drafts
25       of these documents.
```

1                              GENGER

2                    MS. WACHTLER:  We'll join in that

3        request.

4    BY MR. LEINBACH:

5        Q.        Okay.  Do you remember anything

6    else about your conversation with Carol Schepp

7    about Page 1 of this document?

8        A.        No.  It was really more of a

9    discussion with Ed.

10       Q.        Okay.  Do you know if Page 1 of

11   Exhibit S was circulated in draft form along

12   with the divorce stipulation?

13       A.        No, it wasn't.  It wasn't drafted

14   at that time.

15       Q.        Okay.  Do you know if Page 1 was

16   circulated to Arie or Arie's lawyers?

17       A.        It for sure was.

18       Q.        A draft?

19       A.        His lawyers wrote it, so . . .

20       Q.        Okay.  Okay.  You said that you had

21   conversations with everyone at the divorce.

22                 So let's go to Ed Klimerman.  Tell

23   me about your conversations with Ed Klimerman

24   regarding Page 1 of Exhibit S.

25       A.        That it -- that it needed to exist;

```
 1                        GENGER
 2   that we expected that he would have already had
 3   it prepared.
 4       Q.       Okay.  Why did this document need
 5   to exist?
 6       A.       Because Orly and I agreed to split
 7   things 50-50, and that either this had to exist
 8   or to take the underlying document and split it
 9   in two, but in any case, her commitment was to
10   split things with me 50-50 --
11       Q.       Okay.
12       A.       -- and that I was somewhat
13   surprised that he didn't have a power of
14   attorney to do that.
15       Q.       Did Mr. Klimerman tell you that he
16   had spoken with Orly about the document?  And
17   we're talking about Page 1 --
18       A.       I don't remember.
19       Q.       -- Exhibit S?
20       A.       I don't remember.
21               You mean about the concept, not of
22   the document itself?
23       Q.       In sum or in substance.
24       A.       Yeah, I don't remember.
25       Q.       Do you know if Ed Klimerman ever
```

1                          GENGER

2    spoke with Orly about Page 1 in sum or in

3    substance?

4        A.      I believe he did.

5        Q.      Okay.  And what's the basis of your

6    belief?

7        A.      It's my recollection that when she

8    got it, she consulted either Ed or my father,

9    and I believe it was Ed.

10       Q.      Okay.  You say when she got the

11   document.  What are you talking about?

12       A.      Before she signed it, I believe

13   that she consulted with either my father or

14   Mr. Klimerman.

15       Q.      Okay.  Why do you -- what's your

16   basis for that belief?

17       A.      I remember being told that at the

18   time.

19       Q.      By whom?

20       A.      By David Parnes.

21       Q.      David Parnes told you that Orly had

22   spoken with your father or Klimerman about the

23   document?

24       A.      Something like that.

25       Q.      Okay.  How did David Parnes know?

```
 1                        GENGER

 2      A.      I don't know.  I'm not in his head.

 3      Q.      Okay.  You've --

 4      A.      That's what I -- that's what I

 5   remember him telling me.

 6      Q.      Okay.  So you're -- is it fair to

 7   say that your only reason for believing that

 8   your sister knew or talked with Ed about this

 9   document is David Parnes?

10      A.      Well, Ed was her lawyer.  He

11   drafted it.  So I mean, I would imagine that he

12   speaks to his client about --

13              MS. WACHTLER:  I'm sorry.  Ed was

14      whose lawyer?

15              THE WITNESS:  Orly's lawyer.

16      Q.      Ed was Orly Genger's lawyer?

17      A.      Yeah.

18      Q.      Okay.

19      A.      Absolutely.

20      Q.      And did Ed Klimerman ever speak to

21   you about conversations that he had with Orly?

22      A.      No.

23      Q.      Okay.  Do you know if he ever had

24   any conversations with Orly?

25      A.      On any topic ever?
```

```
 1                          GENGER
 2       Q.        No.  Did he ever have conversations
 3    where he spoke to Orly about legal matters?
 4       A.        About this document?
 5       Q.        Yeah.
 6       A.        I don't know what -- what he does
 7    or doesn't discuss with Orly.
 8       Q.        I'll make it broader.
 9                 Do you know if Orly Genger and Ed
10    Klimerman ever had discussions where she asked
11    him for legal advice, ever?
12       A.        In front of me?
13       Q.        No.  Ever.
14       A.        In any context?
15       Q.        Yes.
16       A.        Yes.
17       Q.        Okay.  What were those
18    conversations?
19       A.        They weren't in front of me.
20       Q.        Okay.  What were they about?
21       A.        Well, I know he had a power of
22    attorney from her.
23       Q.        Okay.  That's not what we're
24    talking about.  We're -- I'm asking you:  Do
25    you know if Orly Genger ever sought legal
```

```
 1                          GENGER
 2    counsel from Ed Klimerman, ever?
 3        A.      I believe she has.
 4        Q.      Okay.  What's your basis for that
 5    belief?
 6        A.      She testified that he was her
 7    lawyer, and she -- he had powers of attorney
 8    for her, and he was the family attorney, and
 9    there would be no one else to represent her.
10        Q.      Okay.  When -- she testified to
11    this when?
12        A.      And on top of that, he also
13    represented her -- at least Sonnenschein
14    represented her in connection with the
15    correction of D&K LP.  So there are certain
16    instances.
17        Q.      Let's break this down.
18                She testified that -- when did she
19    testify?
20        A.      One of the billion depositions that
21    we've had here.
22        Q.      Okay.  That we've had here?
23        A.      In the various Genger litigations.
24    I don't remember.
25        Q.      Okay.  She testified that Ed
```

```
 1                         GENGER

 2    Klimerman was her lawyer?

 3         A.      Yeah, best as I recall.

 4         Q.      Do you know if I was counsel in any

 5    of these litigations?

 6         A.      I remember that John was asking the

 7    question.  I don't remember who --

 8         Q.      John, John Dellaportas --

 9         A.      I believe so, yeah.

10         Q.      -- was asking questions about

11    Orly's being represented by Ed Klimerman?

12         A.      Yeah.

13         Q.      Okay.

14         A.      That's what I recall.  We can

15    always go back to the transcripts.

16         Q.      Okay.  Okay.  So you say Orly

17    consulted with either Ed Klimerman or your

18    father about the document.

19                 Did Orly ever tell you about

20    conversations between him and your father or

21    her and your father?

22         A.      All I can remember her is saying

23    that she was very grateful that I was able to

24    make this happen and just enormous gratitude on

25    her part.
```

```
 1                        GENGER
 2        Q.        Okay.  And that was after --
 3        A.        After this thing was all wrapped
 4   up.
 5        Q.        -- the document was signed?
 6        A.        Yeah.
 7        Q.        Okay.  After the document was
 8   signed, she acknowledged to you that she had
 9   signed the document?
10        A.        Yes, actually now that you -- yes.
11        Q.        She did?
12        A.        She did, yes.
13        Q.        She told you, "Sagi, you know that
14   indemnity document, I signed it"?
15        A.        No.  No, it wasn't like that.  It's
16   like she talked to me, "Now all the documents
17   have been signed, I've taken care of it, and,
18   Sagi, I just want to thank you for all the hard
19   work in helping to make all this happen."
20        Q.        Okay.  So she told you the document
21   was signed and she thanked you?
22        A.        Yes.
23        Q.        Do you know when this conversation
24   took place?
25        A.        Somewhere abouts mid November.
```

```
 1                        GENGER
 2       Q.       Okay.  Mid November.
 3                Was it in person?
 4       A.       Yes.
 5       Q.       Okay.  Where was it?
 6       A.       I think -- I think it's the diner
 7   around from her apartment at the time.
 8       Q.       Okay.  You met her at a diner
 9   around the corner?
10       A.       If I -- if I remember correctly,
11   yeah.
12       Q.       Okay.  Diner near her apartment?
13       A.       I just say that because we would
14   meet there -- that's where we would regularly
15   meet.
16       Q.       Okay.  Did you have any other
17   conversations with Orly Genger about this
18   document after it was signed?  When I say --
19                MS. WACHTLER:  I'm sorry.  I don't
20        mean to interrupt, but when was this?  Mid
21        November of what year?
22                MR. LEINBACH:  I should have --
23                THE WITNESS:  I'm sorry.  2004.
24       Q.       Okay.  Did you have any other
25   conversations with Orly Genger about Page 1 of
```

```
 1                        GENGER
 2   this document?
 3       A.      No.  I think it went -- we all
 4   thought it would have no meaning.
 5       Q.      Okay.  Have you ever produced a
 6   signed copy of Page 1 of Exhibit S in any
 7   litigation prior to 2014?
 8       A.      There's the arbitration we
 9   discussed.
10       Q.      Okay.  So --
11       A.      I don't remember -- I know I
12   discussed with them the promise.  I don't know
13   that I discussed with them the indemnity.  I
14   just don't remember.
15       Q.      During the arbitration before Judge
16   Milonas, you spoke to someone -- or I take that
17   back.  Strike that.
18               I think what you're saying is
19   during the arbitration with Justice Milonas,
20   you produced this document?
21       A.      For sure Page 2.
22       Q.      But we're talking about Page 1.
23       A.      I don't remember.
24       Q.      You don't remember?
25       A.      I don't remember.
```

```
 1                      GENGER
 2       Q.       So when you spoke with Frank
 3   Velie --
 4       A.       Yeah.
 5       Q.       -- about Page 2 --
 6       A.       Yes.
 7       Q.       -- this promise document, you don't
 8   know whether you spoke to him about the
 9   indemnity that went with it?
10       A.       I don't remember.
11       Q.       Okay.  Did he ask you whether your
12   sister had any responsibility to pay?
13       A.       I don't remember.
14       Q.       Because you see Page 2 says "my
15   sister and I"?
16       A.       That's right.
17       Q.       He didn't ask you about that?
18       A.       I don't recall him asking about it.
19       Q.       Did you have any other -- can you
20   recall any other conversations with anyone
21   besides the people that were at the -- I'm
22   sorry, let's clean that up.
23                The people that were at the closing
24   of the divorce stipulation were Carol Schepp --
25       A.       Yeah.
```

```
 1                         GENGER
 2        Q.       -- Ed Klimerman and David Parnes?
 3        A.       Right.
 4        Q.       Your mom and your dad were there as
 5   well?
 6        A.       No, my father was not there.
 7        Q.       Your father was not there.  That's
 8   right.
 9                 Your mom was there?
10        A.       Yes.
11        Q.       Did you have any conversations with
12   your mom about this document?
13                 MR. MEISTER:  When you say "this
14        document," you hit the table --
15        Q.       Meaning Page 1 --
16        A.       Page 1.
17        Q.       -- of Exhibit S.
18        A.       That it exists?  Yes.
19        Q.       Okay.  Anything else?
20        A.       I mean, I guess there was -- there
21   was discussion in preparation for a settlement
22   conference, but I was instructed last time not
23   to talk about that, so . . .
24        Q.       Okay.  Do you recall any
25   conversations with David Parnes about Page 1 of
```

<pre>
 1                         GENGER
 2    Exhibit S?
 3         A.       Sure.   Yeah.
 4         Q.       Okay.   When were these
 5    conversations?
 6         A.       I recently had conversations with
 7    him about it.
 8         Q.       Okay.   But what about, say, between
 9    2004 and now?
10         A.       It would certainly make sense that
11    I discussed it with him, but I don't remember
12    exactly the conversations.
13         Q.       Okay.   And just so we're clear.
14    I'm not sure why I didn't understand it before.
15                  Why was it that David Parnes
16    originally was in possession of the originals?
17    Why was that?
18         A.       Because --
19                  MR. MEISTER:   Possession of the
20         originals of what?
21                  MR. LEINBACH:   The originals of --
22                  MR. MEISTER:   -- the first page?
23                  MR. LEINBACH:   Both, actually,
24         because he had both of them.
25         A.       Because he -- he -- the documents
</pre>

```
 1                          GENGER
 2     had to be for -- while they may not have been
 3     signed at the same time together, they were
 4     basically had to be held in abeyance until the
 5     second -- until the indemnity was signed.
 6          Q.      Okay.  And -- wait.  Until the
 7     indemnity was signed?
 8                  Until this document was signed?
 9                  MR. DELLAPORTAS:  Page 1 of Exhibit
10          S.
11          A.      Until Page 1 was signed, right.  So
12     he --
13          Q.      Page 1, I'm sorry.  I'm gesturing.
14          A.      Right.  So he held Page 2 --
15          Q.      Right.
16          A.      -- and, like, the understanding was
17     that my sister would sign Page 1.  And
18     afterwards he -- he held -- so he held Page 2
19     until Page 1 was executed.
20          Q.      Okay.
21          A.      And maybe also afterwards.  I don't
22     remember.
23          Q.      Okay.  Do you know whether your mom
24     has made any demands under Page 2 of this
25     promise document?
```

```
 1                            GENGER

 2        A.        Yes.

 3        Q.        Has she made any demands for money?

 4        A.        Yes.

 5        Q.        When?

 6        A.        A couple of weeks ago.

 7        Q.        Okay.  She made a demand for how

 8   much?

 9        A.        $200,000.

10        Q.        Okay.  Did you pay that?

11        A.        Yes.

12        Q.        How did you pay it?

13        A.        It was by check.

14        Q.        Check from the personal account of

15   yours?

16        A.        Yes, yes.

17        Q.        So an account in the name of Sagi

18   Genger, and you wrote a check from that

19   account?

20        A.        It would be a joint account with my

21   wife.

22        Q.        Okay.  Were there any other

23   demands?  Have there been any other demands?

24        A.        No, not formal demands, no.

25        Q.        Any informal demands?
```

```
1                          GENGER
2        A.      She -- I guess the answer is no.
3        Q.      So this is the only formal or
4    informal demand?
5        A.      It's a fair answer.
6        Q.      Is it a correct answer?
7        A.      It's very difficult.  You
8    know, she's never before said, "I have this
9    document, please give me money."  That's . . .
10       Q.      Okay.
11               MR. LEINBACH:  Let's mark this as
12       exhibit -- what are we on?  This is T?
13               THE COURT REPORTER:  Yes.
14                   (Sagi Exhibit T, Exhibit C to Sagi
15               Genger's Reply Affidavit, was marked for
16               identification.)
17                   (Discussion off the record.)
18               MR. LEINBACH:  The first page is
19       Exhibit C because -- and I'm going to
20       represent to you -- that this was Exhibit C
21       to an exhibit that you submitted.
22               MR. DELLAPORTAS:  Fine.
23               THE WITNESS:  Fine.
24               I -- I didn't see that this --
25               MR. LEINBACH:  That's what I wanted
```