# EXHIBIT L

2020-01-01 jg jlg Doc 423-1 Filed 06/25/20 Entered 06/25/20 30:49:31 Exhibit KBT
Deposition Page 2 of 79  Pg 2 of 79
MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                          1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ---------------------------------------------

 3   SAGI GENGER,

 4                          Third-Party Plaintiff,

 5              -v-     Civil Action No. 1:17cv8181

 6   ORLY GENGER,

 7                          Third-Party Defendant.

 8   ---------------------------------------------

 9

10           DEPOSITION OF MICHAEL BOWEN, a Witness

11   herein, taken by the Plaintiff, at the offices of

12   KELLEY DRYE & WARRREN LLP, 101 Park Avenue, 27th

13   Floor, New York, New York 10178, on Friday, October

14   5, 2018, at 10:00 a.m., before Jeffrey Shapiro, a

15   Shorthand Reporter and notary public, within and

16   for the State of New York.

17

18

19

20

21

22

23

24

25
```



```
 1   A P P E A R A N C E S :

 2   KELLEY DRYE & WARREN LLP

 3   Attorneys for SAGI GENGER

 4   101 Park Avenue, 27th Floor

 5   New York, New York 10178

 6   BY:  JOHN DELLAPORTAS, ESQ.

 7

 8

 9   Also Present:

10   Sagi Genger

11

12                        ***

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1

 2

 3              IT IS HEREBY STIPULATED AND AGREED by

 4    and between the attorneys for the respective

 5    parties hereto, that the filing, sealing and

 6    certification be, and the same are hereby waived;

 7

 8              IT IS FURTHER STIPULATED AND AGREED

 9    that all objections, except as to the form of the

10    questions, shall be reserved to the time of the

11    trial;

12

13              IT IS FURTHER STIPULATED AND AGREED

14    that the within examination may be subscribed and

15    sworn to before any notary public with the same

16    force and effect as though subscribed and sworn to

17    before this Court.

18

19

20

21

22

23

24

25
```



MICHAEL PAUL BOWEN                                          October 05, 2018
SAGI GENGER -v- ORLY GENGER                                                4

```
 1   Whereupon,

 2                         MICHAEL BOWEN,

 3   after having been first duly sworn, was examined

 4   and testified as follows:

 5                      DIRECT EXAMINATION

 6   BY MR. DELLAPORTAS:

 7          Q.    State your name for the record.

 8          A.    Michael Paul Bowen.

 9          Q.    What is your address?

10          A.    My work address is 1633 Broadway, New

11   York, New York 10019.

12                (Exhibit 1 was so marked for

13           identification.)

14   BY MR. DELLAPORTAS:

15          Q.    Good morning, Mr. Bowen.

16          A.    Good morning.

17          Q.    So I've marked as Exhibit Kasowitz 1,

18   the subpoena in this case for Kasowitz Benson &

19   Torres, LLP.

20          Mr. Bowen, you're here as the corporate

21   witness for Kasowitz Benson & Torres, LLP?

22          A.    Yes.  The witness for the entity

23   Kasowitz, Benson, & Torres.

24          Q.    And if I just refer to it for

25   shorthand as Kasowitz, you will know I'm referring
```



1                         Bowen

2     to the firm?

3              A.    Sure or KBT.

4              Q.    Yeah, I'll never remember that.

5     Let's go with Kasowitz, but you can refer to it as

6     KBT if you prefer.

7          So you have a subpoena in front of you?

8              A.    I do.

9              Q.    If you can turn to Exhibit A.

10             A.    Yes.

11             Q.    And, specifically, the document

12    request on subject matters?

13             A.    Yes.

14             Q.    Do you see numbers one through nine?

15             A.    Correct.

16             Q.    Did you undertake a search on behalf

17    of the firm to see what documents you had?

18             A.    Yes.

19             Q.    And can you describe that search or

20    that process?

21             A.    I made a reasonable inquiry and also

22    used my own intimate knowledge of the firm's role

23    in connection with all things Genger.

24             Q.    And you have produced in response to

25    that one document entitled, "First Amendment to



```
 1                        Bowen

 2      Settlement Agreement and Release"; is that

 3      correct?

 4            A.    Correct.  And I think that's

 5      responsive to Request No. 4.

 6                  MR. DELLAPORTAS:  Okay.  So let's

 7            mark that as Kasowitz Exhibit 2.

 8                  (Exhibit 2 was so marked for

 9            identification.)

10   BY MR. DELLAPORTAS:

11            Q.    So, other than this, you have no

12      responsive documents?

13            A.    That's correct.

14            Q.    Was anything withheld on privilege

15      grounds?

16            A.    Yes and no.  Excuse me.

17            Yes and no, because the primary objection is

18      relevance, although some documents that we deemed

19      irrelevant would also be privileged or at least

20      some of them are.

21            Q.    And when you say the primary

22      objection, where were those objections interposed?

23            A.    We can go through them all, but if

24      you take No. 4 as an example, "All documents

25      concerning the attached stipulation and the
```



|   |   |
|---|---|
| 1 | Bowen |
| 2 | attached first amendment to stipulation and |
| 3 | release," that would involve documents, for |
| 4 | example, of e-mail of either drafting this thing |
| 5 | or circulating it for signature.  And in our view |
| 6 | that's irrelevant. |
| 7 | Q.    Why is that irrelevant in your view? |
| 8 | A.    It's irrelevant because it has |
| 9 | nothing to do with identifying assets that belong |
| 10 | to Orly Genger or assets that are to be paid to |
| 11 | Orly Genger. |
| 12 | Q.    And has Kasowitz served any written |
| 13 | objections in response to the subpoena? |
| 14 | A.    No.  We are interposing the |
| 15 | objections orally. |
| 16 | Q.    So why don't we go through and you |
| 17 | can tell me what specifically are your objections? |
| 18 | Let's start with No. 1 -- if any. |
| 19 | A.    Well, we object to it as overbroad |
| 20 | and irrelevant because, again, to the extent the |
| 21 | firm has any knowledge of any agreements where |
| 22 | Orly Genger owes money or is a debtor, it's |
| 23 | irrelevant to property that -- or assets that she |
| 24 | owns or that are to be paid to her.  So it's |
| 25 | beyond the scope of Article 52. |



1                        Bowen

2          On the other hand, if there are documents or

3     agreements that reflect assets owned by Orly

4     Genger or that are to be paid to Orly Genger, that

5     would be responsive and we think relevant and we

6     undertook a search for that and there are none.

7          Q.    Okay.  Number 2.  Do you have

8     objections to No. 2?

9          A.    No.  I think that's completely

10    responsive.  That states, quote, "All documents

11    concerning any property held by or debts owed to

12    Orly Genger."  We -- the firm has no documents

13    responsive to that, but we interpose no objection

14    to that.

15         Q.    Okay.  What about No. 3?  Any

16    objections to that?

17         A.    "All documents relating to the

18    settlement agreement -- " Right.

19         Well, we object to you using the phrase

20    "Orly Settlement Agreement" to define that because

21    it's misleading and confusing.  It's not an Orly

22    Settlement Agreement.  What you are referring to

23    is a settlement agreement between the AG Group and

24    the Trump group and it's usually referred to as

25    the "AG/Trump Settlement Agreement."



MICHAEL PAUL BOWEN                              October 05, 2018
SAGI GENGER -v- ORLY GENGER                                    9

1                        Bowen

2          And because of that agreement or, quote,

3    unquote, "all documents relating to that

4    agreement," has nothing to do with property owned

5    by Orly Genger or property or assets to be paid to

6    Orly Genger.  That entire request, at least

7    Subpart A, is irrelevant.

8          Q.    Why in your -- I'm sorry.  I didn't

9    mean to cut you off.

10         A.    Okay.  Subpart B, "any escrow

11   accounts, arrangements, to the extent that it was

12   for the benefit of Orly Genger" meaning the escrow

13   assets belong to her or are to be paid to her, we

14   deem that relevant and would produce responsive

15   documents if any, but I can attest today that

16   there are none.

17         And the same with Subsection C, "any

18   promissory notes issued thereunder."  So if there

19   were any promissory notes in the possession,

20   custody, or control of Kasowitz that were payable

21   to Orly Genger or reflected assets that she owns

22   or that are due to be paid to her, we'd deem that

23   responsive and would produce any documents if any.

24   But I can attest here today that we are in

25   possession of none; no such documents.



```
1                          Bowen

2        Q.    Okay.  We'll circle back to that.

3   Let's move on.  Let's go through the list first.

4        A.    Okay.  Number 4, I have already spoke

5   about unless you want me to reiterate it.

6        Q.    So you have given us the first

7   amendment and the stipulation itself, but you

8   haven't given us any documents related to what you

9   are interposing and irrelevance objection?

10       A.    Correct.

11       Q.    Number 5?

12       A.    Which states, quote, "All agreements

13  as to the past, present, or future disposition of

14  any settlement proceeds under the Orly settlement

15  agreement," close quote.

16       Again, we object to that phrase Orly

17  settlement agreement as misleading and potentially

18  misleading and potentially false.

19       But if you are referring to the AG/Trump

20  Settlement Agreement, which we think you are, if

21  there were agreements that reflected assets owned

22  by Orly or to be paid to Orly under that

23  settlement agreement or in relation to that

24  settlement agreement, that's relevant in our view

25  and we would produce such documents if any
```



```
 1                        Bowen

 2    existed.  And we did search for such documents,

 3    but I can attest, on behalf of the firm, there ae

 4    no such documents in our possession, custody, or

 5    control.

 6         Q.    Let's go to No. 6.  Any objections to

 7    that?

 8         A.    Quote, "all accounts, statements for

 9    any escrow accounts related to the" -- what you

10    call the "Orly Settlement Agreement."

11         Again, the same objection as misleading,

12    intentionally so, but the AG/Trump Settlement

13    Agreement.  If there were account statements for

14    escrow accounts that reflected assets owned by

15    Orly or to be paid to Orly Genger, we would

16    produce those, but I can attest that we're not,

17    you know, we're not in custody, possession, or

18    control of any such accounts.

19         In fact, I don't mind telling you that we

20    are not in possession, custody, or control of any

21    account statements or any escrow accounts relating

22    to the AG/Trump Settlement Agreement, period.

23         Q.    Okay.  Number 7.  Do you have any

24    objection to that?

25         A.    Quote, "All documents concerning any
```



1                          Bowen

2    indemnity demands and/or indemnity payments made

3    under the Orly settlement agreement."  The same

4    objection as using that phrase to be potentially

5    misleading.

6         We read that as referring to the AG/Trump

7    Agreement.  It is kind of a vague, ambiguous

8    objection there.  I'm not really sure what you are

9    asking.  Maybe you can clarify that today, but I

10   can say we're not aware of any -- the firm is not

11   aware of indemnity demands and/or indemnity

12   payments related to the AG/Trump Settlement

13   Agreement period.

14        But we would deem, if we were aware or had

15   such documents and they reflected Orly's assets or

16   assets to be paid to Orly, we would deem that

17   relevant and responsive.

18        But like I said, I can go beyond that and

19   say we are not aware of any indemnity demands,

20   period.  But that is subject to you clarifying

21   what you really meant by that.  I may be

22   misinterpreting that.

23        Q.   We will come back to that, let's just

24   get through our list.

25        Number 8.  Any objections to that?



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        13

```
 1                      Bowen

 2        A.    Quote, "All payments made to any

 3   person or entity pursuant to the Orly Settlement

 4   Agreement."  The same objection as intentionally

 5   misleading by referring to it as the "Orly

 6   Settlement Agreement" it is the AG Group/Trump

 7   Group Settlement Agreement.

 8        With that understanding, if we had records,

 9   meaning the firm, of payments to Orly or that were

10   to be paid to Orly in relationship to that -- in

11   relation to that particular settlement agreement,

12   but this is also subsumed under your first

13   request, those documents, in our view, would be

14   responsive and relevant and we would produce them,

15   if any.

16        To the extent that you are asking about

17   other people that -- that are not Orly or that

18   don't reflect assets owned by her or to be paid to

19   her, we would object that that is beyond the scope

20   of Article 52 and irrelevant and not responsive.

21        Having said all of that, on behalf of the

22   firm, I can attest that there are -- the firm is

23   in possession of no records whatsoever of any

24   payments made under this AG/Trump Settlement

25   Agreement.
```



```
 1                          Bowen

 2         Q.    Lastly, No. 9, "All non privileged

 3   communications regarding any of the forgoing

 4   subjects."

 5         A.    Everything I said previously would

 6   apply to that.

 7         Q.    Incorporate all of your prior

 8   objections?

 9         A.    Right.  Obviously, you're -- you're

10   subpoenaing a law firm that represents Orly

11   Genger.  Every single one of these requests could

12   impinge upon privilege; so it could be the case

13   that there are e-mails and other types of

14   documents that would be attorney-client privilege

15   and work-product privilege, and we're not

16   undertaking to do a log because we think that is

17   overly burdensome and bordering on harassment.

18         And when you subpoena a law firm that

19   represents a person that you are adverse to, I

20   assume you're expecting a lot of it to be

21   privileged.

22         Q.    So, other than what you have just

23   stated, does Kasowitz have any further objections

24   to Nos. 1 through 9?

25         A.    I don't think so.
```



MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

| | Bowen |
|---|---|
| 1 | |

1                          Bowen

2          Q.     Let's go back to No. 7, because that

3     one, I think, you asked for clarification on?

4          A.     Correct.

5          Q.     Have you read the -- what you refer

6     to as the AG/Trump Settlement Agreement?

7          A.     Only in part and a long time ago.

8          Q.     Okay.  Are you aware that there are

9     two promissory notes that were issued pursuant to

10    the Trump Group -- AG/Trump Group Settlement

11    Agreement for $7.5 million each?

12         A.     There are promissory notes by the

13    Trump Group if I am remembering correctly, yes.

14         Q.     Okay.  And those payments, to the

15    best of your knowledge, have not been made yet;

16    correct?

17         A.     To the best of the firm's knowledge

18    -- I mean, the firm had no knowledge of that

19    whatsoever.

20         Q.     Okay.  Do you recall in reading the

21    agreement that the Trumps have certain rights to

22    deduct defense costs and other related legal costs

23    for indemnification and whatnot?

24         A.     Correct, yes.

25         Q.     From those ultimate payments of $15



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        16

```
 1                       Bowen
 2    million?
 3           A.    That's my understanding, yes.
 4           Q.    Okay.
 5           A.    And when I say "my" I mean on behalf
 6    of the firm.
 7           Q.    Yeah.  I'll just -- everything from
 8    this point forward, I will have an understanding
 9    if you say "my" you mean the firm and if I say
10    "you" I mean the firm.
11           A.    If there are any singular pronouns, I
12    mean, I'm speaking with the royal we.
13           Q.    Yeah.  I'll assume the royal we
14    unless you specify other words and you can assume
15    from me the royal we unless I specify you
16    personally?
17           A.    Understood.
18           Q.    So with that clarification, do you
19    have any documents responsive to that demand?
20           A.    Well, with that clarification, the
21    firm is unaware of any documents relating to those
22    two promissory notes or the Trump Group's claim of
23    offset on promissory notes that relate to assets
24    owned by Orly or to be paid to Orly.
25           Q.    Okay.  So you have intentionally
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        17

                                Bowen

1

2    narrowed the request to your view of anything

3    that's relating to payments to be made to Orly?

4         A.    Or that reflects assets she owns.

5         Q.    Okay.  And why in your view would

6    indemnity demands by the Trump Group not relate to

7    any assets owned by Orly or to be paid to Orly?

8         A.    You are dealing with the scope of the

9    firm's understanding of this, so with that caveat,

10   the payments that are due under the AG/Trump

11   Settlement Agreement, and under those two

12   promissory notes, are to the AG Group and not to

13   Orly.

14        Q.    Okay.

15        A.    If there is some arrangement within

16   the AG Group that allocates any portion of the

17   payments to Orly, the firm is unaware of it.

18        Q.    Is the firm aware of any arrangement

19   with respect to the payment of the remaining

20   proceeds at all?

21        A.    My hesitation in answering that

22   question is that it may be impinging on privileged

23   information.  To the extent that we have that

24   information, it would be in the attorney-client

25   relationship with Orly.  And I'm not at liberty to



```
 1                      Bowen
 2   waive privilege, so I would assert privilege as to
 3   that question on behalf of Orly Genger as the
 4   owner of the privilege.
 5          Q.    Well, you declined to produce
 6   documents responsive to our requests on the ground
 7   that Kasowitz affirmatively takes the position
 8   that there is no arrangement that Orly will get
 9   any of that money.  Do I understand that
10   correctly?
11          A.    No.  You misstated my testimony.
12   It's not that we affirmatively understand that
13   Orly is not getting any of that money, it's that
14   the Kasowitz has no information.
15          Q.    Does that include Mr. Hirschman when
16   you say, "Kasowitz has no information"?
17          A.    Well, Mr. Hirschman is Orly Genger's
18   spouse, so he may have information qua spouse, but
19   not as a partner in the firm.  And I frankly don't
20   know what is in his head.
21          Q.    Okay.  So nobody in -- in making the
22   decision not to produce documents responsive to
23   this request on the ground that Orly wasn't
24   getting any of the money, nobody asked
25   Mr. Kasowitz as to his knowledge of the ultimate
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        19

```
 1                      Bowen

 2    disposition of the $15 million?  I'm sorry,

 3    Mr. Hirschman?

 4          A.    I understood you meant Mr. Hirschman.

 5          Well, I'm not going to get into any

 6    methodology that I used in preparing for the

 7    deposition because that's privileged work product.

 8    I am testifying under oath that I made a

 9    reasonable inquiry and a reasonable search.  And

10    your question was -- I'm sorry.  I lost your

11    question.

12          Q.    In deciding not to produce documents

13    responsive to the subpoena on the ground that they

14    do not relate to payments ultimately to be made to

15    Orly Genger, did the firm inquire with its

16    partner, Mr. Hirschman, to confirm that in fact

17    none of the $15 million will ultimately be paid to

18    Orly Genger?

19          A.    Well, without specifying what

20    methodology I used to gather information

21    responsive to this subpoena, and to make decisions

22    about what is and is not responsive, I can testify

23    that to firm's understanding and to the firm's

24    knowledge, none of that money belongs to or is to

25    be paid to Orly Genger.
```



```
 1                        Bowen

 2          Q.    And is your position driven by the

 3    fact that on the face of the agreement it says

 4    that the money is to be paid to something called

 5    the "AG Group"?

 6          A.    I don't understand your question.

 7          Q.    What is the basis of your

 8    understanding that none of the money is to be paid

 9    to Orly Genger?

10          A.    The basis for the firm's

11    understanding is the knowledge, institutional

12    knowledge, that we have based on our review of

13    documents, some of which are privileged, and my

14    reasonable inquiry of the lawyers at the firm that

15    have been involved in the Genger matter since the

16    firm was originally involved.

17          And if you are asking me did we make some

18    kind of interpretation and are we just basing this

19    on the interpretation of one document, the answer

20    is no.

21          Q.    Okay.  And circling back to my

22    question:  Did anyone inquiry of Mr. Hirschman

23    about that?

24          A.    I'm not going to answer any questions

25    about methodology that I used on behalf of the
```



```
 1                          Bowen
 2    firm to be prepared to answer questions today
 3    because that's a protected work product.  But I am
 4    telling you and attesting under oath that I made
 5    reasonable inquiry.  I don't mind telling you that
 6    reasonable inquiry would involve communications
 7    with Mr. Hirschman.
 8          Q.    Is Mr. Hirschman currently a partner
 9    in the firm?
10          A.    Yes.
11          Q.    Is he an equity partner?
12          A.    I don't know what you mean by that.
13    I'm not sure what that means at my firm.  Now I'm
14    speaking personally, not on behalf of the firm.
15    The firm knows.
16          I did not do any reasonable inquiry on that
17    particular question, so I don't know the answer to
18    that.
19          Q.    Okay.
20          A.    It's beyond the scope.
21          Q.    Well, you know, every firm organizes
22    their partnership different from every other firm,
23    but in some cases the title "partner" is just a
24    title and in other cases it implies what I view as
25    more of an actual partnership which is an
```



```
 1                          Bowen
 2   ownership, and they share the profits and what
 3   have you.  So I don't know how Kasowitz organizes
 4   things, but to that extent, would you view
 5   Mr. Hirschman as a either an equity partner or a
 6   true partner or a profit sharing partner?
 7          A.    That is beyond the scope of what I'm
 8   prepared to attest to on behalf of the firm.  I
 9   honestly don't know the answer to that question.
10          Q.    Okay.  So who, in your view, is the
11   $15 million to be paid to?
12          A.    Well, the view of the firm is that
13   the money is to be paid into -- into, I guess, a
14   trust or into an escrow -- I forget how the
15   wording works -- into an escrow that's to be held
16   by me personally and in -- I shouldn't say
17   personally, but me in my capacity as partner with
18   the Kasowitz firm.  But the disposition of that
19   money, once -- if it is ever received -- is up to
20   the AG Group.
21          Q.    When you say, "the AG Group" what do
22   you mean by that?
23          A.    Well, the AG Group is defined in the
24   AG/Trump Settlement Agreement.
25          Q.    Let's go ahead and mark that as
```



MICHAEL PAUL BOWEN                                   October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        23

```
 1                      Bowen
 2    Kasowitz 3.
 3                (Exhibit 3 was so marked for
 4         identification.)
 5    BY MR. DELLAPORTAS:
 6         Q.    So if you look on the opening
 7    paragraph, there is the description of the AG
 8    Group.  Do you see that?
 9         A.    Yes.
10         Q.    When you refer to the AG Group are
11    you -- what you are referring to is consistent
12    with this definition?
13         A.    Yes.
14         Q.    And so the definition has the AG
15    Group including Arie Genger; is that right?
16         A.    Yes.
17         Q.    And Orly Genger?
18         A.    Yes.
19         Q.    And Arnold Broser?
20         A.    Yes.
21         Q.    And David Broser?
22         A.    Yes.
23         Q.    And it says, "In their individual
24    capacity on behalf of all entities managed, owned
25    or controlled in any way by Arnold or David Broser
```



2020-01-01 jg jg Doc 1423-13 Filed 06/25/20 Entered 06/25/20 30:49:31 Exhibit KBT
Deposition Transcript Pg 25 of 79 Pg 25 of 79
MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        24

1                           Bowen

2    and which are in any way relating to the subject

3    matter hereof."

4         Do you see that?  It's lines 4 and 5?

5         A.    Yes.  That's the -- you read the

6    parenthetical after David Broser?  Yes.

7         Q.    So, what entities are those?

8         A.    I have no idea.

9         Q.    You don't know any -- you don't know

10   the names of any entities associated with Broser?

11        A.    No.

12        Q.    Let's go back to Kasowitz 2 --

13        A.    Okay.

14        Q.    -- which is the first amendment.

15        A.    Right.

16        Q.    What are the circumstances by which

17   this came about?

18        A.    I'm not sure that's within the scope

19   of your subpoena, but I'm willing to give you some

20   leeway.

21        Q.    I think there is a whole category.

22        Well, all documents concerning any property

23   -- it's No. 4.  So you can answer, you can object,

24   but that's my question.

25        A.    Well, I object that it's outside the



|    |                                                |
|----|------------------------------------------------|
| 1  |                    Bowen                       |
| 2  | scope of the subpoena.  Your authority is to look |
| 3  | for assets that belong to Orly Genger or that are |
| 4  | to be paid to her.  I don't see how the context of |
| 5  | this first amendment has anything to do with that |
| 6  | for the reasons we just discussed.             |
| 7  |      Q.    Yet you produced it.                |
| 8  |      A.    Yes.  Yes, we did because you       |
| 9  | specifically asked for it and you produced a copy |
| 10 | to us but it was unsigned so we gave you the   |
| 11 | executed copy.                                 |
| 12 |      Q.    Okay.  And you would agree --       |
| 13 |      A.    Just so it's perfectly clear that you |
| 14 | have the operative document.                   |
| 15 |      Q.    Okay.  And you would agree with me, |
| 16 | wouldn't you, that this document contemplates an |
| 17 | eventually payment of up to $15 million to you; |
| 18 | correct?                                       |
| 19 |      A.    No.                                 |
| 20 |      Q.    No?  What does it do?  You tell me. |
| 21 |      A.    It is a mechanism for payment under |
| 22 | the AG/Trump Settlement Agreement that goes into |
| 23 | an escrow account that would be set up by me    |
| 24 | and/or the Kasowitz firm per direction from the AG |
| 25 | Group.                                         |



1              Bowen

2      Q.    And so when you say, "direction by

3  the AG Group," what would you consider to be

4  direction by the AG Group?

5      A.    I don't know how else to describe

6  what I just described.

7      Q.    Let's assume a year from now $15

8  million comes in.  What will it take for you to

9  make a payment to anyone of that $15 million?

10     A.    It would take direction from the AG

11 Group.

12     Q.    Meaning what?

13     A.    Meaning direction from the members of

14 the AG Group.

15     Q.    Meaning Arie Genger, Orly Genger, and

16 the two Brosers?

17     A.    That's how it's defined to the firm's

18 understanding in the relevant documents.

19     Q.    Okay.  So, the only way you will

20 release the proceeds at some -- if such proceeds

21 should come in the future -- is from a written

22 instrument signed by Arie Genger, Orly Genger,

23 Arnold Broser and David Broser?

24     A.    I don't know if there is a

25 requirement for a written instrument.  It may be



| | |
|---|---|
| 1 | Bowen |
| 2 | right.  I don't -- it's beyond the scope. |
| 3 | Q.    Well, let's say they all get on the |
| 4 | phone with you.  Let's take out writing. |
| 5 | A.    What is the question? |
| 6 | Q.    Is it correct that the only way you |
| 7 | will release the proceeds is if you are instructed |
| 8 | by all four of those individuals to do so in the |
| 9 | same manner? |
| 10 | A.    No, that is not correct. |
| 11 | Q.    How is it incorrect? |
| 12 | A.    There is no understanding that the |
| 13 | firm is aware of that it's a majority vote or a |
| 14 | consensus vote or anything like that.  It's |
| 15 | whatever -- whatever the agreement there is in and |
| 16 | among the members of AG Group, the firm has no |
| 17 | knowledge of that. |
| 18 | Q.    Is the AG Group a corporation? |
| 19 | A.    I have no idea. |
| 20 | Q.    A trust? |
| 21 | A.    I have no knowledge. |
| 22 | Q.    LLC? |
| 23 | A.    No knowledge. |
| 24 | Q.    When you say you are going to take |
| 25 | instructions from the AG Group, how is that going |



1                          Bowen

2    to be communicated to you?

3          A.    I think that's beyond the scope of

4    this deposition and beyond the scope of your

5    authority under Article 52.  With that objection,

6    and without waiving that objection, I'm really not

7    sure how to answer that question.

8          How would that be communicated to me.

9          Q.    Look, in a few days we are going to

10   go before a judge, just to be frank.  The judge is

11   going to want to know about this $15 million.  You

12   are the escrow agent for the $15 million.  Clearly

13   you know the circumstances under which you would

14   release the $15 million, so why don't you just

15   share this with me now so that you don't

16   unnecessarily annoy the federal judge?

17         A.    Is that a question?

18         Q.    It's a suggestion.  I've asked

19   several questions and you have been very

20   disingenuous.  Why don't you just try to answer

21   them.

22         A.    Look.  I don't understand why you are

23   making this into a hostile, ad hominem attack on

24   me.

25         Q.    I'm not making an ad hominem on you.



```
 1                      Bowen

 2        A.    I'm speaking on behalf of the firm.

 3   I have --

 4        Q.    You are saying you have $15 million

 5   and you --

 6        A.    Excuse me.  Let me finish.

 7        Q.    -- have no idea how it is going to.

 8   Do you understand how this is going to look when

 9   the judge sees this transcript?  I'm trying to

10   help because I don't want -- I don't need to make

11   unnecessary motions.  I'm just trying to collect

12   some money here.  I'm not trying to burden the

13   court.

14        A.    You interrupted my answer.  You spoke

15   over me so that the court reporter couldn't take

16   down what I was saying.

17        Q.    Knock yourself out.

18        A.    I'm not going to engage in this kind

19   of argumentative behavior.  I thought that we were

20   going to be here as two professionals talking in a

21   professional way.  You have immediately devolved

22   into your normal mode of behavior, which is ad

23   hominem attack and unreasonable speeches on the

24   record.

25        Everything you said I disagree with.  I have
```



MICHAEL PAUL BOWEN                                      October 05, 2018
SAGI GENGER -v- ORLY GENGER                                           30

```
 1                         Bowen

 2   been very clear about the scope of which I'm

 3   prepared to answer and the scope within which we

 4   think your subpoena is authorized.

 5        If you want to continue this, you must deal

 6   with me civilly.  If you do that again, I'm going

 7   to leave and then you can explain to the federal

 8   judge and you can go look at the ethical rules,

 9   the professional rules which require you to be

10   civil, why it was you weren't able to complete

11   this deposition.

12        Q.    I have been perfectly --

13        A.    Do you want to continue?

14        Q.    I have been perfectly civil with you.

15   Your answers, frankly, are an embarrassment.

16        A.    Don't characterize my answers.

17   That's not being civil.  Ask a question.  If you

18   have objections to my answers, you can proceed.

19        Q.    Please testify as to under -- what

20   circumstances you will release the proceeds

21   pursuant to the document where you are the escrow

22   agent?

23        A.    I have already testified.  This is

24   asked and answered -- I'll interpose that

25   objection -- at the direction of the AG Group.
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        31

```
 1                          Bowen

 2          Q.    What does that mean?

 3          A.    I don't know how else to explain it

 4    to you.

 5          Q.    What does it mean?

 6          A.    What do you not understand about it?

 7          Q.    Tell me what it means to be at the

 8    direction of the AG Group?

 9          A.    Well, first of all I object that this

10    is outside the scope of your subpoena.  If you had

11    a basis to say that some of that money is either

12    belongs to Orly Genger or is payable to Orly

13    Genger, you can make that showing and we can have

14    that discussion.

15          Q.    Well, I think we have a document

16    here --

17          A.    We'll probably have to -- excuse me.

18    I'm in the middle of my answer.

19          Q.    Okay.

20          A.    We'll probably have to litigate that,

21    but as of right now I see that outside of the

22    scope of your authority under Article 52 and

23    outside the scope of this subpoena.

24          However, without waiving that objection, I'm

25    willing to give you some latitude which is what I
```



2020401001jglglD DocD4o28-113FileEi6d/257115/2EnEntter26d/257115/2330:49:31 ExEbxhiKBiTKBT
Deposition TgarSsctipti779 Pg 33 of 79

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                          32

1                        Bowen

2    said and I'm willing to describe to you the firm's

3    understanding of how this mechanism works.

4         Q.    So please proceed.

5         A.    Well, I have already told you that

6    the AG Group has to give direction about how the

7    money is disbursed after it hits the escrow

8    account held by the firm.

9         Q.    Uh-huh.

10        A.    You asked me how is that direction

11   going to be communicated.  My response is, on

12   behalf of the firm, however the AG Group wants to

13   communicate it.  It can be in writing, it can be a

14   phone call.  It would have to be something that

15   could be documented I would assume just to, you

16   know, discharge our recordkeeping responsibilities

17   to show the flow of the money and, you know, 1099s

18   and whatnot.

19        And then you are asking me who can speak on

20   behalf of the AG Group whether it has to be all

21   four in consensus, whether it has to be a majority

22   vote, whether somebody else can speak on behalf of

23   the AG group and my answer is:  We don't have any

24   information about any agreements between the AG

25   Group.  We're not aware that there is any dispute



MICHAEL PAUL BOWEN                                October 05, 2018
SAGI GENGER -v- ORLY GENGER                              33

1                          Bowen

2    among the members of the AG Group, that there is

3    any agreement among the AG Group about who can

4    direct the money and who can't direct the money

5    maybe.  If that -- maybe that will become an issue

6    down the road but we are not aware of it.

7              Q.   Are you aware of anyone who is

8    authorized to speak on behalf of the AG Group?

9              A.   Well, my understanding is that the

10   members of the AG are reflected in Exhibit 3,

11   these four individual people, and then the

12   entities as you have pointed out.  I'm not aware

13   of any issue about who the spokesperson for the

14   group can be.

15        If you are asking me can I identify who the

16   spokesperson for the group is, the answer is no.

17   We're not aware that a spokesperson has been

18   designated.  We're not aware that it's an issue.

19             Q.   Well, let me ask you:  $15 million

20   comes in, Arie Genger calls you up and says, I'm

21   speaking on behalf of the AG Group, will you send

22   him the money?

23             A.   I can't really answer that question.

24   It's a hypothetical.  I'm not -- again, I think

25   it's outside the scope of the subpoena so I'll



```
 1                          Bowen

 2   object on that basis, but in the spirit of giving

 3   you some latitude so that you have some

 4   transparency into this arrangement at least as far

 5   as the firm is aware, the answer is maybe yes,

 6   maybe no.  I mean, if we don't hear from the other

 7   members of the group that there is some

 8   dissension, then the answer would be that we would

 9   follow that direction, hypothetically speaking.

10          Q.   If I ask that question for Orly

11   Genger, would you give the same answer?

12          A.   If Orly Genger called up speaking on

13   behalf of the AG Group?  Yes, the same answer.

14          Q.   What about Arnold Broser?

15          A.   Same answer.

16          Q.   David Broser?

17          A.   Same answer.

18          Q.   Has any money been received pursuant

19   to this document?

20          A.   No.

21          Q.   This Kasowitz 2?

22          A.   No.

23          Q.   Okay.  Have there been any

24   communications with members of the Trump Group

25   about potential receipt of this money pursuant to
```



1                          Bowen

2    this document?

3            A.    Well, the trump Group signed Exhibit

4    2, the members of the Trump Group did, so yes.

5            Q.    Were new notes issued pursuant to

6    this document?

7            A.    No.

8            Q.    Promissory notes?

9            A.    I think there were amendments.  It

10   might have been a supplemental amendment.  I don't

11   recall.  It just reflects the same information

12   that's in this amendment.

13           Q.    I'm sorry.  Can you just read that

14   back.

15           A.    I will explain.  If you read Exhibit

16   2 you will see that it's making amendments about

17   the direction of how the Trump group is to route

18   the money.  I believe and I'm going from memory

19   here, that the note itself -- the originally

20   issued note -- refereed to Watell.

21        That there was either a supplemental

22   attachment to the note or an amendment to the note

23   that substituted Kasowitz firm, me, for Watell.

24   Any changes to the note are changes that you see

25   reflected here.



2020101 jQjlgJg Doc 423-1 3-1 File 06/25/25/2 Entered 06/25/25 30:49:31 Exhibit KBT
Deposition Transcript Part 8 Pg 37 of 79 Pg 37 of 79

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        36

                              Bowen

1                              Bowen

2          Q.    And Kasowitz was in possession of the

3     old notes?

4          A.    The answer to that is no.

5          Q.    What about the new notes?  Or the

6     amended notes?

7          A.    Yes.

8          Q.    You haven't produced those?

9          A.    No.

10         Q.    Why haven't you produced those?

11         A.    Because we don't see it within the

12    scope of the subpoena or the scope of your -- the

13    wording.

14         Q.    And the reason?

15         A.    If you want it, I will take it under

16    advisement.  I mean, we gave you the executed

17    version of the first amendment because you gave it

18    to us unsigned.  In the spirit of full

19    transparency, we wanted you to have the document

20    that shows that that's the operative agreement so

21    you don't have any confusion about it.

22         Q.    And in your view, why were the

23    amended subordinated notes production of the

24    amendment subordinated notes beyond the scope of

25    the subpoena?



2020010101jljlgDoc423-13-FileFil6d/25/25/2Entenetd6d/25/25/2300-49:31ExhEbihitibiKBT
Deposition Transcript Pg 38 of 79 Pg 38 of 79

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                          37

                              Bowen

1

2          A.    Because it doesn't reflect assets

3     owned by Orly or to be paid to Orly.

4          Q.    Why not?

5          A.    I don't know what you mean "why not,"

6     it doesn't.

7          Q.    Well, because it's to be paid to a

8     quote, unquote, group of which Orly is one member;

9     correct?

10         A.    Well, your statement that she is a

11    member of the AG Group is correct.

12         Q.    And the notes are to paid to the AG

13    Group; correct?

14         A.    No.  They are to be paid at the

15    direction of the AG Group.

16         Q.    Okay.  And the AG Group is not in

17    itself some sort of corporation or partnership as

18    far you know.  It's not some sort of legal entity;

19    correct?

20         A.    The firm has no information about

21    that.

22         Q.    Okay.  But to the best of your

23    knowledge, you're not aware of any legal entity

24    created that's known as the AG Group?

25         A.    The firm is not.



MICHAEL PAUL BOWEN                                          October 05, 2018
SAGI GENGER -v- ORLY GENGER                                              38

1                          Bowen

2          Q.    Okay.  So we have notes to be paid at

3    the direction of a group of which Orly is one

4    member and yet you are taking the position that

5    that is not, in any way, relevant to that process

6    by which we seek to identify assets potentially

7    payable to Orly Genger herself?

8          A.    That's correct because as I testified

9    earlier, it is the firm's understanding that there

10   is no -- there is no arrangement that any amount

11   of that money is to be paid to Orly or that she

12   owns or has any claims to any amount of that

13   money.

14         Q.    What is the firm's understanding as

15   to how that money is to be disbursed if received?

16         A.    It's up to the AG Group.  It has

17   nothing to do with any kind of ownership claim by

18   Orly.

19         Q.    Has the AG Group shared that

20   understanding with Kasowitz?

21         A.    That's the firm's understanding.  I'm

22   not going to try and parse out what part of that

23   may be protected by privilege and what part of it

24   is coming through third party communications.  I'm

25   not in a position to do that.



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                         39

```
 1                          Bowen
 2          Q.    Well, has the AG Group shared its
 3   intention as to how, if the money is received, it
 4   intends to direct you to disburse it?
 5          A.    No.  Other than it's our
 6   understanding, again, based on communications that
 7   I can't parse out, that Orly Genger has no claim
 8   to any of that money nor is any of that money
 9   being paid to her.
10          Q.    What is your understanding based on?
11          A.    I already explained to you that I
12   can't parse out what communications that's based
13   on because some are privileged and some are not.
14   And it's just -- it's an impossibility to try and
15   make that kind of fine distinction, but it
16   involved communications with our client and it
17   involved communications with the members of the AG
18   Group.
19          Q.    Okay.  Is Arnold Broser a client of
20   the firm with respect to this matter?
21          A.    Not with respect to the Gengers, no.
22          Q.    With respect to anything else?
23          A.    No.  Well, I don't know.
24          Q.    That you are aware?
25          A.    Well, I -- I don't know.
```



<pre>
 1                          Bowen

 2          Q.     In which you, Michael Bowen, are

 3     aware?

 4          A.     Well, I'm not really here testifying

 5     on my behalf to try and move this along.  I can

 6     say that it's without the scope of the subpoena so

 7     I didn't do any reasonable inquiry trying to

 8     figure out if the firm represents the Brosers in

 9     any, you know, any other matter totally unrelated

10     to this.  I have no knowledge of that.  I guess,

11     just to help you, I will volunteer in my

12     individual capacity, I have to idea.

13          Q.     Let me just limit it to this.

14     Limited to this, Arnold Broser is not a client of

15     the firm?

16          A.     That's correct.

17          Q.     And what about David Broser?

18          A.     Same answer.

19          Q.     What about Arie Genger?

20          A.     Arie Genger is a little more

21     complicated because we -- the firm has appeared on

22     his behalf in some of his litigations involving

23     disputes with Sagi Genger, who may or may not be

24     related to this settlement agreement because it's

25     so convoluted.  I don't know the answer to that.
</pre>



                            Bowen

1

2        Q.    With respect to this settlement

3   agreement, you are not able tell me whether the

4   firm believes it has a privileged attorney-client

5   relationship with Arie Genger?

6        A.    That's correct.  I'd have to look

7   into that.

8        Q.    And the reason I ask is because you

9   declined to answer certain questions with regard

10  to your knowledge of the ultimate disposition o

11  these proceeds on privileged grounds.

12       So, when you make that objection, are you

13  specifically speaking of Orly's privilege or are

14  you speaking also of a potential privilege with

15  Arie?

16       A.    Well, I haven't declined to answer

17  anything.  I have answered all of your questions.

18  I have interposed objections that constrain the

19  information that I can provide.

20       It is certainly the case that we represent

21  Orly Genger in all aspects of her dispute --

22  disputes, plural, with Sagi Genger, and certainly

23  in connection with the AG/Trump Group Settlement

24  Agreement so that prohibits me from divulging

25  communications that we have had with members of



1                          Bowen

2     the AG Group to come to conclusions or the

3     understanding that we have.  It's not really

4     conclusions, it's really just our understanding.

5           Q.    So you are declining or you feel

6     constrained not to identify communications with

7     any of the four members of the AG Group?  Is that

8     what I understood your last answer to mean?

9           A.    I can't parse out how we came to the

10    understanding based on who told us what, because

11    some of that is privileged and I'm not going to

12    give you unprivileged communications so you can

13    deduce privileged information.

14          Q.    Well, let's put aside what I can

15    deduce and not deduce.  You have made a statement

16    that Kasowitz believes that none of the $15

17    million will ultimately be paid to Orly.  I have

18    asked you the basis for that understanding and you

19    said it's -- you're constrained by the privilege

20    from answering it.  I have asked who that

21    privilege is with --

22          A.    I've got to correct you.

23          Q.    Hold on.  Let me finish and then you

24    can correct everything I said that is wrong.

25          I've asked you the basis for who you had the



|    | Bowen |
|----|-------|
| 1  | |

Bowen

2   privilege with, and you said, "Orly and maybe

3   Arie."  What I'd like for you to do is to identify

4   for me any communications you have had with anyone

5   who is not Orly Genger or Arie to the extent you

6   are maintaining a privileged relationship with him

7   with respect to this matter with regard to the

8   ultimate disposition of the $15 million?

9        A.    I can't answer that question because

10  you -- you made some misstatements in there about

11  what I have said just moments ago.  So I can't

12  adopt your long preamble and now, because you

13  interrupted me when I tried to correct you, I

14  don't remember what it was you were saying that it

15  was mistaken.

16       Q.    I can do without the preamble.

17       A.    I'd like to correct the preamble.

18       Q.    You can read it back and make any

19  corrections you want.

20            (Readback of prior question.)

21            THE WITNESS:  So you are mistaken in

22        saying that I'm constrained from telling

23        you the basis for the understanding.  I

24        told you the basis for the understanding.

25        You didn't ask to get into the



MICHAEL PAUL BOWEN                                  October 05, 2018
SAGI GENGER -v- ORLY GENGER                                      44

```
 1                        Bowen
 2         communications that -- the substance of
 3         the communications that the firm has had,
 4         I presume the question is with each member
 5         of the AG Group on that topic, and my
 6         answer to that is:
 7              Because of the privilege, I cannot
 8         parse out which information came from
 9         which member of the AG Group, or how many
10         discussions we had over what period of
11         time or who had these discussions on
12         behalf of the firm.  That's not within the
13         scope of preparing for this deposition so
14         I don't have that information at my
15         fingertips.
16              And then, on top of that, there are
17         privilege concerns because some of that
18         information certainly came from Orly
19         Genger who is a client and some came from
20         Arie Genger who may be a client for these
21         purposes.  I'm not clear on that on behalf
22         of the firm.  That would take further
23         investigation on my part.
24         Q.    Let me just limit it to the Brosers.
25    What communications have you had with Brosers with
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                         45

```
1                        Bowen

2    respect to the ultimate disposition of the

3    proceeds?

4         A.    Other than telling you that there

5    were communications with the Brosers between the

6    Brosers and the firm on that topic I cannot get

7    into details of the communications.  That's not

8    available to me.

9         Q.    Why can't you?

10        A.    That's not something that I prepared

11   in anticipation of the testimony today.  I did not

12   see it within the scope of the subpoena or

13   relevant to your inquiry.

14        Q.    Why did you not see it within the

15   scope of the subpoena?

16        A.    The question is:  Did the firm have

17   an understanding that anything relating to the

18   settlement agreement or the $15 million notes, you

19   know, minus whatever setoffs the Trump Group is

20   going to claim.  And that payment mechanism, if

21   anything related to that has a relationship to or

22   assets owned by Orly or assets to be paid to Orly,

23   and the firm's understanding is that it does not.

24        So how the firm came to that understanding

25   and what goes into that understanding and what
```



```
 1                        Bowen
 2   other people may have claims to that money or
 3   don't have claims to that money, all of that is
 4   irrelevant to us and irrelevant to your subpoena.
 5         Once the firm has the understanding that it
 6   is not an asset of Orly and it's not payable to
 7   Orly, that answers your question.
 8         Q.    And so even if the firm has an
 9   understanding as to whom that money is payable to,
10   you're not going to share that with me here today?
11         A.    It's payable at the direction of the
12   AG Group, the AG Group has given us no direction
13   on where the money is to be paid.
14         Q.    How do you know that it is not
15   ultimately to be paid in part to Orly Genger?
16         A.    Because our understanding, based on
17   communications that we have had with members of
18   the AG Group, Orly has no claim to any of that
19   money and none of that money is payable to her.
20         Q.    What's that understanding -- I'm
21   sorry, when were those communications made?
22         A.    Over the course of multiple years
23   going back to at least the day of the amendment.
24   I think even earlier than this.  What's the date
25   of this?  June of -- no.  This is dated, I think,
```



2020-0101 jgjlg Doc 423-1 Filed 06/25/20 Entered 06/25/20 30:49:31 Exhibit KBT Deposition Transcript Pg 48 of 79 Pg 48 of 79

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                         47

1                        Bowen

2    last summer, in 2017.  It certainly predates that

3    so it's a series of communications that goes back

4    many years.

5          Q.    When you say, "many years" what is

6    the start of that?

7          A.    When was the trial that we did in

8    front of Judge Jaffe

9          Q.    In 2015?

10          A.    Yeah, so it started in that time

11    period to the present.

12          Q.    So who does have a claim to those

13    assets if not Orly?  To those proceeds if not

14    Orly?

15          A.    Well, since it's at the control of

16    the AG Group, I think the AG Group would have that

17    understanding.  The firm does not.

18              (Recess taken.)

19    BY MR. DELLAPORTAS:

20          Q.    I'm going to just clarify one of your

21    prior answers.

22          A.    Sure.

23          Q.    When you say that Orly Genger has no

24    claim to the payments made under the note, are you

25    saying that the money -- that the money is going



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        48

```
 1                          Bowen
 2    to AG Group, and beyond that you don't know what
 3    they plan to do with it, or are you saying that
 4    you have knowledge that the AG Group will not be
 5    transmitting any of that to Orly Genger?
 6           A.    The latter.
 7           Q.    Okay.
 8                 MR. DELLAPORTAS:  I would like to
 9           next mark as Kasowitz 4 a document
10           entitled:  "Satisfaction of Judgment"
11           dated March 28, 2018.
12                 (Exhibit 4 was so marked for
13           identification.)
14    BY MR. DELLAPORTAS:
15           Q.    Mr. Bowen, this is a satisfaction of
16    judgment in the predecessor case in which your
17    firm represented Ms. Genger; correct?
18           A.    It's a 2014 case?
19           Q.    Yes.
20           A.    Yes.  That's correct.
21           Q.    And this payment was -- this
22    satisfaction was filed on March 28, 2018?
23           A.    According to the document, yes.
24           Q.    Okay.  And the third whereas clause
25    says that, "Whereas Orly Genger caused the
```



MICHAEL PAUL BOWEN                                      October 05, 2018
SAGI GENGER -v- ORLY GENGER                                           49

```
 1                        Bowen
 2   $21,005.24 to be paid on March 27, 2018."
 3          A.    I see that.
 4          Q.    And it was signed and filed by
 5   Kasowitz; correct?
 6          A.    Yes.
 7          Q.    How did Ms. Genger make that payment?
 8          A.    I have no knowledge.
 9          Q.    Do you know where the money came
10   from?
11          A.    No.
12          Q.    And Kasowitz doesn't know where the
13   money came from?
14          A.    I don't believe so.  I don't believe
15   this went to Kasowitz.
16          Q.    How did Kasowitz have the comfort
17   level to file a statement in federal court saying
18   a payment was made?
19          A.    I don't understand your question.
20   Are you saying that we didn't have a reasonable
21   basis to make that statement?  Did you receive the
22   money?  Your client should know whether or not he
23   received the money.  We never heard any complaint
24   that the money was not received.
25          Q.    What was the basis for your belief
```



MICHAEL PAUL BOWEN                                      October 05, 2018
SAGI GENGER -v- ORLY GENGER                                           50

```
1                        Bowen

2    that the $21,000 and so forth, was paid by Orly

3    Genger on March 27, 2018?

4         A.    That's beyond the scope of your

5    subpoena, number one.  It's trying to invade

6    privilege, number two.  Number three, do you have

7    the basis to say the money wasn't paid?  Is what

8    you are saying is that the money was not paid?  Is

9    that what your claim is?

10        Q.    Well, I'm just here to ask

11   questions --

12        A.    Is that implicit in your questions?

13        Q.    -- not to answer questions.

14        A.    Let me put it this way:  To the

15   extent that you are implicit in your question of

16   the claim that $21,005.24 reflected on Exhibit 4

17   was not in fact paid in full satisfaction of the

18   judgment, then to the extent that that is what you

19   are saying, we -- we reject that claim.  We have

20   no information that it was not paid.

21        Q.    Implicit in my question is that if

22   Kasowitz was being truthful in his representation

23   in federal court, then Ms. Genger, at one point in

24   time, during the course of this litigation, had

25   access to $21,000 in order to make that payment.
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        51

```
 1                        Bowen
 2   My question is:  Where did that come from?
 3        A.   That's a false premise.  Why would
 4   you possibly say that.
 5             (Laughter.)
 6             Why are you laughing?
 7        Q.   Because you are being an idiot.
 8   That's fine.
 9        A.   So you just called me an idiot.
10   Calling me an idiot in a federal deposition is
11   against your ethical obligations.
12        Q.   Can you answer the question?
13        A.   Can you acknowledge the fact that you
14   just violated your ethical obligations by calling
15   me an idiot?
16        Q.   Can you answer the question?
17        A.   Do you want to retract that statement
18   or do something to try and fix the fact that you
19   just made another ad hominem attack after I told
20   you that I will not tolerate that?
21        Q.   Can you please answer the question?
22        A.   If you acknowledge the fact that you
23   are out of line and you retract your statement.
24        Q.   I will correct it:  Your answer was
25   idiotic.
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        52

```
 1                          Bowen
 2          A.     Fine.   That's still an ad hominem
 3    attack.   Do you think that's better?   Do you know
 4    a federal judge is going to be reviewing this
 5    transcript?   Fine.   I will take that as your -- as
 6    your position.   I'll make sure a federal judge
 7    reviews this transcript.
 8          Q.     Wonderful.   Can you now answer the
 9    question?
10          A.     State your question again, please.
11          Q.     Can you read back the last question.
12          (Question read back.)
13    BY MR. DELLAPORTAS:
14          Q.     If Kasowitz was being truthful in his
15    representation to the federal court that Orly paid
16    -- cause to be paid $21,000, implicit within that
17    is that Orly at one time had access to $21,000 and
18    my question is:   What is Kasowitz' knowledge with
19    respect to the source of that asset?
20          A.     I can't answer that question because
21    you have false premises.   The fact that somebody
22    has paid a judgment doesn't mean that that person
23    had the assets to pay the judgment.   You can ask a
24    third party to pay the judgment.   You can obtain
25    loans which means you are taking on even more debt
```



1                          Bowen

2    to pay the judgment.

3          Q.    So which is it?

4          A.    So I don't know, but I can't answer

5    the question with all of those presuppositions

6    that you put in there, which are not necessarily

7    true.  Leaving that aside, if your question is,

8    what does the firm know about where Orly Genger

9    got the money to pay this judgment, this amount of

10   money that is reflected in Exhibit 4, the answer

11   is, which I think I told you before, we don't

12   know.

13         Q.    That includes Mr. Hirschman?  He

14   doesn't know how his wife paid that judgment?

15         A.    I don't know how a spouse or the

16   information a spouse had in relationship to a

17   spouse.  I'm not here testifying on behalf of

18   Mr. Hirschman.  And there are spousal privileges

19   that may or may apply to that information.  I can

20   only speak on behalf of the firm.

21         On behalf of the firm, we have no knowledge

22   about where that money was sourced from or even

23   how it was transmitted.  I guess I have to look at

24   how it was transmitted.  I may -- the firm may

25   have that information.  It was not something I



```
 1                        Bowen
 2   prepared for today because you didn't identify it
 3   as a topic in your subpoena.
 4         But, in any event, to suggest that Kasowitz
 5   as a firm is acting in bad faith because it didn't
 6   have a good faith basis for filing this
 7   satisfaction of judgment, on behalf of the firm, I
 8   completely reject that and I think it's unethical
 9   and unprofessional for you even to suggest it.
10   That's my answer.
11         Q.    First of all, you're being
12   disingenuous.  There was no suggestion that you
13   were acting in bad -- the firm was acting in bad
14   faith in filing this piece of paper.  I do think
15   there is a serious question in that regard with
16   respect to your answers here today but we will
17   proceed.
18         Is that your signature on page 2 or is that
19   Mr. Hirschmann?
20         A.    Well, I will just note that, once
21   again, you are making an ad hominem attack.
22         Q.    I'm clarifying an allegation you made
23   against me.
24         A.    You're making an ad hominem attack on
25   me and you are saying I'm acting in bad faith when
```



```
 1                           Bowen
 2    I'm here --
 3                    (Talking over each other.)
 4            Q.    That's a serious question.
 5            A.    -- trying to give you serious and
 6    professional and careful answers on behalf of the
 7    firm.
 8            Q.    Okay.  Well, one is them is:  Whose
 9    signature is that on page 2?
10            A.    Which exhibit?
11            Q.    Kasowitz 1.
12            A.    That's my signature.
13            Q.    And so at the time you made this, you
14    had no idea how Orly came to pay the $21,000?
15            A.    It's asked and answered, but I will
16    try and explain it again to you.  The firm has no
17    information about the source of those funds.  It
18    may have information about the mechanism of how
19    the funds were transferred, but I did not prepare
20    that information for today.  I don't personally
21    have it and I did not prepare that information for
22    today, because it was not identified as a topic
23    for this deposition.
24         By the way, this also doesn't refer to
25    assets that Orly owns or that are payable to Orly.
```



1                          Bowen

2          Q.    And when you say "the firm" you are

3    excluding Mr. Hirschman who is a partner of the

4    firm?

5          A.    Absolutely not.

6          Q.    So you are saying Mr. Hirschman has

7    no idea where that money came from?

8          A.    Absolutely not.  I'm speaking only on

9    behalf of the firm.

10         Q.    And you understand that the firm is

11   comprised of its partners; correct?

12         A.    Yes.

13         Q.    Mr. Hirschman is one of its partners?

14         A.    Yes.

15         Q.    If fact, he was the -- listed as the

16   lead counsel with respect to the matter in which

17   the satisfaction of judgment was filed.

18         A.    That may be.

19         Q.    He is not just some random partner

20   who I picked out of the website.  He was actually

21   the lead partner and lead attorney with respect to

22   the matter that I'm now asking you about; correct?

23         A.    Asked and answered.

24         Q.    Okay.  And so when you're speaking

25   that the firm doesn't know where this $21,000 came



1                           Bowen

2     from, are you including Mr. Hirschman in that or

3     are you excluding Mr. Hirschman from that?

4          A.    Speaking on the information that is

5     available to the firm, qua firm, that

6     Mr. Hirschman has information available to him,

7     qua spouse -- I'm not privy to that information

8     speaking only on behalf of the firm.  Speaking on

9     behalf of the firm, I'm not excluding any

10    available source of information available to the

11    firm.

12         Q.    And how do you parse through, in your

13    mind, what Mr. Hirschman knows qua firm versus qua

14    spouse?

15         A.    I don't even know how to answer that

16    question.

17         Q.    It was the basis upon which you

18    answered the last question so I'd like to probe

19    the basis on which you answered the last question.

20         A.    Let me put it this way:  I didn't

21    interview Mr. Hirschman to invade his marital

22    relationships with his wife.  I didn't ask him

23    about personal information of any sort at any

24    time.  I am, however, privy to information that

25    Mr. Hirschman has that's relevant to your



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        58

```
 1                        Bowen

 2    subpoena.  And that is available to the firm

 3    meaning it's information that he learned in his

 4    capacity as a lawyer at the firm.

 5            Q.    When you said you didn't interview

 6    him about his marital communications, did you

 7    interview Mr. Hirschman at all with respect to

 8    your preparation for this?

 9            A.    I 'm not providing any answers about

10    what I did to prepare for this deposition other

11    than saying that I made reasonable inquiry and I

12    made reasonable searches and drawing upon my own

13    personal experiences as a partner at the firm, and

14    as a lawyer for Orly Genger, since we became

15    involved in the Genger affairs on behalf of Orly

16    Genger in, I guess, that was 2015.

17            Q.    Let me ask you more generally:  What

18    bank accounts are you aware that Ms. Genger

19    currently has access to?

20            A.    The firm is aware of no bank accounts

21    that she has that is in her name or that belong to

22    her.  I have anecdotal information that -- that

23    belongs to the firm that she had some kind of an

24    account that was attached, I think, by your client

25    that had a few thousand dollars, like, $8,000 or
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        59

```
 1                         Bowen
 2   something to that extent, which is, I think, part
 3   of this 2014 proceeding, if I remember right.
 4         Q.     Does Ms. Genger pay for your
 5   services?  Pay the firm?
 6         A.     That's privileged information.  I'm
 7   not getting into any financial arrangements
 8   between Orly Genger and the firm other than to
 9   tell you that there is no money or assets that
10   belong to her or that are payable to her in that
11   relationship.
12         Q.     Can you read that back.
13               (Readback of prior question.)
14   BY MR. DELLAPORTAS:
15         Q.     What do you mean by that?
16         A.     I mean, there is no money going the
17   other way.  Meaning the firm doesn't hold assets
18   for Orly Genger and there are no assets or funds
19   that are payable to Orly Genger that the firm has.
20   For example, sometimes clients pay a retainer that
21   has not been charged against yet.  There's nothing
22   like that in this relationship.
23         Q.     Okay.  Have payments been made during
24   the relationship from Orly Genger to the firm?
25         A.     I'm not privy to answer that
```



1                          Bowen

2    question; it's privileged information.

3          Q.    What's your basis for saying that's

4    privileged information?

5          A.    Because the relationship between

6    attorney-client is highly confidential and most

7    often privileged.  Unless you have some authority

8    you want to talk about, we can reconsider it.  You

9    have to have a reason if you are going to get into

10   the financial relationship with an attorney and a

11   client.

12         Q.    Yes.

13         A.    Given the fact that you are looking

14   for assets I'm comfortable in telling you that

15   there has been no payment of any sort from Orly

16   Genger to my firm in this year, 2018.

17         Q.    What about during the -- since the

18   lawsuit was filed in October 2017?

19         A.    I'm not -- I think that information

20   would both be irrelevant and protected by

21   privilege.

22         Q.    Why in your view would it be

23   irrelevant?

24         A.    It's not identifying assets that

25   belong to Orly Genger or that are payable to Orly



1                        Bowen

2    Genger.

3         Q.     And you don't believe that if Orly

4    Genger made a payment from an account less than a

5    year ago, that might not have some bearing on the

6    location of her assets today?  You are so

7    confident in that that you are willing to have the

8    direction to yourself not to answer that question

9    in the context of discovery?

10        A.     I don't understand your question.  If

11   your question is:  Is the firm aware of the bank

12   account that it received funds from and the bank

13   account belongs to Orly Genger, the answer to that

14   question is no.  The firm is not aware -- other

15   than the one account I identified a moment ago,

16   which had $8,000 in it and I believe that was

17   attached by your client in the prior proceeding,

18   sub district, I believe, I may be getting those

19   facts mixed up in my head, but again, to try and

20   reframe your question so I understand it.

21        If your question is:  Did the firm ever

22   receive any payment from Orly Genger from a bank

23   account that the firm can identify as belonging to

24   Orly Genger?  The answer is no.

25        Q.     When you use the term "belong" --



```
 1                         Bowen
 2    "an account belonging to Orly Genger," what do you
 3    mean by that?
 4          A.    I mean an account that is either for
 5    her benefit or that she controls.
 6                MR. DELLAPORTAS:  We'll mark Kasowitz
 7          5 a document entitled "Satisfaction of
 8          Judgment" dated May 8, 2018.
 9                (Exhibit 5 was so marked for
10          identification.)
11    BY MR. DELLAPORTAS:
12          Q.    This is, again, a document that your
13    firm filed it looks like May 2018.  Do you
14    recognize it?
15          A.    Yes.
16          Q.    Is that your signature on the second
17    page?
18          A.    Yes.
19          Q.    It reflects that a judgment was
20    satisfied to Ms. Dahlia Genger in the amount of
21    $58,059.30.
22          Do you see that?
23          A.    Yes.
24          Q.    What was the source of the payment
25    for that $58,000?
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                         63

1                         Bowen

2          A.     The firm has no information about

3    that.

4          Q.     So you are representing that the firm

5    does not know how Ms. Genger made that $58,000

6    payment?

7          A.     No.   That's a separate question.   The

8    first question was what's the source and the

9    answer is that the firm does not know the source.

10   The second question is how the payment was made.

11   The answer to that is that the firm may have that

12   information, but I didn't research that and I'm

13   not prepared to address it because it wasn't

14   within the scope of your subpoena.

15         Had you identified it I could have given you

16   a definitive answer.   So we made no, you know,

17   whatever mechanism or method or route the money

18   went, but I don't have that information at the tip

19   of my finger tips right here today.

20         Q.     So, your view is that Ms. Genger's

21   access to $58,000 just a few months ago, was not

22   within the scope of our subpoena?

23         A.     No.   I didn't testify to that.   I

24   testified that had you identified that one of the

25   topics that you wanted to discuss was the method



1                           Bowen

2    or manner in which these satisfaction -- excuse

3    me -- these judgments were paid that are reflected

4    in these two documents Exhibits 4 and 5, I could

5    have been prepared to address that because it may

6    very well be that the firm does know how those

7    payments were made

8           Q.    Well, one of the subjects are

9    assets --

10          A.    Excuse me, one second.

11          Q.    -- of Ms. Genger?

12          A.    I have to finish that answer.

13          Q.    Okay.

14          A.    You also said that the fact that she

15   had access to this money and you made a comment

16   that that should be relevant within the scope of

17   your subpoena --

18          Q.    One would think.

19          A.    Well, I understand that you are

20   expressing your view -- your own personal view of

21   that -- but logic kind of dictates that that may

22   or may not be true because it always is the case

23   that an impecunious person can have a debt paid by

24   somebody else on their behalf, now whether that

25   happened here or not, I have no information.  The



1                          Bowen

2    firm has no information.

3         Q.    So the firm doesn't know where this

4    money came from either?  That's what you are

5    saying?

6         A.    No.  Because you keep subtilely

7    changing the question and I think -- I want to,

8    make sure we are not misunderstanding each other.

9    If you are asking me the source of the money, the

10   firm does not know the source of the money.

11        If you are asking where the money came from,

12   what the manner was in which the money was

13   transferred from one location to another, was it

14   by check, was it by wire, or some other type of

15   electronic transfer, the answer is:  We may be

16   aware of that but I have not prepared that

17   information for today's deposition.

18        Q.    Is the firm aware of where Ms. Genger

19   currently resides?

20        A.    I believe that's outside the scope of

21   this deposition.  I don't understand what her --

22   where she -- I guess -- well, first of all, I

23   should clarify:  When you say where she resides,

24   are you asking for her domicile, in the technical

25   sense of that word?



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        66

                              Bowen

1

2          Q.     Interpret it however will yield an

3    answer.

4          A.     Well, the firm is aware that she

5    primarily resides in Tel Aviv, Israel.  And also

6    that she has an interest in some form that -- I'm

7    not necessarily -- I may not be remembering

8    correctly, I believe a condominium in Austin,

9    Texas.  She spends some time there.  But I don't

10   know.  And I think there have been public filings

11   on that.  So whatever the public filings are to

12   the extent that the firm's knowledge on that as of

13   the time that those filings were made.

14         Q.     Does Ms. Genger have any interest in

15   any other homes other than the two that you just

16   described?

17         A.     Well, I don't know that she has any

18   interest in the Tel Aviv home.  If by "interest"

19   you mean ownership interest, the firm doesn't have

20   information about that at all.

21         Q.     What do you know about that subject?

22         A.     The only information that the firm

23   has is that she lives there at the address that is

24   a matter of public record.

25         Q.     What about other homes?



MICHAEL PAUL BOWEN                                October 05, 2018
SAGI GENGER -v- ORLY GENGER                                      67

```
 1                      Bowen
 2          A.    The firm has no information about
 3   that at all other than the fact that she does have
 4   some type of interest and it may be through
 5   marital property and it may not.  I don't know the
 6   ins and outs -- the firm doesn't know the ins and
 7   outs of the Austin, Texas property.
 8          Q.    When you say "marital property," what
 9   do you mean?
10          A.    I'm not using that in any kind of
11   legal or technical meaning or a term of art
12   meaning.  I just know that sometimes a husband and
13   wife can own property as joint tenants in common
14   or income and it's not something where -- it
15   doesn't necessarily reflect that one spouse or
16   another actually contributed anything to the
17   purchasing the property it's just by virtue of
18   their status of being married that it's considered
19   to belong to both.
20          Q.    What other marital property are you
21   aware of with respect to Ms. Genger?
22          A.    None.
23          Q.    Does Ms. Genger have an interest in
24   her husband's partnership interest?
25          A.    The firm is not aware of that.  To
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        68

| | |
|---|---|
| 1 | Bowen |
| 2 | the extent it's relevant, the firm is not aware of |
| 3 | it. |
| 4 | Q.    When you mentioned you made a |
| 5 | reasonable inquiry with respect to the subject |
| 6 | matters of the subpoena, what specifically did you |
| 7 | do? |
| 8 | A.    I'm sorry? |
| 9 | Q.    When you say you made a reasonable |
| 10 | inquiry with respect to the subject matters of the |
| 11 | subpoena -- it's a term you've used several times |
| 12 | in deposition -- what, specifically, did you do? |
| 13 | A.    I'm not going to answer that |
| 14 | question.  That is privileged work-product |
| 15 | information.  I will repeat what I said before, |
| 16 | which is:  I made reasonable inquiries of |
| 17 | personnel at the firm who have knowledge into |
| 18 | Genger matters.  I made reasonable searches in the |
| 19 | sense that I looked at information both in |
| 20 | documentary form and otherwise that's available to |
| 21 | the firm that's related to this topic, and the |
| 22 | representation of Orly Genger. |
| 23 | And I'm basing it on my extensive knowledge |
| 24 | and participation in representing Orly Genger |
| 25 | since the firm became involved in the very |



```
 1              Bowen
 2  beginning -- I mean, in the very beginning of the
 3  firm's involvement starting sometime in 2015, I
 4  believe.
 5        Q.    Where does Mr. Hirschman live?
 6        A.    Well, I don't think that's relevant.
 7  I don't see how that's relevant to the subpoena.
 8        Q.    So you are declining to answer?
 9        A.    I'm declining to answer on the basis
10  that confidential information about a partnership,
11  individual partners, is beyond the scope of this
12  subpoena.  If you want to clarify why you think
13  it's relevant I'm willing to reconsider, but I
14  don't see any relevance whatsoever.
15        Q.    To the best of your knowledge, are
16  they still married?
17        A.    I don't see how that's relevant
18  either.
19        Q.    Okay.
20        A.    If you want to explain why you think
21  it -- I mean, look, one of the things that you
22  have not ever tried to justify is why you are
23  trying to interfere or interpose into this private
24  marital relationship between Ms. Sagi's own sister
25  and her husband.  If you want to explain it, you
```



2020-01-01 jDglg D Doc 423-11 File 6d/25/25/2 Entere e6d/25/25/23 30:49:31 E xh Eib it KBT
Deposition Trans Pg rScript 79 Pg 71 of 79

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        70

                              Bowen

1

2  can explain it.

3        Q.    You just said they had marital

4  property.

5        A.    How -- how --

6        Q.    I have an uncollected $3 million

7  judgment.  Isn't it, at least, marginally rel

8  event that I inquiry about their marital property?

9        A.    You're not asking about their marital

10  property.  Now you are asking about their marital

11  relationship and whether or not they are still

12  married.

13        Q.    Yes.

14        A.    And I guess the question --

15        Q.    Isn't that relevant to marital

16  property if they are in fact still married?  No?

17        A.    No.  Well, first of all, I don't

18  think it's a valid question.  I think it's an

19  offensive question.

20        Q.    An offensive to ask whether they are

21  still marred?

22        A.    Yes.

23        Q.    Okay.

24        A.    Secondly, I'm speaking on behalf of

25  the firm, and the firm doesn't have information



                              Bowen

1

2   about the marital status of it's various partners

3   unless or until there is some reason to notify the

4   firm about a marriage or a divorce or some other

5   type of change in status that the firm might need

6   to be aware of in terms of insurance.

7        I see that you're not really paying

8   attention to my answer so I am just going to stop

9   even though my answer is not finished.  If you

10  want to listen --

11       Q.   The reporter is capturing you

12  answers.

13       A.   No, I'm not going to speaking when

14  I'm being treated in this fashion.  If you want to

15  listen to the answer --

16       Q.   You're being treated perfectly fine.

17  Stop making speeches.  You are allowed to answer

18  the question.  I didn't interrupt.  You

19  interrupted yourself.  You were making a speech,

20  finish your speech and then we will go on to the

21  next question.  I'm listening.  I can do two

22  things at the same time.

23       A.   You were talking to your client.

24       Q.   I was not talking to my client.  I

25  was reviewing my notes while I was listening to



MICHAEL PAUL BOWEN                                          October 05, 2018
SAGI GENGER -v- ORLY GENGER                                              72

```
 1                            Bowen
 2    your answer.  Believe it or not, I'm capable of
 3    doing that.
 4              A.    Tell me where I was and I will pick
 5    it up.
 6              Q.    The reporter can tell you that.
 7                    (Readback of prior question.)
 8              THE WITNESS:  I got it.  So continuing
 9              my answer to the extent that your question
10              is asking whether or not there has been
11              any communications with the firm with
12              respect to Mr. Hirschman marital status
13              other than the fact he was married to Orly
14              Genger at some point, I believe, in 2016
15              if my memory is correct, the answer is no.
16              MR. DELLAPORTAS:  Make the next one
17              marked as Kasowitz Exhibit 6, February 5,
18              2018 letter.
19                    (Exhibit 6 was so marked for
20              identification.)
21    BY MR. DELLAPORTAS:
22              Q.    This is a letter you submitted to the
23    court.
24              A.    Correct.
25              Q.    If you go to the last page, the first
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        73

                              Bowen

1

2     full paragraph on page 3.

3          A.    Yes.

4          Q.    In it you wrote to Judge Freeman

5     "Orly has attested that long before this action,

6     she purchased a home in Tel Aviv with her husband

7     and that she lives there with her infant

8     daughter."

9          What attestation are you referring to there?

10         A.    It would be the sworn declaration

11    that she submitted in this action.

12         Q.    In this case?

13         A.    I believe so.

14         Q.    Okay.  Do you represent Arie Genger

15    with respect to this matter?  I'm talking about

16    the case we are currently in to today?

17         A.    The judgment enforcement case?

18         Q.    Yes.

19         A.    I don't think he is a party in this

20    action.  We may or may not represent him for

21    purposes of discovery if and when there is any

22    discovery propounded on him, but I don't know the

23    answer to that.

24         Q.    So, I will represent to you that we

25    served a subpoena on him and he did not appear for



MICHAEL PAUL BOWEN                                October 05, 2018
SAGI GENGER -v- ORLY GENGER                                     74

                              Bowen
1
2    that as in fact I e-mailed you a few weeks ago.
3    Are you representing with respect to that
4    subpoena?
5         A.    I don't believe so.  What do you mean
6    you e-mailed me about it?
7         Q.    I e-mailed you --
8         A.    Do you mean me personally or the
9    firm?  Somebody else?
10        Q.    I e-mailed you personally.
11        A.    About Arie Genger?
12        Q.    Yes.  I e-mailed you, Mr. Freedman,
13   and Mr. Montclair --
14        A.    Mr. who?  I'm sorry.
15        Q.    Montclair?  Paul Montclair?  He was
16   prior attorney of Arie with regard to our subpoena
17   and asked if you represented him with regard to
18   that subpoena?
19        A.    You didn't get a response from
20   anybody at my firm?
21        Q.    No, I only e-mailed you.
22        A.    When you say Mr. Friedman, who are
23   you talking about?
24        Q.    Leon Friedman.  That's another prior
25   attorney of Mr. Genger.



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        75

                                Bowen

1  
2          A.    It's possible that I missed that

3   e-mail.  If you didn't include anybody else on the

4   Kasowitz team.  I don't remember it personally.

5   On behalf of the firm, I have no information that

6   we represent Arie Genger with respect to any

7   process that you may or may not have served on

8   him.

9          Q.    In this case.

10         A.    I have no information about whether

11  or not -- right, in this case.  Currently.  Let's

12  just say currently.  And I don't have any

13  information about whether you in fact did serve

14  process on him.

15         Q.    Okay.

16         A.    So I can't comment on that either.

17         Q.    So, suffice it to say that we don't

18  believe your relevance objections were well taken.

19         Our position is this deposition has to be

20  continued until the proper documents are produced

21  and the proper questions are answered, but subject

22  to that position we have nothing further for

23  today?

24         A.    Okay.

25               (Time noted:  11:41 a.m.)



```
 1                            Bowen

 2               THE WITNESS:  Read and sign.

 3            (Time noted:  p.m.)

 4

 5

 6                    _____
                            MICHAEL BOWEN

 7

 8   Subscribed and sworn to before me
     this _____ day of _____, 20____.
 9   _____
                NOTARY PUBLIC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        77

```
1

2                           I N D E X

3
    WITNESS              EXAMINATION BY                    PAGE
4
    MR. BOWEN            DIRECT / DELLAPORTAS              4
5

6
                            EXHIBITS
7
    KASOWITZ      DESCRIPTION                             PAGE
8
    1             Subpoena                                4
9
    2             Amendment to Settlement Agreement       6
10
    3             AG/Trump Settlement Agreement           23
11
    4             Satisfaction of Judgment                48
12
    5             Satisfaction of Judgment                62
13
    6             February 5, 2018 letter                 72
14

15

16

17

18

19

20

21

22

23

24

25
```



1

C E R T I F I C A T I O N

2

3                    I, Jeffrey Shapiro, a Shorthand

4    Reporter and notary public, within and for the

5    State of New York, do hereby certify:

6                    That MICHAEL BOWEN, the witness whose

7    examination is hereinbefore set forth, was first

8    duly sworn by me, and that transcript of said

9    testimony is a true record of the testimony given

10   by said witness.

11                   I further certify that I am not

12   related to any of the parties to this action by

13   blood or marriage, and that I am in no way

14   interested in the outcome of this matter.

15

16                   IN WITNESS WHEREOF, I have hereunto

17   set my hand this 14th day of October, 2018.

18

19

20

21                                    _____

22

23                                    JEFFREY SHAPIRO

24

25

