# EXHIBIT I

*ARIE GENGER VS.*
*SAGI GENGER*

---

*SAGI GENGER*
*March 20, 2014*

---



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106465A.TXT*
*Min-U-Script® with Word Index*

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NEW YORK
     -----------------------------------------X
 3   ARIE GENGER and ORLY GENGER, in her
     individual capacity and on behalf of
 4   THE ORLY GENGER 1993 TRUST,

 5                           Plaintiffs,

 6        -against-

 7   SAGI GENGER, TPR INVESTMENT ASSOCIATES,
     INC., DALIA GENGER, THE SAGI GENGER
 8   1993 TRUST, ROCHELLE FANG, individually
     and as trustee of THE SAGI GENGER 1993
 9   TRUST, GLENCLOVA INVESTMENT COMPANY, TR
     INVESTORS, LLC, NEW TR EQUITY I, LLC,
10   NEW TR EQUITY II, LLC, JULES TRUMP,
     EDDIE TRUMP, MARK HIRSCH and
11   TRANS-RESOURCES, INC.,

12                           Defendants.

13   -----------------------------------------X
     (CAPTION CONT'D ON FOLLOWING PAGE)
14
                               1211 Avenue of the Americas
15                             New York, New York

16                             March 20, 2014
                               10:13 a.m.
17

18             CONTINUED DEPOSITION of SAGI GENGER,

19   taken before Ashley Shugar, a Shorthand

20   Reporter and Notary Public of the State of New

21   York.

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24               New York, New York 10022
                     212-750-6434
25                   Ref: 106465A
```

```
 1    (CAPTION CONT'D FROM PREVIOUS PAGE)
      ------------------------------------------X
 2    SAGI GENGER, individually and as assignee
      of THE SAGI GENGER 1993 TRUST, and TPR
 3    INVESTMENT ASSOCIATES, INC.

 4         Cross-Claimants, Counterclaimants,
           and Third-Party Claimants,
 5

 6         -against-

 7    ARIE GENGER, ORLY GENGER, GLENCLOVA
      INVESTMENT COMPANY, TR INVESTORS, LLC,
 8    NEW TR EQUITY I, LLC, NEW TR EQUITY II,
      LLC, JULES TRUMP, EDDIE TRUMP, MARK
 9    HIRSCH, TRANS-RESOURCES, INC., WILLIAM
      DOWD, and THE ORLY GENGER 1993 TRUST,

10

11         Cross-Claim, Counterclaim and/or
           Third-Party Defendants.
12
      Index No. 651089/2010
13    ------------------------------------------X

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2

 3   ZEICHNER ELLMAN & KRAUSE LLP

 4   Attorneys for Plaintiff Orly Genger

 5        1211 Avenue of the Americas, 40th Floor

 6        New York, New York 10036

 7   BY:  BRYAN D. LEINBACH, ESQ.

 8        PHONE    212.223.0400

 9        E-MAIL   bleinbach@zeklaw.com

10

11

12   MITCHELL SILBERBERG & KNUPP LLP

13   Attorneys for Plaintiff Arie Genger

14        12 East 49th Street, 30th Floor

15        New York, New York 10017

16   BY:  LAUREN J. WACHTLER, ESQ.

17        PHONE    212.509.3900

18        E-MAIL   ljw@msk.com

19

20

21

22

23

24

25
```

```
 1    A P P E A R A N C E S  (CONT'D):

 2

 3    MORGAN, LEWIS & BOCKIUS LLP

 4    Attorneys for Defendant Sagi Genger

 5        101 Park Avenue

 6        New York, New York 10178

 7    BY:   JOHN DELLAPORTAS, ESQ.

 8        PHONE     212.309.6690

 9        E-MAIL    jdellaportas@morganlewis.com

10

11

12    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

13    Attorneys for Defendants Glenclova Investment

14    Company, TR Investors, LLC, New TR Equity I,

15    LLC, New TR Equity II, LLC, TRANS-RESOURCES,

16    INC., MARCH HIRSCH, EDDIE TRUMP and JULES TRUMP

17        One Rodney Square

18        Wilmington, Delaware 19899

19    BY:   DOUGLAS D. HERRMANN, ESQ.

20        PHONE     302.651.3163

21        E-MAIL    douglas.herrmann@skadden.com

22

23

24

25
```

```
 1    A P P E A R A N C E S  (CONT'D):

 2

 3    GOLDBERG SEGALLA LLP

 4    Attorneys for the Third-Party Defendant William

 5    Dowd

 6         11 Martine Avenue, Suite 750

 7         White Plains, New York 10606

 8    BY:  BRIAN T. STAPLETON, ESQ.

 9         PHONE    914.798.5470

10         E-MAIL   bstapleton@goldbergsegalla.com

11

12

13    ALSO PRESENT:

14         ROBERT A. MEISTER, ESQ.,

15         Pedowitz & Meister LLP

16

17

18

19

20

21

22

23

24

25
```

```
 1  ------------------- I N D E X -------------------
 2  WITNESS                  EXAMINATION BY        PAGE
 3  SAGI GENGER              MR. LEINBACH            9
 4
 5
 6  ------ REQUESTS FOR PRODUCTION OF DOCUMENTS -----
 7  PAGE    81  The original document of Page 2
 8              to Exhibit S
 9          81  Any e-mails or writings relating
10              to Page 2 of Exhibit S in Sagi
11              Genger or his counsel's
12              possession
13         110  Any documents that relate to
14              drafts of Page 1 or Page 2 of
15              Exhibit S
16         110  Any e-mails referring to any
17              drafts of Page 1 or Page 2 of
18              Exhibit S
19         144  An image of Sagi Genger's
20              computer hard drive
21         197  Identify the deposition
22              referenced in Paragraph 23 of
23              the Counterclaims
24
25
```

```
 1   --------------- E X H I B I T S ---------------
 2   SAGI        DESCRIPTION              I.D.   REF.
 3   Exhibit R   First Amended Answer,    ---    153
 4               Counterclaims,
 5               Cross-Claims, and
 6               Third-Party Complaint of
 7               Sagi Genger, Individually
 8               and as Assignee of the
 9               Sagi Genger 1993 Trust,
10               and TPR Investment
11               Associates, Inc.
12               Description
13   Exhibit S   The promise letter dated  12   ---
14               October 30, 2004 and
15               attached indemnity letter
16               dated November 11, 2004
17   Exhibit T   Exhibit C to Sagi        126   ---
18               Genger's Reply Affidavit
19
20
21          (EXHIBITS RETAINED BY MR. LEINBACH)
22
23
24
25
```

```
 1              S T I P U L A T I O N S

 2

 3              IT IS HEREBY STIPULATED AND AGREED by

 4    and between the attorneys for the respective

 5    parties herein, that filing and sealing be and

 6    the same are hereby waived.

 7              IT IS FURTHER STIPULATED AND AGREED

 8    that all objections, except as to the form of

 9    the question, shall be reserved to the time of

10    the trial.

11              IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be sworn to and

13    signed before any officer authorized to

14    administer an oath with the same force and

15    effect as if signed and sworn to before the

16    Court.

17

18

19                        - oOo -

20

21

22

23

24

25
```

```
 1   S A G I   G E N G E R,
 2   called as a witness, having been first duly
 3   sworn by a Notary Public, continued to be
 4   examined and testified as follows:
 5
 6   CONTINUED EXAMINATION BY
 7   MR. LEINBACH:
 8        Q.      Good morning, Mr. Genger.
 9        A.      Good morning, Mr. Leinbach.
10        Q.      Of course you know I'm
11   Bryan Leinbach.  I represent Orly Genger.
12        A.      Uh-huh.
13        Q.      I know you've been through all the
14   instructions.  I'm not going to waste your time
15   with those.
16             MR. DELLAPORTAS:  I'm sorry, Bryan.
17        Which case are we on?
18             MR. LEINBACH:  This is the Arie --
19        the 2010 case.
20             MR. DELLAPORTAS:  Oh, okay.
21             MR. LEINBACH:  The Arie/Orly case.
22             MR. DELLAPORTAS:  All right.  Go
23        ahead.
24        Q.      So we're starting today with the --
25   well, I guess what we've called the 2010 case.
```

```
 1                        GENGER
 2              Do you understand what that means?
 3       A.      Yes.
 4       Q.      Okay.  I'm not going to go through
 5  the instructions again.  But of course, as you
 6  know, if you don't understand something, you
 7  can tell me you don't understand it and I'll
 8  rephrase the question.
 9       A.      Fair enough.
10       Q.      Is there any reason why you cannot
11  give truthful testimony today?
12       A.      Not that I'm aware.
13       Q.      Okay.  Do you know who Rochelle
14  Fang is?
15       A.      Yes, I do.
16       Q.      Okay.  Who's Rochelle Fang?
17       A.      She is my mother-in-law.
18       Q.      Okay.  And what is Rochelle Fang's
19  mailing address?
20       A.      I don't know her mailing address.
21  I can tell you where her home is.
22       Q.      Okay.  Where does she live?
23       A.      The last time I visited her, she
24  was at 73rd and Broadway.
25       Q.      Okay.  But you know she doesn't
```

```
1                           GENGER
2   live there right now?
3        A.      I don't know that.
4        Q.      Okay.  Do you know where she does
5   live right now?
6        A.      That's the only address I have for
7   her.
8        Q.      Okay.  So you've -- you're saying
9   that she lives where?
10       A.      As far as I know, she lives on 73rd
11  and Broadway.
12       Q.      She lives in an apartment building
13  on 73rd and Broadway?
14       A.      Between Broadway and West End,
15  yeah.
16       Q.      Okay.  Would it be surprising to
17  tell you that when we last tried to serve
18  process upon her at that apartment building,
19  that they had told us that she does not live
20  there any longer?
21       A.      That would surprise me.
22       Q.      Okay.  How is it that you get in
23  contact with Ms. Rochelle?
24       A.      She usually comes over for the
25  weekends to see her grandchildren.
```

```
 1                          GENGER
 2      Q.      Okay.  And you visit her where she
 3   lives?
 4      A.      No.  I haven't in years visited
 5   her.
 6      Q.      So your testimony, just to make
 7   sure that I understand this correctly, is that
 8   she lives at an apartment building on 73rd and
 9   Broadway?
10      A.      Right.  Well, it's called the Level
11   Club.  And I used to live in that building many
12   years ago.  The last time I saw her, she was
13   there, and I'm not aware that she moved.
14      Q.      And you're not aware that she lives
15   anywhere else?
16      A.      That's correct.
17              (Discussion off the record.)
18      Q.      I believe we marked this last time,
19   but I don't have the originals from the last
20   time, so we're going to mark this again as --
21              MR. LEINBACH:  Where were we at the
22      last time?  We stopped at T?
23              MR. HERRMANN:  R.
24              MR. LEINBACH:  So this would be S.
25              (Sagi Exhibit S, the promise letter
```

```
1                        GENGER

2              dated October 30, 2004 and attached

3              indemnity letter dated November 11, 2004,

4              was marked for identification.)

5                   (Discussion off the record.)

6      Q.     Mr. Genger, if you could just

7   please take a look at the -- the document --

8      A.     Yeah.

9      Q.     -- and tell me when you're ready.

10     A.     (Document review.)

11            Ready for what?  Ready for

12  questions about it?

13     Q.     Yes.

14            Do you recognize this document?

15     A.     I do.

16     Q.     If you'd actually turn to Page 2.

17            Do you recognize that document?

18     A.     I do.

19     Q.     Okay.  Let's start with Page 2.

20     A.     Okay.

21     Q.     This is a letter.  It has your

22  letterhead, and it's dated October 30th, 2004.

23            Do you see that?

24     A.     Yeah.  I mean, it's my incorrect

25  letterhead, but yes.
```

```
 1                          GENGER
 2      Q.      Okay.  Why do you say it's your
 3   incorrect letterhead?
 4      A.      Because I lived at 1211 Park
 5   Avenue, not 1121.
 6      Q.      1221 or 1121 Park Avenue.  Okay.
 7      A.      Right.  Just like your building
 8   here --
 9      Q.      Yep.
10      A.      -- at 1211.
11      Q.      1211.  So that's a typo.
12              Who prepared this document?
13              MR. DELLAPORTAS:  "This" being
14      Page 2?
15              MR. LEINBACH:  Yes.
16      Q.      We're just talking only about
17   Page 2.
18              Who prepared Page 2?
19      A.      I think it was Carter Ledyard, with
20   the assistance of Edward Klimerman.
21      Q.      Okay.  Carter Ledyard?  Who did
22   Carter Ledyard represent --
23      A.      My mother.
24      Q.      -- when they prepared this
25   document?
```

```
 1                        GENGER
 2      A.      My mother.
 3      Q.      They represented Dalia Genger?
 4      A.      Right.
 5      Q.      And you say Edward Klimerman also
 6  prepared this document?
 7      A.      Yeah.  Because I remember there
 8  were some changes that had to be made and -- I
 9  don't remember exactly, but Carol Schepp
10  was at -- at Carter Ledyard is the principal
11  drafter.
12      Q.      Okay.  Carol Schepp at Carl --
13  Carter Ledyard?
14      A.      Yeah.
15      Q.      Can you spell her name, please?  Do
16  you remember?  Is it with a C?
17      A.      It's on the front page of the -- of
18  the stipulation settlement --
19      Q.      Okay.
20      A.      -- I believe.
21      Q.      Okay.  Now, I believe when we ended
22  last time, we were talking about the genesis of
23  this document.
24              How did Page 2, how did this
25  document come to be?
```

```
 1                        GENGER
 2      A.      Well, my sister and I were pleading
 3   with my mother to sign what substantially was a
 4   stipulation of settlement, and she was very
 5   doubtful about his representations that the TRI
 6   shares were worthless --
 7                 MR. DELLAPORTAS:  Wait.  Arie?  You
 8        said "his."
 9      A.      His being Arie's.
10                 His representations were worthless.
11   And my sister and I said that we would execute
12   these documents to give her more comfort.
13      Q.      Okay.  You say your sister and I
14   were pleading with her.
15      A.      Right.
16      Q.      You had conversations where it was
17   you, your sister, and Dalia?
18      A.      Yeah.  I wouldn't even call it
19   conversations, but yes.
20      Q.      Okay.  What do you mean you
21   wouldn't "call it conversations"?
22      A.      My sister was, I mean, crying
23   hysterically and literally begging my mother to
24   bring this -- all this matter to a conclusion.
25   It was very difficult for her, as it was for
```

```
 1                        GENGER
 2    me.
 3         Q.       Okay.
 4         A.       And, you know, this is I think what
 5    I would say it was an important part in --
 6    in -- in getting her to agree.
 7         Q.       Okay.  So let's unpack that a
 8    little bit.
 9                  You say your sister was crying.
10                  So you're talking about a specific
11    meeting in person?
12         A.       I have one specific meeting in
13    mind.  I'm sure that there were others, but
14    there was one that was particularly emotional.
15         Q.       Okay.  And where was this meeting?
16    Where did that take place?
17         A.       It was at her -- it was then a
18    hotel room she was staying in.  It was like a
19    long-term hotel at the --
20         Q.       Who's "she"?
21         A.       My mother.  Excuse me.
22                  -- at the Bristol Plaza --
23         Q.       Okay.
24         A.       -- which is now -- she lives at the
25    condominium side of that hotel, so it's the
```

```
 1                        GENGER
 2    same address.
 3         Q.      Okay.  So Dalia's hotel room at the
 4    Bristol Plaza.
 5                 Do you know when?
 6         A.      It must have been before the
 7    agreement was signed.  I don't remember how
 8    much it was before.
 9         Q.      And by "agreement," we're talking
10    about the divorce stipulation --
11         A.      That's what I meant, yes.
12         Q.      -- between your father and mother?
13         A.      Right.  Right.
14         Q.      Okay.  So it was sometime before
15    the divorce stipulation was signed.
16                 And the divorce stipulation was
17    signed on October 30th, 2004?
18         A.      I think it was signed on various
19    dates.
20         Q.      It was signed on various dates?
21         A.      I don't know.  It speaks for
22    itself.  It has -- it has notarized signatures
23    so . . .
24         Q.      Okay.  You're saying that this
25    conversation took place before the stipulation
```

```
1                          GENGER
2     was signed?
3         A.      Yes, for sure.
4         Q.      Okay.  It was at the Bristol Hotel
5     Plaza in your mom's hotel room.
6                 And what -- what --
7         A.      And -- and there was a
8     conversation, actually, while it was -- while
9     she was -- I remember speaking to her.  She was
10    on a yacht somewhere and I spoke to her just to
11    reconfirm our position on the matter.
12        Q.      Okay.  So that's a second
13    conversation?
14        A.      Yeah.  I mean, again, I don't want
15    to give the impression that there were only
16    two.  Those are the two that stick out in my
17    mind.
18        Q.      All right.  Well, let's go back to
19    the first conversation.
20        A.      Sure.
21        Q.      What do you remember about your
22    conversation between you, your mother, and
23    Orly?
24        A.      My mother was highly suspicious
25    about my father's representation that the TRI
```

```
 1                         GENGER
 2    shares were worthless --
 3         Q.      Okay.
 4         A.      -- and that she wanted some ability
 5    to call it back.  And in the beginning, she
 6    wanted the ability to call it back within the
 7    context of the agreement so that the
 8    stipulation of settlement itself would reflect
 9    that.
10         Q.      Okay.  So Dalia did not believe
11    that the TRI shares were worthless?
12         A.      I wouldn't say that she did not
13    believe.  I said -- I said she expressed
14    significant pessimism or skepticism about my
15    father's representations.
16         Q.      What'd you think?
17         A.      I thought she was nuts.
18         Q.      Okay.  You thought the TRI shares
19    were worthless?
20         A.      I -- yeah.  That's what I thought.
21         Q.      And what did you say during this
22    conversation that was --
23         A.      I don't remember.  I remember what
24    the upshot of it was.  I don't remember who
25    said what.
```

```
1                        GENGER
2                The only thing I can really
3    remember saying was my sister was literally
4    crying, you know, "Why?  Why not just bring
5    this to an end?"
6                I mean, she was -- it was very,
7    very emotional and, you know, we said we'll do
8    anything that's, you know, necessary to --
9    to -- to move it forward --
10        Q.      Do -- okay.  Do anything necessary?
11        A.      -- and --
12        Q.      Go ahead.  I'm sorry.
13        A.      I mean, you know, not "anything
14   necessary," I don't know if we used those
15   words, but that she should just tell us what it
16   is that she wants so that she can have comfort
17   that these things are moving forward properly.
18        Q.      Okay.  And what did she say?  What
19   did Dalia say?
20        A.      I don't -- I don't remember.  I
21   don't remember what she said at that meeting.
22        Q.      Okay.
23        A.      I just I really remember my sister
24   because it was so emotional.  It was just a
25   very, very sharp -- it's a very sharp memory.
```

```
 1                      GENGER
 2      Q.      Okay.  Do you remember anything
 3   else that your sister said during that meeting?
 4      A.      No.  Just, "Why aren't you willing
 5   to agree?  Why won't you do this?"
 6              At some point we offered to enter
 7   into the arrangement that's reflected in these
 8   documents.
 9      Q.      Okay.  So at that meeting you
10   discussed this document --
11      A.      I --
12      Q.      -- Page 2?
13      A.      I don't know that we discussed the
14   document, but the concept.  I don't remember if
15   it was in that meeting or it grew out of that
16   meeting later on.  I just don't remember.
17      Q.      Okay.  Do you remember whether you
18   and your sister and Dalia discussed this
19   document at that meeting?
20      A.      I don't think this document was in
21   existence --
22      Q.      Okay.  Do you remember --
23      A.      -- I mean, because of the
24   concept --
25      Q.      -- speaking to your sister and
```

```
1                        GENGER
2    Dalia about a promise -- the promise that's
3    memorialized in this document?
4        A.      Sure.
5        Q.      Okay.  What did your sister say on
6    that point?
7        A.      She said that, you know, it's
8    whatever -- whatever I'll commit to, she'll do
9    50 percent of.  And I explained to her the
10   general concept is that we would give my mother
11   the ability to call back value in the -- of her
12   shares that would have been allocated to her.
13   She was fine with that.
14       Q.      Okay.  I just want to make sure I
15   understand.
16               So you're the one who suggested a
17   promise that you would repay your mother?
18       A.      I don't remember if I'm the one who
19   suggested it or if it was suggested by my
20   mother or by her attorney, but I had a
21   discussion with Orly about it.
22       Q.      Okay.  And it was --
23       A.      I don't -- I don't remember whose
24   idea it was.
25       Q.      And it was at that meeting --
```

```
 1                        GENGER
 2        A.      No.
 3        Q.      -- you suggested that you would
 4   repay your mother?
 5        A.      No.  I don't think -- I don't -- I
 6   don't remember that it was at that meeting.
 7   I --
 8        Q.      Okay.  So what did you say at that
 9   meeting about --
10        A.      As I told you before, the only
11   specific thing that I remember at that specific
12   meeting was my sister's comments because they
13   were, you know, so emotional.  I mean, she was
14   crying.  I -- I've really never seen her like
15   that before.
16                And a product of that meeting, I
17   don't know if it was in that meeting or later,
18   was a decision to put it -- bring -- you could
19   sort of say effect the arrangement that we have
20   here --
21        Q.      Okay.
22        A.      -- in these documents.
23        Q.      So when did you talk about this
24   document -- if you didn't talk about this
25   document or the promise at that meeting, when
```

```
 1                        GENGER
 2    did you talk about this document with your
 3    sister?
 4        A.      At some point before the divorce,
 5    you know, I informed my sister or maybe she was
 6    informed on her own, I don't remember, that
 7    what we were going to do was give my mom the
 8    ability to exercise rights as described in the
 9    second page.
10        Q.      Okay.
11        A.      And -- and she said, "I'll just do
12    whatever you do and I'll split it with you
13    50-50."
14        Q.      So this was -- the conversation was
15    in person?
16        A.      Yes.
17        Q.      Okay.  Where was this conversation?
18        A.      I shouldn't say I know it was in
19    person.
20                But let me think about it for a
21    second.
22                I don't -- I don't remember the
23    specifics.  I remember that when she left, she
24    was -- she -- she told me that she would split
25    with me whatever -- whatever the commitment
```

```
 1                         GENGER
 2     was.  And at that point, she already understood
 3     what the commitment would be.
 4         Q.      Okay.
 5         A.      And then I -- I reconfirmed it by
 6     phone with her.
 7         Q.      Okay.  But let's -- okay.  Let's go
 8     back here.
 9                 So you said when I left, so that
10     means it was an in-person conversation.
11                 MR. DELLAPORTAS:  "When she left."
12         Q.      "When she left" --
13         A.      "When she left," right.
14         Q.      -- so it was an in-person
15     conversation?
16         A.      You know, I really -- as I said --
17     I want to correct what I said before.
18                 I -- I have to think about it.  But
19     I don't remember if it was in person or phone.
20     It's over ten years ago.
21         Q.      Okay.
22         A.      Or may it's not over; it's about
23     ten years ago.
24                 I remember that that's what she
25     told me, and then that was it.
```

```
 1                            GENGER
 2        Q.        Okay.  Over the phone or in person,
 3   do you remember when this conversation was?
 4        A.        It was -- it was -- we had multiple
 5   conversations about what was going on, and she
 6   was interested in knowing that this thing was
 7   being brought to a conclusion.
 8        Q.        Okay.  And when did these multiple
 9   conversations take place?
10        A.        Again, in the weeks leading to
11   October of -- end of October 2004.
12        Q.        So in October?  September?
13        A.        September, October.
14        Q.        How many conversations would you
15   say?
16        A.        If I had to guesstimate, I'd say
17   half a dozen, somewhere thereabouts.
18        Q.        Okay.  And during any of these
19   conversations, did you discuss the terms of
20   Page 2 with your sister?
21        A.        Yes.
22        Q.        Okay.  What did you say?
23        A.        That we would give my mother the
24   ability to call back the value of those shares.
25   Essentially the substance of what's in here.
```

```
 1                          GENGER
 2        Q.       Okay.  Did you give her a copy of
 3    Page 2 to review?
 4                 MR. DELLAPORTAS:  Object to form.
 5        A.       Did I give her a copy of Page 2 to
 6    review?  I think at least -- at least a draft
 7    of it, if not the final copy.
 8        Q.       You gave her a draft to review?
 9        A.       At least a draft.  I don't --
10    because I know she's had a piece of paper like
11    this before her, but I don't remember if it was
12    a final draft or -- I don't remember.
13        Q.       Okay.  So when did you give her a
14    draft or final to review?
15        A.       In one of those meetings.
16        Q.       At one of those meetings in
17    September or October of 2004?
18        A.       Yeah.
19        Q.       But you don't know whether it was a
20    draft or whether it was a signed copy?
21        A.       Well, it was not a signed copy
22    because she wasn't around on October 30th,
23    2004, so it could not have been signed.
24        Q.       When you say "she," who are you
25    talking about?
```

```
1                          GENGER
2       A.        My mother -- my sister.  Excuse me.
3       Q.        Okay.  But your sister didn't sign
4    Page 2.
5       A.        Oh, you're absolutely right.
6                 Yes, but my point is that I believe
7    my mother signed the agreement on October 30th,
8    2004, and that would have been its final form,
9    and my sister wasn't around.  That's what I
10   think I was trying to get to.
11      Q.        Okay.  We'll get back to that.
12                So let me to talk to you about
13   these conversations with your sister where you
14   told her about this agreement.
15                What did your sister say to you
16   when you explained the terms of Page 2?
17      A.        That it's absolutely appropriate;
18   that if that's what moves the ball forward, it
19   should be done; and that we should -- she'd
20   back me, obviously, 50-50 on whatever we had to
21   do.
22      Q.        Did you have conversations with her
23   after the document was signed?
24      A.        Yes.
25      Q.        Okay.  What did you tell her?
```

```
 1                        GENGER
 2       A.      The document was signed, we have a
 3   letter prepared to essentially split it.   It
 4   was a nonevent.
 5       Q.      A nonevent?
 6       A.      From my perspective, at least, it
 7   was.
 8       Q.      All right.   Let's go back to -- you
 9   said that there was a second conversation that
10   took place on a -- when your sister was on a
11   boat?
12       A.      Yeah, she was, I think --
13               MR. MEISTER:   Wait.
14               Objection to form.
15       A.      I believe she was on a boat off of
16   Fiji while the divorce settlement was being
17   signed.
18       Q.      Okay.  Boat off of Fiji.
19               Do you know when that was?
20       A.      October 30th, 2004, or thereabouts.
21       Q.      Around October 30th?
22       A.      Yes.
23       Q.      Okay.  So you called your sister
24   on, what, her cell phone?
25       A.      No.  It was like some special phone
```

```
 1                            GENGER
 2   call.  I remember a satellite phone or
 3   something like that.  I don't know exactly, but
 4   it was an unusual phone mechanism.
 5       Q.      Okay.  Do you know like what time
 6   of day?
 7       A.      I believe it was the evening of the
 8   30th --
 9               MS. WACHTLER:  I --
10               MR. HERRMANN:  I'm sorry --
11               MS. WACHTLER:  Yeah.
12               MR. HERRMANN:  I got lost, too.
13               Was it Orly who was on the boat off
14       of Fiji --
15               MS. WACHTLER:  Or Dalia?
16               THE WITNESS:  Yes.
17               MS. WACHTLER:  You said --
18               MR. DELLAPORTAS:  It was Orly.
19               THE WITNESS:  Orly.
20   BY MR. LEINBACH:
21       Q.      Orly is off a boat -- is on the
22   boat off of Fiji.
23       A.      Fiji, that's right.
24               MS. WACHTLER:  And you called Orly.
25       Okay.
```

```
 1                           GENGER
 2        Q.      So you called her.  It was in the
 3    evening where you were?
 4        A.      I believe it was the evening, yeah.
 5        Q.      Okay.  And what did you say to her
 6    on that phone call?
 7        A.      That I was about to sign the
 8    document reflective of what we discussed.
 9        Q.      Okay.
10        A.      I think I read it to her, she said,
11    "Fine, whatever it is I'll back -- backstop you
12    50-50."
13        Q.      You read the document to her over
14    the phone?
15        A.      I -- I think I did.
16        Q.      Okay.
17        A.      If not -- if not read it to her, I
18    certainly described it to her.
19        Q.      Okay.  Was anybody else in the room
20    with you when you had this phone call with your
21    sister?
22        A.      I don't remember.
23        Q.      Where were you when you had this
24    phone call?
25        A.      I was at Sonnenschein's offices.
```

```
 1                          GENGER

 2        Q.       You were at Sonnenschein's offices?

 3        A.       Yeah.

 4        Q.       Okay.  Was anybody -- did you hear

 5   anybody on the phone with your sister when you

 6   had this conversation?

 7        A.       I think I also spoke to my father.

 8        Q.       You also spoke with your father --

 9        A.       Right.

10        Q.       -- during that conversation?

11        A.       Right.

12        Q.       Okay.  What did you tell your

13   father during that conversation?

14        A.       That it looked like things would

15   get wrapped up, and -- you know, obviously, in

16   retrospect, I was wrong.  Apparently we had

17   successfully resolved all of the matrimonial

18   issues.

19                 I mean, it sounds to say funny it

20   now sitting here.

21        Q.       Okay.  Did you tell your father

22   during this phone conversation in Fiji that

23   this Page 2, this document, existed?

24        A.       Did I?  No.

25        Q.       Why?
```

34

```
1                              GENGER
2        A.        I mean not that I remember.  I
3   don't know.
4        Q.        Why?
5        A.        I don't -- I mean, it's not hiding
6   it from him.  I don't know.  What's the --
7        Q.        Why didn't you tell him?
8        A.        Well, the only -- you can start off
9   why did I tell Orly at all as opposed to --
10                  MR. DELLAPORTAS:  Just answer the
11       question.
12       A.        I didn't see a reason to speak to
13  him about it.
14       Q.        You didn't see a reason to tell
15  your father about this document which is
16  Page 2?
17       A.        I don't -- I don't remember on that
18  phone call having a -- thinking that this was a
19  problem with him.
20       Q.        You didn't think that this would be
21  an issue, that he'd need to know this at all?
22       A.        Well, I would think he knows.
23       Q.        You would think he knows?
24       A.        Yes.
25       Q.        How?
```

1                         GENGER

2        A.       Well, I knew it.  Orly knew it.

3    His lawyer knew about it.  It was in drafts of

4    the stipulation that were taken out.

5        Q.       Okay.  Did you ever share drafts of

6    Page 2 with your father?

7        A.       Well, as I recall, it was in part

8    of -- at the beginning it was going to be an

9    exhibit to the stipulation itself.  So when we

10   circulated those, it was attached to it.

11       Q.       When you circulated the divorce --

12       A.       Well, I didn't circulate it;

13   when -- when the lawyers circulated it.

14       Q.       When the lawyers circulated the

15   divorce stipulation --

16       A.       Right.

17       Q.       -- you're saying a draft of Page 2

18   was attached to the drafts of the divorce

19   stipulation?

20       A.       That's right.

21       Q.       Okay.  When were those drafts sent?

22       A.       I'm guessing, but, you know,

23   Septemberish of 2004.

24       Q.       Okay.  Are there any e-mails -- do

25   you have any e-mails that corroborate, you

1                         GENGER
2     know, drafts being sent with this document
3     attached to the divorce stipulation?
4         A.      I'd have to go back.  I mean --
5     yeah, it was -- it was basically a table of
6     contents, and I remember clearly that it was
7     there and that Ed didn't want it to be in
8     there.
9         Q.      Okay.  Let's unpack it for one more
10    second though.
11        A.      Sure.
12        Q.      You say drafts of the divorce
13    stipulation were sent out that attached Page 2;
14    is that correct?
15        A.      I don't remember if it attached it
16    or just named it.  I don't remember.
17        Q.      Okay.  You don't know if it
18    attached it or not?
19        A.      It's so many hundreds of pages.  I
20    really don't remember.  I couldn't -- that --
21    that would be the same answer for any page in
22    the stipulation.
23        Q.      Okay.  You have drafts of the
24    divorce stipulation which you say named the
25    document in it?

```
 1                      GENGER
 2      A.      Drafts or at least it was listed as
 3   an exhibit.
 4      Q.      It was listed as an exhibit in --
 5      A.      For that for sure I remember.
 6   That -- that's --
 7      Q.      Okay.  When were those drafts sent?
 8      A.      Well, before -- I don't remember,
 9   so October, September, or something.
10      Q.      Do you have copies of those drafts?
11      A.      I don't know.  I could check.
12      Q.      Did you -- have you ever produced
13   those drafts in any litigation?
14      A.      Not that I can think of, no.
15      Q.      Have you ever produced drafts of
16   the divorce stipulation in any litigation?
17      A.      I know in the arbitration there
18   were -- they went through drafts.  I don't
19   remember if I'm the one who produced them.
20      Q.      But the question is:  Did you
21   produce any drafts --
22      A.      I -- I don't know.
23      Q.      -- of the divorce stipulation?
24      A.      I don't know.
25      Q.      Do you have any drafts of the
```

```
 1                          GENGER
 2    divorce stipulation in your possession?
 3         A.      If I go back to old e-mails, I may
 4    have them.
 5         Q.      Okay.  Who else would have had had
 6    drafts of the divorce stipulation with
 7    reference to Page 2?
 8         A.      I would guess Carol Schepp because
 9    she -- she's the one that wanted it in the
10    table of contents.
11         Q.      Okay.  Carol Schepp.
12         A.      Right.
13         Q.      Anybody else?
14         A.      Well, I think Ed Klimerman received
15    them and objected to it.
16         Q.      Ed Klimerman received them?
17         A.      Yes.
18         Q.      So he would have drafts.
19         A.      I don't know what he has or doesn't
20    have.
21         Q.      Your father?
22         A.      It was -- it was -- it was
23    circulated so I don't know -- you know, it was
24    circulated by them, so I don't know what --
25         Q.      When you say "them," who do you
```

GENGER

1                              GENGER

2  mean?

3     A.       I mean by -- by Carter Ledyard.

4     Q.       Okay.  Your father, did he receive

5  these drafts?

6     A.       I don't know.  As I said in my

7  earlier deposition, I don't know what he and Ed

8  were speaking about behind closed doors.

9     Q.       Okay.  So you know that Carol

10  Schepp received drafts of the divorce

11  stipulation that referenced Page 2?

12     A.       I think she produced them, not --

13     Q.       You know that Ed Klimerman received

14  copies of the divorce stipulation

15  that referenced Page 2?

16     A.       I presume so, because if it was

17  circulated to me, it was circulated to him.

18     Q.       Okay.  Why do you say you

19  "presume"?

20     A.       Because -- because as a matter of

21  practice -- you know, I'm not sure.

22             I want to say that everything that

23  I was given also went to my father simult- --

24  my father's counsel simultaneously, but I'm not

25  sure that's true.  It's ten years ago.

```
 1                      GENGER

 2             What -- the one thing I do remember

 3     is there being a discussion between Carol

 4     Schepp and Ed Klimerman where Carol wanted to

 5     make this agreement an integrated part of the

 6     stipulation, and Ed did not want it.

 7        Q.    Okay.  Let's -- we'll get back to

 8     that in a second, but I want to make sure that

 9     I understand this.

10             Drafts of the divorce stipulation

11     were circulated which attached this document or

12     made reference to it.

13             How were they circulated; by

14     e-mail?

15        A.    I don't remember.

16        Q.    Do you -- you don't remember?

17             So you don't remember if someone

18     walked up --

19        A.    I remember get --

20        Q.    -- and handed you them or if they

21     got e-mailed to you?

22        A.    No, I remember I received e-mails

23     from that period.  I'm not sure that everything

24     that I received was by e-mail.  It's ten years

25     ago.  It's -- it's difficult to remember.  But
```

```
 1                      GENGER
 2    there are -- certainly are e-mails that deal
 3    with drafts.
 4         Q.      Okay.
 5         A.      I don't know that essentially what
 6    would be the table of contents that I'm
 7    referring to was included in there or in an
 8    e-mail or if it was just done by hard copy.  I
 9    just don't know.
10         Q.      Okay.  Let's talk about
11    conversations that you had with Ed Klimerman
12    about Page 2 of this document.
13         A.      Sure.
14         Q.      How many conversations do you
15    think -- would you say you had with Ed
16    Klimerman about this document?
17         A.      At least two.
18         Q.      At least two?
19         A.      Yeah.
20         Q.      Okay.  When were those
21    conversations?
22         A.      It's the same time frame.
23         Q.      Okay.  So what time frame are we
24    talking about?  September, October 2004?
25         A.      Yeah.
```

```
1                            GENGER
2        Q.      Okay.  What was the substance --
3    let us back up one second.
4                Can you remember the difference
5    between these two conversations?
6        A.      I remember the second conversation
7    reasonably well.
8        Q.      Okay.  What do you remember about
9    the first conversation?  Do you remember
10   anything about that?
11       A.      That he didn't want it to be part
12   of the stipulation of settlement.
13       Q.      Okay.  So he knew this document
14   existed but did not want it to be part of the
15   stipulation of settlement; is that accurate?
16       A.      That's correct.
17       Q.      Why?
18       A.      Because it's an agreement between
19   the children and the mother, and it has nothing
20   to do with Arie, and it's -- it doesn't belong
21   there.
22       Q.      Okay.  You testified earlier that
23   he may have had a hand in drafting this
24   document?
25       A.      Yeah, only because -- when I say
```

```
 1                         GENGER
 2    "hand in," there was some touch-ups done on the
 3    night it was done, and it was done in his
 4    office.  So when I say -- it's not that he
 5    stood behind drafting it, he just may have
 6    helped ministerially.
 7         Q.      Okay.  You say there were touch-ups
 8    of it, do you mean touch-ups of this document?
 9         A.      Of the -- of the second page, yes.
10         Q.      Okay.  You were in his office doing
11    what?
12         A.      It was closing.  All the documents
13    were being closing, documents that needed to be
14    signed.
15         Q.      So it was the closing of the
16    divorce stipulation?
17         A.      Right.
18         Q.      That was when, on the evening of
19    October 30th?
20         A.      It was the 30th going into -- it
21    was on the 30th going into the 31st, if I
22    remember correctly.
23         Q.      Okay.  So it was late in the
24    evening?
25         A.      Right.
```

1                          GENGER

2       Q.      Okay.  And this document was one of

3   the documents that was being shuffled back and

4   forth for signature?

5       A.      Yes.

6       Q.      Okay.  Who was it being shuffled

7   back and forth to?

8               MR. MEISTER:  Are you referring to

9       October 30th?

10              MR. LEINBACH:  Yeah.

11      A.      I think the people who were there

12  were Ed Klimerman, my mother, Carol Schepp, and

13  myself.

14      Q.      Okay.  Ed Klimerman, your mother,

15  Carol Schepp, and yourself all saw this

16  document?

17      A.      Absolutely.

18      Q.      Okay.  When was this document

19  signed?

20              MR. HERRMANN:  Talking still just

21      about Page 2?

22              THE WITNESS:  Yeah.

23              MR. LEINBACH:  Just -- just about

24      Page 2.

25      A.      I'm not sure if I signed it -- I'm

```
 1                         GENGER
 2    not sure if I signed it only when Orly
 3    returned.  I know that it was held -- David
 4    held the documents so that they would both be
 5    released together --
 6         Q.       Okay.  You --
 7         A.       -- but I don't remember if I signed
 8    it before he started to hold it or after.
 9         Q.       So you don't remember whether you
10    signed it on October 30th, 2004?
11                  MS. WACHTLER:  I'm sorry.  Did you
12        say "David"?
13                  THE WITNESS:  David Parnes.
14                  MS. WACHTLER:  Oh, David Parnes.
15                  MR. LEINBACH:  Yeah.
16         A.       I think I signed it at the closing
17    table --
18         Q.       Okay.
19         A.       -- and gave it to David.
20         Q.       So you weren't sure, but you're
21    sure now?  You --
22         A.       I'm not sure.  I'm giving you my
23    best guesstimate.  I'm not sure.
24         Q.       I don't want you to guess.  I want
25    you to --
```

```
 1                          GENGER
 2        A.       Then I can't answer the question.
 3        Q.       Did you -- so you don't know
 4   whether you signed it on the 30th or not?
 5        A.       I mean, I don't have recollection
 6   sufficient enough to say that I'm sure.
 7        Q.       Do you remember signing the
 8   document at all?
 9        A.       Yeah, I signed it at some point.
10        Q.       Okay.  So looking at Page 2, down
11   here where it says "Sagi Genger," that's your
12   signature?
13        A.       Yes, it is, absolutely.
14        Q.       Okay.  And underneath that where it
15   says "Dalia Genger," that's Dalia Genger's
16   signature?
17        A.       Yes.
18        Q.       Okay.  Do you know when Dalia
19   Genger signed this document?
20        A.       I'm reasonably sure that she did at
21   the closing table.
22        Q.       Okay.  When you say "at the closing
23   table," was that before or after the divorce
24   stipulation was signed?
25        A.       I don't remember.
```

```
1                        GENGER
2       Q.      Do you remember whether it was on
3    the same day that the divorce stipulation was
4    signed?
5       A.      Yeah.  It was at that -- at that
6    time around the table.
7       Q.      It was on the same day that the
8    divorce stipulation was signed?
9       A.      Yeah.  We left there with a signed
10   copy.
11      Q.      Okay.
12      A.      What I remember was we had a signed
13   copy, David took it and was holding until Orly
14   signed the indemnity.  That was --
15      Q.      Okay.  You had a --
16      A.      That's what I remember.
17      Q.      -- you had a signed copy that was
18   signed by Dalia, and you left where?  You left
19   Sonnenschein's offices?
20      A.      I left Sonnenschein's offices, yes.
21      Q.      Okay.  You had --
22      A.      It may have also been signed by me.
23   I just don't -- I don't remember.
24      Q.      You had in your hand an original
25   copy that was signed by Dalia?
```

```
 1                        GENGER
 2      A.      I think David had in his hand an
 3   original copy that was --
 4      Q.      Okay.  How many copies of this
 5   document were signed?
 6      A.      I don't know.
 7      Q.      More than one?
 8      A.      I don't remember.
 9      Q.      You don't remember?
10      A.      No.
11      Q.      So it could have just been one?
12      A.      Could be.
13      Q.      It could be more than one?
14      A.      Could be.
15      Q.      You say that David had the
16   document?
17      A.      Yes.
18      Q.      Was David present for signing of
19   the divorce stipulation?
20      A.      I guess so, yeah.  Yes.
21      Q.      And just to make sure that the
22   record is clear, when you say "David," you're
23   referring to David Parnes?
24      A.      To David Parnes, yes.
25              So when I enumerated the people, I
```

```
1                          GENGER
2    forgot to mention David.  David was there.
3        Q.      Okay.  So David Parnes was present
4    at Sonnenschein's offices during the
5    negotiation and signature of the divorce
6    stipulation?
7        A.      The negotiation is a completely --
8        Q.      Yeah.
9        A.      -- it's a -- for the finalization
10   of the documents.
11       Q.      That's fair enough.
12               During the day when these documents
13   were executed, David Parnes was present at
14   Sonnenschein?
15       A.      Yeah.
16       Q.      Okay.  Did David Parnes know about
17   Page 2?
18       A.      Yes, very much so.
19       Q.      Okay.  And why do you -- why do you
20   say "very much so"?
21       A.      Because it -- it was a matter that
22   concerned me personally and he was my attorney.
23       Q.      Okay.
24       A.      And it was a -- a very important
25   document for getting the stipulation of
```

```
1                           GENGER
2    settlement executed.
3         Q.      Okay.  Did --
4         A.      And --
5         Q.      Did you provide David Parnes with
6    drafts of Page 2?
7         A.      I don't know that I ever provided
8    drafts.  I think probably Carol did.  But,
9    again, I don't remember.
10        Q.      Okay.  Did Carol circulate drafts
11   of Page 2 to David Parnes?
12        A.      I just don't remember.
13        Q.      Did Carol Schepp circulate the
14   divorce stipulation that you say attached or
15   referenced Page 2 to David Parnes?
16        A.      I remember seeing it.  I presume
17   David got it, but I don't remember.
18        Q.      Okay.  You say David -- when you
19   left their offices, David had the agreement,
20   that he was holding it?
21        A.      That's right.
22        Q.      Can you tell me why David Parnes
23   was holding this agreement?
24        A.      Because it was -- it was in -- it
25   was not in balance.  My -- we didn't have -- we
```

```
1                        GENGER
2     expected that we would have this document and
3     my sister's document signed at closing --
4          Q.       Uh-huh.
5          A.       -- and my sister did not leave a
6     power of attorney -- attorney with sufficient
7     scope to do that.  And that's what I remember
8     with Ed.  So when she came back, we did what we
9     did here.
10         Q.       Okay.  When she came back?
11         A.       From her trip to Fiji.
12         Q.       Okay.  Who knew that David Parnes
13    had the original?  You.  Anybody else?
14         A.       I don't remember.
15         Q.       Where is the original of Page 2
16    now?
17         A.       I believe it's with my attorneys.
18         Q.       Who's your attorneys?
19         A.       Morgan Lewis.
20         Q.       Okay.  So Morgan Lewis right now
21    has the original copy of Page 2?
22         A.       I haven't examined it to see it's
23    original, but it looks to me like it's an
24    original.
25         Q.       Well, how did they get the original
```

```
 1                           GENGER
 2     copy of Page 2?
 3          A.      Mr. Parnes had them, and he --
 4          Q.      Okay.
 5          A.      -- had sent them to them.
 6          Q.      David Parnes had this original
 7     document --
 8          A.      Right.
 9          Q.      -- and he gave it to your lawyers?
10          A.      Yes.
11          Q.      At whose direction?
12          A.      At my direction.
13          Q.      You told him to give them this
14     document?
15          A.      I did.
16          Q.      Have you ever produced Page 2 in
17     any litigation?
18                  MR. DELLAPORTAS:  Other than in
19          the -- in the settlement conference,
20          correct?
21                  MR. LEINBACH:  Yeah.
22          Q.      I'm -- I'm asking about in any
23     litigation at all, have you ever produced this
24     document?
25                  MR. DELLAPORTAS:  Well, I have an
```

```
 1                           GENGER
 2        agreement with Yoav that it be treated
 3        as --
 4                 MR. LEINBACH:  I understand.  I get
 5        it.
 6                 And I'm not asking --
 7                 MR. DELLAPORTAS:  No, but
 8        just state --
 9                 MR. LEINBACH:  Yeah.
10                 MR. DELLAPORTAS:  -- that we had an
11        agreement whereby it would be treated as
12        produced in this litigation,
13        notwithstanding that it was initially
14        handed over in the settlement conference.
15                 MR. LEINBACH:  I -- I get that --
16                 MR. DELLAPORTAS:  Okay.
17                 MR. LEINBACH:  -- and that's not
18        what I'm asking.
19   BY MR. LEINBACH:
20        Q.    What I'm saying is --
21        A.    In the arbitration.
22        Q.    This document was produced during
23   the arbitration before Judge Milonas?
24        A.    It was -- yeah, it was produced.
25        Q.    Okay.  Produced by whom?
```

```
 1                          GENGER
 2        A.      By me.
 3        Q.      You produced this document during
 4    the Milonas arbitration?
 5        A.      I gave a copy of it to my mother's
 6    attorneys.
 7        Q.      Okay.  You gave a copy to whom?
 8    Let's just be clear.
 9        A.      I think it's Frank Velie.
10             MS. WACHTLER:  I'm sorry.  Frank
11        who?
12             MR. HERRMANN:  Velie.
13             THE WITNESS:  Velie.
14             It doesn't matter.  It's some guy
15        at Sullivan & Worcester, whoever --
16             MS. WACHTLER:  No, it does matter.
17        I just want to know.  I've never heard the
18        name, so . . .
19             MR. LEINBACH:  Yeah, I haven't
20        either.
21             MR. STAPLETON:  Frank Velie, I
22        think -- I think it's V-I-L --
23             MR. HERRMANN:   -- E-L-E.
24        V-I-E-L-E, I think.
25             MR. STAPLETON:  V-I- --
```

```
1                         GENGER
2              Yeah, I remember he was at the
3        arbitration.
4                 MR. LEINBACH:  Okay.  So --
5                 MS. WACHTLER:  Is he a lawyer?  I
6        don't know.
7                 THE WITNESS:  Yeah.
8                 MS. WACHTLER:  I'm sorry.
9                 MR. HERRMANN:  I thought he --
10                THE WITNESS:  Yeah.
11                MR. HERRMANN:  Wasn't he the guy
12       that questioned everybody?  Did he
13       question --
14                THE WITNESS:  Yeah, I think so.
15  BY MR. LEINBACH:
16       Q.      Okay.  So this is -- this is
17  Dalia's lawyer?
18                MS. WACHTLER:  Oh, Dalia's lawyer?
19       Q.      And you gave -- you gave Dalia's
20  lawyer a copy of this document -- we're talking
21  about Page 2 still -- You gave it to him --
22       A.      Right.
23       Q.      -- during the Milonas arbitration?
24       A.      Yes.  Absolutely.
25       Q.      Okay.  And did you give it to him
```

```
 1                          GENGER
 2     in hard copy?  Did you send him an e-mail?
 3          A.      I don't remember.
 4          Q.      Okay.  Did you ever speak with
 5     Mr. Velie about this document?
 6          A.      Yes.
 7          Q.      Okay.  Tell me about that
 8     conversation.
 9                  Was there more than one?
10          A.      I don't know if there's a privilege
11     issue.  So one second.  Hold on.
12          Q.      Was Mr. Velie your lawyer?
13          A.      Yes.
14                  MS. WACHTLER:  He was your lawyer?
15          Q.      He was your lawyer during the
16     arbitration?
17                  MS. WACHTLER:  I thought you said
18          he was Dalia's lawyer.
19          A.      May I speak to my lawyer and I'll
20     come back.
21          Q.      Okay.
22                  MS. WACHTLER:  There's a question
23          pending.
24                  MR. STAPLETON:  Yeah, there's a
25          question pending.
```

```
1                          GENGER
2                MR. DELLAPORTAS:  And there's a
3          privilege question.
4          Q.      Just answer just yes or no, was he
5     your lawyer?
6          A.      And as I'm saying to you, he was my
7     lawyer, and I need to understand if -- in this
8     context of whether he was acting as my lawyer.
9          Q.      Okay.
10                      (A recess was taken from 10:52 a.m.
11                 to 10:57 a.m.)
12               MR. LEINBACH:  Can you just read
13          back the question that I had asked before
14          we went on break?
15                      (The requested portion of the
16                 record was read.)
17               MR. DELLAPORTAS:  So we took a
18          break because the witness wanted to consult
19          about a privilege issue.  I think the
20          answer is that Mr. Velie had previously
21          represented the witness for other unrelated
22          matters, but was not the witness's lawyer
23          for purposes of this arbitration, and thus
24          there's no privilege, and so you can ask
25          about those conversations.
```

```
1                        GENGER
2    BY MR. LEINBACH:
3         Q.      Okay.  Tell me about your
4    conversations with Mr. Velie concerning Page 2
5    of this exhibit.
6         A.      That it's a document; that it
7    exists; that it may be relevant to the
8    arbitration.
9         Q.      Okay.  So you told this -- you
10   told -- and this guy's name is Frank Velie?
11        A.      Yeah.
12        Q.      You told Mr. Velie that this
13   document exists?
14        A.      Yes.
15        Q.      You provided him with a copy of
16   this document?
17        A.      Yes.
18        Q.      Was this prior to the hearings
19   before Justice Milonas?
20        A.      Yes.
21        Q.      Okay.  So you provided him with a
22   copy of the document before the hearings and
23   told him what about it?
24        A.      "This may be relevant to your
25   case."
```

```
1                           GENGER
2        Q.      Did you say why?
3        A.      What?
4        Q.      Did you say why?  Did you explain
5   it?
6        A.      It has to do with the shares.  I
7   don't -- it has to do with it.
8        Q.      Okay.  You told him it has to do
9   with the TRI shares.
10                Anything else?
11       A.      No.  I said, "Here, read it.  This
12  is what it is.  It may be relevant; it may not
13  be relevant.  This document exists."
14       Q.      Okay.  Did he ask you any questions
15  about the document?
16       A.      Not that I can recall.
17       Q.      He didn't ask you anything?  He
18  just said --
19       A.      You're talking about --
20       Q.      -- he took it and said, "Thank
21  you"?
22       A.      He took it.  He looked at it.  You
23  know, he said, "Thank you."  That's it.  I
24  don't remember -- he maybe didn't say, "Thank
25  you."  He just took it.  I don't know what's --
```

```
1                              GENGER
2    I didn't ask him for a legal analysis.
3         Q.      Okay.  Was anybody else present
4    with you when you had these conversations with
5    Frank Velie?
6         A.      I don't remember.
7         Q.      Was it -- were they in person?
8         A.      Yes.
9         Q.      Okay.  They were in person.
10               Where were these conversations?
11        A.      In his office.
12        Q.      They were in his offices.
13               And it was just you and him?
14        A.      I didn't say that.
15        Q.      Okay.  Can you remember whether
16   there was anyone present?
17        A.      I just don't remember.
18        Q.      Did you provide him with -- well,
19   you provided him with a copy, right?
20        A.      Yes.
21        Q.      Okay.  At that time, the original
22   was where?
23        A.      I don't remember at that time where
24   it was.
25        Q.      Okay.  Going back to 2004, you say
```

```
 1                          GENGER
 2    that when you guys -- when you left the signing
 3    at Sonnenschein, David Parnes had possession of
 4    this document which is Page 2?
 5         A.      I think so, yeah.
 6         Q.      Was there ever a time between 2004
 7    and the time when David Parnes provided this
 8    document to Morgan Lewis that he was not in
 9    possession of the original document?
10         A.      Yes.
11         Q.      Okay.  When was that?
12         A.      Well, for some time it was in my
13    possession, and I think -- I think before that,
14    it was in my father's possession.
15         Q.      Okay.  So 2004, he takes the
16    document.  And then you said at some point in
17    time, it came in your father's possession and
18    your possession, the original document?
19         A.      I -- I'm not sure it was the -- I
20    think it's the original that came into my
21    father's possession and was returned to me.
22         Q.      Okay.
23         A.      And then it -- then I had it for a
24    while.  And then when I moved offices, I
25    identified documents that were particularly --
```

# Exhibit F

# Part 2

*ARIE GENGER VS.*
*SAGI GENGER*

---

*SAGI GENGER*
*March 20, 2014*

---



**Ellen Grauer**
**COURT REPORTING** Co. LLC
126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106465A.TXT*
*Min-U-Script® with Word Index*

```
 1                            GENGER
 2     that when you guys -- when you left the signing
 3     at Sonnenschein, David Parnes had possession of
 4     this document which is Page 2?
 5          A.       I think so, yeah.
 6          Q.       Was there ever a time between 2004
 7     and the time when David Parnes provided this
 8     document to Morgan Lewis that he was not in
 9     possession of the original document?
10          A.       Yes.
11          Q.       Okay.   When was that?
12          A.       Well, for some time it was in my
13     possession, and I think -- I think before that,
14     it was in my father's possession.
15          Q.       Okay.   So 2004, he takes the
16     document.   And then you said at some point in
17     time, it came in your father's possession and
18     your possession, the original document?
19          A.       I -- I'm not sure it was the -- I
20     think it's the original that came into my
21     father's possession and was returned to me.
22          Q.       Okay.
23          A.       And then it -- then I had it for a
24     while.   And then when I moved offices, I
25     identified documents that were particularly --
```

```
 1                          GENGER
 2   where originals might be of importance, and I
 3   sent them to David.
 4        Q.      Okay.  You said it came into your
 5   father's possession.
 6                How did that happen?
 7        A.      Well, I used to share office space
 8   with him.
 9        Q.      Okay.
10        A.      And I left -- when he asked me to
11   leave, I left there a box of documents which
12   included this.
13        Q.      Okay.
14        A.      And eventually, if I remember
15   correctly, David Lentz returned them to me.
16        Q.      Okay.  You said it came into your
17   father's possession.
18                Did you hand this document to your
19   father?
20        A.      No.  I mean, the box with documents
21   that contained that.
22        Q.      Okay.  So you put the original
23   document in a box?
24        A.      I think it's the original, I'm not
25   sure.  But certainly a copy of it was there.
```

```
1                         GENGER
2         Q.      Okay.  But I'm not talking about
3    copies.  We're talking about the original
4    document.
5               And you say that it was originally
6    with David Parnes and sometime it came into
7    your father's possession, I just want to know
8    when that was.
9         A.      I'm not sure if it's the original.
10        Q.      Okay.  So you don't know whether it
11   came into your father's possession?
12        A.      I don't know whether the original
13   came into his possession.
14        Q.      Okay.  So once again, from the
15   beginning, from 2004 --
16        A.      Right.
17        Q.      -- when you left the divorce
18   stipulation signing --
19        A.      Right.
20        Q.      -- at Sonnenschein's offices, it
21   was in David Parnes's possession?
22        A.      Right.
23        Q.      Was there any point in time between
24   2004 and the time when David Parnes provided
25   the original document to Morgan Lewis that it
```

```
 1                          GENGER
 2    was out of David's possession?
 3         A.      Yes.
 4         Q.      Okay.  When was the original
 5    document out of David Parnes's possession?
 6         A.      I had it for a while and produced
 7    it to him.  And prior to that, it may or may
 8    not be true that my father had the original.
 9         Q.      Okay.  You don't know whether or
10    not that was the original document?
11               MR. MEISTER:  Objection.
12               Whether what was the original
13         document?
14               MR. LEINBACH:  Whether -- whether
15         the document that was provided to Arie --
16         and we'll get into that -- was the original
17         document which came-- the original
18         Page 2 --
19               THE WITNESS:  Right.
20               MR. LEINBACH:  -- which came from
21         David Parnes.
22         Q.      You don't know?
23         A.      I don't know.
24         Q.      How did this copy come into your
25    father's possession?  Did you hand it to him?
```

```
 1                          GENGER

 2        A.      No.  As I said, I had a box there

 3    with documents.

 4        Q.      Okay.  So you put the document,

 5    whether -- either an original or a copy, into a

 6    box --

 7        A.      Right.

 8        Q.       -- and you presented the box to

 9    him?

10        A.      No.  I left it there.  And

11    Mr. Lentz was kind enough to bring it back to

12    me.

13        Q.      Okay.  So you had a box of

14    documents that you brought to the office?

15        A.      Yeah.

16        Q.      Okay.  And when I say "offices,"

17    we're talking about?

18        A.      TRI's offices.

19        Q.      And this was on West 57th Street?

20        A.      I think so, yeah.

21        Q.      Okay.  You brought a box of

22    documents to the offices at West 57th Street?

23        A.      Right.

24        Q.      And that -- one of the documents in

25    that box you think was either an original or a
```

```
1                            GENGER
2    copy of Page 2?
3         A.      Yes.
4         Q.      Okay.  Did your father know what
5    was in the box?
6         A.      I have no idea.
7         Q.      Okay.  So when you say that you --
8    it came into Arie's possession, you don't know
9    whether Arie actually had -- knew he had a
10   document?
11        A.      That's true.
12        Q.      Okay.  Did you ever speak with your
13   father about this document?
14        A.      No.
15        Q.      Ever?
16        A.      No.  Not about the stipulation.
17   Always with Ed.
18        Q.      Okay.  No, but we're talking about
19   Page 2.
20        A.      No, this was part of the whole
21   stipulation arrangement.
22               And what I said at the last time,
23   and people didn't take it seriously apparently.
24   I, at the time, was trying shepherd everyone to
25   a document that they're willing to sign.
```

```
1                         GENGER
2              Ed was having private conversations
3    with my father, Ms. Schepp was having -- and
4    another lawyer were having private
5    conversations with my mother.  I don't know
6    what happened in those conversations.
7              All I know is was that I was
8    helping to wordsmith a document that they were
9    both willing to sign.
10      Q.      Okay.  I heard that.
11              But I want to ask you this question
12   again.
13              Did you ever --
14      A.      And I -- I didn't -- I didn't deal
15   directly --
16      Q.      Did you ever --
17      A.      Yeah.
18      Q.      -- speak with your father about
19   Page 2 to this exhibit?
20      A.      No.
21      Q.      Ever?
22      A.      Well, we did recently, but no prior
23   to 2014.
24      Q.      Okay.  Prior to 2014, you've never
25   spoken with your father about this document?
```

```
 1                         GENGER
 2       A.      About the document itself?  I don't
 3   remember having a conversation about the
 4   documents.
 5       Q.      Okay.  Do you remember having any
 6   conversation that such a document, in sum or in
 7   substance, existed?
 8       A.      That such an arrangement existed,
 9   yes.  But not necessarily that it was
10   documented.
11       Q.      Okay.  Do you remember talking to
12   your father about an arrangement -- the
13   arrangement that's memorialized in this
14   document?
15       A.      Yes.
16       Q.      Okay.  When?
17       A.      I don't remember.
18       Q.      2010?  2011?  2004?  2005?
19       A.      Somewhere between 2004 and 2007.
20       Q.      Okay.  How many conversations did
21   you have?
22       A.      I don't remember.
23       Q.      More than one?
24       A.      I really don't remember.
25       Q.      Where were these conversations?
```

```
1                          GENGER
2         A.      I don't remember.
3         Q.      Okay.  What was the substance of
4    your conversations with your father about the
5    sum or substance of Page 2 of this exhibit?
6         A.      That Orly and I agreed that Mom
7    could come back to us with respect to the
8    shares that were -- would have been allocated
9    to her otherwise.
10        Q.      Okay.  You told your father that
11   you had agreed --
12        A.      Right.
13        Q.      -- that you and Orly had agreed to
14   pay your mother money that related to the
15   shares, the TRI shares?
16        A.      Yes.
17        Q.      And what'd your father say?
18        A.      He didn't like it.
19        Q.      Okay.  Do you remember specifically
20   what he said?
21        A.      I don't remember.  But I remember
22   he didn't like it.
23        Q.      Did he tell you why he didn't like
24   it?
25        A.      He just -- he didn't like his
```

```
 1                          GENGER
 2    ex-wife getting anything.
 3         Q.      Okay.
 4         A.      If I'd have told him she's getting
 5    a nickel, he wouldn't like that.
 6         Q.      Okay.  He -- you're saying that he
 7    knew this promise document existed between 2004
 8    and 2007?
 9         A.      He knew that we had an arrangement.
10    I don't know if he saw -- listen, I don't know
11    what Ed -- what his lawyers showed him.  So I
12    can't tell you that I know what he saw.
13              The way he would have seen it in
14    the normal course would not have been from me.
15    Documents were delivered through the lawyers.
16              So, you know, I can't tell you --
17    for instance, I can't tell you sitting here
18    today, that he saw the penultimate draft of the
19    stipulation of settlement, or any draft for
20    that matter, because it was given to his
21    lawyers, and the lawyers would speak to him.  I
22    was one step removed from him.
23         Q.      Uh-huh.
24         A.      So I don't know -- I don't know
25    whether he saw this or any of the other myriad
```

```
 1                          GENGER
 2    of documents.
 3         Q.        But you'd had conversations with
 4    your father about the divorce stipulation prior
 5    to its signing, correct?
 6         A.        Yes.
 7         Q.        Okay.  And during any of those
 8    conversations prior to the divorce stipulation
 9    signing, did you ever think to inform your
10    father that this document was being negotiated
11    or was being -- or was going to be signed?  And
12    when I say "this," I mean Page 2 to this
13    exhibit.
14         A.        Yes.
15         Q.        Okay.  You just -- you just
16    testified that you had never had any
17    conversations with your father about the
18    document itself.
19         A.        That's correct.
20         Q.        Okay.  Between 2004 and 2007, you
21    informed him that it existed?
22         A.        I rem- -- that the arrangement
23    existed.
24         Q.        Okay.  Do you remember whether
25    these conversations were prior to the divorce
```

```
1                         GENGER
2    stipulation's signing?
3         A.      Yes, we had conversations
4    beforehand.
5         Q.      So prior to the divorce stipulation
6    signing --
7         A.      Right.
8         Q.      -- you had conversations with your
9    father about the substance of Page 2?
10        A.      Yes.
11        Q.      Okay.  And what did your father say
12   to you during those conversations prior to the
13   divorce stipulation signing?
14        A.      I think he was -- he was dead set
15   against it.
16        Q.      Okay.  Did he say why?
17        A.      He didn't want anything going to my
18   mother.
19               He said it's worthless, this is an
20   opportunity for estate planning, and there's no
21   reason to give my mother a window to get any
22   money out of it, something along those lines.
23        Q.      Did you have conversations prior to
24   this document's signing -- we're still talking
25   about Page 2.
```

```
1                              GENGER

2                Did you have any conversations with

3    anyone other than the people you've named?

4                You've named so far Carol Schepp,

5    Ed Klimerman --

6        A.      Right.

7        Q.      -- and your sister.

8        A.      Right.

9        Q.      Did you speak with anyone else

10   prior to this document's signing?

11       A.      About the document?

12       Q.      Yeah.

13       A.      Not that I can remember --

14               MS. WACHTLER:   You forgot David

15       Parnes.

16       Q.      Yeah.

17       A.      And David Parnes, I'm sorry.

18       Q.      And you spoke with David Parnes,

19   I'm sorry.

20               MR. LEINBACH:   Thank you for that.

21               THE WITNESS:   Thank you.

22               MR. MEISTER:   And you forgot Arie.

23               THE WITNESS:   Right.

24               MR. LEINBACH:   Well, that's true.

25       Q.      Arie Genger, you spoke with Arie
```

```
 1                         GENGER
 2     Genger.
 3         A.      So all the people -- all the people
 4     that I mention now --
 5         Q.      Uh-huh.
 6         A.      -- I don't -- no one else comes to
 7     mind as being part of this, but I'd be
 8     surprised if there were.  I can think about it.
 9         Q.      Do you have any e-mails
10     from 2004, 2005, 2006 that reference this
11     document?
12         A.      Yes.
13         Q.      Okay.  Have you produced those
14     e-mails in any litigation?
15         A.      Yes.
16         Q.      What litigation did you produce
17     those e-mails?
18                 THE WITNESS:  Which litigation did
19         we produce those?
20         A.      Oh, I gave a copy of the e-mail
21     to -- actually, to Robert Meister who had it
22     produced in an action that I'm not a party to.
23         Q.      Okay.  And this was in what year?
24         A.      It was a few weeks ago.
25         Q.      Okay.  Prior to 2014, have you
```

```
 1                          GENGER
 2    produced any e-mails that reference Page 2 in
 3    any litigation?
 4         A.      Not that I can recall.
 5         Q.      Okay.  Prior to 2014, have you
 6    produced any other writings that reference
 7    Page 2 in any litigation?
 8         A.      Again, in the arbitration they got
 9    a copy of the document itself.
10         Q.      Did you give Mr. Velie any other
11    documents that relate to Page 2?  Any e-mails,
12    writings?
13         A.      I don't know.
14         Q.      You don't know?
15                 Do you have copies of what you
16    produced to Mr. Velie during the marital
17    arbitration?
18         A.      I don't know.
19         Q.      Do you know -- is there a way for
20    you to audit what you gave Mr. Velie?
21         A.      All of it went to my father and to
22    my mother.  They both have copies of it so --
23    or had copies of it, so I don't --
24         Q.      You're saying -- you said that you
25    gave documents to Mr. Velie?
```

```
 1                        GENGER
 2      A.       Yeah.  So what I'm trying to
 3  explain, maybe inartfully, is that my father,
 4  at that point at least, I thought, my father
 5  and my mother are the principals.  I've given
 6  them the documents.  I don't have to be the
 7  custodian of the documents for the rest of my
 8  life, so I -- you know, that's . . .
 9      Q.       You said that you gave documents to
10  Mr. Velie during the Milonas arbitration.
11               I'm asking you:  Do you know what
12  documents you gave him during that arbitration?
13      A.       Well, this is one of them.
14      Q.       Okay.
15      A.       I couldn't give you a scope of
16  everything.
17      Q.       Do you know whether you gave him
18  any other documents that relate to this Page 2
19  that we're talking about?
20      A.       I -- I don't know.
21      Q.       Okay.  Do you know whether you have
22  given e-mails or had -- or have had e-mail
23  conversations -- -- strike that -- let's clean
24  this up.
25               Have you sent e-mails to anyone
```

```
 1                        GENGER
 2     that relates to this Page 2, you talk about
 3     Page 2?
 4          A.      Yes.
 5          Q.      Okay.  Who?
 6          A.      My attorneys.
 7          Q.      Okay.  Your attorneys.
 8                  And who are those people?
 9          A.      Mr. Dellaportas.
10          Q.      Uh-huh.
11          A.      Mr. Parnes.
12          Q.      Anybody else?
13          A.      Not that I can think of.
14          Q.      Can you think of any other
15     conversations you've had with anyone about this
16     document, Page 2?
17          A.      With anyone else that I mentioned?
18          Q.      Yeah.
19          A.      No, sitting here right now, I don't
20     remember.
21          Q.      Okay.  How did Page 2, the original
22     document, come back in David Parnes's
23     possession?
24          A.      As I said, when I moved to
25     Connecticut, I took -- I gathered some of the
```

```
 1                        GENGER
 2   documents that I thought may be particularly
 3   important --
 4        Q.      Uh-huh.
 5        A.      -- and I sent them to David for
 6   safekeeping.
 7        Q.      You sent them to David for
 8   safekeeping?
 9        A.      Yes.
10        Q.      Okay.  And how did they -- the
11   original Page 2 come into your possession?
12        A.      I don't remember.
13        Q.      You don't remember if he sent it
14   directly to you?
15        A.      I don't remember because I don't
16   remember if Lentz gave me back the original.  I
17   just don't remember what the custody, you know,
18   of it was.
19        Q.      Okay.  Did David --
20        A.      I don't know if David had it, and
21   he -- David just left it at my office at some
22   point.  I just don't know.
23        Q.      Okay.  But that's -- you're talking
24   about the box that was in TRI's offices?
25        A.      No, there's multiple things.  We're
```

```
1                          GENGER
2     confusing things, and maybe it's my fault I
3     wasn't clear.
4                  I don't remember if that box had
5     the original or a copy.  That's one.
6         Q.      Yeah.
7         A.      Two, assuming it didn't have the
8     original for the moment --
9         Q.      Uh-huh.
10        A.      -- I don't know if David had the
11    original, left them in my offices, and I
12    returned them to him, whether my mother had the
13    originals, gave them to David, and then they
14    came back to me.  I just don't remember.
15        Q.      How did your mother get in
16    contact -- get in possession with the original
17    document?
18        A.      Well, it's a letter to her.
19        Q.      Okay.  You said that that letter,
20    once it was signed at the -- on October 30th,
21    left in David Parnes's possession?
22        A.      That's right.
23        Q.      Okay.  So how did it come into your
24    mother's possession?
25        A.      He may have given it to her.  I
```

```
1                        GENGER
2    just don't know.
3              I -- you know, you're asking me
4    about some -- about a piece of paper ten years
5    ago that at the time was of no great
6    significance to me.  So I just don't know.
7         Q.     Okay.  It didn't mean anything to
8    you?
9         A.     It meant they would -- they would
10   execute this thing and get it over with, which
11   was obviously a mistaken belief.
12        Q.     Okay.  Do you know whether the
13   original -- whether it was the original
14   document that you instructed David Parnes to
15   send to your lawyers?
16        A.     I don't -- I don't know.  I'm
17   sorry, I don't understand your question.  I
18   apologize.
19        Q.     Okay.  Do you know for a fact that
20   your lawyers possess the original copy of this
21   document?  And I'm talking about Page 2 of this
22   exhibit.
23        A.     They have what I think is the
24   original.  I don't know -- I'm not like a --
25   you know, sometimes something looks like the
```

```
 1                         GENGER
 2    original and it's not.
 3         Q.      So you've seen it?
 4         A.      Yes, I've seen it.
 5         Q.      You've seen the document?
 6         A.      Yes.
 7         Q.      Okay.  And that's what we're
 8    calling -- you're saying is the original which
 9    is in your lawyer's possession?
10         A.      I believe so, yes.
11              MR. LEINBACH:  Okay.  At this
12         time -- and I know we've asked for it
13         before -- we would ask that the original
14         copy of this document be produced to us so
15         that we can review it and have it analyzed,
16         and we would also ask that any e-mails or
17         any other writings that relate to this
18         document that you have in your possession
19         or in your lawyer's possession be produced
20         to us.
21              MS. WACHTLER:  I join in that
22         request.
23              MR. DELLAPORTAS:  I don't know if
24         what I have is the original.  I'm not a
25         handwriting expert.  It did not come with a
```

1              GENGER

2      giant red stamp on it that said "Original."

3      If it turns out -- we're going to have it

4      looked at.  If it turns out it is the

5      original, we'll make it available for

6      inspection.

7              MS. WACHTLER:  Well, we'd like to

8      make it available for inspection to

9      determine if it's the original at the same

10     time your expert does.

11             MR. LEINBACH:  I -- that was

12     actually what I thought my point was.

13             MS. WACHTLER:  Yeah, I agree.

14             MR. DELLAPORTAS:  What's the

15     significant of that?  I don't know how --

16             MR. STAPLETON:  What's the

17     significance of this -- of finding the

18     original of this particular set of

19     documents?

20             MR. DELLAPORTAS:  No, no.  What is

21     the significance of experts reviewing it to

22     see if it's an original at the same time or

23     in succession?

24             I don't know if they can both do it

25     at the same time.  I don't know how this is

```
 1                        GENGER
 2        done.  I assume someone puts it in a
 3        microscope and --
 4              MS. WACHTLER:  I'm not a
 5        handwriting expert, but I have had some
 6        experience with having things done pursuant
 7        to a forensic analysis to determine whether
 8        or not they're an original, and I think
 9        that if you have all of your experts there
10        at once, that's up to you.
11              But we are entitled to the original
12        when there is an issue here relating to the
13        genuineness of these documents.
14              MR. DELLAPORTAS:  Well, let me --
15              MR. LEINBACH:  Yeah, I --
16              MR. DELLAPORTAS:  Let me start with
17        the following which is:  This document has
18        absolutely nothing to do with the case.  We
19        agreed to allow --
20              MS. WACHTLER:  Oh, I disagree.  I
21        disagree.
22              MR. LEINBACH:  Okay.  With all due
23        respect --
24              MR. DELLAPORTAS:  Let me finish.
25              We allowed the witness to -- as an
```

1                        GENGER

2         accomodation, to answer questions about it

3         just so we could avoid another discovery

4         fight.

5                   MS. WACHTLER:   Or sanctions.

6                   MR. DELLAPORTAS:   Whatever.

7                   And if it's the original, I'll make

8         it available for inspection.   If it's

9         simply another copy, then you already have

10        a copy.

11                  MS. WACHTLER:   You know, John, I --

12        I don't disagree with your, you know,

13        genuineness and everything, but -- and I'm

14        not saying I don't trust you, but for you

15        to come back and say, "Oh, by the way, this

16        is not the original," or "This is the

17        original," I just don't think that that's

18        the appropriate way to produce or respond

19        to a request for an original.

20                  MR. DELLAPORTAS:   I don't know

21        that -- I was -- I was asked to produce the

22        original.

23                  MS. WACHTLER:   Correct.

24                  MR. DELLAPORTAS:   I, as of today,

25        don't know whether I have the original.   If

```
1                           GENGER
2        I --
3                MS. WACHTLER:  Well, why don't you
4        produce what you were given by Sagi --
5                MR. DELLAPORTAS:  Well, first of
6        all -- first of all, I'm never going to
7        produce anything.  I'll make it available
8        for inspection.  So that's No. 1.
9                And I'll make it available for
10       inspection if it turns out to be an
11       original.  If it's another copy, then
12       there's really no point in it.
13               MS. WACHTLER:  How are we going to
14       know whether it's the original?  Just
15       because you say it's the original or it's a
16       copy?
17               MR. DELLAPORTAS:  If I --
18               MS. WACHTLER:  That's just as good
19       as Sagi saying he doesn't even know if
20       it -- what he gave somebody or where it
21       was.
22               I just -- I --
23               MR. DELLAPORTAS:  If I believe it's
24       an original --
25               MS. WACHTLER:  I'm not -- I don't
```

```
1                              GENGER

2          want to get into colloquy.

3                    Our request stands, and I join in

4          the request for the original.  If you're

5          not going to make it available, we'll do

6          what we need to do.

7                    MR. DELLAPORTAS:  If I believe it's

8          an original, I will make it available.

9                    MS. WACHTLER:  Right.  That's --

10                   MR. DELLAPORTAS:  And your expert

11         can come and look at it and see whether

12         they believe it's an original.

13                   MS. WACHTLER:  Okay.  Okay.  That's

14         your solution.

15                   MR. DELLAPORTAS:  Is there

16         something objectionable about that, and if

17         so, what?

18                   MS. WACHTLER:  I'm objecting.

19                   MR. LEINBACH:  Yeah, there is

20         something objectionable about it.

21                   MS. WACHTLER:  I told you what my

22         objection is.

23                   MR. LEINBACH:  Because -- because

24         we have the right to our own independent

25         expert to review the document --
```

```
1                               GENGER
2                    MR. DELLAPORTAS:  We agree.
3                    MR. LEINBACH:  -- and determine
4           it's validity.
5                    Yeah, but that's not -- that's not
6           contingent on whether or not you determine
7           that it's an original.  You see?  Because
8           you're not a handwriting expert.
9                    MR. DELLAPORTAS:  I agree.  I'm not
10          a handwriting expert.
11                   MR. LEINBACH:  And -- and you're --
12          the person that you pay as a handwriting
13          expert is not someone that I have to take
14          at face value to determine it's validity.
15                   MR. DELLAPORTAS:  I a hundred -- so
16          far we're in agreement.
17                   MR. LEINBACH:  Okay.  So --
18                   MR. STAPLETON:  And there's a far
19          more pragmatic objection also which is
20          this:  Having had some experience with
21          determining the originality of handwriting
22          specimens, the process may be one in which
23          the original document is destroyed.  So
24          if -- and I don't mean the original
25          document is destroyed, I mean the original
```

```
 1                          GENGER
 2         ink that they are looking at is destroyed.
 3         So if that examination by your expert
 4         destroys the original specimen such that we
 5         can't meaningfully examine it, then you're
 6         subject to a spoliation sanction.
 7                 MR. DELLAPORTAS:  What does this
 8         have to do with your client?  I'm just
 9         curious.  Can you articulate what this has
10         to do with --
11                 MS. WACHTLER:  You -- you've
12         brought him in.
13                 MR. LEINBACH:  You've made
14         multiple --
15                 MS. WACHTLER:  You brought him in.
16                 MR. STAPLETON:  Because my client's
17         being sued by your client.
18                 MS. WACHTLER:  Right.
19                 MR. DELLAPORTAS:  And what does
20         this have to do with your client's defense
21         of my claims?
22                 MR. STAPLETON:  Because --
23                 MR. DELLAPORTAS:  Articulate it.
24         Since you've decided --
25                 MS. WACHTLER:  Why don't you
```

```
1                          GENGER
2       articulate what your client --
3               MR. DELLAPORTAS:  Since you've --
4               MS. WACHTLER:  -- has to do with
5       brining him into a lawsuit?
6               MR. DELLAPORTAS:  Since it's --
7       since you've decided to offer your opinion
8       on this, please tell me what this has to do
9       with the defense of your client.
10              MR. LEINBACH:  No, no, no, we're
11      not taking a deposition of Brian Stapleton;
12      we're taking the deposition of your client.
13              And what we're asking for is the
14      original document, and we have every right
15      to it.  And we don't have --
16              MR. DELLAPORTAS:  I agree.
17              MR. LEINBACH:  And we do not have
18      to rely upon your expert's
19      determination for --
20              MR. DELLAPORTAS:  I didn't ask you
21      to rely --
22              MS. WACHTLER:  Yeah, let's not
23      waste everybody's time.  That's your
24      position.  We'll make whatever application
25      we need to make for --
```

```
 1                       GENGER
 2            MR. DELLAPORTAS:  Let me articulate
 3       my position.
 4            MS. WACHTLER:  You did.  You --
 5       you've articulated it.
 6            Let's move on.
 7            MR. DELLAPORTAS:  I'm going to
 8       articulate my position just so it's clear
 9       because it was interrupted through all of
10       this.
11            We have what may be an original.
12       We are going to review it.  Whether it's an
13       original or not in our view, we will make
14       it available after we review it for
15       everybody to look at and examine to their
16       heart's content.  Okay?
17            Thank you.
18            MR. LEINBACH:  We -- I object
19       with -- I object to your proposed solution,
20       all right?  Because I think it's -- I think
21       it's not sufficient, and we'll -- we'll
22       deal with that in due course.  Either we'll
23       call the Court or we'll do a motion, I
24       suppose.
25            MR. DELLAPORTAS:  Wonderful.
```

1                           GENGER

2                MR. LEINBACH:  Okay.  Moving along.

3    BY MR. LEINBACH:

4        Q.     Let's look at Page 1 of this

5    document.

6        A.     Yes.

7        Q.     Okay.  You know Page 1 of this

8    document?

9        A.     Yes.

10       Q.     Do you know who drafted Page 1 of

11   this document?

12       A.     Yes.

13       Q.     Who was that?

14       A.     I should say I know the firm.  In

15   all likelihood, Ed Klimerman and such.

16       Q.     "All likelihood"?

17              Do you know Ed Klimerman drafted --

18       A.     I know it came --

19       Q.     -- Page 1?

20       A.     I know it came from his office.

21       Q.     You know it came from his offices.

22              And how do you know that?

23       A.     Because I have the original e-mail

24   in which he sent it to me.

25       Q.     Okay.  We'll get to that.

```
 1                         GENGER
 2                 Did you have any conversations --
 3      well, actually let's back that up.
 4                 You see here it says "Sagi Genger."
 5                 Is that your signature on the
 6      document?
 7          A.      Yes.
 8          Q.      Okay.  You see down here where it
 9      says "Orly Genger"?
10                 Is that your sister's signature on
11      the document?
12          A.      It is, yes.
13          Q.      Were you present when your sister
14      signed this document?
15          A.      I don't remember.
16          Q.      Do you know whether -- so this --
17      but this is your sister's signature?  You know?
18          A.      I recognize it as her signature,
19      yes.
20          Q.      Okay.  Were you present when she
21      signed this document?
22          A.      I don't remember.
23          Q.      Okay.  Do you know when this
24      document was signed?
25          A.      I think it was signed on -- on the
```

```
 1                              GENGER
 2    day -- either on that day or on the 11th.
 3         Q.        Okay.   You know or you're guessing?
 4         A.        I have good reason to believe.
 5         Q.        Okay.   What is your basis?
 6         A.        Because at the time, it was David
 7    Parnes's practice to essentially fax himself
 8    documents instead of scan, and we have one that
 9    says -- with her signature that says
10    November 11th in the fax line.
11         Q.        You have a document that has a fax
12    legend on it?
13         A.        Right.   You have it.   I gave it to
14    you.
15         Q.        It's a copy?
16         A.        What?
17         Q.        It's a copy?
18         A.        Right.
19         Q.        It's not this document?
20         A.        It's -- these documents were
21    scanned in on that date, on November 11th.
22         Q.        Okay.
23         A.        So by November 11th, they were
24    signed.
25         Q.        Is there a fax cover sheet --
```

```
 1                          GENGER
 2        A.       No.
 3        Q.       -- that goes with this copy you're
 4   talking about?
 5        A.       It's what I gave you, which is this
 6   page but with a -- what do they call the thing
 7   on the top --
 8        Q.       A fax legend.
 9        A.       -- a fax legend at the top that
10   indicates November 11th.
11        Q.       Okay.  Let's unpack that for a
12   second.
13                 So this document, you say this is
14   your sister's signature?
15        A.       Yeah.
16        Q.       You don't recognize -- you don't
17   know when -- or you don't know when she -- if
18   you were there when she signed it?
19        A.       I don't remember.
20        Q.       And you don't know when that was?
21        A.       I think it was on the 10th or the
22   11th.
23        Q.       Okay.  Do you know who has the
24   original copy of this document?  And by "this,"
25   I mean Page 1 of this exhibit.
```

```
 1                         GENGER
 2      A.       Yeah, I believe it's with
 3  Mr. Dellaportas's offices.  Same answer.
 4      Q.       Okay.  So Mr. Dellaportas has the
 5  original copy of this document?
 6      A.       He has what appears to me to be an
 7  original.
 8      Q.       Okay.  Do you know that it's the
 9  original document?
10      A.       With absolute certainty it's -- it
11  appears to me to be the original.  I -- I
12  believe it's the original.
13      Q.       How did the -- how did what you
14  think is the original document come to --
15      A.       It was in the files for years.  We
16  took it out.  It looks -- doesn't look like a
17  copy.  It looks like a normal pen signature.
18  In fact, I think one of the signatures, I
19  forgot on which document, is in blue.  So that
20  would suggest to me that it's the original.
21      Q.       Okay.  Let's start at the
22  beginning.
23               You say that you have reason to
24  believe this document was signed on
25  November 10th or November 11th of 2004; is that
```

```
 1                      GENGER
 2   accurate?
 3        A.       That's right.  That's right.
 4        Q.       Okay.  Where did -- once the
 5   document was signed, where did the original
 6   document go?
 7        A.       To the best of my recollection,
 8   David had it at least immediately thereafter.
 9        Q.       Okay.  Did that go into David
10   Parnes's possession in November of 2004?
11        A.       He would have, at least at the
12   outset, have all of the documents.
13        Q.       Okay.  And how did it come to be
14   signed?  Who gave it to Orly to sign?
15        A.       I think ultimately Ed gave it to
16   her to sign.
17        Q.       Ed Klimerman gave this document to
18   Orly?
19        A.       Yeah, because I -- I think -- I'm
20   not sure.  Maybe I shouldn't answer.  And I --
21   I don't know the answer.
22        Q.       How do you know -- do you know that
23   Ed Klimerman --
24        A.       I don't know.  I think so, but I
25   don't know.  So I shouldn't --
```

```
 1                          GENGER
 2       Q.      So what's your basis for believing?
 3       A.      Because as I recall, my sister
 4   wanted to consult with Ed about the document
 5   before signing it.
 6       Q.      Okay.  So before signing the
 7   document, your sister --
 8       A.      I think so.
 9       Q.      -- spoke with Ed Klimerman?
10       A.      I think so, yes.
11       Q.      You think so?
12       A.      I know she spoke to someone.  I
13   presume it's either Ed or it's my father, but I
14   don't know that for a fact.
15       Q.      Okay.  So what's your basis for
16   believing that your sister spoke with Ed
17   Klimerman about this document?
18       A.      Because she told me so.
19       Q.      She told you?
20       A.      She told me that she just wanted to
21   take time to have -- to have -- she had wanted
22   someone to look at it, and I don't remember if
23   it was Ed or my father.  Maybe it was another
24   person.
25       Q.      Okay.  So let's do this.  You --
```

```
 1                          GENGER
 2    did you speak with your sister about this
 3    document before it was signed?  And when I say
 4    "this document," you know we're talking about
 5    Page 1 now, right?
 6          A.        Yes.
 7          Q.        Okay.  Did you speak with your
 8    sister about Page 1?  Let's call it the
 9    "indemnity document."
10          A.        Yes.
11          Q.        When?
12          A.        I spoke to her on October 30th that
13    -- well, I spoke to her beforehand that we
14    would have to put -- that she would put a
15    document -- a document together that we would
16    split the -- the commitment to my mother.
17                    And on October 30th, told her that,
18    you know, for whatever reason she had failed to
19    give Ed a power of attorney that would have
20    enabled it to be done at the closing table.
21    And she was, like, "Fine, you know, what we
22    agreed to is what we agreed to," and she came
23    back and she signed it.
24          Q.        Okay.  So let's just unpack that.
25                    You had a conversation with your
```

```
 1                          GENGER
 2    sister before this document was signed about an
 3    indemnity that she was going to indemnify you?
 4    You guys spoke about that?
 5         A.     Right.
 6         Q.     And what did you say to her about
 7    this indemnity?
 8         A.     I think it's more about what she
 9    said to me.
10         Q.     Okay.  What did she say to you
11    about this indemnity?
12         A.     She said to me, "Obviously whatever
13    you think is correct and that it's 50-50
14    between us and, you know, if that's what mom
15    wants and it gets it closed, that's what we'll
16    do."
17         Q.     Okay.  So you explained to her --
18    strike that because I'm putting words in your
19    mouth.
20                Did you explain to your sister --
21         A.     Right.
22         Q.     -- that -- that you were asking her
23    to indemnify you?
24         A.     No.  What she said to me was
25    what -- I mean, she was the talker; I was the
```

```
1                          GENGER
2    listener.
3         Q.      Okay.
4         A.      So she said, "Sagi, I understand
5    what needs to be done.  Whatever you do, I'll
6    back you 50-50."
7                 That's the conversation.
8         Q.      Okay.  So you didn't talk to her
9    about an indemnity.  She just volunteered to
10   you --
11        A.      Well, I explained, "This is the
12   situation.  What do you think we should do?"
13                It's two siblings trying to get
14   matters solved.  She understood the concept.
15   And she said, "Yes, Sagi, whatever you'll do,
16   we'll do it 50-50."
17        Q.      When was this conversation?
18        A.      That was -- I described earlier,
19   well before the stipulation was signed.
20        Q.      Oh, so you -- this conversation is
21   the -- this conversation with your sister and
22   your mother -- and -- and Dalia in the hotel
23   room?
24        A.      No.  That's where the kernel -- I
25   guess the kernel started to -- either developed
```

```
 1                        GENGER
 2     or started to develop there.
 3                But afterwards we discussed that
 4     this is what was going to be done, and she
 5     thought that's fine and that she'll split with
 6     me whatever it is that we have to do.
 7         Q.      Okay.  And when was that
 8     conversation?
 9         A.      Those conversations occurred in
10     September or October 2004.
11         Q.      Okay.  And where did these
12     conversations take place?  Were they in person?
13     Were they on the phone?
14         A.      In -- I want to say in person.  I
15     don't remember having telephone conversations
16     with her.
17         Q.      Okay.  And where did they take
18     place?
19         A.      I think at my place.
20         Q.      Okay.  Your place.
21                Where were you living at the time?
22         A.      1211 Park.
23         Q.      Okay.  So these were all
24     conversations you had with your sister at 1211
25     Park Avenue?
```

```
 1                          GENGER
 2       A.       I believe it's 1211 Park.
 3       Q.       During any of these conversations,
 4  did you describe to your sister, in sum or in
 5  substance, Page 1, what's written here?
 6       A.       She described it to me.
 7       Q.       She described to you the indemnity?
 8       A.       She described to me that she would
 9  backstop me for 50 percent of whatever it is
10  that we do, and I explained to her what had to
11  be done.
12       Q.       Okay.  But you read this document,
13  correct?
14       A.       Which one are you referring to now?
15       Q.       Page 1 --
16       A.       Yes.
17       Q.       -- of this exhibit, which I believe
18  this is Exhibit S we're talking about --
19       A.       Yes.
20       Q.       -- you've read this document,
21  correct?
22       A.       Yes.
23       Q.       Okay.  Did you explain to her the
24  substance of this document, or did she explain
25  to you the substance of this document?
```

```
 1                          GENGER
 2              MR. DELLAPORTAS:  Object to form.
 3              I think your timeline is a little
 4      off.
 5              THE WITNESS:  Again --
 6              MS. WACHTLER:  There was no
 7      timeline in the question.
 8              THE WITNESS:  Maybe you were
 9      getting confused.
10              MR. DELLAPORTAS:  You asked him if,
11      sitting here today, he's read the document
12      and he said yes.  And then you asked him if
13      he explained that document --
14              MR. LEINBACH:  Yeah.  Okay.
15              MR. DELLAPORTAS:  -- to her.
16              MR. LEINBACH:  Look.  That's fair
17      enough.
18   BY MR. LEINBACH:
19      Q.      In September or October, did you --
20              THE WITNESS:  I don't even know
21      what you're confused about so . . .
22      Q.      In September or October --
23      A.      Right.
24      Q.      -- 2004, did you explain the sum or
25   substance of Page 1 of Exhibit S to your
```

```
 1                        GENGER
 2    sister?
 3        A.      So, again, what I would say is we
 4    talked about the contents of Page 2 of the
 5    document.
 6        Q.      Okay.
 7        A.      And she said obviously, "Whatever
 8    you do, I'll share and I'll pay half of it."
 9        Q.      So she just said, "I'll pay half"?
10        A.      Absolutely.
11        Q.      Okay.  Did -- so you didn't
12    describe this document to her?
13        A.      No.  She said to me, "Whatever it
14    is that you'll do, I'll back you for half of
15    it."  I mean, that's --
16        Q.      Okay.
17                MR. DELLAPORTAS:  Object.  Object
18        to form.
19                I don't know that you've
20        established that the document existed at
21        the time of the calls.
22        Q.      When --
23        A.      Yeah, the concept --
24                THE WITNESS:  Thank you.
25        A.      But when I'm talking about -- these
```

1          GENGER
2    discussions may even predate the existence of
3    the document.  So I explained to her the idea,
4    and she said, "Yes, whatever you do, I'll cover
5    you for half."
6        Q.      Okay.  Who asked for this document
7    to be drafted?
8        A.      Which one?
9        Q.      Page 1 of Exhibit S.
10       A.      I don't remember specifically.
11       Q.      You don't remember if you asked
12   someone to draft this document?
13       A.      I saw in the e-mail from Ed that
14   says "as you requested."  I don't know if that
15   was precise -- I mean, I don't remember
16   personally myself requesting it but it may very
17   well be correct.
18       Q.      Okay.  Do you know if you -- strike
19   that.
20               Were any drafts of this document,
21   Page 1 of Exhibit S -- were any drafts of Page
22   1 circulated before they were signed -- before
23   the document was signed?
24       A.      I don't know.
25       Q.      You don't know whether any drafts

```
 1                      GENGER
 2   were circulated?
 3        A.      I don't know.
 4        Q.      Did you ever provide a copy of this
 5   document to your sister to look at?
 6        A.      She signed it, so yeah.
 7        Q.      Did you provide a copy of this
 8   document to your sister?
 9        A.      Again, I don't remember if I'm the
10   person that gave it to her to sign.
11        Q.      Did you ever speak to your sister
12   about this document after it had been drafted?
13        A.      Yes.
14        Q.      Okay.  When was that?
15        A.      Sometime after, a day or two after.
16        Q.      After what?
17        A.      After she signed it --
18        Q.      Oh.
19        A.      -- maybe even the same day.
20        Q.      So between the time it was
21   drafted --
22        A.      Right.
23        Q.      -- and the time that she signed
24   it --
25        A.      Right.
```

```
1                        GENGER
2       Q.      -- you had no conversations with
3    your sister about this document at all?
4       A.      I did not say that.
5       Q.      Okay.  Did you have any
6    conversations with your sister?
7       A.      I just don't remember.
8       Q.      Did you have any conversations with
9    your father about this document between the
10   time it was drafted and the time it was signed?
11      A.      I don't remember.
12      Q.      Did you have conversations with
13   anyone about this -- this document, and we're
14   talking about Page 1 --
15      A.      Right.
16      Q.      -- of Exhibit S, between the time
17   the document was drafted and the time the
18   document was signed?
19      A.      Everyone who was at the closing
20   table.
21      Q.      Okay.  So you had a conversation
22   with Carol Schepp about this document?
23      A.      Carol Schepp, my mother, Ed
24   Klimerman, David Parnes.
25      Q.      Okay.  Please tell me about your
```

```
 1                        GENGER
 2    conversations with Carol Schepp about Page 1 of
 3    Exhibit S.
 4        A.       The conversation was that this was
 5    the arrangement; that unfortunately Ed did not
 6    have a proper power of attorney to deal with
 7    this on the 30th; that I had spoken to my
 8    sister and that she would, you know, back me
 9    for half of whatever has to be done; and that
10    we'll draft a document to reflect that.
11        Q.       Okay.  And what did she say to you?
12        A.       I don't think she cared.  I think
13    it was just Ed that had to do something.
14        Q.       When was this conversation?  When
15    did it take place?
16        A.       Around the closing table, so that's
17    the 30th, 31st.
18        Q.       Oh, so it was on that day?
19        A.       Yeah.
20        Q.       So did she know about the document
21    before the actual closing on the 30th?
22        A.       Did who know?
23        Q.       Carol Schepp.
24        A.       Carol Schepp had drafted various --
25    various forms of the promise beforehand.
```

```
 1                           GENGER
 2      Q.      Okay.  We're talking about Page 1,
 3   this document.
 4      A.      No, no -- because what -- what
 5   Carol was envisioning is that there would be
 6   one -- Page 2, that there would be two sister
 7   documents, one reflecting my part and one
 8   reflecting my sister's part, but that -- that's
 9   not how matters got arranged.
10              So the -- the -- the need for
11   this -- I guess there was some sort of
12   misunderstanding, but I guess the need for this
13   document came about on October 30th, you know,
14   to have this specifically drafted.
15              MS. WACHTLER:  I'm sorry.  Which
16      specifically?  Are you talking about Page 1
17      or 2?
18              THE WITNESS:  Page 1.  Page 1, yes.
19      Q.      Okay.  Carol Schepp originally
20   envisioned a single document?
21      A.      Well, no, two -- two documents that
22   looked like Page 2, one signed by me and one
23   signed by my sister.
24      Q.      Okay.  Are there any drafts that
25   reflect this?
```

```
 1                        GENGER
 2        A.      Not -- I don't think I have, but
 3   there were drafts, I'm sure, at the time.
 4        Q.      Were there drafts circulated that
 5   reflected this idea that there would be two
 6   identical documents like Page 2?
 7        A.      I don't remember.
 8        Q.      Do you have copies --
 9        A.      I don't --
10        Q.      -- of any drafts?
11        A.      I could check, but I doubt it.
12        Q.      Do you have copies of any e-mails
13   that refer to this original idea --
14        A.      I can go back and check if you guys
15   want, but it's a long time ago.  It's ten years
16   ago.
17             MR. LEINBACH:  All right.  At this
18        time I would like to ask that any documents
19        that relate to drafts of either Page 1 or
20        Page 2 of Exhibit S be produced to us.
21             MR. DELLAPORTAS:  We'll take it
22        under advisement.
23             MR. LEINBACH:  And with that, of
24        course, any e-mails referring to any drafts
25        of these documents.
```

1                          GENGER

2                  MS. WACHTLER:  We'll join in that

3        request.

4    BY MR. LEINBACH:

5        Q.        Okay.  Do you remember anything

6    else about your conversation with Carol Schepp

7    about Page 1 of this document?

8        A.        No.  It was really more of a

9    discussion with Ed.

10       Q.        Okay.  Do you know if Page 1 of

11   Exhibit S was circulated in draft form along

12   with the divorce stipulation?

13       A.        No, it wasn't.  It wasn't drafted

14   at that time.

15       Q.        Okay.  Do you know if Page 1 was

16   circulated to Arie or Arie's lawyers?

17       A.        It for sure was.

18       Q.        A draft?

19       A.        His lawyers wrote it, so . . .

20       Q.        Okay.  Okay.  You said that you had

21   conversations with everyone at the divorce.

22                 So let's go to Ed Klimerman.  Tell

23   me about your conversations with Ed Klimerman

24   regarding Page 1 of Exhibit S.

25       A.        That it -- that it needed to exist;

1           GENGER

2    that we expected that he would have already had

3    it prepared.

4        Q.      Okay.  Why did this document need

5    to exist?

6        A.      Because Orly and I agreed to split

7    things 50-50, and that either this had to exist

8    or to take the underlying document and split it

9    in two, but in any case, her commitment was to

10   split things with me 50-50 --

11       Q.      Okay.

12       A.      -- and that I was somewhat

13   surprised that he didn't have a power of

14   attorney to do that.

15       Q.      Did Mr. Klimerman tell you that he

16   had spoken with Orly about the document?  And

17   we're talking about Page 1 --

18       A.      I don't remember.

19       Q.      -- Exhibit S?

20       A.      I don't remember.

21               You mean about the concept, not of

22   the document itself?

23       Q.      In sum or in substance.

24       A.      Yeah, I don't remember.

25       Q.      Do you know if Ed Klimerman ever

1                        GENGER

2    spoke with Orly about Page 1 in sum or in

3    substance?

4        A.      I believe he did.

5        Q.      Okay.  And what's the basis of your

6    belief?

7        A.      It's my recollection that when she

8    got it, she consulted either Ed or my father,

9    and I believe it was Ed.

10       Q.      Okay.  You say when she got the

11   document.  What are you talking about?

12       A.      Before she signed it, I believe

13   that she consulted with either my father or

14   Mr. Klimerman.

15       Q.      Okay.  Why do you -- what's your

16   basis for that belief?

17       A.      I remember being told that at the

18   time.

19       Q.      By whom?

20       A.      By David Parnes.

21       Q.      David Parnes told you that Orly had

22   spoken with your father or Klimerman about the

23   document?

24       A.      Something like that.

25       Q.      Okay.  How did David Parnes know?

```
 1                         GENGER
 2       A.      I don't know.  I'm not in his head.
 3       Q.      Okay.  You've --
 4       A.      That's what I -- that's what I
 5  remember him telling me.
 6       Q.      Okay.  So you're -- is it fair to
 7  say that your only reason for believing that
 8  your sister knew or talked with Ed about this
 9  document is David Parnes?
10       A.      Well, Ed was her lawyer.  He
11  drafted it.  So I mean, I would imagine that he
12  speaks to his client about --
13               MS. WACHTLER:  I'm sorry.  Ed was
14       whose lawyer?
15               THE WITNESS:  Orly's lawyer.
16       Q.      Ed was Orly Genger's lawyer?
17       A.      Yeah.
18       Q.      Okay.
19       A.      Absolutely.
20       Q.      And did Ed Klimerman ever speak to
21  you about conversations that he had with Orly?
22       A.      No.
23       Q.      Okay.  Do you know if he ever had
24  any conversations with Orly?
25       A.      On any topic ever?
```

```
 1                        GENGER
 2        Q.      No.  Did he ever have conversations
 3   where he spoke to Orly about legal matters?
 4        A.      About this document?
 5        Q.      Yeah.
 6        A.      I don't know what -- what he does
 7   or doesn't discuss with Orly.
 8        Q.      I'll make it broader.
 9                Do you know if Orly Genger and Ed
10   Klimerman ever had discussions where she asked
11   him for legal advice, ever?
12        A.      In front of me?
13        Q.      No.  Ever.
14        A.      In any context?
15        Q.      Yes.
16        A.      Yes.
17        Q.      Okay.  What were those
18   conversations?
19        A.      They weren't in front of me.
20        Q.      Okay.  What were they about?
21        A.      Well, I know he had a power of
22   attorney from her.
23        Q.      Okay.  That's not what we're
24   talking about.  We're -- I'm asking you:  Do
25   you know if Orly Genger ever sought legal
```

```
 1                         GENGER
 2    counsel from Ed Klimerman, ever?
 3        A.      I believe she has.
 4        Q.      Okay.  What's your basis for that
 5    belief?
 6        A.      She testified that he was her
 7    lawyer, and she -- he had powers of attorney
 8    for her, and he was the family attorney, and
 9    there would be no one else to represent her.
10        Q.      Okay.  When -- she testified to
11    this when?
12        A.      And on top of that, he also
13    represented her -- at least Sonnenschein
14    represented her in connection with the
15    correction of D&K LP.  So there are certain
16    instances.
17        Q.      Let's break this down.
18                She testified that -- when did she
19    testify?
20        A.      One of the billion depositions that
21    we've had here.
22        Q.      Okay.  That we've had here?
23        A.      In the various Genger litigations.
24    I don't remember.
25        Q.      Okay.  She testified that Ed
```

                              GENGER

1    Klimerman was her lawyer?

2         A.      Yeah, best as I recall.

3         Q.      Do you know if I was counsel in any

4    of these litigations?

5         A.      I remember that John was asking the

6    question.  I don't remember who --

7         Q.      John, John Dellaportas --

8         A.      I believe so, yeah.

9         Q.      -- was asking questions about

10   Orly's being represented by Ed Klimerman?

11        A.      Yeah.

12        Q.      Okay.

13        A.      That's what I recall.  We can

14   always go back to the transcripts.

15        Q.      Okay.  Okay.  So you say Orly

16   consulted with either Ed Klimerman or your

17   father about the document.

18                Did Orly ever tell you about

19   conversations between him and your father or

20   her and your father?

21        A.      All I can remember her is saying

22   that she was very grateful that I was able to

23   make this happen and just enormous gratitude on

24   her part.

```
 1                              GENGER
 2          Q.        Okay.  And that was after --
 3          A.        After this thing was all wrapped
 4     up.
 5          Q.        -- the document was signed?
 6          A.        Yeah.
 7          Q.        Okay.  After the document was
 8     signed, she acknowledged to you that she had
 9     signed the document?
10          A.        Yes, actually now that you -- yes.
11          Q.        She did?
12          A.        She did, yes.
13          Q.        She told you, "Sagi, you know that
14     indemnity document, I signed it"?
15          A.        No.  No, it wasn't like that.  It's
16     like she talked to me, "Now all the documents
17     have been signed, I've taken care of it, and,
18     Sagi, I just want to thank you for all the hard
19     work in helping to make all this happen."
20          Q.        Okay.  So she told you the document
21     was signed and she thanked you?
22          A.        Yes.
23          Q.        Do you know when this conversation
24     took place?
25          A.        Somewhere abouts mid November.
```

```
 1                         GENGER
 2       Q.      Okay.  Mid November.
 3               Was it in person?
 4       A.      Yes.
 5       Q.      Okay.  Where was it?
 6       A.      I think -- I think it's the diner
 7   around from her apartment at the time.
 8       Q.      Okay.  You met her at a diner
 9   around the corner?
10       A.      If I -- if I remember correctly,
11   yeah.
12       Q.      Okay.  Diner near her apartment?
13       A.      I just say that because we would
14   meet there -- that's where we would regularly
15   meet.
16       Q.      Okay.  Did you have any other
17   conversations with Orly Genger about this
18   document after it was signed?  When I say --
19               MS. WACHTLER:  I'm sorry.  I don't
20           mean to interrupt, but when was this?  Mid
21           November of what year?
22               MR. LEINBACH:  I should have --
23               THE WITNESS:  I'm sorry.  2004.
24       Q.      Okay.  Did you have any other
25   conversations with Orly Genger about Page 1 of
```

```
1                        GENGER
2    this document?
3        A.      No.  I think it went -- we all
4    thought it would have no meaning.
5        Q.      Okay.  Have you ever produced a
6    signed copy of Page 1 of Exhibit S in any
7    litigation prior to 2014?
8        A.      There's the arbitration we
9    discussed.
10       Q.      Okay.  So --
11       A.      I don't remember -- I know I
12   discussed with them the promise.  I don't know
13   that I discussed with them the indemnity.  I
14   just don't remember.
15       Q.      During the arbitration before Judge
16   Milonas, you spoke to someone -- or I take that
17   back.  Strike that.
18               I think what you're saying is
19   during the arbitration with Justice Milonas,
20   you produced this document?
21       A.      For sure Page 2.
22       Q.      But we're talking about Page 1.
23       A.      I don't remember.
24       Q.      You don't remember?
25       A.      I don't remember.
```

```
 1                        GENGER
 2      Q.       So when you spoke with Frank
 3    Velie --
 4      A.       Yeah.
 5      Q.       -- about Page 2 --
 6      A.       Yes.
 7      Q.       -- this promise document, you don't
 8    know whether you spoke to him about the
 9    indemnity that went with it?
10      A.       I don't remember.
11      Q.       Okay.  Did he ask you whether your
12    sister had any responsibility to pay?
13      A.       I don't remember.
14      Q.       Because you see Page 2 says "my
15    sister and I"?
16      A.       That's right.
17      Q.       He didn't ask you about that?
18      A.       I don't recall him asking about it.
19      Q.       Did you have any other -- can you
20    recall any other conversations with anyone
21    besides the people that were at the -- I'm
22    sorry, let's clean that up.
23               The people that were at the closing
24    of the divorce stipulation were Carol Schepp --
25      A.       Yeah.
```

122

GENGER

1
2     Q.      -- Ed Klimerman and David Parnes?
3     A.      Right.
4     Q.      Your mom and your dad were there as
5  well?
6     A.      No, my father was not there.
7     Q.      Your father was not there.  That's
8  right.
9             Your mom was there?
10    A.      Yes.
11    Q.      Did you have any conversations with
12  your mom about this document?
13            MR. MEISTER:  When you say "this
14      document," you hit the table --
15    Q.      Meaning Page 1 --
16    A.      Page 1.
17    Q.      -- of Exhibit S.
18    A.      That it exists?  Yes.
19    Q.      Okay.  Anything else?
20    A.      I mean, I guess there was -- there
21  was discussion in preparation for a settlement
22  conference, but I was instructed last time not
23  to talk about that, so . . .
24    Q.      Okay.  Do you recall any
25  conversations with David Parnes about Page 1 of

```
 1                          GENGER
 2    Exhibit S?
 3         A.       Sure.   Yeah.
 4         Q.       Okay.   When were these
 5    conversations?
 6         A.       I recently had conversations with
 7    him about it.
 8         Q.       Okay.   But what about, say, between
 9    2004 and now?
10         A.       It would certainly make sense that
11    I discussed it with him, but I don't remember
12    exactly the conversations.
13         Q.       Okay.   And just so we're clear.
14    I'm not sure why I didn't understand it before.
15               Why was it that David Parnes
16    originally was in possession of the originals?
17    Why was that?
18         A.       Because --
19               MR. MEISTER:   Possession of the
20         originals of what?
21               MR. LEINBACH:   The originals of --
22               MR. MEISTER:   -- the first page?
23               MR. LEINBACH:   Both, actually,
24         because he had both of them.
25         A.       Because he -- he -- the documents
```

```
 1                           GENGER
 2    had to be for -- while they may not have been
 3    signed at the same time together, they were
 4    basically had to be held in abeyance until the
 5    second -- until the indemnity was signed.
 6        Q.      Okay.  And -- wait.  Until the
 7    indemnity was signed?
 8                Until this document was signed?
 9                MR. DELLAPORTAS:  Page 1 of Exhibit
10        S.
11        A.      Until Page 1 was signed, right.  So
12    he --
13        Q.      Page 1, I'm sorry.  I'm gesturing.
14        A.      Right.  So he held Page 2 --
15        Q.      Right.
16        A.      -- and, like, the understanding was
17    that my sister would sign Page 1.  And
18    afterwards he -- he held -- so he held Page 2
19    until Page 1 was executed.
20        Q.      Okay.
21        A.      And maybe also afterwards.  I don't
22    remember.
23        Q.      Okay.  Do you know whether your mom
24    has made any demands under Page 2 of this
25    promise document?
```

```
1                          GENGER
2        A.        Yes.
3        Q.        Has she made any demands for money?
4        A.        Yes.
5        Q.        When?
6        A.        A couple of weeks ago.
7        Q.        Okay.  She made a demand for how
8    much?
9        A.        $200,000.
10       Q.        Okay.  Did you pay that?
11       A.        Yes.
12       Q.        How did you pay it?
13       A.        It was by check.
14       Q.        Check from the personal account of
15   yours?
16       A.        Yes, yes.
17       Q.        So an account in the name of Sagi
18   Genger, and you wrote a check from that
19   account?
20       A.        It would be a joint account with my
21   wife.
22       Q.        Okay.  Were there any other
23   demands?  Have there been any other demands?
24       A.        No, not formal demands, no.
25       Q.        Any informal demands?
```

```
 1                          GENGER
 2       A.       She -- I guess the answer is no.
 3       Q.       So this is the only formal or
 4   informal demand?
 5       A.       It's a fair answer.
 6       Q.       Is it a correct answer?
 7       A.       It's very difficult.  You
 8   know, she's never before said, "I have this
 9   document, please give me money."  That's . . .
10       Q.       Okay.
11                MR. LEINBACH:  Let's mark this as
12       exhibit -- what are we on?  This is T?
13                THE COURT REPORTER:  Yes.
14                    (Sagi Exhibit T, Exhibit C to Sagi
15           Genger's Reply Affidavit, was marked for
16           identification.)
17                    (Discussion off the record.)
18                MR. LEINBACH:  The first page is
19       Exhibit C because -- and I'm going to
20       represent to you -- that this was Exhibit C
21       to an exhibit that you submitted.
22                MR. DELLAPORTAS:  Fine.
23                THE WITNESS:  Fine.
24                I -- I didn't see that this --
25                MR. LEINBACH:  That's what I wanted
```