UNITED STATES BANKRUPTCY COURT         NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x
In re:                                           :     Chapter 7

       ORLY GENGER,                          :

                                            :

                     Debtor.           :     Case No. 19-13895-JLG

-----------------------------------------------------------------------x
DALIA GENGER,                          :

                                            :

                   Plaintiff,        :

                                            :     Ad. No.: 20-01010-jlg

       -against-                              :

                                            :

ORLY GENGER, MICHAEL BOWEN, ARIE  GENGER, :
ARNOLD BROSER, DAVID BROSER,              :
ERIC HERSCHMANN, THE GENGER LITIGATION    :
TRUST, ADBG LLC, TEDCO INC., and          :
DEBORAH PIAZZA as Chapter 7 Trustee,       :

                                            :

                   Defendants.       :

-----------------------------------------------------------------------x

**MEMORANDUM DECISION AND ORDER GRANTING THE CHAPTER 7 TRUSTEE AND THE VARIOUS DEFENDANTS' MOTIONS TO DISMISS DALIA GENGER'S AMENDED COMPLAINT**

A P P E A R A N C E S :

FOLEY & LARDNER LLP
*Attorney for Dalia Genger*
90 Park Avenue
New York, NY 10016-1314
By:     Paul J. Labov, Esq.

LAW OFFICE OF IRA DANIEL TOKAYER
*Attorney for Dalia Genger*
420 Lexington Avenue, Suite 2400
New York, New York 10170
By:     Ira Daniel Tokayer, Esq.

TARTER KRINSKY & DROGIN LLP
*Attorneys for Deborah J. Piazza,*
*Chapter 7 Trustee*
1350 Broadway, 11th Floor
New York, New York 10018
By:     Rocco A. Cavaliere, Esq.

TOGUT, SEGAL & SEGAL LLP
*Counsel for Arie Genger*
One Penn Plaza, Suite 3335
New York, New York 10119
<u>By</u>:    Frank A. Oswald, Esq.
         Jared C. Borriello, Esq.

KASOWITZ BENSON TORRES LLP
*Attorneys for Michael Bowen and Eric Herschmann*
1633 Broadway
New York, New York 10019
<u>By</u>:    Eric D. Herschmann, Esq.
         Michael Paul Bowen, Esq.

HUGHES HUBBARD & REED LLP
*Attorneys for ADBG, LLC, Arnold Broser,*
*David Broser and Tedco, Inc.*
One Battery Park Plaza
New York, NY 10004
<u>By</u>:    Christopher Gartman, Esq.

REITLER KAILAS & ROSENBLATT LLC
*Attorneys for Debtor Orly Genger*
885 Third Avenue
20th Floor
New York, NY 10022
<u>By</u>:    Yann Geron, Esq.

Lance Harris, Esq.
*Trustee of The Genger Litigation Trust*
<u>By</u>:    Lance Harris, Esq.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

### Introduction[1]

Orly Genger ("Orly")[2] is a chapter 7 debtor herein.[3] In 2004, her parents, Dalia and Arie, divorced. Under their 2004 Divorce Agreement, Dalia relinquished her marital claim to the economic benefit (the "Rights") of 794.40 shares of TRI stock (the "Distributed TRI Shares") and those shares were distributed equally between trusts settled for the benefit of Orly and her brother, Sagi (defined below as the "Orly Trust" and "Sagi Trust," respectively). In connection with the transfer of the Distributed TRI Shares to the trusts, Sagi promised Dalia that upon her requests, he would pay her, in the aggregate, an amount equal to the value of the Distributed TRI Shares, and Orly agreed to indemnify Sagi in an amount equal to one-half of his payment obligations to Dalia on account of the promise. Those commitments are memorialized in, respectively, the 2004 Promise and 2004 Indemnity. Dalia maintains that pursuant to those agreements, Orly promised to set aside and pay funds to her that Orly realizes from her beneficial ownership of the Distributed TRI Shares deposited in the Orly Trust. Dalia contends that in 2013, Orly monetized the TRI shares in the Orly Trust (including the Distributed TRI Shares therein) for substantial consideration, including two unmatured promissory notes for $7.5 million (the "Trump Notes"), and a $17.3 million cash payment (with the Trump Notes,

---

[1]    Capitalized terms not defined in the Introduction are defined below.

[2]    In this Memorandum Decision and Order, the Court will refer to the members of the Genger family by their given names.

[3]    *See In re Orly Genger,* Case No. 19-13895-jlg [ECF No. 1]. References to "ECF No. ___" are references to documents filed in on the electronic docket in this Chapter 7 case.  References to documents filed on the electronic docket in the adversary proceeding, *Dalia Genger v. Orly Genger, et al.*, A.P. 20-01010-jlg, shall be to "AP ECF No. __".

collectively, the "Proceeds"). She maintains that $12.25 million of the Proceeds represents Orly's monetization of Dalia's Rights in the Distributed TRI Shares.

Deborah Piazza, Esq. is the chapter 7 trustee of Orly's estate (the "Trustee"). In this adversary proceeding, in addition to Orly and Ms. Piazza, Dalia has named the following individuals and entities as defendants in her Amended Complaint:[4] Arie, the Genger Litigation Trust, Arnold Broser, David Broser, ADBG LLC, TEDCO, Inc., Michael Bowen and Eric Herschmann (with Orly, collectively, the "Transferees," and together with the Trustee, the "Defendants"). The Amended Complaint contains four claims for relief: (i) a request for the entry of a declaratory judgment that the Proceeds, including the Trump Notes, up to $12.25 million plus interest, are held by Orly and the Transferees in constructive trust and/or subject to an equitable lien for Dalia's benefit whose interest at all relevant times is and was superior to the interests of Orly, the Transferees and Debtors' other creditors (Count One); (ii) the specific enforcement of the remedy of a constructive trust in Dalia's favor and for her benefit upon the Proceeds, including the Trump Notes, up to $12.25 million plus interest, and a demand that Bowen deliver the Trump Notes, in whole or in part, to Dalia (Count Two); (iii) the specific enforcement of an equitable lien in Dalia's favor and for her benefit upon the Proceeds, including the Trump Notes, up to $12.25 million plus interest, and a demand that Bowen deliver the Trump Notes, in whole or in part, to Dalia  (Count Three); and (iv) a temporary, preliminary and/or permanent injunction enjoining and restraining Defendants from selling, transferring, assigning, encumbering, hypothecating, or otherwise alienating the Trump Notes and mandating that Defendants take all actions necessary for Dalia to receive the Proceeds, including the Trump Notes (Count Four).

---

[4]    *See* Amended Complaint [AP ECF No. 8] (the "Am. Compl.").

There are two motions to dismiss the Amended Complaint before the Court (collectively, the "Motions"). One is filed by the Trustee (the "Trustee Motion")[5] and the other (the "Transferee Motion")[6] is filed on behalf of Orly, Arie, the Genger Litigation Trust, Arnold Broser, David Broser, ADBG LLC, and TEDCO, Inc. (the "Transferee Defendants"). Messrs. Bowen and Herschmann (collectively with the Transferee Defendants and the Trustee, the "Movants") filed a joinder to the Transferee Motion.[7] The Trustee and Transferee Defendants seek to dismiss the Amended Complaint with prejudice, and make substantially the same arguments in support of their respective motions. For that reason, the Court considers the Motions together. Moreover, because the Transferee Defendants have borne the "laboring oar" in connection with the prosecution of the Motions, in assessing the merits of the Motions, the Court will focus its discussion on the Transferee Motion (and cite to the Trustee Motion, as appropriate). In short, the Movants contend that the Court must dismiss the Amended Complaint because Dalia lacks standing to obtain the relief she seeks therein. Alternatively, they contend that the Court must dismiss the Amended Complaint because it is time-barred and because, in any event, it fails to state claims for relief against them, and must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).[8] Dalia filed a single objection to the Motions (the "Opposition"),[9] which includes a Cross-Motion for Summary Judgment. The Trustee and Transferee Defendants filed replies to the Opposition, including objections to the Cross Motion

---

[5]    *See* Chapter 7 Trustee's Motion to Dismiss Dalia Genger's Amended Complaint [AP ECF No. 16].

[6]    *See* Various Defendants' Motion to Dismiss Dalia Genger's Amended Complaint [AP ECF No. 12].

[7]    *See* Joinder in Motion to Dismiss Amended Complaint [AP ECF No. 36].

[8]    Rule 12(b)(6) is applicable herein pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

[9]    *See* Plaintiff Dalia Genger's Memorandum of Law in Opposition to Motion to Dismiss Amended Complaint and in Support of Cross-Motion for Summary Judgment [ECF No. 39]; Declaration of Ira Daniel Tokayer in Support [AP ECF No. 38] ("Tokayer Decl.").

3

for Summary Judgment.[10]  Messrs. Bowen and Herschmann filed a Reply Brief in further support

of the Motions.[11]

The Court heard argument on the Motions. At that time, Dalia agreed to dismiss Mr.

Bowen as a defendant in the Amended Complaint, subject to his commitment, as escrow agent of

the Trump Notes, not to further alienate the Trump Notes and to adhere to a final judgment on

the Motions. Dalia also agreed to dismiss Count One as subsumed in Counts Two and Three. At

the hearing, the Court denied the Cross-Motion for Summary Judgment on procedural grounds,

without prejudice. Accordingly, in this Memorandum Decision and Order, the Court considers

whether to dismiss Counts Two, Three and/or Four of the Amended Complaint.

As explained below, the Court grants the Motions, without leave to replead.

### Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the Amended Standing Order of Reference of Cases to Bankruptcy Judges of the United

States District Court for the Southern District of New York, dated January 31, 2012 (Preska,

C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Background[12]

In 1985, the Genger family owned a holding company known as TPR Investment

Associates, Inc. ("TPR"). Arie was TPR's majority shareholder (51%) and Dalia, the Sagi

---

[10]    *See* Reply of Chapter 7 Trustee to Dalia Genger's Opposition to Chapter 7 Trustee's Motion to Dismiss
Amended Complaint [ECF No. 24] (the "Trustee Reply"); Various Defendants' Reply and Opposition to Plaintiff
Dalia Genger's Memorandum of Law (A) in Opposition to Motions to Dismiss Amended Complaint and (B) in
Support of Cross-Motion for Summary Judgment [AP ECF No. 28] (the "Transferee Reply").

[11]    *See* Reply Brief by Bowen and Herschmann in Further Support of Motion to Dismiss Amended Complaint [AP
ECF No. 25].

[12]    There is a long history of litigation among the Gengers. The Court reviews some of the litigated matters to
provide context to the discussion of the adversary proceeding and the merits of the Motions.

Genger 1993 Trust (the "Sagi Trust") and the Orly Genger 1993 Trust (the "Orly Trust"),

respectively, collectively held the 49% minority shareholder interests in TPR.[13] In 1985, Arie

formed Trans–Resources Inc. ("TRI"), a Delaware corporation that specializes in manufacturing

fertilizer and producing chemicals for agricultural use, as TPR's wholly owned subsidiary.[14]

Stockholders Agreement

By 2001, TRI had run into financial difficulty and its $230 million in bonds were trading

at a fraction of their face value. Jules Trump and his brother, Eddie Trump, organized a group of

investors (the "Trump Group") which purchased $220 million (face value) of TRI's bonds for

$25 million.[15] Thereafter, the Trump Group entered into an agreement with TPR and TRI,

pursuant to which it converted its bond holdings into a 47.15% equity stake in TRI, with TPR

retaining 52.85% of the shares (the "Stockholders Agreement").[16] Among other things, the

agreement identified a limited universe of permitted transferees of the TRI shares, and called for

a transferring shareholder to give prior written notice to all shareholders of a proposed transfer.

Under the agreement, a share transfer in violation of the restrictions under the Stockholders

Agreement was void and non–transferring shareholders had the right to purchase any invalidly

transferred shares (the "Purchase Rights").[17]

---

[13]   *See Genger v. TR Invs., LLC*, 26 A.3d 180, 183-84 (Del. 2011) ("*Genger v. TR Invs.*").

[14]   *Id.* at 184.

[15]   *Id.*

[16]   *Id.*

[17]   *Id.*

The 2004 Stock Transfers

On October 26, 2004, Arie and Dalia Genger divorced.[18] At that time, Arie held 250 shares of TPR, and TPR owned 3,000 shares of common stock in TRI. On October 26, 2004, pursuant to the Stipulation of Settlement entered in the divorce action (the "2004 Divorce Agreement"),[19] Arie transferred his interests in TPR to Dalia,[20] and caused TPR to transfer 100% of its holdings in TRI, as follows: 794.40 shares of TRI representing 13.99% of TRI's common stock to Arie himself (the "Arie Shares"); 1,102.80 shares of TRI representing approximately 19.43% of TRI's common stock to each of the Sagi Trust (the "Sagi Trust Shares") and the Orly Trust (the "Orly Trust Shares") (the foregoing transfers collectively will be referred to as the "2004 Stock Transfers.").[21]

The distribution of 794.40 shares of TRI to Arie was a distribution of his 50% marital interest in TRI. Dalia held a 50% marital interest in TRI, but under the 2004 Divorce Agreement, she did not receive a distribution on account of that interest. Rather, under the agreement, she agreed that following the transfers of the TRI shares to Arie and the Sagi Trust and Orly Trust, "[she] will have no ownership in TRI."[22] Instead, she conveyed her marital rights to 794.40 TRI shares (i.e., the Distributed TRI Shares) equally among the Orly Trust and Sagi Trust in consideration for a commitment by Sagi and Orly to financially support her. This arrangement was effectuated through the 2004 Divorce Agreement and a letter dated October 30, 2004

---

[18]   *Id.*

[19]   *See* Declaration of Jared C. Borriello in Support of Various Defendants' Motion to Dismiss Dalia Genger's Amended Complaint [AP ECF No. 13] ("Borriello Decl."), Ex. 2 (2004 Divorce Agreement).

[20]   *See id.,* Art. II, § 2(a)(ii).

[21]   *Id.,* Art. II, § 9(a).

[22]   *Id.*, Art. II, § 9(e).

countersigned by Dalia and Sagi (the "2004 Promise"), and a letter dated November 10, 2004

countersigned by Sagi and Orly (the "2004 Indemnity").[23]

Sagi and Dalia, but not Orly, are parties to the 2004 Promise. In it, Sagi acknowledged

that (i) he and Orly "are benefiting by the receipt of a total of 794.40 shares of [TRI], or

beneficial interests in those shares, by trusts for [their] benefit;" and (ii) in reliance on the 2004

Promise, Dalia is "giving up valuable marital rights;" and (iii) that Dalia "desire[s] further

assurance that [she] will have sufficient funds to support [her] lifestyle."[24] He promised, as

follows:

> If you, in your sole and absolute discretion, from time to time desire funds to
> support your lifestyle, you may request in writing that I make payment to you as
> provided in this letter. Promptly upon receipt of the request, I will pay to you (1)
> an amount equal to all dividends, distributions, proceeds or other payments
> attributable to 794.40 shares of TRI (adjusted for any splits or similar action) that
> have previously been paid to Orly, me or any trust for the benefit of either of us,
> less any amounts previously paid to you pursuant to this letter, or (2) any lesser
> amount indicated in your request.[25]

Sagi and Orly, but not Dalia, are parties to the 2004 Indemnity. It states, as

follows:

> In connection with the attached letter (the "Promise") from me to our mother,
> Dalia Genger, dated October 30, 2004, you agree to indemnify, defend, and hold
> me harmless, for and against one-half (1/2) of any and all payments, liabilities,
> damages, claims, actions, losses, settlements, penalties, judgments or obligations
> (each a "Claim"), including my reasonable counsel and other professional fees,
> expenses and costs, which arise from my undertakings in the Promise.
> I will notify you promptly of any Claims.[26]

---

[23]   *See Genger v. Genger*, 76 F. Supp. 3d 488, 492 (S.D.N.Y. 2015) ("*Genger I*").

[24]   Borriello Decl. Ex. 4 (2004 Promise).

[25]   *Id.*

[26]   Borriello Decl. Ex. 5 (2004 Indemnity).

The 2008 Purchase Agreements

Arie failed to notify the Trump Group of the 2004 Stock Transfers and to obtain the
requisite consent to the transfers. In 2008, the Trump Group learned of the 2004 Stock
Transfers.[27] In August 2008, the Trump Group invoked its Purchase Rights under the
Stockholders Agreement, to acquire the 3,000 TRI shares purportedly distributed to Arie and the
Sagi and Orly Trusts pursuant to the 2004 Transfers.[28] Arie rejected that demand and in
response, the Trump Group filed a lawsuit in the United States District Court for the Southern
District of New York to enforce the Stockholders Agreement, including its Purchase Rights.[29]

Sometime after the divorce was finalized, Dalia sold her interests in TPR to Sagi.[30] On
August 22, 2008, the Sagi Trust, TPR, acting through Sagi, as its President, and the Trump
Group entered into an agreement (the "2008 Agreement") under which the Trump Group
purchased the Sagi Trust Shares (i.e., 1,102.80 TRI shares) for $26.7 million.[31] In part, the
agreement provided that if it was determined that the 2004 Stockholder Transfers were legally
void (as transferred in violation of the Stockholders Agreement), TPR, not the Sagi Trust, would
be deemed and treated as transferor of the Sagi Trust Shares to the Trump Group under the
agreement. That day, the Trump Group and TPR also entered into a "Side Letter Agreement"
giving the Trump Group the option to buy the Arie Shares (i.e., 794.40 TRI shares) and the Orly
Trust Shares (i.e., 1,102.80 TRI shares).[32] The Trump Group's rights under the Side Letter

---

[27]  *See Genger v. TR Invs.*, 26 A.3d at 185.

[28]  *Id.* at 185-186.

[29]  *See generally Glenclova Inv. Co. v. Trans-Res., Inc.,* 874 F. Supp. 2d 292 (S.D.N.Y. 2012) ("*Glenclova I*").

[30]  TPR is 99% owned by the Sagi Trust. *See* Borriello Decl. Ex. 16 (*Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC et al.*, C.A. No. 6906-CS, Aug. 1, 2013 Hr'g Tr. at 8:6-8).

[31]  *Genger I*, 76 F. Supp. 3d at 493.

[32]  *Genger v. TR Invs.,* 26 A.3d at 187; *See also* Borriello Decl., Ex. 7 (Side Letter Agreement).

8

Agreement would be triggered only if it was determined that the 2004 Stock Transfers were void. In that event, the legal and beneficial ownership of the TRI shares would be deemed to have remained with TPR, and, accordingly, TPR would be the transferor of the shares.[33]

The Chancery Court Action

In August 2008, with the Sagi Trust Shares in hand, the Trump Group (as majority shareholder) purported to remove Arie from TRI's board and assert control over the board.[34] Arie refused to recognize the Trump Group's authority, and the Trump Group filed suit against Arie in the Delaware Chancery Court (the "Chancery Court") seeking a determination pursuant to 8 Del. Code § 225 that it controlled TRI (the "Chancery Court Action"). After a trial, in July 2010, the Chancery Court ruled that the Trump Group lawfully had the right to purchase the Sagi Trust Shares (because they had been transferred in violation of the Stockholders Agreement and thus, the transfers were void and the TRI shares reverted to TPR), that it held record title to those shares, and that it possessed a majority voting interest and the resulting right to elect the majority of TRI's board (the "Merits Opinion").[35] In August 2010, the Chancery Court issued a "Side Letter Opinion."[36] That ruling addressed the issue of the record and beneficial ownership of the Arie Shares and Orly Trust Shares. The court found that TPR violated the Stockholders Agreement in 2004 when it purported to transfer those shares to Arie and the Orly Trust, the transfers were void and the shares reverted to TPR, the Trump Group had the right to purchase the Arie Shares and Orly Trust Shares from TPR, and that neither Arie nor the Orly Trust were

---

[33]    *Genger v. TR Invs.*, 26 A.3d at 187.

[34]    *Id.*

[35]    *TR Invs., LLC v. Genger,* C.A. No. 3994-VCS, 2010 WL 2901704 at *19 (Del. Ch. July 23, 2010).

[36]    *TR Invs., LLC v. Genger*, C.A. No. 3994-VCS, 2010 WL 3279385 (Del. Ch. Aug. 4, 2010).

record or beneficial owners of any of the TRI shares. It held that TPR was the record and beneficial owner of all TRI shares not then owned by the Trump Group.[37]

Arie appealed the Merits Opinion and Side Letter Opinion. While those appeals were pending, the Trump Group exercised its option to purchase the Arie Shares and Orly Trust Shares from TPR for approximately $7.4 million and $10.3 million (the "Orly Trust Shares Proceeds"), respectively. The proceeds were deposited in separate escrow accounts (the "Escrowed Proceeds").[38] In July 2011, the Delaware Supreme Court affirmed the Chancery Court, in part. It found that the 2004 Stock Transfers were invalid, that the Trump Group legally purchased the Sagi Trust Shares from TPR, and that the Trump Group held majority voting control of the corporation.[39] However, the court reversed the Side Letter Opinion, finding that while the Chancery Court had *in rem* jurisdiction to determine record ownership of the Arie Shares and Orly Trust Shares, it lacked personal jurisdiction over the Orly Trust and TPR, and, as such, lacked the power to declare whether Arie or the Orly Trust held beneficial interests in the Arie Shares and Orly Trust Shares.[40]

---

[37]   *Id.* at *2-3.

[38]   *Glenclova I,* 874 F. Supp. 2d at 297. One escrow agreement was among TPR, the Orly Trust, Orly, as beneficiary of the Orly Trust, and the law firm of Pedowitz & Meister LP ("P&M"). The Trump Group deposited the Orly Trust Shares Proceeds (i.e., $10.3 million) in escrow with P&M (the "P&M Escrow"). The second was with TPR and Skadden Arps (the "Skadden Escrow").  Essentially, the Trump Group deposited the $7.4 million purchase price for the Arie Shares in the Skadden Escrow. *Id.*

[39]   *Genger v. TR Invs.,* 26 A.3d at 195-98.

[40]   *Id.* at 201-03.

10

The Resolution Of The Disputes Regarding
Beneficial Ownership Of The Arie and Orly Shares

The issuance of the Merits and Side Letter Decisions and subsequent appeals thereof

spawned several lawsuits in New York state and federal courts, and the Chancery Court among

Arie, Orly, Dalia, as trustee of the Orly Trust, the Trump Group and the escrow agents over the

beneficial ownership of the Arie and Orly Trust Shares and distribution of the Escrowed

Proceeds. The dispute over the extent of Arie's beneficial ownership of the Arie Shares was put

to bed in the Chancery Court. The Trump Group sued Arie and TPR in that court seeking a

determination that it is the beneficial owner of the Arie Shares.[41] The court ruled that the Trump

Group had the right to purchase the Arie Shares from TPR in 2008, and that Arie was not a

record or beneficial TRI shareholder. The court also ordered that the Skadden Escrow (i.e., $7.4

million) be released to TPR.[42] Arie did not appeal the final judgment order.

On October 4, 2011, Dalia, in her capacity as trustee of the Orly Trust, filed a declaratory

judgment action against the Trump Group and TPR in the Chancery Court seeking an order that

the Orly Trust is the beneficial owner of the Orly Trust Shares.[43] The Trump Group filed a

counterclaim seeking an order declaring that it beneficially owned the Orly Trust Shares. On

August 30, 2013, the parties resolved the action pursuant to a stipulation dismissing the action

(the "Dismissal Stipulation"). Under that agreement, the Trump Group, TPR/Sagi, and Dalia, as

trustee of the Orly Trust, resolved their dispute over the beneficial ownership of the Orly Trust

Shares. They agreed (i) that the Trump Group owns, for all purposes, all rights, title and interest

(beneficially, of record and otherwise) to the Orly Trust Shares (representing 1,102.80 shares of

---

[41]    *TR Invs., LLC, v. Genger*, C.A.No. 6697-CS, 2013 WL 603164 (Del. Ch. Feb. 18, 2013).

[42]    *TR Invs., LLC v. Genger,* C.A.No. 6697-CS, 2013 WL 787117 (Del. Ch. March 1, 2013).

[43]    *See generally Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC et al.*, C.A. No. 6906-CS.

TRI stock), and (ii) as a consequence, the Trump Group owns for all purposes, all rights, title and interest (beneficially, of record and otherwise) to all of the 5,676.4428 authorized and issued shares of TRI.[44] In the stipulation, the Trump Group also disclaimed any and all claims to the Orly Trust Shares Proceeds then on deposit in the P&M Escrow.[45]

Thereafter, TPR (controlled by Sagi) brought an action in the Southern District of New York against P&M, as escrow agent under the P&M Escrow, and Dalia and Orly as Trustee and beneficiary, respectively, of the Orly Trust, seeking a judgment directing the release of the Orly Trust Shares Proceeds from the P&M Escrow (i.e., $10.3 million) to TPR.[46] The district court denied Orly's motion to dismiss the action, granted summary judgment to TPR and directed that the proceeds of the P&M Escrow be released to TPR.[47]

In June 2013, Arie, Orly and David Broser, individually and on behalf of entities in his control (collectively, the "AG Group"), the Trump Group, and Trans-Resources, LLC , as successor to TRI ("Trans-Resources/TRI"), entered into a settlement agreement (the "2013 Settlement Agreement") in which they resolved their conflicting claims over the record and beneficial ownership of the TRI shares.[48] Orly is party to the agreement in her individual capacity and as beneficiary of the Orly Trust. In substance, the economic terms of the agreement are as follows:

> (i) the Trump Group paid counsel to the AG Group ("Wachtel Masyr"), an amount in cash equal to $17.3 million, calculated as $35 million, less the $17.7 million on deposit in the escrow accounts; and

---

[44]  *See* Borriello Decl. Ex. 17 (Dismissal Stipulation) ¶ 2.

[45]  *Id.* ¶ 3.

[46]  *TPR Associates, Inc. v. Pedowitz & Meister LLP*, No. 13 Civ. 8243, 2014 WL 1979932 at *1 (S.D.N.Y. May 15, 2014.

[47]  *Id.* at *8.

[48]  *See* Tokayer Decl. Ex. N (June 2013 Settlement).

12

(ii) Trans-Resources/TRI, on behalf of the Trump Group, delivered two $7.5 million promissory notes (the "Trump Notes") for the benefit of the AG Group.

2013 Settlement Agreement ¶¶ 2-3. In addition, the Trump Group released all claims to funds escrowed in the Skadden Escrow ($7.4 million) and the P&M Escrow ($10.3 million). *Id.*[49] Moreover, Orly, in her individual capacity, and as beneficiary of the Orly Trust, waived all claims that she or the trust may have to ownership (record, beneficial or otherwise) to any shares of Trans-Resources/TRI. *Id.* ¶ 4. The settlement agreement did not purport to waive the claims of the Orly Trust to the shares of Trans-Resources/TRI. *See id*. Thus, pursuant to the 2013 Settlement Agreement, Orly acknowledged that the Trump Group is the record and beneficial owner of the Orly Trust Shares.

<u>2014 Demand and Lawsuit</u>

In January 2014, Dalia demanded $200,000 from Sagi under the 2004 Promise (the "2014 Demand"), which Sagi paid. In February 2014, Sagi demanded $100,000 from Orly under the 2004 Indemnity, which Orly refused to pay. Sagi sued Orly for breach of contract. In support of his complaint, Sagi alleged that he and Orly entered into a tri-party agreement with Dalia, under which Sagi and Orly received Dalia's marital share of the TRI shares in exchange for providing Dalia with financial support derived from the economic value obtained from those shares. Sagi contended that Orly breached that agreement and sought damages equal to 50% of the $200,000 that he paid to Dalia, plus costs and fees incurred in enforcing the agreement.[50] In opposing the complaint and summary judgment motion, Orly denied that the agreement was valid and

---

[49]    The 2013 Settlement Agreement predates the Dismissal Stipulation described above.

[50]    *Genger I*, 76 F. Supp. 3d at 491.

enforceable. Her principal argument was that she never received the promised shares of TRI, and therefore the agreement failed for lack of consideration.[51]

In granting summary judgment to Sagi (the "2015 Judgment"), the district court found that the 2004 Promise and the 2004 Indemnity constitute a single integrated agreement among Dalia, Sagi and Orly (the "2004 Integrated Agreement"), in which Sagi agreed to pay Dalia, upon demand, an amount up to the value of the TRI shares Dalia conveyed to the Orly Trust and Sagi Trust under the 2004 Divorce Agreement and Orly agreed to indemnify Sagi for half of the payments he makes to Dalia.[52] The court held that Orly breached her promise when she rejected Sagi's demand for indemnification. In so ruling, the court found that the 2004 Integrated Agreement provided each party with a benefit in exchange for a legal obligation, and rejected Orly's claim that the 2004 Integrated Agreement was not supported by consideration because the

---

[51]   *Id.*

[52]   *Id.* at 497. In reaching that determination, the district court found that Orly could not contemporaneously sign the 2004 Promise because she was out of the country at the time Sagi and Dalia executed the 2004 Promise. The court also found that before Sagi signed the 2004 Promise, Orly verbally agreed with Sagi to indemnify him for one-half of the payments he would have to make under the 2004 Promise. *Id.* at 493. The district court held that there was "no triable issue as to whether the documents were 'designed to effectuate the same purpose' and to 'be read together.'" *Id.* at 497. The court reasoned, as follows:

> The 2004 Promise and the 2004 Indemnity are sufficiently unambiguous such that there is no triable issue as to whether they form an integrated agreement, even though they were executed on different dates and were not all between the same parties . . . . Indeed, neither agreement makes any sense without the promises expressed in the other. Without the 2004 Indemnity, Sagi could be obligated under the 2004 Promise to pay Dalia double the economic benefit he received from his shares of TRI, and Orly would effectively have received the shares as a gift. Further, the 2004 Indemnity explicitly attaches and cross-references the 2004 Promise[.]

*Id.* (citations omitted).

Orly Trust never received the TRI shares.[53] The court also rejected Orly's defenses to

enforcement of the agreement.[54] On appeal, the Second Circuit affirmed the judgment.[55]

<u>2017 Demand and Lawsuit</u>

On October 21, 2017, Dalia demanded $6,000,000 from Sagi under the 2004 Promise

(the "2017 Demand"). Sagi rejected the demand, and Dalia sued him for breach of contract.[56] In

---

[53]    *Genger I*, 76 F. Supp. 3d at 499. The court found:

> [T]he 2004 Promise states that Orly and Sagi are benefiting from receipt of *either* the TRI shares
> *or* 'beneficial interests in those shares,' by their respective trusts. . . . Thus, the question becomes
> whether Orly has benefited from the Orly Trust's receipt of beneficial interests in the TRI shares.
> There is no genuine dispute as to whether she has so benefited: Orly's claims to beneficial
> ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3
> million from the Trump Group under the 2013 Settlement Agreement. Further, no court has issued
> a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares.

*Id.*

[54]    Orly contended that (i) Sagi was judicially estopped from arguing that the Orly Trust received a beneficial
interest in the TRI shares, (ii) even if the 2004 Integrated Agreement was valid, it should nevertheless be rescinded
because there was a mutual mistake as to whether Sagi and Orly were being treated equally in their parents' divorce,
(iii) Orly has no contractual duty to indemnify Sagi without first receiving notice and an opportunity to defend, and
Sagi failed to give Orly such notice. *See Genger I*, 76 F. Supp. 3d at 500-502. The district court rejected those
defenses, finding that there was no triable issue as to whether Orly had a viable defense to the 2004 Integrated
Agreement. *Id*. at 503.

[55]    *See Genger v. Genger,* 663 Fed. Appx. 44 (2d Cir. 2016) ("*Genger II*"). In doing so, and without limitation, the
circuit held that "the [2004 Promise] and the [2004 Indemnity] form an integrated agreement in which Orly has a
contractual duty to reimburse Sagi for half of the amount he pays Dalia for living expenses." *Id.* at 48. It also
rejected Orly's assertion that the agreement fails for lack of consideration, as follows:

> To the extent Orly [asserts that the record does not reveal that she actually received any money
> from the 2013 Settlement Agreement], she seeks to ground it by suggesting that the record does
> not reveal that she received any money from the settlement. But surely any $32 million transaction
> for her shares would confer upon her more than a peppercorn, which is all we need to conclude
> (and all we do conclude) as to the extent of any benefit she received. Consideration encompasses
> more than just receiving cash: it "exists where there is 'either a benefit to the promisor or a
> detriment to the promisee.'" *See Hollander v. Lipman*, 65 A.D.3d 1086, 1087 (2d Dep't
> 2009) (quoting *Weiner v. McGraw–Hill, Inc*., 57 N.Y.2d 458 (1982)). Orly does not dispute that
> she was part of a group that settled a claim involving the shares she was to receive as part of the
> [2004] Divorce [Agreement]. Orly benefitted from the shares regardless of whether the settlement
> money went to Orly, as a gift to Arie, or to pay debts owed to her litigation partners. Moreover,
> her argument oddly assumes that she derives no benefit from her brother's undertaking to support
> the mother of them.

*Id.* at 49-50.

[56]    *See Genger v. Genger*, No. 17-CV-8181 (KBF), 2018 WL 3632521, at *2 (S.D.N.Y. July 27, 2018) ("*Genger
III*").

answering the operative complaint, Sagi conceded that the 2004 Promise was valid and enforceable, but argued "the payment obligation was a joint obligation of his with Orly, who has recently indicated she will not honor that obligation, and thus it would be inequitable for Sagi to once again make a payment to Dalia without Orly's immediate reimbursement."[57] He also brought a third-party complaint against Orly to enforce the 2004 Indemnity.[58]

Dalia moved for summary judgment against Sagi on her breach of contract claim, and Sagi moved for partial summary judgment against Orly.[59] In turn, Orly moved to dismiss the third-party complaint for lack of subject matter jurisdiction. In granting Dalia summary judgment against Sagi, the district court found that based on the rulings in *Genger I* and *Genger II*, "it has been conclusively established that: (1) the 2004 Integrated Agreement is valid and enforceable; (2) Sagi and Orly monetized their beneficial interests in the TRI shares for a total of $69.3 million, [$24.7 million] of which was attributable to Dalia's conveyed marital interest;[60] and (3) pursuant to the 2004 Integrated Agreement, Dalia is entitled to demand payment up to a certain

---

[57]   *Id.* (citation omitted).

[58]   *Id.* That complaint included claims for: (i) breach of contract; (ii) promissory estoppel claim; and (iii) declaratory judgment claim to the extent of the $3,000,000 liability sought in that action.

[59]   *Id.* at *3, 7.

[60]    In considering the amount of Dalia's demand under the agreement, the district court noted, as follows:

> Both Dalia and Sagi agree that Dalia's conveyed marital interest of 794.4 shares represents 36% of the total TRI shares that were monetized. Using that figure, the maximum amount payable to Dalia under the 2004 Integrated Agreement is approximately $24.7 million (or 36% of the total $69.3 million value). Orly has not specifically disputed the 36% figure, though she has raised unrelated questions about how the so-called "cap" in the 2004 Integrated Agreement affects her obligations to Sagi. In any event, there has been absolutely no suggestion by <u>any</u> party that Dalia's demand for $6 million <u>exceeds</u> the amount attributable to her conveyed marital interest of 794.4 shares, and indeed the figure cited by Dalia and Sagi is consistent with documents previously submitted to the Court in connection with the 2014 Lawsuit.

*Id.* at *6 n.5.

amount in her 'sole and absolute discretion.'"[61] The district court held that there was no triable

issue as to whether all elements of a breach of contract claim under New York law were

satisfied.[62] The district court denied Orly's motion to dismiss[63] and granted Sagi's motion for

partial summary judgment against Orly (the "2018 Judgment").[64] On appeal, the Second Circuit

affirmed the 2018 Judgment.[65]

Orly Files Chapter 7 Bankruptcy
Case in the Western District of Texas

On July 12, 2019, Orly commenced a voluntary case under chapter 7 of the Bankruptcy

Code (the "Chapter 7 Case") in the United States Bankruptcy Court for the Western District of

Texas (the "Texas Bankruptcy Court").[66]  Ron Satija, Esq. was appointed chapter 7 trustee (the

"Texas Trustee") in the case. On September 27, 2019, the Texas Trustee filed a Motion to

Approve Compromise and Settlement to resolve the estate's fraudulent transfer claims against

---

[61]   *Id.* at *6.

[62]   *Id.* at *7.  In New York, a breach of contract claim requires: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages to the plaintiff caused by that breach. *See Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

[63]   *Genger III,* 2018 WL 3632521, at *5-6.

[64]   In so ruling, the district court reasoned, as follows:

> As previously noted, it has already been conclusively established that the 2004 Integrated Agreement is valid and enforceable, and therefore that Orly is required to indemnify Sagi for half of any payments made pursuant to the 2004 Promise. Indeed, Sagi's third-party claims in this action are nearly identical to the claims he prevailed on in the 2014 Lawsuit, the only difference being the quantum of Dalia's demand (and the fact that Sagi has yet to pay). The Court has reviewed all of Orly's arguments in opposition to summary judgment and finds them to be without merit . . .

 *Id.* at *7.

[65]   *See Genger v. Genger*, 771 Fed. Appx. 99 (2d Cir. 2019) ("*Genger IV*").

[66]   Voluntary Petition for Individuals Filing For Bankruptcy [ECF No. 1] (the "Chapter 7 Petition").

certain of the Transferee Defendants.[67] On June 12, 2019, Dalia purported to resign as Trustee of the Orly Trust. On October 18, 2019, Dalia, acting on her own behalf, objected to the proposed settlement. In part, she contended that she has a right to impose a constructive trust on the Trump Notes.[68] Ultimately, the Texas Trustee effectively abandoned the settlement motion.

The Chapter 7 Case is Transferred to New York

On or about September 13, 2019, Sagi filed a motion to dismiss the Chapter 7 Case for Orly's alleged bad faith filing or, alternatively, to transfer the venue of the case to the United States Bankruptcy Court for the Southern District of New York.[69] The Debtor opposed the motion. The Texas Bankruptcy Court directed that venue of the case be transferred to this

---

[67] *See* Application Under Federal Rule of Bankruptcy Procedure 9019 and Local Rule 9019 to Approve Compromise [ECF No. 52].

[68] *See* Objection and Response of Dalia and D&K GP LLC to the Trustee's Application Under Federal Rule of Bankruptcy Procedure 9019 and Local Rule 9019 to Approve Compromise [ECF No. 115]. Specifically, Dalia asserts that:

> This two-party family dispute does not belong in bankruptcy. This contrived bankruptcy is intended solely to frustrate Dalia's extant rights to constructive trust over two $7.5 million promissory notes nominally held by Michael Bowen, Debtor's attorney, **and to avoid the rights and remedies of only two people – Dalia and Sagi Genger.** Every other party to this bankruptcy and the Motion is an Insider to the Debtor, all of whom are expecting a multi-million dollar payday for their actual fraud. Importantly, however, is that there are no other meaningful creditors. Effectively, this is a two-party dispute, now pending in the US District Court SDNY, that has been strategically removed to this venue to avoid the SDNY proceedings.

> The Settlement Agreement seeks to assign rights to the $15 million in promissory notes (*See* paragraphs 4 and 5) *to Debtor's father and husband* with nothing to be retained by the estate. As set out herein, Dalia already enjoys a constructive trust over that consideration by operation of New York Law. Accordingly, her interest is superior to that of the Trustee under Fifth Circuit precedent.

*See id.* ¶¶ 13-14.

[69] *See* Judgment Creditor Sagi Genger's Motion to Dismiss Bankruptcy Case or, Alternatively, To Transfer Venue, and Memorandum of Law In Support [ECF No. 32].

Court.[70] The case arrived in this Court on December 10, 2019,[71] and thereafter, Ms. Piazza was appointed Trustee.

### The Adversary Proceeding[72]

On January 22, 2020, Dalia commenced this adversary proceeding by filing a two count complaint seeking a declaratory judgment that a constructive trust exists over the monetized proceeds of the Distributed TRI Shares held by the Orly Trust.[73] On June 7, 2020, Dalia filed the Amended Complaint which is the subject of the Motions.

In the Amended Complaint, Dalia seeks a declaratory judgment recognizing a constructive trust and/or an equitable lien imposed for her benefit, up to $12.25 million plus interest, on all property that Orly has realized from her alleged beneficial ownership of the Distributed TRI Shares held by the Orly Trust, and Dalia's Rights in those shares (i.e., her marital claim to the economic benefit of those shares), including the Trump Notes. Am. Compl. ¶ 1. Dalia contends that Orly diverted the proceeds from such Rights from her and misappropriated them to insiders, for no legal consideration, with the actual and/or constructive intent to hinder, delay and defraud Dalia's entitlement to such proceeds. *Id.* In support of the Amended Complaint, Dalia contends that together, the 2015 Judgment and the 2018 Judgment establish that (i) pursuant to the 2013 Settlement Agreement, Orly, Arie, David Broser and their various

---

[70]   *See* Order Transferring Case [ECF No. 168]; Amended Order Transferring Case [ECF No. 179].

[71]   *See* Receipt of Inter District Transfer [ECF No. 192].

[72]   The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint. Accordingly, in discussing the Amended Complaint, the facts recited herein are those alleged in the Amended Complaint, which the Court presumes to be true in resolving this Motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("In any event, a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact.").

[73]   *See* Dalia Genger's Complaint Seeking a Declaratory Judgment and the Imposition of a Constructive Trust for the Benefit of Dalia Genger [AP ECF No. 1].

affiliated entities will receive $32.3 million in exchange for a declaration that the Trump Group owns all right, title and interest in the TRI shares, including Orly's waiver of all her claims to the shares; (ii) the $32.3 million consists of the $17.3 million cash up front and the Trump Notes (aggregating $15 million); and (iii) that Dalia is entitled to be paid up to $12.25 million from the monetized proceeds. Am. Compl. ¶¶ 21-23. *See also id.* ¶ 38 ("Thus, according to two final non-appealable judgments, of the $32.3 million monetized and received by Orly pursuant to the 2013 Settlement Agreement, Orly must pay Dalia up to $12.25 million from the monetized proceeds of the Rights, representing 50% of the $24.7 million to which Dalia is entitled under the 2004 Agreements . . .").

Dalia asserts that since the execution of the 2004 Integrated Agreement, "Orly has devised devious and fraudulent schemes to deprive Dalia of her bargain with the intent to hinder, delay and defraud Dalia, including by fraudulently transferring and encumbering Orly's $32.3 million of the proceeds from the monetization of the very Rights that were to be set aside for Dalia's retirement in order to nullify Dalia's ability to reclaim those rights." Am. Compl. ¶ 20. She complains that Orly's alleged bad acts include actions that she took in 2013 when to frustrate Dalia's rights, Orly secretly and fraudulently transferred approximately $17.3 million of the $32.3 million obtained in the 2013 Settlement Agreement to Arie's creditors and/or business partner, David Broser and his affiliated entities, as well as the Genger Litigation Trust and ADBG LLC, in purported satisfaction of false liabilities and for no consideration or value to Orly. *Id.* ¶ 39.[74] She says that Orly's alleged wrongdoing continued in 2014 when Orly breached her duty to Dalia and repudiated her promise to Dalia by refusing either to pay Dalia from the

---

[74]     Dalia identifies the "Genger Litigation Trust" as a "purported trust" whose "purported co-trustees" are Lance Harris and David Broser. Am. Compl. ¶ 8. Among other things, she asserts that the Genger Litigation Trust "does not exist as a matter of law." *Id.* Dalia asserts that ADBG LLC is a limited liability company with its "principal place of business in New York, whose managing member upon information and belief is David Broser." *Id.* ¶ 9.

proceeds from her monetization of the Rights, or to reimburse and indemnify Sagi for his payments to Dalia made pursuant to Dalia's request. *Id.* ¶ 46. Dalia maintains that instead of making the payments called for under the 2004 Integrated Agreement, Orly "diverted and misappropriated the proceeds from her monetization of the Rights, including the Trump Notes, by transferring and encumbering them for no legal consideration or value to Orly and with the actual and/or constructive intent to hinder, delay and defraud Dalia." *Id.* ¶ 47.

Dalia maintains that Arie is a beneficiary of Orly's alleged fraudulent transfers (*id.* ¶¶ 5, 24, 25), and that in 2013, David Broser and various affiliated entities including the Genger Litigation Trust and ADBG LLC improperly received $17.3 million of Orly's monetization of the Rights for no consideration and for no value to Orly. *Id.* ¶¶ 6, 8, 9. She also challenges Eric Herschmann's alleged interest in the Trump Notes. *Id.* ¶¶ 7, 26. In substance, in support of the Amended Complaint, Dalia asserts that she has "first call" on up to $12.25 million plus interest of the $32.3 million that she alleges Orly monetized and received pursuant to the 2013 Settlement Agreement. In the three Counts of the Amended Complaint that remain subject to the Motions, Dalia seeks the "specific enforcement" of the remedies of a constructive trust (*id.* ¶¶ 52-54 (Count Two)) and equitable lien (*id.* ¶¶ 55-56 (Count Three)) in her favor upon the proceeds of Orly's monetization of the shares, including the Trump Notes. She also seeks a temporary, preliminary and/or permanent injunction enjoining and restraining Orly and the Transferees from selling, transferring, assigning, encumbering, hypothecating, or otherwise alienating the Trump Notes and mandating that Orly and the Transferees take all actions necessary for Dalia to receive the proceeds of Orly's monetization of the Rights, including the Trump Notes. *Id.* ¶¶ 57-59 (Count Four). A condition precedent for Dalia to demonstrate that she is entitled to relief under Count Four is that she establishes a right to relief under either

21

Count Two or Count Three. Accordingly, at this time, the Court focuses its discussion on those Counts of the Amended Complaint.

Count Two

In Count Two, Dalia seeks the enforcement of a constructive trust for her benefit against Orly and the Transferees. Am. Compl. ¶ 54. Dalia contends that she transferred her Rights to Orly and Sagi in exchange for "their promise to set aside and pay funds received [from the Rights] in an amount equal to all dividends, distributions, proceeds and other payments attributable to the shares . . . or any lesser amount upon request by Dalia, for Dalia's retirement." *Id.* ¶ 15. She says that the promise is reflected in the 2004 Promise and 2004 Indemnity and that those agreements "provided for Dalia to demand payment from Sagi who in turn had a right of indemnification from Orly." *Id.* ¶ 16-19. She asserts that when she transferred the Rights to Orly, a confidential and fiduciary relationship of familial trust and confidence existed between her and Orly, and she relied on Orly's promise to pay her from the monetized proceeds of the Rights and/or reimburse and indemnify Sagi for his payments to her made pursuant to her request. *Id*. ¶¶ 43-45.

Dalia maintains that in 2014 and thereafter, Orly breached her duty to Dalia and abused the trust and confidence placed by Dalia in her by (i) repudiating her promise and refusing to pay Dalia from the  proceeds of her monetization of the Rights and/or reimburse and indemnify Sagi for his payments to Dalia made pursuant to Dalia's request; and (ii) diverting and misappropriating the proceeds of her monetization of the Rights, including the Trump Notes, by transferring and encumbering them for no legal consideration or value to Orly.  Am. Compl. ¶¶ 46, 47. She says that Orly took those actions "with the actual and/or constructive intent to hinder, delay and defraud Dalia." *Id.* ¶ 47.  Dalia contends that Orly and the Transferees will be "unjustly enrich[ed]" if they are permitted to retain the proceeds of the monetization of the

Rights, including the Trump Notes and any liens thereon, and that "Orly, her estate and the

Transferees may not in good conscience retain the benefits of Orly's monetization of the Rights."

*Id.* ¶¶ 48, 49. Accordingly, she says that she is entitled to the "specific enforcement of the

remedy of a constructive trust in her favor and for her benefit upon the proceeds of Orly's

monetization of the Shares, including the Trump Notes, up to $12.25 million plus interest." *Id.* ¶

54.

      A constructive trust "is the formula through which the conscience of equity finds

expression. When property has been acquired in such circumstances that the holder of the legal

title may not in good conscience retain the beneficial interest equity converts him into a trustee."

*Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380 (1919) (Cardozo, J.); *accord Counihan v.*

*Allstate Ins. Co.,* 194 F.3d 357, 360 (2d Cir.1999); *Simonds v. Simonds,* 45 N.Y.2d 233, 241

(1978). New York law controls the determination of whether Dalia has pled facts demonstrating

that a constructive trust applies herein.  *In re First Central Financial Corp.*, 377 F.3d 209, 212

(2d Cir. 2004); *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989). A request to

impose a constructive trust is not an independent cause of action. *Anwar v. Fairfield Greenwich*

*Ltd.*, 728 F.Supp. 2d 372, 419 (S.D.N.Y. 2010). It seeks to impose an equitable remedy the key

purpose of which is to prevent unjust enrichment. *See In re Koreag Controle et Revision S.A*, 961

F.2d 341, 354 (2d. Cir. 1992); *Simonds v. Simonds*, 45 N.Y.2d at 242. "In other words, the

[constructive] trust is simply a remedy for recovery should a plaintiff's claim for unjust

enrichment prevail." *Amusement Industry, Inc. v. Stern*, 693 F. Supp. 2d 327, 357 (S.D.N.Y.

2010).

      To establish grounds under New York law for imposing a constructive trust, a plaintiff

must demonstrate: (i) a confidential or fiduciary relationship with the alleged constructive

trustee; (ii) a promise, express or implied; (iii) a transfer made in reliance on that promise; and

23

(iv) unjust enrichment. *See In re Ades & Berg Grp. Inv'rs,* 550 F.3d 240, 245 (2d Cir. 2008); *see also Bankers Sec. Life Ins. Soc'y v. Shakerdge,* 49 N.Y.2d 939, 940 (1980); *Simonds v. Simonds*, 45 N.Y.2d at 241-242. Moreover, "[w]hile a showing of actual fraud or wrongful conduct is not strictly required for a constructive trust, New York law is clear that a constructive trust is an equitable remedy intended to be 'fraud-rectifying' rather than 'intent-enforcing.'" *In re First Central Financial Corp.,* 377 F.3d at 216 (quoting *Bankers Sec. Life Ins. Soc'y,* 49 N.Y.2d at 940). Generally, a plaintiff must prove the elements of a constructive trust by clear and convincing evidence. *Schmeider v. Hall*, 421 F.Supp. 1208 (S.D.N.Y. 1976), *aff'd,* 545 F.2d 768 (2d Cir.), *cert. denied,* 430 U.S. 955(1977).

The effect of a constructive trust in bankruptcy is "profound," because it removes the trust *res* from the bankruptcy estate and "places its beneficiary ahead of other creditors with respect to the trust *res*." *Cadle Co. v. Mangan (In re Flanagan),* 503 F.3d 171, 181 (2d Cir. 2007); *accord In re Ades & Berg Group Investors,* 550 F.3d at 245; *In re First Central Financial Corp.,* 377 F.3d at 217–18. Nonetheless, in this circuit, it is settled that bankruptcy law does not eclipse state constructive trust law. *In re Howard's Appliance Corp.,* 874 F.2d at 93 ("[W]hile the outer boundaries of the bankruptcy estate may be uncertain, 'Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition.'") (quoting *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n.10 (1983)). Still, the Second Circuit has cautioned that in considering application of constructive trust law in the context of a bankruptcy case, courts must "'act very cautiously' to minimize conflict with the goals of the Bankruptcy Code." *In re First Central Finance Corp.,* 377 F.3d at 217 (quoting *In re N. Am. Coin & Currency, Ltd.,* 767 F.2d 1573, 1575 (9th Cir.1985)). That is because a constructive trust "is fundamentally at odds with the general goals of the Bankruptcy Code." *In re Omegas Group, Inc.,* 16 F.3d 1443, 1451 (6th Cir.1994). "[B]y creating a separate allocation mechanism outside

24

the scope of the bankruptcy system, 'the constructive trust doctrine can wreak ... havoc with the priority system ordained by the Bankruptcy Code.'" *In re First Central Finance Corp*., 767 F.3d at 217 (quoting *In re Haber Oil Co.,* 12 F.3d 426, 436 (5th Cir.1994)). Accordingly, "bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so." *In re Haber Oil Co.,* 12 F.3d at 436 (internal quotation marks and citations omitted).

Count Three

In Count Three, Dalia asserts that as an alternative to the constructive trust, she is entitled to an equitable lien on the proceeds of Orly's monetization of the Rights. *See* Am. Compl. ¶¶ 55-56. Under New York law, a court will impose an equitable lien where the facts surrounding a transaction evidence that the parties intended that a specific piece of property is to be held or transferred to secure an obligation. *See Teichman by Teichman v. Community Hosp. of W. Suffolk*, 87 N.Y.2d 514, 520 (1996) ("As we have long recognized, an equitable lien 'is dependent upon some agreement express or implied that there shall be a lien on specific property.'") (quoting *James v. Alderton Dock Yards,* 256 N.Y. 298, 303 (1931)). *See also Security Pacific Mortg. And Real Estate Services, Inc. v. Republic of Philippines*, 962 F.2d 204, 208 (2d Cir. 1992) ("New York law permits the imposition of an equitable lien on property if there is an express or implied contract, meeting certain requirements, concerning the property.") (citations omitted). The agreement "must deal with some particular property either by identifying it or by so describing it that it can be identified and must indicate with sufficient clearness an intent that the property so described or rendered capable of identification is to be held, given or transferred as security for the obligation." *James v. Alderton Dock Yards,* 256 N.Y. at 303. Moreover, an equitable lien requires "clear intent that the specific property at issue acts as security for the obligation." *Ryan v. Cover*, 75 A.D.3d 502, 502 (2d Dep't 2010).

## **The Motions**

The Motions focus on Counts Two and Three of the Amended Complaint. The Transferee Defendants assert that the Court should dismiss the Amended Complaint, with prejudice, because Dalia lacks standing to assert the claims at issue in the Amended Complaint, those claims are time-barred, and, in any event, the Amended Complaint fails to state claims for relief against them. Transferee Motion at 1. They say that Dalia lacks standing to sue because she has no equitable or legal claim to the Distributed TRI Shares or to the Proceeds. *Id.* ¶¶ 58-67.[75] A cause of action to impose a constructive trust or equitable lien is subject to a six-year limitations period. The Transferee Defendants contend that those claims for relief are time barred because, at the latest, Dalia's claims accrued in June 2013, when Orly entered into the 2013 Settlement Agreement, which is more than six years before January 22, 2020 – the date Dalia commenced this action. *Id.* ¶ 53.[76] Finally, the Transferee Defendants assert that, in any event, the Amended Complaint does not allege facts, that if true, state a claim for a constructive trust (*id*. ¶¶ 68-77), an equitable lien (*id.* ¶¶ 80-81) or injunctive relief. *Id.* ¶¶ 82-83.[77]

Dalia disputes those contentions. She contends that her right to impose a constructive trust and/or an equitable lien on the Proceeds grants her constitutional and prudential standing to sue. Opposition at 20-22. She denies that the Amended Complaint is time-barred. She says that the statute of limitations was not triggered until Orly wrongfully withheld property from Dalia by allegedly repudiating her commitment to support Dalia in response to Dalia's demand in 2014 and again in 2017. *Id.* at 12-13. Alternatively, Dalia maintains that Orly did not act to frustrate her rights to the Proceeds until 2017 and 2018 when Orly began to encumber the Trump Notes in

---

[75]   *See* Trustee Motion ¶¶16, 37-38, 40, 54; Trustee Reply ¶¶ 8-9.

[76]   Trustee Motion ¶¶ 23-25.

[77]   *See id.* ¶¶30-49 (constructive trust); ¶¶ 50-54 (equitable lien); ¶¶ 55-60 (injunction).

favor of her father, brother and business partners. *Id.* at 13. Dalia also contends that certain of the Transferees fraudulently concealed those actions and, as such, she did not discover those actions until 2019. *Id.* at 13-19. Thus, she says that the statute of limitations was tolled during that period. *Id.* at 19. She maintains that in either event, she timely commenced the adversary proceeding. Finally, she contends that the Amended Complaint alleges facts sufficient to support a claim for a constructive trust (*id.* at 23-32) and equitable lien. *Id.* at 32-33.

The Court considers those matters below.

## Discussion

Whether Dalia Has Demonstrated
That She Has Standing To Bring Suit

Every party in a federal court must demonstrate proper standing to bring a case. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). The doctrine of standing focuses on whether the plaintiff is the proper party to sue. In applying that doctrine, courts "limit[] the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016) ("*Spokeo*"). To maintain a case, the plaintiff is must "allege[ ] such a personal stake in the outcome of the controversy as to warrant [her] invocation of federal-court jurisdiction." *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009) (citing *Warth v. Seldin*, 422 U.S. 490, 498-499 (1975)). If the plaintiff cannot do so, the court lacks subject matter jurisdiction to hear the case. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 433 F.3d 181, 198 (2d Cir. 2005) ("Without jurisdiction [a] court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to a court is of announcing the fact and dismissing the case.") (quoting *Steel Co. v. Citizens for a Better*

*Env't,* 523 U.S. 83, 94 (1998)). Accordingly, whether Dalia has standing to sue is a threshold issue for the Court in resolving the Motions.

A party bringing suit must demonstrate that it has both constitutional and prudential standing to sue. *See Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1106 (2d Cir. 1992); s*ee also Warth v. Seldin*, 422 U.S. at 498 ("[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."); *Wight v. BankAmerica Corp.,* 219 F.3d 79, 86 (2d Cir.2000) (quoting *Lamont v. Woods,* 948 F.2d 825, 829 (2d Cir.1991) ("The doctrine of standing incorporates both constitutional and prudential limitations on federal court jurisdiction.")). To establish constitutional standing, a plaintiff must demonstrate three elements: (i) an "injury in fact"; (ii) a causal connection between the injury and defendant's conduct; and (iii) likelihood that a federal court decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("*Lujan*"). Once a plaintiff satisfies those elements, the action "presents a case or controversy that is properly within federal courts' Article III jurisdiction." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). The Constitution is not the source of the prudential standing requirements. Those requirements "have been developed by the Supreme Court on its own accord and applied in a more discretionary fashion as rules of judicial 'self-restraint'. . . further to protect, to the extent necessary under the circumstances, the purpose of Article III." *Sullivan v. Syracuse Hous. Auth.*, 962 F.2d at 1106 (citations omitted).  "[P]rudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone

28

of interests protected by the law invoked.'" *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. at

12 (citation omitted); *Devlin v. Scardelletti,* 536 U.S. 1, 7 (2002).

Dalia bears the burden of demonstrating her standing to bring this action. *See Keepers,*

*Inc. v. City of Milford,* 807 F.3d 24, 39 (2d Cir. 2015) ("The party invoking federal jurisdiction

bears the burden of establishing prudential and constitutional standing. . .") (internal quotation

marks omitted). *See, e.g., Lujan,* 504 U.S. at 560–61 (constitutional standing); *Premium*

*Mortgage Corp. v. Equifax, Inc.,* 583 F.3d 103, 108 (2d Cir. 2009) (prudential standing).

Because the elements of standing "are not mere pleading requirements but rather an

indispensable part of the plaintiff's case, each element must be supported in the same way as any

other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

evidence required at the successive stages of the litigation. *Lujan,* 504 U.S. at 561. At this stage

of the litigation, Dalia must "allege facts that affirmatively and plausibly suggest that [she] has

standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL,* 671 F.3d 140, 145 (2d Cir.2011)

(citations omitted). *See also Bogart v. Isr. Aero. Indus. Ltd.*, No. 09-Civ-4783, 2010 WL 517582,

at *3 (S.D.N.Y. Feb. 5, 2010) (to meet burden of demonstrating standing to sue, the plaintiff

must demonstrate that its complaint "allege[s] facts demonstrating that [it] is a proper party to

invoke judicial resolution of the dispute.") (quoting *Thompson v. Cty. of Franklin*, 15 F.3d 245,

249 (2d Cir. 1994)). However, "at the pleading stage, standing allegations need not be crafted

with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352

F.3d 625, 631 (2d Cir. 2003). Rather, "general factual allegations of injury resulting from the

defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations

embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561

(citation omitted).

The injury-in-fact element requires that the plaintiff be "the proper party to bring this suit." *Raines v. Byrd,* 521 U.S. 811, 818 (1997). That is to say that the complaint must demonstrate that plaintiff has a personal stake in the alleged dispute. *Id.* at 819. To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S.Ct. at 1548 (citing *Lujan*, 504 U.S. at 560). An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Id.* It is "concrete," if it "actually exist[s]." *Id.* (citing *Black's Law Dictionary* (9th ed. 2009)). The size of the financial loss is irrelevant. "Even a small financial loss is an injury for purposes of Article III standing." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin*, 710 F.3d 71, 85 (2d Cir. 2013). The Transferee Defendants argue that Dalia has not alleged facts demonstrating that she has suffered an injury in fact, because the Amended Complaint "is premised on the false representation that she is entitled to the benefit of the TRI shares." Transferee Motion ¶ 60; Transferee Reply ¶¶ 18, 22. They assert that Dalia lacks any legal or equitable interest in the Orly Trust Shares or the Proceeds thereof, and, for that reason, Dalia cannot establish an actual, personal injury in fact sufficient to establish constitutional standing. Transferee Motion ¶¶ 55, 63. They argue that the 2004 Divorce Agreement is clear that Dalia has no ownership interest in any TRI shares, and that the Amended Complaint fails to plead the existence of any agreement between Dalia and Orly (or the Orly Trust) regarding the TRI Shares or their proceeds. *Id*. ¶ 61. They deny that either the 2004 Promise or the 2004 Indemnity supports Dalia's claims for relief because neither of those agreements is between Dalia and Orly – there is no privity between Dalia and Orly. *Id*. ¶ 62. Rather, they contend that those agreements are clear that pursuant to the 2004 Divorce Agreement, the Distributed TRI Shares were transferred to the Orly Trust and Sagi Trust, and that Dalia was not otherwise granted any continuing ownership interest in those

30

shares. *Id.* ¶¶ 62, 66. Accordingly, they contend that in the Amended Complaint, Dalia is asserting the rights of the Sagi Trust and Orly Trust, not her own rights. *Id.* ¶ 67. Thus, they also maintain that Dalia lacks prudential standing to assert the claim. *Id.*[78]

Dalia says that since transferring her interests in the Distributed TRI Shares pursuant to the 2004 Divorce Agreement, she has never claimed an interest in the actual TRI shares. Opposition at 21. She maintains that she has both constitutional and prudential standing to sue because under the 2004 Promise and 2004 Indemnity, Sagi and Orly granted her an interest in the future monetization of her marital rights to those shares. *Id.* at 20. That contention is consistent with the allegations in support of the Amended Complaint. Dalia alleges that she relinquished her marital claim to the economic benefit of the Rights associated with the Distributed TRI Shares to the Orly Trust and Sagi Trust, in exchange for Sagi and Orly's promises to set aside and pay funds received on account of those Rights, for her retirement. Am. Compl. ¶ 15. She says (i) that "Orly promised to pay [her] from the monetized proceeds of the Rights and/or reimburse and indemnify Sagi for his payments to Dalia made pursuant to Dalia's request" (*id.* ¶ 44); (ii) that she transferred the Rights to Orly in reliance on that promise (*id.* ¶ 45); and (iii) that the promise is reflected in the 2004 Promise and 2004 Indemnity. *Id.* ¶ 16. Dalia asserts that in 2014 and thereafter, Orly breached her duty to her by refusing to pay her the proceeds of her monetization of the Rights, and/or reimburse or indemnify Sagi for his payments to her. *Id.* ¶ 46. She contends that because she has an interest in the Proceeds, she has been injured by those actions and that Orly and the Transferee Defendants will be unjustly enriched if they are permitted to retain the Proceeds of the monetization of the Rights, including the Trump Notes. *Id.* ¶ 48.

---

[78]    *See* Trustee Motion ¶¶ 36-38, 40-41, 67; Trustee Reply ¶¶ 8-9.

Dalia maintains that because the Second and Third Claims for Relief state claims for the imposition of a constructive trust or equitable lien on the Proceeds, respectively, it follows that she has constitutional and prudential standing to assert those claims. Opposition at 20. As support for her contention that those counts state claims for relief, Dalia relies on *Gimbel v. Feldman,* 1995 WL 500487 (E.D.N.Y. Aug. 8, 1995), *McGovern v. Solomon*, 466 F. Supp. 2d 554, 557 (S.D.N.Y. 2007), and *In re Chowaiki & Co. Fine Art Ltd*., 593 B.R. 699, 712 (Bankr. S.D.N.Y. 2018). *Id*. However, Dalia overstates the significance of those cases and misplaces her reliance on them. *Gimbel* and *McGovern* support the proposition that under New York law, family members of a decedent who dies intestate have standing to seek to impose a constructive trust on estate assets in the hands of other family members who will be unjustly enriched if they retain those assets.[79] This case does not present a dispute among family members of a decedent

---

[79]   In *Gimbel v. Feldman*, 1995 WL 500487 (E.D.N.Y. 1995), the plaintiff ("Gimbel") sued the defendant ("Feldman") to recover assets once held by their mother ("Mary") and allegedly transferred to Feldman as a result of Feldman's fraud and undue influence.  Among other things, in his complaint, Gimbel sought to impose a constructive trust under New York law on the assets in Feldman's possession and control. *Id*. *3. Feldman sought to dismiss that claim pursuant to Rule 12(b)(6) on the grounds that the complaint did not state a claim for relief, Gilbert lacked standing to pursue the constructive trust claim, and Gilbert failed to join the estate as a party to the complaint. *Id*. The district court denied the motion. First, it found that Gilbert stated a claim for the imposition of a constructive trust under New York law. The court held that Gimbel's complaint alleged facts demonstrating (i) the existence of a confidential or fiduciary relationship among Mary and Feldman; (ii) a promise by Feldman to hold Mary's assets as trustee while Mary remained alive and promising to return the assets if and when requested; (iii) Mary's transfer of those assets to Feldman in reliance upon Feldman's promise; and (iv) that after Mary's death, Feldman was unjustly enriched. *Id*. * 3-4. It also found that the estate was not a necessary party to the litigation, because Gimbel had standing to seek the imposition of a constructive trust. As to the latter, the district court found that "[i]t is also implicit that the equitable doctrine of the constructive trust -- which operates upon a defendant's promise to the decedent made within a confidential relationship, reliance by the decedent, and unjust enrichment of the defendant to the detriment of the plaintiffs -- conveys standing to the plaintiffs." *Id*. *4 (citing *Tesauro v. Tesauro,* 112 N.Y.S.2d 246 (Sup. Ct., Kings County 1952)). In *Tesauro,* two children of the decedent ("Carmine") sued other members of their family to set aside certain deeds of conveyances and to recover certain real and personal property allegedly removed from Carmine's estate by fraud. The complaint also sought an accounting of such rents, profits and income received from such property and a judgment of partition, or, in the alternative, a sale of the properties and a division of the proceeds. 112 N.Y.S.2d at 249.  The defendants sought to dismiss the complaint alleging, among other things, that the plaintiffs did not have the legal capacity to sue. *Id*. The court rejected that objection as "untenable." *Id.* at 250. In so holding the court found that "[t]he proposition is elementary. Plaintiffs are entitled to share in the estate of their father who died intestate, Decedent's Estate Law, § 83, and may sue to enforce their rights." *Id.*

   *McGovern v. Solomon*, 466 F. Supp. 2d 554 (S.D.N.Y. 2006), also involved a dispute among family members over the disposition of the assets of a decedent who died intestate. Like the *Gimbel* court, the district court in *McGovern* found that a daughter who otherwise would have inherited certain assets from her father,

who died intestate. Those cases are plainly distinguishable on their facts and law and do not

support Dalia's thesis. Nor does *Chowaiki*. In that case, the court rejected the defendant's

assertion that the plaintiff ("Rosen") lacked standing to sue to impose a constructive trust on

funds in the hands of the debtor transferred pre-petition from a bank account, because the facts

alleged in the complaint, and documents that the court was permitted to review in the context of

the Rule 12(b)(6) motion, demonstrated that Rosen had an interest in the account. *In re Chowaiki*

*& Co. Fine Art Ltd.,* 593 B.R. at 714. The right to assert an interest in funds on deposit in a bank

account is not at issue herein. In any event, the court granted the chapter 7 trustee's Rule

12(b)(6) motion to dismiss Rosen's complaint since Rosen failed to demonstrate that the debtor

had been unjustly enriched and did not plead a facially plausible fiduciary relationship with the

debtor's principal or any other relationship of trust that might warrant the imposition of a

constructive trust. *Id*. at 720-724.[80]

---

had standing to seek to impose a constructive trust on assets allegedly improperly transferred inter vivos. In that case, a daughter ("Maureen") brought a counterclaim seeking to impose a constructive trust on assets transferred *inter vivos* by her deceased mother ("Anne") to her sibling ("Bonnie") when Anne allegedly was incompetent. Bonnie sought to dismiss Maureen's counterclaim on the ground that Maureen, who had never been adjudicated an executrix of Anne's estate, lacked standing to commence a lawsuit to recover assets on behalf of what would in effect be Anne's estate. *Id*. at 556-57. The district court rejected that contention, finding that it is "implicit that the equitable doctrine of the constructive trust ... conveys standing" upon those who would otherwise have inherited from the decedent. *Id*. at 557 (citing *Gimbel v. Feldman,* 1995 WL 500487, *4).

[80]    In *In re Chowaiki & Co. Fine Art Ltd,* 593 B.R. 699 (Bankr. S.D.N.Y. 2018) the debtor (the "Gallery") operated a fine art gallery. In October 2017, Ezra Chowaiki ("Chowaiki"), one the Gallery's principals, induced Rosen to wire transfer $230,000 (the "Wired Funds") to the Gallery's bank account in New York. *Id*. at 707. Rosen wired those funds based upon Chowaiki's promise that they would be used to acquire a painting and that, in consideration for the Wired Funds, Rosen would hold a 24% interest in the painting. *Id*. After the Gallery filed its chapter 7 case, Rosen learned that Chowaiki had not acquired the painting. *Id*. Thereafter, Rosen sued the Gallery seeking, among other things, the imposition of a constructive trust and the immediate turnover of the Wired Funds to him. *Id*. at 707-708. Under New York law, the holder of a bank account is presumed to have title to the funds deposited in the bank account. It was undisputed that the Wired Funds were transferred to the Gallery from a bank account owned by a third party, and not by Rosen. The chapter 7 trustee moved to dismiss the complaint on the grounds that Rosen failed to allege an injury in fact that he personally suffered and therefore lacked constitutional standing to prosecute the adversary proceeding. *Id*. at 713. The bankruptcy court (Vyskocil, J.) rejected those contentions finding that Rosen had alleged facts that demonstrated sufficient dominion and control over the bank account to demonstrate an interest in the funds in the account. *Id*. at 714-715. As such, Judge Vyskocil found that Rosen had met his burden of establishing Article III standing to pursue his claims against the Gallery. *Id*. at 715. Nonetheless, the bankruptcy court found that the complaint, read in a light most favorable to Rosen, failed to plead facts sufficient to support a finding that the Gallery was unjustly enriched. As such, it determined that Rosen had

The only promises that Dalia points to in support of her claim to the Proceeds are those contained in the 2004 Promise and 2004 Indemnity. *See* Am. Compl. ¶¶ 15-19. The Court must determine whether the allegations in the Amended Complaint demonstrate that Dalia has an interest in the Proceeds that gives her standing to bring the Amended Complaint. In making that assessment, the Court notes that a complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "even if [a document] is not formally incorporated by reference" a court may consider it if it was "integral to the complaint." *Id.* at 153; *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (noting that district court may consider exhibits omitted from plaintiff's complaint but attached as exhibits to defendant's motion papers because "there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim"). The Court can consider the contents of the 2004 Promise and 2004 Indemnity in resolving the Motion because Dalia refers to, and relies on, those agreements in support of the Amended Complaint. A court also may consider "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. at 322; *see also Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) (stating that even where the proceeding transcripts were not attached to the complaint, incorporated by reference, or integral to the plaintiff's claims, they could still be considered because the Court "may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment"). That is particularly significant here, because, as noted previously,

---

failed to demonstrate that he had suffered a predicate injury necessary for the imposition of the remedy of a constructive trust. *Id.* at 720-22. The court also found that Rosen did not plead a facially plausible fiduciary relationship with Chowaiki or any other relationship of trust that might warrant the imposition of a constructive trust. *Id.* at 722.

on two occasions, the district court ruled on the rights of the parties to the 2004 Promise and

2004 Indemnity.

In her Opposition, Dalia asserts that the 2004 Promise and 2004 Indemnity

"conclusively" establish "the elements [of] a promise and a transfer in reliance thereon."

Opposition at 27-28. The Court finds no merit to those assertions. Orly is not party to the 2004

Promise. In the 2004 Indemnity, Orly confirmed her verbal agreement with Sagi to indemnify

him for one-half of the payments he would have to make under the 2004 Promise. *See* Tokayer

Decl. Ex. 7 (2004 Indemnity). *See also Genger I,* 76 F. Supp. 3d at 493. ("At the time the 2004

Promise was signed, Orly was vacationing in Fiji, and thus could not contemporaneously sign the

2004 Promise. . . . However, before Sagi signed the 2004 Promise, Orly verbally agreed to

indemnify Sagi for 50% of the payments he would have to make under the 2004 Promise.")

(internal citations omitted) (footnote omitted).  In *Genger I,* the district court summed up the

financial relationship among Dalia, Sagi and Orly, as follows:

> Dalia receives financial support in exchange for the transfer of the TRI shares to
> the Sagi Trust and the Orly Trust; Sagi receives an ownership interest in the TRI
> shares in exchange for a commitment to financially support Dalia; and Orly
> receives an ownership interest in TRI shares in exchange for a commitment to
> indemnify Sagi.

*See id.* at 499. Still, Dalia contends that the written agreements do not preclude a constructive

trust claim, because "Orly's oral promise is not contained in Orly's executed 2004 Indemnity,

although its economic substance is reflected therein." Opposition at 28. However, the district

court found that Orly's verbal agreement with Sagi is reflected in the 2004 Indemnity. It did not

find that Orly had a verbal agreement with Dalia. In any event, in the Amended Complaint, Dalia

fails to allege that she had a verbal agreement with Orly and the conclusory assertion in the

Opposition does not sustain such an allegation.  Finally, apparently abandoning the allegations in

the Amended Complaint, Dalia contends that "[r]egardless of the reason, the fact remains that

35

Dalia has no direct legal remedy against Orly, but rather must rely on equity." *Id.* However, Dalia cannot rely on equity because she cannot point to any express or implied promise by Orly to support her. In short, Dalia has not alleged facts demonstrating that she has a financial interest in the Proceeds. As such, she lacks constitutional and prudential standing to assert the claims at issue herein. *See Jacob v. Conway,* 150 A.D.3d 973, 974 (2d Dep't 2017) (reversing the trial court and finding that the plaintiff lacked standing to commence an action for constructive trust because the plaintiff's interest in the subject real property and the mother's other assets was merely a "potential, speculative interest," which was insufficient to give rise to standing); *Aliano v. Aliano,* 251 A.D.2d 436, 437 (2d Dep't 1998) (plaintiffs lack standing to impose constructive trust in favor of third party). For that reason, the Court dismisses the Amended Complaint.

Whether the Amended
Complaint is Time Barred

Assuming, *arguendo,* the Dalia could demonstrate that she has standing to bring the claims at issue in Counts Two and Three, the Court dismisses the Amended Complaint as time barred. "The statute of limitations is an affirmative defense on which the defendant bears the burden of proof." *Ellington Long Term Fund, Ltd. v. Goldman, Sachs & Co.,* No. 09 Civ. 9802(RJS), 2010 WL 1838730, at *2 (S.D.N.Y. May 4, 2010). "Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss." *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989); *see New York v. W. Side Corp.,* 790 F.Supp.2d 13, 28 (E.D.N.Y.2011) ("[I]t is well-established that a statute of limitations defense may only be resolved on a pre-answer motion to dismiss where the complaint alleges specific information to permit such a finding.") "Such a motion is properly treated as a Rule 12(b)(6) motion to dismiss for failure to state a

claim upon which relief can be granted rather than a Rule 12(b)(1) motion to dismiss for lack of jurisdiction over the subject matter." *Ghartey v. St. John's Queens Hosp.,* 869 F.2d at 162.

Under New York law, an action to impose a constructive trust or equitable lien is governed by the six-year statute of limitations "for which no limitation is specifically prescribed by law." N.Y.C.P.L.R. 213(1). *See Morando v. Morando*, 41 A.D.3d 559, 561 (2d Dep't 2007) ("A cause of action to impose a constructive trust or equitable lien is subject to a six-year limitations period"). *See also Reale v. Reale*, 485 F. Supp. 2d 247, 252 (W.D.N.Y. 2007) ("A cause of action for a constructive trust is governed by New York's six-year statute of limitations applicable to those claims 'for which no limitation is specifically prescribed by law.'" (quoting N.Y. C.P.L.R. 213(1)); *Reisner v. Stoller*, 51 F.Supp. 430, 453 (S.D.N.Y. 1999) ("Claims for the creation of an equitable lien are subject to the six- year statute of limitations under N.Y.C.P.L.R. 213(1) pertaining to actions 'for which no limitation is specifically prescribed by law.'").

A determination of when the wrongful act triggering the running of the statute of limitations occurs "depends upon whether the constructive trustee acquired the property wrongfully, in which case the property would be held adversely from the date of acquisition, or whether the constructive trustee wrongfully withholds property acquired lawfully from the beneficiary, in which case the property would be held adversely from the date the trustee breaches or repudiates the agreement to transfer the property." *Quadrozzi v. Est. of Quadrozzi*, 99 A.D.3d 688, 690 (2d Dep't 2012) (citing *Maric Piping Inc. v. Maric*, 271 A.D.2d 507, 508 (2d Dep't 2000) (internal quotation marks and citations omitted). *See also Reisner v. Stoller*, 51 F.Supp. at 453 (The six-year limitations period begins to run on the date when the property is wrongfully withheld from the party asserting the equitable lien.) In other words, the limitations period for an equitable lien or a constructive trust "runs from the occurrence of the wrongful act or event which creates a duty of restitution." *Dolmetta v. Uintah Nat'l Corp.,* 712

37

F.2d 15, 18 (2d Cir.1983) (citing *Scheuer v. Scheuer,* 308 N.Y. 447 (1955); *Augustine v. Szwed,* 77 A.D.2d 298, 301 (4th Dep't 1980); *Mann v. Mann*, 77 A.D.2d 866 (2d Dep't 1980)).

The Transferee Defendants describe the Amended Complaint as "a thinly veiled attempt to relitigate the 2004 Divorce Agreement between Dalia and Arie, an event that occurred sixteen years ago, in order to attack the 2013 Settlement Agreement, an event that occurred six years and seven months before this action was commenced." Transferee Motion ¶ 46.[81] They argue that regardless of whether the trigger date is in October 2004 or June 2013, the Court should dismiss the Amended Complaint with prejudice because the relief Dalia is seeking is barred by the applicable six-year statute of limitations. *Id.*[82] Dalia rejects that contention. She contends that the cause of action did not accrue, and the statute of limitations did not begin to run, until Orly breached the 2004 Indemnity and rejected Sagi's demand that she indemnify him for 50% of the $200,000 payment he made to Dalia pursuant to the 2004 Promise. Opposition at 12-13. Moreover, Dalia asserts that, in any event, the statute of limitations was equitably tolled until at least 2019, because it was not until then, that Dalia learned that Orly had encumbered the Trump Notes. *Id.* The Court considers those matters below.

In the Amended Complaint, Dalia does not assert that Orly wrongfully acquired the Rights. She maintains that she relinquished her Rights to Sagi and Orly, in exchange for their promise to set aside and pay funds received therefrom upon Dalia's request, for her retirement, and that the promise is reflected in the 2004 Integrated Agreement. Am. Compl. ¶¶ 15, 16, 44.

---

[81] The Transferee Defendants assert that Dalia has conceded that the claims at issue in the Amended Complaint stem from the 2004 Divorce Agreement because in her opposition to the Texas Settlement Motion, Dalia asserted that the Proceeds "are being used in lieu of maintenance, in the nature of a Domestic Support Obligation," and that "the [2013] Settlement Agreement improperly interferes with the equitable distribution of marital property ordered by the New York Supreme Court as a domestic support obligation." Transferee Motion ¶ 47; *see also* Borriello Decl. Ex. 30 (Dalia Objection to Texas Settlement Motion) ¶¶ 16, 35. The Court finds no merit to that assertion. Dalia has not challenged any aspect of the 2004 Divorce Agreement in this Motion.

[82] *See* Trustee Motion ¶¶ 23-25, 71; Trustee Reply ¶¶ 3-5, 38.

38

Dalia complains that in 2014 and thereafter Orly breached her duty to Dalia and abused the trust

and confidence that Dalia had placed in Orly when Orly repudiated her promise and refused to

pay Dalia from the proceeds of her monetization of the Rights and/or reimburse and indemnify

Sagi for his payments to Dalia made pursuant to Dalia's request. *Id.* ¶ 46. However, at the heart

of the Amended Complaint is Dalia's contention that in 2013, Orly monetized her beneficial

interests in the Rights for Proceeds totaling $32.3 million—without accounting for Dalia's

alleged rights in the Proceeds—and since that time she has transferred or encumbered the

proceeds in violation of the 2004 Integrated Agreement, and to Dalia's prejudice. *E.g., id.* ¶¶ 1,

20, 23, 39. In her Opposition, Dalia contends that her claim to impose a constructive trust or

equitable lien on the Proceeds did not arise until 2017 and 2018, when Orly began encumbering

the anticipated proceeds of the Trump Notes. She says that is so because prior to that time, and

notwithstanding the payment of $17.3 million in Proceeds to Arnold Broser and Davis Broser

(collectively, the "Brosers"), the proceeds of the Trump Notes – which have not been paid - were

sufficient to cover the amount payable by Orly to Dalia under the 2004 Integrated Agreement

(i.e., $12.25 million). Opposition at 13. She reasons that only then – effectively when the

Proceeds "last dollars" were put at risk of loss - did her claim to impose a constructive trust or

equitable lien on the Proceeds arise. *Id.* Dalia cites no support for that contention, and the Court

finds no merit to it.

   The Court finds that Dalia's cause of action against Orly accrued when Orly monetized

the Rights pursuant to the 2013 Settlement Agreement and failed to account for Dalia's alleged

interest in the Proceeds. That is because when, as here, alleged trust property is transferred to a

third party in violation of the alleged trust, "the statute of limitations begins to run when the

defendant 'convey[s] the property out of the plaintiffs' reach.'" *Ackermann v. Ackermann,* 908

F.Supp. 2d 540, 543 (S.D.N.Y. 2012) (quoting *Delango v. Delango,* 203 A.D.2d 319 (2d Dep't

1994)), *aff'd,* 549 Fed. App'x 45, 46 (2d Cir. 2014) ("[W]e find no error in the District Court's

dismissal of Ackerman's complaint as time-barred."). *See also Murphy v. Morlitz*, 2017 WL

4221472 *8 (S.D.N.Y. Sept. 21, 2017), *aff'd,* 751 F. App'x  28 (2d Cir. 2018) (finding that the

statute of limitations on constructive fraud claim began to run on the day of the sale of the

insurance policy that was being held for the plaintiff). In 2013, Orly breached her alleged

promise to Dalia and violated the alleged trust when she monetized her beneficial interests in the

Rights – without making provision for Dalia – and transformed those interests into the Trump

Notes and the $17.3 million cash that was distributed to the Brosers and their affiliated entities,

including the Litigation Trust and ADBG, in purported satisfaction of certain liabilities and

allegedly for no consideration or value to Orly. Dalia commenced this action more than six-years

after Orly entered into the 2013 Settlement Agreement. Accordingly, the action is time-barred.

*See Grunfeld v. Kasnett*, 18 Misc. 3d 1143(A) (Sup. Ct., Kings County 2008) (granting

defendant's motion to dismiss the constructive claim (count five) as barred by the statute of

limitations); *Soscia v. Soscia*, 35 A.D.3d 841, 843 (2d Dep't 2006) (finding that to the extent that

the amended complaint may be read to plead a cause of action to impose a constructive trust, it is

time barred); *Goldrick v. Goldrick*, 99 Misc. 2d 749, 756–757 (Sup. Ct., Suffolk County 1979)

(granting defendants cross motion to dismiss the complaint because the claims of constructive

trust and equitable lien were both time barred by the statute of limitations).

    "Federal courts typically refer[] to state law for tolling rules, just like they do for statute

of limitations rules." *Thompson v. Rovella*, No. 3:15CV1742, 2017 WL 601399, at *6 (D.Conn.

Feb. 14, 2017) (internal quotation marks and citation omitted).  See *Statistical Phone Philly v.

NYNEX Corp.*, 116 F. Supp. 2d 468, 482 (S.D.N.Y. 2000) ("[F]ederal law of equitable tolling

governs plaintiffs' federal cause of action while the state law of equitable tolling governs

plaintiffs' state law claims"), *aff'd sub nom. Black Radio Network, Inc. v. Nynex Corp.,* 14 Fed.

App'x 111 (2d Cir. 2001). *See also Meridien Intern. Bank Ltd. v. Government of the Republic of Liberia*, 23 F. Supp. 2d 439, 446 (S.D.N.Y. 1998) ("As the doctrines of equitable tolling would affect the relevant statutes of limitations, state law of equitable tolling should govern the state claims and federal law of equitable tolling should govern the federal claims."). New York state law does not differentiate between doctrines of fraudulent concealment (equitable tolling) and equitable estoppel. *See Statistical Phone Philly v. NYNEX Corp.,* 116 F.Supp.2d at 484 (finding that the doctrines of fraudulent concealment and equitable estoppel are analyzed in the same manner) (citing *Meridien Int'l Bank Ltd. v. Government of Republic of Liberia,* 23 F.Supp.2d at 446). *See also Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. 2002) ("New York appears to use the label 'equitable estoppel' to cover both the circumstances 'where the defendant conceals from the plaintiff the fact that he has a cause of action [and] where the plaintiff is aware of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired.'") (quoting Joseph M. McLaughlin, *Practice Commentaries,* N.Y. C.P.L.R. C201:6, at 63 (McKinney 1990)).

Under New York law, "[i]t is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 448–449 (1978) (citations omitted); *see also Davis v. Peterson,* 254 A.D.2d 287, 287 (2d Dep't 1998) (indicating that it is well settled that a "defendant may be estopped to plead the Statute of Limitations where [the] plaintiff was induced by fraud, misrepresentation or deception to refrain from filing a timely action."). "It is 'fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit.'" *Sabourin v. Chodos*, 129 N.Y.S.3d 669, 683 (Sup. Ct., New York County 2020) (quoting *Zumpano v. Quinn,* 6 N.Y.3d 666, 674 (2006)). "The doctrine of equitable estoppel is an

41

'extraordinary remedy.'" *Pahlad v. Brustman,* 33 A.D.3d 518, 519 (1st Dep't 2006), *aff'd,* 8

N.Y.3d 901 (2007) (quoting *E. Midtown Plaza Hous. Co. v. City of New York,* 218 A.D.2d 628,

628 (1st Dep't 1995) ("that extraordinary remedy is only applicable in circumstances where there

is evidence that plaintiff was lulled into inaction by defendant in order to allow the statute of

limitations to lapse"). It will not apply in cases in which "the plaintiff possesses 'timely

knowledge' sufficient to place him or her under a duty to make inquiry and ascertain all the

relevant facts prior to the expiration of the applicable Statute of Limitations." *Harris v.*

*Wilmorite Corp.,* 266 A.D.2d 902 (4th Dep't 1999) (quoting *McIvor v. DiBenedetto,* 121 A.D.2d

519-520 (2d Dep't 1986)). Accordingly, "[i]t is 'fundamental to the application of equitable

estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow

kept them from timely bringing suit.'" *Sabourin v Chodos*, 69 Misc. 3d 312, 315 (Sup. Ct., New

York County 2020) (quoting *Zumpano v. Quinn,* 6 N.Y.3d at 674). *See also Shoreham Hills,*

*LLC. v. Sagaponack Dream House, LLC*, 66 Misc. 3d 1231(A) (Sup. Ct., Suffolk County 2020)

(noting that to benefit from the equitable tolling doctrine under New York law, "a plaintiff must

establish that subsequent and specific actions were taken by the defendant, separate from those

that provide the factual basis for the underlying cause of action, and that those subsequent

actions by the defendant somehow kept the plaintiff from timely bringing suit. . . Generalized or

conclusory allegations of fraudulent concealment are not sufficient to toll the statute of

limitations.") (citations omitted).

Equitable tolling is an affirmative defense to the assertion that an action is barred by the

statute of limitations, which means that Dalia did not need to affirmatively plead it in her

Amended Complaint. *See Quinn v. United States*, No. 20-CV-3261 (KMK), 2021 WL 738756, at

*7 (S.D.N.Y. Feb. 25, 2021); *Lopez v. Nassau Cnty. Sheriffs Dep't*, No. 17-CV-3722, 2018 WL

3321430, at *5 (E.D.N.Y. July 5, 2018) (recognizing same principle). In her Opposition, Dalia

addressed the statute of limitations argument raised by the Movants in their Motions. *See Mira v. Kingston*, 218 F. Supp. 3d 229, 237 (S.D.N.Y. 2016), *aff'd*, 715 F. App'x 28 (2d Cir. 2017) (considering the "[p]laintiff's papers filed in opposition to the motion to dismiss" where the "[p]laintiff herself [had] raised the possibility of an equitable tolling argument in her response to the motion to dismiss"); *Lopez v. Nassau Cty. Sheriffs Dep't*, 2018 WL 3321430 at *5  (allowing the plaintiff to submit a "supplemental affidavit demonstrating entitlement to equitable tolling of his claims" in opposition to a motion to dismiss). To rely on the doctrine of fraudulent concealment, a plaintiff must demonstrate "(1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." *Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.*, 100 F. Supp. 2d 178, 183 (S.D.N.Y. 2000). *See In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 60 (2d Cir.1998) (citing *Butala v. Agashiwala*, 916 F.Supp. 314, 319 (S.D.N.Y.1996)). Fraudulent concealment does not lessen a plaintiff's duty of diligence; it merely measures what a reasonably diligent plaintiff would or could have known regarding the claim. *See Campbell v. Upjohn Co.,* 676 F.2d 1122, 1128 (6th Cir.1982).

Dalia does not maintain that the statute of limitations should be tolled because she was denied access to the 2013 Settlement Agreement. She acknowledges that she received a copy of the agreement and that the agreement clearly spells out (i) that the initial $17.3 million payment would be made to Orly's then-attorney of record, William Wachtel, and (ii) that the $15 million Trump Notes were not yet payable, and until they became payable (an indefinite date dependent on various litigations) they would be held in escrow by the same Mr. Wachtel. Opposition at 14. She complains that the statute should be tolled because certain of the Transferee Defendants allegedly "stymied" her efforts to learn about the Trump Notes "typically with false statements under oath." *Id.* The Court finds no merit to that contention. First, although Dalia complains

about the level of Mr. Bowen's cooperation at a deposition, she does not accurately recite his

testimony.[83]   More significantly, even if Dalia's recitation of Mr. Broser's actions in avoiding

---

[83]   Dalia contends that Mr. Bowen "was repeatedly asked if there was any other sort of agreement directing the disposition of the Trump Note proceeds" and that "[h]e repeatedly denied that there were none[.]" Opposition a 16. As support for that contention, Dalia purported to quote from the transcript of the deposition of Mr. Bowen (the "Bowen Transcript") taken by Sagi's counsel on October 5, 2018 in district court litigation, as follows:

> Q. Is it correct that the only way you will release the proceeds is if you are instructed by all four of those individuals to do so in the same manner?
> …
> A. There is no understanding that the firm is aware of that it's a majority vote or a consensus vote or anything like that.· It's whatever -- whatever the agreement there is in and among the members of AG Group, the firm has no knowledge of that.
> …
> A. And then you are asking me who can speak on behalf of the AG Group whether it has to be all four in consensus, whether it has to be a majority vote, whether somebody else can speak on behalf of the AG group and my answer is: We don't have any information about any agreements between the AG Group. We're not aware that there is any dispute among the members of the AG Group, that there is any agreement among the AG Group about who can direct the money and who can't direct the money maybe. If that -- maybe that will become an issue down the road but we are not aware of it.

Opposition at 16-17 (citing Bowen Transcript at 27:6-17).  However, the quotation is miscited, as the final "answer" begins at page 32, line 19 and runs through page 33, line 6, not on page 27.  Moreover, Dali takes the "answer" out of context. A more complete recitation of Mr. Bowen's testimony is, as follows:

> A. Well, I have already told you that the AG Group has to give direction about how the ·money is disbursed after it hits the escrow account held by the firm.
>
> Q. Uh-huh.
> · · ·
>
> A. You asked me how is that direction going to be communicated.· My response is, on behalf of the firm, however the AG Group wants to communicate it.· It can be in writing, it can be a phone call.· It would have to be something that could be documented I would assume just to, you know, discharge our recordkeeping responsibilities to show the flow of the money and, you know, 1099s and whatnot.
> · · ·
>
> And then you are asking me who can speak on behalf of the AG Group whether it has to be all four in consensus, whether it has to be a majority vote, whether somebody else can speak on behalf of the AG group and my answer is:· We don't have any information about any agreements between the AG Group.· We're not aware that there is any dispute among the members of the AG Group, that there is any agreement among the AG Group about who can direct the money and who can't direct the money maybe.· If that -- maybe that will become an issue down the road but we are not aware of it.

Bowen Transcript 32:5-33:6. Finally, Dalia contends that Mr. Bowen "twice claimed under oath that the [March 17 Settlement Agreement] did not exist." Opposition at 17. Dalia has pointed to no support in the record for that contention.

disclosure of matters relating to the Trump Notes is accurate (Opposition at 14-15), it does not

provide grounds to toll the running of the statute of limitations. As noted, the statute was

triggered by Orly's monetization of the Rights, including the issuance of the Trump Notes and

transfer of the $17.3 million in cash. It is undisputed that Dalia was aware of all of those matters

no later than 2016, if not sooner. If Dalia believed she had grounds for seeking to impress a

constructive trust on the notes and other proceeds, she could have sued Orly in 2016, when she

sued Sagi. Actions to encumber the notes did not trigger a new limitations period. Accordingly,

the Court dismisses the Amended Complaint for the additional reason that it is time-barred.

Whether The Counts
State Claims For Relief

Finally, assuming, *arguendo,* that Dalia could demonstrate that she has standing to sue,

and timely commenced this adversary proceeding, the Court dismisses Counts Two, Three and

Four of the Amended Complaint because they fail to state claims against the Defendants upon

which relief can be granted.

A Rule 12(b)(6) motion is "designed to test the legal sufficiency of the complaint, and

thus does not require the [c]ourt to examine the evidence at issue." *DeJesus v. Sears,*

*Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) (citing *Carey v. Mt. Desert Island Hosp.*,

910 F. Supp. 7, 9 (D. Me. 1995)); *see also Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.

1998) (noting that under Rule 12(b)(6), the issue "is not whether a plaintiff is likely to prevail

ultimately, but whether the claimant is entitled to offer evidence to support the claims" (quoting

*Branham v. Meachum,* 77 F.3d 626, 628 (2d Cir. 1996))). "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("*Iqbal*") (quoting *Bell Atl.*

*Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ("*Twombly*"). A claim is facially plausible "when

45

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In

resolving a Rule 12(b)(6) motion, a court must "accept all factual allegations in the complaint as

true," even if the allegations are doubtful in fact. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*

551 U.S. 308, 309 (2007); *see also Twombly,* 550 U.S. at 544.

Under Rule 12(b)(6), courts assess the sufficiency of the complaint in light of the

pleading requirements in Rule 8 of the Federal Rules of Civil Procedure ("Rule 8").[84] Rule

8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing

that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  Under Rule 8's "liberal" notice

pleading standards, "the pleader need only set forth a short and plain statement of the claim

showing that the pleader is entitled to relief."  *Liquidation Tr. v. Daimler AG (In re Old CarCo*

*LLC)*, 435 B.R. 169, 176 (Bankr. S.D.N.Y. 2010) (citation omitted); *see also Swierkiewicz v.*

*Sorema N.A.*, 534 U.S. 506, 514 (2002) ("The liberal notice pleading of Rule 8(a) is the starting

point of a simplified pleading system, which was adopted to focus litigation on the merits of a

claim.").  Thus, Rule 8 "does not demand that a complaint be a model of clarity or exhaustively

present the facts alleged[.]" *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)

(citation omitted).   However, it requires that each defendant is given "fair notice of what the

plaintiff's claim is and the ground upon which it rests." *Mayle v. Felix*, 545 U.S. 644, 655 (2005)

(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Harrison v. N.J. Cmty. Bank (In re*

*Jesup & Lamont, Inc.*, 507 B.R. 452, 459-60 (Bankr. S.D.N.Y. 2014) (explaining that under Rule

8(a), "a plaintiff must disclose sufficient information to permit the defendant 'to have a fair

---

[84]   Rule 8 is made applicable herein by Bankruptcy Rule 7008.

understanding of what the plaintiff is complaining about and to know whether there is a legal

basis for recovery.'" (citation omitted)).  Accordingly, the "short and plain statement" called for

in Rule 8 must provide "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, 550 U.S. at 547.  In other words, the plaintiff must plead "factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal,* 556 U.S. at 678.

Count Two

As noted, in Count Two, Dalia seeks the enforcement of a constructive trust on the

Proceeds for her benefit against Orly and the Transferees. To establish grounds under New York

law for imposing a constructive trust, a plaintiff must demonstrate: (i) a confidential or fiduciary

relationship with the alleged constructive trustee; (ii) a promise, express or implied; (iii) a

transfer made in reliance on that promise; and (iv) unjust enrichment. *See In re Ades & Berg

Grp. Inv'rs,* 550 F.3d 240, 245 (2d Cir. 2008); *see also Bankers Sec. Life Ins. Soc'y v.

Shakerdge,* 49 N.Y.2d 939, 940 (1980). In this light, the Court considers whether Dalia has

alleged facts that, if true, state grounds for imposing a constructive trust on the Proceeds.

### *Confidential or Fiduciary Relationship*

"'[A]t the heart of the fiduciary relationship' lies 'reliance, and de facto control and

dominance.'" *United States v. Chestman*, 947 F.2d 551, 568-69 (2d Cir. 1991) (quoting *United

States v. Margiotta*, 688 F.2d 108, 125 (2d Cir. 1982)). "A fiduciary relationship arises 'between

two persons when one of them is under a duty to act for or to give advice for the benefit of

another upon matters within the scope of the relation.' Put differently, '[a] fiduciary relation

exists when confidence is reposed on one side and there is resulting superiority and influence on

the other.'" *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848 (2011) (internal citations omitted) (first

quoting *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19 (2005); second quoting *AG*

*Capital Funding Partners, L.P v. State St. Bank & Trust Co.*, 11 N.Y.3d 146, 158 (2008)).  *See*

*also Orange Cty. Legislature v. Diana*, 968 N.Y.S.2d 319, 340 (Sup. Ct., Orange County 2013)

(Under New York law, a fiduciary relationship is deemed to exist "when one party is under a

duty to act for the benefit others; it is a relationship in which one party reposes special

confidence and trust in another and reasonably relies on such party to act in his or her best

interest."); *Schneiderman ex rel. People v. Lower Esopus River Watch, Inc.*, 39 Misc. 3d

1241(A) (Sup. Ct., Ulster County 2013) ("fiduciary relationship arises when a party reposes trust

in another to carry out certain duties and the other party agrees to accept that delegation of trust

and carry out those duties") (citation omitted).

Dalia simply asserts that "[a] confidential and fiduciary relationship of familial trust and

confidence existed between [her] and . . . Orly, when Dalia transferred the Rights to [Orly]." Am.

Compl. ¶ 43. The Movants contend that the conclusory allegation is insufficient to withstand a

motion to dismiss. *See* Transferee Motion ¶ 71; Transferee Reply ¶ 27. They maintain that

because Dalia has not alleged facts demonstrating that such a relationship exists – and cannot do

so – Dalia cannot state a claim in support of the imposition of a constructive trust and the Court

should dismiss Count Two of the Amended Complaint.[85] Dalia disputes that contention. She

maintains that the mother/daughter relationship *per se* constitutes a confidential relationship, and

if that is not enough, the circumstances surrounding the transfer of  Rights, specifically the

enormous trust that would have been required for Dalia to transfer her most substantial asset to

her children for no consideration other than their commitment to support her in retirement,

establishes on its face the existence of a confidential and fiduciary relationship. Opposition 26-

27. She also maintains that although Orly and Dalia have been at loggerheads for several years

---

[85]    *See* Trustee Motion at ¶¶ 32-35; Trustee Reply ¶¶ 16-17.

now, in 2004, there was no hint of any such adversity between them and that is the time period

that is relevant to the analysis. *Id.* at 26.

As to the latter point, in her Opposition, Dalia asserts that Orly cannot dispute that she

had a close familial relationship with her in 2004 because Orly has attested to such a

relationship. As support she cites to Orly's testimony at a March 23, 2015 deposition that "before

everything became terrible, we were a very close family." *Id.*[86] Dalia misplaces her reliance on

that testimony because Orly was testifying about her once close relationship with brother, not

about her relationship with her mother.[87]  She also points to the Verified Complaint that Orly

filed on July 9, 2009, in New York State Supreme Court. In that complaint, Orly alleges that she

"relied upon her mother to protect her interests, including her Trust's ownership interests in TPR

and TRI, and alert her to anything that may adversely affect her or her Trust's assets." *Id.* at 27.[88]

Dalia asserts that in that pleading, Orly had the very same TRI ownership interest at issue in this

case. However, Dalia overstates the substance of Orly's allegation. In proper context it is clear

---

[86]    *See* Tokayer Decl. Ex. S (March 23, 2015 deposition transcript *Orly Genger v. Sagi Genger*, 100687/08 (N.Y. Sup. Ct., New York County) at 2745:13-14.

[87]    The relevant testimony is as follows:

> Q.  Let's go back to the time you were living in the house with your parents and your brother. Can you describe for us what your relationships and interactions were like? Let's focus on the pre-potential divorce issues, and then we'll walk through that, if we could.

> A.  Well, again, my brother's older than I am, seven years older, so we did not-you know, we didn't share in the same social circles. It's a four- person family. The rest of our family was in Israel, so it was just us. We were – you know, before everything became terrible, we were a close family. My brother, I always viewed him as sort of a little father, and I know that's the way my parents viewed him as well. He was always there to protect me.

*Id.* 5-17.

[88]    *See* Tokayer Decl. Ex. T (Verified Complaint, *Orly Genger, in her Individual Capacity and on Behalf of the Orly Genger 1993 Trust (Both in its Individual Capacity and on Behalf of D&K Partnership) v. Dalia Genger, et al.* (N.Y. Sup. Ct., New York County July 9, 2009)) ¶ 72.

that Orly is focusing on Dalia's fiduciary relationship, as Trustee of the Orly Trust, with Orly, as

Trust beneficiary, not Orly's familial relationship with Dalia.[89]

Moreover, Dalia overstates the significance of her familial relationship with Orly in

pleading that a confidential and fiduciary relationship existed by her and Orly in 2004. The case

law is clear that such a relationship is relevant to but is not *per se* determinative that a

confidential relationship exists among Dalia and Orly.  *See Almazan v. Almazan,* No. 14-civ-311

(AJN), 2015 WL 500176 , at *12 (S.D.N.Y. Feb. 4, 2915) ("While courts have inferred fiduciary

relationships based on familial bond in particular instances, they generally do not accept the

premise that familial bond, alone, is sufficient.") (citations omitted); *Halvorsen v. Sheive*, No.

02-CV-6187P, 2004 WL 627939, at *6 (W.D.N.Y. Feb. 10, 2004) (noting that "the existence of a

biological relationship is relevant but not itself determinative of a confidential relationship.");

*United States v. Chestman,* 947 F.2d 551, 568 (2d Cir.1991) (concluding that "marriage does not,

without more, create a fiduciary relationship ... [a]lthough spouses certainly may by their

conduct become fiduciaries, the marriage relationship alone does not impose fiduciary

status"); *McCaffery v. McCaffery,* 11–cv–703 (DRH)(WDW), 2012 WL 3260299, at *4

(E.D.N.Y. Aug. 8, 2012) (noting that a sibling relationship, standing alone, does not impose a

fiduciary relationship). The fact that Dalia transferred the Rights to Orly does not establish that a

confidential relationship existed among them at the time of the transfer. *See Sanxhaku v.*

---

[89]    As relevant, in the Verified Complaint, Orly alleges, as follows:

> 71. As Trustee of the Orly Trust, Dalia owes an undiluted fiduciary duty to the Trust's beneficiary,
> Orly, to monitor, manage, maintain, and protect the Orly Trust's assets, including the Orly Trust's
> ownership interests in TPR and TRI, from challenge or diminution in value.

> 72. In addition, Dalia also owes duties of care and loyalty to Orly arising from the close familial
> relationship between herself and her daughter. Orly relied upon her mother to protect her interests,
> including her Trust's ownership interests in TPR and TRI, and alert her to anything that may
> adversely affect her or her Trust's assets.

*See id.* ¶¶ 71-72.

*Margetis*, 151 A.D.3d 778, 779-780 (2d Dep't 2017) ("defendant's intention at the time of the transfer was to provide each of her children with a residential property in Brooklyn as a gift, and . . . defendant had sufficient means to make such a transfer and thereafter provide for her own financial needs"). To plead the existence of such a relationship, courts require allegations suggesting "one party reposing confidence and trust in the other," in addition to a familial relationship to successfully allege the existence of a fiduciary relationship. *Almazon v. Almazon*, 2015 WL 500176, at *12. *See also Bice v. Robb,* 07–cv–2214 (PAC), 2012 WL 762168, at *7 (S.D.N.Y. Mar. 9, 2012) *aff'd,* 511 F. App'x 108 (2d Cir.2013) (no fiduciary relationship existed between father and son who engaged in arm's length transaction). Dalia fails to meet that burden. Her conclusory allegation lacks factual support and does not meet the pleading standards. Such conclusory allegations are insufficient to withstand a motion to dismiss. *See In re Commodore Bus. Machines, Inc.*, 180 B.R. 72, 79 (Bankr. S.D.N.Y. 1995); *Faulkner v. Arista Recs. LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) (finding that no fiduciary relationship existed between a recording artist and their record label). *But cf. Quadrozzi v. Est. of Quadrozzi*, 99 A.D.3d 688, 692 (2d Dep't 2012) (finding that a confidential relationship arose in the context of relatives sharing a business relationship over several decades); *Genger v. Genger*, 121 A.D.3d 270, 278 (1st Dep't 2014) (denying Arie's claim for a constructive trust and finding that while "[f]amily members stand in a fiduciary relationship toward one another in a co-owned business venture. . . a fiduciary relationship ceases once the parties thereto become adversaries").

Assuming *arguendo*, that the Court accepts Dalia's proposition that a confidential relationship exists with Orly merely due to their familial relationship, the claim for constructive trust still fails because Dalia does not plead the other elements of a constructive trust claim, namely that Orly made a promise and Dalia transferred her Rights in reliance thereon.

51

### An Express or Implied Promise by Orly To Support
### Dalia and a Transfer in Reliance On That Promise

The only promises that Dalia points to in support of her claim are the promises contained in the 2004 Promise and 2004 Indemnity. *See* Am. Compl. ¶¶ 15-19. In her Opposition, Dalia asserts those writings "conclusively" establish "the elements [of] a promise and a transfer in reliance thereon." Opposition 27-28. The Court finds no merit to those assertions. Orly is not party to the 2004 Promise. In the 2004 Indemnity, she confirmed her verbal agreement with Sagi to indemnify him for 50% of the payments he would have to make under the 2004 Promise. *See Genger I,* 76 F. Supp. 3d at 493. ("At the time the 2004 Promise was signed, Orly was vacationing in Fiji, and thus could not contemporaneously sign the 2004 Promise. . . . However, before Sagi signed the 2004 Promise, Orly verbally agreed to indemnify Sagi for 50% of the payments he would have to make under the 2004 Promise.") (internal citations omitted) (footnote omitted).  In *Genger I,* the district court summed up the financial relationship among Dalia, Sagi and Orly, as follows:

> Dalia receives financial support in exchange for the transfer of the TRI shares to the Sagi Trust and the Orly Trust; Sagi receives an ownership interest in the TRI shares in exchange for a commitment to financially support Dalia; and Orly receives an ownership interest in TRI shares in exchange for a commitment to indemnify Sagi.

*See id.* at 499. Still, Dalia contends that the written agreements do not preclude a constructive trust claim, because "Orly's oral promise is not contained in Orly's executed 2004 Indemnity, although its economic substance is reflected therein." Opposition at 28. However, the district court found that Orly's verbal agreement with Sagi is reflected in the 2004 Indemnity. It did not find that Orly had a verbal agreement with Dalia. In any event, in the Amended Complaint, Dalia fails to allege that she had a verbal agreement with Orly and the conclusory assertion in the Opposition does not sustain such an allegation.  Finally, Dalia contends that "[r]egardless of the

reason, the fact remains that Dalia has no direct legal remedy against Orly, but rather must rely

on equity." *Id.* However, Dalia cannot rely on equity because she Dalia cannot point to any

express or implied promise by Orly to support her. For this additional reason, Dalia's claim for a

constructive trust fails. *See Van Brunt v. Rauschenberg,* 799 F. Supp. 1467, 1474 (S.D.N.Y.

1992) ("without a transfer of property in reliance of a promise or agreement, there cannot be a

constructive trust); *see also Caballero v. Anselmo*, 759 F. Supp. 144, 148 (S.D.N.Y. 1991).

   *Unjust Enrichment*

   Unjust enrichment exists where "the acts of the parties or others have placed in the

possession of [the defendant] money, or its equivalent, under such circumstances that in equity

and good conscience he ought not to retain it." *Miller v. Schloss,* 218 N.Y. 400, 407 (1916). In

short, "[t]he essential inquiry in any action for unjust enrichment . . . is whether it is against

equity and good conscience to permit the defendant to retain what is sought to be recovered."

*Paramount Film Distrib. Corp. v State*, 30 N.Y.2d 415, 421 (1972) (citations omitted). *See also

Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC*, 31 A.D.3d 983, 988 (3d Dep't

2006) ("The essence of . . . a cause of action [predicated on unjust enrichment] is that one party

is in possession of money or property that rightly belongs to another.") (citations omitted). The

case law is clear the "[u]njust enrichment is not a catchall cause of action to be used when others

fail." *See Corsello v Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012). Rather, a claim for

unjust enrichment and a remedy of a constructive trust is applicable "only in unusual situations

when, though the defendant has not breached a contract nor committed a recognized tort,

circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.*  It is

not available to Dalia. As noted, the Amended Complaint is clear that whatever claims that Dalia

may have against Orly are based in contract, not equity. *See* Am. Compl. ¶¶ 15-20.

Based on the foregoing, the Court dismisses Count Two on the additional ground that it
fails to state a claim for relief against Orly.

Count Three

As noted, in Count Three, Dalia asserts that as an alternative to the imposition of a
constructive trust, she is entitled to an equitable lien on the Proceeds. In support of Count Three,
Dalia asserts that she "is entitled to the specific enforcement of an equitable lien in her favor and
for her benefit upon the proceeds of Orly's monetization of the Shares, including the Trump
Notes, up to $12.25 million plus interest . . ." Am. Compl. ¶ 56.  In opposing the Motions, Dalia
maintains that the "2004 Integrated Agreement" specifically links Orly and Sagi's promise to
pay her with Orly's and Sagi's monetization of the Rights and that the agreement evidences an
agreed-upon express, let alone implied, lien upon the Rights and the proceeds therefrom, which
stands as security for the obligation to support her.  Opposition at 32-33.  Dalia maintains that
Orly's alleged repudiation of her commitment to Dalia makes it equitable and just for this Court
to impose lien where otherwise there would be no relief. *Id*. at 33.

Under New York law, a court will impose an equitable lien where the facts surrounding a
transaction evidence that the parties intended that a specific piece of property is to be held or
transferred to secure an obligation. *See Teichman by Teichman v. Community Hosp. of W.
Suffolk*, 87 N.Y.2d 514, 520 (1996) ("As we have long recognized, an equitable lien 'is
dependent upon some agreement express or implied that there shall be a lien on specific
property.'") (quoting *James v. Alderton Dock Yards,* 256 N.Y. 298, 303 (1931)). The intention to
create an equitable lien must "clearly appear from the language and attendant circumstances. *See
Vardaros v. Zapas*, 24 Misc. 3d 1247(A) (Sup. Ct., Queens County 2009).  The 2004
Agreements provide only that Orly will indemnify Sagi. They do not speak to the monetization
of the Distributed TRI Shares and do not mention specific property serving as security for Orly's

54

obligations under the agreement. Dalia fails to allege the existence of an agreement that the proceeds of the monetization of the Rights, including the Trump Shares, was supposed to be held as security for Orly's obligations. Accordingly, Count Three fails to state a claim for the imposition of an equitable lien on the Proceeds in Orly's and the Transferee Defendants' possession. *See East 51st Development Co. v. HFZ East 51, LLC*, No. 652135/2016, 2019 WL 6916089, at * 3 (N.Y. Sup. Ct., New York County Dec. 19, 2019) (Trial court property dismissed claim for equitable lien where "[t]he plaintiffs fail to allege that there is any express or implied agreement that the property at issue here was to be held as security for the obligations defendants allegedly owed to plaintiffs."); *Teichman by Teichman v. Community Hosp. of W. Suffolk*, 87 N.Y.2d at 520 (The Plan does not identify property subject to the right of refund; it does not describe the property in such a way as to make identification possible; and it does not state the parties' intention that the property be "held, given or transferred as security for [an] obligation."); *IMS Engineers- Architects, P.C. v. State,* 51 A.D.3d 1355, 1358 (3d Dep't 2008*)* ("The contracts contain no express or implied agreement that these funds are to fulfill any obligation to claimant – thus no equitable lien was created.")

The Court dismisses Count Three for the additional reason that it fails to state a claim for relief against Orly.

Count Four

In support of Count Four of the Amended Complaint, Dalia asserts that she "will suffer irreparable harm if Orly and/or the Transferees sell, transfer, assign, encumber, hypothecate or otherwise alienate the proceeds of Orly's monetization of the Rights, including the Trump Notes." Am. Compl. ¶ 58. She seeks a "temporary, preliminary and/or permanent injunction enjoining and restraining defendants from selling, transferring, assigning, encumbering, hypothecating, or otherwise alienating the Trump Notes and mandating that defendants take all

actions necessary for Dalia to receive the proceeds of Orly's monetization of the Rights,

including the Trump Notes." *Id.* ¶ 59. This Count fails to state a claim for relief against the

Defendants because, as described above, Dalia has not demonstrated that she has any right to or

interest in the Proceeds or the Trump Notes. Accordingly, the Court dismisses Count Four for the

additional reason that it fails to state a claim for relief against the Defendants.

<u>Whether To Grant Dalia Leave To Replead</u>

Dalia requests leave to replead should the Court find any technical pleading deficiency in

the Amended Complaint. Opposition at 33. Rule 15 of the Federal Rules of Civil Procedure[90]

provides that, except in circumstances not relevant here, "a party may amend its pleading only

with the opposing party's written consent or the court's leave. The court should freely give leave

when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the

district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d

184, 200 (2d Cir.2007). "A district court has discretion to deny leave for good reason, including

futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* (citing *Foman v.

Davis,* 371 U.S. 178, 182 (1962)); *see also Anthony v. City of New York,* 339 F.3d 129, 138 n.5

(2d Cir.2003) ("We have interpreted [Rule 15] in favor of allowing. . . amendment absent a

showing by the non-moving party of bad faith or undue prejudice.").

For the reasons set forth above, the Court finds that Dalia has failed to state any claims

for relief against the Defendants. Moreover, as discussed above, the Court finds that Dalia lacks

standing to bring this suit and, in any event, that the suit is barred by the six-year statute of

limitations.  The Court is not persuaded that Dalia can plead around those defects. As such, the

Court denies Dalia's request for leave to replead on the grounds that it would be futile for her to

---

[90]    Rule 15 is made applicable herein by Bankruptcy Rule 7015.

do so. *See, e.g., Dep't of Econ. Dev. V. Arthur Andersen & Co. (U.S.A.),* 739 F. Supp. 804, 807 (S.D.N.Y. 1990) (denying leave to amend the complaint to replead a specific claim on ground of futility where plaintiffs lacked standing); *Fitzgerald v. Berman*, No. 1:02-CV-926(NAM/RFT), 2006 WL 752785, at *2 (N.D.N.Y. Mar. 22, 2006) (denying leave to amend the complaint to replead a specific claim on ground of futility and because the plaintiff lacked standing). *See also Nasso v. Bio Reference Lab., Inc*., 892 F.Supp. 2d 439, 455 (E.D.N.Y. 2012) (denying plaintiff leave to replead claim barred by statute of limitations); *Thompson v. Accent Capital,* Civ. No. 3:11 CV 00069, 2011 WL 3651848, at *5 (D.Conn. Aug. 18, 2011) (same) (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

## <u>Conclusion</u>

Based on the foregoing, the Court grants the Motions and denies Dalia's request for leave to replead.

IT IS SO ORDERED.

Dated: New York, New York
       August 12, 2021

                                       /s/ *James L. Garrity, Jr.*
                                       Hon. James L. Garrity, Jr.
                                       U.S. Bankruptcy Judge